IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; LAVELLE LEMON, MARLON REID, LAURETHA CELESTE SIMS, PATRICIA SMITH, COLEY TYSON, <br><br>       Plaintiffs, <br><br> v. <br><br> THE STATE OF GEORGIA; and BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia, <br><br>       Defendants. | Civil Action File No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **(Fourteenth and Fifteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; 52 U.S.C. §§ 10301 and 10302)** |

### INTRODUCTION

1.     This is an action to enjoin the State of Georgia and its Secretary of

State from enforcing Act No. 251 (2015 Ga. L. 1413) ("H.B. 566"), insofar as it

redistricts Georgia House of Representatives Districts 105 and 111.  This

redistricting of Districts 105 and 111 is a racial gerrymander, enacted for the

purpose of electing and protecting white Republican incumbents.  H.B. 566

therefore violates the United States Constitution and Section 2 of the Voting

Rights Act of 1965, 52 U.S.C. § 10301.

2.      H.B. 566 was enacted with a racially discriminatory purpose in violation of the Fourteenth Amendment and Section 2 of the Voting Rights Act because the Act's proponents used race as a method to redraw House Districts 105 and 111 so as to prevent African-American voters from having an equal opportunity to elect a candidate of choice.

3.      H.B. 566 is a racial gerrymander that violates the Fourteenth and Fifteenth Amendments because racial concerns predominated with respect to the drawing of the District 105 and 111 boundary lines.

4.      H.B. 566 is a partisan gerrymander that invidiously and improperly distorts the political process in violation of the Fourteenth Amendment.

5.      Voting patterns in Districts 105 and 111 are racially polarized. These polarized voting patterns are highly correlated with support for Georgia's two major political parties.  Georgia's African-American voters overwhelmingly favor candidates from the Democratic Party, and the state's white voters overwhelmingly favor candidates from the Republican Party.

6.      Over the course of this census cycle, Districts 105 and 111 experienced an influx of minority voters and increased minority voter participation.  This resulted in African-American Democratic candidates nearly defeating better-funded white Republican incumbents in those districts.

7.     Instead of allowing the incumbents the opportunity to appeal to their districts' increasingly diverse electorate, the Legislature, which is dominated by white Republicans, redrew these districts to make them safer for white Republican incumbents.  Race was used as the means for achieving this partisan end.

8.     The Legislature manipulated Districts 105 and 111 with surgical precision, splitting precincts to cut out census blocks with higher percentages of African-American Democratic voters and moving in census blocks with higher percentages of white Republican voters.

9.     Since Georgia maintains voter registration by race but not by party, and because the Legislature split voting precincts and divided districts by census blocks, the proponents of H.B. 566 necessarily used race when redrawing the boundary lines of Districts 105 and 111.

10.    H.B. 566 moves pockets of white and minority voters between Georgia House districts, thereby minimizing minority voting strength and making competitive districts safer for white voters' candidates of choice.

11.    H.B. 566 unnecessarily fences many African-American voters out of Districts 105 and 111, which retain a smaller number of African-American voters. H.B. 566 does this for the purpose of impairing the ability of both groups of African-American citizens to elect representatives who share their political views,

3

based on the perceived content of their political speech and political associations.

12.     The racial gerrymander of H.B. 566 has already proven to be very effective, by shifting enough voters to allow white Republican incumbents to prevail over African-American Democratic challengers in Districts 105 and 111 in hotly contested elections held on November 8, 2016.

13.     H.B. 566 is a "mid-census cycle redistricting plan."  Unlike redistricting plans adopted when new census data is released every ten years to comply with the United States Constitution's "one person, one vote" requirement, there was no legitimate reason for the legislature to enact a new redistricting plan for the Georgia House of Representatives, which it had done just a few years earlier in light of the 2010 census.  Under the circumstances, the only rational explanation is that the General Assembly intended to racially gerrymander Districts 105 and 111 for partisan purposes.

14.     For these reasons, and as further alleged in detail below, Plaintiffs respectfully pray for this Court to issue relief by issuing a declaratory judgment that H.B. 566 is unlawful, insofar as it redistricts House Districts 105 and 111, and to return those districts to the status quo as it existed during the 2012 and 2014 election cycles.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction of this action pursuant to (1) 28 U.S.C. §

1343(a), because this action seeks to redress the deprivation, under color of state

law, of rights, privileges and immunities secured by the Voting Rights Act; and (2)

42 U.S.C. § 1983 and 28 U.S.C. 1331, because this action arises under the

Fourteenth and Fifteenth Amendments to the United States Constitution.

16.     This Court has jurisdiction to grant both declaratory and injunctive

relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

17.     This Court has personal jurisdiction over the State of Georgia and the

individual Defendant, who is a citizen of the State of Georgia and resides within

this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2),

because a substantial part of the events or omissions giving rise to the claim

occurred in this District.

19.     This case must be heard and determined by a district court of three

judges pursuant to 28 U.S.C. § 2284.

## THE PARTIES

### The Plaintiffs

20.     Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP

("Georgia NAACP") is a non-partisan, interracial, nonprofit membership

organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African-Americans. It is headquartered in Atlanta and currently has approximately 10,000 members. The Georgia NAACP's membership includes African-American voters who reside in Georgia House Districts 105 and 111. Its membership includes African-American voters who were displaced from those districts by H.B. 566, and African-American voters who remain in those districts after its enactment. These members have suffered harm because they no longer live in a district in which they have an equal opportunity to elect a candidate of choice to the Georgia House of Representatives. These members were subjected to race- and partisan-based redistricting in violation of their constitutional rights.

21.    Plaintiff LAVELLE LEMON is an African-American resident and Democratic registered voter of Georgia. She resides within Georgia House of Representatives District 111 in Henry County. Due to the passage of H.B. 566, Plaintiff Lemon did not have an equal opportunity to elect a candidate of choice in District 111 in the November 2016 election, and she will not have an equal opportunity to do so in the 2018 and 2020 election cycles. Plaintiff Lemon is further injured by the race- and partisan-based redistricting of House District 111 perpetrated by H.B. 566.

22.     Plaintiff MARLON REID is an African-American resident and Democratic registered voter of Georgia.  He resides within Georgia House of Representatives District 105 in Gwinnett County.  Due to the passage of H.B. 566, Plaintiff Reid did not have an equal opportunity to elect a candidate of choice in District 105 in the November 2016 election, and he will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Reid is further injured by the race- and partisan-based redistricting of House District 105 perpetrated by H.B. 566.

23.     Plaintiff LAURETHA CELESTE SIMS is an African-American resident and Democratic registered voter of Georgia.  She resides within Georgia House of Representatives District 111 in Henry County.  Due to the passage of H.B. 566, Plaintiff Sims did not have an equal opportunity to elect a candidate of choice in District 111 in the November 2016 election, and she will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Sims is further injured by the race- and partisan-based redistricting of House District 111 perpetrated by H.B. 566.

24.     Plaintiff PATRICIA SMITH is an African-American resident and Democratic registered voter of Georgia.  She resides within Georgia House of Representatives District 105 in Gwinnett County.  Due to the passage of H.B. 566, Plaintiff Smith did not have an equal opportunity to elect a candidate of choice in

District 105 in the November 2016 election, and she will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Smith is further injured by the race-and partisan-based redistricting of House District 105 perpetrated by H.B. 566.

25.     Plaintiff COLEY TYSON is an African-American resident and Democratic registered voter of Georgia.  He resides within Georgia House of Representatives District 105 in Gwinnett County.  Due to the passage of H.B. 566, Plaintiff Tyson did not have an equal opportunity to elect a candidate of choice in District 105 in the November 2016 election, and he will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Tyson is further injured by the race- and partisan-based redistricting of House District 105 perpetrated by H.B. 566.

### The Defendants

26.     Defendant STATE OF GEORGIA is a sovereign state in the United States.

27.     Defendant BRIAN KEMP is sued in his official capacity as Secretary of State of Georgia.  Defendant KEMP is the State of Georgia's chief election officer and as such is responsible is responsible for overseeing the conduct of its elections.

## FACTS AND BACKGROUND

28.     The Georgia House of Representatives is composed of 180 members. Each representative is elected from a single-member district.

29.     The Georgia state legislative districts are typically redrawn after each census.

30.     Jurisdictions that undergo demographic changes traditionally adopt a new redistricting plan every ten years, so as to comply with the United States Constitution's "one person, one vote" requirement when new decennial census data is released.

31.     Georgia state legislative elections are partisan.  Primary and general elections feature a majority vote requirement.  If no candidate receives a majority of the votes cast, a runoff election is held between the top two candidates.  This makes it more difficult for African-American, Latino, and Asian-American voters to elect candidates of choice because they comprise a minority of the electorate.

32.     There is a long—and well documented—history of voting discrimination against minority voters, especially African-Americans, in Georgia. Indeed, the Northern District of Georgia has recently acknowledged "Georgia's long history of discrimination" in this area. *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (*citing Brooks v. State Bd. of Elections,* 848 F. Supp. 1548, 1560–61,

1571 (S.D. Ga. 1994) (stating that Georgia's "segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof")), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

33.     The history of voting discrimination against minority voters in Georgia between 1982 and 2006 is further detailed in various reports produced during the 2006 reauthorization of the Voting Rights Act.  *See* Am. Civil Liberties Union, *The Case for Extending and Amending the Voting Rights Act* 108-479, *available at* https://www.aclu.org/files/pdfs/votingrightsreport20060307.pdf; RenewtheVRA.org, *Voting Rights in Georgia 1982-2000*, *available at* http://www.protectcivilrights.org/pdf/voting/GeorgiaVRA.pdf.  Additional evidence of voting discrimination can be found in various academic articles and books.  *See*, *e.g.*, Laughlin McDonald et al., *Georgia*, *in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990 67-102 (Chandler Davidson & Bernard Grofman eds., 1994).

34.     The historical background of Georgia House redistricting includes the enactment of several plans in violation of the federal Voting Rights Act or the

Constitution.  *See*, *e.g.*, *Georgia v. United States*, 411 U.S. 526 (1973) (finding a violation of Section 5 of the Voting Rights Act); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 1116 (1983) (finding discriminatory purpose); *Miller v. Johnson*, 515 U.S. 900, 917 (1995) (finding racial gerrymandering); *Abrams v. Johnson*, 521 U.S. 74, 107 (1997) (same); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) (finding that the redistricting plan violated one person, one vote principle); *Georgia v. Ashcroft*, 539 U.S. 461, 486 (2003) (noting that redistricting plan made it more difficult for minority voters to elect a candidate of their choice).

35.     One result of the Georgia legislature's redistricting efforts is that minorities have historically been and continue to be underrepresented in the Georgia House of Representatives.  According to the 2015 American Community Survey, approximately 62.8 percent of Georgia's citizen voting age population is white, 31.6 percent is African-American, 4.4 percent is Latino, and 2.6 percent is Asian-American.  Citizen Voting-Age Population: Georgia, U.S. CENSUS BUREAU (2015), *available at*

https://www.census.gov/content/dam/Census/library/visualizations/2016/comm/citizen_voting_age_pop/cb160-tps148_georgia.pdf.

36.     By contrast, of the 180 members of the Georgia House of Representatives, 131 (72.8%) are white, 46 (25.6%) are African-American, 2 (1.1%) are Latino, and one (0.6%) is Asian-American.

37.     Moreover, race and party are highly correlated in Georgia and have been for decades.  For example, there are currently 119 Republicans in the Georgia House of Representatives, of whom 118 (99.2%) are white and one (0.8%) is Hispanic.  There are no African-American Republicans in the Georgia House.  By contrast, there are currently 61 Democrats in the Georgia House, of whom 46 (75.4%) are African-American, 13 (21.3%) are white, one (1.6%) is Asian-American, and one (1.6%) is Hispanic.

38.     The Georgia legislature has repeatedly sought to amend the post-2010 redistricting plan for the Georgia House of Representatives even though there is no legal or other legitimate reason for it to do so.

39.     The Georgia legislature enacted Act No. 1EX (2011), its first post-2010 Census redistricting plan for the House of Representatives, in August 2011. Act No. 1EX (2011) was adopted by both the Georgia House of Representatives and the Georgia Senate after little debate in a largely party-line vote and was opposed by the overwhelming majority of the state's African-American and other minority legislators.

40.     Before the 2011 House of Representatives' plan codified in Act No. 1EX (2011) was ever implemented, the Georgia legislature amended it by enacting Act No. 277 (S.B. 513) (2012) in February 2012.  Act No. 277 amended 15 districts, which encompass 19 different counties.  Act No. 277 was adopted by both the Georgia House of Representatives and the Georgia Senate after little debate in a largely party-line vote and was opposed by the overwhelming majority of the state's African-American and other minority legislators.

41.     The redistricting plans codified in Act No. 1EX (2011) and Act No. 277 (2012) were precleared by the United States Department of Justice.

42.     The Georgia legislature enacted H.B. 566, its third post-2010 Census redistricting plan for the House of Representatives, in May 2015.

43.     H.B. 566 amended 17 districts, which encompass Atkinson, Bryan, Butts, Cobb, Chatham, Clayton, Fayette, Fulton, Gwinnett, Hall, Henry, Lamar, Lanier, Lowndes, Newton, Rockdale, Spalding, Ware, and White Counties.

44.     H.B. 566 was adopted by both the Georgia House of Representatives and the Georgia Senate after little debate.  In fact, minority and Democratic legislators in the House of Representatives were initially given no indication that the changes contained the bill were anything other than innocuous and minor.

45.     Once H.B. 566 reached the Senate and minority legislators discovered the nature of several of the changes, Senator Vincent Fort, who is African-

American, criticized the changes to Districts 105 and 111 as racial gerrymanders. Representative Randy Nix, who is white and chaired the House Reapportionment Committee at the time, responded only that lawmakers had the opportunity to approach him with changes they wanted to make to their districts. Sandra Parrish, *Democrats Call on Governor to Veto Redistricting Bill*, WSB RADIO, May 1, 2015, *available at* http://www.wsbradio.com/news/democrats-call-governor-veto-redistricting-bill/KBHnfw7ZK6VDvSXw8MiplM/.

46.     Representative Nix argued that the bill made no significant changes to any of the districts and that all of the lawmakers whose districts were affected had agreed to the changes. David Wickert, *Gwinnett House district gets voting rights scrutiny*, THE ATLANTA JOURNAL-CONSTITUTION, Sept. 21, 2016, *available at* http://www.myajc.com/news/localgovtpolitics/gwinnetthousedistrictgetsvotingrigh tsscrutiny/yUlarJWHWlawwAed9nM5uN/.

47.     The Senate passed the measure by a narrower and largely party-line 39-14 margin after minority legislators became aware of and started raising concerns about potential voting rights violations. *Id.* H.B. 566 was opposed by the state's African-American senators.

48.     The Georgia Legislature's adoption of H.B. 566 included departures from the normal procedural sequence. It also included substantive departures from the factors usually considered by the Legislature in redistricting.

49.     During the 2015 legislative session, African American legislators serving on the House Legislative and Congressional Reapportionment and the Senate Reapportionment and Redistricting Committees ("House and Senate Redistricting Committees") were excluded from the process of drawing and negotiating the plans codified in H.B. 566.

50.     During the 2015 legislative session, minority residents of Georgia were denied the opportunity to analyze and comment on the plans enacted in H.B. 566. The House and Senate Redistricting Committees did not hold any public hearings or allow public comment on the plans prior to voting on them.

51.     Despite the growth of the minority population in Georgia since 2010, H.B. 566 reduces the number of districts in which minority voters have an equal opportunity to elect candidates of choice. Minority voters have therefore lost voting strength.

52.     H.B. 566 uses race as the predominant factor to allocate African-American and other minority voters into and out of House Districts 105 and 111. The changes to these districts reduce the ability of African-American and other minority voters to elect a candidate of choice to the Georgia House.

53.     Not satisfied with these efforts, in 2017 the legislature attempted to enact H.B. 515, which would have decreased the African-American population in District 111 again, as well as in District 40. H.B. 515 would have been the fourth

post-2010 Census redistricting plan for the House of Representatives.  This proposed legislation was ultimately tabled in the face of a backlash from African-American, Democratic legislators, as well as hostile articles in the news media. *See*, *e.g.*, Mark Joseph Stern, *Georgia Republicans Pass Racial Gerrymander to Kick Black Voters Out of GOP Districts*, SLATE,  March 7, 2017, *available at* http://www.slate.com/blogs/the_slatest/2017/03/07/georgia_republicans_pass_racial_gerrymander.html.

### Changes to House District 105 by H.B. 566

54.     House District 105 elections in the 2012 and 2014 election cycles were conducted under the boundaries enacted by the legislature in Act No. 277.

55.     Under those boundaries, 48.4 percent of District 105's voting age population were white, 32.4 percent were African-American, 12.6 percent were Latino, and 4.6 percent were Asian.  The combined minority voting age population was 51.6 percent.

56.     In the November 2012 general election, Joyce Chandler received 10,561 votes and Renita Hamilton received 10,007 votes.  The margin of victory was 554 votes, or 2.7 percentage points.

57.     Representative Chandler is white and a Republican.  Ms. Hamilton is African-American and a Democrat.

58.     In the November 2014 general election, Representative Chandler defeated Renita Hamilton by 789 votes, or 5.6 percentage points.  Representative Chandler received 7,497 votes and Ms. Hamilton received 6,708 votes.

59.     The voting patterns in the November 2012 and November 2014 elections in House District 105 were racially polarized.

60.     H.B. 566 amended House District 105 by moving out part of Precinct Lawrenceville M, and moving in all of Precinct Harbins C and part of Harbins A.

**Table 1 – House District 105 Voting Age Population (2010 Census)**

|  | 2012 plan | | Current plan | | Change | |
|---|---|---|---|---|---|---|
| **White alone, not Hispanic or Latino** | 17,712 | 48.4% | 19,204 | 52.7% | +1,492 | +4.3% |
| **African-American alone, not Hispanic or Latino** | 11,841 | 32.4% | 11,071 | 30.4% | -770 | -2.0% |
| **Hispanic/Latino** | 4,612 | 12.6% | 3,945 | 10.8% | -667 | -1.8% |
| **Other** | 2,415 | 6.6% | 2,229 | 6.1% | -186 | -0.5% |
| **Total** | 36,580 | | 36,449 | | -131 | |

61.     As redrawn by H.B. 566, 52.7 percent of District 105's voting age population are white, 30.4 percent are African-American, 10.8 percent are Latino, and 4.2 percent are Asian.  The combined minority voting age population is 47.3 percent.

62.     H.B. 566 increased the white voting age population of House District 105 by 4.3 percentage points.  It decreased the African-American voting age

population by 2.0 percentage points, and it decreased the combined minority voting age population by 4.3 percentage points.

63.     The November 2016 House District 105 election was conducted under the district boundaries codified in H.B. 566.

64.     In the November 2016 general election, Representative Chandler defeated Donna McLeod by 222 votes, or 0.9 percentage points.  Representative Chandler received 12,411 votes and Ms. McLeod received 12,189 votes.  The margin was so close that the race went to a recount.  Curt Yeomans, *Rep. Joyce Chandler wins recount in House District 105 race*, THE GWINNETT DAILY POST, Sept. 21, 2016, *available at* http://www.gwinnettdailypost.com/local/rep-joyce-chandler-wins-recount-in-house-district-race/article_52ac6b29-6157-595b-8f16-8da2129e1ad5.html.

65.     Donna McLeod is African-American and a Democrat.

66.     Voting in the November 2016 election in House District 105 was racially polarized.

67.     If the November 2016 general election had been conducted under the district boundaries that had been employed in the 2012 and 2014 election cycles, Ms. McLeod would likely have defeated Representative Chandler.

## Changes to House District 111 by H.B. 566

68.     Georgia House District 111 elections in the 2012 and 2014 election cycles were conducted under the district boundaries enacted in Act No. 277.

69.     Under those district boundaries, 56.1 percent of District 111's voting age population were white, 33.2 percent were African-American, 5.6 percent were Latino, and 3.3 percent were Asian.  The combined minority voting age population is 43.9 percent.

70.     In the November 2012 general election, Brian Strickland received 13,172 votes and Bill Blackmon received 11,695 votes.  The margin of victory was 1,477 votes or 5.9 percentage points.

71.     Representative Strickland is white and a Republican.  Mr. Blackmon is African American and a Democrat.

72.     In the November 2014 general election, Representative Strickland received 9,540 votes and Jim Nichols received 8,416 votes.  The margin of victory was 1,124 votes, or 6.3 percentage points.

73.     Mr. Nichols is white and a Democrat.

74.     The voting patterns in the November 2012 and November 2014 elections in House District 111 were racially polarized.

75.     H.B. 566 amended House District 111 by removing precincts and census blocks that are predominantly populated by minority voters, and inserting precincts and census blocks that are predominantly populated by white voters.

76.     H.B. 566 split Precinct Henry 32 – Mount Caramel.  Some of the census blocks remained in District 111, while others were moved out.

77.     As redrawn by H.B. 566, 58.1 percent of District 105's voting age population are white, 31.0 percent are African-American, 5.2 percent are Latino, and 3.7 percent are Asian.  The combined minority voting age population was 41.9 percent.

**Table 2 – House District 111 Voting Age Population (2010 Census)**

|  | 2012 plan | | H.B. 566 | | HB  515 | | Total Change | |
|---|---|---|---|---|---|---|---|---|
| **White alone, not Hispanic or Latino** | 21,638 | 56.1% | 22,228 | 58.1% | 22,847 | 59.6% | +1,209 | +3.4% |
| **African-American alone, not Hispanic or Latino** | 12,798 | 33.2% | 11,852 | 31.0% | 11,496 | 30.0% | -1,302 | -3.2% |
| **Other** | 4,109 | 10.7% | 4,155 | 10.9% | 4,014 | 10.5% | -95 | -0.2% |
| **Total** | 38,545 | | 38,235 | | 38,357 | | -188 | |

78.     According to the 2010 Census, H.B. 566 increased the white voting age population of House District 111 by 2.0 percentage points.  It decreased the African-American voting age population by 2.2 percentage points.

79.     The November 2016 House District 105 election was conducted under the district boundaries codified in H.B. 566.

80.     In the November 2016 general election, Representative Strickland received 14,488 votes and Darry Payton received 13,542 votes.  The margin of victory was 946 votes, or 3.4 percentage points.

81.     Darryl Payton is African-American and a Democrat.

82.     Voting in the November 2016 election in House District 105 was racially polarized.

83.     If the November 2016 general election had been conducted under the district boundaries that had been employed in the 2012 election cycle, Mr. Payton may have defeated Representative Strickland.

### Demographic Changes in Counties Affected by H.B. 566

84.     Recent demographic changes have taken place in the areas redistricted by H.B. 566, as demonstrated by a comparison of data from the 2010 U.S. Census and the 2015 American Community Survey.

85.     In Gwinnett County, the non-Hispanic African-American population percentage increased from 22.9 percent in 2010 to 24.7 percent in 2015.  The Asian population also rose from 10.5 to 11.0 percent in that span.  The Hispanic population increased from 20.1 to 20.3 percent and the non-Hispanic white population declined from 79.9 percent to 79.7.

86.     In Henry County, the non-Hispanic African-American population increased from 36.3 to 38.4 percent between 2010 and 2015.  The Hispanic

population increased from 5.8 to 6.3 percent and the non-Hispanic white

population dropped from 52.5 to 49.5 percent during that period.

**COUNT ONE:**
**(52 U.S.C. § 10301 and 42 U.S.C. § 1983 - Discriminatory Purpose in Violation**
**of the Fourteenth Amendment to the United States Constitution and Section 2**
**of the Voting Rights Act, Against all Defendants)**

87.     Plaintiffs repeat and re-allege each and every allegation contained in

Paragraphs 1 to 86 above, as if fully set forth herein.

88.     42 U.S.C. § 1983 authorizes suits for the deprivation of a right

secured by the Constitution or the laws of the United States caused by a person

acting under the color of state law.

89.     Section 1 of the Fourteenth Amendment to the United States

Constitution provides that:

> No state shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any state deprive any
> person of life, liberty, or property, without due process of law; nor deny to
> any person within its jurisdiction the equal protection of the laws.

90.     Section 2 of the Voting Rights Act of 1965 prohibits the imposition of

any voting standard, practice, or procedure enacted with a discriminatory purpose.

52 U.S.C. § 10301(a).

91.     There is no legitimate, non-racial reason for the mid-census cycle

changes to Georgia House Districts 105 and 111 in H.B. 566.

92.     H.B. 566 was adopted, at least in part, for the purpose of disadvantaging African-American and other minority voters relative to white voters in those districts.  From the outset, Defendants intended to reduce the number of minority voters and increase the number of white voters to reduce minority voting strength and prevent them from being able to elect a candidate of choice to the Georgia House in the 2018 and 2020 election cycles.

93.     Several of the indicia of discriminatory purpose are present in this case.  There is evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision, including contemporaneous statements by decision makers.  In Districts 105 and 111, minority-preferred candidates were on the verge of achieving success due to demographic changes and increasing voter participation. Defendants "moved the goal posts" by enacting a mid-census cycle redistricting plan that make those districts noncompetitive.  Statements and communications from key decision makers indicate that they were aware that H.B. 566 would have an effect on the ability of minority voters to elect a candidate of choice to the Georgia House in the context of racially polarized voting.  Legislators provided virtually no notice of the proposed changes, sought to minimize or eliminate public

comment, and expedited the legislative process in ways intended to reduce input from anyone other than its main proponents.

94.     By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution and Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

## COUNT TWO:
## (42 U.S.C. § 1983 – Racial Gerrymander in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, Against Defendant Kemp)

95.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 94 above, as if fully set forth herein.

96.     Race predominated with respect to the redistricting in H.B. 566 of Georgia House Districts 105 and 111, where pockets of voters were spirited in and out for the purpose of minimizing the opportunity of minority voters to participate effectively in the political process and for the purpose of capping African American and other minority representation and influence in the Georgia House of Representatives.

97.     The predominance of Defendants' racial purpose is laid bare by their reduction of the African-American population and registered voter percentage in District 105 and 111 after an African-American candidate for the Georgia House

nearly defeated the white incumbent.  In this context, the reduction of the African-American population percentage constitutes "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale."  *Bethune-Hill v. Virginia State Bd. of Elecs.*, 137 S.Ct. 788, 798 (Mar. 1, 2017) (*quoting Miller v. Johnson*, 515 U.S. 900, 913 (1995)).

98.    The November 2016 contests in House Districts 105 and 111 demonstrate that the Legislature's efforts have been successful.

99.    The racial gerrymandering of House Districts 105 and 111 by H.B. 566 violate the rights of Plaintiffs guaranteed to them by the Fourteenth and Fifteenth Amendment to the U.S. Constitution.  *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

100.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## COUNT THREE:
### (42 U.S.C. § 1983 – Partisan Gerrymander in Violation of the Fourteenth Amendment to the United States Constitution, Against Defendant Kemp)

101.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 100 above, as if fully set forth herein.

102.   A redistricting plan constitutes an unconstitutional partisan gerrymander if political classifications "were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Vieth v. Jubelirer*, 541 U.S. 267, 307 (Kennedy, J., concurring in the judgment).  In *LULAC v. Perry*, 548 U.S. 399 (2006), a majority of the Justices expressed interest in a test for unconstitutional partisan gerrymandering under the Fourteenth Amendment.  548 U.S. at 420 (Kennedy, J.), 466 (Stevens, J., concurring in part and dissenting in part), and 483 (Souter, J., concurring in part and dissenting in part).  Lower courts have recently held that a redistricting plan is a partisan gerrymander in violation of the Fourteenth Amendment if it "(1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds." *Whitford v. Gill*, No. 15-cv-421-bbc, 2016 WL 6837229 at *35 (W.D. Wis. Nov. 21, 2016).  That test is satisfied here.

103.   The redistricting of Districts 105 and 111 in H.B. 566 is a partisan gerrymander that violates Plaintiffs' Fourteenth Amendment right to equal protection of the laws.  H.B. 566 intentionally and surgically removes Democratic voters from these districts for the purpose of making them noncompetitive and ensuring electoral victory for their Republican incumbents.  There was no legitimate legislative reason for passing this mid-decade redistricting plan,

particularly when a plan that complied with the U.S. Constitution and the Voting Rights Act had been enacted a few years beforehand.

104.   Partisan affiliation and race are highly correlated in Georgia.

105.   The proponents of H.B. 566 utilized racial demographics and analyses of past elections to predict the level of support for Democratic candidates and, based on the perceived content of voters' political speech, drew Georgia House districts for the purpose of minimizing the electoral strength of voters who seek to be represented by Democratic legislators.

106.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a.   Assume jurisdiction of this action and request a three-judge panel pursuant to 28 U.S.C. § 2284;

b.   Declare that H.B. 566, insofar as it redistricts Georgia House Districts 105 and 111, violates the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act;

c.     Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Georgia House Districts 105 and 111 under the current district boundaries as codified in H.B. 566;

d.     Issue an order requiring Georgia to preclear voting changes during the following ten-year period pursuant to 52 U.S.C. § 10302;

e.     Set a reasonable deadline for state authorities to enact or adopt a redistricting plan for the Georgia House of Representatives that remedies the statutory and constitutional violations with respect to Districts 105 and 111;

f.      If state authorities fail to enact or adopt a valid plan by the Court's deadline, order the implementation of a new redistricting plan remedying the aforementioned violations by returning Districts 105 and 111 to their pre-H.B. 566 configurations, and making necessary changes to adjoining districts;

g.     Retain jurisdiction to render any and all further orders that this Court may deem necessary;

h.     Award plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action, such as expert fees; and

i.      Order such additional relief as the interests of justice may require.

Dated: April 24, 2017            Respectfully submitted,


By:    /s/ William V. Custer
       William V. Custer
       Georgia Bar No. 202910
       Jennifer B. Dempsey
       Georgia Bar No. 217536
       Julia Fenwick Ost
       Georgia Bar No. 940532
       Bryan Cave LLP
       One Atlantic Center
       Fourteenth Floor
       1201 West Peachtree Street, NW
       Atlanta, Georgia 30309-3488
       Telephone: (404) 572-6600
       Facsimile: (404) 572-6999
       bill.custer@bryancave.com
       jennifer.dempsey@bryancave.com
       julia.ost@bryancave.com

       Bradley S. Phillips (*pro hac vice – to be filed*)
       Gregory D. Phillips (*pro hac vice – to be filed*)
       John F. Muller (*pro hac vice – to be filed*)
       Thomas P. Clancy (*pro hac vice – to be filed*)
       Munger, Tolles, & Olson LLP
       350 South Grand Avenue
       Fiftieth Floor
       Los Angeles, California 90071-1560
       Telephone:  (213) 683-9100
       Facsimile:   (213) 687-3702

       Ezra D. Rosenberg, (*pro hac vice – to be filed*)
       Julie Houk (*pro hac vice – to be filed*)
       John Powers (*pro hac vice – to be filed*)
       erosenberg@lawyerscommittee.org
       jhouk@lawyerscommittee.org
       jpowers@lawyerscommittee.org
       Lawyers' Committee for Civil Rights Under Law

1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
Telephone:   (202) 662-8600
Facsimile:    (202) 783-0857

*Counsel for Plaintiffs*