# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **GEORGIA STATE CONFERENCE OF** | * | |
| **THE NAACP, et al.,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **CA No. 1:17cv01427-TCB** |
| **v.** | * | |
| | * | |
| **STATE OF GEORGIA and** | * | |
| **BRIAN KEMP, in his official capacity** | * | |
| **as Secretary of State for the State of** | * | |
| **Georgia,** | * | |
| | * | |
| **Defendants.** | * | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## PARTIAL MOTION TO DISMISS

### Introduction

Plaintiffs, individual African American voters and the Georgia State

Conference of the NAACP, filed this action challenging the 2015 redistricting of

state legislative house member districts 105 and 111.  Plaintiffs assert three claims

(counts) in their challenge to the redistricting of these two state legislative house

districts.  First, they assert that the redistricting was intentionally racially

discriminatory in violation of the Fourteenth Amendment and Sec. 2 of the Voting

Rights Act, 52 U.S.C. § 10301.  Doc. 1 Count One.  Second, Plaintiffs assert that

the redistricting is a racial gerrymander, i.e., that race was the predominant factor

in the redistricting, in violation of the Fourteenth and Fifteenth Amendments.  Doc. 1 Count Two.  Third, Plaintiffs assert that the redistricting is a political gerrymander.  Doc. 1 Count Three.  Plaintiffs' first claim is brought against both Secretary Kemp in his official capacity and the State of Georgia.  Doc. 1 p. 22. Plaintiffs' second and third claims are brought only against Secretary Kemp.  Doc. 1 pp. 24-25.

Defendant, the State of Georgia, now moves to dismiss Plaintiffs' first claim, the only claim brought against this Defendant, as barred by the Eleventh Amendment and for failure to state a claim.  Defendant, Secretary of State Brian Kemp, in his official capacity, moves to dismiss Plaintiffs' first and third claims for failure to state a claim.

## I.    Count One of Plaintiffs' Complaint Should be Dismissed for Lack of Subject Matter Jurisdiction.

As described above, Plaintiffs' Complaint asserts a claim against the State of Georgia for violation of the Fourteenth Amendment and Sec. 2 of the Voting Rights Act, 52 U.S.C. § 10301.[1]   The claim is barred by the Eleventh Amendment.

The Eleventh Amendment places constitutional limits on a federal court's subject matter jurisdiction.  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S.

---

[1] Defendant, Secretary of State Brian Kemp, in his official capacity, does *not* contend that Plaintiffs' claims against him, for injunctive relief, are barred by the Eleventh Amendment.

89, 98 (1984).   It deprives federal courts of jurisdiction to entertain a suit brought

by an individual against a non-consenting state.   *See Nev. Dep't of Human Res. v.*

*Hibbs*, 538 U.S. 721, 726 (2003); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). "The

ultimate guarantee of the Eleventh Amendment is that nonconsenting States may

not be sued by private individuals in federal court." *Bd. of Trs. of the Univ. of Ala.*

*v. Garrett*, 531 U.S. 356, 363 (2001).[2]   "Unless a State has waived its Eleventh

Amendment immunity or Congress has overridden it, [ ] a State cannot be sued

directly in its own name regardless of the relief sought." *Kentucky v. Graham*, 473

U.S. 159, 167 (1985) (citing *Alabama v. Pugh*, 438 U.S. 781 (1978) (per curium)).

There are three ways to override the Eleventh Amendment bar:  (1) consent

by the state to be sued in federal court on the claim involved; (2) waiver of

immunity by a state, or (3) abrogation of immunity.  *See Atascadero State Hosp. v.*

*Scanlon,* 473 U.S. 234, 253 (1985); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44,

72-77 (1996).[3]  Here, both Plaintiffs' Fourteenth Amendment claim and their claim

pursuant to Sec. 2 of the Voting Rights Act, 52 U.S.C. § 10301, are barred.

---

[2] While an exception to Eleventh Amendment immunity exists under *Ex Parte Young*, 209 U.S. 123 (1908), it is limited to suits against *state officers* for prospective injunctive relief.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997).

[3] The Supreme Court has repeatedly barred claims against States where there was no override of Eleventh Amendment Immunity.  *See, e.g., Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000) (barring ADEA claims); *Vt. Agency of Nat. Res. v.*

### A.     The State of Georgia has Not Consented to Suit.

In order to evidence consent that overrides the Eleventh Amendment bar, there must be an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Atascadero State Hosp.*, 473 U.S. at 238 n.1.  The State of Georgia has not consented to suit in federal court on *any* claim and has expressly preserved its sovereign immunity in the state constitution.  *See* GA. CONST. ART. I, § II, ¶ IX(f). Plaintiff does not appear to allege otherwise.

### B.     The State of Georgia has not Waived Eleventh Amendment Immunity.

A waiver of Eleventh Amendment immunity must be express.  "The Court will give effect to a State's waiver of Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction."  *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305-306 (1990) (internal quotation

---

*U.S. ex rel. Stevens*, 529 U.S. 765 (2000) (barring suits under the False Claims Act); *Alden v. Maine*, 527 U.S. 706 (1999) (barring private suit in federal or state court under the Fair Labor Standards Act); *Fla. Prepaid Post-Secondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627 (1999) (barring claims under the Patent and Plant Variety Protection Remedy Clarification Act); *Garrett*, 531 U.S. at 360 (finding no abrogation for ADA Title I claims).

and citation omitted).  Here, the State of Georgia has not waived its immunity as to any of Plaintiffs' claims.

### C.     Congress has not Abrogated the State's Immunity.

The Supreme Court has held that in order to override the Eleventh Amendment, Congress must do so with "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'"  *Pennhurst*, 465 U.S. at 99 (quoting *Quern v. Jordan*, 440 U.S. 332, 342 (1979)).  Here, there has been no valid abrogation of the State of Georgia's  Eleventh Amendment immunity as to any of Plaintiffs' federal claims.

### 1.  Plaintiffs' Fourteenth Amendment Claim.

Plaintiffs' Fourteenth Amendment claim is necessarily brought pursuant to 42 U.S.C. § 1983.[4]  The Supreme Court has repeatedly held that "§ 1983 does not override a State's Eleventh Amendment immunity."  *Will*, 491 U.S. at 63; *Quern*, 440 U.S. at 342; *Kentucky*, 473 U.S. at 169 n.17.  Therefore, Plaintiffs' claims

---

[4] Section 1983 provides a cause of action for violations of federal constitutional or statutory rights by any "person" acting under color of law.  The Supreme Court has ruled that the term "person" in this context is to be given its ordinary meaning; "a State is not a 'person' within the meaning of § 1983." *Will v.  Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989).  Therefore, Plaintiffs' claims against the State of Georgia, pursuant to 42 U.S.C. § 1983, also fail to state a claim.

pursuant to 42 U.S.C. § 1983, against the State of Georgia, are barred by the Eleventh Amendment.

### 2.   Plaintiffs' Claim Pursuant to Sec. 2 of the Voting Rights Act.

To the extent Plaintiffs' Sec. 2 claim against the State of Georgia is brought pursuant to 42 U.S.C. § 1983, as noted above, it is barred.  Moreover, assuming Plaintiffs bring their Sec. 2 claim as an implied right of action, it is also barred because Sec. 2 does not abrogate the Eleventh Amendment.

When determining whether Congress has validly abrogated a State's sovereign immunity, the court must make two determinations.  The court must first ask "whether Congress unequivocally expressed its intent to abrogate that immunity" and then "whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel*, 528 U.S. at 73 (citing *Seminole Tribe*, 517 U.S. at 55).  Here, Plaintiffs cannot satisfy the first prong of this test.  Sec. 2 of the Voting Rights Act does *not* express any intent to abrogate the State's Eleventh Amendment immunity.  Section 2 provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [52 USCS § 10303(f)(2)], as provided in subsection (b).

6

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.  In the absence of statutory language making clear Congress' intent to abrogate Eleventh Amendment immunity, there can be no abrogation. [5] Defendants acknowledge that the Sixth Circuit has held that Sec. 2 of the Voting Rights Act does abrogate Eleventh Amendment immunity.  *Mixon v. State of Ohio*, 193 F.3d 389, 398 (6th Cir. 1999).  However, as two district courts have recently explained, the *Mixon* court did not address that Sec. 2 provides only an *implied* right of action and abrogation of sovereign immunity must be *express*.  *Greater Birmingham Ministries v. Alabama*, 2017 U.S. Dist. LEXIS 28671, 31-33 (N.D. Ala. 2017); *Lewis v. Bentley*, 2017 U.S. Dist. LEXIS 13565, 26-30 (N.D. Ala. 2017).

---

[5] By comparison, Congress has expressly provided that a "state shall not be immune under the Eleventh Amendment . . . from suit" for violation of certain civil rights statutes passed pursuant to Congress' spending clause powers.  42 U.S.C. § 2000d-7(a)(1).

> Congress' power to abrogate a State's immunity means that in certain circumstances the usual constitutional balance between the States and the Federal Government does not obtain. "Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Fitzpatrick* [*v. Bitzer*], 427 U.S. [445,] 456 [(1976)]. In view of this fact, it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment. The requirement that Congress unequivocally express this intention in the *statutory language* ensures such certainty.

*Atascadero*, 473 U.S. at 242-243 (emphasis added). Likewise, the Eleventh Circuit has held that Congressional intent to abrogate the Eleventh Amendment must be clear in the statute and not simply inferred from general language or legislative history. *Florida Paraplegic Association, Inc. v. Miccosukee Tribe of Indians of Florida*, 166 F.3d 1126, 1131 (11th Cir. 1999); *Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1321 (11th Cir. 2016). Because Sec. 2 of the Voting Rights Act does not expressly abrogate the Eleventh Amendment, Plaintiffs' claim against the State of Georgia is barred.

## II. Plaintiffs' Claim of Intentional Discrimination in Violation of Sec. 2 of the Voting Rights Act and the Fourteenth Amendment Fails to State a Claim for Relief.

Plaintiffs' complaint alleges in part a violation of the Fourteenth Amendment and Sec. 2 of the Voting Rights Act for "discriminatory purpose." Doc. 1 p. 22. However, both Sec. 2 of the Voting Rights Act and the Fourteenth

Amendment require a showing of discriminatory *effect* and Plaintiffs have failed to sufficiently allege any discriminatory effect.  *Johnson v. DeSoto*, 72 F.3d 1556, 1561 (11th Cir. 1996) (holding that a Sec. 2 Plaintiff must show a discriminatory effect even where Plaintiff has proven discriminatory intent)[6]; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-1189 (11th Cir. 1999) (holding that to establish a Fourteenth Amendment claim Plaintiffs must show *both* discriminatory intent *and* effect.).[7]  Here, Plaintiffs' complaint fails to sufficiently allege a racially discriminatory effect.[8]

---

[6] The *DeSoto* case was a challenge to an at-large election structure brought pursuant to Sec. 2 of the Voting Rights Act *and* the First, Thirteenth, Fourteenth, and Fifteenth Amendments.  *Johnson v. DeSoto*, 868 F. Supp. 1376, 1378 (M.D. Fl. 1994), *rev'd* 72 F.3d 1556.

[7] Defendants do not concede that the challenged legislation was enacted with discriminatory intent but recognize that on a motion to dismiss all factual allegations in the complaint are accepted as true.

[8] Paragraphs 87-94, setting out Plaintiffs' discriminatory intent claim, make no reference at all to *any* discriminatory effects.  However, because Plaintiffs improperly incorporate all prior paragraphs of their complaint into each count of their complaint, Defendants will address Plaintiffs' factual allegations regarding effects that are included in other sections of the complaint.  *See Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1166 (11th Cir. 2009) (explaining that the problem with permitting a complaint to simply incorporate all previous paragraphs by reference is that "it is impossible to determine the factual basis for each claim."); *See also  Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) (explaining that "[t]he typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions.").

In determining whether a redistricting plan has a discriminatory effect, the Supreme Court has repeatedly reaffirmed the three prong test initially enunciated in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986) as necessary preconditions to bringing an action.

> First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative district. [*Gingles*, 478 U.S.] at 50, 106 S. Ct. 2752, 92 L. Ed. 2d 25. Second, the minority group must be "politically cohesive." *Id.*, at 51, 106 S. Ct. 2752, 92 L. Ed. 2d 25. And third, a district's white majority must "vote[ ] sufficiently as a bloc" to usually "defeat the minority's preferred candidate." *Ibid.* Those three showings, we have explained, are needed to establish that "the minority [group] has the potential to elect a representative of its own choice" in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is "submerg[ed] in a larger white voting population." *Growe v. Emison*, 507 U. S. 25, 40, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993).

*Cooper v. Harris*, __ U.S. __, 197 L. Ed. 2d 837, 854 (May 22, 2017).  "If any one of the *Gingles* prongs is not established, there is no vote dilution." *Johnson v. Hamrick*, 296 F.3d 1065, 1073 (11th Cir. 2002).  Here, Plaintiffs have not sufficiently alleged *any* of the three prongs.[9]

---

[9] While the Supreme Court has never addressed whether Plaintiffs may establish a Sec. 2 claim of intentional discrimination without evidence of the *Gingles* preconditions, *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (explaining in the context of a Sec. 2 effects challenge that Plaintiffs must show they have the potential to be over 50% in a district, and declining to "consider whether intentional discrimination affects the *Gingles* analysis"), the law in this circuit requires a showing of discriminatory effects.  *DeSoto*, 72 F.3d at 1561-1563.

**A. Plaintiffs Have Not Alleged That They Are Sufficiently Large and Geographically Compact to Constitute a Majority in a Single-Member District.**

Plaintiffs, African American voters, have failed to allege that they are sufficiently numerous and geographically compact to constitute a majority in either of the challenged state house districts. *Gingles*, 478 U.S. at 50. Instead, Plaintiffs allege only that their relative percentage in these districts has been reduced. Doc. 1 ¶¶ 55, 60, 61, 69, 77. In House District (HD) 105, African Americans made up 32.4% of the voting age population prior to the challenged redistricting, and 30.4% after. Doc. 1 ¶ 60. In House District 111, African Americans made up 33.2% of the voting age population prior to the 2015 redistricting, and 31% after. Doc. 1 ¶ 77. Plaintiffs never allege that a majority African American district is possible.

Moreover, to the extent Plaintiffs contend that they can meet the first *Gingles* precondition by forming a coalition district, i.e., a district that is majority minority by combining African-Americans *and* Hispanics *and* Asians, they fail to sufficiently allege facts to support such a conclusion. As a preliminary matter, the Supreme Court has never squarely addressed whether or not Plaintiffs may satisfy the first *Gingles* precondition by combining different minority communities to form a majority in a single member district. *See Growe v. Emison*, 507 U.S. 25, 41-42 (1993) ("Assuming (without deciding) that it was permissible for the District

Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," the Plaintiffs failed to show that those minority groups were politically cohesive); *see also Bartlett v. Strickland*, 556 U.S. 1, 13-14 (2009) (distinguishing between two types of coalition districts and not addressing whether a district where a combination of minorities formed a majority satisfied the first *Gingles* precondition.).  Assuming for purposes of this motion that Plaintiffs can satisfy the first *Gingles* precondition by demonstrating that a coalition of minority voters can form a relevant majority in a single member district, Plaintiffs have failed to make sufficient factual allegations here.

Plaintiffs allege only that prior to the challenged redistricting, HD 105 had a 32.4% African American voting age population, a 12.6% Hispanic voting age population, and a 4.6% Asian voting age population.  Doc. 1 ¶ 55.  These three minority groups combined constitute 49.6% voting age population in the district. But Plaintiffs assert that the "minority voting age population was 51.6 percent." *Id.*  Plaintiffs reach this number by simply subtracting the white non-Hispanic voting age percentage from 100%.  Thus, Plaintiffs include all "others" and persons declaring more than one race as part of their "coalition district" to get above 50% voting age population.  There is no support in the law for such a loose definition of a minority coalition district.  At a minimum, Plaintiffs should be

required to allege what racial or language minorities constitute their coalition.

Plaintiffs have not done so.  Moreover, even if Plaintiffs could simply subtract the

white non-Hispanic population from 100% to reach their "coalition" percentage,

Plaintiffs fail to allege that their coalition can constitute a majority of the *citizen*

voting age population.  *See Negron v. City of Miami Beach*, 113 F.3d 1563, 1569

(11th Cir. 1997) (holding that "the proper statistic for deciding whether a minority

group is sufficiently large and geographically compact is voting age population *as

refined by citizenship*.") (emphasis added); *Accord League of United Latin Am.

Citizens v. Perry*, 548 U.S. 399, 428 (2006) (noting that "Latinos in [the relevant

district] could have constituted a majority of the *citizen voting-age population* in

the district.") (emphasis added).  Plaintiffs appear to recognize that citizenship

voting age population is the relevant data pool as they cite to the U.S. Census

Bureau's 2015 American Community Survey for Georgia's statewide data.  Doc. 1

¶ 35.  However, despite the availability of data for Gwinnett County, where HD

105 is located, Plaintiffs fail to recognize the huge disparity between the Hispanic

population and the Hispanic *citizen* population.  *See* Exhibit 1.[10]  According to the

---

[10] "The court may judicially notice a fact that is not subject to reasonable dispute
because it . . . can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  *See also*,
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (explaining
that "courts must consider the complaint in its entirety, as well as other sources

U.S. Census Bureau, Gwinnett County has a non-citizen population of approximately 118,526 or 13.79% of the county's population.  Of that 118,526 non-citizen population, 56.4% is Hispanic, while only 7.8% is white non-Hispanic. Exhibit 1 p. 1.  Given the disparity between citizenship rates of white non-Hispanic persons and Hispanic persons, a 49.6% or even 51.6% coalition district consisting of a 12.6% Hispanic population, cannot satisfy the first *Gingles* prong.

Plaintiffs' contentions regarding HD 111 are even weaker.  HD 111 was never close to majority minority.  Doc. 1 ¶ 77 (alleging the district had a 56.1% white non-Hispanic voting age population before 2015 and a 58.1% white non-Hispanic voting age population after the 2015 redistricting.).

### B. Plaintiffs Have Failed to Sufficiently Allege That Voters in Their Coalition are Politically Cohesive.

As set out above, Plaintiffs must allege sufficient facts to establish all three of *Gingles* preconditions, including facts sufficient to show that Plaintiffs' minority coalition is politically cohesive.  478 U.S. at 46.  Political cohesion is particularly important where Plaintiffs seek to establish the first *Gingles* precondition with a minority coalition district.  *Growe*, 507 U.S. at 41.  Here however, Plaintiffs

---

courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") (citing 5B Wright & Miller §1357 (3d ed. 2004 and Supp. 2007)).

provide no facts to support a conclusion of political cohesion.  First, as noted above, Plaintiffs do not expressly identify which racial and/or language groups make up their coalition.  Second, Plaintiffs assert that all of Georgia's 46 African American state house members are Democrats, and that "race and party are highly correlated in Georgia and have been for decades."  Doc. 1 ¶ 37.  Yet Plaintiffs allege that two of Georgia's 180 state house legislative districts are represented by a Hispanic member, and that one of these two Hispanic members is a *Republican*. Doc. 1 ¶¶ 36-37.  Plaintiffs do not attempt to explain how African American Democrats and Hispanic Republicans are nonetheless "politically cohesive."

While Plaintiffs allege generally that voting is "racially polarized," they never allege that African-American voters, Hispanic voters, Asian voters, or any other minority constitutes a politically cohesive group.  Doc. 1 ¶ 5 (asserting that African American voters are overwhelmingly Democrats and white voters are overwhelmingly Republican), ¶¶ 59, 66, 74, and 82 (asserting generally that voting in 2012, 2014 and 2016 was racially polarized in both HD 105 and HD 111).  Plaintiffs have failed to sufficiently allege facts to support a conclusion that Plaintiffs' coalition is politically cohesive.

**C. Plaintiffs Have Failed to Sufficiently Allege That White Voters Vote as a Bloc to Defeat the Candidates of Choice of the Minority.**

As discussed above, Plaintiffs allege generally, in a conclusory manner, that elections in 2012-2016 were racially polarized.  Doc. 1 ¶¶ ¶¶ 59, 66, 74, and 82.  However, Plaintiffs' more detailed factual allegations, regarding the very same elections, contradict their conclusory allegations.  While the voting age population, refined by citizenship and registration data, for HD 105 clearly shows that it is majority white non-Hispanic, Plaintiffs allege that in 2016 the white Republican *incumbent* received 12,411 (50.45%) votes and the African-American Democratic challenger received 12,189 (49.55%), a difference of only 222 votes or less than 1%.  Doc. 1 ¶ 64.

Defendants concede that the 2016 election demonstrates that HD 105 is likely what the Supreme Court has referred to as a "crossover district," a district that minority voters might win with some crossover votes from the white majority.  *Bartlett*, 556 U.S. at 14-15.  However, as the Supreme Court has now held, the legislature's refusal to create cross over districts does not have a racially discriminatory effect on minority voters.  *Id*.  In rejecting the argument that a 39% African American minority voting age population could satisfy the first *Gingles* precondition with crossover voting, the Supreme Court held:

16

> because they form only 39 percent of the voting-age population in District 18, African-Americans standing alone have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength. That is, African-Americans in District 18 have the opportunity to join other voters--including other racial minorities, or whites, or both--to reach a majority and elect their preferred candidate. They cannot, however, elect that candidate based on their own votes and without assistance from others. Recognizing a § 2 claim in this circumstance would grant minority voters "a right to preserve their strength for the purposes of forging an advantageous political alliance." *Hall v. Virginia*, 385 F.3d 421, 431 (CA4 2004); *see also Voinovich*, 507 U.S., at 154, 113 S. Ct. 1149, 122 L. Ed. 2d 500 (minorities in crossover districts "could not dictate electoral outcomes independently"). Nothing in § 2 grants special protection to a minority group's right to form political coalitions. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *De Grandy*, 512 U.S., at 1020, 114 S. Ct. 2647, 129 L. Ed. 2d 775.

*Bartlett*, 556 U.S. at 14-15.

Plaintiffs have failed to sufficiently allege all of the *Gingles* preconditions.

Therefore, count one of Plaintiffs' complaint should be dismissed.

### III.  Plaintiffs Fail to Sufficiently Allege a Claim for Political Gerrymandering.

Plaintiffs' partisan gerrymander claim (count three of the complaint) should

be dismissed because it relies on a new constitutional test that the U.S. Supreme

Court has not analyzed and that the Plaintiffs fail to adequately plead and

contextualize.  While Plaintiffs cite to the Supreme Court's most recent political

gerrymandering cases, they rely entirely on a 2016 trial court decision which

involved a statewide partisan gerrymandering challenge in Wisconsin, but Plaintiffs failed to allege facts consistent with the theory of recovery in the Wisconsin case.

The Supreme Court first directly addressed partisan gerrymandering claims in *Davis v. Bandemer*, 478 U.S. 109 (1986), which was a challenge to Indiana's redistricting for its entire state legislature following the 1980 census. 478 U.S. at 115. Six justices held that partisan gerrymandering claims were justiciable (a four-Justice plurality and a two-Justice dissent), and three justices held that the claims were nonjusticiable political questions. *Id.* at 109–12. The *Bandemer* majority could not, however, agree on the proper test for adjudicating partisan gerrymandering claims. The four-Justice plurality held that plaintiffs must prove "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.* at 127 (plurality opinion). "Regarding the effects element, the plurality stated that a plaintiff must prove that it 'has been unconstitutionally denied its chance to effectively influence the political process' or that the 'electoral system [has been] arranged in a manner that will consistently degrade a voter's or group of voters' influence on the political process as a whole.'" *Common Cause v. Rucho*, No. 1:16-CV-1026, 2017 U.S. Dist. LEXIS 30242, at *20 (M.D.N.C. Mar. 3, 2017) (quoting *Bandemer*, 478 U.S.

18

at 132–33, 142–43 (plurality opinion)).

This test from the *Bandemer* plurality stood for eighteen years as the standard by which lower courts examined partisan gerrymandering claims until the Supreme Court revisited the issue in *Vieth v. Jubelirer*, 541 U.S. 267 (2004).[11] *Vieth* was a challenge to Pennsylvania's redistricting plan for all of its congressional districts following the 2000 census.  541 U.S. at 272.  Again, the Court fractured on many of the fundamental issues in the case, but, ultimately, five Justices voted to affirm the lower court's dismissal of the gerrymandering claim. Writing for a four-Justice plurality, Justice Scalia held that *Bandemer* should be overruled because partisan gerrymandering claims were nonjusticiable political questions with no "judicially enforceable limit on the political considerations that the States and Congress may take into account when districting."  *Id.* at 305 (plurality opinion).  Justice Kennedy concurred in the judgment that the complaint should be dismissed, but held open the possibility that partisan gerrymandering claims would become justiciable if "workable standards" emerged for "measuring the burden a gerrymander imposes on representational rights."  *Id.* at 317

---

[11] Note, however, that no lower court ever ultimately granted relief for a partisan gerrymandering claim using the *Bandemer* test.  *See Vieth*, 541 U.S. at 279–80 (plurality opinion) ("[I]n *all* of the cases we are aware of involving that most common form of political gerrymandering [, the drawing of district lines], relief was denied."  (emphasis in original))

(Kennedy, J., concurring in the judgment).

Finally, the Court most recently addressed the issue in *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), a statewide challenge to Texas's congressional districts. In *LULAC*, the Court fractured yet again, ultimately affirming the lower court's dismissal of the partisan gerrymandering claim but failing to agree on a justiciable standard. 548 U.S. at 420 (plurality opinion) (holding that plaintiffs' claims must be dismissed because of "the absence of any workable test for judging partisan gerrymanders"). Thus, as the law stands today, no majority of the Court has provided lower courts with a test by which to adjudicate partisan gerrymandering claims. Furthermore, after "*Vieth's* abrogation of *Bandemer's* discriminatory effects test, the Supreme Court has failed to provide lower courts with guidance as to the proper standard for assessing whether an alleged partisan gerrymander produces discriminatory effects." *Common Cause*, 2017 U.S. Dist. LEXIS 30242 at *29–30.

Plaintiffs here, ask this court to apply a standard applied by a district court in Wisconsin to a statewide partisan gerrymandering claim, and not yet examined by the Supreme Court, to a their claim that two (2) of Georgia's one hundred eighty (180) legislative house districts, Districts 105 and 111, are the product of unconstitutional partisan gerrymandering. The case that Plaintiffs rely on,

20

*Whitford v. Gill*, No. 15-cv-421-bbc, 2016 U.S. Dist. LEXIS 160811, 2016 WL

6837229 (W.D. Wis. Nov. 21, 2016), appears to be the first case in which a trial

court has struck down a redistricting plan because of partisan gerrymandering.  The

plaintiffs in *Whitford* presented the court with a new measure for determining the

discriminatory effect of partisan gerrymanders, the "efficiency gap."  2016 U.S.

Dist. LEXIS 160811 at *31.  "The efficiency gap is the difference between the

parties' respective wasted votes in an election, divided by the total number of votes

cast."  *Id.*  In the complaint, the *Whitford* plaintiffs used efficiency gap as part of a

proposed three-prong test for determining whether a statewide redistricting plan is

an unconstitutional partisan gerrymander.  *See id.* at *32.  Rather than adopt the

plaintiffs' proposed test outright, the trial court instead developed its own three-

prong test:

> [T]he First Amendment and the Equal Protection clause prohibit a
> redistricting scheme which (1) is intended to place a severe impediment on
> the effectiveness of the votes of individual citizens on the basis of their
> political affiliation, (2) has that effect, and (3) cannot be justified on other,
> legitimate legislative grounds.

2016 U.S. Dist. LEXIS 160811 at *111.  The court did, however, accept the

efficiency gap as a tool that could provide corroborative evidence of an

"aggressive partisan gerrymander."  *Id.* at *187.

21

Here, Plaintiffs borrow the *Whitford* court's three-prong test in a statewide challenge and claim that the redistricting of Districts 105 and 111, in isolation, can form the basis of a partisan gerrymander claim pursuant to the Fourteenth Amendment.[12]  Doc. 1 ¶ 103.  Notwithstanding the fact that the *Whitford* test is by no means settled law, the only direct allegation that Plaintiffs make concerning the test is simply, "That test is satisfied here."  *Id.* at ¶ 102.  This is a legal conclusion that cannot serve as a basis for stating a valid partisan gerrymander claim.  *See Amer. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (on consideration of a motion to dismiss courts are to "eliminate any allegations in the complaint that are merely legal conclusions").

Plaintiffs' reliance on the test from *Whitford* shows that they have failed to state a viable partisan gerrymander claim for two further reasons.  First, the *Whitford* test was developed in the context of a challenge to an entire state's redistricting plan, and the *Whitford* decision relied, at least with regard to the intent prong, on the fact that the challenged plan affected the entire state.  The Supreme Court has long acknowledged that political considerations will inevitably play

---

[12] The Whitford challenge was premised on both a First Amendment and Fourteenth Amendment Equal Protection claim.  *Whitford*, 2016 U.S. Dist. LEXIS 160811 at *87 (discussing Justice Kennedy's opinion in *Vieth* that "in the end, it may be the First Amendment, not the Equal Protection Clause, which provides the framework within which political gerrymandering claims should be analyzed.").

some role in redistricting.  *See, e.g.*, *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("The reality is that districting inevitably has and is intended to have substantial political consequences."); *Vieth*, 541 U.S. at 286 (plurality opinion) ("[P]artisan districting is a lawful and common practice.").  What becomes unconstitutional is "an *excessive* injection of politics."  *Vieth*, 541 U.S. at 293 (plurality opinion); *see also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, __ U.S. __, 135 S. Ct. 2652, 2658 (2015) (defining partisan gerrymandering as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power.").  In determining how a plaintiff could show an *excessive* injection of politics to support a claim of discriminatory intent, the *Whitford* court held that the "intent to entrench a political party in power signals an excessive injection of politics into the redistricting process that impinges on the representational rights of those associated with the party out of power."  *Whitford*, 2016 U.S. Dist. LEXIS 160811 at *119.  The *Whitford* court (and notably nearly every other court that has addressed partisan gerrymandering) was addressing a *statewide* redistricting plan.  Here, Plaintiffs are only challenging two state house districts of 180, and they have provided the Court with no basis by which it could determine whether the *Whitford* test is either reliable or appropriate for single-district challenges.

Second, even though the court in *Whitford* did not explicitly incorporate the efficiency gap measure into its three-prong test, the measure permeated the court's analysis.  Here, Plaintiffs make no allegations concerning the efficiency gap measure.  The degree to which the efficiency gap formed the basis for the *Whitford* court's ultimate conclusion that Wisconsin's state legislature redistricting plan is unconstitutional, *see generally Whitford*, 2016 U.S. Dist. LEXIS 160811, shows that any subsequent plaintiff seeking to use the *Whitford* test must at least make allegations concerning the efficiency gap.  Without such allegations, the Complaint fails to provide the Court with a meaningful basis to determine whether the *Whitford* test is a reliable measure here and whether Plaintiffs' allegations meet the test.

Because Plaintiffs rely entirely on the *Whitford* test and have failed to allege facts to support showing that the test is a reliable measure here, the complaint fails to state a claim for partisan gerrymandering.  *See LULAC*, 548 U.S. at 418 (opinion of Kennedy, J.) ("[A] successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . . show a burden, as measured by a *reliable standard*, on the complainants' representational rights." (emphasis added)).  As Justice Kennedy noted, there is no "agreed upon model of fair and effective representation," so determining whether political classifications are related to a

24

legitimate legislative purpose is an "analysis difficult to pursue." *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring).  Because "there are yet no agreed upon substantive principles of fairness in districting, [courts] have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights."  *Id.* at 307–08.  Thus, "the results from one gerrymandering case to the next would likely be disparate and inconsistent." *Id.* at 308.

In the alternative, this Court should stay consideration of Plaintiffs' partisan gerrymandering claim until the U.S. Supreme Court rules on the viability of the *Whitford* test, which is currently on appeal to that Court.  *See Whitford*, No. 15-cv-421-bbc, Notice of Appeal [Doc. 191] (W.D. Wis. Feb. 24, 2017).

## CONCLUSION

For the foregoing reasons, Defendants pray that their Motion to Dismiss be granted and the first and third count of Plaintiffs' Complaint be dismissed.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                    112505

ANNETTE M. COWART          191199
Deputy Attorney General

RUSSELL D. WILLARD          760280
Senior Assistant Attorney General

25

/s/Cristina Correia
CRISTINA CORREIA          188620
Assistant Attorney General

/s/Josiah B. Heidt
JOSIAH B. HEIDT          104183
Assistant Attorney General

Attorneys for Defendant

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Support of Motion to Dismiss was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

## Certificate of Service

I hereby certify that on May 30, 2017, I electronically filed this Brief in Support of Motion to Dismiss using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Julie Houk
John Powers
Ezra Rosenberg
Lawyers' Committee for Civil Rights
    Under Law
1401 New York Avenue, Suite 400
Washington, DC  20005

William Vance Custer, IV
Jennifer Burch Dempsey
Julia Fenwick Ost
Bryan Cave, LLP-ATL
One Atlantic Center
14th Floor
1201 West Peachtree St, NW
Atlanta, GA  30309-3488

Bradley S. Phillips
Gregory D. Phillips
John F. Muller
Thomas P. Clancy
Munger, Tolles & Olson, LA-CA
50th Floor
350 South Grand Avenue
Los Angeles, CA  90071-1560

I hereby certify that I have mailed by United States Postal Service, postage prepaid, the document to the following non-CM/ECF participants:  NONE

This 30th day of May, 2017.

/s/Cristina Correia
Cristina Correia           188620
Assistant Attorney General