IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **GEORGIA STATE CONFERENCE OF THE NAACP, et al.,** | * * * | |
| Plaintiffs, | * * | |
| | * | CA No. 1:17cv01427-TCB |
| v. | * * | |
| **STATE OF GEORGIA and BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia,** | * * * * * | |
| Defendants. | * | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF
PARTIAL MOTION TO DISMISS**

**I.  Plaintiffs' Constitutional and Sec. 2 Claims Against the State of Georgia Are Barred by the Eleventh Amendment.**

Plaintiffs appear to concede that they may not bring a constitutional claim, pursuant to 42 U.S.C. § 1983, against the State of Georgia.[1] Doc. 22 p. 9.[2]

---

[1] Plaintiffs characterize the first count of their complaint as a claim alleging a violation of "both Section 2 of the Voting Rights Act and 42 U.S.C. § 1983." Doc. 22 at 9.  Of course, Section 1983 is not a source of substantive federal rights. Instead, this statute "provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations omitted).  Defendants assume that Plaintiffs' concession that they may not proceed against the State of Georgia pursuant to 42 U.S.C. § 1983 is a concession that they may not proceed with their constitutional claim against the State of Georgia. *See* Doc. 1 p. 22.

1

Plaintiffs continue to assert their claim pursuant to Sec. 2 against the State of Georgia and contend that "the courts have made clear that Congress intended to abrogate state sovereign immunity with regard to Section 2 of the Voting Rights Act." Doc. 22 at 13. Importantly, Plaintiffs do not contend that *Congress* has made its intent clear. Instead, Plaintiffs simply argue that Congress has created a private right of action under Section 2, and therefore abrogated the Eleventh Amendment. Doc. 22 at 4-6. These concepts are not one and the same, however. Nor do *any* of the Supreme Court cases cited by Plaintiffs support their argument that Sec. 2 of the Voting Rights Act abrogates Eleventh Amendment immunity. Plaintiffs equate discussions about the intrusion into state sovereignty by various provisions of the Voting Rights Act with *abrogation* of Eleventh Amendment *immunity*. Doc. 22 at 10-11. Those concepts are not one and the same.

None of the Supreme Court cases cited by Plaintiffs, *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996); *Lopez v. Monterey Cty.*, 525 U.S. 266 (1999); and *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), include *any* discussion of Eleventh Amendment immunity, and none were suits against a State. Instead, these cases discussed Sec. 5 of the Voting Rights Act.[3] That part of

---

[2] The page numbers refer to the ECF page number.
[3] *Morse* also addressed Sec. 10 of the Voting Rights Act which prohibits poll taxes. 52 U.S.C. § 10306.

the Voting Rights Act required federal preclearance of any change in an election "standard, practice, or procedure" before the change could be implemented by a covered State or political subdivision.[4]  52 U.S.C. § 10304(a).  These cases provide no basis for the Plaintiffs' conclusion that Sec. 2 abrogates the Eleventh Amendment.  To the extent these cases even discuss the broader concept of state sovereignty; those discussions are limited to Congress' power to subject States and their political subdivisions to the preclearance requirement, not whether Congress has abrogated Eleventh Amendment *immunity*.  That a state may be sued *by the Department of Justice* under the Voting Rights Act does not implicate the Eleventh Amendment.  *See United States v. Mississippi*, 380 U.S. 128, 140-41 (1965) (An action by the United States against a state in federal court is not barred by the Eleventh Amendment).  The Eleventh Amendment bars only actions by *private citizens* against the States.  *Id.*  Additionally, while private individuals may sue a *state official* to enforce provisions of the Voting Rights Act; that does not lead to a conclusion that Congress therefore intended to abrogate the Eleventh Amendment's bar of private individuals suing *the State*.  Plaintiffs' arguments amount to nothing more than an argument that because Congress created a cause of

---

[4] In *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), the Supreme Court held that Sec. 4(b) of the Voting Rights Act, 52 U.S.C. § 10303(b), the formula for determining what States and political subdivisions were covered by Sec. 5, was unconstitutional.

action, it clearly intended to abrogate the Eleventh Amendment. To the contrary, by creating a private right of action Congress has simply permitted private Plaintiffs to sue *state officials* for a violation of Sec. 2 of the Voting Rights Act. Additionally, as noted above, the Department of Justice may sue a State in its own name, since the Eleventh Amendment is not a bar to such a suit.

Similarly, statutory language in Sec. 2 prohibiting imposition of certain practices or procedures by "any State or political subdivision," does not indicate Congress intended to abrogate the Eleventh Amendment. Congress must "unequivocally express[ ] its intent to abrogate that immunity." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (citing *Seminole Tribe v. Fla.*, 517 U.S. 44, 55 (1996)). Moreover, the legislative intent to abrogate the Eleventh Amendment must be clear *in the statute* and not simply inferred from general language or legislative history. *Florida Paraplegic Association, Inc. v. Miccosukee Tribe of Indians of Florida*, 166 F.3d 1126, 1131 (11th Cir. 1999); *Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1321 (11th Cir. 2016). Because Sec. 2 of the Voting Rights Act does not expressly abrogate the Eleventh Amendment, Plaintiffs' claim against the State of Georgia is barred.

## II.     Plaintiffs' Must Allege Sufficient Facts to Establish All Three *Gingles* Preconditions to State a Claim Under Sec. 2 of the Voting Rights Act and the Constitution.

Plaintiffs contend that they need not satisfy the three preconditions initially enunciated in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986) *if* they are able to prove that the 2015 changes to House Districts 105 and 111 were enacted with racially discriminatory intent.  Doc. 22 at 13-17.  While the Supreme Court has never squarely addressed the level of effects evidence that is needed to prove vote dilution where discriminatory intent is present, the Eleventh Circuit has.

A violation of either Sec. 2 of the Voting Rights Act or the Fourteenth Amendment requires proof of the three *Gingles* preconditions.  *Johnson v. DeSoto County Bd. of Comm'rs*, 204 F.3d 1335, 1344-1345 (2000).  The Eleventh Circuit has held that the effects evidence required under the Constitution and Sec. 2 is essentially the same:

> As an initial matter, we doubt that any plaintiff, . . . can establish a constitutional vote dilution claim where his section 2 claim has failed. Plaintiffs say that, after a claimant has proved discriminatory intent, he need only produce minimal evidence of injury resulting from the challenged electoral scheme to prevail under the Constitution. But, the Supreme Court, historically, has articulated the same general standard, governing the proof of injury, in both section 2 and constitutional vote dilution cases.

*Johnson*, 204 F.3d at 1344.  Even after proof of discriminatory intent, the court in *Johnson v. DeSoto* held that:

5

> to satisfy section 2's standard in a vote dilution case, plaintiffs must show (at a minimum) that: (1) 'the minority group … is sufficiently large and geographically compact to constitute a majority in a single-member district;' (2) the minority group is politically cohesive; and (3) the white majority votes as a bloc sufficiently to defeat the minority group's preferred candidates.

*Johnson*, 204 F.3d at 1338 (quoting *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986). "And, even if the [statutory and constitutional] standards are not completely identical in application, we know that section 2 was intended to be more permissive than the constitutional standard." *Johnson*, 204 F.3d at 1344. "[T]o establish a constitutional vote dilution claim, Plaintiffs must show that: (1) the [jurisdiction's minority] population lacks an equal opportunity to participate in the political process and elect candidates of its choice; (2) this inequality of opportunity results from the . . . voting scheme; and (3) a racially discriminatory purpose underlies the [ ] voting scheme." *Id.* at 1345.  Again, in *Johnson* the Eleventh Circuit affirmed a judgment for the Defendants where the Court accepted that Plaintiffs had proven discriminatory intent, but failed to show the minority population was sufficiently large to constitute a majority in a single-member district because that amounted to a failure to "show that the inequality of opportunity *results from* the [ ] current electoral system." *Id.* (emphasis added). Plaintiffs have not cited any Supreme Court or Eleventh Circuit precedent to the contrary.  Moreover, Plaintiffs appear to concede that their complaint does *not*

6

sufficiently allege that they can satisfy the first *Gingles* precondition. Doc. 22 at 16-17 (asserting that they need not satisfy the first *Gingles* precondition and then suggesting only that they have sufficiently alleged the second and third preconditions).

Finally, Plaintiffs' contend that they have sufficiently alleged the second and third *Gingles* preconditions and insist they need not allege a politically cohesive minority coalition because "Plaintiffs need not . . . satisfy [the first] precondition." Doc. 22 at 17.  Not only is Plaintiffs' position refuted by *Johnson v. DeSoto* but Plaintiffs' statement is circular.  Political cohesion among minority voters, however *Plaintiffs* choose to describe "minority" for purposes of their claim, must be shown in addition to the ability to constitute a majority in a single member district. *Gingles*, 478 U.S. at 46.  Plaintiffs pled in their Complaint that the minority population amounted to all persons *except* non-Hispanic whites. Therefore, Defendants assumed that Plaintiffs were asserting a claim that a minority coalition could constitute a majority in a single-member district. *See* Doc. 1 ¶¶ 55, 60, 61 (describing "combined minority voting age population" in HD 105); ¶¶ 69, 77, and 78 (describing "combined minority voting age population" in HD 111).  If, despite the allegations in their complaint, Plaintiffs instead are asserting only that African-American voters' voting strength alone has been

diluted, then Defendants concede that allegations that African-American voters are politically cohesive are sufficient to satisfy the second *Gingles* precondition, although not the third. Plaintiffs must still allege sufficient facts to support a conclusion that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. 51. Because Plaintiffs have not sufficiently alleged facts to support all three of the *Gingles* preconditions, they have failed to state a claim under either the U.S. Constitution or Section 2 of the Voting Rights Act.

### III. Plaintiffs Fail to Sufficiently Allege a Claim for Political Gerrymandering.

Plaintiffs have the burden of articulating a viable standard for their partisan gerrymander claim. As Defendants argued in their motion to dismiss brief, recent U.S. Supreme Court decisions on this issue have not produced a standard for adjudicating partisan gerrymander claims that even a plurality of the justices can accept. Doc. 20-1 pp. 20. Plaintiffs themselves agree that there is uncertainty regarding how the Supreme Court will examine partisan gerrymander claims. Doc. 22 pp. 20. At best, lower courts can only count on the Supreme Court agreeing that a plaintiff must establish discriminatory intent and discriminatory effect to succeed on a partisan gerrymander claim. *See Common Cause, et al. v. Rucho, et al.*, No. 1:16-CV-1026, 2017 U.S. Dist. LEXIS 30242, at *21 (M.D.N.C. Mar. 3,

8

2017). There is no agreed upon standard for how a court should adjudicate such a claim, however. Thus, Plaintiffs must still articulate how the legal standard they rely on is a reliable legal basis for the Court to adjudicate the claim at issue here. *See League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399, 418 (2006) (opinion of Kennedy, J.) ("[Plaintiffs must] show a burden, as measured by a reliable standard, on [their] representational rights"). They fail to do so.

Here, Plaintiffs continue to rely on the three-prong standard from *Whitford v. Gill*, No. 15-cv-421-bbc, 2016 U.S. Dist. LEXIS 160811, 2016 WL 6837229 (W.D. Wis. Nov. 21, 2016), as the standard that the Court should apply to their partisan gerrymander claim. Plaintiffs argue that they have (1) pled sufficient facts to satisfy the *Whitford* standard; and simultaneously argue that (2) a fundamental aspect of the way in which the *Whitford* court developed its standard—the case was a statewide challenge—is not relevant here. These arguments cannot overcome Defendants' motion to dismiss. First, Plaintiffs cannot plead facts sufficient to satisfy a legal standard that they have not even articulated as a reliable way for the Court to adjudicate a claim challenging 2 of 180 state house districts. *See* LULAC, 548 U.S. at 418 (opinion of Kennedy, J.). Second, even if the Court applies the *Whitford* standard, Plaintiffs have not pled facts sufficient to state a

claim under that standard.

### A. *Plaintiffs have not shown that* Whitford *is reliable here.*

The *Whitford* standard may be reliable in certain contexts, but Plaintiffs have failed to show that it is reliable here. Plaintiffs sidestep the statewide nature of the *Whitford* decision and argue that this factor is not relevant here, but they fail to allege how the *Whitford* standard can still be reliable when applied to two-district challenge. In other words, Plaintiffs fail to allege how the *Whtiford* standard can be reliably used in a case that they admit is fundamentally different from the case in which the standard was developed. The statewide context for the *Whitford* standard cannot be ignored. This is particularly true for the effects prong of the standard. *See Whitford*, 2016 U.S. Dist. LEXIS at \*79 (describing how the reliable evidence of discriminatory effects was based in part on (1) a comparison of the percentage of the statewide vote that Democrats garnered and the number of seats in the general assembly that Democrats actually won; and (2) an expert's statistical "S" curve analysis tied to statewide changes in each party's vote share). Because Plaintiffs have failed to allege how the *Whitford* standard can be applied to single-district partisan gerrymander challenges, they have failed to sufficiently allege facts that it is a reliable standard for the Court to use here. *See LULAC*, 548 U.S. at 418 (opinion of Kennedy, J.).

### B. *Plaintiffs fail to state a claim under the* Whitford *standard.*

Even accepting the *Whitford* standard as applicable to a challenge to 2 of 180 state house districts, Plaintiffs have failed to plead facts sufficient to satisfy a crucial element of the first and second prongs of the standard. The first prong of the standard is whether the drawing of district lines "[wa]s intended to place a *severe* impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation," and the second prong is that the new district lines have that intended effect. *Whitford,* 2016 U.S. Dist. LEXIS 160811 at *111 (emphasis added). While the *Whitford* court did not explicitly adopt the efficiency gap measure as part of its standard, it used the efficiency gap to corroborate both the intent and the effects prong of the standard and to conclude that the discriminatory effects of the gerrymander would be persistent. *Whitford*, 2016 U.S. Dist. LEXIS at *80-89. Assuming *arguendo* that the efficiency gap measure is not a necessary condition to successfully pleading a claim for a partisan gerrymander claim that relies on the *Whitford* standard, Plaintiffs must nonetheless provide *some* measure that the Court can use to test whether the facts alleged satisfy the standard they present, namely that H.B. 566 imposes a *severe* impediment on voters' rights. Because Plaintiffs have failed to provide such an alternative measure, they have failed to state a claim for relief. *See Vieth v.*

11

*Jubelirer*, 541 U.S. 267, 288 (2004) (plurality opinion) (implying that a viable standard must be both relevant and judicially manageable).

Plaintiffs allege only that H.B. 566 "intentionally and surgically removes Democratic voters . . . for the purpose of making them noncompetitive" and ensuring Republican victory.  Doc. 1 at ¶ 103.  Plaintiffs also allege that because party affiliation and race are highly correlated in Georgia, proponents of H.B. 566 used racial demographics and voting patterns to draw district lines to minimize the voting strength of Democratic voters.  *Id.* at ¶¶ 104-105.  Nevertheless, these allegations, if proved, would not show that H.B. 566 was intended to place a *severe* impediment on the effectiveness of Democratic individuals' votes; much less that H.B. 566 had such a *severe* effect.  Moreover, Plaintiffs have not alleged facts to show what constitutes "severe" in this case or provided any other measure for how the Court could determine whether H.B. 566 burdens their constitutional rights.  No other allegations in the Complaint support the severity requirement in the first and second prongs of the *Whitford* standard either.  The onus is on Plaintiffs to provide allegations sufficient to state a claim for partisan gerrymandering within the context of the Supreme Court decisions on this issue.

The facts that Plaintiffs have pled demonstrate the need for a reliable measure of what is "severe" to be able to successfully state a claim using the

*Whitford* standard. Plaintiffs' allegations concerning the percentage change in the makeup of the districts before and after H.B. 566 are insufficient to allow the Court to determine whether the change was intended to create and had the effect of creating a *severe* impediment on voters' rights. Even accepting as true Plaintiffs' allegations that voting in House Districts 105 and 111 is racially polarized and that race is highly correlated with support for the two major political parties, Plaintiffs have still only alleged that African-American voters favor Democratic candidates and that white voters favor Republican candidates. *Id.* at 5. Plaintiffs do not allege any facts about the partisan preferences of the other minorities who are present in the districts. Thus, Plaintiffs can only rely on the alleged percentage changes of African-American and white voters to support their partisan gerrymander claim. The percentage change that Plaintiffs allege for House District 105 is a 4.3% increase in the white, non-Hispanic voting age population and a 2.0% decrease in the African-American voting age population. Doc. 1 at ¶ 62. These changes for House District 111 are allegedly a 2.0% increase and a 2.2% decrease, respectively. *Id.* at ¶ 78. Plaintiffs do not offer any measure for this Court to use in determining whether these percentage changes are sufficient to demonstrate a *severe* discriminatory effect.

Plaintiffs also analyze three elections to support their claims, two that were held prior to the passage of H.B. 566 (2012 and 2014) and one held after (2016). For House District 105, the Republican candidate's margins of victory prior to H.B. 566 were 2.7% (2012) and 5.6% (2014), and after H.B. 566 the margin was 0.9%. For House District 111, these numbers were 5.9% (2012), 6.3% (2014), and 3.4% (2016), respectively. Finally, the Democratic candidate for House District 105 was the same person for the elections in 2012 and 2014, but a new Democratic candidate ran in the 2016 race. *Id.* at 56-58, 64-65.

Plaintiffs provide no method by which the Court could determine whether these changes amount to a *severe* impediment on the effectiveness of Democratic voters in House Districts 105 and 111. Further, these numbers show that the two districts have a recent history of close races and have party affiliations that are within less than ten percentage points of each other (assuming that race is as closely correlated with party as Plaintiffs allege). If anything, the closeness of these numbers demonstrates that the changes in H.B. 566 had a *much less* than *severe* impact on the effectiveness of Democratic voters in House Districts 105 and 111, if the changes had any such impact at all. Without a viable measure, there is no way to determine if the changes had any impact on the partisanship of the district, or, if instead, the narrowing percentages could be explained by another

14

factor such as the change in the Democratic candidate for the 2016 election in House District 105.

The fatal flaw in Plaintiffs' of the *Whitford* standard is that they do not provide the Court with a method by which it can measure whether the changes were intended to and in fact created a *severe* impediment on effectiveness of the votes of individual citizens and, therefore, burdened their rights under the standard. *See Vieth*, 541 U.S. at 313 (opinion of Kennedy, J.) (A viable complaint must provide the court with a way to "measure the burden a gerrymander imposes on representational rights."). Thus, Plaintiffs have failed to state a claim for relief.

## CONCLUSION

For the foregoing reasons, Defendants pray that their Motion to Dismiss be granted and the first and third count of Plaintiffs' Complaint be dismissed.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                  112505

ANNETTE M. COWART         191199
Deputy Attorney General

RUSSELL D. WILLARD         760280
Senior Assistant Attorney General

/s/Cristina Correia
CRISTINA CORREIA              188620
Assistant Attorney General

15

        /s/Josiah B. Heidt
        JOSIAH B. HEIDT    104183
        Assistant Attorney General

        Attorneys for Defendants

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

16

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Support of Motion to Dismiss was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

## Certificate of Service

I hereby certify that on June 27, 2017, I electronically filed this Reply Brief in Support of Motion to Dismiss using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Jon M. Greenbaum
Julie Houk
John Powers
Ezra Rosenberg
Lawyers' Committee for Civil Rights
   Under Law
1401 New York Avenue, Suite 400
Washington, DC  20005

William Vance Custer, IV
Jennifer Burch Dempsey
Julia Fenwick Ost
Bryan Cave, LLP-ATL
One Atlantic Center
14th Floor
1201 West Peachtree St, NW
Atlanta, GA  30309-3488

Bradley S. Phillips
Gregory D. Phillips
John F. Muller
Thomas P. Clancy
Munger, Tolles & Olson, LA-CA
50th Floor
350 South Grand Avenue
Los Angeles, CA  90071-1560

I hereby certify that I have mailed by United States Postal Service, postage prepaid, the document to the following non-CM/ECF participants:  NONE

This 27th day of June, 2017.

/s/Cristina Correia
Cristina Correia         188620
Assistant Attorney General