IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; et al.,** | |
| **Plaintiffs,** | **1:17-cv-1427-TCB-WSD-BBM** |
| **v.** | |
| **STATE OF GEORGIA; et al.,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before MARTIN, Circuit Judge, and DUFFEY and BATTEN, District Judges.

MARTIN, Circuit Judge:

Georgia State Conference of the NAACP, Lavelle Lemon, Marlon Reid, Lauretha Celeste Sims, Patricia Smith, and Coley Tyson ("plaintiffs") bring this action alleging that Georgia's 2015 redistricting of Georgia House of Representatives Districts 105 and 111 resulted from racial and partisan gerrymandering that violates the Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  Doc. 1 ¶¶ 1–4, 20–25.  The redistricting challenged here is embodied in Georgia Act No. 251, 2015 Ga. Laws 1413 ("H.B. 566").  Id. ¶ 1.

These plaintiffs have sued the State of Georgia and Georgia Secretary of State

Brian Kemp ("defendants"), seeking to enjoin H.B. 566. <u>Id.</u> ¶¶ 1, 26–27.

The plaintiffs' complaint sets forth three counts. Count One alleges that

H.B. 566 was enacted with a discriminatory purpose, or an intent to dilute the vote,

in violation of the Fourteenth Amendment (asserted under 42 U.S.C. § 1983) and

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. <u>Id.</u> at 22. Count One is

brought against both the State and Secretary Kemp. <u>Id.</u> Count Two alleges that

H.B. 566 constitutes racial gerrymandering, which violates the Fourteenth and

Fifteenth Amendments. <u>Id.</u> at 24. Count Two is asserted under § 1983 and against

only Secretary Kemp. <u>Id.</u> Count Three alleges that H.B. 566 creates partisan

gerrymandering in violation of the Fourteenth Amendment right to equal

protection. <u>Id.</u> at 25. Count Three is also brought under § 1983, and it too is

against only Secretary Kemp. <u>Id.</u>

The defendants have moved to dismiss Counts One and Three under Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 20. They ask us to dismiss

Count One against the State, because the Eleventh Amendment to the U.S.

Constitution grants sovereign immunity to states. Doc. 20-1: 2. The defendants

also move to dismiss Counts One and Three for failure to state a claim. <u>Id.</u> at 2.

After careful review, we find the State is not entitled to sovereign immunity

against the Count One claim brought under Section 2 of the Voting Rights Act.

The State is, however, entitled to sovereign immunity for the Count One claim brought under § 1983 (asserting a violation of the Fourteenth Amendment).  We also hold that the plaintiffs failed to state a claim upon which relief may be granted for Counts One and Three.  As a result, the defendants' partial motion to dismiss is granted without prejudice.

## I.  THE FACTS

We take the plaintiffs' factual allegations in the complaint as true, and construe them in the light most favorable to the plaintiffs.  Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam).  The facts we recount here have not therefore been subjected to the rigors of proof, but instead are taken from the plaintiffs' complaint.

The Georgia General Assembly makes up the legislative branch of Georgia government, and is composed of the Senate and the House of Representatives.  See Ga. Const. Art. III § II.  The House of Representatives is comprised of 180 members, each elected from a single district.  Doc. 1 ¶ 28.  Georgia legislative elections are partisan and require a candidate to get a majority of the vote.  Id. ¶ 31.  If no candidate receives a majority, then a runoff election is held between the two candidates who got the most votes.  Id.  Because non-white voters are a minority of Georgia's overall electorate, this system makes it more difficult for them to elect candidates of their choice.  Id.

Plaintiffs allege a long history of discrimination against non-white voters in Georgia, especially as to African Americans.  Id. ¶¶ 32–33.  One way that this discrimination has been carried out, plaintiffs say, is through redistricting plans. Id. ¶ 34.  Racial and partisan gerrymandering has caused the underrepresentation of minorities in the Georgia House of Representatives, both now and in the past.  Id. ¶ 34–35.  According to a 2015 survey, Georgia's voting age population is 62.8% white, 31.6% African-American, 4.4% Hispanic/Latino, and 2.6% Asian-American.  Id. ¶ 35.  In contrast, the make-up of the Georgia House is 72.8% white, 25.6% African-American, 1.1% Hispanic/Latino, and 0.6% Asian-American.  Id. ¶ 36.

Race and party have long been highly correlated in Georgia.  Id. ¶ 37.  Of the 119 Republicans in the Georgia House, 99.2% of them are white, and none are African-American or Asian-American.  Id.  There is one Hispanic/Latino Republican in the House.  Id.  Of the 61 Democrats in the House, 75.4% of them are African-American and 21.3% are white.  Id.  There is one Asian-American Democrat and one Hispanic/Latino Democrat.  Id.

Typically, redistricting plans are adopted every ten years so that the districts accord with new census data.  Id. ¶¶ 29–30. For example, the Georgia General Assembly adopted a new plan after the 2010 census.  Id. ¶¶ 38–40.  This plan was

finalized in February 2012 by Georgia Act No. 277 ("the 2012 plan"), and it was precleared by the United States Department of Justice. Id. ¶¶ 40–41.

Despite the 2012 plan, the Georgia General Assembly redrew districts again in May 2015, with H.B. 566 reflecting those changes.[1] Id. ¶ 42. H.B. 566 revised 17 districts of the Georgia House of Representatives, including Districts 105 and 111. Id. ¶¶ 43, 60, 75. It was enacted largely along party lines and adopted outside of the normal legislative procedures. Id. ¶ 47–48. Some legislators criticized H.B. 566 as racial gerrymandering. Id. ¶ 45. Indeed, African-American legislators were excluded from the process of drawing and negotiating the redistricting in H.B. 566, and minority residents of Georgia were denied any opportunity for public comment on the measure. Id. ¶¶ 49–50. H.B. 566 redrew House districts along racial and party lines. Id. ¶¶ 2, 4, 5. For purposes of this Order, we accept the complaint's allegation that H.B. 566 redrew district lines to make certain districts safer for white Republican incumbents. Id. ¶¶ 7–8, 10–12.

H.B. 566 changed the racial make-up of Districts 105 and 111 in ways that reduced the ability of African-American and other minority voters to elect candidates of their choice. Id. ¶¶ 51–52. Under the 2012 plan, District 105's

---

[1] On June 25, 2013, the Supreme Court's decision in Shelby County v. Holder, 570 U.S. ___, 133 S. Ct. 2612 (2013), held that the Voting Rights Act's preclearance coverage formula in Section 4(b) was unconstitutional. Id. at 2631. The Georgia General Assembly's May 2015 redistricting plan therefore did not require preclearance.

voting age population was 48.4% white, 32.4% African-American, 12.6% Hispanic/Latino, and 4.6% Asian-American.  Id. ¶ 55.  Under H.B. 566, the redrawn District 105 became 52.7% white, 30.4% African-American, 10.8% Hispanic/Latino, and 4.2% Asian-American.  Id. ¶ 61.  The changes to the racial make-up of the voting age population of District 105 are summarized here:

|  | **2012 plan** | | **H.B. 566** | | **Change** | |
|---|---|---|---|---|---|---|
| **White** | 17,712 | 48.4% | 19,204 | 52.7% | +1,492 | +4.3% |
| **African-American** | 11,841 | 32.4% | 11,071 | 30.4% | -770 | -2.0% |
| **Hispanic/Latino** | 4,612 | 12.6% | 3,945 | 10.8% | -667 | -1.8% |
| **Other** | 2,415 | 6.6% | 2,229 | 6.1% | -186 | -0.5% |
| **Total** | 36,580 | | 36,449 | | -131 | |

Id. at 17.  The 2012 plan was in effect for the District 105 elections in 2012 and 2014.  Id. ¶ 54.  In both elections, Joyce Chandler, a white Republican, defeated Renita Hamilton, an African-American Democrat, by narrow margins: 554 votes in 2012 (2.7 percentage points) and 789 votes in 2014 (5.6 percentage points).  Id. ¶¶ 56–58.  The voting patterns in these elections were racially polarized.  Id. ¶ 59. After H.B. 566 took effect for the District 105 election in 2016, Ms. Chandler defeated Donna McLeod, who is also an African-American Democrat, by just 222 votes (0.9 percentage points) in another racially divided election.  Id. ¶¶ 63–66.

6

Had the 2012 plan still been in effect, the plaintiffs allege Ms. McLeod would have likely defeated Ms. Chandler.  Id. ¶ 67.

Under the 2012 plan, the voting age population of District 111 was 56.1% white, 33.2% African-American, 5.6% Hispanic/Latino, and 3.3% Asian-American.  Id. ¶ 69.  After H.B. 566 redrew District 111, it became 58.1% white, 31% African-American, 5.2% Hispanic/Latino, and 3.7% Asian-American.  Id. ¶ 77.  The changes to the racial make-up of the voting age population of District 111 are summarized here:

|  | **2012 plan** | | **H.B. 566** | | **Change** | |
| --- | --- | --- | --- | --- | --- | --- |
| **White** | 21,638 | 56.1% | 22,228 | 58.1% | +590 | +2.0% |
| **African-American** | 12,798 | 33.2% | 11,852 | 31.0% | -946 | -2.2% |
| **Other** | 4,109 | 10.7% | 4,155 | 10.9% | +46 | +0.2% |
| **Total** | 38,545 | | 38,235 | | -310 | |

Id. at 20.[2]  The 2012 plan was in effect for the District 111 elections in 2012 and 2014.  Id. ¶ 68.  In the 2012 election, Brian Strickland, a white Republican, defeated Bill Blackmon, an African-American Democrat, by 1,477 votes (5.9

---

[2] The information in this table was taken from the complaint, and is intended to reflect the changes resulting from H.B. 566.  The plaintiffs' table included the change that would have resulted from enactment of H.B. 515, a bill introduced during the 2017–2018 legislative session that would have further redrawn District 111.  H.B. 515 never became law, however, so while we understand this information is relevant to the plaintiffs' allegations of intent, it is less useful for our purposes here.  The table therefore excludes the H.B. 515 data.

percentage points). Id. ¶¶ 70–71. In the 2014 election, Mr. Strickland defeated Jim Nichols, a white Democrat, by 1,124 votes (6.3 percentage points). Id. ¶¶ 72–73. Both elections were racially polarized. Id. ¶ 74. After H.B. 566 took effect for the District 111 election in 2016, Mr. Strickland defeated Darryl Payton, an African-American Democrat, by 946 votes (3.4 percentage points) in another racially polarized election. Id. ¶¶ 79–82. Had the 2012 plan still been in effect, the plaintiffs allege Mr. Payton may have defeated Mr. Strickland. Id. ¶ 83.

The plaintiffs' complaint also sets out that the Georgia General Assembly tried to enact another bill in 2017, known as H.B. 515, which would have decreased the African-American population in District 111 even further. Id. ¶ 53. H.B. 515 would have been yet another mid-census redistricting plan. Id. It failed to pass, however, largely due to backlash from African-American Democrats in the Georgia legislature as well as negative media coverage. Id. at 20, ¶ 53.

Among the plaintiffs is the Georgia State Conference of the NAACP, which alleges that its members have been subjected to racial and partisan gerrymandering. Id. ¶ 20. The other plaintiffs are Ms. Lemon, Mr. Reid, Ms. Sims, Ms. Smith, and Mr. Tyson, who are all registered Democratic African-American voters residing in either District 105 or 111. Id. ¶¶ 21–25. The plaintiffs say that because of H.B. 566, they did not have an equal opportunity to elect the candidate of their choice in 2016, and that they will continue to be so deprived in

the 2018 or 2020 elections.  Id.  They also say they were injured by the racial and partisan based redistricting in H.B. 566.  Id.

The plaintiffs have sued the State of Georgia and Georgia Secretary of State Brian Kemp, Georgia's chief election officer, in his official capacity.  Id. ¶¶ 26–27.  Count One claims intentional vote dilution, and is brought under § 1983 (alleging a violation of the Fourteenth Amendment) and Section 2 of the Voting Rights Act.  Id. at 22.  Under this claim, the plaintiffs assert there was no legitimate non-racial reason for H.B. 566's redistricting and that it was done with the intent to dilute minority voting strength.  Id. ¶¶ 91–92.  They allege that minority voters were on the verge of electing a Democrat, and H.B. 566 was enacted in order to keep Districts 105 and 111 from being competitive for Democrats.  Id. ¶¶ 93–94.

Count Two is a racial gerrymandering claim brought under § 1983, alleging a violation of the Fourteenth and Fifteenth Amendments.  Id. at 24.  It is brought against Secretary Kemp.  Id.  For this claim, the plaintiffs assert that race predominated H.B. 566's redistricting for the purpose of minimizing minority voter participation and influence in the Georgia House of Representatives.  Id. ¶ 96.  The context of the recent elections in these districts is evidence that racial considerations were the controlling reason for H.B. 566's changes.  Id. ¶ 97.

Count Three is a partisan gerrymandering claim brought under § 1983, alleging a violation of the Fourteenth Amendment.  Id. at 25.  For this claim, the

plaintiffs assert that H.B. 566's redistricting was intended to remove Democratic voters from Districts 105 and 111 so as to ensure electoral victory for the Republican incumbents. Id. ¶ 103. They say there was no legitimate reason for the redistricting, and that race was used as a proxy for partisan affiliation in order to redraw the lines and minimize Democratic voting strength. Id. ¶¶ 103–105.

The plaintiffs seek declaratory and injunctive relief. Id. at 27–28. Among other things, they ask for a declaration that H.B. 566 violates the U.S. Constitution and Section 2; an injunction against defendants implementing H.B. 566; an order requiring Georgia to preclear voting changes; a reasonable deadline for a new redistricting plan; and attorney's fees. Id.

## II. JURISDICTION

The State has moved to dismiss Count One for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Because the State asserts only a facial challenge to subject matter jurisdiction, we accept the allegations in the complaint as true. See Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1335–36 (11th Cir. 2013). Specifically, the State says both the Fourteenth Amendment claim (brought under 42 U.S.C. § 1983) and the Section 2 claim against the State are barred by the Eleventh Amendment. Doc. 20-1: 2–8. The plaintiffs respond that their Section 2 claim is not barred on immunity grounds, and they are right. Doc. 22: 3–7.

The Eleventh Amendment deprives federal courts of jurisdiction to decide suits that private individuals bring against nonconsenting states.  Bd. of Trs. Of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363, 121 S. Ct. 955, 962 (2001).  However, Congress can do away with states' Eleventh Amendment immunity through legislation.  Id.  In determining whether Congress has abrogated the states' sovereign immunity, we ask first, whether Congress has "unequivocally expressed its intent to abrogate [] immunity"; and second, whether in doing so Congress "acted pursuant to a valid exercise of power."  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55, 116 S. Ct. 1114, 1123 (1996) (quotations omitted and alteration adopted).  Under the first inquiry, the intent to abrogate must be "unmistakably clear in the language of the statute."  Id. at 56, 116 S. Ct. at 1123 (quotation omitted).

Our reading of the text of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, tells us it "unequivocally expresse[s]" an intent to abrogate state sovereign immunity.  Id. at 55, 116 S. Ct. at 1123 (quotation omitted).  The statute specifically forbids "any State or political subdivision" from discriminating against voters "on account of race or color."  52 U.S.C. § 10301 (emphasis added).  Our reading comports with that of the Sixth Circuit, the only federal court of appeals to have considered this issue.  In making its decision, the Sixth Circuit relied, as we

11

do, on the explicit textual reference to "State[s]" in the statute.  See Mixon v. Ohio, 193 F.3d 389, 398 (6th Cir. 1999).

The State, on the other hand, points us to two district court opinions to argue that Section 2 does not indicate a clear intent to abrogate Eleventh Amendment immunity because it provides only an implied (not express) right of action.  Doc. 20-1: 7 (citing Greater Birmingham Ministries v. Alabama, No. 2:15-CV-02193, 2017 WL 782776, at *10–13 (N.D. Ala. Mar. 1, 2017); Lewis v. Bentley, No. 2:16-CV-690-RDP, 2017 WL 432464, at *9–10 (N.D. Ala. Feb. 1, 2017)).  This argument fails to persuade us.  Among other things, we reject the notion that "because Section 2 . . . is silent as to whether it creates a private right of action, it is also necessarily silent as to the parameters of such a right."[3]  Greater Birmingham Ministries, 2017 WL 782776 at *12.  Even though the statute does not explicitly provide a private right of action, it is clear from the text that if the statute offers a right of action to an individual, then that right must be one that is enforceable against a "State or political subdivision."  52 U.S.C. § 10301

---

[3] As we see it, the fact that private causes of action may be implied alone contradicts this reasoning.  The Supreme Court has said that a statute can confer a private right of action even if it doesn't explicitly say so, as long as its text, structure, and "contemporary legal context" clearly indicate that Congress intended to provide such a right.  See Alexander v. Sandoval, 532 U.S. 275, 286–91, 121 S. Ct. 1511, 1519–22 (2001).  We know, therefore, that a statute can have text and structure clear enough to show Congress's intent to provide a private right of action.  That being the case, we reject the notion that a statute clear enough to establish a private right of action would "necessarily" be so vague as to be "silent as to the parameters" of that right.  Greater Birmingham Ministries, 2017 WL 782776 at *12 (emphasis added).

(emphasis added). Given that Section 2 contains an implied private right of action,

see Morse v. Republican Party of Va., 517 U.S. 186, 232, 116 S. Ct. 1186, 1212

(1996), we find that its text includes an "unmistakably clear" signal of Congress's

intent to abrogate Eleventh Amendment immunity. Seminole Tribe, 517 U.S. at

56, 116 S. Ct. at 1123 (quotation omitted).

As for the second part of the inquiry, we find that Congress "acted pursuant

to a valid exercise of power" in enacting the Voting Rights Act and (in the process)

abrogating state sovereign immunity in Section 2, id. at 55, 116 S. Ct. at 1123.

The State does not argue to the contrary. The Supreme Court has recognized that

Congress can abrogate Eleventh Amendment immunity when enacting legislation

under the enforcement provision (§ 5) of the Fourteenth Amendment. See

Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S. Ct. 2666, 2671 (1999). Although

Section 2 was enacted under the enforcement provision (§ 2) of the Fifteenth

Amendment, "the two enforcement provisions are identical, and both Amendments

share the common goal of eradicating discrimination." Mixon, 193 F.3d at 399.

Indeed, the Supreme Court has noted that the Voting Rights Act was "designed to

implement the Fifteenth Amendment and, in some respects, the Fourteenth

Amendment," United States v. Board of Comm'rs of Sheffield, 435 U.S. 110, 126–

27, 98 S. Ct. 965, 976–77 (1978), and has also held that "Congress had the

authority to regulate state and local voting through the provisions of the Voting

Rights Act." City of Rome v. United States, 446 U.S. 156, 179–80, 100 S. Ct. 1548, 1563 (1980), abrogated on other grounds by Shelby Cty., 133 S. Ct. 2612. As a result, we agree with the Sixth Circuit that "Congress may abrogate sovereign immunity by passing legislation under the Fifteenth Amendment." Mixon, 193 F.3d at 399; see also id. ("We can see no reason to treat the enforcement provision of the Fifteenth Amendment differently than the identical provision of the Fourteenth Amendment and the Supreme Court has not held to the contrary.").

Because Section 2 effects a valid abrogation of state sovereign immunity, we have jurisdiction to entertain the plaintiffs' Section 2 claim against the State. In contrast, 42 U.S.C. § 1983 does not abrogate Eleventh Amendment immunity. See Quern v. Jordan, 440 U.S. 332, 342, 99 S. Ct. 1139, 1146 (1979). We therefore dismiss the plaintiffs' Fourteenth Amendment claim against the State, which they brought pursuant to § 1983, for lack of subject matter jurisdiction. This dismissal is without prejudice.[4] We now turn to the merits of the plaintiffs' claims against the State and Secretary Kemp.

## III. PLEADINGS

The defendants move to dismiss Counts One and Three under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be

---

[4] "A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice." Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam).

granted. Doc. 20-1: 8, 17. To survive the motion to dismiss, the plaintiffs' allegations, taken as true, must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim meets this standard when the pleaded "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). A recital of the elements of a cause of action, supported only by conclusory statements, is not enough to adequately plead a claim. Id.

## A. COUNT ONE: INTENTIONAL DILUTION OF THE VOTE

The defendants move to dismiss Count One of the plaintiffs' complaint for failure to state a claim. Doc. 20-1: 8–9. Count One alleges a violation of the Fourteenth Amendment right to equal protection. Doc. 1: 22. Count One also asserts a claim under Section 2 of the Voting Rights Act. Id. The plaintiffs allege that H.B. 566 was adopted for the discriminatory purpose of "disadvantaging African-American and other minority voters relative to white voters" in Districts 105 and 111. Id. ¶ 92. The plaintiffs also allege there is "no legitimate, non-racial reason" for the mid-census changes that H.B. 566 made. Id. ¶ 91. While the plaintiffs label Count One as a "discriminatory purpose" claim, we understand it to claim discriminatory intent. See Doc. 1: 22. For that reason, we refer to this claim as one of intentional dilution of the vote.

The defendants argue that the plaintiffs have failed to state a claim of intentional dilution of the vote under the Fourteenth Amendment and Section 2 because they did not sufficiently allege any discriminatory effect as required by the Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752 (1986). Doc. 20-1: 9–10. We first address what showing of discriminatory effect is required for an intentional vote dilution claim. Then, we determine whether the plaintiffs have stated a claim upon which relief may be granted.

1. Required Showing of Discriminatory Effect

Whether brought under the Fourteenth Amendment or Section 2, an intentional vote dilution claim alleges that a particular redistricting plan was crafted "invidiously to minimize or cancel out the voting potential of racial or ethnic minorities." See City of Mobile v. Bolden, 446 U.S. 55, 66, 100 S. Ct. 1490, 1499 (1980) (plurality opinion).[5]

In Bolden, a plurality of the Supreme Court held that neither the Fourteenth Amendment nor Section 2 prohibited electoral practices which merely produced racially discriminatory results. 446 U.S. at 66, 100 S. Ct. at 1499 (plurality

---

[5] In single-member districts like Districts 105 and 111, "the usual device for diluting minority voting power is the manipulation of district lines." Voinovich v. Quilter, 507 U.S. 146, 153, 113 S. Ct. 1149, 1155 (1993). There are two primary methods by which that manipulation is done: "cracking" and "packing." "Cracking" refers to "the dispersal" of minority voters "into districts in which they constitute an ineffective minority of voters." Id. at 153–54, 113 S. Ct. at 1155 (quotation omitted). "Packing" refers to "the concentration" of minority voters "into districts where they constitute an excessive majority." Id. (quotation omitted).

opinion); see also Gingles, 478 U.S. at 35, 106 S. Ct. at 2758. The Court required a showing of both discriminatory intent and discriminatory effect, not just one or the other. See id. In response to the Supreme Court's Bolden ruling, Congress amended Section 2. See Gingles, 478 U.S. at 35, 106 S. Ct. at 2758. As amended, Section 2 allowed plaintiffs to prove a case either in the way the Court recognized in Bolden—an intentional vote dilution claim showing discriminatory intent and effect—or a separate "results" vote dilution claim that could establish a Section 2 violation "by showing discriminatory effect alone." See id.

Gingles was the first case in which the Supreme Court looked at the new "results" type of vote dilution claim under Section 2. The Gingles Court held this type of claim could proceed in cases where "'the totality of the circumstances' reveal that 'the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected class] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" Id. at 43, 106 S. Ct. at 2762 (quoting 52 U.S.C. § 10301(b)). The Court instructed that the "totality of the circumstances" was to be determined by considering a number of factors listed in the Senate Report associated with the amendment to Section 2. Id. at 48, 106 S. Ct. at 2765. But in order to bring a "results" claim, plaintiffs would first need to show three "necessary preconditions." Id. at 50, 106 S. Ct. at 2766.

17

They are: (1) "a 'minority group' must be sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district"; (2) "the minority group must be politically cohesive"; and (3) "a district's white majority must vote sufficiently as a bloc to usually defeat the minority's preferred candidate." Cooper v. Harris, 581 U.S. ___, 137 S. Ct. 1455, 1470 (2017) (quotations omitted and alteration adopted).

Because the amendment was to Section 2, but the Constitution remained the same, the holding in Bolden is still good law as to intentional vote dilution claims brought under the Fourteenth Amendment. That means, in order to make a Fourteenth Amendment claim, a plaintiff must still show both discriminatory intent and effect. See, e.g., Burton v. City of Belle Glade, 178 F.3d 1175, 1188–89 (11th Cir. 1999). What the Supreme Court has never addressed, however, is how Gingles might affect an intentional vote dilution claim brought under the amended version of Section 2. Another three-judge district court recently explained:

> Because intent is not an element of results-only claims and results-only claims are usually easier to prove, few voters have asserted intentional vote dilution claims since § 2 of the [Voting Rights Act] was amended, and thus the Supreme Court has not had occasion to establish a specific analytical framework for intentional vote dilution claims post-amendment and post-Gingles. Thus, while there is Supreme Court guidance regarding what plaintiffs must show to prove dilutive effects under the § 2 results test (e.g., Gingles and its progeny) and there is precedent concerning the proof required to show discriminatory intent in intentional vote dilution cases under the Fourteenth Amendment, the level of proof of dilutive effects required in a § 2 intentional vote dilution claim is less clear.

18

Perez v. Abbott, ___ F. Supp. 3d ___, No. SA-11-CV-360, 2017 WL 1787454, at *53 (W.D. Tex. May 2, 2017) (footnotes omitted).  Demonstrative of this observation by the Perez court, the Supreme Court has specifically left this question open.  See Bartlett v. Strickland, 556 U.S. 1, 20, 129 S. Ct. 1231, 1246 (2009) (plurality opinion) ("We therefore need not consider whether intentional discrimination affects the Gingles analysis."); Voinovich, 507 U.S. at 158, 113 S. Ct. at 1157–58 ("We need not decide how Gingles' first factor might apply here . . . .").

Because the defendants here argue that the plaintiffs have not sufficiently alleged the three Gingles preconditions necessary to show discriminatory effect, we must address what the Supreme Court has not.  That is, whether all three Gingles preconditions must be alleged in order to bring an intentional vote dilution claim under Section 2.

The plaintiffs' argument for relaxing at least the first Gingles precondition has its appeal.  Indeed, the federal courts have almost uniformly accepted that the first Gingles precondition should be relaxed in the way the plaintiffs ask us to do here.  See Garza v. Cty. of Los Angeles, 918 F.2d 763, 771 (9th Cir. 1990); Abbott, 2017 WL 1787454, at *55; Comm. For a Fair & Balanced Map v. Ill. Bd. of Elections, 835 F. Supp. 2d 563, 581 (N.D. Ill. 2011) (per curiam); Cano v. Davis, 211 F. Supp. 2d 1208, 1249 (C.D. Cal. 2002) (per curiam) ("We agree that,

where invidious intent exists in a vote dilution case, it may be appropriate to relax the first or even second of the <u>Gingles</u> pre-conditions, as well as to consider intent in connection with the 'totality of the circumstances' inquiry.").  In doing so, these courts heeded the Supreme Court's instruction that "the <u>Gingles</u> factors cannot be applied mechanically and without regard to the nature of the claim."  <u>Voinovich</u>, 507 U.S. at 158, 113 S. Ct. at 1157.

The <u>Gingles</u> factors were crafted in response to a "results" claim—that is, a claim that alleges discriminatory effect without showing discriminatory intent. The idea is that if courts impose all of the <u>Gingles</u> factors on an intentional discrimination claim, this would require both intent claims and "results" claims to make the same showing of discriminatory effect, but also require intent claims to make an additional showing of discriminatory intent.  And if both claims require the same proof of effect, but intent claims then require something more, there would have been no reason for Congress to have allowed both intentional and result claims to survive the amended version of Section 2.  <u>See</u> S. Rep. 97-417, at 107–09 (explaining that the "results test" is an alternative to intentional discrimination claims).[6]  To hold otherwise renders intentional vote dilution claims superfluous and would prevent a claim under Section 2, like the one here, that

---

[6] Although reliance on legislative history is generally not favored, the Supreme Court in <u>Gingles</u> made clear that this Senate Report is "the authoritative source for legislative intent" on Section 2.  478 U.S. at 43 n.7, 106 S. Ct. at 2762 n.7.

alleges racial gerrymandering with a group that is slightly less than large enough to constitute a majority in a given district.

However we are obliged to resist the appeal of plaintiffs' argument. We do not write on a clean slate, and we are bound by Eleventh Circuit precedent. See Ala. Legislative Black Caucus v. Alabama, 988 F. Supp. 2d 1285, 1305–06 (M.D. Ala. 2013).[7] Under this circuit's law, Section 2 "expressly requires a showing of

---

[7] Cases challenging the constitutionality of the apportionment of congressional or state legislative districts like this one, which require a three-judge district court, demonstrate an oddity in the federal jurisprudence which results in the slow and incomplete development of a cohesive body of law in voting rights cases. See 28 U.S.C. § 2284. Decisions from panels like ours are reviewed only by the Supreme Court, and not the relevant U.S. Court of Appeals. See id. § 1253. Only certain cases are decided by three-judge district court panels like this one. Other cases (that do not challenge congressional or state legislative districts) can bring the same claims, but those cases go through the normal appellate process. First they are heard by a district court, then the U.S. Court of Appeals hears the appeal, and sometimes the case is reviewed by the Supreme Court. In light of this, some say the traditional rationale for stare decisis—following the precedent of courts that review the lower court's decisions—does not make sense for three-judge district courts like ours. For example, several judges have expressed doubt as to whether three-judge district courts are bound by their circuit's precedent. See Ala. Legislative Black Caucus, 988 F. Supp. 3d at 1342 n.13 (Thompson, J., concurring in part and dissenting in part); Parker v. Ohio, 263 F. Supp. 2d 1100, 1112 n.3 (S.D. Ohio 2003); Poe v. Werner, 386 F. Supp. 1014, 1016–17 (M.D. Pa. 1974). And at least one three-judge district court has concluded it was not. See Jehovah's Witnesses in the State of Wash. v. King Cty. Hosp. Unit No. 1, 278 F. Supp. 488, 504–05 (W.D. Wash. 1967) (per curiam) ("In this special three-judge court [] we are not bound by any judicial decisions other than those of the United States Supreme Court."). Nevertheless, this panel elects to follow Eleventh Circuit precedent.

At the same time, we realize that what we decide here cannot be reviewed by the Eleventh Circuit sitting en banc, even if the en banc court were to disagree with us. And our lack of guidance extends beyond the en banc court, because the Supreme Court routinely issues summary affirmances of three-judge district courts in voting cases. Those summary opinions often tell us nothing more than that a judgment was correct "but not necessarily the reasoning." Mandel v. Bradley, 432 U.S. 173, 176, 97 S. Ct. 2238, 2240 (1977) (per curiam) (quotation omitted). Thus, in this area of voting rights, we are left to fill in gaps where we have little or incomplete guidance from the courts that may ultimately resolve these issues.

discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results." Johnson v. DeSoto Cty. Bd. of Comm'rs, 72 F.3d 1556, 1563 (11th Cir. 1996) ("DeSoto I"). Although intent "is circumstantial evidence of discriminatory results that should be considered," id. at 1565, it does not "lessen[] the amount of discriminatory results that must be shown" in this circuit. Id. at 1564; see also Johnson v. DeSoto Cty. Bd. of Comm'rs, 204 F.3d 1335, 1338 (11th Cir. 2000) ("DeSoto II") (requiring all three Gingles preconditions be shown in an intentional vote dilution case under Section 2). And that "is not the end of the story." Negrón v. City of Miami Beach, 113 F.3d 1563, 1566 (11th Cir. 1997). The plaintiffs must also ultimately establish a discriminatory effect under the totality of the circumstances based on the Senate Report factors. See id.

## 2. Application to Count One

We next consider whether the plaintiffs have sufficiently alleged their intentional vote dilution claim. For the purposes of our ruling on their motion to dismiss, the defendants do not dispute that the plaintiffs have sufficiently alleged discriminatory intent. Doc. 20-1: 9 n.7. After reviewing the complaint as well as the factors set forth by the Supreme Court for finding intent in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266–68, 97 S.

Ct. 555, 564–65 (1977), we agree that plaintiffs' allegations of discriminatory intent are sufficient.

We must therefore turn to consider discriminatory effect. The defendants argue that the plaintiffs failed to allege all three of the Gingles preconditions required to bring a Section 2 claim. Doc. 20-1: 10. Because the first two Gingles preconditions were not properly alleged by the plaintiffs, we need not address the third.

The first Gingles precondition requires the plaintiff to show the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." Gingles, 478 U.S. at 50, 106 S. Ct. at 2766. For the purposes of determining whether a single-member district is "sufficiently large," this circuit uses the voting age population as opposed to the registered voter population. Negrón, 113 F.3d at 1568–69. For District 111, the complaint alleges that the voting age population was 56.1% white under the 2012 plan and 58.1% white under H.B. 566. Doc. 1: 20. Thus, for District 111, the plaintiffs failed to allege how any minority coalition could be "sufficiently large" to constitute a majority in this district. See Gingles, 478 U.S. at 50, 106 S. Ct. at 2766.

For District 105, we assume the "minority group" is all non-white voters.[8] See Doc. 1 ¶ 92 (referring to "African-American and other minority voters relative to white voters"). This group was sufficiently large to constitute a majority. Under the 2012 plan, 48.4% of the voting age population was white voters, but under H.B. 566, white voters became 52.7%. Doc. 1: 17. Accepting the plaintiffs' allegations as true, we find they properly alleged the first Gingles precondition for District 105. Under the 2012 plan, District 105 would have had a sufficiently large non-white voting population to constitute a majority, and the district as drawn under the 2012 plan is clearly geographically compact enough to meet this precondition.[9]

The second Gingles precondition requires the plaintiff to show the minority group is "politically cohesive." Gingles, 478 U.S. at 51, 106 S. Ct. at 2766. The plaintiffs made no allegations as to the political cohesiveness of all non-white voters for either district. As we've said, we believe it appropriate to assume here

---

[8] For our ruling on this motion to dismiss, we assume all non-white voters is a cognizable "minority group" for an intentional vote dilution claim. See Growe v. Emison, 507 U.S. 25, 41, 113 S. Ct. 1075, 1085 (1993) ("Assuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2 . . . .").

[9] We reject the defendants' argument that the Hispanic voting age population numbers based on U.S. Census data must be reduced based on conjecture about legal citizenship. See Doc. 20-1: 13–14. The defendants are correct that the relevant voting age population applies only to U.S. citizens. Negrón, 113 F.3d at 1569. But the data from Gwinnett County they provide are not specific enough to District 105 to cause us to reject the allegations in the complaint. We decline the defendants' invitation to take judicial notice of a county-wide Hispanic citizenship rate and apply it to a smaller area.

that all non-white voters could be considered a "minority group."  But the plaintiffs did not allege any facts to support the notion that all non-white groups, including African-American, Hispanic/Latino, Asian-American, and any other ethnic minority's voters, are politically cohesive in Districts 105 and 111.  Rather, the plaintiffs offered only allegations of political cohesion with regard to African-American voters.  See Doc. 1: ¶¶ 5, 11; see also Doc. 22: 11–12 ("Plaintiffs allege that African-Americans in the relevant geographic areas are a politically cohesive minority group.  That is all that is required here . . . .  (citation omitted)).

The problem for these plaintiffs is that in order to satisfy the first Gingles precondition the relevant "minority group" must be sufficiently large to constitute a majority.  African-Americans constitute about one-third of the voting age population in Districts 105 and 111.  Doc. 1: ¶¶ 55, 61, 69, 77.  Thus if we consider them to be the relevant "minority group," then the first precondition cannot be met because they are not sufficiently large to constitute a majority.  On the other hand, if all non-white voters are the relevant "minority group," then the second precondition cannot be met because the plaintiffs failed to allege these widely varying ethnic groups are politically cohesive.  For this reason, we must dismiss Count One of plaintiffs' complaint to the extent it is brought under Section 2 of the Voting Rights Act.  This dismissal is without prejudice.

We come to the same result for Count One, to the extent it asserts a Fourteenth Amendment claim. The Eleventh Circuit has questioned whether "vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive section 2." DeSoto II, 204 F.3d at 1344–45. That's because if the Gingles preconditions cannot be shown, neither can the causation requirement necessary for a Fourteenth Amendment claim under the law of this circuit. See id. at 1345–46.

We have already dismissed (without prejudice) the portion of Count One in which the plaintiffs asserted § 1983 claims of a Fourteenth Amendment violation by the State of Georgia. We now dismiss for failure to state a claim (also without prejudice) the remainder of the plaintiffs' Count One claim against the State, to the extent it is brought under Section 2. We also dismiss Count One against Secretary Kemp for the failure to state a claim. This dismissal of Count One against Secretary Kemp is without prejudice.

## B. COUNT THREE: PARTISAN GERRYMANDERING

The defendants move to dismiss Count Three of the plaintiffs' complaint. Doc. 20-1: 17. As we've set out above, Count Three is brought under § 1983 and alleges partisan gerrymandering in violation of the Fourteenth Amendment right to equal protection. Doc 1: 25, ¶ 103. The plaintiffs' more detailed allegation is that "H.B. 566 intentionally and surgically remove[d] Democratic voters" from

Districts 105 and 111 "for the purpose of making them noncompetitive and ensuring electoral victory for their Republican incumbents." Id. ¶ 103. The plaintiffs allege there "was no legitimate legislative reason" for the redistricting. Id. They also allege that racial demographics from past elections were used to minimize the electoral power of voters who were more likely to vote for Democratic legislators. Id. ¶ 105.

The defendants argue the plaintiffs improperly rely on a new constitutional test from Whitford v. Gill, 218 F. Supp. 3d 837 (W.D. Wis. 2016) ("Whitford II").[10] Doc. 20-1: 17–18, 20–21. And even if the Whitford test applies, the defendants assert the plaintiffs have not alleged facts to support a plausible claim of partisan gerrymandering. Id. at 18.

As the defendants acknowledge, the Supreme Court has consistently held that partisan gerrymandering claims are justiciable and not barred by the political question doctrine. Id. A majority of the Supreme Court first held in Davis v. Bandemer, 478 U.S. 109, 106 S. Ct. 2797 (1986), that claims "that each political group in a State should have the same chance to elect representatives of its choice as any other political group" were justiciable. Id. at 124, 106 S. Ct. at 2806; see id.

---

[10] Whitford I and Whitford II are, unsurprisingly, two decisions made in the same case. Whitford I is the three-judge district court's decision on the defendants' motion to dismiss. Whitford II is that panel's final order after trial. In our discussion of these cases, we will also use the term "Whitford standard" when we refer to the test, developed in the Whitford cases, for discerning whether redistricting lines were drawn in a constitutional manner.

at 165, 106 S. Ct. at 2827 (Powell, J., joined by Stevens, J., concurring in part and dissenting in part) ("I agree with the Court that . . . the allegations in this case raise a justiciable issue.").  Then in every partisan gerrymandering case that has come before the Court since Bandemer, a majority of the Justices have reaffirmed that these claims are indeed justiciable, at least in some form.  In Vieth v. Jubelirer, 541 U.S. 267, 124 S. Ct. 1769 (2004), "five Members of the Court [were] convinced" that "it would be contrary to precedent and profoundly unwise to foreclose all judicial review" of political gerrymandering claims.  Id. at 317, 124 S. Ct. at 1799 (Stevens, J., dissenting); id. at 306, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment); id. at 346, 124 S. Ct. at 1817 (Souter, J., joined by Ginsburg, J., dissenting); id. at 364, 124 S. Ct. at 1827 (Breyer, J., dissenting).  And in League of United Latin American Citizens v. Perry, 548 U.S. 399, 126 S. Ct. 2594 (2006) ("LULAC"), the Court reaffirmed that "an equal protection challenge to a political gerrymander presents a justiciable case or controversy."  Id. at 413, 126 S. Ct. at 2607; see also Shapiro v. McManus, 577 U.S. ___, 136 S. Ct. 450, 456 (2015) (acknowledging a majority of the Court had held partisan gerrymandering claims justiciable).

The justiciability of partisan gerrymandering claims is therefore certain under current caselaw.  However, the Supreme Court has never agreed on "what substantive standard to apply."  LULAC, 548 U.S. at 414, 126 S. Ct. at 2607.  So

we look elsewhere. The three-judge district court in <u>Whitford II</u> concluded that a redistricting scheme would be unconstitutional if it "(1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds." 218 F. Supp. 3d at 884. With this in mind, the court set forth a three-part test (the "<u>Whitford</u> standard") for showing a constitutional violation. Step one—discriminatory intent against an identifiable political group— is drawn from <u>Bandemer</u>. <u>See</u> <u>Whitford v. Nichol</u>, 151 F. Supp. 3d 918, 927–28 (W.D. Wis. 2015) ("<u>Whitford I</u>"). Steps two and three are modeled after the "one-person, one-vote" gerrymandering cases that require states to show any population deviations over ten percent are justified by a legitimate state interest. <u>See</u> <u>id.</u> at 928 (citing <u>Brown v. Thompson</u>, 462 U.S. 835, 842–43, 103 S. Ct. 2690, 2696 (1983)). More specifically, step two requires that plaintiffs show a discriminatory effect. <u>Id.</u> Then, if the plaintiff has made the showings necessary for steps one and two, step three shifts the burden to the defendants to show the discriminatory effect "was the necessary result of either a legitimate state policy or the state's underlying political geography." <u>See</u> <u>id.</u> (quotation omitted).

Another three-judge district court concisely articulated this standard by saying: "In order to establish a partisan gerrymandering claim under the Equal Protection Clause, a plaintiff must show both (a) discriminatory intent and (b)

discriminatory effects." <u>Common Cause v. Rucho</u>, ___ F. Supp. 3d ___, 2017 WL 876307, at *10 (M.D.N.C. Mar. 3, 2017) (per curiam).

1.  Applicability of *Whitford*

At the outset, we reject the defendants' arguments that the <u>Whitford</u> standard is too unsettled in the law.  In their partisan gerrymandering claim, the plaintiffs generally allege that they meet the same standards set by the <u>Whitford</u> and <u>Common Cause</u> courts when those courts found redistricting challenges were sufficient to survive a motion to dismiss.  <u>See</u> <u>Common Cause</u>, 2017 WL 876307, at *13; <u>Whitford I</u>, 151 F. Supp. 3d at 931.  We agree that, at least at this stage of the litigation, if properly alleged and supported, this "proposed standard is judicially manageable."  <u>Whitford I</u>, 151 F. Supp. 3d at 931.  Like our fellow three-judge district courts, we acknowledge that our judgment could change as the record develops.  But for now, "current law does not foreclose plaintiffs' claims" if they "are modeled after a standard that the Supreme Court has adopted in other contexts."  <u>Id.</u>[11]

Alternatively, defendants ask us to stay consideration of this claim until the Supreme Court rules in <u>Whitford</u>, which is currently on direct appeal to the

---

[11] Defendants recognize in their reply brief that "[a]t best, lower courts can only count on the Supreme Court agreeing that a plaintiff must establish discriminatory intent and discriminatory effect to succeed on a partisan gerrymandering claim."  Doc. 24: 8.  The <u>Whitford</u> standard encompasses this basic showing.

Supreme Court.  Doc. 20-1: 25; <u>see</u> 28 U.S.C. § 1253.  They point out that the

parties in <u>Whitford</u> have raised issues relevant to our appeal, including what test

should be used in that case for determining if improper partisan gerrymandering

took place.  Doc. 20-1: 25.  We decline their invitation to stay this action.  Just as a

grant of certiorari does not change the law, neither does a pending appeal.  <u>See</u>

<u>Schwab v. Sec'y, Dep't of Corr.</u>, 507 F.3d 1297, 1298–99 (11th Cir. 2007) (per

curiam) ("We don't know how the Supreme Court is going to decide the issues on

which it has granted review in the [] case, and the Supreme Court itself probably

does not know given the fact that briefing has not even been completed in that

case.").  The Supreme Court's jurisprudence on partisan gerrymandering teaches

us that the Court could rule in a variety of ways on the issues before it in <u>Whitford</u>,

including not ruling on them at all.  We will not delay consideration of this case for

possibly a year or more, waiting for a decision that may not ultimately affect it.  If

the Supreme Court's ruling in <u>Whitford</u> impacts any ruling in this case, that ruling

can be adjusted accordingly.

<u>2.  Application to Count Three</u>

Turning to the plaintiffs' allegations in support of Count Three, the

defendants next argue those allegations fail to state a claim upon which relief may

be granted.  Doc. 20-1: 22–24.  After thoroughly reviewing the complaint, we

conclude that the plaintiffs have properly alleged discriminatory intent but failed to meet their burden in alleging discriminatory effect.

With respect to discriminatory intent, the plaintiffs allege that H.B. 566 intentionally removed Democratic voters from Districts 105 and 111 for the purpose of making them "noncompetitive" and "ensuring electoral victory for their Republican incumbents." Doc. 1 ¶ 103. They also allege the proponents of H.B. 566 used racial demographics and analyses of past elections to predict support for Democratic candidates and minimize the strength of Democratic voters. Id. ¶ 105. And they allege that H.B. 566 was enacted by Republican legislators, id. ¶¶ 42, 47, outside of the normal procedures and without an opportunity for public review and comment. Id. ¶¶ 48, 50. The plaintiffs say that African-American legislators—all of whom are Democrats—were excluded from the drawing and negotiating process for H.B. 566. Id. ¶¶ 37, 49. These allegations are sufficient to allege discriminatory intent against an identifiable political group: Democratic voters. See Whitford I, 151 F. Supp. 3d at 927–28.

In order to survive a motion to dismiss, however, the plaintiffs must give us a judicially manageable method for measuring the discriminatory effect of partisan gerrymandering. See LULAC, 548 U.S. at 414, 126 S. Ct. at 2607. This is their burden, despite the fact that the Supreme Court has never agreed on one. As we've said, the Supreme Court has made clear that political gerrymandering claims are

justiciable.  But since it has not yet arrived at such a method for measuring discriminatory effect in partisan gerrymandering, the lower courts are left to search for one.  See Shapiro, 136 S. Ct. at 456 (indicating that plaintiffs may go forward on a political gerrymandering claim if they provide "a plea for relief based on a legal theory put forward by a Justice of this Court and uncontradicted by the majority in any of our cases").

That brings us to the so-called "efficiency gap."  "The efficiency gap is the difference between the [political] parties' respective wasted votes in an election, divided by the total number of votes cast."  Whitford I, 151 F. Supp. 3d at 921; see also id. at 928–30 (explaining the metric in further detail); Nicholas O. Stephanopoulos & Eric M. McGhee, Partisan Gerrymandering and the Efficiency Gap, 82 U. Chi. L. Rev. 831 (2015) (same).  The courts in Whitford and Common Cause have held that partisan symmetry, measured by the efficiency gap, is one way to make a political gerrymandering claim, and we agree.  See Common Cause, 2017 WL 876307, at *3–4; Whitford I, 151 F. Supp. 3d at 928–29.  Several Justices have indicated that "the symmetry standard, a measure social scientists use to assess partisan bias [] is undoubtedly a 'reliable standard' for measuring" the burden on a plaintiff's representative rights.  See LULAC, 548 U.S. at 466, 126 S. Ct. at 2637 (Stevens, J., concurring in part and dissenting in part); see also id. at 468 n.9, 126 S. Ct. at 2638 n.9 ("I appreciate Justice Kennedy's leaving the door

open to the use of the [symmetry] standard in future cases . . . ."); id. at 483, 126 S.

Ct. at 2647 (Souter, J., joined by Ginsburg, J., concurring in part and dissenting in

part) ("[N]or do I rule out the utility of a criterion of symmetry as a test . . . .").

Neither has a majority of the Supreme Court ever rejected this standard. Cf. id. at

417, 126 S. Ct. at 2609 (plurality opinion) (rejecting a rule or presumption "of

invalidity when a mid-decade redistricting plan is adopted"); Vieth, 541 U.S. at

284, 124 S. Ct. at 1780 (plurality opinion) (rejecting a predominant- intent-to-

achieve-partisan-advantage standard shown by direct or circumstantial evidence of

subordinating neutral redistricting criteria); Bandemer, 478 U.S. at 129–30, 106 S.

Ct. at 2808–09 (rejecting a proportional representation requirement).

So while we are comfortable that the efficiency gap is a method of analysis

gaining acceptance, these plaintiffs have not engaged it. Indeed, their complaint

alleges only that the defendants minimized "the electoral strength of voters who

seek to be represented by Democratic legislators." Doc. 1 ¶ 105. This complaint

stands in contrast with those of the plaintiffs in Whitford and Common Cause, who

affirmatively alleged that they would rely on the "efficiency gap" as the metric by

which partisan symmetry could be measured. Common Cause, 2017 WL 876307,

at *3–4; Whitford I, 151 F. Supp. 3d at 928–29. Both of those groups of plaintiffs

also supported their allegations of discriminatory effect with statistics on the

efficiency gaps in the redistricting plans they challenged. See id. Our plaintiffs

have fallen far short of carrying this burden. They have given us no metric by which we can measure discriminatory effect. Neither have they made clear whether they intend to rely on partisan symmetry as their test. Finally, they have supplied the court with no explanation or statistical analysis to support their partisan gerrymandering claim or show that it is judicially manageable. Instead they offer only the conclusory allegation that the <u>Whitford</u> test "is satisfied here." Doc. 1 ¶ 102.

We therefore dismiss the plaintiffs' complaint with regard to Count Three for failure to state a claim.[12] This dismissal, like the others, is without prejudice.

## <u>CONCLUSION</u>

It is **ORDERED** that the motion to dismiss filed by the defendants, Doc. 20, is **GRANTED**. Count One, to the extent it brings a Fourteenth Amendment claim against the State, is dismissed without prejudice for lack of jurisdiction. Count One, to the extent it brings a Section 2 claim against the State, is dismissed without prejudice for failure to state a claim. Counts One and Three against Secretary Kemp are dismissed without prejudice for failure to state a claim.

---

[12] If the plaintiffs file an amended complaint, they may wish to elaborate on some of the statistical and judicial manageability issues the defendants raise in their motion to dismiss. For example, the defendants point out that the efficiency gap measure in <u>Whitford</u> was designed to analyze a statewide redistricting plan as a whole, as opposed to two individual redrawn districts. Docs. 20-1: 22–23; 24: 10. Plaintiffs could aid the court in responding to this observation.

DUFFEY, District Judge, concurring in the judgment:

I concur with the majority's ultimate holding that the claims in Counts One and Three should be dismissed for their failure to state a plausible claim, and that Plaintiffs' Fourteenth Amendment claim against the State, asserted under § 1983, should be dismissed because we have no subject matter jurisdiction to consider it. I do not join in the decision to recite the long list of allegations in the Complaint because most are not germane to the legal issues before this Court and because many of the allegations are conclusory and opinionated.

I write separately to underscore my regret that Eleventh Circuit precedent requires courts in our circuit to engage in a decision-making process antithetical to judicial restraint, economy, and otherwise practical results. These precedents here required us to address an assertion of Eleventh Amendment immunity even where other grounds exist to dismiss a claim. The Eleventh Amendment immunity asserted by the State was considered because the defense was not expressly asserted as "conditional" in the State's pleadings and the State was not otherwise given the opportunity to advise us whether it requested its Eleventh Amendment arguments be addressed even if the Court found, as it does, that Count One fails to state a claim. I find the inflexible precedent in Seaborn v. State of Fla., Dep't of Corr., 143 F.3d 1405 (11th Cir. 1998) and McClendon v. Georgia Dep't of Cmty.

36

Health, 261 F.3d 1252 (11th Cir. 2001) illogical as applied, and, in this case,

results in the expenditure of judicial time and resources to express obligatory dicta.

Before discussing our circuit's case law on this issue, I consider first the threshold

question whether our three-judge panel is bound by Eleventh Circuit law at all.

### Whether Circuit Authority is Binding on Three-Judge District Courts

The doctrine of *stare decisis* generally requires a lower court to follow the

precedent of the courts that review its decisions.  See Parker v. Ohio, 263 F. Supp.

2d 1100, 1112 n.3 (S.D. Ohio 2003).  As the majority notes, where a three-judge

district court considers the constitutionality of a redistricting plan, its decisions are

reviewed directly by the United States Supreme Court, not the United States Court

of Appeals in which the district court is located.  See 28 U.S.C. § 1253.  Because

of this unique appellate process, some judges have doubted whether a three-judge

district court is bound by its circuit's precedent.  See Ala. Legislative Black

Caucus v. Alabama, 988 F. Supp. 2d 1285, 1342 n.13 (M.D. Ala. 2013)

(Thompson, J., concurring in part and dissenting in part); Parker, 263 F. Supp. 2d

at 1112 n.3; Poe v. Werner, 386 F. Supp. 1014, 1016-17 (M.D. Pa. 1974).

I am aware of only one three-judge district court that concluded it was not

bound by its circuit's precedent.  See Jehovah's Witnesses in the State of Wash. v.

King Cty. Hosp. Unit No. 1, 278 F. Supp. 488, 504-505 (W.D. Wash. 1967) (per

curiam) ("In this special three-judge court [] we are not bound by any judicial decisions other than those of the United States Supreme Court."). The majority of three-judge district courts and circuit courts opine, albeit with little reasoning, that three-judge district courts are bound by the precedent in their circuit. See Finch v. Miss. State Med. Ass'n., Inc., 585 F.2d 765, 773 (5th Cir. 1978); Lewis v. Rockefeller, 431 F.2d 368, 371 (2d Cir. 1970); Baksalary v. Smith, 579 F. Supp. 218, 227 (E.D. Penn. 1984); Russell v. Hathaway, 423 F. Supp. 833, 835 (N.D. Tex. 1976); Hopson v. Schilling, 418 F. Supp. 1223, 1234-35 n.15 (N.D. Ind. 1976); Athanson v. Grasso, 411 F. Supp. 1153, 1157 (D. Conn. 1976); Alabama NAACP State Conference of Branches v. Wallace, 269 F. Supp. 346, 350 (M.D. Ala. 1967).

The majority here elects to follow circuit precedent. I reach this conclusion reluctantly in this case because I find that following circuit precedent promotes, albeit to an uncertain degree, uniformity of the law at least within a circuit. I also follow it knowing that application of circuit precedent in this case leads to a practically illogical result. There is scant guidance from the Supreme Court regarding cases challenging the constitutionality of the apportionment of congressional or state legislative districts, and the law in this area is not well-settled. As the majority notes, this is in part the result of the Supreme Court

routinely issuing summary affirmances of three-judge district courts in voting cases. Those summary opinions most often state that a judgment was correct "but not necessarily the reasoning." Mandel v. Bradley, 432 U.S. 173, 176, 97 S. Ct. 2238, 2240 (1977) (per curiam) (quotation omitted). Circuit courts, however, have, on limited occasions, considered and ruled on similar claims in cases in which congressional or state legislative districts are not challenged, because these cases go through the normal appellate process. It seems the rationale for following circuit precedent is because courts have found that some law is better than no law.

I note also that, in other contexts, courts are, for various reasons, required to follow precedent that "does not perfectly track the power of revisory review[.]" Amanda Frost, Inferiority Complex: Should State Courts Follow Lower Federal Court Precedent on the Meaning of Federal Law? 68 Vand. L. Rev. 53, 78 (2015). For instance, the Erie doctrine requires federal courts to follow state high court precedent on questions of state law, see Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), and the Federal Circuit considers its decisions on matters of patent law to bind the other federal courts of appeals, despite that the courts of appeals are not subordinate to the Federal Circuit, see Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1361 (Fed. Cir. 1999) (en banc). I conclude that, though it is unclear whether a three-judge panel is bound by its circuit's precedent, I agree it

should be followed here, even though in this case it leads to judicial inefficiency to do so.

<u>Whether Courts Must Address Eleventh Amendment Immunity</u>

Having agreed to follow Eleventh Circuit precedent, the next question is whether Eleventh Circuit cases require the Court to consider Eleventh Amendment immunity before addressing the merits of a claim. In <u>Steel Co. v. Citizens for Better Env't</u>, 523 U.S. 83, 94 (1998), the Supreme Court held that federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case. <u>Id.</u> The prohibition stated in the Eleventh Amendment, however, is a "rather peculiar kind of 'jurisdictional' issue." <u>McClendon v. Georgia Dep't of Comm'ty Health</u>, 261 F.3d 1252, 1257 (11th Cir. 2001) (internal citations omitted) (quoting <u>United States v. SCS Bus. & Tech. Inst., Inc.</u>, 173 F.3d 890, 892 (D.C. Cir. 1999)). "Unlike most subject matter jurisdiction issues, which cannot be waived by the parties and must be raised by a court on its own initiative, the Eleventh Amendment does not automatically deprive a court of original jurisdiction." <u>Id.</u> (citing <u>Wisconsin Dep't of Corr. v. Schacht</u>, 524 U.S. 381, 389 (1998)). While courts have the discretion to raise Eleventh Amendment questions *sua sponte*, they are not required to do so. <u>See</u> <u>Schacht</u>, 524 U.S. at 387-89; <u>Nair v. Oakland Cty. Cmty. Mental Health Auth.</u>, 443 F.3d 469, 474 (6th Cir.

2006) (distinguishing Eleventh Amendment immunity from Article III jurisdiction).

In view of the unique nature of the Eleventh Amendment bar, the circuit courts are split on whether the Eleventh Amendment immunity question, like an Article III jurisdiction question, must be resolved before reaching the merits of a case. Nair, 443 F.3d at 476 (describing circuit split). "[T]he trend in this area seems to favor giving federal courts discretion over the issue[.]" Id.

The rule in our circuit, however, is that "[a]n assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction[,]" and thus "an assertion of Eleventh Amendment immunity must be resolved before a court may address the merits of the underlying claim(s)." Seaborn, 143 F.3d at 1407. In McClendon, the Eleventh Circuit announced an exception to what appeared to be a bright-line subject matter jurisdiction rule. In McClendon, the defendants argued that the Eleventh Circuit could affirm the district court's dismissal of the plaintiffs' claims either on Eleventh Amendment grounds or because the plaintiffs' complaint failed to state a claim. 261 F.3d at 1257. After summarizing their Eleventh Amendment defense, the defendants stated that the "dismissal of [the plaintiffs'] complaint can also be affirmed on the ground that [their] complaint failed to state a claim upon which relief could be

41

granted." Id. at 1257-58.  At oral argument, counsel for the defendants stated that either the Eleventh Amendment or failure to state a claim was a sufficient basis to affirm the district court's decision.  Id. at 1258.  The Eleventh Circuit "*interpret*[*ed*] the defendants' position as a conditional assertion of Eleventh Amendment sovereign immunity—they insist upon that defense only if it is necessary to prevent judgment against them on the merits."  Id. (emphasis added).  The court found that, "[b]ecause the Eleventh Amendment 'grants the State a legal power to assert a sovereign immunity defense should it choose to do so,' the defendants are free to conditionally assert that defense in order to allow a federal court to decide in their favor on the merits."  Id. (quoting Schacht, 524 U.S. at 389).

The Eleventh Circuit specifically noted its holding in McClendon was "limited to the conclusion that the *conditional* assertion of the Eleventh Amendment gives a federal court the discretion to dispose of the merits favorably to the state or its officials if it chooses to do so."  Id. at 1259 (emphasis added).  The court noted that its holding does not conflict with Seaborn, because, "in contrast to the defendants here, there is no indication that the defendants in Seaborn expressed a willingness to permit the court to reach the merits instead of considering the Eleventh Amendment issue."  Id. at 1258-59.  McClendon appears

to require an expression of a conditional assertion, at least in a written pleading or during oral argument.

Here, as in Seaborn, there is "no indication that [Defendants] . . . expressed a willingness to permit the court to reach the merits instead of considering the Eleventh Amendment issue." Id. In the absence of a written or other expression that Defendants' assertion of Eleventh Amendment immunity is conditional, we are bound to apply Seaborn, which requires us to resolve Defendants' "assertion of Eleventh Amendment immunity . . . before [we] may address the merits of the underlying claim(s)." Seaborn, 143 F.3d at 1407.[1]

I strongly disagree with the bright-line rule in Seaborn, including because the opinion fails to consider the substantial differences between Eleventh Amendment immunity and traditional Article III jurisdiction. In McClendon, the Eleventh Circuit, though recognizing these differences, was nevertheless constrained by its prior holding in Seaborn until there were statements made at oral argument allowing the court to find a conditional assertion exception—an exception unique to our circuit. The McClendon court favorably cited the First Circuit's decision in Parella v. Ret. Bd. of Rhode Island Emps.' Ret. Sys., 173 F.3d

---

[1] It seems the majority opinion could have been more focused and this concurrence not necessary if the State was asked to advise us if its assertion of its Eleventh Amendment immunity was conditional or not.

46 (1st Cir. 1999), in which the First Circuit held a court may bypass the Eleventh

Amendment issue where other dispositive grounds exist.  In <u>Parella</u>, the court

reasoned that the distinctions between the Eleventh Amendment bar and ordinary

restrictions on subject matter jurisdiction suggest "that Eleventh Amendment

issues do not fall into the category of Article III questions that <u>Steel Co.</u> would

define as necessarily antecedent." <u>Id.</u> at 55.  The <u>Parella</u> court noted that the

Supreme Court in <u>Steel Co.</u> rejected the assertion of "hypothetical jurisdiction"

where a court's Article III jurisdiction is in doubt, because a court without

Article III jurisdiction has no power to declare the law, and any opinion would thus

be an advisory opinion.  <u>Id.</u> (citing <u>Steel Co.</u>, 523 U.S. at 101).  The First Circuit

explained that, in the Eleventh Amendment context, there is not the same risk of

rendering an advisory opinion.  The court reasoned:

> [B]ecause Eleventh Amendment immunity can be waived, the
> presence of an Eleventh Amendment issue does not threaten the
> court's underlying power to declare the law.  If this were not the case,
> sua sponte consideration of a possible Eleventh Amendment bar
> would have to be obligatory, not discretionary—but the Supreme
> Court has now clearly stated that courts are free to ignore possible
> Eleventh Amendment concerns if a defendant chooses not to press
> them.

<u>Id.</u> (citation omitted).

Based on this reasoning, the First Circuit suggested that the "relevant maxim

in the Eleventh Amendment context is not that federal courts cannot act without

first establishing their jurisdiction, but rather that courts should 'not reach constitutional questions in advance of the necessity of deciding them.'" Id. at 56 (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 62 (1999) (Ginsburg, J., concurring in part and concurring in the judgment)). The Parella court also noted that avoiding Eleventh Amendment questions where there are other dispositive issues would produce two positive outcomes: (1) avoiding squandering judicial resources, and (2) avoiding forcing defendants to expend their resources on Eleventh Amendment questions in situations in which they would rather not do so. Id. Finally, the Parella court noted that requiring courts to rule on Eleventh Amendment questions would require them, "under certain circumstances, to begin their opinions with the equivalent of 'obligatory dicta.'" Id. at 57. The reasoning in Parella allowed the Eleventh Circuit to interpret an exception to the Seaborn bright-line test. The result in the majority opinion here is that the Court elected to engage in the Eleventh Amendment application analysis, which ultimately is unnecessary dicta in this case. I find the reasoning and the result in Parella legally and practically sound, as have the majority of the circuit courts. See Nair, 443 F.3d at 476.

I believe our circuit, if confronted with the facts here, would find a conditional assertion is implied where a state moves to dismiss counts for failure to

state a claim, or an *en banc* panel of the Eleventh Circuit would overturn the inflexible rule in <u>Seaborn</u> altogether.  This conclusion is supported by the circuit's favorable review of <u>Parella</u> and its practical approach to evaluating Eleventh Amendment issues when other dispositive arguments are asserted.  In <u>Ramos v. Tomasino</u>, ___ F. App'x ___, 2017 WL 2889472 (11th Cir. July 7, 2017), a decision issued just last month, the defendant asserted several grounds for dismissal, including one based on Eleventh Amendment sovereign immunity.  In choosing not to consider the defendant's Eleventh Amendment sovereign immunity argument, the court stated:  "Because all of Ramos's claims are barred by <u>Rooker-Feldman</u> and <u>Parker</u> immunity grounds, we decline to address Ramos's additional argument concerning Eleventh Amendment immunity, and those arguments that do not involve the application of immunity."  <u>Id.</u> at *5 n.4.  Though it is an unpublished decision, the circuit in <u>Ramos</u>, by declining to address the Eleventh Amendment immunity issue even in the absence of "conditional" language, accomplished the same practical results reached in <u>McClendon</u>, because "avoiding Eleventh Amendment questions where there are other dispositive issues . . . permits courts to avoid squandering judicial resources."  <u>McClendon</u>, 261 F.3d at 1259 (alteration not adopted) (quoting <u>Parella</u>, 173 F.3d at 56).[2]

---

[2] The judicially created "conditional" assertion of an Eleventh Amendment sovereign

In view of the Eleventh Circuit's practical approach in declining to consider the Eleventh Amendment immunity issue in <u>McClendon</u> and in <u>Ramos</u>, I believe it would today decline to apply the inflexible standard in <u>Seaborn</u>. Instead, it is the logical and reasonable next step for the circuit either to overrule <u>Seaborn</u> or to "interpret" a failure to state a claim defense in a case like ours to imply a conditional assertion of the State's Eleventh Amendment immunity defense and allow courts to decline to address Eleventh Amendment immunity where, as here, the claim against the State is dismissed on the merits. If we were not bound to apply <u>Seaborn</u>, I would avoid addressing an opinion on the application of the Eleventh Amendment and whether Section 2 abrogates Eleventh Amendment immunity, which, as it turns out, is the equivalent of "obligatory dicta" in this opinion. <u>See</u> <u>Parella</u>, 173 F.3d at 57. Such a result also is consistent with the historic principles of judicial restraint.

---

immunity defense promotes inconsistent results that do not promote stability. For example, if in one case a state defendant asserted Eleventh Amendment and Rule 12(b)(6) failure to state a claim grounds for dismissal and said the Eleventh Amendment defense was "conditional," but in another case the state failed to state this apparently obligatory "conditional" language, even though it seeks for the Rule 12(b)(6) grounds to be determined first, the Court has to go through two different analytical processes even if in both cases there is a finding that the claim fails to meet the Rule 12(b)(6) standard. In the case here where the obligatory "conditional" assertion language is not used, the Court and the parties wasted time and effort to address the now inconsequential Eleventh Amendment argument. The better rule in cases where there is a motion to dismiss under Rule 12(b)(6) is always to first determine if a complaint even asserts plausible claims before deciding if the Eleventh Amendment bars them.