**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| AUSTIN THOMPSON, an individual; WAYNE SWANSON, an individual; DARRYL PAYTON, an individual; AUDRA CUNNINGHAM, an individual; SABRINA MCKENZIE, an individual; JAMIDA ORANGE, an individual, ANDREA SNOW, an individual; SAMMY ARREY-MBI; LYNNE ANDERSON, an individual; and CORETTA JACKSON, an individual,<br><br>   Plaintiffs,<br><br>  v.<br><br>BRIAN KEMP, in his official capacity as Secretary of State of the State of Georgia,<br><br>   Defendant. | Case No. 1:17-cv-01427-TCB-WSD-BBM |

**THOMPSON PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

## I.   INTRODUCTION

Defendant Brian Kemp, the Secretary of State of Georgia, has moved to partially dismiss the Thompson Plaintiffs' (the "Plaintiffs") Complaint—specifically the claims alleged under the Voting Rights Act ("VRA")—based on a misinterpretation of the VRA and Plaintiffs' claims. Plaintiffs challenge the current redistricting plan for the Georgia House of Representatives, as revised mid-cycle in 2015 by House Bill 566 ("H.B. 566"), as impermissible vote dilution under Section 2 of the VRA. ECF No. 20 ("Compl.") ¶ 131. Specifically, Plaintiffs allege that the plan intentionally discriminates against African-American voters and fails to include at least one additional majority-minority district mandated by the VRA in the Atlanta metropolitan area. *Id.*  ¶¶ 14, 124.

Defendant mounts three lines of attack on Plaintiffs' VRA claims, all of which fail as a matter of law. First, Defendant erroneously challenges the standing of *some* Plaintiffs' to bring a Section 2 results claim (Count II). But not only does Defendant concede that the remaining Plaintiffs have standing to assert the claim, Defendant's attempt to limit Plaintiffs' Section 2 results claim to the districts redrawn by H.B. 566, rather than the current House of Representatives redistricting map in the Atlanta metropolitan area as amended by H.B. 566, has no basis in either the Plaintiffs' allegations or the case law. Second, Defendant proposes that

this Court decide Plaintiffs' Section 2 intentional discrimination claim in line with the standards required for a claim of discriminatory effects, a reading that runs contrary to both binding precedent and the purpose of the VRA itself. Third, Defendant incorrectly asserts that Plaintiffs have failed to sufficiently allege facts to support a claim for vote dilution under Section 2 of the VRA. This argument fails for the same reason as Defendant's standing argument; where the State *failed* to draw additional majority-minority districts as required by the VRA, Plaintiffs' Section 2 results claim is not limited to those districts the State saw fit to redraw in H.B. 566. Plaintiffs have adequately alleged all three of the *Gingles* preconditions, as well as a variety of additional circumstances probative of vote dilution, sufficient to state a claim under Section 2.    Because Plaintiffs have satisfied the applicable standards for asserting their VRA claims, the Court should deny Defendant's motion to dismiss.

## II.   LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. A complaint does not require detailed factual allegations; it simply must plead

"enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

A Rule 12(b)(1) attack that challenges the subject matter jurisdiction alleged on the face of the pleadings requires the court to accept the sufficiency of the allegations as true. Fed. R. Civ. P. 12(b)(1). Though the burden is on the plaintiffs to establish standing, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).

## III.    ARGUMENT

### A. Plaintiffs Have Standing In This Case

Defendant's standing argument centers on the extent to which Plaintiffs who do not reside in districts altered by H.B. 566 can assert a Section 2 injury for the State's failure to draw additional majority-minority districts in the Atlanta metropolitan area (Count II).[1] As set forth below, Defendant concedes that some Plaintiffs have standing to assert the Section 2 results claim, but, in challenging the

---

[1] Plaintiffs do not dispute that Counts I and III of their Complaint are directed at House Districts 105 and 111 and that standing to assert those claims is limited to those Plaintiffs residing in those districts.

3

standing of the remaining Plaintiffs, improperly attempts to limit Plaintiffs' Section 2 challenge to the districts redrawn in H.B. 566.

Under Article III of the United States Constitution, federal courts are limited to adjudicating "cases" and "controversies." U.S. Const. art. III, § 2. Article III standing requires: (1) an injury that is "concrete and particularized," and "actual or imminent"; (2) a "causal connection" between the injury complained of and the defendant's action; and (3) that the injury will likely be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-561 (citations and internal quotations marks omitted). "For purposes of ruling on a motion to dismiss for want of standing," courts "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490 (1975) (internal citation omitted). In alleging the State has failed to draw additional majority African-American districts required by Section 2 of the VRA, Plaintiffs have asserted facts that easily carry their burden.

Courts have routinely held that "supported allegations that Plaintiffs reside in a reasonably compact area that could support additional [majority-minority districts] sufficiently proves standing for a Section 2 claim for vote dilution." *Pope v. Cty. of Albany*, No. 1:11-CV-0736 LEK/CFH, 2014 WL 316703, at *5 (N.D.N.Y. Jan. 28, 2014); *see also Whitford v. Nichol*, 151 F. Supp. 3d 918, 926

(W.D. Wis. 2015) ("Under Section 2, the scope of the claim is tied to the scope of the injury, so standing to sue is limited to '[p]laintiffs [who] reside in a reasonably compact area that could support additional' majority-minority districts.") (citation omitted). The "personalized injury" that Section 2 plaintiffs face is dilution of their "individual voting power" by the creation of fewer majority-minority districts for the "sufficiently numerous and geographically compact minority population." *Pope*, 2014 WL 316703, at *5. The State's failure to create the additional majority-minority districts "that Plaintiffs contend are required by the VRA" confers sufficient injury for plaintiffs to litigate their claims. *Id.*

Plaintiffs have properly and sufficiently alleged an ongoing, cognizable injury under Section 2. Plaintiffs reside in a geographically compact area within the Atlanta metropolitan region, Compl. ¶¶ 21-30, in which African-American voters are sufficiently numerous and geographically compact to comprise a majority of eligible voters in at least one additional House district, *id.* ¶¶ 108, 111. The State's failure to create additional majority African-American districts in the Atlanta metropolitan area dilutes Plaintiffs' individual voting power in violation of the VRA. *Id.* ¶¶ 131.[2]

---

[2] Defendant mischaracterizes Plaintiffs' Section 2 claim as calling for the creation of "one additional majority African-American district." Mot. to Dismiss at 13; *see also id.* ("Plaintiffs allege that one additional majority African-American district

Defendant does not dispute that the Complaint alleges sufficient injury under the Section 2 results test for at least some of the Plaintiffs. Specifically, Defendant concedes that Plaintiffs Cunningham, Thompson, Swanson, and Payton have standing to assert the Section 2 results claim set forth in Count II. Mot. to Dismiss at 8.[3]

Defendant's only challenge to standing is that the other plaintiffs alleging the same injury do not reside in districts that were specifically altered by H.B. 566. *Id.* at 7-8. But regardless of whether they reside in a district that has been subject to alteration by H.B. 566, Plaintiffs are *all* harmed by "[t]he current district boundaries for the House of Representatives" which "dilute the electoral strength of the African-American residents in the Atlanta metropolitan area, in violation of Section 2 of the Voting Rights Act." Compl. ¶ 131. Plaintiffs' Section 2 results claim does not hinge on what the State did or did not do to specific districts in

---

could have been drawn in the metro Atlanta area."); *id.* at 15 (referring to "the additional district" Plaintiffs allege should have been drawn). Plaintiffs' Complaint clearly and repeatedly alleges that the State could have but failed to draw "*at least* one additional majority-minority district that would provide African-American voters the ability to elect their candidates of choice." Compl. ¶ 1 (emphasis added); *see also id.* ¶¶ 14, 108, 109, 111, 113, 132.

[3] Defendant also does not dispute that Plaintiffs Thompson, Swanson, and Payton have standing to assert Counts I and III, as they each reside in either HD 105 or HD 111. *Id.*

2015. Rather, it relies on the "current district boundaries," as amended by H.B. 566, and the map's failure to include "at least one additional district in the Atlanta metropolitan area in which African Americans have the opportunity to elect their candidates of choice." *Id*. ¶ 132; *see also id.* ¶ 135 ("The totality of the circumstances establishes that the current House of Representatives district map has the effect of denying African-American voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act."); *id.* ¶ 7 ("H.B. 566 has its genesis in the 2011 redistricting map (Act No. 1EX), which packed Georgia's African-American voters into as few districts as possible."). The fact that the Georgia General Assembly chose to engage in a mid-cycle redistricting neither limits Plaintiffs' Section 2 harm to those districts altered by H.B. 566 nor inoculates Defendant from a Section 2 results challenge based on the map as a whole.

### B. Plaintiffs Have Alleged a Valid Section 2 "Intent" Claim Under the Voting Rights Act

#### 1. A Section 2 intent claim does not require proof of discriminatory results in the form of the *Gingles* preconditions.

Defendant argues that "Section 2 is not violated by allegations of discriminatory intent without corresponding factual allegations setting forth all

7

three preconditions in *Thornburg v. Gingles*." Mot. to Dismiss at 11.[4] Defendant

cites to this Court's prior decision in which it dismissed a Section 2 discriminatory

intent claim for failure to allege discriminatory results. *See* ECF No. 28 at 21. In its

decision, the Court stated it was bound by Eleventh Circuit precedent, citing

*Johnson v. DeSoto Cty. Bd. of Comm'rs*, 72 F.3d 1556 (11th Cir. 1996)

("*DeSoto*"), which requires a showing of discriminatory results for Section 2 intent

claims. This Court proceeded to evaluate whether the *NAACP* Plaintiffs had

sufficiently pleaded discriminatory results as laid out in the *Gingles* factors. ECF

No. 28 at 22-24. It did not evaluate whether the *NAACP* Plaintiffs had adequately

alleged that discriminatory results were shown by other means. That is, even if

Plaintiffs are required to allege discriminatory results in order to bring a Section 2

intent claim under Eleventh Circuit precedent,[5] they are not required to allege

discriminatory results exclusively in the form of the *Gingles* factors.

---

[4] While Defendant broadly argues that Count I, which alleges intentional
discrimination in violation of Section 2 of the VRA as well as the Fourteenth and
Fifteenth Amendments, fails to state a claim as to which relief may be granted,
Defendant's argument fails to address Plaintiffs' constitutional claims, in particular
Plaintiffs' Fifteenth Amendment claim which was not alleged in the NAACP
Plaintiffs' original complaint. *See* Mot. to Dismiss at 10-11.

[5] Neither Congress nor the Supreme Court has defined the extent or scope of
discriminatory effects a plaintiff must allege in discriminatory intent claims.
*Thornburg v. Gingles*, 478 U.S. 30, 79–80 (1986);  *see also Perez v. Abbott*, No.
SA-11-CV-360, 2017 WL 3495922, at *9 (W.D. Tex. Aug. 15, 2017) ("[T]he
Supreme Court has declined to decide whether the *Gingles* preconditions apply to

8

While the Eleventh Circuit's decision in *DeSoto* held that "discriminatory intent alone is insufficient to establish a violation of Section 2," 72 F.3d at 1561, it did not conclude that the only means of establishing discriminatory effect was satisfaction of the *Gingles* preconditions. The court in *DeSoto* relied on the United States Supreme Court's decision in *Voinovich v. Quilter*, 507 U.S. 146 (1993), to conclude that a district court must consider "'the consequences of [an] apportionment plan before ruling on its validity.'" *DeSoto*, 72 F.3d at 1562 (quoting *Voinivich*, 507 U.S. at 155). Neither *Voinovich* nor *DeSoto* established that the only "consequence[]" of intentional dilution under Section 2 is the failure to create additional majority-minority districts as demonstrated by the *Gingles* preconditions.

Other circuits that have considered intent claims under Section 2 have declined to adopt a *Gingles* requirement, relying instead on numerous factors to decide if a practice produces discriminatory effects. *See e.g.*, *United States v. Brown*, 561 F.3d 420 ,433 (5th Cir. 2009) (describing the types of circumstantial evidence that is probative of discriminatory intent, including "the impact of an intentional vote dilution/discrimination claims under § 2."). Indeed, in *Bartlett v. Strickland*, the Supreme Court expressly declined to decide the issue. 556 U.S. 1, 20 (2009) (finding that because the case did not involve allegations of intentional conduct, the Court "need not consider whether intentional discrimination affects the *Gingles* analysis," and emphasizing that the case's "holding does not apply to cases in which there is intentional discrimination against a racial minority").

action bear[ing] more heavily on one race than another, the historical background of the decision, the specific sequence of events leading up to the challenged decision, [d]epartures from the normal procedural sequence, and statements by members of the decisionmaking body") (citations and internal quotation marks omitted); *Garza v. Cty. of Los Angeles, Cal.*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990) ("The Court finds that the claims that a challenged electoral system or practice violates Section 2 due to a discriminatory purpose may be determined independently of any analysis of the preconditions set forth in *Gingles*.") (citation omitted); *McMillan v. Escambia County, Fla.*, 748 F.2d 1037, 1046–47 (5th Cir. 1984) (quoting S. Rep. No. 97-417, at 27 n. 108) ("The Senate Report further states that if a section 2 plaintiff chooses to prove discriminatory intent, 'direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions' would be relevant evidence of intent."); *United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 306 (D.S.C. 2003), *aff'd sub nom. United States v. Charleston Cty., S.C.*, 365 F.3d 341 (4th Cir. 2004) ("Claims of intentional discrimination under Section 2 are assessed according to the standards applied to constitutional claims of intentional racial discrimination in voting.") (citation omitted); *Alabama Legislative Black Caucus v. Alabama*, No. 2:12-CV-1081, 2012 WL 6706665, at *4 (M.D. Ala. Dec. 26, 2012) (applying

*Arlington Heights* factors to deny defendant's motion to dismiss plaintiffs' Section

2 intent claim); *Old Person v. Cooney*, 230 F.3d 1113, 1130 (9th Cir. 2000)

(same).

Requiring Plaintiffs to allege discriminatory results exclusively in the form

of the *Gingles* factors would render Section 2 intent claims meaningless (and

redundant of Section 2 results claims) by imposing a *de facto* bar on claims of

intentional discrimination that occur in areas where minorities would comprise less

than 50% of eligible voters in a hypothetical single-member district. *See Garza v.*

*Cty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) ("To impose the [*Gingles*

factors] requirement [] would prevent any redress for districting which was

deliberately designed to prevent minorities from electing representatives in future

elections governed by that districting," a "result wholly contrary to Congress'

intent in enacting Section 2 of the Voting Rights Act."). By Defendant's logic, the

General Assembly could have  publicly declared that it sought to discriminate

against African-American voters in Districts 105 and 111 by diluting their

influence in House elections just as they were on the verge of electing their

preferred candidates, and such action would not constitute intentional

discrimination unless Plaintiffs could show that African Americans could have

comprised a majority of eligible voters in a given district. Such a finding would

11

invite intentional discrimination of minority populations whose voting age populations are less than 50 percent of a given district. This is not mandated under the VRA, and indeed would be an intolerable outcome under the statute.

### 2. Plaintiffs have alleged discriminatory effects sufficient for an intent claim

Based on the governing standard, Plaintiffs have sufficiently alleged discriminatory effect as part and parcel of their discriminatory intent claim under Section 2. Plaintiffs allege that in 2015, the General Assembly attempted to dilute the voting strength of African-American voters by intentionally moving them out of districts where their votes could have resulted in the election of their candidate of choice. *See* Compl. ¶ 96 ("Georgia would have seen its African-American representation in the House increase" were it not for the redrawing of District 111 in 2015); *id.* ¶ 84 (if District 105 had not been redrawn in 2015, Georgia's African-American representation in the House would have increased).

Indeed, Plaintiffs further allege that the intentional manipulation of district lines in H.B. 566 directly resulted in the failure to draw at least one additional majority-black district. *See* Compl. ¶ 15 ("At least some African-American voters who reside in House District 111 and whose voting power was intentionally diluted as a result of the General Assembly's passage of H.B. 566 could have been drawn into a new majority-minority district in which they would have had an opportunity

to elect their candidates of choice."); *id.* ¶ 113 ("By "unpacking" House districts that have been packed with African-American voters, and combining African-American population in nearby districts that has been "cracked," including voters in House District 111 whose voting power was intentionally diluted in H.B. 566, the General Assembly could have drawn at least one additional majority-minority district in the Atlanta metropolitan area, as required by Section 2 of the Voting Rights Act."). Accordingly, under any standard, Plaintiffs' Section 2 intent claim survives.

### C. Plaintiffs Have Alleged a Valid Section 2 "Results" Claim Under the VRA

Defendant challenges Plaintiffs' Section 2 results claim on two grounds. *First*, Defendant contends that because H.B. 566 only made changes to certain districts and not the entirety of the Atlanta metropolitan area, Plaintiffs' Section 2 claim for at least one additional majority-minority district in the Atlanta metropolitan area is insufficient to establish the first *Gingles* prong. Mot. to Dismiss at 13-14.[6] *Second*, Defendant contends that Plaintiffs failed to allege facts

---

[6] Defendant does not dispute that Plaintiffs have sufficiently alleged the second and third *Gingles* preconditions. Plaintiffs' Complaint clearly meets the threshold for pleading both, alleging political cohesion, *see* Compl. ¶ 56 ("African-American voters in Georgia overwhelmingly support Democratic candidates"); *id.* ¶ 115 ("African-Americans voters in the Atlanta metropolitan area are politically cohesive."), and defeat by white bloc voting, *id.* ¶ 116 ("There is significant

"beyond simply the three *Gingles* preconditions to support a finding" of vote

dilution. *Id.* at 15. Both of these attacks are belied by the facts alleged in Plaintiffs'

complaint and the Section 2 case law. Plaintiffs have clearly satisfied Rule 12(b)(6)

by alleging that, under the totality of the circumstances, the Georgia General

Assembly failed to create at least one additional majority-minority district in the

House of Representatives redistricting plan, as amended by H.B. 566.

> **1.   Plaintiffs have sufficiently alleged that the current House redistricting plan, as amended by H.B. 566, violates the Section 2 "results" prong**

Defendant incorrectly contends that Plaintiffs' Section 2 "results" claim with

respect to the Atlanta metropolitan area is barred by the relatively narrow scope of

changes made by H.B. 566. Mot. to Dismiss at 13-14. This argument fails for the

same reason Defendant's standing argument fails. *See supra* Section III.A. Indeed,

Defendant's argument under Rule 12(b)(6) is little more than a thinly-veiled

reiteration of his arguments under Rule 12(b)(1). *See* Mot. to Dismiss at 14

("Plaintiffs have not sufficiently alleged how H.B. 566 caused them any injury.").

Just as Defendant does not dispute that certain Plaintiffs residing in the affected

---

racially polarized voting in the Atlanta metropolitan area such that the White
majority votes as a bloc usually to defeat African Americans' preferred candidates
of choice."); *id.* ¶ 134 ("[E]lections in this area reveal a clear pattern of racially
polarized voting that allows the bloc of White voters to usually defeat the African
Americans' preferred candidates.").

areas have standing to assert a Section 2 results claim, Defendant cannot dispute

that those same Plaintiffs have alleged a Section 2 results claim for the failure to

draw at least one additional majority-minority district. *See* Compl. ¶¶ 15, 113.

Defendant's argument that Plaintiffs have failed to assert a Section 2 results

claim for the Atlanta metropolitan area more broadly, meanwhile, fails to

recognize that Plaintiffs' Section 2 results claim is based on the "current district

boundaries for the House of Representatives," as amended by H.B. 566, which

"dilute the electoral strength of the African-American residents in the Atlanta

metropolitan area, in violation of Section 2 of the Voting Rights Act." Compl. ¶

131; *see also id.* ¶ 135 ("The totality of the circumstances establishes that the

current House of Representatives district map has the effect of denying African-

American voters an equal opportunity to participate in the political process and to

elect candidates of their choice, in violation of Section 2 of the Voting Rights

Act."). Plaintiffs' Section 2 claim thus includes but is not limited to the districts

affected by H.B. 566. It is well established that the Section 2 results test evaluates

the lines as they currently exist to determine whether additional majority-minority

districts are required. *See Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)

("When applied to a claim that single-member districts dilute minority votes, the

first *Gingles* condition requires the possibility of creating more than the existing

number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice."). Indeed, Defendant's attempt to limit Plaintiffs' Section 2 results claim to the districts redrawn by H.B. 566 is all the more baseless where it is the State's *failure* to draw additional majority-minority districts in its current House plan, including its amendment to that plan in H.B. 566, that violates Section 2. *See, e.g.*, Compl. ¶¶ 108, 131-32.

In sum, the *Thompson* Plaintiffs have sufficiently alleged that "African-American voters in the Atlanta metropolitan area are sufficiently numerous and geographically compact such that they can comprise a majority of eligible voters in at least one additional House district." Compl. ¶ 112. This satisfies the first *Gingles* precondition.

### 2. Plaintiffs have alleged sufficient facts to sustain their Section 2 claim.

Defendant further contends that Plaintiffs' Section 2 claim fails to "allege facts beyond simply the three *Gingles* preconditions" to support a finding of vote dilution in the Atlanta metropolitan area. Mot. to Dismiss at 15. Defendant's argument on this score fails as a matter of law and fact.

First, Defendant claims that the number of majority African-American districts in the Atlanta metropolitan area is "roughly proportional" to the overall African-American voting population in the region, which in Defendant's view

precludes a finding of vote dilution. Mot. to Dismiss at 16. But even if the number of majority African-American districts is proportional to the African-American population in the Atlanta metropolitan area,[7] the Supreme Court has unequivocally held that "[p]roportionality is not a safe harbor for States; it does not immunize their election schemes from § 2 challenge." *De Grandy*, 512 U.S. at 1026 (O'Connor, J., concurring). The Court expressly rejected the invitation to adopt any definitive rule that vote dilution cannot occur as a matter of law whenever such proportionality exists. *De Grandy*, 512 U.S. at 1017. To the contrary, proportionality is "not dispositive" in a Section 2 results challenge; it is merely a relevant fact in the totality of the circumstances to be analyzed when determining whether members of a minority group have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. at 1000. Indeed, "the degree of probative value assigned to proportionality may vary with other facts," and "[n]o single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength." *Id*. at 1020-21; *see also League of Latin American Citizens v. Perry*, 548 U.S. 399, 442 (2006) (finding Section 2 "results" violation under "the totality of the circumstances . . . [e]ven assuming

---

[7] It is not necessary to address this factual issue at this stage of the litigation because Plaintiffs have met their pleading burden as a matter of law.

[the redistricting plan] provides something close to proportional representation for Latinos") *id.* at 438 (reiterating that there "is no magic parameter" in determining proportionality, and proportionality cannot itself overcome other evidence of vote dilution).

Moreover, in *De Grandy* the Court clearly recognized certain circumstances under which, even where proportionality exists, there can still be a violation of Section 2. For instance, the Court stated that, "where a State has split (or lumped) minority neighborhoods that would have been grouped into a single district (or spread among several) if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere in the jurisdiction, the inconsistent treatment might be significant evidence of a § 2 violation, even in the face of proportionality." *Id*. at 1015.[8] Notably, here Plaintiffs specifically allege that the current redistricting plan, as amended by H.B. 566, "cracked" and "packed" populations of African-American voters, thereby diluting their voting power. *See, e.g.*, Compl. ¶ 113 ("By "unpacking" House districts that have been packed with African-American voters, and combining African-American population in nearby

---

[8] The Court also recognized that the facts necessary to show a violation of Section 2 in the face of proportionality may have been "obscured" in *De Grandy* by the rule of thumb adopted by the district court that anything short of the maximum number of majority-minority districts consistent with the *Gingles* conditions would violate Section 2. *Id*. at 1016.

districts that has been "cracked," including voters in House District 111 whose

voting power was intentionally diluted in H.B. 566, the General Assembly could

have drawn at least one additional majority-minority district in the Atlanta

metropolitan area, as required by Section 2 of the Voting Rights Act"); *id.* ¶ 109

(alleging that redistricting plan "'packs' African-American voters in certain House

Districts, including but not limited to House Districts 61, 75, 88, and 92, and

"cracks" African-American population centers among other districts, preventing

the emergence of at least one additional district in which minorities have an

opportunity to elect their candidates of choice").

Furthermore, Plaintiffs have alleged a variety of "Senate Factors" to support

their claim of vote dilution under the "totality of the circumstances." *Id.* ¶ 135.

When it amended the Voting Rights Act, Congress established a non-exclusive list

of factors that the court may consider in determining whether a plaintiff has met

the burden of establishing discriminatory results. *See* S.Rep. No. 97-417, 97th

Cong., 2d Sess. (1982), at 28-29; *see also Gingles*, 478 U.S. at 36 (noting that

Senate Factors "elaborate[] on the circumstances that might be probative of a § 2

violation"). This court has held that, "[i]n evaluating the totality of the

circumstances, th[ose] . . . seven 'Senate Report Factors' are considered in

evaluating whether minority voters have less opportunity to participate in the

political process." *Cofield v. City of LaGrange, Ga.*, 969 F. Supp. 749, 773 (N.D.

Ga. 1997). Although the Senate Report itself and the cases interpreting it have

made clear that "there is no requirement that any particular number of factors be

proved, or that a majority of them point one way or the other," *United States v.*

*Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n. 33 (11th Cir. 1984) (*quoting*

S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), at 29); *see id.* ("The statute

explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report

indicates that no particular factor is an indispensable element of a dilution claim."),

Plaintiffs' Complaint clearly alleges the existence of a number of the Senate

Factors.

For instance, Plaintiffs allege the first Senate Factor by detailing the storied

"history of official voting-related discrimination" in Georgia, S. Rep. No. 97-417,

at 28, including:

- "In 1871, Georgia became the first state to enact a poll tax" that "reduced turnout among African-American voters in Georgia by half" and "has been described as the single most effective disenfranchisement law ever passed," abolished only in 1945 (Compl. ¶ 36);
- The state's "literacy and understanding tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that African-Americans would be left waiting in line when the polls closed, the adoption of 'White primaries,' and the use of discriminatory redistricting processes" (*Id.* ¶ 37);

- The use of "segregated polling places" in "17 municipalities and 48 counties in Georgia" as recently as 1962 (*Id.* ¶ 39);

- Georgia's status as a "'covered jurisdiction' under Section 5 of the Voting Rights Act upon its enactment in 1965" and until Section 5's invalidation in 2013 (*Id.* ¶ 40);

- Judicial notice of Georgia's history of voting discrimination (*Id.* ¶ 42); and

- The invalidation of Georgia's redistricting plans, including as recently as 2003 (*Id.* ¶ 43).

Plaintiffs further allege the second Senate Factor regarding "the extent to which voting in the elections of the state or political subdivision is racially polarized," S. Rep. No. 97-417, at 29. Specifically, the complaint alleges that:

- "African Americans in Georgia, including in House Districts 105 and 111, overwhelmingly vote for Democratic candidates over Republican candidates, and all of the African-American representatives currently serving in the Georgia House are Democrats. In the past 50 years, Georgia Republicans have only elected one African-American representative." (Compl. ¶ 56).

- "The voting patterns in the 2012, 2014, and 2016 general elections in House District 105 exhibited a high level of racial polarization." (*Id.* ¶ 87).

- "There is significant racially polarized voting in the Atlanta metropolitan area such that the White majority votes as a bloc usually to defeat African Americans' preferred candidates of choice." (*Id.* ¶ 116).

- "[E]lections in this area reveal a clear pattern of racially polarized voting that allows the bloc of White voters to usually defeat the African Americans' preferred candidates." (*Id.* ¶ 134).

21

Plaintiffs allege the fifth Senate Factor by detailing "the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process," S. Rep. No. 97-417, at 29. The Complaint specifically highlights:

- The persistent lower health status of minority populations in Georgia compared to the white population (Compl. ¶ 50);
- The infant mortality rate among African-Americans in Georgia nearly twice that of white individuals ( *Id.* ¶ 50);
- The unemployment rate of African-Americans in Georgia over twice that of Whites (*Id.* ¶ 51);
- Disparity in home values with African-American populations at or over 40% (*Id.* ¶ 52);
- A gap of 16 percentage points between African-American high school graduation rates and White rates (*Id.* ¶ 53); and

  The percentage of African-Americans in Georgia's prisons (over 50%) compared to their share of the state's population (31%) (*Id.* ¶ 54).

Plaintiffs also allege the sixth Senate Factor by providing examples of "the use of overt or subtle racial appeals in political campaigns," S. Rep. No. 97-417, at 29, including:

- Racially divisive phone calls from a Republican firm in 2014 that referred to Democratic candidates for House District 105 as "an Asian businessman or an African American swim mom" (Compl. ¶ 45);
- A board of commissioner member from Gwinnett County referencing Civil Rights leader and U.S. Congressman John Lewis as a "racist

pig" and calling his reelection "illegitimate" because it was from a majority-minority district (*Id*. ¶ 46);

- References by the Mayor of Georgia's seventh largest city to Democratic U.S. Senate candidate Jon Ossoff as having an "ethnic sounding name" and indicating as a result he would not receive votes from a majority-white district (*Id*. ¶ 47); and

- A Georgia state senator's description of Georgia's Sixth District, which is majority-white, as gerrymandered so as not to support Jon Ossoff, specifically because he is a former aide of an African-American Congressman (*Id*. ¶ 48).

In short, Defendant's contention that Plaintiffs have failed to allege Section 2 vote dilution under the totality of the circumstances is plainly false. While proportionality is part of the totality analysis, it does not end the inquiry altogether, let alone overcome the numerous allegations of "circumstances . . . probative of a § 2 violation" on a motion to dismiss. *Gingles*, 478 U.S. at 36. Defendant's attempt to short circuit this Court's Section 2 analysis with assertions of proportionality, thus, finds no basis in either the case law or the Complaint.

## IV.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss (ECF No. 47).

Dated:  November 27, 2017          Respectfully submitted,

By /s/ *Aria Branch*_____
Marc Erik Elias (*admitted pro hac vice*)
Aria C. Branch (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: ABranch@perkinscoie.com

Abha Khanna (*admitted pro hac vice*)
**Perkins Coie, LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

Quinton Washington (GA Bar No. 159067)
**Bell & Washington LLP**
196 Peachtree Street SW, Suite 310
Atlanta, GA 30303
Phone: (404) 437-6641
Email: Quinton@bellwashington.com

*Attorneys for Plaintiffs*

## <u>LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE</u>

I certify that this pleading has been prepared with Times New Roman 14

point, as approved by the Court in L.R. 5.1(C), N.D. Ga.

Respectfully submitted, this 27th day of November, 2017.

By /s/ *Aria Branch*
Aria C. Branch (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: ABranch@perkinscoie.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of November, 2017, I filed the

foregoing **THOMPSON PLAINTIFFS' OPPOSITION TO DEFENDANT'S**

**MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.


By /s/ *Aria Branch*
Aria C. Branch (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: ABranch@perkinscoie.com


*Counsel for Plaintiffs*