## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GEORGIA STATE CONFERENCE )
NAACP, et. al., )
 )
   Plaintiffs, )  CIVIL ACTION NO.
 )  **1:17-cv-01247-TCB-WSD-BBM**
   v. )
 )
STATE OF GEORGIA et. al., )
 )
   Defendants. )

Declaration of Dr. Peyton McCrary

Pursuant to 28 U.S.C. § 1746, I, Peyton McCrary, make the following declaration:

I. Introduction

1. My name is Peyton McCrary, and I reside in Arlington, Virginia. I am an historian by training and taught history at the university level from 1969 until 1990. During the 1980s I served as an expert witness in 14 voting rights cases in the South. From 1990 until my retirement in 2016, I was employed by the Voting Section, Civil Rights Division, of the Department of Justice. My responsibilities in the Civil Rights Division included the planning, direction, coordination, and performance of historical research and empirical analysis for voting rights litigation, including the identification of appropriate expert witnesses to appear for the government at trial. I was trained in the use of Geographic Information Systems software, and worked with experts in analyzing both redistricting issues and the statistical analysis of racially polarized voting. In addition, I have presented sworn written testimony in ten cases, including six since my employment by the Department of Justice.

1

2.  I received B.A. and M.A. degrees from the University of Virginia in 1965 and 1966, respectively, and obtained my Ph.D. from Princeton University in 1972.  My primary training was in the history of the United States, with a specialization in the history of the South during the 19th and 20th centuries.  For 20 years I taught courses in my specialization at the University of Minnesota, Vanderbilt University, and the University of South Alabama.  In 1998-99 I took leave from the Department of Justice to serve as the Eugene Lang Professor in the Department of Political Science at Swarthmore College.  For the last eleven years I have co-taught a course on voting rights law as an adjunct professor at the George Washington University Law School.

3.  I have published a prize-winning book, *Abraham Lincoln and Reconstruction: The Louisiana Experiment* (Princeton, N.J., Princeton University Press, 1978) (winner of the L. Kemper Williams Prize of the Louisiana Historical Association), six law review articles, seven articles in refereed journals, and seven chapters in refereed books.  Over the last three decades my published work has focused on the history of discriminatory election laws in the South, evidence concerning discriminatory intent or racially polarized voting presented in the context of voting rights litigation, and the impact of the Voting Rights Act in the South.  Over the last four decades I have published numerous reviews of books in my areas of specialization and served as a scholarly referee for numerous journals and university presses.  I continued to publish scholarly work in my areas of expertise while employed by the Department of Justice and expect to continue my scholarly writing now that I have retired from government service.  A detailed record of my professional qualifications, a curriculum vitae, which I prepared and know to be accurate, is submitted with my declaration.

4.  I have been asked by attorneys for the plaintiffs in this litigation to assess the degree to which the adoption of a mid-decade realignment of the boundaries of 17 state house districts

by the state of Georgia in Act No. 251, 2015 Ga. Laws 1413 (H.B. 566) was motivated by a racially discriminatory purpose as to the re-redistricting of House District 105 in Gwinnett County, and House District 111 in Henry County – and whether that racial purpose was the predominant motive underlying the adoption of the boundary realignments in Districts 105 and 111. The rate at which I am being compensated in this litigation, $300.00 per hour, is my standard rate for serving as a consultant or expert witness.

5. Examining the intent underlying the adoption of legislation is a task I have frequently undertaken in my scholarly writing and in my service as an expert witness in voting rights litigation. I first addressed the intent underlying the adoption of discriminatory election laws in *Brown* v. *Board of School Commissioners of Mobile County*, 542 F. Supp. 1078 (S.D. Ala. 1982), and *Bolden* v. *City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982). In both cases the court relied in part on the evidence presented in my testimony. Subsequently I summarized that evidence in "History in the Courts: The Significance of *City of Mobile v. Bolden*," in Chandler Davidson (ed.), *Minority Vote Dilution* (Washington, D.C., Howard University Press, 1984), 47-65, and in "Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits," 28 *How. L.J.* 463 (1985). The court in another Alabama case relied in part on the evidence of discriminatory intent presented in my expert testimony in *Dillard* v. *Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986). I have summarized the evidence in that case in "Minority Representation in Alabama: The Pivotal Case of *Dillard v. Crenshaw County*," in Raymond Arsenault and Orville Vernon Burton (eds.), *Dixie Redux: Essays in Honor of Sheldon Hackney* (Montgomery, Al., New South Books, 2013), 403-22, and in "Alabama," co-authored with Jerome A. Gray, Edward Still, and Huey Perry, in Chandler Davidson and Bernard Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990*

(Princeton, N.J., Princeton University Press, 1994), 38-66, 397-409 (winner of the Richard Fenno Prize, American Political Science Association).

6.  In "Race and Reapportionment, 1962: The Case of Georgia Senate Redistricting," co-authored with Steven F. Lawson, *Journal of Policy History*, 12 (No. 3, 2000), 293-320, I examined the intent underlying the use of multi-member districts in the first legislative redistricting following the decision in the malapportionment case *Toombs v. Fortson*, 205 F. Supp. 248 (N.D. Ga. 1962).  I recounted the facts regarding Georgia congressional redistricting in 1981 and Georgia legislative redistricting in 2001 in "The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act," 11 *Mich. J. Race & L.* 275 (2006) (co-authored with Christopher Seaman and Richard Valelly), *reproduced before publication in Voting Rights Act: Section 5 Preclearance and Standards: Hearings Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 96-181 (2005).  I have addressed the intent underlying the adoption of at-large elections in a major Georgia city in "The Dynamics of Minority Vote Dilution: The Case of Augusta, Georgia, 1946-1986," *Journal of Urban History*, 25 (Jan. 1999), 199-225.

7.  My understanding of the proper role of an expert witness, based on my 37 years of experience in voting rights litigation, is that an expert is merely to assist the fact-finder by applying the methodology generally employed in his or her field of expertise to factual questions before the court.  In this declaration, therefore, as in previous expert testimony and scholarly publications, I have employed the standard methodology used by historians and political scientists in investigating the intent underlying the adoption or maintenance of election laws, and the effects of these laws.  For the convenience of the court in this case I have cross-referenced prior judicial findings to place in context the evidence I provide in this declaration.  However, I

avoid expressing any legal opinions in this declaration, as in prior sworn testimony in other

cases.  Although I write about the history of voting rights law in my scholarly publications and

co-teach a course on voting rights law, I am a historian by training, not an attorney.

8.  The sources on which I rely in this investigation are the sorts of documents which

historians and political scientists routinely utilize in their analysis of legislative decision-making

about matters such as redistricting.  I examined all available documents related to the legislative

history of H.B. 566, including House and Senate Journal entries, and videotapes of House and

Senate floor debates.  To understand the district realignments in House Districts 105 and 111, I

examined quantitative data from the Legislative and Congressional Reapportionment Office, as

well as data from the United States Bureau of the Census.  To place the 2015 re-redistricting in a

broader historical context, I examined documents relating to the 2006 re-redistricting in Georgia,

as well as the 2011 statewide legislative redistricting in Georgia following the publication of the

2010 decennial census and the partial re-redistricting in 2012; this includes the public Section 5

submissions regarding the 2006 partial redistricting, the statewide 2011 redistricting, and the

2012 re-redistricting.  I examined as well various reports concerning the demographic changes in

Gwinnett and Henry counties in the quarter century preceding the 2015 re-redistricting.  As

always in such an investigation, I consulted pertinent studies by political scientists and legal

scholars; in addition, I also considered relevant coverage by newspapers and other media.  Also

informative are: the transcript of a 30(b)(6) deposition in this litigation of Gina H. Wright,

Executive Director of the Legislative and Congressional Reapportionment Office, November 20,

2017, and the exhibits attached to that deposition; the transcript of the deposition of Dan

O'Connor, December 13, 2017, in this litigation, and the exhibits attached to that deposition; and

the transcript of a deposition of Robert M. Strangia, December 18, 2017, in this litigation.  I

understand that additional documents pertinent to my investigation are likely to emerge in the course of discovery in this case and, if asked, I will examine these documents and supplement this declaration.

9.   Following this Introduction, section II discusses the historical context of the 2015 re-redistricting from the 1965 Voting Rights Act to the 21st century. Section III summarizes the continued evidence of racially polarized in Georgia and the evolution of the relationship between race and party preference in Georgia.  The fourth section describes the pattern of population growth and demographic change in Gwinnett and Henry counties since 1970, with special emphasis on the increase of minority population in the 21st century.  Section V summarizes the mid-decade re-redistrictings in 2006 and 2012, and the 2011 statewide redistricting, and the sixth section recounts the brief legislative history of H.B. 566 in 2015.  Section VII probes the map-drawing phase of boundary realignments in House Districts 105 and 111, where the integral relationship between race and party is displayed.  The brief conclusion to the declaration provides the eighth section.  I conclude that the boundary realignments for Districts 105 and 111 required by the passage of H, B. 566 were designed to dilute minority voting strength – in order to protect the incumbents' re-election prospects without endangering Republican control of neighboring districts – and that utilizing a racially discriminatory means of advantaging partisan control is evidence of a racially discriminatory purpose.  This racial purpose was the predominant (indeed the *only*) goal of these boundary realignments.

## II.  The Historical Context of Redistricting in Georgia

10.  Georgia was one of the states covered by the special provisions of the Voting Rights Act in 1965 because its long history of racial discrimination affecting voting included both a literacy test and other devices as well as a low level of registration or voting.  As recently as

1958 the state had adopted a new voter registration act that added to the provisions enacted at the turn of the twentieth century a "good character and understanding qualification" requiring prospective registrants to answer correctly 20 of 30 questions to the satisfaction of the county registrar.  Even if administered fairly, notes one study, the questions "were difficult for even the best educated person to answer," and the tests were usually administered by unsympathetic whites with little legal education of training.[1]  In the state as a whole only 27 percent of voting age African Americans were registered to vote in November, 1964, as compared with 63 percent of voting age whites.[2]

11.  In Fulton County, however, Atlanta blacks were registered and voting at high enough levels to concern white political leaders in 1962 when the Supreme Court decided that constitutional challenges to malapportioned legislative districts were justiciable in a Tennessee case known as *Baker v. Carr*.[3]  A federal court in Georgia promptly ruled in *Toombs v. Fortson* that the Georgia state legislature was malapportioned.[4]  To comply with the court's legislative redistricting order, the legislature had to reapportion at least one of its two houses.  Under Georgia law the state senate could be redistricted by statute, but reapportioning the state house would require a constitutional amendment.[5]  Led by Carl Sanders, the president pro-tem of the

---

[1]  Laughlin McDonald, Michael B. Binford, and Ken Johnson, "Georgia," in Chandler Davidson and Bernard Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, NJ, Princeton University Press, 1994), 71, 410.

[2]  U.S. Commission on Civil Rights, *Political Participation* (Washington, DC, G.P.O., 1968), 238-39.

[3] 369 U.S. 136 (1962).

[4] See *Toombs v. Fortson*, 205 F. Supp. 248 (N.D. Ga. 1962).  The same year a federal court found the state's county unit system for electing statewide officeholders – which allocated "county unit" votes to each county based on its seats in the malapportioned state house – unconstitutional.  *Gray v. Sanders*, 203 F. Supp. 158 (N.D. Ga. 1962).  This decision was ultimately upheld by the Supreme Court in *Gray v. Sanders*, 372 U.S. 368 (1963).

[5] Peyton McCrary and Steven F. Lawson,  "Race and Reapportionment, 1962: The Case of Georgia Senate Redistricting," *Journal of Policy History*, 12 (No. 3, 2000), 316 n. 61.

state senate who had just won the Democratic gubernatorial primary – when the Democratic primary was still the only election that mattered in Georgia – the legislature voted to require multi-member districts for all counties with population that entitled them to more than one senator.[6]  Several senators pointed out that the state constitution required "one Senator from each district," but the majority pressed ahead with a multi-member plan.[7]  As the floor leader for the bill, veteran Frank Twitty from south Georgia, put it: "I am not going to vote for anything that would automatically put a member of a minority race in the Senate," and as he saw it "without countywide races a Negro would almost certainly be elected to the Senate from Fulton County."[8]  The state courts subsequently required the 1962 elections for the reapportioned state senate to be conducted on a single-member district basis, despite the actions of the legislature establishing multi-member districts.  As a result, attorney Leroy Johnson became the first black person elected to the Georgia legislature since Reconstruction.[9]

12.  The federal court in *Toombs v. Fortson* ordered further reapportionment to cure the malapportionment of districts in both houses of the legislature.  In a special election in 1965 in a heavily black house district, Julian Bond, the communications director of the Student Non-violent Coordinating Committee (SNCC), won a landslide victory.  Citing the fact that Bond and SNCC had issued a statement strongly opposing the war in Vietnam, the house refused to seat Bond by a vote of 184 to 12.  Bond challenged his expulsion in federal court and – after he had

---

[6]  *Id.*, 302-03.

[7]  *Id.*, 303, 316 n. 65.

[8]  *Id.*, 304, 317.

[9]  *Id.*, 305-06, 318-19.  See Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (New York, Cambridge University Press, 2003), 84-89.

won re-election to the seat a second and third time – the Supreme Court ultimately ruled that his expulsion was unlawful.[10]

13.   The implementation of the Voting Rights Act of 1965 – by suspending tests or devices and sending federal examiners into Southern counties with few registered blacks - almost immediately secured a major increase in the number of African Americans on the voting rolls. By August, 1967, black registration in Georgia had increased to 53 percent of the voting age population, but white registration had grown to 80 percent. [11]  Numerous counties switched from single-member districts to at-large elections between 1965 and 1970 for county commissions or school boards, almost all without submitting these changes for preclearance under Section 5 of the Act.[12]  These jurisdictions eventually returned to the use of district elections, either as a result of lawsuits (or the threat of lawsuits) or Department of Justice objections.[13]

14.   After publication of the 1970 decennial census, Georgia drew new redistricting plans for both state house and state senate to comply with the one person, one vote standard, and submitted both for preclearance under Section 5.  The Attorney General objected to the house plan because it diluted minority voting strength by increasing the number of multi-member districts and requiring candidates in those multi-member districts to compete for individually numbered posts and meet a majority vote requirement.  *Georgia v. United States*, 411 U.S. 526, 528-30.[14]  The state refused to revise the house plan and contended that Section 5 preclearance was not required for redistricting plans.  The United States sued to enforce its objection and the

---

[10]  *Id.*, 136-38.

[11]  U.S. Commission on Civil Rights, *Political Participation*, 238-39.

[12]  McDonald, *Voting Rights Odyssey*, 131-32.

[13]  McDonald, et.al., "Georgia," 82, 99-100 (Table 3.8), 412 n. 101.

[14]  The Department of Justice initially objected to the state senate plan because the district boundaries in Fulton and Richmond counties in such a way as to decrease minority voting strength, but precleared a revised senate plan.  McDonald, *Voting Rights Odyssey*, 148.

courts ruled against Georgia, citing among other precedents *Allen v. State Bd. Of Elections*, 393 U.S. 544 (1969).[15]  The state adopted a new house plan in 1974, with fewer multi-member districts and 24 majority-black districts, which the Department of Justice precleared.  In the 1974 elections 19 African American candidates won seats in the house and two won senate seats.[16]

15.   Black plaintiffs filed numerous lawsuits challenging the use of at-large elections for local governing bodies in the 1970s, winning some and settling others favorably.[17]  In the highest profile case, Burke County plaintiffs won at the trial court level, at the Fifth Circuit, and at the Supreme Court.[18]  The Court's findings reflect the sort of factual evidence found in many of the other Georgia cases.  Burke County was almost as large as Rhode Island, making it difficult to campaign at large.  In addition, the difficulties of running countywide were enhanced by the use of numbered posts and a majority vote requirement, as well as the racial segregation that affected every aspect of social contacts between whites and blacks.  There was also strong evidence that county commissioners were unresponsive to the policy interests of African Americans.  Above all, there was "overwhelming evidence of bloc voting along racial lines."[19]  The Court also affirmed the lower courts' finding that Burke County had intentionally maintained its at-large elections because the county's legislative delegation had "retained a system which has minimized the ability of Burke County Blacks to participate in the political system."[20]

16.   Following publication of the 1980 decennial census, Georgia's congressional redistricting plan failed to secure preclearance under Section 5.[21]  The case turned on the facts

---

[15]   See *Georgia v. United States*, at 530-32.
[16]   McDonald, *Voting Rights Odyssey*, 148.
[17]    *Id.*, 159-63.
[18]   *Rogers v. Lodge,* 458 U.S. 613 (1982).
[19]   *Id.*, at 623.
[20]   *Id.*, at 626.
[21]   *Busbee v.* Smith, 549 F. Supp. 494 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 1166 (1983).

surrounding the fifth congressional district, centered in the capital city of Atlanta. Black civil rights leader Andrew Young had represented the district during the mid-1970s, when whites were a majority of its voting-age population, but when Young left to head the United Nations delegation in 1977 the district elected a moderate white Democrat, Wyche Fowler. After the 1980 census the legislature increased the black population percentage in the fifth district to 57 percent, but whites were still 54 percent of the registered voters.[22] Because voting patterns had become more racially polarized in recent years, knowledgeable observers believed that the black concentration in the newly configured district was not great enough to provide African American voters an equal opportunity to elect a candidate of their choice.[23]

17.  The trial court found abundant evidence, both direct and circumstantial, that "[t]he Fifth District was drawn to suppress black voting strength."[24] For example, a key player in the legislative decision-making process, Joe Mack Wilson, who chaired the House Reapportionment Committee, complained to fellow legislators that "the Justice Department is trying to make us draw nigger districts and I don't want to draw nigger districts."[25] The trial court also found that Speaker Tom Murphy "purposefully discriminated on the basis of race in selecting the House members of the conference committee where the final redistricting plan was determined," in that he selected white legislators "he knew would adamantly oppose the creation of a congressional

---

[22.] *Busbee,* 549 F. Supp. at 498.
[23.] *Busbee,* 549 F. Supp. at 499.
[24.] *Id.* at 515.
[25.] *Busbee,* 549 F. Supp. at 501; Bullock, *Redistricting*, 144-45.  Wilson was also quoted as saying "I'm not for drawing a nigger district and I'm not for drawing a Republican district." *Id.* at 512. According to the trial court, "Wilson uses the term 'nigger' [routinely] to refer to black persons." *Busbee*, at 500.

district in which black voters would be able to elect a candidate of their choice," and refused to appoint any black members to the conference committee.[26]

18.   Because the redistricting plan had a racially discriminatory purpose, it was not entitled to preclearance, even though it was ameliorative rather than retrogressive in effect. As the three-judge court stated, "[s]imply demonstrating that a plan increases black voting strength does not entitle the State to the declaratory relief it seeks; the State must also demonstrate the absence of discriminatory purpose."[27] The court found the plan objectionable "because State officials successfully implemented a scheme designed to minimize black voting strength," and as a result the plan was "not free of racially discriminatory purpose."[28]

19.   After Congress amended Section 2 of the Act in 1982 to make it possible for plaintiffs to challenge discriminatory election laws under a results test, without the necessity of proving that the practice was adopted or maintained with a racially discriminatory purpose, the number of successful lawsuits in Georgia jumped dramatically.[29]   A systematic study of Georgia cities and counties over 10,000 with over 10 percent black populations found that between 1980 and 1990 many of the jurisdictions surveyed switched from at-large to single-member district elections.   Litigation under Section 2 – or sometimes the mere threat of litigation – was the primary cause of these changes.   The result of the change to single-member districts was a substantial increase in the percentage of elected officials in both cities and counties.[30]

---

[26.]   *Id.* at 510.  Murphy explained at trial that he was concerned that "we were gerrymandering a district to create a black district where a black would certainly be elected." *Id.* at 509–10.
[27.]   *Id*. at 516.
[28.]   *Id*. at 518.
[29]   McDonald, *Voting Rights Odyssey*, 182-84.
[30]   McDonald, et.al., "Georgia," 77-81, 91-100 (Tables 3.1-3.8).

### III.  Racially Polarized Voting and the Evolution of Party Preference

20.  The clear implication of this pattern of change is that voting patterns in Georgia continued to be polarized along racial lines, as in the past, but fairly drawn single-member districts provided a means for increasing minority representation *in spite of* that white refusal to vote for minority-preferred candidates.  This is consistent with the numerous dilution cases in which courts made judicial findings of racially polarized voting.[31]

21.  A recent study by Charles Bullock and Ronald Keith Gaddie provides evidence that statewide voting patterns in Georgia remain polarized along racial lines into the 21st century.  Estimates utilizing the two standard statistical measures, ecological regression and the ecological inference technique developed by political scientist Gary King, show that, for African American congressional candidates in Georgia in the 1990s, between 20 and 40 percent of white voters crossed over to vote for the candidates that black voters favored by 90 to 99 percent.[32]  To knowledgeable historians and political scientists, such findings constitute racially polarized voting – but such polarized voting is substantively significant only in contests where minority-preferred candidates lose the election.[33]

22.  Exit poll data demonstrate that African American voters are the most reliably Democratic voters in Georgia, but most whites consistently vote Republican.  Bullock and Gaddie report that "since 1992, Democrats have always taken at least 80 percent of the black vote while most whites invariably preferred Republicans."[34]  Exit polls in statewide elections for

---

[31]  *Id.*, 84-85, 412-13 (citing judicial findings of racially polarized voting).

[32]  Charles S. Bullock III and Ronald Keith Gaddie, *The Triumph of Voting Rights in the South* (Norman, University of Oklahoma Press, 2009), 101 (Table 3.6).

[33]  See, e.g., Bernard Grofman, Lisa Handley, and Richard G. Niemi, *Minority Representation and the Quest for Voting Equality* (New York, Cambridge University Press, 1992), 50-51.

[34]  Bullock and Gaddie, *Triumph of Voting Rights,* 100.

federal office from 1992 through 2006 show that African Americans supported the Democratic candidate at rates between 81 and 92 percent, whereas whites voted Democratic at rates between 23 and 45 percent.[35]

23.  As in the past, Georgia elections are usually characterized by a pattern of racial disparities in voter participation.  Turnout figures provided by the Georgia Secretary of State reveal that, from 1992 through 2006, the white percentage of registered voters who turned out to vote in the general election was consistently higher than for African Americans.  In the 1996 presidential election, for example, white turnout was 64.3 percent and black turnout only 53.5 percent.  In 2000 the presidential election brought 71.4 percent of whites to the polls but only 62.8 percent of blacks.  In the 2004 contest white turnout was at 80.4 percent and black turnout at only 72.2 percent.[36]

24.  These official numbers are more reliable than the biennial survey estimates published by the Bureau of the Census.  Professors Bullock and Gaddie report the Census Bureau's survey estimates for registration and turnout by race for Georgia from 1980 through 2006.[37]  These tables reveal an inconsistent pattern in both registration and turnout in Georgia.  Bullock and Gaddie note that the Census Bureau includes Hispanics with non-Hispanic whites in the published estimates; correcting that error, Bullock and Gaddie report that non-Hispanic white registration in Georgia "has exceeded that for blacks since 2002," and non-Hispanic white turnout has exceeded black turnout between 2002 and 2006 by 5-8 percent.[38]

---

[35]  *Id.*, 100, 103 (Table 3.8).

[36]  *Id.*, 86 (Table 3.2).

[37]  *Id.*, at 380 (Table B.1: registration by race), and 383 (Table B.2: turnout by race).

[38]  *Id.*, 83-85.

25.   Furthermore, political scientists have assembled strong evidence that the biennial surveys from the Bureau of the Census reflect an over-reporting bias that leads observers to underestimate the degree of racial disparity in registration and turnout.  Studies of the over-reporting problem compare the survey estimates from the Bureau of the Census – which depend on "self-reporting" by the individuals surveyed – with the official data collected by states such as Georgia that maintain racial data on political participation.  The findings of these studies make clear that: 1) a significant percentage of respondents of both races report that they registered or voted; 2) black respondents over-report their registration and voting at a higher rate than whites over-report participation.[39]  As a result, the estimates found in the biennial surveys from the Census Bureau –  even when separating Hispanics from non-Hispanic whites – underestimate the degree of racial disparities in registration and turnout.  These disparities in participation remain a characteristic of electoral behavior in Georgia in the 21st century, although they have decreased as a result of a half century of enforcing the Voting Rights Act.

### IV. Demographic Change in Gwinnett and Henry County

26.   The House districts at issue in this litigation, District 105 in Gwinnett County and District 111 in Henry County, are located in fast-growing suburban or exurban counties in the burgeoning Atlanta metropolitan region.  Between 1970 and 1999, reports the Brookings

---

[39] See, e.g., Paul Abramson and William Claggett, "Race-Related Differences in Self-Reported and Validated Turnout," *Journal of Politics*, 46 (1984), 719-38; Abramson and Claggett, "Race-Related Differences in Self-Reported and Validated Turnout in 1986," *Journal of Politics*, 51 (1989), 397-408; Abramson and Claggett, "Racial Differences in Self-Reported and Validated Turnout in the 1988 Presidential Election," *Journal of Politics*, 53 (1991), 186-97; Daron Shaw, Rodolfo O. de la Garza, and Jongho Lee, "Examining Latino Turnout in 1996: A Three-State Validated Survey Approach," *American Journal of Political Science*, 44 (2000), 338-46; Seth McKee, M.V. Hood, and David Hill, "Achieving Validation: Barack Obama and Black Turnout in 2008," *State Politics & Policy Quarterly*, 12 (No. 1, 2012), 3-22.

Institution, Gwinnett County grew from 72,349 to 523,900 (a 624 percent change).  During the same years Henry County population increased from 23,724 to 110,700 (a 367 percent change).[40] This phenomenal population growth during these decades did not include significant minority increases; the Brookings report characterized both Gwinnett and Henry counties at the end of the 20th century as "overwhelmingly white."[41] In 1999 Gwinnett was just under 10 percent white and Henry was just over 12 percent white.[42]

27.  Much of the population change during this period reflected "white flight" from Atlanta – especially affecting Gwinnett and neighboring counties: "white Atlantans' exodus to the northern parts of the metropolis has been fueled in large part by a desire to distance themselves from blacks, from crime, and from poverty."[43]  MARTA, the Atlanta metropolitan rapid transit system, had not reached Gwinnett or Henry counties by 1999.   There was, in fact, great white opposition to MARTA in the suburbs.[44]  MARTA ridership was heavily black, according to a 1989 survey: 1) travel within the city of Atlanta was 74 percent African American; 2) travel from city to suburb was 78 percent black; 3) travel from suburb to city was 57 percent black; and 4) travel from suburb to suburb was 81 percent black.[45]  Most whites in the suburbs had access to vehicles: in exurban counties "the ratio of cars to people was 1.23 to 1. In contrast, non-whites in the city of Atlanta "are less likely than whites to have access to a car," so they could not drive to either jobs or homes in the suburban or exurban counties.[46]

---

[40]   The Brookings Institution Center on Urban and Metropolitan Policy, *Moving Beyond Sprawl: The Challenge for Metropolitan Atlanta* (Washington, D.C., The Brookings Institution, 2000), 9.
[41]   *Id.*, 14.
[42]   *Id.*, 15.
[43]   *Id.*, 33.
[44]   *Id.*, 22.
[45]   *Id.*, 23.
[46]   *Id.*, 24, 28.

28.  According to the Brookings report, Gwinnett County in 1999 had "experienced explosive population and job growth in the past two decades."  The county led the metropolitan region in "net population increase," and ranked "second in net employment increase."[47]  Because of the increased demand for housing, there was a surge in construction jobs.  Over three-fourths of "Gwinnett's housing units were single-family homes," and in some parts of the county "median home values were among the highest in the Atlanta region."[48]  But the county was also "one of the areas most plagued by sprawl and traffic congestion.[49]  The Brookings report characterized Henry County as "chiefly a bedroom community offering more affordable single-family detached housing than other parts of the region;" 86 percent of the county's housing stock consisted of single-family homes.[50]

29.  This pattern of demographic change took a different direction in the 21st century.  According to the 2010 census Gwinnett was now a majority-minority county; the non-Hispanic white population had dropped to only 44 percent.[51]  The non-Hispanic black population was now 23 percent, Hispanics were now 20 percent, and the Asian population almost 11 percent.[52]  When the 2015 re-redistricting at issue in this litigation took place, according to the American Community Survey of the Bureau of the Census, Gwinnett's non-Hispanic whites were only 40 percent of the population; a quarter of the county's population was African American, Hispanics made up almost 21 percent of the population, and Asians 11 percent.[53]

---

[47]  *Id.*, 41.

[48]  *Id*.

[49]  *Id*.

[50]  *Id*.

[51]  U.S. Bureau of the Census, *American FactFinder*, Gwinnett County, Georgia, 2010 Demographic Profile Data (Not Hispanic, White alone).

[52]  *Id.*, Not Hispanic, Black alone, Asian alone.

[53]  U.S. Bureau of the Census, 2012-2016 American Community Survey 5-year Estimates, Gwinnett County, Georgia.  Five-year estimates do not provide an exact point estimate, because

30.  By 2010 the non-Hispanic white majority in Henry County was down to 53 percent.[54]  The non-Hispanic black population had increased to 36 percent; Hispanics were now six percent of the population, and Asians made up another three percent.[55]  According to the American Community Survey 5-year estimates for Henry County, by the time of the 2015 re-redistricting non-Hispanic whites had become a minority of the county's population at 48 percent.[56]  Non-Hispanic blacks were now almost 40 percent of the population; Hispanics were now six percent and Asians three percent.[57]

31.  The fact that the Republican base of electoral support in the white community was threatened by the dramatic increase of black, Hispanic, and Asian population in these two counties was a key focus of the mapmakers and legislators in the boundary alignments enacted by the General Assembly in 2015.  The growth of the African American population was the most important threat, both because blacks were by far the largest minority group in Gwinnett and Henry and because blacks were the most reliably Democratic voters in Georgia.

### V.  Legislative Redistricting and Re-redistricting in Georgia, 2006-2015

32.  The 2015 realignment of district boundaries at issue in this case presents a sub-set of redistricting which might be called "re-redistricting" or "mid-decade redistricting" –  a redistricting plan adopted *after* a constitutionally apportioned plan has been enacted following a decennial census, and *not* required by a court order.[58]  One legal commentator, writing about

---

they are based on multi-year pooled survey results.  Because the ACS data are based on sample surveys, they include margins of error.

[54]  U.S. Bureau of the Census, *American FactFinder*, Gwinnett County, Georgia, 2010 Demographic Profile Data (Not Hispanic, White alone).

[55]  *Id.*, Not Hispanic, Black alone, Asian alone.

[56]  U.S. Bureau of the Census, 2012-2016 American Community Survey 5-year Estimates, Henry County, Georgia.

[57]  *Id.*.

[58]  Justin Levitt and Michael P. McDonald, "Taking the 'Re' Out of Redistricting: State

Georgia re-redistricting in 2006, has termed this sort of re-redistricting "pinpoint redistricting,"
because it focuses on realigning boundaries in a few select districts to advantage specific
individual candidates – and to enhance the election prospects of candidates of the majority
Republican Party generally.[59]  Respected political scientist Charles Bullock of the University of
Georgia calls the sort of re-redistricting enacted by Georgia in 2015 – a practice only employed,
as he understands the facts, in the years since 2000 – "a break with tradition."[60]

33.  In 2006 the state adopted a re-redistricting plan that was not justified either by a need
to satisfy the one person, one vote requirement of the Fourteenth Amendment or remedy a
judicial finding of liability.  Despite the novelty of such re-redistricting, the Georgia Supreme
Court rejected the plaintiffs' claim that the General Assembly lacked the constitutional authority
to enact such a mid-decade redistricting.[61]  Unlike the 2015 plan, none of the districts included
substantial minority population.  In submitting the changes for federal preclearance, Attorney
General Thurbert Baker cited specific goals that could be characterized as satisfying traditional
districting criteria: decreasing splits in counties, improving the compactness of a district on Saint
Simon's Island, and reducing the number of ballot combinations for election administrators to
explain to voters.[62]  Plaintiffs challenged the state senate re-redistricting in federal court as a

---

Constitutional Provisions on Redistricting Timing," 95 *Geo. L.J.* 1257 (April 2007), use both
"re-redistricting" and "mid-decade redistricting" to describe such unnecessary redistricting plans.
[59]  Alex J. Whitman, "Pinpoint Redistricting and the Minimization of Partisan Gerrymandering,"
59 *Emory L.J.* 211 (2009).
[60]   Charles S. Bullock III, *Redistricting: The Most Political Activity in America* (Lanham, MD,
Rowman & Littlefield Publishers, 2010), 12.
[61]   *Blum v. Schrader*, 281 Ga. 238 (2006).
[62] See Thurbert E. Baker to John Tanner, March 17, 2006, File No. 2006-2917 [Section 5
Submission of Georgia State Senate Redistricting], and Baker to Tanner, March 20, 2006, File
No. 2006-2699 [Georgia State House Redistricting].  Both plans were precleared by the Attorney
General.

partisan gerrymander that also violated the one-person, one-vote standard, but did not claim a racial effect; in any event their lawsuit was unsuccessful.[63]

34.   In 2011 Georgia enacted statewide redistricting plans for Congress, the state house, and state senate.  The state submitted the plans for administrative preclearance by the Department of Justice, but also filed a declaratory judgment action seeking preclearance by a three-judge court in the District of Columbia.[64]  The submission included the state's guidelines for redistricting, beginning with its interpretation of federal law regarding population equality: "each congressional district should be drawn with a total population of plus or minus one person from ideal district size" and each legislative district "should be drawn to achieve a total population that is substantially equal as practicable."[65]  In addition the guidelines called for complying with the Voting Rights Act, as well as the federal and state constitutions; districts should, furthermore, be "composed of contiguous geography" (not including point contiguity), and no multi-member districts should be included in the plan.[66]  The guidelines then noted that the redistricting committees "should consider" respecting county and precinct boundaries, making districts compact, satisfying communities of interest, and avoiding "the unnecessary

---

[63] *Kidd v. Cox*, 2006 WL 1341302 (N.D. Ga. 2006).  The changes affecting Clarke County were likely made "to fragment Democratic voters after a Democratic representative announced her candidacy for an open seat."  See Levitt and McDonald, "Taking the 'Re' Out of Redistricting," at 1276 n. 50.  See further, Whitman, "Pinpoint Redistricting," at 224-230.

[64] Samuel S. Olens to T. Christian Herren, October 21, 2011, File No. 2011-26 [Section 5 Submissions], noting at 12 that the state had filed an action seeking preclearance of the plans.

[65] *Id.*, at 6.  Note that this language did *not* call for the standard adopted in the 2015 redistricting (no more than plus or minus one percent deviation).

[66] *Id.*, at 7.

pairing of incumbents."[67]  None of the three plans reduced the number or percentage of majority-minority districts.[68]  The Department of Justice precleared the plan.

35.  In 2012 the state adopted legislation that revised house and senate district boundaries just enacted in 2011 as part of the statewide redistricting plan following the 2010 decennial census.  Unlike the 2011 redistricting plans, there was no need to realign district boundaries to comply with federal or state law.  No election had been held under the 2011 plan before the 2012 revisions – unlike the 2015 re-redistricting – so it's difficult to understand any other "need" justifying the revisions.  The 2012 House bill made just three changes affecting seven counties; as in 2006, these changes had at least plausible explanations.  The first change reduced the number of districts that split Hall County in northeast Georgia – the home county of both the governor and lieutenant governor.  The second change eliminated the pairing of two incumbents.  The third corrected a misallocation in the 2011 statewide plan that had split a precinct unnecessarily.[69]  Perhaps not surprisingly, in light of the fact that no majority-minority districts were affected, the 2012 re-redistricting plans were precleared by the Department of Justice.

36.  The 2012 re-redistricting adopted the same Guidelines as governed the 2011 statewide redistricting process.  These guidelines required legislative districts to "achieve a total population that is [as] substantially equal as practicable, considering the principles listed below."  The "principles below" included: compliance with the Voting Rights Act; compliance with the United States and Georgia Constitutions; district contiguity (not just point contiguity); no multi-

---

[67]  *Id.*  By listing these traditional criteria as something the committees "should consider," along with protecting incumbents, these guidelines seem to treat these criteria as secondary to the previously mentioned concerns.

[68]  *Id.*, at 11.

[69]  Samuel S. Olens to T. Christian Herren, March 16, 2012, File No. 2012-1454 [Section 5 Submission of Georgia State House Redistricting].

member districts; district compactness; respect for communities of interest and the boundaries of counties and precincts; and efforts to avoid pairing incumbents.[70]

37.   The 2015 re-redistricting at issue in this lawsuit was the first to occur *after* the Supreme Court decision effectively eliminated the preclearance requirements of the Voting Rights Act in *Shelby County v. Holder*.[71]   Thus the changes never underwent federal scrutiny before taking effect.   In 2015 the General Assembly did not publish guidelines such as those in 2011-2012, so we have to infer the criteria the legislative majorities had in mind from their actions.   As in 2006 and 2012, the state did not need to realign district boundaries in 2015 as a way of curing a malapportionment problem; the population deviations in the existing plan were well within the limits recognized by the federal courts (in fact the deviations were around plus or minus one percent).   In fact, the only principle set forth in prior redistricting guidelines that was mentioned – and then only mentioned in conversations with the plan-drawers of the Reapportionment Office – was the protection of incumbents.

## VI.  The Legislative History of H.B. 566

38.   The official record of legislative deliberations over H.B. 566 is sparse.   Neither House nor Senate held public hearings or provided an opportunity for public comment.   The Legislative and Congressional Reapportionment Committee Chair, Randy Nix, emphasized the important role played by the Legislative and Congressional Reapportionment Office in working with individual members on each of the boundary realignments.[72]   He told his colleagues that the committee adhered to all the rules and regulations regarding changes to district boundaries, but the only redistricting criterion Nix mentioned was that the committee made sure that no district

---

[70]   Olens to Herren, March 16, 2012, at 5-6.

[71]   133 S.Ct. 2612 (2013).

[72]   House floor proceedings, March 11, 2015 (Day 29, PM), (YouTubeVideo) beginning at 59:50.

had a population deviation of plus or minus one percent; as noted earlier, however, the existing districts adopted in 2012 already met that exacting standard.[73]  He stressed that district boundaries were revised only at the request of individual members, that all members affected by the changes agreed to accept the results, and that the boundary realignments affected 11 districts represented by Republican and six represented by Democrats.[74]  The House Committee on Legislative and Congressional Reapportionment sent the bill (as amended in committee) to the House floor with a "Do Pass" recommendation.[75]  The bill passed unanimously, 169-0, two days later.[76]

39.  In the Senate the Committee on Reapportionment and Redistricting sent H.B. 566 to the floor with a "Do Pass" recommendation, but when the full Senate considered the bill the committee's chair, Republican Mike Crane joined Democratic Senator Vincent Fort in proposing an amendment to the bill (changing the effective date of the law, if enacted, to July 1, 2015).[77]  The purpose of changing the effective date, said the two sponsors, was to give the House an opportunity to reconsider revisions to two of the affected districts, as requested by the representatives from Districts 59 and 60 (even though the affected members had not voted against H.B. 566 on final passage).[78]  Several Republican senators spoke against the amendment, stressing that the House vote was virtually unanimous and custom obligated the Senate to defer to the House vote on its own plan, as a professional courtesy.[79]  In the floor debate most senators agreed that in such a re-redistricting there was traditionally an agreement that the House drew its

---

[73]  *Id.*

[74]  *Id.*

[75]  *House Journal*, March 9, 2015, at 2003-04.

[76]  *Id.*, March 11, 2015, at 2147.

[77]  Senate floor proceedings, March 31, 2015 (Day 39, PM), (YouTubeVideo) beginning at 38:10.

[78]  *Id.*

[79]  *Id.*

own districts, the Senate drew its own districts, and that each body deferred to the other.[80]   The committee had been assured that H.B. 566 complied with the Voting Rights Act, but Senator Fort charged that the bill would "pack" District 60 and dilute minority voting strength in District 59.[81] There was no reference in the floor debates to Districts 105 or 111.[82]   The Senate passed H.B. 566 on a mostly party-line vote, 39-14.[83]

40.   A month later, however, Senator Fort joined with local Democrats in Gwinnett County in asking Governor Nathan Deal to veto H.B. 566 because it "dilutes black voting strength."[84]   Jim Shealey, chair of the Gwinnett County Democratic Party, charged that the bill "takes probably the most competitive district in Gwinnett County and now it's a non-competitor."[85]   Renita Hamilton, an African American Democrat, had "already lost twice to a Republican in the [current] district but only by a few hundred votes."[86]   Senator Fort characterized the revised District 105 as one "where African-Americans would not be able to vote for [and elect] a candidate of their choice."[87]   He added that "not only is racial gerrymandering a factor in the Gwinnett district, but in Districts 59 and 60 in the city of Atlanta and District 111 in Henry County as well."[88]   The Governor did not veto H.B. 566.

---

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Senate Journal*, March 31, 2015, at 2569.  With all roll call votes, I have compared the votes cast with the party affiliations of the legislators as listed in the senate roster.

[84] Sandra Parrish, "Democrats Call on Governor to Veto Redistricting Bill," WSB Radio, May 1, 2015, 6:16 AM.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

VII.  How the Plan Was Drawn

41.  To understand the purposes of the boundary realignments in Districts 105 and 111, the most direct evidence is provided by observing how the lines came to be drawn in the Legislative and Congressional Reapportionment Office.  That is where legislators who wanted to have their district boundaries redrawn met with the technical staff they needed to execute their wishes. The depositions of its Executive Director, Gina Wright, redistricting data specialist Dan O'Connor, and Geographic Information System (GIS) technician Rob Strangia, provide valuable information about: 1) the GIS software used by the office – Maptitude for Redistricting; 2) the process by which legislators worked with staff of the Reapportionment Office; 3) the redistricting criteria Wright and her staff tried to follow; 4) their routine use of racial data on population at the census block level, as well as their regular use of voter registration and turnout data available only at the precinct level; and 5) and their daily use of political data (the candidate preference votes in recent statewide contests)  also available only at the precinct level on their system.  Each deponent also provides information about past redistrictings and re-redistrictings, as well as deliberations about another possible boundary realignment bill in 2017.[89]

42. As to the redistricting criteria she and her staff followed in developing the 2015 House plan – as in past plan drawing – Wright emphasized that they sought "to comply with all state and federal law, which would include the Voting Rights Act."  She added that they also considered "criteria such as contiguity, compactness, keeping counties/precincts whole as much

---

[89] Transcript of Deposition of Gina H. Wright, November 20, 2017, Georgia State Conference of the NAACP v. Kemp (hereafter Wright Deposition); Transcript of Deposition of Dan O'Connor, December 13, 2017, Georgia State Conference of the NAACP v. Kemp (hereafter O'Connor Deposition); Transcript of Deposition of Robert M. Strangia, December 18, 2017, Georgia State Conference of the NAACP v. Kemp (hereafter Strangia Deposition).

as possible, communities of interest," and "[f]urther down would be incumbency."[90]  The

guidelines adopted by the General Assembly in 2011 and 2012 recognized only the criterion of

*avoiding the pairing of incumbents* – not protecting the re-election prospects of incumbents.

*None* of the criteria Wright listed – unless she viewed incumbency protection as one of the

state's districting criteria – explain the decision to realign district boundaries in 2015.  After all,

the existing 2011 plan, as modified by the re-redistricting of 2012, satisfied all the traditional

redistricting criteria Wright mentioned (including federal approval under Section 5 of the Voting

Rights Act).

43.  The complexities of the boundary realignments in Districts 105 and 111 were best

explained in the depositions of Dan O'Connor, a redistricting data specialist in the

Reapportionment Office, and (on a very specific methodological point) GIS technician Rob

Strangia.  Asked to explain O'Connor's role in the Reapportionment Office, Wright described

him as "a data junkie," who has a "unique ability" to analyze and remember election history,

geography, and other data.  "He does a lot of map requests and information requests from

members."[91]  She added that O'Connor's knowledge of the kind of election details needed by

candidates and officeholders explains "a lot of the members like to pick his brain about things

like that."[92]  In his deposition, O'Connor conceded that among Republicans at the capitol  "you

are considered to be the person they turn to . . . when they want to analyze the likely performance

of their district" in a future election.[93]  O'Connor had essentially played this role during years

when he was employed by the Georgia Republican Party and by the General Assembly.  He

---

[90] Wright Deposition, at 20-21.
[91]  Wright Deposition, 210:16-211:1-5.
[92]  *Id.*, 211:14-16.
[93] O'Connor Deposition, 144:24-25, 145:1-4. For a similar exchange, see 77:16-20.

conceded in his deposition that "one of your roles was to make sure that Republicans maintained control of the House."[94]

44.  After the 2016 election, O'Connor was asked to assess the prospects for revising the boundaries of Districts 105 and 111, among others, should the legislative majority decide to revise the 2015 plan in 2017.  Because the Republican incumbents had experienced very close elections in 2012 and 2014, both 105 and 111 were considered "very competitive districts."[95] Shown an email in which he referred to Gwinnett County as "a tough calls county" because it had several marginal House seats, O'Connor agreed that he was referring to "the fact that there are a number of seats where Republicans are winning by very close margins."[96]  O'Connor conceded that in Representative Joyce Chandler's district (105), where she won the 2016 election by a very small margin, "Chandler would have lost if her district hadn't been tweaked in 2015."[97]

45.  In the same email, O'Connor had remarked that Henry County was changing so much that he was "not sure there's much more you can do" to improve Republican chances of winning in District 111 – Brian Strickland's seat – without weakening Republican chances in neighboring districts.[98]  In District 111 the black population was 37.84 percent before passage of H.B. 566 but only 35.31 percent after it became law.[99]  O'Connor conceded in his deposition "that if the 2015 redistricting had not taken place, he [Strickland] would have likely lost in

---

[94] O'Connor said "yes."  O'Connor Deposition, 51:124-25, 52:1-4.  The question was posed in terms of O'Connor's work on the statewide redistricting plan in 2011, but his answer is consistent with his description of his role in regard to the 2015 plan and a proposed 2017 plan (see below).

[95] O'Connor Deposition, 65:7-24, 66:7-15.

[96] *Id.*, 68:18-25, 69:1-14.

[97] *Id.*, 90:15-24.

[98] *Id.*, 69:16-22.

[99] Pl. Ex. 44, Wright Deposition: Dan O'Connor to David Knight, October 8, 2015, 3:44 PM (relying on 2010 Census).

2016."[100]  O'Connor added, however, that the standard practice of using past election results by precinct as a way of gauging how a candidate might fare in a future contest was "hard to calculate" for Strickland's district "because there are so many split precincts in the district."[101]

46.   District 111 had 13 precincts, *five* of which were split by the boundaries of the 2015 plan.[102]  O'Connor agreed that having such a high percentage of split precincts in the district "makes it really hard to assess political performance."[103]  "What challenges does having split precincts create in terms of predicting partisan performance," O'Connor was asked.  He had already explained that election results were only available at the precinct level for Georgia counties and thus it was only possible to "estimate" –  and clearly O'Connor was skeptical of such estimates – "Republican performance at any unit lower than the precinct level."[104]  The only available data below the precinct level are the racial variables which the Census Bureau provides by census block, O'Connor explained.[105]  Because block-level racial data are available, they provide a more reliable basis for predicting political performance than past election results – especially when dealing with split precincts.

47.   When splitting precincts, the Reapportionment Office staff uses census block geography to execute the precinct splits.  The best-informed explanation of the methodology used by the Reapportionment Office to predict the political performance of districts with split precincts is found in the deposition of GIS technician Rob Strangia.[106]  Asked to assume

---

[100] *Id.*, 76:18-24.
[101] O'Connor Deposition, 77:24-25, 78:1-2.
[102] *Id.*, 79:4-25, 80:1-22.
[103] *Id.*, 79:23-25, 81:1.
[104] *Id.*, 23:24-25, 24:1-3 (observing that "the precinct's the only level you can get an, you know, really official count of the area").
[105] *Id.*, 23:16-25, 24:1-8.  O'Connor agreed that "at the block level you're able to do anlyssis of what the racial demographics of the precinct are."  *Id.*, 81:7-10.
[106] Strangia Deposition, 24-27, 85-91.

hypothetically that the vote in the entire precinct is split between Republicans and Democrats on

a 50-50 basis, Strangia explains:

"If you have a hundred registered voters in [a precinct] and . . . there's two blocks in the precinct, one block has 60 percent of the voting age population, the other block has 40 percent of the voting age population, it's going to allocate the election data based on these percentages to the block level geography.  It's only an estimate."[107]

"It's going to . . . put 60 percent of the votes for both candidates in the block with the larger population and 40 percent in the one with the lower population."[108]

To estimate political performance at the census block level, in other words, the staff

*disaggregates* precinct data by a widely used – but inexact and insufficient – methodology.[109]

The methodology *assumes* that the variable – in this case a political variable such as candidate

preference – is distributed *within* a larger unit such as a precinct equally throughout the larger

unit, so that candidate preference is distributed in each part of a split precinct in precisely the

same percentage as in the entire precinct.[110]

48.  Thus in District 111, for example, the precisely measured racial variable in each

census block likely provides a more reliable predictor of future political performance in each

portion of a split precinct that is within District 111 than the disaggregated political variables at

---

[107] *Id.*, 25:20-25, 26:1-3.

[108] *Id.*, 26:14-18.

[109] I have used the term "disaggregate," the more commonly used word  –  where Strangia uses the term "allocate"  –  to describe estimating (based on data from a precinct) the election results for each census block contained within the precinct.  Strangia says in his deposition that he understands from personal contacts at meetings of the National Conference of State Legislatures that both Texas and Florida use the same methodology.  Strangia Deposition, 27:6-10, 17-20.  He also notes that the Reapportionment Office has used this methodology for disaggregating data since he has worked for the state.

[110] In my experience that assumption is unprovable and unlikely to be true when estimating the distribution of either political or racial variables – at least in most areas of the United States.  The converse of "disaggregation" is "aggregation"  – here to add all precinct results in a district with no split precincts to obtain an arithmetic sum for the district (which of course requires making no assumptions about the distribution of data, as required by *dis*-aggregation).

the block level.  Split precincts, in other words, increase the need to use racial data as a means of predicting Republican (or Democratic) performance – because African Americans in Georgia vote so heavily Democratic year after year.

49. At a more general level, as well, the racial composition of a district – or of an entire county – is a good predictor of future political performance.  "Is it true that what's going on in both Henry and Gwinnett counties is that they're becoming increasingly minority," O'Connor was asked, and he answered: "Correct."  He agreed as well that "these were counties that, up until recently, had been predominantly white and predominantly Republican," and conceded that "with the increase in minority population in these counties, they are becoming more Democrat[ic]." [111]  The reason for that, O'Connor agreed, "is that most African-Americans vote Democrat[ic]," and as a result "the more African-American a district is, the less likelihood a Republican is going to win it." [112]

50. O'Connor was asked to generalize beyond Districts 105 and 111: "Would it be fair to say that there aren't too many legislative districts in Georgia that are less than 40 percent black and are represented by Democrats?"  He responded: "that would be a fair assessment, yes." [113] In fact, O'Connor provided data on this subject in a 2015 email to Republican Representative Jan Jones, the speaker pro tem of the Georgia House – based on the election outcomes in the 2014 election.  "Of the 60 Democrats elected, 48 were from black-majority districts (with Gerald Green the only Republican in the General Assembly from a majority-black district)." [114]  As for the areas of Republican success, O'Connor noted that "of the 75 House districts that were less

---

[111] *Id.*, 71:9-23.
[112] *Id.*, 85:15-23.
[113] O'Connor Deposition, 142:12-17.
[114]  Dan O'Connor to Jan Jones, September 4, 2015, 4:24 PM [GA2-001168].  And see Table 1 (above), which accompanied O'Connor's email.

than 20% black in voter registration, Republicans held a 73-2 advantage."[115]  This is stark

documentation of the correlation between race and party in current Georgia politics.

Table 1: Election Outcomes by Racial Composition of House Districts, 2014

| Black Percentage Registered Voters | Democrats Elected | Republicans Elected | Independents Elected | Totals |
|---|---|---|---|---|
| 70% and higher | 5 | 0 | 0 | **5** |
| 60-69.9% | 22 | 0 | 0 | **22** |
| 50-59.9% | 21 | 1 | 0 | **22** |
| 40-49.9% | 7 | 1 | 0 | **8** |
| 30-39.9% | 2 | 10 | 1 | **13** |
| 20-29.9% | 1 | 34 | 0 | **35** |
| 10-19.9% | 2 | 37 | 0 | **39** |
| Under 10% | 0 | 36 | 0 | **36** |
| **Totals:** | **60** | **119** | **1** | **180** |

Source: Dan O'Connor to Jan Jones, September 4, 2015, 4:24 PM.

51.  Wright drew most of the maps revising House districts in 2015, in consultation with

the affected legislators.   Asked about the data she typically had available when drawing district

plans, Wright replied: "When I work on a plan, I use the pending changes box, which is a feature

in Maptitude that shows you how your numbers change" as you switch geographic units in and

out of districts.  "I like to have the political data there as well as other data, racial data,

population data, all of those other things."[116]  The racial data from the 2010 decennial census

were available at the census block level.  The "political data" to which she referred were the

votes by precinct in past contests.[117]  Wright added that voter registration and turnout data by

---

[115]  *Id.*
[116] Wright Deposition, at 104-05.
[117] *Id.*, at 24-25.

race at the precinct level "is built in to our political data layer that we can use in our system."[118]
In short, plan drawers were always aware of both racial composition and past candidate preferences as predictors of future political performance in each potential district configuration.

52.  When asked whether there is "any correlation between race and partisanship in Georgia," Wright replied cautiously: "There have been studies of that, and they seem to show that there is some correlation."[119]  Asked to explain her understanding of that correlation, she replied: "districts that are majority-minority districts tend to elect Democratic candidates," and she conceded that "districts that are, let's say, 65 percent or more white tend to elect Republican candidates."[120]  The correlation between partisan voting and race in elections in Georgia and many other states is, in fact, recognized by most political scientists, historians, journalists, and persons active in politics.[121]

53.  It was Wright's job to work with each legislator who came to her with a request to revise their district boundaries and to meet their requests to the extent possible, without endangering the re-election prospects of neighboring legislators.  Asked what the representatives from District 105 and District 111 "wanted to achieve" when they came to her office, she said only: "They were looking for a political advantage."[122]  She recalled that her first conversation regarding boundary realignment of District 105 was with Joyce Chandler, the incumbent, "prior to the [20]14 election."[123]  Wright agreed that during that conversation with Representative

---

[118] *Id.*, at 25-26.
[119] Wright Deposition, at 31.
[120] *Id.*, at 31-32.
[121] Bullock and Gaddie, *Triumph of Voting Rights,* 100.
[122] Wright Deposition, at 21-22.
[123] *Id.*, at 22.  Note that just before the 2016 elections, Representative Chandler said to the press that she "doesn't recall requesting a change to her district, adding "I was not privy to the reason behind that."  David Wickert, "Gwinnett House District Gets Voting Rights Scrutiny," *Atlanta Journal-Constitution*, September 21, 2016.

Chandler, "part of the conversation was about her trying to maximize the chances of her being able to retain her seat."[124]  She recalled also talking with the legislator from District 104, who would have to agree to boundary realignments designed for Representative Chandler that affected his district, and regularly with the committee chair, Randy Nix.[125]  No legislator raised any other concerns.

54.  When asked whether "the issue of the changing demographics in Gwinnett County [was] brought up," Wright answered in the affirmative.  She agreed that between 2000 and 2010: 1) the county's total population "grew a lot;" 2) the county's "white non-Hispanic population decreased" by about 50,000; and thus 3) the growth in population was caused by the growth in "the non-white population."[126]  In fact, she conceded, "the black population went from 13 percent to 22.9 percent."[127]

55.  Wright conceded that she was aware that both the black population and the Hispanic population of District 105 decreased when its boundaries were revised in 2015 – and that in the pre-2015 version of the district President Obama received more votes than Mitt Romney, whereas in the version of District 105 adopted in 2015 Romney would have defeated Obama.[128] She was aware of both the racial and the political effects of the boundary changes in the district,

---

[124] Wright Deposition, at 23.

[125] *Id.*, at 17, 22-23.

[126] Wright Deposition, at 86-89.

[127] *Id.*, at 91.

[128] Wright Deposition, at 193-94. Racial data were good predictors of political outcomes for District 105, in O'Connor's view.  President Obama carried District 105 in the 2012 presidential election 50.8 percent to 48.4 percent; under the plan enacted in 2015 the President would have lost to Mitt Romney 46.3 percent to 52.8 percent.  In the 2014 gubernatorial contest Nathan Deal lost District 105 to Democrat Jason Carter, 48.5 percent to 49.3 percent; after adoption of H.B. 566 the Governor would have carried District 105 53.4 percent to 44.4 percent.  Pl. Ex. 38, Wright Deposition: Dan O'Connor to Steve Henson, April 28, 2015, 11:50 AM (relying on 2010 Census).

she agreed, because the factors she had available in Maptitude when drawing plans included

"racial demographics according to the census, performance in statewide partisan elections, and

the percentage of black and Hispanic registered voters."[129]  In short, Wright was aware that the

changes to District 105 had both an undisputed racial effect and a predicted political effect.

56.  As to her discussions with Brian Strickland of District 111 in Henry County, and

legislators from other affected districts in the county, Wright agreed that it would "be fair to say

that the goal was for Representative Strickland in 111 to be able to maintain his seat" while

trying to avoid the threat that incumbents from neighboring districts "would not be reelected."[130]

As noted earlier, Wright regarded it as her job to satisfy this goal, to the extent possible.

57.  When census data from 2000 and 2010 was put before her, Wright agreed that the

population of Henry County increased from over 119,000 to around 204,000, and that this

growth was predominantly due to the influx of minority population: "the white non-Hispanic

population goes from 80.1 percent to 52.5 percent" and the black non-Hispanic population in

Henry County "went from 14.7 percent to 36.3 percent."  She conceded that another way of

saying this was: "between 2000 and 2010 the white non-Hispanic population goes from being

roughly four-fifths white to being roughly half white."[131]  Wright clearly understood that this

dramatic demographic change significantly affected the possibility of achieving Representative

Strickland's political goal, as a similar growth of minority population had been a matter of

concern for Joyce Chandler in Gwinnett County.

58.  The boundary realignments in Districts 105 and 111 that resulted from the passage of

H.B. 566 brought a decrease in the minority population of both districts.  The Democratic leader

---

[129] Wright Deposition, at 195-96.
[130] Wright Deposition, at 27-29, 175-77.
[131] Wright Deposition, at 95, 101-02.

in the state senate, Steve Henson, requested data regarding the racial changes in these districts from Dan O'Connor before the bill was signed into law.  The black population in District 105 dropped from 36.69 percent in the 2012 plan to 34.69 percent after adoption of H.B. 566.  The Hispanic population declined from 14.13 percent to 12.19 percent in the district.  The African American percentage of the registered voters in District 105 – always lower than the population percentage – was 34.9 percent in 2014; in the new plan created by H.B. 566, blacks were only 31.6 percent of the registered voters.  Hispanics declined from 4.2 percent of registered voters to only 3.7 percent.[132]  Subsequently critics said "lawmakers took a highly competitive Gwinnett County district and made it easier for incumbent Republican Rep. Joyce Chandler of Grayson to get re-elected" – by means of "removing hundreds of minorities from District 105 and placing them in adjacent District 104," which "intentionally" fragments minority voters "so that they can't join together to elect a candidate they think represents their interests."[133]

## VIII.  Conclusion

59.  As far as the record makes clear, the decisions made by the state in realigning the boundaries of House Districts 105 and 111 in the 2015 re-redistricting were based on the goal of enhancing the re-election prospects of Republican incumbents or – if an incumbent decided not to run for re-election – a new Republican candidate for the seat.  That goal was pursued, however, by using the dilution of minority voting strength as a means to that political end.  In my own research, and in the scholarly work of historians and political scientists in my field of expertise, using racially discriminatory means to achieve political goals is evidence of a racially

---

[132] Pl. Ex. 38, Wright Deposition: Dan O'Connor to Steve Henson, April 28, 2015, 11:50 AM (relying on 2010 Census).

[133]  David Wickert, "Gwinnett House District Gets Voting Rights Scrutiny," *Atlanta Journal-Constitution*, September 26, 2016.

discriminatory intent.  It is my understanding that this view among social scientists is not inconsistent with the standards applied in the federal courts over the last 35 years.

60.  The evidence presented in this declaration makes clear, in my judgment, that in the 2015 re-redistricting no traditional redistricting criteria were at issue in the legislative decision, other than incumbent protection.  The only goal announced by any of the actors was the goal of deferring to the wishes of incumbent legislators to enhance their re-election prospects, without endangering the re-election of other Republican legislators.  In the case of the incumbents in House Districts 105 and 111, the Reapportionment Office staff knew that these districts were perilously close to the racial threshold of 40 percent African American – which virtually always meant Democrats would win the district – and that Representatives Chandler and Strickland had come very close to losing in 2014.  Electoral safety required cutting the African American percentage of the population and the registered voters in Districts 105 and 111.[134]  This would dilute minority voting strength by fragmenting minority population concentrations.  Even if there is no majority-minority district at issue, in today's political environment cross-over voting by whites supporting minority-preferred candidates can often make districts with less than a 50 percent voting age population *ability to elect* districts for minority voters, even where there is racially polarized voting.  Because the singular goal of using a racially discriminatory means of enhancing incumbent re-election prospects was the *only* goal of these legislators – and the state, which deferred to their wishes – the goal of racial discrimination was necessarily the predominant motive of the 2015 mid-decade redistricting as applied to House Districts 105 and 111.

---

[134]  Voter registration data are ephemeral; for a variety of reasons the percentage of the voting age population that is registered is subject to significant change.  Total population and voting age population are more stable variables for designing districting plans.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of December, 2017.

Peyton McCrary

# Appendix

## CURRICULUM VITAE: PEYTON McCRARY

Professorial Lecturer, George Washington University Law School, 2006 -        pmccrary@law.gwu.edu

Historian, U.S. Department of Justice, 1990-2016 (retired)
Civil Rights Division, Voting Section
1800 G Street, N.W, Room 7267
Washington, D.C. 20006

> Principal Functions: Research for voting rights litigation; identifying consultants and expert witnesses to be used in cases; working with attorneys and experts to prepare for direct testimony and cross-examination; supervising the preparation of contracts and processing the reimbursement of consultants and expert witnesses; drafting presentation of factual evidence in memoranda, briefs, and proposed findings of fact; legislative history research.

EDUCATION:    University of Virginia:    B.A. (Honors), 1965
                                                    M.A., History, 1966

              Princeton University:    Ph.D., History, 1972

TEACHING FIELDS:    Voting Rights Law; Minority Voting Rights; U.S. History; History of the South; Southern Politics; Civil War and Reconstruction; American Political Parties and Voting Behavior; Theory and Methods of Historical Analysis

CAREER RECOGNITION:

Maceo Hubbard Award, U.S. Department of Justice, Civil Rights Division, 2011

PAST ACADEMIC AND RESEARCH APPOINTMENTS:

Eugene Lang Professor [Visiting], Department of Political Science, Swarthmore College, Swarthmore, Pennsylvania, 1998-1999.

Distinguished Scholar, Joint Center for Political and Economic Studies, Washington, D.C., 1987-1988.

Associate Professor of History, 1978-82, Professor of History, 1982-90, University of South Alabama, Mobile, Alabama.

Assistant Professor of History, 1976-1978, Vanderbilt University, Nashville, Tennessee

Instructor, Assistant Professor of History, 1969-1976, University of Minnesota, Minneapolis, Minnesota

BOOK:

*Abraham Lincoln and Reconstruction: The Louisiana Experiment* (Princeton, N.J., Princeton University Press, 1978), 423 pages.  Winner, Kemper Williams Prize, Louisiana Historical Association, 1979.

BOOK CHAPTERS:

"Minority Representation in Alabama: The Pivotal Case of *Dillard v. Crenshaw County*," in Raymond Arsenault and Orville Vernon Burton (eds.), *Dixie Redux: Essays in Honor of Sheldon Hackney* (Montgomery, Al., New South Books, 2013), 403-22.

"The Constitutional Foundations of the 'Preclearance' Process: How Section 5 of the Voting Rights Act Was Enforced, 1965-2005," in Daniel McCool (ed.), *The Most Fundamental Right: Contrasting Perspectives on the Voting Rights Act* (Bloomington, Indiana University Press, 2012), 36-66.

"Race and Municipal Reform in the Progressive Era: The Adoption of At-large Elections in Norfolk, Virginia, 1914-1918," in Orville Vernon Burton, et.al. (eds.), *The Struggle for Equality: Essays on Sectional Conflict, the Civil War, and the Long Reconstruction* (Charlottesville, University Press of Virginia, 2011), 238-53.

"The Law of Preclearance: Enforcing Section 5," co-authored with Christopher Seaman and Richard Valelly, in David Epstein, et.al. (eds.), *The Future of the Voting Rights Act* (New York, Russell Sage Foundation, 2006), 20-37.

"Alabama," co-authored with Jerome A. Gray, Edward Still, and Huey Perry, and "South Carolina," co-authored with Orville Vernon Burton, Terence R. Finnegan, and James W. Loewen, in Chandler Davidson and Bernard Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, N.J., Princeton University Press, 1994), 38-66, 397-409.  Winner, Richard Fenno Prize, American Political Science Association.

"History in the Courts: The Significance of *City of Mobile v. Bolden*," in Chandler Davidson (ed.), *Minority Vote Dilution* (Washington, D.C., Howard University Press, 1984), 47-65.

LAW REVIEW ARTICLES:

"How the Voting Rights Act Works: Implementation of a Civil Rights Policy, 1965-2005," *South Carolina Law Review*, 57 (Summer 2006), 785-825.

"The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act," co-authored with Christopher Seaman and Richard Valelly, *Michigan Journal of Race & Law*, 11 (Spring 2006), 275-323.  [An unpublished version was printed in *Voting Rights Act: Section 5 Preclearance and Standards: Hearings Before the Subcomm. On the Constitution, H. Comm. On the Judiciary, 109th Cong., 96-181 (2005)(Serial No. 109-69).]*

"Bringing Equality to Power: How the Federal Courts Transformed the Electoral Structure of Southern Politics, 1960-1990," *University of Pennsylvania Journal of Constitutional Law*, 5 (May 2003), 665-708.

"Yes, But What Have They Done to Black People Lately? The Role of Historical Evidence in the Virginia School Board Case," *Chicago-Kent Law Review*, 70 (No. 3, 1994), 1275-1305.

"Keeping the Courts Honest: The Role of Historians as Expert Witnesses in Southern Voting Rights Cases," co-authored with J. Gerald Hebert, *Southern University Law Review*, 16 (Spring 1989), 101-28.

"Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits," *Howard Law Journal*, 28 (No. 2, 1985), 463-93.

JOURNAL ARTICLES:

"The Interaction of Policy and Law: How the Courts Came to Treat Annexations under the Voting Rights Act," *Journal of Policy History*, 26 (No. 4, 2014), 429-58.

"The Struggle for Minority Representation in Florida, 1960-1990," *Florida Historical Quarterly*, 86 (Summer 2007), 93-111.  Jillian Prescott Memorial Lecture, Florida Historical Society, 2006.

"Race and Reapportionment, 1962: The Case of Georgia Senate Redistricting," co-authored with Steven F. Lawson, *Journal of Policy History*, 12 (No.3, 2000), 293-320.

"The Dynamics of Minority Vote Dilution: The Case of Augusta, Georgia, 1946-1986," *Journal of Urban History*, 25 (Jan. 1999), 199-225.

"Racially Polarized Voting in the South: Quantitative Evidence from the Courtroom," *Social Science History*, 14 (Winter 1990), 507-31.

"The Party of Revolution: Republican Ideas About Politics and Social Change, 1862-1867," *Civil War History*, 30 (December 1984), 330-50.

"Class and Party in the Secession Crisis: Voting Behavior in the Deep South, 1856-1861," co-authored with Clark Miller and Dale Baum, *Journal of Interdisciplinary History*, VIII (Winter 1978), 429-57.

REVIEW ESSAYS:

"Race and Misrepresentation: Review of Maurice T. Cunningham, *Maximization, Whatever the Cost: Race, Redistricting, and the Department of Justice*," H-Net, Feb. 2002.  www.h-net.msu.edu/reviews/showrev.cgi?path=214111015008351.

"Review of David Lublin, *The Paradox of Representation: Racial Gerrymandering and Minority Interest in Congress*," H-Net, May 1998.
www.h-net.msu.edu/reviews/showrev.cgi?path=23313895266679.

"Without Fear and Without Research: Abigail Thernstrom on the Voting Rights Act," co-authored with Pamela S. Karlan, *Journal of Law and Politics*, IV (Spring 1988), 751-77.

"The Political Dynamics of Black Reconstruction," *Reviews in American History*, 12 (March 1984), 51-57.

ENCYCLOPEDIA ARTICLE:

"The Reconstruction Myth," in Charles Reagan Wilson and William Ferris (eds.), *Encyclopedia of Southern Culture* (Chapel Hill, University of North Carolina Press, 1989), 1120-21 [reprinted in Jonathan Birnbaum and Clarence Taylor (eds.), *Civil Rights Since 1787: A Reader on the Black Struggle* (New York, New York University Press, 2000), 150-53.]

BOOK REVIEWS: American Historical Review, Journal of Interdisciplinary History, Journal of Southern History, Social Science History, American Review of Politics.

COURTROOM TESTIMONY AS AN EXPERT WITNESS:

(United States as Amicus Curiae), *SCLC v. Evans*, M.D.Ala. (Montgomery), December 1991.  [Challenge to the method of electing certain circuit judges in Alabama]

(Plaintiffs), *Vereen v. Ben Hill County*, M.D.Ga. (Macon), December 1989.  [Challenge to the state law requiring appointment of county school boards by the local grand jury, as applied in more than a dozen counties]

(Plaintiffs), *Hall v. Holder*, M.D.Ga. (Macon), December 1989.
[Challenge to the sole commissioner form of government in Bleckley County, Georgia]

(Plaintiffs), *Irby v. Fitzhugh*, E.D.Va. (Richmond), June 1988.
[Challenge to the appointment of all school boards in the Commonwealth of Virginia]

3

(Plaintiffs), *Dillard v. Crenshaw County, et.al.*, M.D.Ala. (Montgomery), Preliminary Injunction Hearing, March 1986.  [Challenge to the at-large election of public officials in more than 180 Alabama counties, municipalities, and school boards]

(Plaintiffs), *Whitfield v. Clinton*, E.D.Ark. (Helena), March 1988.  [Challenge to the use of the statewide majority vote requirement in Phillips County, Arkansas]

(Plaintiffs), *Dent v. Culpepper*, M.D.Ga. (Macon), Preliminary Injunction Hearing, November 1987. [Challenge to the at-large election of the City Commission in Cordele, Georgia]

(Plaintiffs), *Jackson v. Edgefield County, School District*, D.S.C. (Columbia), April 1986.  [Challenge to the at-large election of the Edgefield County School Board]

(Plaintiffs), *Harris v. Graddick*, M.D.Ala. (Montgomery), February 1985.  [Challenge to the procedures by which election officials are selected and elections conducted in Alabama]

(Plaintiffs), *Woods v. Florence*, N.D.Ala. (Birmingham), August 1984.  [Challenge to the method of appointing the Jefferson County Personnel Board]

(Plaintiffs), *Collins v. City of Norfolk*, E.D.Va. (Norfolk), May 1984.  [Challenge to the at-large election of the Norfolk City Council]

(United States), *County Council of Sumter County, S.C. v. U.S.*, D.D.C., February 1983.  [Defense of Section 5 Objection to the at-large election of the Sumter County Council]

(United States), *U.S. v. Dallas County Commission*, S.D.Ala. (Selma), October 1981.  [Challenge to the at-large election of the Dallas County Commission]

(Plaintiffs), *Bolden v. City of Mobile*, S.D.Ala. (Mobile), May 1981.  [Challenge to the at-large election of the Mobile City Commission]

(Plaintiffs), *Brown v. Board of School Commissioners of Mobile County*, S.D.Ala. (Mobile), April 1981. [Challenge to the at-large election of the Mobile County School Board]

SWORN WRITTEN TESTIMONY AS AN EXPERT WITNESS:

(Plaintiffs) November 20, 2017, *Alabama State Conference NAACP v. State of Alabama*, C.A. No. 2:16-cv-731, M.D. Ala. [Challenge to the method of electing appellate judges in Alabama]

(Plaintiffs) July 24, 2017, *Thompson v. State of Alabama*, C.A. No. 16-cv-783-WKW, M.D. Ala. [. [Challenge to felon disfranchisement provisions in Alabama]

(United States) June 25, 2012, and July 20, 2012, *State of Florida v. United States*, C.A. No. 1:11-cv-01428, D.D.C. [Defense of the constitutionality of Section 5 of the Voting Rights Act]

(United States) August 1, 2011, *Laroque v. Holder*, C.A. No. 1:10-0561, D.D.C. [Defense of the constitutionality of Section 5 of the Voting Rights Act]

(United States) November 15, 2010, and February 16, 2011, *Shelby County, Alabama, v. Holder*, C.A. No. 1:10-cv-00651, D.D.C. [Defense of the constitutionality of Section 5 of the Voting Rights Act]

(United States as Defendant-Intervenor) July 31, 1996, *Cook v. Marshall County, Mississippi, and United States*, C.A. No. 3:95 CV 155-D-A, N.D. Miss. [Defense of Marshall County's redistricting plan]

(United States as Defendant-Intervenor) July 19, 1994, *Hays v. State of Louisiana*, C.A. No. 92-1522S, W.D. La. (Shreveport).  [Defense of Louisiana's congressional redistricting plan]

(United States) March 25, 1991, *State of Georgia v. Thornburg,* C.A. No. 90-2065, D.D.C.  [Defense of Section 5 objection to the method of electing certain superior court judges in Georgia]

(Plaintiffs) January 20, 1988, *Irby v. Fitzhugh*, C.A. No. 87-0633-R, E.D.Va. (Richmond).  [Challenge to the appointment of all school boards in the Commonwealth of Virginia]

(United States) June 25, 1984, *U.S. v. Halifax County, N.C.*, C.A. No. 83-88-CIV-8, E.D.N.C. (Wilson). [Challenge to the at-large election of the Halifax County Commission]

(Plaintiffs) April 22, 1983, *Wilson v. Powell*, C.A. No. 383-14, S.D.Ga. (Dublin).  [Challenge to the appointment of the Johnson County School Board by the county grand jury]

(United States) September 28, 1982, *County Council of Sumter County, S.C. v. U.S.*, C.A. No. 82-0912, D.D.C.  [Defense of Section 5 Objection to the at-large election of the Sumter County Council]

CONGRESSIONAL TESTIMONY:

"Testimony Before the Subcommittee of National Parks and Public Lands, Committee on the Interior, U.S. House of Representatives, June 14, 1988.

"Written Testimony of Dr. Peyton McCrary," in *Extension of the Voting Rights Act: Hearings Before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, U.S. House of Representatives*, 97th Cong., 1st Sess., Serial No. 24 (3 vols., Washington, D.C., G.P.O., 1982), III, 2749-76.

CONFERENCE PAPERS:

"The Deep South Fights Back: Constitutional Challenges to Section 5 of the Voting Rights Act, 1966-1980."  Southern Historical Association, November 2012.

"From *Gomillion v. Lightfoot* to *City of Pleasant Grove v. United States*: Annexations, De-annexations, and the Voting Rights Act." Constitution Day Conference, San Francisco State University, September 2010.

"Two Kinds of Vote Dilution: From *Baker v. Carr* to *White v. Regester*." Organization of American Historians, April 2010.

"How the Voting Rights Act Works: Implementation of a Civil Rights Policy, 1965-2005," University of South Carolina School of Law, October 2005; [revised version, Southern Historical Association, November 2005].

"Bringing Equality to Power: Federal Courts and the Transformation of Southern Electoral Politics, 1960-2000." Organization of American Historians, April 2002.

"Why the Voting Rights Act Worked: A Judicial Model of Policy Implementation." Social Science History Association, October 1997; [revised version, Association of Public Policy Analysis and Management, November 1997].

"Yes, But What Have They Done to Black People Lately? The Role of Historical Evidence in the Virginia School Board Case." Southern Historical Association, November 1992.

"The Impact of the Voting Rights Act in Alabama," co-authored with Jerome Gray, Edward Still, and Huey Perry.  American Political Science Association, 1989 [revised version presented at a Conference on the Impact of the Voting Rights Act, Rice University, Houston, Texas, May 1990].

"Taking History to Court: The Issue of Discriminatory Intent in Southern Voting Rights Cases."  Joint Center for Political and Economic Studies, Washington, D.C., June 13, 1988.

"Keeping the Courts Honest: Expert Witnesses in Voting Rights and School Desegregation Cases," co-authored with J. Gerald Hebert.  Southern Historical Association, November 1986.

"Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits." Conference on Voting Rights Law, Howard University School of Law, Washington, D.C., January 1985.

"The Subtle Gerrymander: Discriminatory Purposes of At-large Elections in the South, 1865-1982." Organization of American Historians, April 1983.

"The Party of Revolution: Republican Ideas About Politics and Social Change, 1861-1868."  Southern Historical Association, November 1980.

"After the Revolution: American Reconstruction in Comparative Perspective." American Historical Association, December 1979.

"The Civil War Party System, 1854-1876: Toward a New Behavioral Synthesis?" Southern Historical Association, November 1976.

CHAIRPERSON, PANELIST, OR COMMENTATOR:

Alabama Association of Historians, 1983.
Alabama Department of Archives and History, 1988.
American Historical Association, 2017.
American Political Science Association, 1987, 2003.
Brookings Institution, 1990.
National Association of Secretaries of State, 1983.
Organization of American Historians, 1979, 1995.
Social Science History Association, 1981, 1987, 1996, 1997, 1999.
Southern Historical Association, 1973, 1985.
University of Alabama, 1983.
University of Utah, 2007.

ACADEMIC REFEREE:

Book-length manuscripts: Princeton University Press, University of North Carolina Press, University of Tennessee Press, University of Alabama Press, Louisiana State University Press, University of Georgia Press.

Article-length manuscripts: Journal of American History, American Historical Review, Sociological Spectrum, Gulf Coast Historical Review, Social Science History.

CONSULTANT:

Test Design: College Board Achievement Test, American History; Educational Testing Service, Princeton, N.J., 1979-1983

Archival: Re-organization of Section 5 Objection Files, Civil Rights Division/Voting Section, U.S. Department of Justice, Washington, D.C., January-July, 1989.

Litigation Research: Civil Rights Division/Voting Section, U.S. Department of Justice, Washington, D.C., August 1989 to August 1990.

FELLOWSHIPS AND GRANTS:

John D. and Catherine T. MacArthur Foundation, 1987-1988: Distinguished Scholar, Joint Center for Political and Economic Studies, Washington, D.C.

American Philosophical Society, 1983: Research Travel Grant.

Rockefeller Foundation, 1982-1983: Research Fellowship.

Carnegie Corporation of New York, 1982-1983: Research Fellowship.

National Endowment for the Humanities, 1980: Summer Research Stipend.

University of South Alabama, 1978-1987: Faculty Research Grants; Research Council Grant.

Vanderbilt University, 1976-1978: Manuscript Preparation Grant.

University of Minnesota, 1969-1976: Faculty Research Grants.

Princeton University, 1966-69: University Fellow; Herbert Osgood Fellow; NDEA Fellow.

University of Virginia, 1961-1966: Echols Scholar; Du Pont Scholar; Ford Foundation Fellow.