IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA STATE CONFERENCE NAACP, et. al., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. **1:17-cv-01427-TCB-WSD-BBM** |
| v. | ) ) | |
| STATE OF GEORGIA et. al., | ) ) | |
| Defendants. | ) | |

Rebuttal Declaration of Dr. Peyton McCrary

Pursuant to 28 U.S.C. § 1746, I, Peyton McCrary, make the following declaration:

I. Introduction

1. My name is Peyton McCrary, and I reside in Arlington, Virginia. I am an historian by training and taught history at the university level from 1969 until 1990. From 1990 until my retirement in 2016, I was employed by the Voting Section, Civil Rights Division, of the Department of Justice. I set forth my qualifications as an expert in my initial declaration in this case, dated December 22, 2017. I have been asked by attorneys for the plaintiffs in this litigation to reply to the rebuttal report by Professor John Alford, including reference both to evidence presented in my initial declaration[1] and relevant evidence that became available through discovery since preparation of my December report.

2. In my initial declaration my task was to assess the degree to which the adoption of a mid-decade realignment of the boundaries of 17 state house districts by the state of Georgia in

---

[1] Declaration of Dr. Peyton McCrary, December 22, 2017, Georgia State Conference of NAACP v. State of Georgia, C.A. No. 1:17-cv-01247-TCB-WSD-BBM (hereafter McCrary Reply Declaration).

1

Act No. 251, 2015 Ga. Laws 1413 (H.B. 566) was motivated by a racially discriminatory purpose as to the re-redistricting of House District 105 in Gwinnett County, and House District 111 in Henry County – and whether that racial purpose was the predominant motive of Republican legislators underlying the adoption of the boundary realignments in Districts 105 and 111.[2]

3. To place the re-redistricting of 2015 in historical context, my initial declaration summarized the history of redistricting in Georgia, including the mid-decade re-redistrictings in 2006 and 2012, and the 2011 statewide redistricting. To place these decisions in their social context, I summarized the pattern of population growth and demographic change in Gwinnett and Henry counties since 1970, with special emphasis on the increase of minority population in those counties in the 21st century. To place the decisions concerning House Districts 105 and 111 in political context, I discussed the continued evidence of racially polarized voting in Georgia and the evolution of the relationship between race and party preference in Georgia. Long before the 2015 re-redistricting, I demonstrated, it was clear to knowledgeable observers that African Americans were the most reliable Democratic voters in Georgia, whereas a substantial majority of white voters were reliably Republican.

4. My discussion of the boundary realignments for House Districts 105 and 111 in 2015 began with the brief legislative history of H.B. 566. The map-drawing phase of these boundary realignments – documented in deposition transcripts and exhibits – provided key evidence as to the integral relationship between race and party. I concluded that the boundary realignments for Districts 105 and 111 required by the passage of H, B. 566 were designed to dilute minority

---

[2] McCrary Declaration, Paragraph 4, pp. 2-3.

voting strength – as a means of protecting the incumbents' re-election prospects without endangering Republican control of neighboring districts.

5. Utilizing a racially discriminatory means of advantaging partisan control is, in my view as an historian, evidence of a racially discriminatory purpose. When considering how to strengthen districts represented by Republican incumbents believed to be at risk, the means utilized by the state in 2015 were to decrease the African American percentage of the population and registered voters in any district where incumbent Republicans were at risk of losing to a Democratic opponent in the next election. This racial purpose was the predominant (indeed the *only*) goal of the boundary realignments for House Districts 105 and 111.

### The Rebuttal Report of John Alford

6. In his rebuttal report, Professor Alford does not rely on any research of his own regarding the purposes underlying the adoption of H.B. 566. The views he expresses are based only on his critical reading of my declaration.[3] His interpretation of the relationship between race and party displays a misunderstanding of the way in which federal courts have dealt with this question, and his conception of how to assess the intent underlying the adoption of election laws reflects an inaccurate view of the standard applied by the courts, by historians, and by other social scientists.

7. My first concern regarding Professor Alford's rebuttal report, dated January 31, 2018, is that he uses selective quotation to mis-represent the discussion of districting criteria in 2011, 2012, and 2015, in my initial declaration. The legislature adopted no guidelines in 2015 for

---

[3] Expert Report of John R. Alford, January 31, 2018 (hereafter Alford Report). In contrast to his lack of independent research concerning the purposes of the 2015 re-redistricting, Professor Alford writes (p. 1) that he undertook "a replication of the Ecological Regression and Ecological Inference analysis of past elections involving Black candidates" examined by plaintiffs' expert, Professor Jowei Chen, which Alford summarizes in pp. 1-9 of his report.

3

revision of house district boundaries.  One of the criteria adopted in the statewide redistricting of 2011 and in 2012, as I explain in my initial declaration, was a policy that the redistricting committees "should consider" avoiding any "unnecessary pairing of incumbents."[4]  In revising some district boundaries in 2012, the legislature adopted the same districting guidelines followed in 2011.[5]

8.  In his rebuttal report Professor Alford does not challenge my documentation of the state's redistricting guidelines – not even the criterion adopted by the legislature, that committees should "consider" avoiding unnecessary "*pairing* of incumbents."[6]  Instead he quotes from my imprecise paraphrase of that criterion elsewhere in my declaration, referring to "the protection of incumbents" rather than to the "pairing of incumbents."[7]  The term "incumbency protection" is used in varying ways in the context of redistricting, including in some instances avoiding the pairing of incumbents.  The National Conference of State Legislatures provides a survey of redistricting criteria in each of the states, which demonstrates that 12 states *prohibit* incumbency protection, 5 states allow it, and 2 states require incumbency protection; the remainder of the states do not mention this criterion.[8]

---

[4] McCrary Declaration, Paragraph 43, pp. 20-21, quoting Samuel S. Olens to T. Christian Herren, October 21, 2011, at 7, File No. 2011-26 [Section 5 Submission].
[5] McCrary Declaration, Paragraphs 35, 36, pp. 21-22, relying on Samuel S. Olens to T. Christian Herren, March 16, 2012, at 5-6, File No. 2012-1454 [Section 5 Submission].
[6] McCrary Declaration, Paragraph 36, pp. 21-22 (emphasis added).
[7] Id., Paragraph 37, p. 22, quoted in Alford Report, p. 11.
[8] Emphasis added.  NCSL, "Redistricting Criteria" (February 2, 2018), http://www.ncsl.org/research/redistricting/redistricting-criteria.aspx.  In fact, when I examined the state redistricting guidelines cited by the NCSL survey more closely, it turned out that one of the two states listed as requiring incumbency protection (Kansas) requires only prohibiting the pairing of incumbents.  See Kansas Legislative Research Department, Guidelines and Criteria for 2012 Kansas Congressional and Legislative Redistricting (January 9, 2012).  Of the five states listed by the NCSL survey as allowing incumbency protection, four allowed only the pairing of incumbents and only one (Vermont) allowed what it called incumbency protection.  Vermont House of Representatives, An Outline of Redistricting Standards and Guidelines (March 29,

9. Incumbency protection in some instances can be used as a smoke screen for the improper use of race. As the Supreme Court observes in *LULAC v. Perry*, "incumbency protection can be a legitimate factor" in devising redistricting plans, but where, as here, "incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters."[9] The Court went on to find that "the State took away the Latinos' opportunity because Latinos were about to exercise it," which the majority found "bears the mark of intentional discrimination."[10] As the Court observed more recently in *Cooper v. Harris*, "if legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests . . . their action still triggers strict scrutiny."[11]

10. None of the changes adopted by the state in its revision of the boundaries of House Districts 105 and 111 in H.B. 566 were necessary to avoid pairing incumbents.[12] The decision by the leaders of the House to protect the re-election prospects of incumbents in 2015 was implemented only through the requests of incumbent legislators themselves (both Republicans and Democrats), without any public hearings or opportunities for input from constituents. The boundary revisions for House Districts 105 and 111 involved discussions among legislators and

---

2001). According to the Vermont guidelines, it would be legitimate "to consider incumbency among the many other standards established to guide the redistricting process," but warned that "this factor is unlikely to be viewed as much of a justification to support any significant deviation from mathematical equality."
[9] 548 U.S. 399, 440-41 (2006).
[10] *Id.*, at 440.
[11] *Cooper v. Harris*, 137 S.Ct. 1455, 1473 n. 7 (2017). See also *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (2016) ("If the Republican-dominated Legislature targeted voters who, based on race, were unlikely to vote for Republicans, that constitutes racial discrimination even if done for partisan ends.").
[12] McCrary Declaration, Paragraph 37, pp. 21-22.

the staff of the Reapportionment Office, and plan-drawing guided only by the goal of political advantage of the incumbents – using race as a metric for measuring political advantage.[13]

11. In his rebuttal report Professor Alford refers only to the evidence I presented regarding the work of Gina Wright, the Executive Director of the Reapportionment Office, who drafted many of the boundary realignments after consultation with the incumbents who wanted revision of their districts. Wright emphasized that Representatives Joyce Chandler in District 105 and Brian Strickland in District 111 asked only that their districts improve their re-election prospects. She acknowledged, however, that the GIS system used by her office, Maptitude for Redistricting, provided a racial breakdown of the registered voters – but not the party composition – of each precinct, and that she used both party and racial data in revising district boundaries.[14]

12. Professor Alford ignores, however, the abundant evidence I presented from the deposition and emails of Wright's fellow staff member in the Reapportionment Office, Dan O'Connor, who best explained the complexities of boundary realignments in Districts 105 and 111 – and who routinely used racial data concerning districts as a metric for predicting Republican prospects for winning elections.[15] Randall Nix, who chaired the House Reapportionment Committee in 2015, said in his deposition in this case that "when we were trying finalize" H.B. 566, he talked to O'Connor "probably daily," explaining that "Dan probably knows more about the maps than any human being alive."[16] In his own deposition

---

[13] *Id.*, Paragraphs 41-58, pp. 25-35. See Deposition of Dan O'Connor, January 25, 2018, Georgia State Conference of NAACP v. Kemp (hereafter O'Connor Deposition), at 244 (conceding that he routinely provided racial as well as political data to legislators and staff because racial data was "a metric that you use to assess political performance").
[14] McCrary Declaration, Paragraphs 41-42, 51-57, pp. 25-26, 31-34.
[15] *Id.*, Paragraphs 43-50, 58, pp. 26-31, 34-35.
[16] Deposition of Randall O. Nix, January 10, 2018, Georgia State Conference of the NAACP v.

O'Connor conceded that among Republican legislators he was "considered to be the person they turn to . . . when they want to analyze the likely performance of their district" in a future election.[17]  Wright said in her deposition that O'Connor "does a lot of map requests and information requests from members," and that because of his ability to analyze election history and other data, "a lot of the members like to pick his brain about things like that."[18]

13. Asked about data he provided to Speaker Pro Tem Jan Jones, O'Connor conceded that "if you take districts that are 40 percent or more back . . . there are only two Republicans elected from those districts," and that "if you go below 30 percent, you have three Democrats elected and . . . 107 Republicans elected."[19]  In general, when legislators or legislative staff consulted O'Connor, he emphasized that districts between 30 and 40 percent African American registered voters were highly competitive and that those with black registered voters over 35 percent were especially vulnerable to Democratic challengers.[20]  Asked about his December 2014 emails to Spiro Amburn, chief of staff to the House Speaker, O'Connor conceded he advised Amburn that "Districts 105 and 111 were vulnerable for the incumbents."[21]  Asked about an email to Representative Chuck Efstration from Gwinnett County in which O'Connor observed that Districts "105 and 111 are about 50-50 splits, with a large minority increase in both

---

Kemp (hereafter Nix Deposition), at 92-93.
[17] O'Connor Deposition, December 13, 2017, at 144-45, quoted on p. 26 of my initial declaration.
[18] Deposition of Gina H. Wright, November 20, 2017, at 210-11, quoted on p. 26 of my initial declaration.
[19] O'Connor Deposition, January 25, 2018, at 288-89.  In one email O'Connor observed that "Chandler's district [105] is 40 percent or so minority when you combine blacks, Asians, and Hispanic registered voters."
[20] See, e.g., O'Connor Deposition, January 25, 2018, at 202 ("districts over 30 percent black [in turnout] at the time tended to elect Democrats"), and at 241 (conceding that in his view "once a district gets in the 30 to 35 percent black range [of voter registration], it becomes more of a target for Democrats").
[21] O'Connor Deposition, January 25, 2018, at 222

Gwinnett and Henry," O'Connor explained that he was referring to "increase in minority voter registration," which was "making those districts tossup districts" between Republicans and Democrats.[22]

14. Professor Alford's view is that "at the policymaking level partisan advantage and incumbent protection, rather than racial animus, were the driving force motivating the changes to the district lines in these districts."[23] This claim suggests that Professor Alford thinks – incorrectly – that evidence of racial "animus" is required to prove that a voting change has a racially discriminatory purpose, and that a racial purpose must be the sole purpose of the change. His understanding of the intent requirement of both Section 2 of the Voting Rights Act and of the Equal Protection Clause of the Fourteenth Amendment is fundamentally different from my own. In many of my scholarly publications over the last three decades, I have written about the history of the Voting Rights Act and its enforcement in the federal courts.[24] In the following pages,

---

[22] O'Connor Deposition, January 25, 2018, at 266.
[23] Alford Report, p. 12.
[24] See, e.g., "History in the Courts: The Significance of *City of Mobile v. Bolden*," in Chandler Davidson (ed.), *Minority Vote Dilution* (Washington, D.C., Howard University Press, 1984), 47-65; "Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits," *Howard Law Journal*, 28 (No. 2, 1985), 463-93; "Alabama," co-authored with Jerome A. Gray, Edward Still, and Huey Perry, and "South Carolina," co-authored with Orville Vernon Burton, Terence R. Finnegan, and James W. Loewen, in Chandler Davidson and Bernard Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, N.J., Princeton University Press, 1994), 38-66, 397-409; "The Dynamics of Minority Vote Dilution: The Case of Augusta, Georgia, 1946-1986," *Journal of Urban History*, 25 (Jan. 1999), 199-225; "Race and Reapportionment, 1962: The Case of Georgia Senate Redistricting," co-authored with Steven F. Lawson, *Journal of Policy History*, 12 (No. 3, 2000), 293-320; "Bringing Equality to Power: How the Federal Courts Transformed the Electoral Structure of Southern Politics, 1960-1990," *University of Pennsylvania Journal of Constitutional Law*, 5 (May 2003), 665-708; "The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act," co-authored with Christopher Seaman and Richard Valelly, *Michigan Journal of Race & Law*, 11 (Spring 2006), 275-323; "The Constitutional Foundations of the 'Preclearance' Process: How Section 5 of the Voting Rights Act Was Enforced, 1965-2005," in Daniel McCool (ed.), *The Most Fundamental Right: Contrasting Perspectives on the Voting Rights Act* (Bloomington, Indiana University Press,

utilizing what I have concluded from my research and writing on the Voting Rights Act, I summarize my understanding of the intent requirement in voting rights law in greater detail than in my initial declaration – and explain how it differs from the view articulated here by Professor Alford.[25]

The Issue of Discriminatory Intent

15.  I became involved as an expert in voting rights litigation in 1980 – testifying in 1981 in *Bolden v. City of Mobile*,[26] and *Brown v. Board of School Commissioners of Mobile County*,[27] on remand from the Supreme Court.[28]  I decided that, to provide effective testimony to assist the court in its fact finding, I needed to understand the relevant case law.  The court would, I learned, be guided in assessing the purpose underlying the adoption and maintenance of at-large elections by *Village of Arlington Heights v. Metropolitan Housing Development Corporation*,[29] where the Supreme Court provided guidelines for assessing claims of discriminatory intent.  Among other things the Court observed that, in deciding that a voting change was motivated by discriminatory intent, the fact finder need not find that this illicit purpose was the sole reason for the change.  The Court also declared that proof of a discriminatory purpose does not require proof of racial

---

2012), 36-66; "Minority Representation in Alabama: The Pivotal Case of *Dillard v. Crenshaw County*," in Raymond Arsenault and Orville Vernon Burton (eds.), *Dixie Redux: Essays in Honor of Sheldon Hackney* (Montgomery, Al., New South Books, 2013), 403-22; and "The Interaction of Policy and Law: How the Courts Came to Treat Annexations under the Voting Rights Act," *Journal of Policy History*, 26 (No. 4, 2014), 429-58.

[25] As noted in my initial declaration, I am not an attorney and my understanding of the intent requirement under Section 2 and the Fourteenth Amendment reflects only my view as a historian who writes about the Voting Rights Act.

[26] 542 F. Supp. 1050 (S.D. Ala. 1982).

[27] 542 F. Supp. 1078 (S.D. Ala. 1982),

[28] In *City of Mobile v. Bolden*, 446 U.S. 55 (1980), the Court decided that, to prevail in a voting rights claim under the Fourteenth or Fifteenth Amendments, plaintiffs must prove that the challenged election practice was adopted or maintained with a racially discriminatory purpose; it then remanded the case to the lower courts for reconsideration under the intent standard.

[29] 429 U.S. 252 (1977).

animus. The guidelines set forth by the Supreme Court in *Arlington Heights* are consistent with the methodology for analyzing decision-making I was taught in my Ph.D. program at Princeton, where we were trained to examine the political, social, and institutional context in which each decision was made. I have followed this approach in all my scholarly writing.

16. Not long thereafter I read a court decision that explained how the intent standard was to be applied in the redistricting context, *Rybicki v. State Board of Elections*. Decided on January 12, 1982 – *before* Congress amended Section 2 of the Voting Rights Act to create a statutory results test – *Rybicki* applied the intent standard as enunciated in *City of Mobile v. Bolden*, in assessing the redistricting plans for the Illinois state senate and state house.[30] The approach taken by the court in the Illinois case was also consistent with the way historians are trained to examine the intent of political decisions.

17. The facts in *Rybicki* resembled those in the present case. The state's defense was that the boundaries of the districts under challenge were designed to protect the re-election of incumbent legislators.[31] The court found, however, as to one senate district, that "the requirements of incumbency are so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, district for Senator Joyce is virtually coterminous with a purpose to practice racial discrimination."[32] Addressing another senate district, the court found

---

[30] 574 F. Supp. 1082, 1084 (N.D. Illinois 1982) (applying *Arlington Heights*, 429 U.S. at 265-66, *Mt. Healthy City School Bd. Of Education v. Doyle*, 429 U.S. 274 (1977), and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979)). The following year the three-judge court in *Rybicki v. State Board of Elections,* 574 F. Supp. 1147 (N.D. Illinois, 1983), addressing other aspects of the case, applied the results test of amended Section 2 rather than the Fourteenth Amendment.
[31] See 574 F. Supp. at 1112 n. 86 ("Defendants have not indicated how the purpose to preserve incumbencies can be unraveled from simple racial motives. Thus, we hold that the defendants have not discharged their burden of proof under *Mt. Healthy* that similar district lines would have been drawn absent the purpose to dilute the black vote.").
[32] 574 F. Supp. at 1109.

that "these shifts in racial population, even if undertaken for the immediate purpose of providing a safe Senate seat for white Senator Dawson, are so closely linked to a desire to minimize black voting strength that they constitute strong evidence of a discriminatory purpose."[33]  With regard to house districts the court found: "The net effect of these racial population changes has been the purposeful dilution of the black voting strength on the West Side by at least one House District."[34]

18.  Some years later the trial court in *Garza v. County of Los Angeles* made a similar finding regarding the redistricting of county supervisor districts.  The supervisors "appear to have acted primarily on the political instinct of self-preservation," but understood that the "prerequisite to self-preservation" was the "dilution of Hispanic voting strength."[35]  To the judge, the "continued fragmentation of the Hispanic vote was a reasonably foreseeable consequence of the adoption of the 1981 plan."[36]  In reaching this decision the trial court relied in part on the expert analysis of a historian.  The appeals court affirmed this finding that the supervisors' goal of preserving their seats was coupled with intentional dilution of Hispanic voting strength, noting that under the *Arlington Heights* precedent "discrimination need not be

---

[33] *Id.*, at 1110.  Addressing other senate districts, the court found that "the immediate purpose of these movements of racial populations was primarily to preserve the incumbencies of two white Senators," but the process was "so intimately intertwined with, and dependent on, racial discrimination and dilution of minority voting strength that purposeful dilution has been clearly demonstrated." *Id.*
[34] *Id.*, at 1112.
[35] *Garza v. County of Los Angeles*, 756 F. Supp. 1298, 1318 (C.D. Ca. 1990, aff'd 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 111 S.Ct. 681 (1991) (relying in part on *Rybicki* in finding that the redistricting of the County Board of Supervisors was intentionally discriminatory).  *Id.*, at 1305, 1350.
[36] *Id.*, at 1318.

11

the sole goal in order to be unlawful."[37]  As a historian my view of how to determine intent is consistent with the standard applied by the federal courts in *Rybicki* and *Garza*.

19. In my initial declaration I set forth my expert opinion that the only purpose of H.B. 566 – as far as Districts 105 and 111 were concerned – was to protect the re-election prospects of two Republican incumbents (or the election of any other Republican candidate for those two seats should the incumbents not seek re-election), by cutting the African American percentage of the population and the registered voters in those districts.[38]  The strategy necessary to protect Republican chances of retaining those seats, in other words, was to dilute minority voting strength – to compensate for the rapid growth of minority populations in their respective counties, Gwinnett and Henry.  "Because the singular goal of using a racially discriminatory means of enhancing incumbent re-election prospects was the *only* goal of these legislators – and of the state, which deferred to their wishes – the goal of racial discrimination was necessarily the predominant motive of the 2015 mid-decade redistricting as applied to House Districts 105 and 111."[39]

20. Professor Alford criticizes what he calls "the conflation of partisanship with racial intent" in my initial declaration.[40]  He claims that the evidence in my declaration "suggests that

---

[37] 918 F.2d 763, 771 (9th Cir. 1990).  In a concurring opinion, Judge Alex Kozinski wrote that "this case will be remembered for its lucid demonstration that elected officials engaged in the single-minded pursuit of incumbency can run roughshod over the rights of protected minorities." *Id.*, at 778.  Judge Kozinski provided a telling analogy to demonstrate that racial animus – that is, racial prejudice or bigotry – is not a necessary ingredient of discriminatory intent.  A member of the majority group who seeks to keep minorities out of his neighborhood because he believes that their presence will lower property values – despite having no personal prejudice against minority group members – would nevertheless be guilty of racial discrimination.  "Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood."
[38] McCrary Declaration, Paragraph 60, p. 36.
[39] Id.
[40] Alford Report, p. 10.

at the policymaking level partisan advantage and incumbent protection, rather than racial animus, were the driving force motivating the changes to the district lines in these districts."[41]  As I have noted above, under the case law proving discriminatory intent does *not* require proof of racial animus. [42]

21.  Professor Alford treats as conclusive evidence that partisanship was the only purpose of H.B 566 a comment by Reapportionment Office director Gina Wright, when asked what legislators from Districts 105 and 111 wanted to achieve.  Ms. Wright said "only" – his word – that they "were looking for a political advantage" when they came to discuss revisions to their districts.[43]  Gina Wright emphasized, as I noted in my initial declaration, only that Representatives Joyce Chandler (District 105) and Brian Strickland (District 111) sought boundary revisions that would enhance their chances of re-election.[44]  She conceded, however, that when using Maptitude for Redistricting (the GIS software used by the Reapportionment Office) to revise district boundaries she had racial data at the census block and precinct levels, the racial composition of registered voters and turnout at the precinct level, and past election outcomes at the precinct level, and she was thus aware of both the racial and political effects of each boundary change.[45]  Wright also conceded that both Gwinnett and Henry counties experienced rapid growth in their minority populations after 2000, and that as a result the African American population – and registered voters – increased to the point where they represented

---

[41] Id., p. 12.
[42] McCrary Declaration, Paragraph 15, p. 8.
[43] Alford Report, p. 10, quoting McCrary Declaration, Paragraph 53, p. 32.
[44] Deposition of Gina H. Wright, November 20, 2017, at 25-29, 175-77, paraphrased in McCrary Declaration, Paragraphs 53 and 56, pp. 32-34.
[45] Deposition of Gina H. Wright, November 20, 2017, at 25-26, 104-05, 195-96, paraphrased in McCrary Declaration, Paragraph 53, pp. 32-33.

approximately a third of the electorate in both Chandler's and Strickland's districts.[46]  When asked whether there was a correlation between race and partisan identification in Georgia, she conceded that various studies had shown that "there is some correlation."[47]

22.  The evidence regarding Georgia voting patterns provided in my initial declaration – ignored by Professor Alford – supports the views communicated by Dan O'Connor to legislators.  Exit poll data demonstrate that African American voters are the most reliably Democratic voters in Georgia, but most whites consistently vote Republican.  Political scientists Charles Bullock and Keith Gaddie report that "since 1992, Democrats have always taken at least 80 percent of the black vote while most whites invariably preferred Republicans."[48]  Exit polls in Georgia statewide elections for federal office from 1992 through 2006 show that African Americans supported the Democratic candidate at rates between 81 and 92 percent, whereas whites voted Democratic at rates between 23 and 45 percent.[49]

23.  In Professor Alford's rebuttal report, his statistical analysis of the Georgia voting patterns confirms the conclusions expressed in my initial declaration regarding both the pattern of racial polarization in recent Georgia elections *and* the degree to which African Americans provide the most reliable Democratic voters for those designing redistricting plans.  Tables 1 and 2 in Professor Alford's report compare his findings with the findings of plaintiffs' expert, Professor Chen.  *Both* political scientists confirm that voting patterns are racially polarized,

---

[46] Deposition of Gina H. Wright, November 20, 2017, at 86-89, 91, 95, 101-02, 193-94, paraphrased on pp. 33-34, of my initial declaration.
[47] Deposition of Gina H. Wright, November 20, 2017, at 31, quoted on p. 32 of my initial declaration.
[48] Charles S. Bullock III and Ronald Keith Gaddie, *The Triumph of Voting Rights in the South* (Norman, University of Oklahoma Press, 2009), 100.
[49] *Id.*, 100, 103 (Table 3.8).

whether using ecological regression of Gary King's ecological inference technique, and that African American voters provide overwhelming support for Democratic candidates.[50]

24.  Professor Alford views the standard for addressing racial polarization inaccurately. He assumes erroneously that the standard for assessing racial polarization focuses on *the race of the candidate* – rather than on the race of the voters.[51]  He faults Professor Chen's report – and by implication my initial declaration – for focusing on "the political party, rather than the race of the candidate."[52]  However, the salient question in the view of the federal courts – and of many historians and political scientists writing about voting rights cases – is whether the voters of the majority group usually defeat the preferred candidates of *minority voters*.[53]  By arguing that his results "show that voters are responding to the party of the candidate, and not the race of the candidate,"[54] Professor Alford echoes the position of the state of North Carolina in the landmark Section 2 case *Thornburg v. Gingles*.  In its decision in that matter the Supreme Court specifically rejected the state's argument that plaintiffs in a vote dilution lawsuit need to prove that the *cause* of the polarized voting is race and not party or some other variable, such as socio-economic status.[55]  Professor Alford's quantitative findings actually confirm the point that I emphasized in my initial declaration, that African American voters provide the most reliably

---

[50] Alford Report, at 7 (Tables 1 and 2).  Professor Alford's estimates show black support for Democratic candidates ranging from 79-89 percent and non-black support ranging from 18-36 percent, using EI and even more pronounced racial polarization using ecological regression.
[51] Id., pp. 5, 8.
[52] Alford Report, p. 5.
[53] *Thornburg v. Gingles*, 478 U.S. 30 (1986) (emphasis added).
[54] Id., p. 8.
[55] 478 U.S. 30, 62-64, 72-73 (1986) (emphasis added).   See the discussion of the Court's rejection of this *causality* requirement in Bernard Grofman, Lisa Handley, and Richard G. Niemi, *Minority Representation and the Quest for Voting Equality* (New York, Cambridge University Press, 1992), 51-52.  See also the discussion of the causality defense in McCrary, "Discriminatory Intent," pp. 491-92.

15

Democratic voters and for this reason decreasing the percentage of black voters in a district is the best means of supporting Republican candidates.

VIII. Conclusion

25. The decisions made by the state of Georgia in realigning the boundaries of House Districts 105 and 111 in the 2015 re-redistricting were based on the goal of enhancing the re-election prospects of Republican incumbents or – if an incumbent decided not to run for re-election – a new Republican candidate for the seat. That goal was pursued, however, by decreasing minority voting strength to enhance Republican electoral prospects. In my own research, and in the scholarly work of most historians and political scientists in my field of expertise, using racially discriminatory means to achieve political goals is evidence of a racially discriminatory intent. It is my understanding that this view among social scientists is not inconsistent with the standards applied in the federal courts over the last 35 years.

26. In the re-redistricting adopted by the state in 2015, no traditional redistricting criteria were at issue in the legislature's decision. Avoiding the pairing of incumbents was a criterion included in redistricting guidelines in 2011 and 2012, but no legislators in the affected districts were paired under the plan that H.B. 566 revised. The only goal announced by any of the actors in 2015 was the policy of deferring to the wishes of incumbent legislators to enhance their re-election prospects, without endangering the re-election of other Republican legislators. In the case of the incumbents in House Districts 105 and 111, the Reapportionment Office staff knew that these districts were perilously close to the racial threshold of 40 percent African American population – which virtually always meant Democrats would win the district – and that Representatives Chandler and Strickland had come very close to losing in 2014. Electoral safety justified to the Republican majority cutting the African American percentage of the population

and the registered voters in Districts 105 and 111.[56] This would weaken minority voting strength by fragmenting minority population concentrations. Even in districts where there is less than a 50 percent minority voting age population, in today's political environment cross-over voting by whites supporting minority-preferred candidates can sometimes provide minority voters an ability to elect their preferred candidates, even where there is racially polarized voting.[57] Because the singular goal of using a racially discriminatory means of enhancing incumbent re-election prospects was the *only* goal of these legislators – and the state, which deferred to their wishes – the goal of racial discrimination was necessarily the predominant motive of the 2015 mid-decade redistricting as applied to House Districts 105 and 111.

---

[56] Voter registration data are ephemeral; for a variety of reasons the percentage of the voting age population that is registered is subject to change. Total population and voting age population are more stable variables for designing districting plans.
[57] Bernard Gofman, Lisa Handley, and David Lublin, "Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence," 79 N.C. L. Rev. 1383, 1407-09 (June 2001).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of February, 2018.

                                                                         _____
                                                                          Peyton McCrary