IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; LAVELLE LEMON, MARLON REID, LAURETHA CELESTE SIMS, PATRICIA SMITH, COLEY TYSON, | Civil Action No. 1:17-cv-01427-TCB-WSD-BBM CONSOLIDATED |
| Plaintiffs, | |
| v. | |
| BRIAN KEMP, in his official capacity as Secretary of the State for the State of Georgia | |
| Defendant. | |
| AUSTIN THOMPSON, et al. | |
| Plaintiffs, | |
| v. | |
| BRIAN KEMP, in his official capacity as Secretary of the State for the State of Georgia | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

                                                                    Page

I.    INTRODUCTION ..................................................................... 1

II.   FACTUAL BACKGROUND ...................................................... 4

      A.    Summary of the Evidence ................................................. 4

      B.    The Key Officials Involved in H.B. 566's Re-redistricting ................. 6

      C.    The Demographic Trends Leading Up to H.B. 566 ........................ 8

            1.    Changing Demographics In Henry and Gwinnett
                  Counties ........................................................... 8

            2.    Voting In Georgia Is Racially Polarized ...................... 10

      D.    The Creation of House Bill 566 ....................................... 15

      E.    The Passage of H.B. 566 ............................................. 21

      F.    The New District 105 and 111 Maps ................................. 25

      G.    The Consequences of H.B. 566 ...................................... 28

III.  ARGUMENT ........................................................................ 30

      A.    Plaintiffs Are Entitled To The Requested Injunction ................. 31

            1.    Plaintiffs Are Likely To Prevail On The Merits Of Their
                  Claim Of An Unconstitutional Racial Gerrymander ............. 34

                  (a)   Legal Doctrine For Racial Gerrymandering Claim ....... 34

                  (b)   Evidence Demonstrates That Defendant Used Race
                        As The Predominant Factor In Redrawing Districts
                        105 and 111 ............................................. 38

                  (c)   Defendant's Purpose In Using Race As The
                        Predominant Factor—To Further Partisan
                        Advantage—Is Not A "Compelling Interest"
                        Sufficient To Withstand Strict Scrutiny ............... 43

            2.    Plaintiffs Will Suffer Irreparable Harm Absent An
                  Injunction ....................................................... 44

3.    The Balance Of The Equities Weighs In Favor Of Plaintiffs ....................................................................46

4.    The Injunction Would Be In The Public Interest.....................49

IV.   CONCLUSION...................................................................49

# TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Ala. Legislative Black Caucus v. Alabama*,
   575 U.S. __, 135 S. Ct. 1257 (2015)...................................................................34

*Arcia v. Fla. Sec'y of State*,
   522 F.3d 1335 (11th Cir. 2014) .........................................................................32

*Bethune-Hill v. Va. State Bd. of Elections*,
   580 U.S. __, 137 S. Ct. 788 (2017).............................................34, 35, 36, 37, 43

*Boire v. Pilot Freight Carriers*,
   515 F.2d 1185 (5th Cir. 1975) ......................................................................47, 48

*Bonner v. City of Pritchard*,
   661 F.2d 1206 (11th Cir. 1981) (en banc.) ........................................................48

*Bush v. Vera*,
   517 U.S. 952 (1996)..................................................................3, 35, 37, 42

*Canal Auth. of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ......................................................................48, 49

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   324 F. Supp. 2d 1358 (N.D. Ga. 2004) *aff'd*, 408 F.3d 1349 (11th
   Cir. 2005) ...........................................................................33, 45, 49

*Clark v. Putnam Cty.*,
   293 F.3d 1261 (11th Cir. 2002) ..................................................................34, 36

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017)....................................................... 3, 35, 36, 37, 42, 43, 50

*Covington v. North Carolina*,
   No. 1:15-CV-399, 2017 WL 5992358 (M.D.N.C. Dec. 1, 2017)......................42

*Cunningham v. Adams*,
   808 F.2d 815 (11th Cir. 1987) ....................................................................33, 44

*Davis v. Chiles*,
   139 F.3d 1414 (11th Cir. 1998) ..........................................................37

*Dillard v. City of Greensboro*,
   870 F. Supp. 1031 (M.D. Ala. 1994) ...................................................45

*Dillard v. Crenshaw Cty.*,
   640 F. Supp. 1347 (M.D. Ala. 1986) .......................................45, 46, 48

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
   765 F. Supp. 724 (N.D. Ga. 1991) ...............................................32, 33

*Fla. State Conference of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ..........................................................32

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)............................................................................32

*Ga. State Conf. of the N.A.A.C.P. v. Fayette Cty. Bd. of Com'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015) (Batten, J.) ........... 44, 45, 48, 49

*Georgia State Conference of N.A.A.C.P. v. Kemp*,
   841 F.Supp.2d 1320 (N.D. Ga. 2012)..................................................32

*Harris v. Graddick*,
   593 F. Supp. 128 (M.D. Ala. 1984) .....................................................46

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)............................................................................32

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006)............................................................................43

*McDonald's Corp. v. Robertson*,
   147 F.3d 1301 (11th Cir. 1998) ..........................................................33

*Miller v. Johnson*,
   515 U.S. 900 (1995)...........................................34, 35, 36, 43, 44

*Osmose, Inc. v. Viance, LLC*,
   612 F.3d 1298 (11th Cir. 2010) ..........................................................32

*Perez v. Abbott*,
   267 F. Supp. 3d 750 (W.D. Tex. 2017) ............................................................32

*Reynolds v. Sims*,
   377 U.S. 533 (1965) .............................................................................45, 46, 49

*Scott v. Roberts*,
   612 F.3d 1279 (11th Cir. 2010) ....................................................................33, 44

*Shaw v. Hunt*,
   517 U.S. 899 (1996) .............................................................................................32

*Shaw v. Reno*,
   509 U.S. 630 (1993) .............................................................................................35

*United States v. Georgia*,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) .....................................................33, 34

*United States v. Hays*,
   515 U.S. 737 (1995) .............................................................................................32

*United States v. Alabama*,
   791 F.2d 1450 (11th Cir. 1986) .........................................................................33

*Vera v. Richards*,
   861 F. Supp. 1304 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*,
   517 U.S. 952, 116 S. Ct. 1941, 135 L. Ed. 2d 248 (1996) ................................42

*Warth v. Seldin*,
   422 U.S. 490 (1975) .............................................................................................32

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ...............................................................................................46

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) .............................................................................................46

## I.     __INTRODUCTION__

Plaintiffs are the Georgia NAACP and black voters who reside within Georgia House Districts 105 and 111. Plaintiffs seek an order from this Court preliminarily enjoining the current unconstitutional districting plan as it affects Districts 105 and 111 and five adjoining districts affected by the changes to 105 and 111. As set forth below, the record satisfies the requirements for a preliminary injunction.

In 2015, the Republican-dominated Georgia General Assembly passed H.B. 566 after two elections were held under a post-2010 census plan. The bill, among other things, amended the boundaries of Georgia House Districts 105 and 111. The General Assembly did not re-redistrict to comply with constitutional or statutory requirements. The re-redistricting was not done in response to a court order. Nor did it pass H.B. 566 to further traditional redistricting principles such as compactness or avoiding splitting counties, municipalities, and precincts. Rather, the Republican-dominated General Assembly's *sole* reason for re-redistricting House Districts 105 and 111 was to protect their white Republican incumbents— Joyce Chandler in 105 and Brian Strickland in 111—from losing.

The General Assembly's perceived need to protect white Republican incumbents was motivated by the increasing minority demographics in both House

Districts 105 and 111. The General Assembly accomplished this goal by using voters' racial data as a proxy for political affiliation in order to identify the percentage of black voters it needed to move out of Districts 105 and 111 to maintain its partisan advantage.

The evidentiary record makes abundantly clear that the General Assembly's re-redistricting in 2015 was motivated and accomplished by using race as a proxy for party. Dan O'Connor, who the Republican Speaker installed in the Georgia Legislative and Congressional Redistricting Office ("the Reapportionment Office") and who served as the party's expert in assessing political performance of districts, communicated with legislators and others that redistricting was necessary due to changing racial demographics. For example, in August 2014, O'Connor emailed Chuck Efstration, who represented House District 104, explaining the explosive growth in black voter registration in Gwinnett County and that his district was "an obvious target" for "tweaking" District 105 by swapping out Republicans for Democrats. Ex. 2. Days before H.B. 566 was introduced, O'Connor emailed the Speaker Pro-Tempore Jan Jones that "once a district gets in the 30–35% black range, it becomes more of a target for Democrats," pointing out that both 105 and 111 were two of four Republican-held districts that had tipped over 35%. Ex. 3.

O'Connor attached to these emails and many others data showing the changing racial demographics of Gwinnett and Henry Counties.

The record evidence is also clear that race was used as a means to accomplish the re-redistricting. As the legislators reviewed potential changes with the Reapportionment Office on a computer, a "pending changes" screen was kept open showing the effect on racial demographics for each proposed change.[1] Further, H.B. 566 split several precincts in both districts; and because the Reapportionment Office only had access to accurate racial data, not partisan data, at the sub-precinct level, racial data was necessarily used to examine where precincts should be split to effectuate the General Assembly's goal.

The Supreme Court has repeatedly held that, in redistricting, the use of race as a proxy for partisanship to achieve partisan advantage constitutes racial discrimination under the Fourteenth Amendment. *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017); *Bush v. Vera*, 517 U.S. 952, 968 (1996). Here, overwhelming evidence establishes that race was the predominant factor used by

---

[1] The Reapportionment Office uses Maptitude for Redistricting software. Wright Dep., 16. Maptitude's "pending changes" function gives the operator a window display of the changes in key demographic data to the district caused by the lines of the district being redrawn in real time so that those key demographics can be easily considered by both the operator and those working with the operator. Caliper, the maker of Maptitude for Redistricting, has a brochure explaining the product, which includes an example of the pending changes box on page 3. https://www.caliper.com/pdfs/Maptitude%20for%20Redistricting%20Brochure.pdf

the General Assembly in re-redistricting House Districts 105 and 111, and Plaintiffs can thus clearly satisfy the first factor for obtaining a preliminary injunction: substantial likelihood of success.

Plaintiffs also easily satisfy the other three factors for a preliminary injunction. As numerous courts have held, the deprivation or dilution of the right to vote, as happened here, constitutes irreparable injury (the second factor). The balance of the equities (the third factor) also favors Plaintiffs, because Plaintiffs' fundamental right to vote in an election using constitutional districts outweighs the administrative cost to the State of holding special elections in seven districts. Finally, the public interest (the fourth factor) favors holding the 2018 elections under a constitutional plan.

## II.   FACTUAL BACKGROUND

### A.   Summary of the Evidence

The planning for the 2015 re-redistricting of House Districts 105 and 111 began in 2014 when it became clear to Republican Party officials that the white Republican incumbents in those districts were highly vulnerable to Democratic challengers. Those officials redrew the maps for Districts 105 and 111 in order to protect the incumbents. To effectuate this purpose, the Republicans and the state officials who assisted them used race to identify which voters to move into and out

of the new districts. The map drawers knew that the black population in Districts 105 and 111 had been increasing, and that, in general, black voters largely voted for Democratic candidates while white voters tended to favor Republican candidates. Consequently, to maximize the likelihood that the Republican incumbents would be reelected, the map drawers selected areas with high numbers of black voters to move out of Districts 105 and 111, and selected areas with high numbers of white voters to move into those districts.

The evidence shows that the Reapportionment Office, the office tasked with drawing the district maps as the General Assembly directed, used racial data in redrawing Districts 105 and 111. Notably, inconsistent with traditional redistricting principles, the Reapportionment Office split multiple precincts in Districts 105 and 111. It did not have partisan performance data below the precinct level, but it had racial data down to the census block level. Gina Wright, the primary map-drawer, relied on that racial data as she used mapping software to draw maps for Districts 105 and 111. Each time she created a new iteration, the racial demographics in the newly drawn map automatically updated in a "pending changes" box on her screen. She did not have similarly accurate data showing election results.

Race predominated over traditional redistricting principles in redrawing Districts 105 and 111. Wright acknowledged that the plan was not designed to

further *any* traditional districting principles, but rather was to make Districts 105 and 111 safer for their white Republican incumbents. Not only did the re-redistricting not further any traditional districting principles, it actively undermined them. For example, both 105 and 111 are less compact under the 2015 re-redistricting than under the 2012 plan, District 105 maintained three split precincts and District 111 increased from two split precincts to five, neither district respects city boundaries, and the plan does not respect county boundaries.

### B.    The Key Officials Involved in H.B. 566's Re-redistricting

Several officials were integral in H.B. 566's redrawing of Districts 105 and 111 to reduce their black populations. Randall Nix was the Chair of the House Reapportionment Committee in 2015. Nix Dep., 39–40. He introduced H.B. 566 at the direction of Spiro Amburn, the Chief of Staff to the Speaker of the House, and shepherded it through to passage. *Id.* at 66–67. Joyce Chandler and Brian Strickland represented Districts 105 and 111. Chandler Dep., 54; Strickland Dep., 34. They both asked Nix or Wright to redraw their districts to protect their seats. Wright Dep., 22–23, 27–28. Charles Efstration represented District 104, adjacent to 105; David Knight (130), Andrew Welch (110), Dale Rutledge (109), John Yates (73) represented districts adjoining 111. They were willing to accept changes in the racial demographics of their districts to help their fellow Republicans in 105

and 111 so long as the changes did not threaten their own seats. Wright Dep., 29. Gina Wright drew the districts pursuant to the direction of the legislators.

But the key person for the re-redistricting was Dan O'Connor, a staff member in the Reapportionment Office who Chair Nix testified "probably knows more about the map than any human being alive." Nix Dep., 93. O'Connor began working full-time for the Georgia Republican Party analyzing state districts in 2000. O'Connor Dep., 20–21. Since then, Georgia Republicans have turned to him when they "want to analyze the likely performance of their district." *Id.* at 144–45. In particular, Wright testified, "a lot of the members like to pick his brain about things like" election results and data. Wright Dep., 210–11. O'Connor was considered "the guru of numbers and analytics." Welch Dep., 74.

In 2005, the Republican Party gained a majority in the Georgia House and brought O'Connor into the Reapportionment Office. After a brief period in the House Research Office, the Republican Speaker brought O'Connor to the Reapportionment Office for the 2011 redistricting, where he has been ever since. O'Connor Dep., 41-43. O'Connor understood that his role in the Reapportionment Office was to ensure that the 2011 redistricting maximized Republican political performance. *Id.* at 51-53.

Prior to the 2015 re-redistricting, O'Connor regularly communicated with all of the key players on H.B. 566, including Nix, Wright, Chandler, Efstration, and Amburn. He speaks with Wright daily and spoke to Nix daily during the re-redistricting process. Wright Dep., 192; Nix Dep., 92. O'Connor's central role is reflected in the fact that when Speaker Pro-Tempore Jones searched for documents to prepare for her deposition in this case, she searched her emails for only one term other than "redistricting" and the bill numbers for redistricting legislation—"Dan O'Connor." Jones Dep., 17.

### C.    The Demographic Trends Leading Up to H.B. 566

Two demographic trends led Republicans to redraw Districts 105 and 111. First, blacks in the Atlanta metropolitan area have been migrating in great numbers to areas outside of the Atlanta city center, such as Gwinnett and Henry Counties. Second, voting behavior in Georgia is polarized by race, as strong majorities of black voters support Democrats and strong majorities of whites support Republicans. These two trends have made elections in some formerly staunchly Republican districts closely contested, putting their Republican incumbents at risk.

### 1.    Changing Demographics In Henry and Gwinnett Counties

During the 1990s, Henry and Gwinnett Counties boomed in population. The growth was mostly white in Henry County and more racially mixed in Gwinnett.

Dkt. 64-4, 64-5 (Exs. to Declaration of Expert William Cooper). O'Connor dubbed

the growth "white flight" from other counties closer to Atlanta such as Clayton.

*See* Ex. 4 at 2. Since 2000, Henry and Gwinnett counties have continued to grow,

with the minority population increasing substantially and the white population

stagnating. *See* Dkt. 64-4, 64-5. O'Connor was keenly aware of this shift,

repeatedly distributing data to legislators, journalists, and consultants to show the

demographic transformation of the two counties. *See, e.g.*, Ex. 5 (O'Connor notes

to a Republican lawyer that the growth in black voter participation and stagnation

of white voter participation between 2010 and 2014 in Gwinnett County); Ex. 6

(O'Connor tells a journalist about the increase in black voter participation and the

stagnation in white voter participation in Gwinnett County between 2002 and

2014); Exs. 7-9 (O'Connor writes to a Republican political consultant that black

voter registration in Henry County had gone from 22% to 37%); Ex. 10 (O'Connor

informs Speaker Pro-Tem Jones that "Gwinnett and Henry have been changing

quickly in recent years—virtually all the growth in those 2 counties these days is

minority"). As O'Connor explained to Jones, by 2014 District 105 was at 34.6%

Black voter registration and District 111 was at 36.7%. Ex. 3 at 2.

In 2015, O'Connor pointed out to University of Georgia Political Science

Professor Charles Bullock that "Black [voter] registration ha[d] increased over 600

percent" in Henry County while white growth had stagnated. Previous white flight from Clayton County had left that county majority black and so "almost all growth in Henry now is likely blacks leaving Clayton and DeKalb." Ex. 4 at 2.[2]

### 2.    Voting In Georgia Is Racially Polarized

The second demographic trend in Henry and Gwinnett Counties explains O'Connor's preoccupation with the first—voting in Georgia is racially polarized and has become increasingly so. Although blacks had long preferred Democrats and whites preferred Republicans in Georgia, Dkt 65-1, Declaration of Peyton McCrary (McCrary Dec.), ¶ 21-22, the gap has widened recently due to an increased white preference for Republicans. After the November 2014 elections, for example, O'Connor told the publisher of the Southern Political Report that "[w]hite vote has simply collapsed for the Democrats here, much as it has in the rest of the Deep South." Ex. 12. The "key thing," he noted in an email to a former Congressional candidate, "is that the percentage of whites voting Democratic in Georgia has plummeted over [a] long period." Ex. 13. "Voting in the Deep South," including Georgia, "is more racially-polarized than in the so-called southern 'border' states like Tennessee, Arkansas, and Virginia." *Id.*; *see also* O'Connor

---

[2] In an email to a Republican political consultant describing the declining white voter registration numbers in Henry County, O'Connor dubbed the demographic trends "the 'Clayton Effect.'" Ex. 11.

Dep., 268; Ex. 14 (speculating that President Obama accelerated the trend of southern whites towards the GOP); Ex. 15, at 13 (in a summary of the 2014 Senate race stating that while Democrats may be tempted to "blame the black vote" for their losses, the "Democrats' problem in 2014 is one that has plagued the party for over 10 years in statewide and other contests has been a lack of white support.").

Plaintiffs' expert Jowei Chen estimated the partisan voting patterns of each racial group. Dkt. 63-1, Report of Dr. Jowei Chen, PhD. ("Chen Rep."), 4. His analysis that black voters support Democratic candidates and white voters support Republican candidates confirmed O'Connor's impressions:[3]

| | Black Voter Support for Dem. candidate for District 105 | Non-Black Voter Support for Dem. candidate for District 105 | Black Voter Support for Dem. Candidate(s) for District 111 | Non-Black Voter Support for Dem. Candidate(s) for District 111 |
|---|---|---|---|---|
| 2012 House Election | 99.0% | 21.4% | 98.2% | 18.1% |
| 2014 House Election | 97.9% | 19.2% | 98.6% | 15.7% |
| 2016 House Election | 99.3% | 25.2% | 99.3% | 17.8% |
| 2018 House Special Election | N/A | N/A | 98.7% | 14.2% |

Chen Rep., 5-6; Doc. 94-1 (Reply Report of Jowei Chen, PhD), 13.

Racial polarization is a fact of Georgia politics, and it is implausible that anyone involved in the creation of H.B. 566 could have been unaware of it. Nix,

---

[3] Chen's methodology used "ecological inference," which is a "widely-accepted statistical technique for estimating different racial groups' political behavior." Chen Rep., 4.

for example, testified that it was common knowledge that districts with a high black population tend to vote Democratic. Nix Dep., 221. Don Balfour, a former Republican State Senator from Gwinnett County who chaired the Reapportionment Committee, testified that there is a correlation between districts with large black populations and Democratic districts, saying, "If you get to [a] 50, 55 percent African-American district, I can't win it." Balfour Dep., 13–14. Wright also testified that empirical studies "seem to show that there is some correlation" between race and party. Wright Dep., 31.

Extreme racial polarization in voting behavior means that racial demographics largely determine who wins. The growth of the black population in Gwinnett and Henry Counties meant districts were at risk of flipping to Democrats. O'Connor understood this, sending the following table to Speaker Pro-Tem Jones:

**Georgia---Members Elected to State House, November 2014 (Based on Black Percentage of Registered Voters, October 2014)**

| Black Percentage Registered Voters | Democrats Elected | Republicans Elected | Independents Elected | Totals |
|---|---|---|---|---|
| 70% and higher | 5 | 0 | 0 | 5 |
| 60-69.9% | 22 | 0 | 0 | 22 |
| 50-59.9% | 21 | 1 | 0 | 22 |
| 40-49.9% | 7 | 1 | 0 | 8 |
| 30-39.9% | 2 | 10 | 1 | 13 |
| 20-29.9% | 1 | 34 | 0 | 35 |
| 10-19.9% | 2 | 37 | 0 | 39 |
| Under 10% | 0 | 36 | 0 | 36 |
| **Totals:** | **60** | **119** | **1** | **180** |

Ex. 16. The table shows that of the 57 districts whose percentage of black registered voters exceeded 40 percent, only two were Republican. O'Connor Dep., 287–90. Both of those Republicans originally won their seats as Democrats. *Id.* at 256–57. On the other side, of the 110 districts whose percentage of black registered voters was under 30 percent, only three were Democrats. In the area of 30–40 percent where elections were close, ten districts elected Republicans, two Democrats, and one the House's only Independent.

O'Connor distributed data on the impact of racial demographics on Georgia Senate districts as well. After the 2014 elections, he wrote to a staffer for the Senate Pro-Tem that, "[o]f the 18 Democratic-held Senate seats, 15 are majority black . . . and all three of [the others] have fairly large minority populations." Ex. 17. He also attached detailed tables comparing race and party. Exs. 18–22; *see also* Ex. 23 (O'Connor noting that Senate Democrats held all 17 seats that were over 40% black, and Senate Republicans held 38 of 39 seats that were under 40% black). Jones asked O'Connor to research when Republicans had lost an incumbent in the House to a Democrat, and O'Connor told her that, aside from DeKalb County (which has an unusually high level of white support for Democrats), a Republican incumbent had not lost in Georgia from 2007 to 2015 unless "there was a significant minority percentage, 30% or more." Ex. 24; O'Connor Dep., 299.

O'Connor regularly disseminated racial data alongside political performance data, informing others of the close link between the two. For example, he emailed Ben Jordan, the Chief of Staff to the House Majority Leader, tables showing every House member sorted by party and the percentage of their districts' black population. O'Connor Dep., 302–04; Exs. 25–27. The tables demonstrated the truth of what O'Connor explained to Jones—when the percentage of black voters in a district exceeds 30 percent, the districts are at risk of supporting Democrats, and when it hits 40 percent, they flip. Jacobs responded that he would be "sure" the Majority Leader saw this information. Ex. 28.

O'Connor applied his understanding of the link between racial demographics and partisan performance to the task of re-redistricting Districts 105 and 111. He knew that if the black population in Gwinnett and Henry Counties continued to increase, the districts in those counties would soon elect Democrats. He wrote, for example, that Gwinnett and Henry Counties were becoming "increasingly marginal" for Republicans, Ex. 4 at 1, because of the growth in black voter registration. O'Connor Dep., 206–07; *see also* Ex. 29, O'Connor Dep., 176–78 (informing a Republican campaign staffer that there were fewer voters in the Gwinnett Republican primary in 2014 than 2010 because of accelerating demographic changes); Ex. 30 at 3 ("Gwinnett and Henry Counties are rapidly

changing—the former leans Republican[] but is probably not more than two cycles away from being 50/50 and the latter is already at parity"). Racial demographics are so powerful a predictor that when O'Connor distributed data on the 2014 Georgia House elections, he intentionally omitted data on four house districts in southern Georgia because he assumed that the data was erroneous: the data showed "a majority-black district there barely voting Democratic for Senate and Governor, *which could not be right*." Ex. 31 (emphasis added).

### D. <u>The Creation of House Bill 566</u>

Before 2000, Georgia did not typically redistrict when it was not required to do so because of a new decennial census or a court order. McCrary Dec., ¶ 32. Balfour, who was Chairman of the Senate Reapportionment and Redistricting Committee in 2013–14 and had been in the Senate from 1993–2014, testified that before 2015 he had never seen any significant reapportionment that was not compelled by a new census or court order. Balfour Dep., 29–30. Georgia re-redistricted in 2006 to make slight adjustments to a court-drawn plan from 2004. Wright Dep., 41–42. The 2011 mandatory redistricting created Districts 105 and 111 as new districts due to the growing populations of Henry and Gwinnett Counties. Although they were drawn to be Republican districts, they lacked incumbents that could advocate for themselves, *id.* at 151–52, leaving the districts

vulnerable to the demographic changes in their respective counties. Georgia made three changes to the 2011 maps before the 2012 elections were held. McCrary Dec., ¶ 35.

In 2013, Representative Nix became the Chair of the House Legislative & Congressional Reapportionment Committee at the Speaker's request. Nix Dep., 53–54. He had not previously been a member of the Reapportionment Committee and had no background in redistricting. *Id.* Nevertheless, Amburn, the Speaker's Chief of Staff, told Nix that he should tell members to plan for re-redistricting in 2015, and that if any members wished to make changes to their districts, they should tell Gina Wright and the Reapportionment Office. *Id.* at 66–67, 83–84.

Nix left it to the members to initiate changes, and the members who sought changes spoke with O'Connor. Before the 2014 election, Chandler—who represented District 105—told Nix that she wanted to improve her chances of reelection. *See* Nix Dep., 139–42. Nix referred her to the Reapportionment Office, *id.*, and Chandler met with Wright before the election to discuss "if there was any way to[] give any political boost to District 105." Wright Dep., 22. In July 2014, Chandler asked O'Connor for data on her district. Ex. 32. O'Connor gave her precinct-level racial data and Chandler thanked him. Ex. 33.

Within a month of providing this data to Chandler, O'Connor gave Efstration—who represented adjoining District 104, with a larger white population—a detailed explanation of where the growth in black voter registration was occurring in Gwinnett County. Ex. 2. He noted that shoring up Chandler's district would probably require swapping voters with Efstration, but that Efstration "was right to be cautious about that" because too many changes could threaten his own incumbency.[4] *Id.* The exchange highlighted a concern of O'Connor and others behind H.B. 566: although Districts 105 and 111 were vulnerable to the Democrats, the increased black population in Gwinnett and Henry Counties would mean that too much help for Districts 105 and 111 from adjoining Republican districts could put the adjoining districts at risk as well. Wright Dep., 22, 29.

In September 2014, O'Connor flagged District 105 as one of the top 3 targets for Democrats because of its "racial demographic changes." Ex. 34; O'Connor Dep., 179. A week later, he wrote that he had just received an "assignment" to research "demographics (for instance changes in voter registration)." Ex. 35. Wright also discussed the possibility of boosting District 105's political performance with Nix and Efstration. Wright Dep., 22. Wright said

---

[4] O'Connor testified that this exchange was not his first conversation with Efstration on this topic. O'Connor Dep., 191.

that these discussions included talk of changing racial demographics in Gwinnett County, brought up, "most likely," by Wright. *Id.* at 24. Wright also had conversations about how to shore up District 111 for the Republicans, including how to improve the demographics of its voters without harming the surrounding Republican districts such as District 110. *Id.* at 29. Legislators from surrounding districts, Representatives Welch, Knight, and Yates, made clear to Wright they were willing to help Brian Strickland, who represented District 111, if they could do so without endangering their own seats. *Id.* at 177; Rutledge Dep, 176. Wright testified that in finding that balance, she looked at racial data. *Id.* at 29.

The 2014 elections in Districts 105 and 111 were very close: Strickland won 53.1% of the vote in District 111 while Chandler won 52.8% in District 105. Ex. 86. As O'Connor noted to Amburn, Districts 105 and 111 were two of only three districts that were won by Republicans by a margin under ten percentage points. Ex. 36. Commenting on the 2014 national elections held the same day, O'Connor wrote to a national Republican Party Committee member that one silver lining for the Democrats in their defeat was that Henry County went to the Democrats, a "sign of continuing black migration to th[e] count[y]." Ex. 37 at 2. In addition, "Gwinnett County continue[d] to move in a purple direction," *id.*, which was due to "the racial demographic changes in Gwinnett," O'Connor Dep., 216.

Within days of the November 2014 election, efforts to shore up the districts began. Dale Rutledge, representing District 109, emailed Wright and O'Connor on November 14 seeking demographic data for Districts 109, 110, and 111. Ex. 38. Wright emailed the Secretary of State's office, reiterating a request made before the election for precinct-level data, including racial data, as quickly as possible because multiple members had already requested it. Ex. 39, p. 2; *see also* Ex. 40. On December 19, 2014, O'Connor spoke to Amburn, suggesting that he look at Districts 105 and 111 as candidates for the planned 2015 re-redistricting; he also sent Amburn data on the racial demographics of those districts. Ex. 36. O'Connor also told Amburn that O'Connor and Wright were to meet with Strickland on December 22 to discuss District 111 and that Amburn was invited. *Id.*

Wright began drawing maps for District 105 as early as spring 2014, and produced accompanying stat sheets listing their black voter age population percentage in both Districts 104 and 105. Wright Dep. 298–305; Exs. 41–44. When Wright worked on the map-drawing along with the Republican legislators, they would ask her questions about the changes in real time. When she drew the new maps for District 105, for example, Chandler, Efstration, and Nix were in the room. Nix Dep., 146–50. As Wright clicked on different district lines, the group of legislators looked to see how particular changes would affect their districts: "[I]f

we were to do this, would this happen? If we were to click over here and we would do this, would this happen?" *Id.* at 147. As Wright made each change, the changed racial breakdown of the population in the various districts was displayed on the screen. *Id.* at 148–50. Even when the legislators were not present, when Wright tinkered with the new maps, she kept open at all times a "pending changes" box on her computer screen showing the racial demographics that would result from each proposed change. Wright Dep., 105. After making changes to the maps, Wright testified that she looked at the racial data. *Id.* at 220.

Although Wright had political data available, the racial data was more accurate because only the racial data from the census was available at a level of granularity finer than the precinct level. Strangia Dep., 24–25; Chen Rep. at 2; Wright Dep., 109–12. Wright had racial data available at the census block level but political data available only at the broader precinct level. *Id.* As a result, when Wright drew district lines splitting precincts, she could accurately do so only with the racial data.[5] In addition, though Georgia does not have voters register by party,

---

[5] O'Connor explained in his correspondence that split precincts made evaluating political performance data more difficult and less accurate. *See* Exs. 45–46. He once told Speaker Pro-Tem Jones of splits in a precinct that was "very large and difficult to calculate because of wide variety of politics in the precinct (black portions and heavily white ones)." Ex. 24 at 2. He noted that Maptitude said the district with part of that precinct went narrowly for Democrats, "which could not possibly be the case given how black it is." *Id.*; *see also* O'Connor Dep., 323 (testifying that split precincts makes projecting political performance harder).

it asks registration applicants for their race. Wright Dep., 25, 90, 209. When splitting precincts, the only accurate data Wright had available to her—and visible to her in the "pending changes" box on her computer screen—was racial data. In Districts 105 and 111, where voting behavior splits strongly on racial grounds, racial demographics function as an effective proxy for party.

### E.     The Passage of H.B. 566

The Georgia Assembly's 2015 session began on January 12. In its second week, Nix announced that the House was planning to redistrict again, and that anyone who wanted a change had to meet with the Reapportionment Office. Nix Dep., 79. On February 26, O'Connor met with and emailed the Speaker Pro-Tem Jones, who was also on the Reapportionment Committee, to send her detailed data on the history of voter registration by race in Gwinnett County and Henry County, telling her that he would follow up the next day with "data on districts of Rep. Strickland and Chandler." Exs. 22, 47–48. On February 27, he sent her tables of voter registration data by race for Districts 105 and 111. Exs. 3, 49–50. O'Connor noted in his email that the districts "are at least 35% black in voter registration," and that "once a district gets in the 30–35% black range, it becomes a target." Ex. 3. By this point, District 105 was at 34.6% black voter registration and District 111 was at 36.7%. *Id.* While O'Connor was disseminating racial data and analysis to

the Speaker Pro-Tem, Wright was informing other legislators that the

Reapportionment Office was still working on the map. *See* Ex. 51 (Wright

informing Rutledge on February 27 that she was still working on the map).

On March 5, 2015, Nix introduced H.B. 566. Ex. 52. The same day,

O'Connor emailed Andrew Welch (the representative from District 110) to send

voter registration data by race for Districts 109, 110, 111, and 129. Exs. 53–61.

O'Connor testified that he did so because Welch used the racial data to assess

political performance. O'Connor Dep., 243–44.

On March 9, 2015, the first and only hearing on H.B. 566 was held. Ex. 52.

At the hearing, Nix provided Democrats with a copy of the H.B. 566 map for the

first time. Nix Dep., 186. Nix told Democrats that every legislator affected had

signed off on the changes, but he did not tell them that certain district changes had

been engineered among Republican districts with the intention of preventing them

from flipping to Democrats. *Id.* at 186–87. The same day, the House

Reapportionment Committee voted in favor of H.B. 566. Ex. 62.

After the House vote, O'Connor drafted a document summarizing H.B. 566.

The document gave only three examples of why a district line may be changed:

"eliminating a split precinct (a precinct divided into multiple districts), reuniting a

neighborhood or community of interest, or addressing technical concerns." Ex. 61

at 2. O'Connor testified, however, that he did not recall any revisions to District 105 or District 111 that were made for any of those three reasons. O'Connor Dep., 134–36. Wright, the map-drawer, also conceded that none of the revisions to Districts 105 and 111 furthered any of those three goals. Wright Dep., 236–39. The bill summary's listed purposes of redistricting were therefore all incorrect, while the actual purpose—to maximize Republican political advantage—was conveniently omitted.

On March 10, the day after the Reapportionment meeting, O'Connor emailed Professor Charles Bullock to explain the actual purpose of the bill: "There are no partisan implications" in some of the changes, he wrote, "but in the Gwinnett portion, the black percentage in Rep. Chandler's district drops by two points . . . while Rep. Efstration's district increases from 22% to 24% black." Ex. 64. The "theory" was that Efstration "could 'sacrifice' some voters and still retain a heavily GOP district . . . while [Chandler] has had close calls." *Id.* O'Connor's implication was clear—while some changes did not implicate partisan outcomes, the deliberate removal of black voters from Chandler to Efstration would help Chandler win.

On March 11, only two days after the Reapportionment Committee meeting, the full House passed the H.B. 566. Ex. 52.

Nix presented H.B. 566 to the Senate Committee on Reapportionment on March 26. Nix Dep., 203–05. Nix told the Senate only that all House members had agreed and that the changes did not threaten the map's legality. *Id.* On March 31, 2015, the Senate passed H.B. 566. Ex. 52. The same morning, the Senate Research Office requested the House's formal redistricting principles used to draw the 2011 maps. Ex. 217 at 2. O'Connor testified that he checked with Wright and both believed that no such document existed. *Id.* at 1. The House's 2011 list of principles did exist, however, and were a collection of traditional redistricting principles. Ex. 66. Wright testified that she was aware of this document. Wright Dep., 62.

In April, O'Connor provided racial data on H.B. 566 to a staff member for Democratic Senator Vincent Fort. Exs. 67–68. O'Connor also provided the Democratic Senate Minority Leader with a comparison by race of the then-current District 105 and the proposed District 105. Ex. 38. Armed with this data, Democrats argued that H.B. 566 was a gerrymander that diluted the black vote and urged Governor Nathan Deal to veto the bill. Ex. 70. The Georgia State Conference of the NAACP and the Black Legislative Caucus advocated against passage of H.B. 566 as a racial gerrymander. Ex. 88, ¶ 9. On May 12, 2015,

Governor Deal signed H.B. 566 over the Democrats' objections, and it became law. Ex. 52.

### F.   The New District 105 and 111 Maps

The new maps created by H.B. 566[6] moved significant numbers of black voters out of Districts 105 and 111 into adjoining, whiter districts, and replaced them with white voters. The population moved into District 105 was 60% white and 25.9% black, and the population moved out of District 105 was 29.1% white and 40.3% black. Dkt. 62-1, (Declaration of Plaintiffs' Expert Dr. Gerald Webster), at 30. For District 111, the population moved into the district was 51.8% white and 34.7% black, while the population moved out of the district was 44.5% white and 42.8% black. *Id.* at 33. The Reapportionment Office also calculated the demographic changes at the precinct level. Ex. 71.

These changes to Districts 105 and 111 had significant consequences. Donna McLeod, a black Democratic candidate narrowly defeated in District 105 in 2016, testified that a woman in an area added to the district by H.B. 566 verbally assaulted her for being on her property in a way that Ms. McLeod believed was racially motivated. McLeod Dep., 72–73. She described other racial incidents as

---

[6] Detailed maps of H.B. 566's version of Districts 105 and 111 as well as their surrounding districts are located at Exhibits 77 and 79. Detailed maps of the 2012 versions of Districts 105 and 111 are located at Exhibits 76 and 78. *See also* Cooper Dec., at 5, 7; Ex. 31; Ex. 43.

well, *id.*, and noted that they did not occur in the other parts of District 105. *Id.* at 109–111. Similarly, in District 111, the Republican who won a special election against two black Democrats in 2018 "sent a mailer showing the two Democratic [opponents] as terrorists," Harrell Dep., 36.

Wright conceded that the changes to Districts 105 and 111 were motivated by partisan advantage and not technical improvements. Wright Dep., 29–30, 237–39. But the re-redistricting effected by H.B. 566 actually *undermined* traditional redistricting principles. For example, the plan increased population deviations from the one-person, one-vote goal in both districts. Chen Rep., at 26. The new maps worsened compactness. *Id.* at 27–28. The new maps kept the same number of split precincts for District 105 (while altering the area of splits), but increased that number from two to five in District 111. *Id.* The plan also did not respect municipal boundaries. *Id.* at 28. For example, the maps split up the majority-black city of Lawrenceville—which at a population of 28,546 is half the population of a single House district—into six different districts, including District 105. *Id.* at 31; *see also* Wright Dep., 153–57; Ex. 81. Stockbridge, a majority-black city even smaller than Lawrenceville, was split up between five House Districts, including District 111. Chen Rep., at 32. The overall plans in Gwinnett and Henry Counties also needlessly failed to respect county boundaries—though respecting county

boundaries has been a principle adopted by the General Assembly. *See* Ex. 66;
Wright Dep. at 62. H.B. 566's "racial purpose was the predominant (indeed the
*only*) goal of these boundaries alignments." Dkt. 95-1, ¶ 3 (McCrary Rebuttal
Dec.) (emphasis in original).

The high number and the character of the split precincts in Districts 105 and
111 indicate that Wright used racial data in creating them. None of the three
precinct splits in District 105 were made to comply with traditional redistricting
principles.[7] Chen Rep., at 36. Of the three split precincts, two were split so that the
portion of the precincts within District 105 had a lower percentage of black voters
than the portion outside the district. *Id.* at 34. For example, District 105 removed a
piece of a precinct in the northwestern part of the district in the Lawrenceville area
where 45.6% of the population of voting age was black, and replaced it with a
piece of the split precinct "Harbins A" on the eastern end where just 14.5% of the
voting age population was black. *Id.* at 24. In contrast, the piece of Harbins A that
remained in District 104 had a black voter age population of 33.2%. *Id.* at 34. Also
significantly, Harbins C, the full precinct moved from District 104 to 105, had a
black voting age population of only 11.2%. *Id.* at 24.

---

[7] Although District 105 had the same number of split precincts prior to HB 566, the splits
enacted by HB 566 are different and the plan did not reduce the overall number of split precincts.

The splitting of five precincts in District 111 was not required under traditional redistricting principles. Four of the five were split so that the portion inside District 111 had a lower black voting age population than the portion outside District 111. *Id.* at 38. Since Wright had only racial data to use when splitting the precincts, these effects cannot be explained on a purely partisan basis.

### G.   The Consequences of H.B. 566

The November 2016 elections demonstrated that H.B. 566 succeeded in protecting the white, Republican incumbents. Chandler and Strickland both won reelection in 2016 in extremely close elections. Chandler won 50.45% of the vote, beating her Democratic opponent Donna McLeod 12,411 votes to 12,189 after a recount spurred by the narrow margin confirmed the result. Strickland won 51.69% of the vote, beating his Democratic opponent 14,488 to 13,542. Ex. 86.

Chen estimated what the election results would have been if the 2016 election had been held with the 2012 map. Retaining the vote totals from precincts in both the 2012 and 2015 maps and using ecological inference to estimate vote totals for the precincts added by H.B. 566, he estimated that a Democrat would have defeated Chandler 54.4% to 45.6%, and a Democrat would have defeated Strickland 50.9% to 49.1%. Chen Rep., at 21–22. O'Connor similarly concluded

that if the districts had not been redrawn, Strickland probably would have lost. Ex. 72, at 2. He testified that Chandler would have lost as well. O'Connor Dep., 90.

H.B. 566 sufficiently reduced the black vote in Districts 105 and 111 to protect their Republican incumbents. The percentage of the black vote in District 105 had been steadily increasing, reaching 35.7% by 2014. Chen Rep., at 14. According to Chen, had the boundaries to District 105 remained unchanged, the black vote percentage would have increased again to 37%. *Id.* Instead, it reverted to 32.9%. *Id.* The black vote had also been increasing in District 111, reaching 37.6% by 2014. Chen Rep., at 15. Had the boundaries not changed, the black vote would have increased to slightly more than the 40% level where, as O'Connor demonstrated, Democrats would almost always win. With the changes, it decreased to 37.4%. *Id.*

Although H.B. 566 saved Republican seats in 2016, the existing demographic trends in Gwinnett and Henry Counties continued. O'Connor noted how rapidly these changes were occurring, writing to a staffer for the House majority leader in October 2016 that in just the past seven months, District 105 saw an increase of "1,600 blacks, 1,000 whites, 150 Asians, and 300 Hispanics." Ex. 73 at 2. District 111 saw an increase of "2,000 blacks, 1,000 whites, 100 Asians, and 150 Hispanics." *Id.* House leadership remained interested in whether further re-

redistricting could continue to keep the seats in Republican hands. In January

2017, O'Connor and House leadership discussed what changes could be made in

Gwinnett County to maximize Republican seats given demographic trends with

O'Connor noting that, "it may be a seat or two has to be sacrificed to save others."

Ex. 72. In February 2017, O'Connor emailed Wright racial data on Districts 105

and 111. Ex. 74. Ultimately, the House passed H.B. 515, which would have

reduced the percentage of black voters in District 111, but the bill did not get a

vote in the Senate by the time the General Assembly adjourned on March 31 and

therefore did not become law. Ex. 75 at 5. Plaintiffs filed this lawsuit twenty-five

days later on April 24, 2017. Dkt. 1.

## III.   <u>ARGUMENT</u>

Plaintiffs are entitled to a preliminary injunction requiring Defendant to

conduct the 2018 election using the most recent legislative district maps whose

constitutionality has not been challenged, that is, the maps used in the 2012 and

2014 election cycles. Discovery has shown that race was the predominant factor

motivating the General Assembly's decision to reduce the proportion of black

voters in Districts 105 and 111 and to increase the proportion of white voters. The

General Assembly used race to further Republicans' partisan advantage, but

controlling case law dictates that the use of race for such purposes is not a

compelling state interest sufficient to withstand strict scrutiny. Plaintiffs are

therefore likely to prevail on the merits of their racial gerrymandering claim.

The other three factors for a preliminary injunction are also met here.

Specifically, Plaintiffs will suffer irreparable harm if the 2018 elections for House

Districts 105 and 111 are conducted using constitutionally infirm districts. The

balance of hardships weighs in favor of Plaintiffs as well: their fundamental right

to vote would be infringed absent an injunction, outweighing any burden that

Defendant might experience in complying with the requested injunction. And the

requested injunction would serve the public interest because protecting the right to

vote is unquestionably in the public interest.

Plaintiffs' request for a preliminary injunction should therefore be granted.

## A.   **Plaintiffs Are Entitled To The Requested Injunction**

To prevail on a motion for a preliminary injunction, Plaintiffs must show:

(1) a substantial likelihood that they will succeed on the merits; (2) that the

preliminary injunction is necessary to prevent irreparable injury; (3) that the

threatened injury absent an injunction outweighs the injury an injunction may

impose on Defendant; and (4) that the injunction would not be adverse to the

public interest.[8] *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir.

2010); *Energy Four, Inc. v. Dornier Med. Sys., Inc*., 765 F. Supp. 724, 732 (N.D.

---

[8] Plaintiffs have standing to bring their racial gerrymandering claim. The Supreme Court has held that "[w]here a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744–45 (1995). Here, the individual plaintiffs reside in either House District 111 or House District 105, the districts challenged in this litigation. Ex. 89, Declaration of Lavelle Lemon, resident of District 111; Ex. 87, Declaration of Patricia Smith, resident of District 105; Ex. 90, Declaration of Coley Tyson, resident of District 105.

The Georgia State Conference of the NAACP has associational (also known as representational) standing to bring its racial gerrymander claim. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). Here, the Georgia NAACP's membership includes individuals who reside in House Districts 105 and 111, a required element of associational standing. *Shaw v. Hunt*, 517 U.S. 899, 904 (1996). Francys Johnson, until recently the President of the State Conference, has submitted a declaration affirming that fact. Ex. 88, Declaration of Francys Johnson. The goal of this lawsuit—preventing unconstitutional racial gerrymandering—is germane to the Georgia NAACP's purpose: "to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African-Americans." *Id.* Finally, because plaintiffs here seek injunctive relief, the individual participation of the members of the Georgia NAACP is not required. *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *Florida State Conference of N.A.A.C.P.*, 522 F.3d at 1160.

The Georgia NAACP also has organizational standing to bring this Fourteenth Amendment claim in its own right. Organizational standing, unlike associational or representational standing, permits an organization to seek judicial relief from an injury to the organization itself. *Warth*, 422 U.S. at 511. The Supreme Court has recognized that organizational standing can be conferred by a noneconomic injury, so long as it is sufficiently concrete and traceable to the defendant's conduct. *Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 n. 20 (1982). This basis for standing has been applied in voting rights cases, in both redistricting and vote denial cases. *Perez v. Abbott*, 267 F. Supp. 3d 750, 771–73 (W.D. Tex. 2017); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F.Supp.2d 1320, 1336–37 (N.D. Ga. 2012). In this case, the Georgia State Conference of the NAACP has been harmed as an organization. Francys

32

Ga. 1991). Plaintiffs bear the burden of clearly establishing that they satisfy each of these factors. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1372 (N.D. Ga. 2012) (granting motion for preliminary injunction).

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) ("*Cox I*") *aff'd*, 408 F.3d 1349 (11th Cir. 2005) (*Cox II*) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the

---

Johnson, as Georgia NAACP President, conferred with many members of the Georgia Legislative Black Caucus, including Chair, Dee Dawkins-Haigler, and House minority leader Stacey Abrams, in an effort to investigate about how the changes would impact House Districts 105 and 111 so he could educate the Georgia NAACP leadership and membership. Johnson Dep., 24–25; Ex. 88, ¶ 9.

33

potential deprivation of the ability to vote, the most basic of American citizens'

rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which

were comparatively minor).

As explained below, injunctive relief is warranted, because all four elements

strongly weigh in Plaintiffs' favor.

### 1. Plaintiffs Are Likely To Prevail On The Merits Of Their Claim Of An Unconstitutional Racial Gerrymander

#### (a) Legal Doctrine For Racial Gerrymandering Claim

The Equal Protection Clause of the Fourteenth Amendment "prohibits a

State, without sufficient justification, from 'separat[ing] its citizens into different

voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*,

580 U.S. __, 137 S. Ct. 788, 792 (2017) (citing *Miller v. Johnson*, 515 U.S. 900,

911 (1995)). "A racial gerrymandering claim . . . applies to the boundaries of

individual districts." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. __, 135

S. Ct. 1257, 1265 (2015); *see also Clark v. Putnam Cty.*, 293 F.3d 1261, 1266

(11th Cir. 2002) ("Race may not . . . be used as the primary tool in assigning voters

to electoral districts."). The Supreme Court has explained that the harms of a racial

gerrymander "are personal. They include being 'personally ... subjected to [a]

racial classification,' as well as being represented by a legislator who believes his

'primary obligation is to represent only the members' of a particular racial group."

*Ala. Legis. Black Caucus*, 135 S. Ct. at 1265 (quoting *Vera*, 517 U.S. 952, 957 (1996) (O'Connor, J.) and *Shaw v. Reno*, 509 U.S. 630, 648 (1993)).

Importantly, the Supreme Court has explained that, even where the state's ultimate aim is a partisan one, the use of race as a proxy for partisanship triggers strict scrutiny:

> [I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests . . . their action still triggers strict scrutiny. In other words, the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.

*Cooper*, 137 S. Ct. at 1473 n.7 (citations omitted); *id.* at 1464 n.1 (noting that a plaintiff succeeds in showing that race predominated "even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones"); *see also Vera*, 517 U.S. at 968 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.").

To prevail on a racial gerrymandering claim, the plaintiff must first show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill*, 137 S. Ct. at 797 (citing *Miller*, 515 U.S. at 916). If the plaintiff shows that race was the predominant factor, "the burden shifts to the State to 'demonstrate that its

districting legislation is narrowly tailored to achieve a compelling interest.'"
*Bethune-Hill*, 137 S. Ct. at 801 (citing *Miller*, 515 U.S. at 920); *accord Clark v.
Putnam County*, 293 F.3d 1261, 1267 (11th Cir. 2002).

To satisfy the "race as predominant factor" requirement, the plaintiff "must
prove that the legislature subordinated traditional race-neutral districting principles
. . . to racial considerations." *Bethune-Hill*, 137 S. Ct. at 801. The plaintiff is not
required to show that the redistricting conflicted with traditional redistricting
principles; rather, "[r]ace may predominate even when a reapportionment plan
respects traditional principles . . . if [r]ace was the criterion that, in the State's
view, could not be compromised, and race-neutral considerations came into play
only after the race-based decision had been made." *Id.* at 798 (citation omitted.)
Further, the fact that the lines in question could have been drawn with race-neutral
criteria does not preclude a finding that race was the predominant factor used to
draw the district boundaries. *Id.* at 799 ("The racial predominance inquiry concerns
the actual considerations that provided the essential basis for the lines drawn, not
*post hoc* justifications the legislature in theory could have used but in reality did
not.").

To prove that race was the predominant factor in a redistricting decision, the
plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial

evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137

S. Ct. at 1464 (citation omitted); *see Davis v. Chiles*, 139 F.3d 1414, 1424 (11th

Cir. 1998) ("A court may base such a finding either on circumstantial evidence

regarding a district's shape and demographics or on direct evidence of a district-

drawer's purpose."). Redistricting maps that violate traditional redistricting

principles, for example, may constitute evidence of an unconstitutional racial

gerrymander. *See Bethune-Hill*, 137 S. Ct. at 799 ("In general, legislatures that

engage in impermissible race-based redistricting will find it necessary to depart

from traditional principles in order to do so.").

The Supreme Court has held that the legislature's use of only racial data on a

block-by-block level during the redistricting process strongly indicates that race

predominated in the process:

> Finally, and most significantly, the objective evidence
> provided by the district plans and demographic maps
> suggests strongly the predominance of race. Given that
> the districting software used by the State provided only
> racial data at the block-by-block level, the fact that
> District 30, unlike Johnson's original proposal, splits
> voter tabulation districts and even individual streets in
> many places, suggests that racial criteria predominated
> over other districting criteria in determining the district's
> boundaries.

*Bush v. Vera*, 517 U.S. 952, 970–71 (1996) (O'Connor, J.) (internal citations

omitted).

> (b)    *Evidence Demonstrates That Defendant Used Race As*
> *The Predominant Factor In Redrawing Districts 105 and*
> *111*

Evidence elicited during discovery shows that Georgia used race as the

"predominant factor" in determining the boundaries of Districts 105 and 111.

The Republican-dominated General Assembly's goal for re-redistricting

Districts 105 and 111 was partisan—to make the white, Republican incumbents

less vulnerable to Democratic challengers without making the white, Republican

incumbents in the surrounding districts vulnerable to challenge. But race served

both as the motivation for the perceived need to re-redistrict Districts 105 and 111

and as a crucial measure for determining how the re-redistricting would affect the

performance of the white Republican incumbents in future elections. The

testimony is clear that traditional redistricting principles were not a factor in the re-

redistricting, and in some respects, redistricting principles were undermined. As

demonstrated by the case law, these facts satisfy the predominant factor test.

The Republicans' in-house expert for redistricting was Dan O'Connor. The

House Speaker had installed him in the Reapportionment Office for the 2011

redistricting, and the Republicans had relied on him since 2000 to analyze the

performance of General Assembly districts. Nix, Chair of the Reapportionment

Committee, stated O'Connor "probably knows more about the [2015] map than

any human being alive." Nix Dep., 93. O'Connor closely analyzed the demographic trends in Gwinnett County and District 105 and Henry County and District 111 in the 2014-16 period.

Gwinnett and Henry Counties were becoming progressively more black in voter registration since 2000, as O'Connor set forth in tables that he shared widely with Republicans and selected political scientists and media. In O'Connor's analysis, because voting is racially polarized in Georgia—most blacks voting Democratic and most whites voting Republican—the more black the electorate becomes, the better for Democrats and the worse for Republicans. In emails to Speaker Pro-Tem Jones shortly before H.B. 566 was introduced, he shared his analysis of the changing racial demographics of Gwinnett and Henry Counties, the voter registration data for Districts 105 (46.5% white and 34.6% black) and District 111 (48.0% white and 36.7% black), and his analysis that "once a district gets in the 30–35% [black] range, it becomes a target for Democrats." Ex. 16. When he performed a more detailed analysis of the 2014 elections, he found that only two Republicans—both of whom were originally Democrats—won seats where 40% or more of the population was black. O'Connor Dep., 256–57, 289–90. He shared this analysis with Speaker Pro-Tem Jones and key legislative staffers.

O'Connor also played an important role in instigating the re-redistricting process. Shortly after he provided racial demographic data regarding District 105 to Representative Chandler in July 2014, he told Representative Efstration that his district may need to be "tweak[ed]" to help Chandler. Ex. 2. In a December 19, 2014 email to Spiro Amburn, the Speaker's chief of staff and Chair Nix's point of contact for redistricting in the Speaker's office, O'Connor specifically singled out Districts 105 and 111 for re-redistricting and noted that he and Gina Wright would be meeting with Representative Strickland three days later. Ex. 36.

The changing racial demographics not only provided the impetus for re-redistricting Districts 105 and 111 but the racial demographic data provided a more precise means than the political data for executing the re-redistricting. The Reapportionment Office employed three sets of data when working on a plan: the 2010 Census data, including racial data; the "political performance" data which consisted of past election results; and the voter registration data by race. The political performance data was not available below the precinct level, so in splitting a precinct the plan-drawer would not know how political performance might vary in different areas of the precinct. In contrast, the Census data, including race, was available at the lowest level of geography, the Census block, and so the plan-drawer could see how a precinct split would affect the racial demographics on

a block by block level. Strangia Dep., 25; Chen Rep., 2; Wright Dep., 109–12. The 2015 plan included a number of precinct splits: District 111 went from two split precincts to five, and although District 105 split the same number of precincts, it split different precincts. In all but two cases, the portion of the precinct in District 105 or District 111 had a lower black population percentage than the portion of the precinct in the adjoining district, and in those two cases, the portion in 105 and 111 was contiguous to the rest of the district whereas the other portion was not. Chen Rep., 24–25. As Wright drew, she had open a "pending changes" box that displayed the changing racial data of each district with every alteration, so the accurate racial data was updating and visible to her in real-time. Wright Dep., 105. She concedes that she looked at racial data as she changed the districts. Wright Dep., 220.

The end result was that the black voting age population percentage decreased in Districts 105 and 111 and the decrease was material. In 2016, the white Republican incumbents in both 105 and 111 narrowly defeated their black Democratic opponents. O'Connor testified, and Plaintiffs' expert Chen opined, that the Democrats would have won had not Georgia enacted the re-redistricting.

Wright's testimony is clear that the re-redistricting was motivated by partisan advantage and not by any need to correct any deficiency regarding

traditional redistricting principles in the prior plan. Wright Dep., 236–39. Indeed, in several respects, the new plan fares worse. Geographic compactness, population equality, and minimizing county and precinct splits are among the redistricting principles Georgia has employed in this decade. Ex. 66. The new Districts 105 and 111 are less compact than the prior districts and have larger deviations from population equality. District 111 increased the number of precinct splits from two to five. Neither the 2012 nor the 2015 plan respects county boundaries in Gwinnett County or Henry County. Both plans split majority-minority cities in 105 (Lawrenceville, 6 districts) and 111 (Stockbridge, 5 districts) and the 2015 plan takes population out of District 105 and 111. Chen Rep., 24–25. Though Georgia has not listed respecting municipal boundaries as a traditional redistricting principle, several other courts have found that it is. *See Covington v. North Carolina*, No. 1:15-CV-399, 2017 WL 5992358, at *10 (M.D.N.C. Dec. 1, 2017), report and recommendation adopted, No 1:15CV399, 2018 WL 505109 (M.D.N.C. Jan. 21, 2018); *Vera v. Richards*, 861 F. Supp. 1304, 1334 n.41 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952, 116 S. Ct. 1941, 135 L. Ed. 2d 248 (1996).

     This is a prototypical example of the State using "race as their predominant districting criterion with the end goal of advancing [its] partisan interests," *Cooper*,

137 S. Ct. at 1473 n.7, and "[r]ace was the criterion that, in the State's view, could not be compromised, and race-neutral considerations came into play only after the race-based decision had been made." *Bethune-Hill*, 137 S. Ct. at 798 (citation omitted).

> (c)    *Defendant's Purpose In Using Race As The Predominant Factor—To Further Partisan Advantage—Is Not A "Compelling Interest" Sufficient To Withstand Strict Scrutiny*

Using race to secure partisan advantage in redistricting is not a compelling interest sufficient to withstand strict scrutiny. Indeed, the Supreme Court has long held that partisan protection of incumbents does not justify the use of race as the predominant factor in redistricting. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 441 (2006) ("If . . . incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. By purposely redrawing lines around those who opposed Bonilla, the state legislature took the latter course. This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters."). As the *Miller* Court explained,

> When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls. Race-based assignments

> embody stereotypes that treat individuals as the product
> of their race, evaluating their thoughts and efforts—their
> very worth as citizens—according to a criterion barred to
> the Government by history and the Constitution."

*Miller,* 515 U.S. at 911–12 (citations omitted). For this reason, the Constitution

prohibits the use of race "as a proxy" for partisanship. *Id.* at 914.

As discussed above, evidence establishes that the Defendant's lone purpose

in using race in re-redistricting Districts 105 and 111 was to secure partisan

advantage. But using race to effectuate partisan advantage is not a compelling state

interest sufficient to withstand strict scrutiny. *See Perry*, 548 U.S. at 441; *Miller*,

515 U.S. at 911–12.

### 2.    Plaintiffs Will Suffer Irreparable Harm Absent An Injunction

In the absence of the requested injunction, Plaintiffs will suffer irreparable

harm. "An injury is irreparable 'if it cannot be undone through monetary

remedies.'" *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quoting

*Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this

well-settled principle of law, courts considering motions for preliminary

injunctions have repeatedly found that state actions infringing on the right to vote

constitute irreparable injury. *See, e.g.*, *Ga. State Conf. of the N.A.A.C.P. v. Fayette*

*Cty. Bd. of Com'rs*, 118 F. Supp. 3d 1338, 1347–48 (N.D. Ga. 2015) (Batten, J.)

(holding that plaintiffs established irreparable harm if forced to vote using an election system that would dilute their votes); *Cox I*, 324 F. Supp. 2d at 1368 (holding that the defendant's refusal to accept plaintiff's voter registration in her precinct of residence, preventing her from voting in upcoming election, constituted irreparable injury); *see also Dillard v. City of Greensboro*, 870 F. Supp. 1031, 1035 (M.D. Ala. 1994) (in denying defendant's motion for a stay pending appeal of the district court's injunction remedying a constitutionally defective election practice, holding that "monetary remedies would be inadequate compensation for the plaintiffs").

Here, Plaintiffs will suffer irreparable harm if the 2018 general election is conducted under the unconstitutional maps for Districts 105 and 111. As explained above, Plaintiffs will likely prevail on the merits of their claim that both districts are unconstitutional racial gerrymanders. Conducting the election using constitutionally infirm districts would infringe upon Plaintiffs' "right to full and effective participation in the political processes of [their] State's legislative bodies." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1965). Because monetary remedies are inadequate to compensate for that injury, irreparable injury to their voting rights will ensue absent an injunction. *See, e.g.*, *Fayette County*, 118 F. Supp. 3d at 1347–48; *Cox I*, 324 F. Supp. 2d at 1368; *Dillard v. Crenshaw County*,

640 F. Supp. at 1347, 1363 (M.D. Ala. 1986); *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

Moreover, the Supreme Court has long recognized that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555; *see Williams v. Rhodes*, 393 U.S. 23, 30 (1968) ("[T]he right of qualified voters . . . to cast their votes effectively . . . rank[s] among our most precious freedoms."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (the right to vote is "preservative of all rights"). In recognition of this fundamental principle, courts have repeatedly held that an infringement on the right to vote constitutes irreparable injury. *See, e.g.*, *Dillard*, 640 F. Supp. at 1363; *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

### 3.    The Balance Of The Equities Weighs In Favor Of Plaintiffs

The irreparable injury that Plaintiffs will suffer absent an injunction outweighs any harm Defendant will suffer if the requested injunction is granted. Plaintiffs will suffer irreparable injury to their fundamental right to vote absent an injunction, and by contrast, the harm to Defendant associated with the requested injunction is substantially less. Under the requested injunction, Defendant would have to postpone the candidate qualifying dates and other possibly deadlines for

the seven districts affected—Districts 73, 104, 105, 109, 110, 111, and 130. The current deadlines for 2018 have candidate qualifying beginning March 5 and ending March 9; the General Primary Election on May 22; the General Primary Runoff on July 24; and the General Election on November 6. It is worth noting that in 2012 the General Primary Election was held on July 31. Ex. 83.[9] Thus, there is ample time to conduct primaries so that the general elections take place in November 2018.

The requested injunction would not require Defendant to implement an entirely new plan never before used by Defendant. Rather, Plaintiffs request that Defendant use the most recently used district maps that were not challenged for being unconstitutional, that is, the ones used for the 2012 general election. The 2012 maps are the "last uncontested [maps] which preceded the pending controversy," and may therefore be used. *See Boire v. Pilot Freight Carriers*, 515

---

[9] There have been few contested primaries in these seats in the 2012, 2014, and 2016 elections–District 73, Republican 2016 (John Yates went to a runoff with Karen Mathiak); District 105, Republican (Joyce Chandler defeated Damon Ladd-Thomas 3,151 to 963) and Democrat (Renita Hamilton defeated Rashid Malik 1,222 to 336) 2012, Democrat 2014 (Renita Hamilton defeated Tim Hur 671 to 434), and Democrat 2016 (Donna McLeod defeated Perry Green 638 to 309); District 109, Republican 2012 (Dale Rutledge defeated Steve Devis 5,237 to 2,766); District 130, Republican 2014 (David Knight defeated Jason Lovett 2,754 to 1,133). Exs. 83–85.

F.2d 1185, 1194 (5th Cir. 1975) (citation omitted).[10] Although the injunction may "require additional efforts" on the part of Defendant, conducting the election using the 2012 district maps would not be "impossible or unduly burdensome." *See Fayette County*, 118 F. Supp. 3d at 1348. And even if conducting the 2018 election using the 2012 district maps for House Districts 105 and 111 would impose costs and burdens on Defendant, such burdens "cannot begin to compare with the further subjection of [Plaintiffs'] of their right . . . to full and equal political participation." *Dillard*, 640 F. Supp. at 1363.

Defendant may argue that the requested injunction would upset the status quo regarding the elections for House Districts 105 and 111. But as this Court has recognized, "there is no 'particular magic in the phrase 'status quo.'" *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). "If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Id.*

---

[10] The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

(citing *Callaway*, 489 F.2d at 576). Indeed, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds*, 377 U.S. at 585.

### 4.    The Injunction Would Be In The Public Interest

"[T]he protection of 'franchise-related rights is without question in the public interest.'" *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Cox II*, 408 F.3d at 1355). Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections for Georgia House 105 and 111 using constitutionally drawn districts and thus would be in the public interest.

## IV.  <u>CONCLUSION</u>

The General Assembly has been caught red-handed in a racial gerrymander. The evidence leaves no doubt both that racial trends inspired the re-redistricting of Districts 105 and 111 and that racial data was used to redraw them. The architects of H.B. 566 were aware that the racial demographics of a House District in Georgia are destiny, and that Districts 105 and 111 were about to tip to Democrats unless the demographic trends were reversed.

The evidence also shows that the General Assembly succeeded in redrawing Districts 105 and 111 to reverse the growth in Black population, and relied on racial data to do so. These race-based changes clearly predominated over traditional redistricting principles. Indeed, H.B. 566 did not even attempt to advance such traditional districting principles and, in some respects, undermined them. The evidence is unequivocal H.B. 566 did what the Constitution prohibits— used race as the predominant redistricting criterion with the end goal of advancing partisan interests. *Cooper*, 137 S. Ct. at 1473 n.7.

Given the overwhelming likelihood of success in establishing a racial gerrymander on these facts; the irreparable harm Plaintiffs would suffer by voting in districts illegally drawn on the basis of race; the balance of equities favoring Plaintiffs' wish to vote in districts that comply with the Constitution; and the public's interest in franchise-related rights, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunction.

Dated: February 20, 2018          Respectfully submitted,

By:  /s/ Jon Greenbaum
      Jon Greenbaum*
      Ezra D. Rosenberg*
      Julie Houk*
      John Powers*
      jgreenbaum@lawyerscommittee.org
      jpowers@lawyerscommittee.org
      erosenberg@lawyerscommittee.org
      jhouk@lawyerscommittee.org
      Lawyers' Committee for Civil Rights Under
      Law
      1401 New York Ave., NW, Suite 400
      Washington, D.C. 20005
      Telephone:  (202) 662-8600
      Facsimile:   (202) 783-0857

      Bradley S. Phillips*
      Gregory D. Phillips*
      Thomas P. Clancy*
      Kenneth Trujillo-Jamison*
      Munger, Tolles, & Olson LLP
      350 South Grand Avenue, Fiftieth Floor
      Los Angeles, California 90071-1560
      Telephone: (213) 683-9100
      Facsimile: (213) 687-3702

      /s/ William V. Custer
      William V. Custer
      Georgia Bar No. 202910
      Jennifer B. Dempsey
      Georgia Bar No. 217536
      Julia F. Ost
      Georgia Bar No. 940532
      bill.custer@bryancave.com

jennifer.dempsey@bryancave.com
Bryan Cave LLP
One Atlantic Center, Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, Georgia 30309-3488
Phone: (404) 572-6600
Fax: (404) 572-6999

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on February 20, 2018, I electronically filed the

**Certificate of Service** serving **MEMORANDUM OF POINTS AND**

**AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY**

**INJUNCTION** with the Clerk of Court using the CM/ECF system which will

automatically send email notification of such filing to all counsel of record.

<u>/s/ Jon M. Greenbaum</u>
Jon M. Greenbaum
Lawyers' Committee for Civil Rights
Under Law

37964934.3

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the forgoing MEMORANDUM OF POINTS AND

AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY

INJUNCTION was prepared double-spaced in 14-point Times New Roman

pursuant to Local Rule 5.1(c) and in compliance with the length requirements set

forth in Plaintiffs' consent motion to exceed page limitation.

/s/ Jon Greenbaum
Jon M. Greenbaum
Lawyers' Committee for Civil Rights
Under Law

37964934.3