IN THE MATTER OF

# Georgia State Conference of the NAACP, et al
# vs
# Kemp

Transcript of Examination of

# Randall O. Nix

On January 10, 2018

*Reported by* Joel P. Moyer
*Certified Court Reporter*



## DONOVAN REPORTING
## & VIDEO CONFERENCING
237 Roswell Street   Marietta, GA 30060
770.499.7499   800.547.1512   FAX: 770.428.5801
«««www.donovanreporting.com»»»

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA STATE CONFERENCE OF THE NAACP,
as an organization; LAVELLE LEMON, MARLON
REID, LAURETHA CELESTE SIMS, PATRICIA
SMITH, COLEY TYSON,
         NAACP Plaintiffs,

AUSTIN THOMPSON, WAYNE SWANSON, DARRYL PAYTON,
AUDRA CUNNINGHAM, SABRINA MCKENZIE, JAMIDA
ORANGE, ANDREA SNOW, SAMMY ARREYMBI, LYNNE
ANDERSON, CORETTA JACKSON,
         Thompson Plaintiffs,

    vs.     CASE NO. 1:17-cv-01427-TCB-WSD-BBM

BRIAN KEMP, in his official capacity as
Secretary of the State for the State of
Georgia,
         Defendant.
               — — —

Videotaped Deposition of
RANDALL O. NIX,

Taken by John Powers,

Before Joel P. Moyer,
Certified Court Reporter,

At the Offices of
Balch & Bingham LLP,
Atlanta, Georgia,

On Wednesday, January 10, 2018,
Beginning at 1:02 p.m. & ending at 8:49 p.m.

— — —

Volume of Testimony
(Exhibits Contained in Separate Volume)

Electronically signed by Joel Moyer (501-161-376-4513)        4dd8d33d-566f-46b5-8729-373a760afce8

```
 1     APPEARANCES OF COUNSEL

 2     For the Georgia State Conference
         of the NAACP Plaintiffs:
 3
                 JOHN POWERS
 4               Lawyers' Committee for
                   Civil Rights Under Law
 5               Suite 400
                 1401 New York Avenue, NW
 6               Washington DC 20005
                 202.662.8391
 7
                 ARIEL C. GREEN
 8               GREGORY D. PHILLIPS
                   (Via Telephone)
 9               Munger, Tolles & Olson LLP
                 50th Floor
10               350 South Grand Avenue
                 Los Angeles, CA 90071
11               213.683.9100

12     For the Thompson Plaintiffs:

13               ABHA KHANNA
                   (Via Telephone)
14               Perkins Coie LLP
                 Suite 600
15               700 13th Street, NW
                 Washington, DC 20005-3960
16               202.654.6200

17     For the Defendant:

18               FRANK B. STRICKLAND
                 Strickland Brockington Lewis LLP
19               Midtown Proscenium
                 Suite 2200
20               1170 Peachtree Street, NE
                 Atlanta, GA 30309-7200
21               678.347.2211

22     (Continued on next page)

23

24

25
```

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

```
 1     For the Witness:

 2             K. ALEX KHOURY
               Balch & Bingham LLP
 3             Suite 700
               30 Ivan Allen Jr. Boulevard, NW
 4             Atlanta, GA 30308
               404.261.6020
 5
       ALSO PRESENT:
 6
               Taylor Thompson, Videographer
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX TO PROCEEDINGS
 2                      VIDEO FILE INDEX
```

```
 3    Video File One                          9
 4    Video File Two                         64
 5    Video File Three                      116
 6    Video File Four                       168
 7    Video File Five                       200
 8    Video File Six                        228
 9
```

```
10                     EXAMINATION INDEX
11    RANDALL O. NIX
```

```
12       Examination by Mr. Powers            9
13    Errata Sheet                          251
14    Certificate Page                      253
```

```
15                       EXHIBIT INDEX
16
     Plaintiff's Exhibits
17
```

```
        8   Defendants' Initial Disclosures   202
18
       53   Email thread ending with email to 235
19           Gina Wright from Dan O'Connor
             3-16-2017, with attached Minutes of
20           House Legislative & Congressional
             Reapportionment Committee meeting on
21           March 1, 2017 (GA000092 - 94)

22     54   Composite of emails beginning with 240
             email from Susan Smith to Randy Nix
23           2-21-2017 (GA2-002750 - 743) (Bates
             numbers in reverse order)
24
```

```
25    (Continued on next page)
```

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

1    78   Notice of Deposition of              20
          Representative Randy Nix
2
     79   Color copy of Representative Randy    19
3         Nix's page from the Georgia House of
          Representatives, 2017-2018 regular
4         session

5    80   Color copy of Representative Randy    20
          Nix's Biography
6
     81   Color copy of Representative Randy    30
7         Nix's Facebook About page

8    82   Color copy of the Georgia House of   33
          Representatives' web page for Randy
9         Nix, 2007-2008 regular session

10   83   Color copy of the Georgia House of   36
          Representatives' web page for Randy
11        Nix, 2009-2010 regular session

12   84   Color copy of the Georgia House of   37
          Representatives' web page for Randy
13        Nix, 2011-2012 regular session

14   85   Color copy of the Georgia House of   38
          Representatives' web page for Randy
15        Nix, 2013-2014 regular session

16   86   Color copy of the Georgia House of   39
          Representatives' web page for Randy
17        Nix, 2015-2016 regular session

18   87   Article titled Progressives Target   77
          GOP Advantage in Gold Dome Maps by
19        Maggie Lee, 8-15-2016

20   88   Georgia House of Representatives web  99
          page for Chairman Lane, 2011-2012
21        regular session

22   89   Georgia House of Representatives web  100
          page for Chairman Nix, 2013-2014
23        regular session

24

25   (Continued on next page)

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

| | | | |
|---|---|---|---|
| 1 | 90 | Georgia House of Representatives web page for Chairman Nix, 2015-2016 regular session | 101 |
| 3 | 91 | Georgia House of Representatives web page for Chairman Caldwell 2017-2018 regular session | 101 |
| 5 | 92 | Color copy of map titled Georgia House of Representatives District 069, Plan: House12re | 110 |
| 7 | 93 | Document titled Georgia General Assembly 2015-2016 Regular Session - HB 566, State house districts boundaries of certain districts revise | 117 |
| 10 | 94 | LC 28 7570, House Bill 566 | 127 |
| 11 | 95 | LC 28 7599S, House Bill 566 (COMMITTEE SUBSTITUTE) | 127 |
| 12 | 96 | AM 28 1431, LOST | 128 |
| 13 | 97 | Email from Rich Golick to Dan O'Connor, 8-19-2015 (GA2-003403 - 404) | 132 |
| 15 | 98 | Reapportionment Committee Meeting Notice, 3-9-2015 | 184 |
| 17 | 99 | Article from the Atlanta Journal-Constitution titled Gwinnett House District Gets Voting Rights Scrutiny, 9-21-2016 | 195 |
| 19 | 100 | Georgia General Assembly 2015-2016 Regular Session [HB 566] Senate Vote #280 (MOTION TO TABLE) | 210 |
| 21 | 101 | Georgia General Assembly 2015-2016 Regular Session [HB 566] Senate Vote #279 (ADOPTION OF AMENDMENT #1 BY THE SENATOR FROM THE 28TH) | 211 |

(Continued on next page)

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

|     |     |     |     |
| --- | --- | --- | --- |
| 1 | 102 | Georgia General Assembly 2015-2016 Regular Session [HB 566] Senate Vote #281 (PASSAGE) | 212 |
| 3 | 103 | Excerpt from Georgia Laws 2015 Session, pages 1413 - 1433, General Assembly - House of Representatives Revise Certain Districts.  No. 251 (House Bill No. 566) | 212 |
| 6 | 104 | Email thread ending with email from Randy Nix to Gina Wright and Spiro Amburn, 4-30-2015 (GA000100 - 101) | 213 |
| 8 | 105 | Email thread ending with email from Dan O'Connor to Jan Jones, 9-4-2015 (GA2-001168 - 1169); attachments | 219 |
| 10 | 106 | Document titled Proposed House District 104 and 105, Plan: HD105amdp2-2014 (GA2-003027) | 223 |
| 12 | 107 | Document titled House District 105 (GA2-003012) | 225 |
| 13 | 108 | Document titled HD105amdp1_2014_data | 226 |
| 14 | 109 | Document titled Proposed House District 104 and 105, Plan: HD105amdp1-2014 | 226 |
| 16 | 110 | Document titled HD105amdp2_2014_data | 228 |
| 17 | 111 | Email thread ending with email from Randy Nix to Gina Wright, cc'd to Spiro Amburn, 4-29-2015 (GA000079 - 80) | 229 |
| 20 | 113 | Composite beginning with document titled Proposed Georgia House Districts - Committee Substitute Plan:  House-amdsub-2015 | 244 |
| 22 | 114 | Email thread ending with email from Dan O'Connor to Randy Nix, 6-7-2016 (GA2-002542 - 544) | 246 |

(Continued on next page)

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

115   Color copy of article titled Ga.        248
      Republican Redistricting Plan Called
      'Blatant' Power Grab, 3-8-2017



(End of Index)

Electronically signed by Joel Moyer (501-161-376-4513)                4dd8d33d-566f-46b5-8729-373a760afce8

9

```
 1              January 10, 2018
 2              1:02 p.m.
 3     (Whereupon the reporter provided a written
 4     disclosure to all counsel pursuant to
 5     Article 8.B. of the Rules and Regulations
 6     of the Board of Court Reporting.)
 7          THE VIDEOGRAPHER:  We are now on the
 8     video record.  The time is 1:02 p.m.  The date
 9     is January 10th, 2018.  This is the start of
10     video file number one.
11          Would the court reporter please
12     swear in the witness.
13     RANDALL O. NIX,
14          being first duly sworn, was examined and
15          testified as follows:
16     EXAMINATION
17     BY MR. POWERS:
18     Q     Good morning.
19     A     Good afternoon.
20     Q     That is right.  My name is John
21     Powers.  I'm an attorney with the Lawyers'
22     Committee for Civil Rights Under Law, and I'm
23     one of the attorneys representing the
24     Plaintiffs in this case.  And I'll be taking
25     your deposition today by the agreement of the
```

10

```
 1     parties and pursuant to the Rules of Civil
 2     Procedure.
 3          I just handed you the notice for
 4     your deposition today.  Feel free to look it
 5     over.
 6     A     Okay.
 7     Q     Representative Nix, have you ever
 8     been deposed before?
 9     A     One time a long time ago, probably
10     40 years ago, working for a company that was a
11     food company that I worked for, but it was a
12     very limited deposition.  I was drawn into
13     something that I had nothing to do with, but I
14     had a position that they asked questions on.
15          So for all practical purposes, you
16     can just about say no.
17     Q     Fair enough.  And what was the
18     nature of the claim in that case, if you
19     recall?
20     A     I worked for a food company, and
21     there had been some theft of inventory.  Some
22     product was missing.  And somehow there had
23     been a claim filed on it, and I was asked to
24     come and give the company's side of it.
25     Q     And when you say, "the company's
```

11

```
 1     side of it," with respect to what exactly?
 2     A     Just what was missing, basically.
 3     Q     Fair enough.  And was that in state
 4     court?
 5     A     Yes.
 6     Q     And was that in Georgia?
 7     A     It is actually in Florida.
 8     Q     Okay.  And where in Florida?
 9     A     I don't even recall.  It's been a
10     long time.
11     Q     And other than that, you've never
12     been deposed before?
13     A     No.
14     Q     Have you ever offered sworn
15     testimony in any other capacity?
16     A     Not that I recall, huh-uh
17     (negative).
18     Q     Okay.  I'm going to go through some
19     ground rules.  First, you do understand that
20     you're testifying under oath as if you're in a
21     court of law; correct?
22     A     Yes.
23     Q     And if you don't understand one of
24     my questions, please let me know, and I'll be
25     happy to rephrase it for you so you do
```

12

```
 1     understand.  Is that acceptable?
 2     A     Sure.
 3     Q     And it's very important for the
 4     court reporter here who's transcribing the
 5     proceeding to have a clean record.  And for
 6     that reason, I'd appreciate it if you could
 7     wait before I finish asking my question before
 8     you start answering it.
 9     A     Sure.
10     Q     And finally, if -- when answering my
11     questions, I would appreciate it if you gave
12     verbal responses, such as yes and no, instead
13     of nonverbal responses, such as shaking your
14     head or saying uh-huh or things like that.  Is
15     that okay?
16     A     Okay.
17     Q     All right.  Could you please state
18     your full name for the record?
19     A     Randall Otis Nix.
20     Q     And what's your address?
21     A     371 South Grayson Trail in
22     Hogansville, Georgia 30230.
23     Q     And what county is that in?
24     A     Troup.
25     Q     And do you have an official email
```

Randall O. Nix                Georgia State Conference of the NAACP, et al vs Kemp                January 10, 2018

10  (Pages 13 to 16)

13

1     address that you use to conduct business?
2         A     Yeah.  My House of Representatives,
3     randy.nix@house.ga.gov.
4         Q     And have you used any other email
5     addresses for purposes of communicating about
6     redistricting?
7         A     Not that I recall, no.
8         Q     What did you do to prepare for your
9     deposition today?
10        A     Really, I met briefly with Alex, and
11    he just kind of told me what the deposition
12    would be like and -- but that's it.
13        Q     And when did you meet with him?
14        A     Last Thursday, I believe.
15        Q     For how long?
16        A     Probably 45 minutes.  30, 45
17    minutes.
18        Q     Have you read the complaint in this
19    case?
20        A     I did, yes.
21        Q     Have you read any of the other
22    depositions taken in this case?
23        A     I have not.
24        Q     Have you read any other documents in
25    preparation for your deposition today?

14

1         A     No.
2         Q     What is this lawsuit about, to the
3     best of your knowledge?
4         A     Questioning of the redistricting we
5     did in 2015 is my understanding.
6         Q     And have you discussed the case with
7     anyone?
8         A     Nothing of any -- anything other
9     than a very general nature that, you know, I'm
10    going to do a deposition.  The day that we met,
11    the staff there said -- you know, I said, I'm
12    going to do a deposition.  They knew that, so
13    that -- really, nothing other than that.
14        Q     And have you discussed the case with
15    any of your fellow legislators?
16        A     No.
17        Q     Have you communicated about the case
18    with anyone at the Reapportionment Office?
19        A     Explain -- tell me what you mean by
20    "about the case."  How would -- tell me what
21    you mean there.
22        Q     Have you communicated with folks
23    about the Reapportionment Office about the fact
24    that the redistricting case had been filed?
25        A     Yes.

-15

1         Q     Have you communicated with folks
2     about -- at the Reapportionment Office about
3     any other aspect of the case?
4         A     No.
5         Q     Aside from these communications,
6     have you spoken with anyone else about your
7     deposition today?
8         A     Yes.
9         Q     And with whom was that?
10        A     Several people that I just informed
11    that I had to go to do a deposition this
12    afternoon.
13        Q     Okay.  And who did you inform?
14        A     Several of -- several of my
15    colleagues.  I told my staff when I was leaving
16    the office I had to go to do a deposition.  So
17    there were, there were several people.
18        Q     Did you review your emails that you
19    sent around the time of the redistricting in
20    preparation for this deposition?
21        A     The only thing that I reviewed was
22    what I reviewed with counsel.
23        Q     And what did you review with
24    counsel?
25        A     Several different emails that

16

1     were -- that he had that was -- were shown that
2     had, had anything to do with this.
3         Q     And were those emails that had been
4     sent -- strike that.
5               Roughly how many emails was that?
6         A     Maybe a dozen at the most.
7         Q     And were those the -- were those
8     documents sent by you or from you or to you?
9         A     Primarily to me.
10        Q     And who sent them to you?
11        A     They were -- they were various
12    people.  If you, if you have those and elect to
13    show them to me and let me go over them, I
14    will, but I couldn't tell you specifically who
15    had sent those.
16        Q     Okay.  And did those documents
17    refresh your memory regarding the events of the
18    redistricting in 2015 at all?
19        A     In a very general nature, yes.
20        Q     Did you assist with looking for and
21    producing emails in response to Plaintiffs'
22    discovery requests?
23        A     Yes.  I was told, you know, not to
24    delete anything or remove anything, so that
25    was, that was it.  That was the -- what I did.

Donovan Reporting, PC                                                                770.499.7499

17

1  Other than that, I did not look for things
2  specifically.
3      Q    So you didn't conduct any search for
4  emails that you might have sent related to the
5  redistricting?
6      A    I did not.
7      Q    And that includes of your personal
8  emails in addition to your House emails; is
9  that correct?
10     A    Well, to correct that, he had asked
11 me if I had anything of personal email.  I did
12 look at personal email to see if there was
13 anything related to it, and there was not.
14     Q    Have you deleted any of your emails
15 from around the time of the 2015 session?
16     A    I would say yes.  I try to clean
17 emails out on a fairly regular basis so that I
18 don't have so many in there, so yes.
19     Q    And how frequently do you clean your
20 emails out?
21     A    I'd say probably every six months or
22 so I'll go back in and delete emails that have
23 just kind of stacked up in the queue.
24     Q    I'm sorry.  How often was that?
25     A    Probably every six months.

18

1      Q    And did you delete any emails from
2  2015 after this lawsuit was filed?
3      A    I did not.
4      Q    Do you keep any kind of calendar?
5      A    Yes.
6      Q    And what kind of calendar do you
7  keep?
8      A    Usually on my phone with a
9  day-to-day calendar with appointments,
10 meetings, those type things.
11     Q    And what kind of program is that
12 calendar on?
13     A    Whatever, whatever's on my phone.
14     Q    And did you have that calendar at
15 the time of the 2015 legislative session?
16     A    Probably on a different phone than
17 what I have now, yes, but I was keeping the,
18 keeping it the same way.
19     Q    And when did you get your -- the
20 phone that you use today?
21     A    Probably about a year ago.
22     Q    Have you communicated with anyone
23 related to the redistricting of Georgia House
24 districts since the end of 2014 by email or by
25 text message?

19

1      A    Not that I recall.
2      Q    And so when you communicate with
3  folks, you either call them or speak to them in
4  person?
5      A    Yes.
6      Q    Representative Nix, what's your date
7  of birth?
8      A    -52.
9      Q    Where did you grow up?
10     A    I grew up in Alabama, central
11 Alabama.
12     Q    What town?
13     A    The little -- the closest town you
14 probably recognize is Wetumpka, Alabama.
15     Q    And where did you go to high school?
16     A    Holtville High School.
17     Q    And where did you go to college?
18     A    Troy State University.
19     Q    And when did you graduate from Troy
20 State?
21     A    In 1975.
22     (Whereupon a document was identified as
23 Plaintiff's Exhibit 79.)
24     Q    I'm going to hand you what I'm
25 marking for identification as, I'm sorry, take

20

1  that back, as Plaintiff's Exhibit 79.  And what
2  is this document, Representative --
3      A    This I guess is my House of
4  Representatives page that you -- that they put
5  in with just identifying me in a context.
6  Shows my committees, et cetera.
7      (Whereupon documents were identified as
8  Plaintiff's Exhibit 78 and Plaintiff's
9  Exhibit 80.)
10     Q    And just as a housekeeping matter,
11 I'm going to mark your Notice of Deposition as
12 Plaintiff's Exhibit 78.
13         And I'm going to hand you what I'm
14 marking as Plaintiff's Exhibit 80.  And what is
15 this document?
16     A    Excuse me?
17     Q    What is this document?
18     A    This is the bio that I have on the
19 House of Representatives that if you click on
20 my bio, that's what comes up.
21     Q    And you graduated from Troy State
22 with a bachelor's degree in business; correct?
23     A    Yes.
24     Q    And then what did you do after you
25 graduated?

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

12 (Pages 21 to 24)

---

21

1    A   My first job that I had after that,
2 I worked in the banking industry in Montgomery,
3 Alabama.
4    Q   And who did you work for?
5    A   It was Southern Bank at that time,
6 and then I worked at what was then First
7 Alabama Bank.
8    Q   And how long did you work at those
9 places?
10   A   Probably between the two of them,
11 probably if I recall, probably three to four
12 years.
13   Q   And what was your next job after
14 that?
15   A   When I left the bank, I actually
16 went on active duty with the Air Force and, in
17 the Air National Guard, went to flight
18 training.  And when I came back from that, I
19 went to work with a food company there, Alaga
20 Whitfield Foods in Montgomery.
21   Q   And how long did you work for the
22 food company for?
23   A   I worked or Alaga Whitfield Foods
24 for I believe it was three years.
25   Q   And what position did you have with

---

22

1 them?
2    A   I was assistant sales manager to
3 begin with.  And when I left, I was sales
4 manager.
5    Q   And what was your next job after
6 that?
7    A   I went to work in the brokerage
8 business with Robinson Humphrey as a broker.
9    Q   And how long were you there for?
10   A   Seven years.
11   Q   And what was the last year that you
12 worked for that company?
13   A   Let's see.  I believe I left
14 Robinson Humphrey in 1990.
15   Q   And what job did you have after
16 that?
17   A   When I left Robinson Humphrey?
18   Q   Yeah.
19   A   I spent a short time in business for
20 myself, and then I went back into the brokerage
21 business.  I went back to work with Merrill
22 Lynch probably within a year of the time I left
23 Robinson Humphrey.
24   Q   And what business did you serve?
25   A   It was a business that sold

---

23

1 industrial-type lubricants.
2    Q   And what ended up happening with
3 that business?
4    A   It was one of those things where
5 there was no, you know, hard assets.  I just
6 essentially -- the business didn't go as I
7 thought, and I just simply went back to the
8 business that I was in.
9    Q   And how long were you at Merrill
10 Lynch for?
11   A   Let's see.  I was at Merrill Lynch
12 probably for a year and a half.
13   Q   And what position did you hold with
14 them?
15   A   I was a broker, financial
16 consultant.
17   Q   And what was your next position
18 after that?
19   A   When I left there, I moved to
20 Georgia and went to work with what was then
21 NationsBank securities.
22   Q   And when did you move to Georgia?
23 What year?
24   A   '93.
25   Q   Okay.  And where specifically in

---

24

1 Georgia did you move to?
2    A   Athens.
3    Q   And how long did you hold the --
4 that job position in Athens for?
5    A   I was in Athens for approximately a
6 year.  And then I moved to LaGrange in '94,
7 also with NationsBank in the trust department.
8    Q   And how long were you with
9 NationsBank for?
10   A   Approximately two-and-a-half years.
11   Q   Okay.
12   A   If my memory is serving me well.
13   Q   And what year was -- did you leave
14 NationsBank?
15   A   In either late '96 or early '97.
16   Q   And what position did you hold after
17 that?
18   A   With NationsBank?  Or --
19   Q   At another company, when you left
20 NationsBank.
21   A   When I left NationsBank, I went to
22 work with SunTrust Bank, again as a trust
23 officer.
24   Q   And how long did you work with
25 SunTrust for?

---

Donovan Reporting, PC                                                    770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

---

25

1    A    Approximately a year.
2    Q    And what did you do for them?
3    A    I was a trust officer.
4    Q    Trust officer.
5    A    Uh-huh (affirmative).
6    Q    Okay. And after working with
7  SunTrust, who was your next employer?
8    A    I'm trying to remember. I should
9  have brought my resumé. When I left SunTrust,
10  I believe, if I remember correctly, I went to
11  work again in the brokerage business in
12  LaGrange.
13       And you're going to ask me the name
14  of the company, and I cannot remember it at the
15  moment. It was a -- one of the regional
16  brokerage companies.
17    Q    And how long have you -- are you
18  still in the brokerage business today?
19    A    No.
20    Q    When did you stop working in the
21  brokerage business?
22    A    Probably in, let's see, 2000 --
23  2004-2005 time frame.
24    Q    Okay. And who was your last
25  employer?

---

26

1    A    The last employer that I did
2  securities for was MassMutual.
3    Q    Okay. And why did you stop working
4  for MassMutual?
5    A    They -- I was just wanted to get out
6  of that business. I was kind of tired of the
7  personal sales business. And I decided that I
8  was -- I would get out of the financial sales
9  business.
10    Q    And in the meantime, you attended
11  the Southern Trust School?
12    A    Yes.
13    Q    And where is the Southern Trust
14  School?
15    A    At that time, it was in Mobile,
16  Alabama.
17    Q    And what degree did you receive from
18  that school?
19    A    There was really no degree. It was
20  a certificate that just showed that you had
21  completed that course of study. It was
22  basically within, within the bank that it was
23  recognized.
24    Q    And what course of study was that?
25    A    It was, the Southern Trust School --

---

27

1  I graduated from the Southern Trust School, and
2  it was -- it was essentially learning the trust
3  business.
4    Q    And did you receive any other
5  advanced studies in financial planning?
6    A    I spent some time -- I took some
7  courses on my own. This was not part of the
8  Southern Trust School. But, yes, I did. I
9  took online courses, et cetera, in financial
10  planning on my own.
11    Q    And with whom did you take those
12  courses?
13    A    I don't even recall. I couldn't --
14  I don't remember.
15    Q    Do you have any criminal record? --
16    A    No.
17    Q    Have you ever been arrested?
18    A    No.
19    Q    Following your work in the banking
20  industry, what other jobs have you had since
21  then?
22    A    When I was elected to the
23  legislature, I was with BB&T in LaGrange.
24  Since that time, I have served as a pastor with
25  the United Methodist Church and served in the

---

28

1  legislature.
2    Q    And when were you at BB&T for?
3    A    I was at BB&T in '04 and '05 or --
4  yeah, some, somewhere around '04, '05, and '06.
5    Q    And what did you do for them?
6    A    I was the city executive. It was
7  primarily a commercial lender.
8    Q    And how long have you been a pastor
9  at United Methodist Church for?
10    A    12 years.
11    Q    And is that a big church?
12    A    No.
13    Q    Are you the only pastor?
14    A    Yes.
15    Q    And what are your duties as pastor
16  of the church?
17    A    Primarily there, it's, you know,
18  pastoral services to the members that you would
19  imagine from visiting the people that are
20  sick -- my church only met once a week, so I
21  had a sermon every Sunday -- and primarily, the
22  pastoral duties you would imagine in terms of
23  visitation, funerals.
24       It's an older congregation, so there
25  was quite a bit of that.

---

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

14  (Pages 29 to 32)

29

1    Q    And are you still giving sermons
2  every week?
3    A    No.  I was not appointed last -- I
4  retired essentially as of last June.  The
5  Methodist Church appoints in June, and I was
6  not appointed this last year.
7    Q    Do you currently hold any job other
8  than serving as Georgia State Representative?
9    A    I do not.
10   Q    Turning to the Plaintiff's
11  Exhibit 79, this shows the exhibit -- the
12  committees that you are currently serving on;
13  is that correct?
14   A    Yes.
15   Q    And so you currently serve on the
16  Appropriations, Banks & Banking, Economic
17  Development & Tourism, Education, Ethics,
18  Judiciary, Legislative & Congressional
19  Reapportionment, and Natural Resources &
20  Environment Committees; correct?
21   A    Yes.
22   Q    And you were sworn into office on
23  January 8th, 2007?
24   A    Yes.
25   Q    And your spouse here is listed as

30

1  Debra; correct?
2    A    That's correct.
3    Q    And you have two children; correct?
4    A    Yes.
5    Q    And what are their names?
6    A
7  (Whereupon a document was identified as
8  Plaintiff's Exhibit 81.)
9    Q    I'm handing you what I marked as
10  Plaintiff's Exhibit 81.  Sorry.  And what is
11  this document?
12   A    Oh, it apparently -- it came off the
13  Facebook page.  Again, it's bio.  Just looking
14  at it, it's a little bit out of date, but, yes,
15  it's a bio from, apparently from Facebook.
16   Q    And it's the official State Facebook
17  page; correct?
18   A    Yes, I believe it is.
19   Q    And it notes -- it must be a little
20  outdated because it notes that you're serving
21  as the chairman of the Reapportionment
22  Committee, which is no longer the case;
23  correct?
24   A    That is correct.
25   Q    What district do you -- what State

31

1  House district do you represent,
2  Representative?
3    A    House District 69.
4    Q    And where is that district?
5    A    It covers the northern part of Troup
6  County, all of Heard County, and the southern
7  part of Carroll County.
8    Q    And do you know what the political
9  makeup is of your district?
10   A    What do you mean by political
11  makeup?
12   Q    Is it a relatively
13  conservative-leaning district or relatively
14  liberal district?
15   A    No.  Mine is a relatively
16  conservative district.
17   Q    And what are the racial demographics
18  of your district?
19   A    I honestly could not tell you what
20  the racial demographics are.
21   Q    Would you say that your district is
22  predominantly white with respect to its
23  population?
24   A    Yes.
25   Q    And what are your responsibilities

32

1  as a member of the House?
2    A    To represent the people of my
3  district.
4    Q    And how frequently is the House in
5  session?
6    A    We have annual sessions.
7    Q    And how long is it -- strike that.
8        How long is the Georgia legislature
9  in session each year?
10   A    We are prescribed by the
11  Constitution to have 40 legislative days.
12  They're not necessarily consecutive days.
13  Usually, it's the first three months of the
14  year.  We go in on the second Monday of
15  January.  In my time I've been in there,
16  usually we're finished right at the end of
17  March or early April.
18   Q    And how do you divide your time
19  between traveling to Georgia and getting back
20  and forth to your home county?
21   A    During the session?
22   Q    Yes.
23   A    Usually, I commute during the
24  session for the session days.  Occasionally, I
25  will, if we're -- if things are real intense

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP; et al vs Kemp          January 10; 2018

15   (Pages 33 to 36)

33

1   and I need to be here, I'll stay overnight.
2       Q     Roughly, how long a drive is that?
3       A     It's approximately 70 miles from my
4   house to the capitol.
5       Q     When were you first elected to the
6   House?
7       A     I was elected in 2006 and sworn in
8   in 2007. I believe that's correct. Yes.
9   Elected in November of '06.
10      (Whereupon a document was identified as
11      Plaintiff's Exhibit 82.)
12      Q     I'm handing you what I've marked
13   as -- what I'm marking for identification as
14   Plaintiff's Exhibit 82. Representative Nix,
15   what is this document?
16      A     Again, I assume it's -- it's my page
17   you go to when you click on my name under the
18   House of Representatives.
19      Q     And in the top right-hand corner,
20   does it say 2007-2008 --
21      A     Yeah.
22      Q     -- regular session?
23      A     It does. It's not the current
24   session. That's what I was looking at. It's
25   an older one.

34

1       Q     And for the 2007-2008 session, you
2   served on the Banks & Banking, Economic
3   Development & Tourism, Information & Audits,
4   and Natural Resources & Environment Committees;
5   is that correct?
6       A     That is correct.
7       Q     And did you ask to be placed on
8   those committees, or were you merely assigned
9   them by House leadership?
10      A     If I recall correctly, the only
11   committee I asked to be assigned to was Natural
12   Resources and Environment. The others were
13   assigned by the Speaker.
14      Q     And why did you ask to serve on the
15   Natural Resources and Environment committee?
16      A     My district has probably more of the
17   Chattahoochee River than any other district and
18   big issues related to the water wars, to the,
19   you know, cleanliness of the waters. My --
20   it's just a huge interest in my district, the
21   Chattahoochee River and West Point Lake.
22      And people -- my, my constituents
23   had asked me to be on that, asked if I could be
24   on that committee.
25      Q     Is it fair to say residents of your

35

1   district were concerned about the cleanliness
2   of the Chattahoochee River?
3       A     Yes.
4       Q     And were there -- is the
5   Chattahoochee -- strike that.
6       Do they still have concerns about
7   the cleanliness of the Chattahoochee River?
8       A     I would say they do not as much as
9   they did before. There's been quite a bit of
10   work on that that has improved it, but there's
11   still a -- my district, the people in my
12   district are still very much in tune with
13   what's going on with the Chattahoochee and with
14   West Point Lake.
15      Q     Have you spent -- strike that.
16      Has that been the issue that has
17   concerned you the most while you've served on
18   the legislature?
19      A     No.
20      Q     What would you say that issue is?
21      A     Education. I've been involved more
22   heavily in education-related issues than
23   anything else.
24      Q     And you started serving on the
25   education committee in the 2009 session; is

36

1   that correct?
2       A     I don't recall the exact time, but I
3   was not on it my first session, so either the
4   second or third session.
5       (Whereupon a document was identified as
6       Plaintiff's Exhibit 83.)
7       Q     Handing you what I've marked as
8   Plaintiff's Exhibit 83.
9       A     Okay.
10      Q     And what is this document?
11      A     Again, this is the -- my page out of
12   the, from the legislature for the 2009-2010
13   session.
14      Q     And this session, you -- strike
15   that.
16      For the 2009-2010 regular session,
17   you served on the Banks & Banking, Economic
18   Development & Tourism, Education, Judiciary,
19   and Natural Resources & Environments
20   Committees; is that correct?
21      A     Yes.
22      Q     And what work -- strike that.
23      You mentioned doing a lot of work on
24   education. What work has that been?
25      A     The biggest interest I've had is in

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

---

37

1   workforce development and working on
2   legislation to help prepare our students for
3   the workforce.
4       Q    And have you introduced any bills in
5   the legislature on that issue?
6       A    Yes.
7       Q    And was that bill passed?
8       A    Yes.
9       Q    And what session was that in?
10      A    I'm not exactly sure.  Maybe in
11  2011, the career pathways legislation that I
12  had was passed, House Bill 186.  And I'm not --
13  I'm not sure of the year.  That was the most
14  significant piece of legislation.
15      Q    That was the most significant piece
16  of legislation that you've worked on while
17  you've been a House member?
18      A    Yes, in my opinion.
19      (Whereupon a document was identified as
20      Plaintiff's Exhibit 84.)
21      Q    Yeah.  I'm handing you what I've
22  marked for identification as Plaintiff's
23  Exhibit 84.
24      A    Okay.
25      Q    And what is this document?

---

38

1       A    This is for the 2011-2012
2   legislative session, again, my page off of the
3   House of Representatives website.
4       Q    And during that session, you worked
5   on the Appropriations, Banks & Banking,
6   Economic Development & Tourism, Education,
7   Judiciary, Natural Resources & Environment
8   committee; is that correct?
9       A    That is correct.
10      (Whereupon a document was identified as
11      Plaintiff's Exhibit 85.)
12      Q    I'm now handing you what I've marked
13  for identification as Plaintiff's Exhibit 85.
14  And what is this document?
15      A    Again, this is my page on the House
16  of Representatives website for the 2013-2014
17  session.
18      Q    And during that session, you served
19  as a member of the Appropriations, Banks &
20  Banking, Economic Development & Tourism,
21  Education, Legislative & Congressional
22  Reapportionment, and Natural Resources &
23  Environment Committees; is that correct?
24      A    That is correct.
25      Q    And you were a secretary on the

---

39

1   Banks & Banking committee, and you were a
2   chairman of the Legislative & Congressional
3   Reapportionment Committees; is that correct?
4       A    That is correct.
5       Q    Had you chaired any committees
6   before chairing the Legislative & Congressional
7   Reapportionment Committee in 2013?
8       A    No.
9       Q    And then in the 2015 session, you
10  were made the chair of the Ethics Committee; is
11  that correct -- sorry, in the 2017?
12      A    2017, yes.  That's correct.
13      (Whereupon a document was identified as
14      Plaintiff's Exhibit 86.)
15      Q    I'm handing you what I've marked for
16  identification as Plaintiff's Exhibit 86.  And
17  what is this document?
18      A    Again, this is my web page from the
19  House of Representatives website for the
20  2015-2016 session.
21      Q    And during the 2015-2016 session,
22  you served on the Appropriations, Banks &
23  Banking, Economic Development & Tourism,
24  Education, Legislative & Congressional
25  Reapportionment, and Natural Resources &

---

40

1   Environment Committees; correct?
2       A    Yes.
3       Q    And once again, you were secretary
4   of the Banks & Banking Committee and chairman
5   of the Legislative & Congressional
6   Reapportionment Committee; correct?
7       A    Correct.
8       Q    Have you served on a relatively
9   typical number of committees relative to other
10  Georgia House members?
11      A    Yes.
12      Q    And would you consider yourself to
13  be a relatively active House member?
14      A    Yes.
15      Q    And why is that?
16      A    I take it seriously, and, you know,
17  I try to be engaged.  I feel like, to serve the
18  constituents I have, I need to be as engaged as
19  I can be.
20      Q    Would you consider yourself to be a
21  reliably conservative voice in the Georgia
22  House?
23      A    I would say a consensus voice rather
24  than conservative voice.
25      Q    And what's the distinction between

---

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

41

1  being a consensus voice and being a
2  conservative voice?
3      A   I tend to try to work with, with
4  both sides when I'm working on an issue, not --
5  I'm not strongly partisan.  I have the ability
6  to bring people together to work on issues.
7      Q   And in what cases have you worked
8  with the other side of the aisle to come
9  together and agree on legislation?
10     A   Well, quite a number of issues
11  when -- the education issues that I've passed
12  have always required bringing people together.
13  And several others, even, even things related
14  to the natural resources environment area,
15  which necessary to bring people together, not,
16  not sharply partisan issues one way or the
17  other.
18     Q   And do you remember any specific
19  matters in particular related to your work in
20  the Education and Natural Resources Committee
21  where you had to come together?
22     A   Legislation, Natural Resources &
23  Environment, we had -- I had legislation
24  related to composting and landfills that had
25  strong opinions on both sides, and I was able

42

1  to bring those people together and come up with
2  a bill that we could pass.
3      Same way in education where I was
4  able to get with both sides and work to bring
5  them, bring them together.  There are numerous
6  things, I think if you, if you asked people in
7  the legislature about my ability to do that
8  that, I'm seen as someone who can bring people
9  together.
10     So there are numerous -- I think
11  there would be numerous times that that has
12  occurred, but those are some.
13     Q   And what qualities do you think that
14  you possess that help you to be an effective
15  consensus voice in the House?
16     A   I would say probably the fact that
17  people know me as a person who respects all
18  people.  I don't go out and try to be extremely
19  partisan.  I think that you would find the
20  consensus is that I respect everybody's opinion
21  and try my best to work with them.
22     So I've been involved in a number of
23  things.  I've been chaplain of the day for
24  number of times.  As a matter of fact, I was
25  chaplain of the day yesterday, and I think that

43

1  has given me a position that gives me the
2  opportunity to bring people from both sides
3  together because they -- I think they
4  understand that I'm there to work for the best
5  of everybody.
6      Q   Is my understanding correct that the
7  two committees you've chaired are the
8  Legislative & Congressional Reapportionment
9  Committee and the Ethics Committee?
10     A   That is correct, yes.
11     Q   And how did you -- strike that.
12     Did you want to serve as chairman of
13  the Legislative & Congressional Reapportionment
14  Committee at the, at the time that you had been
15  selected to do so?
16     A   I did not mind serving.  I did not
17  ask for that committee.  The Committee on
18  Assignments had asked me if I would chair that
19  committee.  I did not ask specifically for that
20  committee.  But that was an opportunity to move
21  into a chairmanship, and they had had asked me
22  to serve there.
23     So I guess to answer your question,
24  I did not ask for it, but it was certainly not
25  something that I was afraid to do or did not

44

1  want to do.
2      Q   And you served as chair for two
3  legislative sessions; correct?
4      A   Correct.
5      Q   And at that time, did you ask to
6  chair the ethics committee, or were you asked
7  to do so by the legislative leadership?
8      A   When I, when I left the
9  Reapportionment Committee, yes, I was asked to
10  chair the Ethics Committee by the, by the
11  Speaker.
12     Q   And do you know why you were asked
13  to switch committees in your role as chairman?
14     A   The longstanding chair of the Ethics
15  Committee, Joe Wilkinson, had decided not to
16  run again.  And the Speaker for the reasons
17  I've given you before felt that I would be the
18  person that could best step into his shoes and
19  asked me if I would be willing to, to accept
20  that responsibility, and I said certainly.
21     Q   And has the Ethics Committee been
22  busy during this legislative session?
23     A   Fortunately, not at all during this
24  session.  We're just getting started there.
25  There have been some issues, but relatively

Donovan Reporting, PC                                          770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

45

1    minor, thank goodness.
2        Q    And was the Ethics Committee active
3    during the 2017 session?
4        A    The only way we were really active,
5    we had no ethics complaints we acted upon, but
6    we did training for new members. We had
7    questions from time to time, you know, is this
8    something we can do.
9            But in terms of looking at the
10   Ethics Committee from an investigative
11   standpoint, we did not. We were fortunate that
12   we did not.
13       Q    And aside from House Bill 566, the
14   Reapportionment Committee wasn't particularly
15   active while you were chair of that committee
16   either; correct?
17       A    That is correct.
18       Q    I'd like to walk through your past
19   electoral history. Did you run for any elected
20   office before running for State Representative
21   in District 69 in 2006?
22       A    No.
23       Q    And why did you decide to run for
24   the District 69 seat in 2006?
25       A    My predecessor, Jeff Brown, was a

46

1    good friend of mine, and I had known Jeff for a
2    while, had always supported him. And when he
3    said that he was not going to run, I said, you
4    know, Jeff, I have an interest. What do you
5    think about me running?
6            And he was, he was encouraging. It
7    was not something -- I was not one of those
8    people that had always been out there saying
9    I'm going to run, I'm going to run. It was
10   kind of a target of opportunity that came up,
11   and I was able to run, but it was the first
12   time I had ever run for an office.
13       Q    And what made you decide that that
14   was something you were interested in?
15       A    I had always had a general interest
16   in politics and had a desire to be engaged.
17   I'd always been engaged in things in the
18   community from the Rotary Club to Boys & Girls
19   Club to leadership things with the chamber, and
20   it just seemed like a natural progression.
21       Q    And had you had any personal
22   dealings with the legislature prior to deciding
23   to run besides your association with Jeff
24   Brown?
25       A    No.

47

1        Q    Okay.
2        A    No.
3        Q    And in your 2006 race, did you have
4    an opponent in the Republican primary?
5        A    I did. I did.
6        Q    And what was his name or her name?
7        A    It was him, Zachary Taylor.
8        Q    And what were the main issues in
9    that election?
10       A    To really get known. Neither one of
11   us was that greatly known. As I mentioned, the
12   issues related to the Chattahoochee River, West
13   Point Lake, big things going on at that time.
14           The economy and things were really
15   beginning to happen in the LaGrange area with
16   the Kia coming in. So it was, it was probably
17   as much economic as anything, the issues that
18   were bubbling up. Probably the biggest one, as
19   I mentioned earlier, was the lake issues.
20       Q    And did you have any debates prior
21   to the Republican primary?
22       A    I don't recall that we had debates.
23   We had some forums where questions were asked.
24   But just in terms of a debate, we did not. We
25   had -- if I recall, like the Chamber of

48

1    Commerce had a forum, and we each answered
2    questions related to that.
3        Q    And what was the margin of victory
4    in that election?
5        A    If I remember correctly, it was
6    about 115 votes. It was not a large margin. I
7    won the primary I believe by 115 votes.
8        Q    Wow. And what was the race of
9    Mr. Taylor?
10       A    He's, he's white. He's -- yeah.
11       Q    And did you have an opponent in the
12   general election?
13       A    I did.
14       Q    And what was your opponent's name?
15       A    Doc Davis.
16       Q    And what was the margin of victory
17   in that election?
18       A    I don't remember exactly, but it was
19   probably in the, in the neighborhood of 60-40,
20   maybe 60 plus-40.
21       Q    And were there any debates prior to
22   that election?
23       A    Similar to what I had described
24   earlier.
25       Q    Yeah.

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

49

1    A    I believe that there were a couple
2   of chamber events where they had us come and
3   people asked questions.  Maybe the League of
4   Women Voters.  But it was -- there was not
5   really what I consider a debate, but it was
6   more, you know, we were asked questions about
7   certain issues.
8    Q    And were the issues in the general
9   election roughly the same as they were in the
10  primary election?
11   A    They were similar, yeah, yeah.
12   Q    And is Doc Davis white?
13   A    Yes.
14   Q    And did you have any opponents when
15  you ran for reelection in 2008?
16   A    I don't believe I had any in 2008.
17  In the time I've been in, I've had one opponent
18  in the general election.  I think it was the
19  next year.  So in my time, I had -- the first
20  time I ran, I had a general -- I mean, I had a
21  primary and a general.
22       And then I believe three, three
23  cycles later I had a general opponent.
24   Q    In 2012, you ran against Herbert
25  Giles --

50

1    A    Yeah.
2    Q    -- in the general election?
3    A    Yeah.
4    Q    And what were the main issues in
5   that election?
6    A    They were, they were essentially the
7   same as before.  The economy, things had gone
8   down and had come back.  But most of the issues
9   related to my district were the economy, the
10  environment related to the lake and to the
11  river.  Jobs became an issue.
12       Things, of course, had gone downhill
13  and were beginning to come back up in terms of
14  the economy, but a lot of economic issues
15  related to it.
16   Q    What was the margin of victory in
17  that election?
18   A    If I remember correctly, it was
19  somewhere on the account of 65-35.
20   Q    And your district had been
21  redistricted in the meantime; is that correct?
22   A    Yes, yes.
23   Q    And is Herbert Giles white?
24   A    To be honest with you, I think he
25  is.  He never showed up for anything.  His name

51

1   appeared on the ballot, and I never saw the
2   man.
3    Q    So you never participated in any
4   forums or debates?
5    A    He never showed up.
6    Q    And in 2014 and 2016, you ran
7   unopposed?
8    A    That is correct.
9    Q    Do you think your competitive
10  elections were affected by national politics,
11  or would you consider them to be mainly local
12  affairs?
13   A    When you, when you say
14  "competitive," what do you mean?  You mean the
15  first time when I had a --
16   Q    Your elections in 2006 and --
17   A    Yeah.
18   Q    -- the one in 2012?
19   A    I would say they're more local.  And
20  as I said, the first time I ran, it was a, you
21  know, nobody knew either one of us.  It was a,
22  it was local.  Who you, who you could get out
23  and meet and letting them know who you were.
24   Q    And do you think that is true of
25  elections elsewhere in Georgia based on your

52

1   knowledge as a longtime State Representative,
2   or do you think State House elections just tend
3   to be local due to the size of the district?
4        MR. KHOURY:  Object to the form of
5   the question.  You can answer.
6    A    It's hard to generalize on that.
7   Each, you know, each district is different
8   because of the nature of the district, and it's
9   really hard for me to generalize on that.
10       I do think that maybe especially in
11  the last, last few cycles, probably there's a
12  greater effect from the national scene than
13  there was before.
14   Q    And is it your opinion that in the
15  last couple of election cycles that national
16  politics have had a greater influence on State
17  House elections in Georgia?
18   A    It would appear that way to me, yes.
19   Q    And in the competitive elections in
20  2006 and 2012, did you ever look at the
21  election results at a precinct level to assess
22  where you received support and where you didn't
23  receive support?
24   A    I honest -- I did not sit down and
25  look at those at a precinct level.  I was -- I

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

20   (Pages 53 to 56)

---

53

1    did not go to that level.
2        Q    And you mentioned earlier that
3    you're a member of the House Reapportionment
4    Committee; correct?
5        A    Correct.
6        Q    And roughly how many members does
7    the Reapportionment Committee have?
8        A    I honestly can't tell you the
9    number. We could go to the web page and look
10   it up and see it pretty quickly, but I don't
11   know the exact number.
12       Q    And what is the purpose of the
13   committee?
14       A    The purpose of the committee is to
15   draw the district maps for both the state House
16   districts and the legislative district, federal
17   districts.
18       Q    And you mentioned being asked to
19   join the committee.
20       A    Uh-huh (affirmative).
21       Q    Who specifically asked you to chair
22   the committee in 2013?
23       A    The Speaker.
24       Q    And you hadn't served on the
25   Reapportionment Committee at all prior to

---

54

1    becoming chair; is that correct?
2        A    That is correct.
3        Q    And is it unusual for somebody to be
4    appointed chair of a committee that they've
5    never served before?
6        A    I don't know. I only know my
7    experience. I couldn't say in a general sense
8    whether that is unusual or not.
9        Q    Are you aware of other instances in
10   which fellow legislators have been appointed
11   chair of committees that they hadn't served on
12   the past?
13       A    I don't know specifically, no.
14       Q    Did you speak with anyone about what
15   duties you'd be asked to perform as chair of
16   the Reapportionment Committee before you
17   decided to accept the position?
18       A    No.
19       Q    And --
20       A    Let me, let me clarify that in terms
21   of when you --- usually when the Speaker asks
22   you to take a committee, you usually take that
23   committee. And I trusted his judgment that it
24   would be the opportunity for me and would be
25   the best position.

---

55

1        So when I said I didn't talk to
2    anybody then, basically I accepted the
3    opportunity to do that in that one meeting.
4        Q    At the time you accepted, did you
5    have any expectations about what the
6    Reapportionment Committee would be doing given
7    that they'd just enacted a redistricting plan
8    in the prior session?
9        A    I did not. I knew that in the, in
10   the years after the census when we did the big
11   maps, I knew it was a huge job. And I -- but I
12   knew we had just passed that, we had just done
13   that, so that was my only really conceived
14   notion of what it was.
15       Q    And you had voted in favor of the
16   redistricting plans enacted for the state
17   legislature and congress in 2011 and 2012;
18   correct?
19       A    Yes.
20       Q    And after you accepted the offer to
21   chair the committee, did you ask what role the
22   committee might be playing with respect to
23   redistricting given that a redistricting plan
24   had been passed in the previous session?
25       A    Yes.

---

56

1        Q    And who did you ask?
2        A    I spoke with the former chair and
3    just got, got a little bit of advice from him
4    about the job and what it entailed. I spoke
5    with the people in the Reapportionment Office
6    who, you know, get down to the nuts and bolts
7    of it.
8        Q    Let's break that up. The former
9    chair of the Reapportionment Committee that
10   you're referring to is Roger Lane; is that
11   correct?
12       A    Yes.
13       Q    And roughly when did you speak with
14   Mr. Lane?
15       A    It would have been sometime very
16   early in that session, when the committee
17   assignments were made.
18       Q    Early in 2015?
19       A    Yes.
20       Q    Or strike that.
21       A    Between --
22       Q    Early in 2013?
23       A    Yes.
24       Q    And what did Mr. Lane tell you about
25   the job and -- strike that.

---

Donovan Reporting, PC                                    770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                4dd8d33d-566f-46b5-8729-373a760afce8

57

1      What did Mr. Lane tell you when you
2   spoke to him early in 2013?
3      A   If I recall correctly, it was
4   basically that he was quite proud of the fact
5   that we had passed maps that had not been
6   challenged, that our reapportionment effort had
7   been, been very successful even in the, even
8   with no challenge from the Obama
9   administration, and we had a great deal to be
10   proud of there, the way that we had handled
11   that reapportionment.
12      Q   And what else did he tell you?
13      A   Really not a whole lot. I was just,
14   just asking him. He said, you know, you've
15   just got to -- you've just got to be aware of
16   what, you know, what the districts are and
17   don't -- just be concerned with what's there
18   and don't, don't get carried away with anything
19   because we've done too much. Our work has been
20   too good.
21      Q   And when you say, "don't get carried
22   away with anything," do you mean -- what do you
23   mean?
24      A   Well, I think the idea was that we
25   had been successful with the maps, and we did

58

1   not want to do anything to jeopardize that.
2      Q   Is it fair to say that Mr. Lane's
3   view was that the maps that had been passed at
4   the time were satisfactory and that you
5   shouldn't get carried away with making further
6   changes?
7      A   I wouldn't, I wouldn't classify it
8   that way, but certainly nothing that would,
9   would jeopardize what we had done previously.
10      Q   And was there anything else that you
11   talked about with Mr. Lane about redistricting
12   early in 2013?
13      A   No.
14      Q   And you mentioned that you also
15   spoke with folks at the Reapportionment Office
16   around that time?
17      A   Yes.
18      Q   And that would have also been in
19   early 2013?
20      A   Yes.
21      Q   And who did you speak with
22   specifically at the Reapportionment Office?
23      A   Gina Wright, who is the executive
24   director.
25      Q   And did you meet with her at the

59

1   Reapportionment Office?
2      A   Yes.
3      Q   And was anyone else present for that
4   meeting?
5      A   Not that I recall.
6      Q   What did you talk about at that
7   meeting?
8      A   Essentially that I would need their
9   expertise in terms of any issues related to
10   reapportionment, that I would be depending on
11   them for the, you know, for the specifics, the
12   nuts and bolts of things that went on with
13   reapportionment.
14      Q   And did you talk about anything
15   else?
16      A   Not at that time. I don't recall.
17      Q   And was that the only time you met
18   with folks from the Reapportionment Office in
19   2013?
20      A   In terms of formal meetings? Or
21   tell me what you mean by -- in terms of meeting
22   with them. My office was on the fourth floor,
23   and theirs was just down the hall, so
24   occasionally I would go in. If there were
25   questions, we would discuss things. But there

60

1   were no, you know, specific, formal meetings.
2      Q   And what kinds of questions came up
3   in 2013 that you discussed with --
4      A   I think --
5      Q   -- the folks at the Reapportionment
6   Office?
7      A   Sure. If I recall correctly, during
8   that time there were a number of questions
9   related to local redistricting that we did --
10   that did not fall under my committee, the lines
11   drawn in for school boards and city -- cities
12   and counties and things like that. But it was
13   more, more those types of issues rather than
14   issues that we dealt with specifically as the
15   committee.
16      Q   And what committee hears and passes
17   legislation related to local bodies in Georgia?
18      A   The local governments go through the
19   local government committee. The -- if I
20   understand the process correctly, and you would
21   need to probably talk with Gina to get the
22   specifics on it, they, they aid them with
23   designing their, their maps, but then the
24   locals have to agree on that.
25      And then it goes to the local

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

61

1  government, government -- intergovernmental
2  relations to work those out. We did not, we
3  did not -- my committee did not approve or
4  disapprove those types of issues.
5      Q    But sometimes you'd stop by Gina's
6  office and talk about what was going on at the
7  local level in 2013?
8      A    Or people would come to me and say,
9  you know, my school board's all messed up.
10  What do we need to?
11         You know, go see Gina. That's
12  something she's got to do, yeah.
13     Q    Other than that, were there any
14  issues related to state-level redistricting
15  that came up in 2013?
16     A    Not that I recall.
17     Q    And did you ever consider
18  introducing redistricting legislation in the
19  2013 session?
20     A    No.
21     Q    And why not?
22     A    There was no, there was no demand
23  for it. There didn't seem to be any, any
24  reason to do that.
25     Q    And how did you know that there was

62

1  no demand for it?
2      A    Mainly, I didn't have people coming
3  to me and saying, you know, I need to -- I
4  would like to consider changing my district.
5      Q    And what about 2014?
6      A    In 2014, there were some people who
7  did come and ask about the possibility of
8  making some very minor changes to their, their
9  districts.
10     Q    And roughly when in 2014 would this
11  have been?
12     A    Just, just during the session.
13  There was no -- I couldn't give you a specific
14  time, but the discussions came up.
15     Q    But during the legislative session?
16     A    Yeah.
17     Q    Yeah?
18     A    Yeah.
19     Q    And who came to you asking for
20  changes to be made to their districts?
21     A    I had several people, and I don't
22  remember the exact names, but situations where
23  they had bought property just in the other --
24  just across the line in their district that
25  they wanted to build on. One had bought a

63

1  farm. He wanted to get that into his district.
2         But those types of issues were the
3  ones that I was, was dealing with.
4      Q    And who had the farm that he wanted
5  to get into his district?
6      A    I'm drawing a blank on the name.
7  Jason down in south Georgia, Lakeland, Georgia.
8  I can't, I can't give you his last name. I'm
9  drawing a blank on it. But he -- that was his
10  district. You could find that if you needed to
11  look it up. I could find it.
12     Q    Fair enough. Who else came to you
13  during the 2014 session?
14     A    Representative Dunahoo up in the
15  Hall County area came to me, similar situation.
16  Those are the two that I remember very
17  specifically coming to me and asking for the
18  potential to do some minor changes in their
19  district.
20         MR. KHOURY: John, we've been going
21  a little over an hour. Can we take a break, or
22  are you near a spot where we could take maybe a
23  five-minute break?
24         MR. POWERS: Sure. Five minutes.
25  Five-minute break?

64

1         THE WITNESS: Sure.
2         THE VIDEOGRAPHER: Going off the
3  video record at 2:14.
4         (Proceedings in recess, 2:14 p.m to
5         2:29 p.m.)
6         THE VIDEOGRAPHER: We're now back on
7  the video record. The time is 2:29 p.m. This
8  is the start of video file number two.
9      Q    Representative Nix, you realize that
10  you're still under oath?
11     A    Yes.
12     Q    Great. Before the break, you had
13  mentioned a Representative Dunahoo --
14     A    Yeah.
15     Q    -- in Hall County asking for some
16  minor changes to be made. What concerns or
17  changes did he raise with you?
18     A    He had, he had purchased either a
19  home or some land or something that he really
20  wanted to build on or he wanted to occupy that
21  home. And it was actually across the road or
22  just slightly out of the district, so he wanted
23  to move that line just a little bit to get into
24  that district. Of course, you have to live in
25  your district.

Donovan Reporting, PC                                          770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

65

1    Q    Did anyone else come to you in 2014
2    raising any -- raising the idea of making any
3    changes to their district?
4        A    There were several people that came.
5    I can't tell you specific names, but there were
6    a number of people who came and said, you know,
7    I'd like to do this or this.  The impact of the
8    previous redistricting had set in, and some
9    people had had family members that had been
10   taken out of their district.
11       There was -- all of them were
12   relatively minor.  Some of them had districts
13   split.  They wanted it -- I mean precincts
14   split.  They wanted to try to reunite them.
15   But those were the basic questions that they
16   were coming up with and saying we would like to
17   do that.
18       Q    I take it, you don't recall the
19   names of any of the --
20       A    I don't.
21       Q    Do you recall what parts of the
22   state or what areas folks might have been
23   asking about?
24       A    There were several in the south
25   Georgia area.  I remember that.  There was some

66

1    in the Hall County area.  There was some in the
2    metro, the northern metro area.  I remember
3    those specifically.  I can't give you the
4    names, but they were all over the state in
5    terms of the people that had asked for changes.
6        Q    And if you -- what's your best
7    approximation of the number of people who came
8    to you during the 2014 session?
9        A    Maybe eight or ten.
10       Q    And I meant to ask, by this point,
11   you must have come to the conclusion that --
12   strike that.
13       When did you learn that the
14   redistricting committee might in fact have a
15   role to play in drawing a plan or making
16   changes to districts in the middle of the
17   census cycle?
18       A    Well, I knew that was possible.  I
19   mean, it's not unusual to make those changes.
20   And basically the, the idea was that during the
21   '13-'14 we were not going to do anything.  If
22   we did anything, it would probably be in '15.
23       So that's what I would tell people.
24   We're not going to do anything now.  If we do
25   anything, we'll do it all at one time rather

67

1    than trying to do things piecemeal.
2        Q    And was that a determination that
3    you came to yourself?
4        A    No.  That came from leadership.
5        Q    And who constitutes the leadership?
6        A    The Speaker, the Speaker's office,
7    yes.
8        Q    And the Speaker told you that
9    directly, or did it come from one of the
10   staffers?
11       A    It came from one of the staffers.
12   If I had questions, I would ask them.  Or they
13   would come to me and would ask me.  But
14   basically, it was the staff that would -- that
15   said, you know, we're not going to do anything
16   during these years.  We will consider it maybe
17   for the next, the next year.
18       Q    And who were the staffers that you
19   were talking to about these issues?
20       A    Spiro Amburn, the chief of staff for
21   the Speaker.
22       Q    And was there any other staffer who
23   was involved in redistricting-related issues?
24       A    No.  Basically, this is an issue
25   that would need to come from the top of the, of

68

1    the leadership, and Spiro was my primary
2    contact.
3        Q    And did you ever talk to the Speaker
4    directly during the 2013 or 2014 sessions about
5    redistricting?
6        A    I'm sure that we did, but there was
7    very little specific detail.  It might be,
8    Mr. Speaker, you know, I've had some people
9    interested in making some changes.
10       And it might be, well, that's
11   probably not going to happen.
12       That's kind of vague, but there was
13   never any direct sit down and let's discuss
14   this at that point.
15       Q    Sure, sure.  And did that happen
16   during the 2013 session or the 2014 session or
17   both?
18       A    Really, I don't even know that
19   people were coming up with anything in '13.  It
20   was probably in '14 when people began to see
21   where the, you know, like the purchases of land
22   and those things begin to, to be -- people
23   begin to realize where they, you know, where
24   they wanted to make a change.
25       Q    How frequently were you in contact

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

69

1    with Spiro Amburn during the 2014 cycle?
2        A    Are you talking about relative to
3    redistricting?  Not very often.  Of course,
4    he's on the floor.  I would see him.  But in
5    terms of having any conversations, it was very
6    infrequent.
7        Q    Okay.  What is your understanding as
8    to whether or not the State of Georgia can
9    redistrict a legislative body in the middle of
10   a census cycle?
11       A    It's -- historically, it's been
12   done, so I don't think there's any restriction
13   whatsoever in our ability as a legislature to
14   do that.
15       Q    And how many times has Georgia
16   redistricted in past census cycles when it
17   wasn't required to do so by a court order?
18       A    I couldn't tell you.  I don't, I
19   don't have any idea.
20       Q    Are you aware of any times in which
21   Georgia has redistricted in past census cycles
22   when it wasn't required to do so by a court
23   order?
24       A    Not specifically.
25       Q    Did you ask that question at the

70

1    time that you were serving as chair of the
2    Reapportionment Committee?
3        A    The question of?  What question now?
4        Q    Fair enough.  I'll re-ask the
5    question.
6            Did you inquire with folks at the
7    Reapportionment Office or in the legislature as
8    to when or if Georgia had redistricted in the
9    past in the middle of a census cycle when it
10   wasn't required to do so by a court order?
11       A    I don't know that I specifically
12   asked them, but it was general knowledge that
13   it had happened prior.  You know, there was
14   precedent to do it.  So I don't know that I
15   asked anybody specifically if we could.
16           The question was, you know, will we
17   rather than if we could.  I don't think there
18   was anything that would have prevented us from
19   doing that.
20       Q    And what conversations had you had
21   with folks about the past precedent with
22   respect to mid-census cycle redistricting?
23       A    Just that it had occurred, that
24   there was no, there was no reason why we could
25   not do it if the body decided it wished to do

71

1    it.
2        Q    And who did you have those
3    conversations with?
4        A    I can't give you specific people.  I
5    know that I talked to the people in the
6    Reapportionment Office who had dealt with it.
7    I depended on them for those type -- that type
8    of information.
9            But most likely, it was with them
10   and members of the House who had been there a
11   while, that had seen it.  I had only been
12   through the one redistricting myself.
13       Q    Is there any limitation on the
14   number of times the House can redistrict in the
15   middle of a census cycle?
16       A    Not that I am aware of.
17       Q    Is there any past practice or custom
18   limiting the number of times the House can
19   redistrict in the middle of a census cycle?
20       A    Not that I'm aware of.
21       Q    And can the majority party in the
22   House adopt a redistricting plan to benefit
23   members of its party who are considered to be
24   vulnerable based on the outcome of past
25   elections?

72

1        A    I would assume that it can.
2        Q    And what do you base that -- what do
3    you base your answer on?
4        A    Well, the legislature has the power
5    to act.  And if you can get the votes, you
6    know, that would be the restriction as to
7    whether or not you had the votes if you
8    proposed it.  So the majority party, if they
9    agree to it, could, could do that.
10       Q    And is there any -- strike that.
11           So Republicans in the House, for
12   example, can adopt redistricting plans to
13   benefit members of the Republican Party who
14   might consider -- might be considered to be
15   vulnerable based on the outcome of a past
16   election?
17       A    If it were proposed and if the
18   majority voted for it, yes.
19       Q    And is there a past practice or
20   custom that for the House to redistrict that
21   all existing members have to agree to the
22   changes to their district?
23       A    I'm not sure that that was required.
24   I know in the legislation I carried, that was
25   what I required.  I said that anyone who wishes

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

73

1   to, to change their district, everybody that it
2   touches must agree.
3           Now, I don't know that that is a
4   written, you know, that that's a rule
5   somewhere. But that was the -- that was what I
6   told people when they came to me when we did
7   it, that everybody that it touches must agree.
8       Q     And is there any past practice or
9   custom limiting the size or the degree of help
10   that the House could give to a vulnerable
11   incumbent in a mid-census redistricting plan?
12       A     Again, I'm not sure that there's
13   anything that is specifically written down in a
14   rule.  That is an area that I depended on the
15   office to do because, as I said, we did not
16   want to jeopardize the integrity of the map.
17           So any changes that were made had to
18   be relatively minor so that we didn't
19   jeopardize the good work that we had done when
20   the maps were drawn before.
21           So the Reapportionment Office would
22   have to give you those numbers where they, they
23   felt that any changes had to fall within a
24   very, very tight, small range.
25       Q     And when did you have these

74

1   conversations with folks at the Reapportionment
2   Office on this precise issue?
3           MR. KHOURY: Object to the form of
4   the question.
5       Q     I'll re-ask the question. What did
6   the Reapportionment Office tell you with
7   respect to the size or degree of political
8   advantage that the -- that a mid-census
9   redistricting plan could give to a vulnerable
10   incumbent?
11           MR. KHOURY: Object to the form of
12   the question. You can answer.
13       A     I'm not sure that they gave me the
14   specifics on it. My charge to them was do not
15   do anything that would jeopardize our standing
16   on the work that was done previously. That was
17   part of the charge.
18           That was part of what I told the
19   people that came to me that wanted to change
20   the districts, that we're not going to do
21   anything that would put our good standing in
22   jeopardy where we got this done before.
23           They will have to be relatively
24   minor, and they will have to be -- here again,
25   that's where the Reapportionment Office worked

75

1   with them to establish what they felt that was.
2   I did not establish it.
3       Q     And what are those boundaries to the
4   best of your knowledge?
5       A     I don't know. I did not, I did not
6   set them. I did not discuss them. The -- like
7   I said, the charge I gave was whatever is done
8   cannot put us in a position where we will have
9   a -- we'll be challenged on it, because we got
10   by before.
11           The maps were approved.  The
12   integrity of the maps is good.  So any change
13   has to be minor.  I did not give specifics, and
14   they did not give me very specifics, but it --
15   but they worked with the members.  I was not
16   even there when they worked with the members to
17   try to make the changes that the member
18   requested.
19       Q     Just to be clear, have you been told
20   that there are any limitations to the size or
21   amount of the benefit that a redistricting plan
22   can be drawn to give vulnerable incumbents?
23       A     Not -- not in terms of specifics. I
24   know that there, there are boundaries that we
25   have to stay within, but I do not know -- I

76

1   couldn't give you the specifics on it.
2       Q     Did you know what they were at the
3   time that you were the chair of the House
4   Reapportionment Committee?
5       A     I did not.
6       Q     Now, if a district flipped in the
7   prior election, say from Republican to
8   Democrat, does any past practice or custom
9   prevent the majority party from making changes
10   to that district to try to flip it back so that
11   the Republican Party can take the seat back in
12   the next election?
13       A     I'm not aware of anything that would
14   restrict that. Here again, it's a political
15   process.  If it's proposed, if the majority
16   approved that, I don't think there's any
17   limitation on that.
18       Q     Redistricting, is that an inherently
19   political activity in your opinion?
20       A     I guess the answer to that is
21   certainly it can be. The majority of the
22   things that I worked on were not political in
23   nature. They were more personal, as I've
24   talked about, somebody wanting to -- they've
25   got property just across the line or something

---

**77**

1  of that nature. They're trying to get family
2  members back in or reconnect a precinct that
3  got split.
4        But the answer to your question, it
5  is a political -- it is a political exercise.
6        (Whereupon a document was identified as
7        Plaintiff's Exhibit 87.)
8     Q   Oh, wait. Sorry. I've got to mark
9  it.
10        I'm going to hand you what I've
11  marked for identification as Plaintiff's
12  Exhibit 87. And what is the title of this
13  article?
14     A   Progressives Target GOP Advantage in
15  Gold Dome Maps.
16     Q   And this was written by Maggie Lee
17  on August 15th, 2016; correct?
18     A   Yes. That's what's on it, uh-huh
19  (affirmative).
20     Q   I'd like to direct you to the second
21  page and in particular to the paragraph that
22  starts -- in the middle of the page that starts
23  with, "But fans of the status quo."
24     A   Uh-huh (affirmative).
25     Q   And do you see where the article

**78**

1  refers to you as chairing the House Legislative
2  & Congressional Reapportionment Committee?
3     A   Yes.
4     Q   And you had said that it's not
5  likely that the legislature would approve the
6  formation of a citizens' redistricting
7  commission; is that correct?
8     A   Well, the true quote is that I'm not
9  sure there could ever be an independent
10  redistricting commission. I didn't say they
11  would never do it. But by nature itself, if
12  it's a commission that people have to be
13  appointed to, some political person's going to
14  appoint that person.
15        So my quote, I will stand with
16  there. I'm not sure there could ever be an
17  independent redistricting commission.
18     Q   And do you also stand by the second
19  part of the quote with respect to being --
20  there being political influences on the -- on
21  any redistricting body?
22     A   Sure. That's essentially what I've
23  already told you. Somewhere there would have
24  to be political influence. I just don't think
25  you can take politics out of politics.

**79**

1     Q   Yeah. And as chair of the
2  Reapportionment Committee, how would you
3  balance the considerations and politics that
4  affect the redistricting process?
5     A   I think it goes back to what I told
6  you a little bit earlier, that my charge to the
7  members was -- and let's go back a little
8  further than that. I made the announcement
9  before the entire chamber that we were going to
10  consider redistricting during the session.
11        I made it before the majority
12  caucus, and I made it before the minority
13  caucus. I talked to the minority leader and
14  made them aware that if anybody wished for us
15  to consider that they let us know and that they
16  needed to get with the Reapportionment Office
17  and see if it would work within the parameters
18  that we gave them.
19        And then the fact that as you -- we
20  talked about earlier that my insistence was
21  that everybody had to agree, that we were not
22  going to -- we were not going to change a
23  district if one of the people said I'm not
24  going to do that.
25        And we had people on both sides of

**80**

1  the aisles who wanted to make changes. All of
2  these changes were done. So I think that
3  trying -- that with that balance there was no,
4  no coercion of anybody. It was open to
5  everybody, and everybody had to agree.
6        So I think that went as far as you
7  could go to take the political aspect out of
8  it.
9     Q   Isn't there the issue, however,
10  that, you know, the member might be
11  self-interested in seeking to gain political
12  advantage for him or herself and ignoring the
13  needs of other community members in his or her
14  district?
15     A   Here again, that could be a
16  possibility, but that's where the
17  Reapportionment Office having the charge to
18  make sure that we don't jeopardize our good
19  standing on the maps, that's where they had to
20  balance that.
21        They had to look at that and say,
22  okay, if we are making the change to this
23  district and it affects this district in an
24  amount greater than we feel to do it, we won't
25  do it.

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

---

81

1    Q    And is it your testimony then that
2  the, that the Reapportionment Office has the
3  responsibility of making the determination as
4  to when changes to the district crosses the
5  line from acceptable to unacceptable?
6    A    I relied on them for that
7  information, yeah.  They -- the statistics, the
8  things that go into that, are quite involved,
9  as you might know.  And those people over there
10  understand that tremendously better than I do.
11      So when we had our discussion about,
12  you know, we're not going to, we're not going
13  to jeopardize these maps, you've got to keep it
14  clean, I felt like that that was something that
15  they could very well do.  They were reviewed
16  when they came through by legislative counsel.
17      So, yes, I felt like it was
18  appropriate for them to be able to make that
19  determination because they knew what was there.
20  They knew where the limits were.
21    Q    And when it came time to assess the
22  question of whether or not the changes made to
23  the districts were in compliance with state and
24  federal law, is it fair to say that you've
25  deferred to the Reapportionment Office and

---

82

1  legislative counsel in making that
2  determination?
3    A    In general.  I defer to them to say
4  have we, have we done everything that we need
5  to.  Here again, are we within the
6  boundaries?  Is this going to keep us from
7  being in -- jeopardizing the work we've done
8  before?  That was always one of the, one of the
9  charges.
10      We do not want to -- we don't want
11  to mess up the good work that was done earlier.
12    Q    And when making an assessment as to
13  whether or not the changes in HB 566 were
14  compliant with federal and state law, did you
15  do anything else other than ask the
16  Reapportionment Office and the legislative
17  counsel for their, for their views?
18    A    Not that I recall.
19    Q    And before we move on, you had --
20  you mentioned earlier that at some point you
21  made an announcement on the House floor to all
22  of the members of the legislature.  When did
23  that announcement take place?
24    A    I think we did it early in 2015 as
25  we were beginning to think about formulating

---

83

1  a -- putting a bill together.  As I said, we
2  did not want to do it piecemeal.  So I think in
3  all fairness, both sides of the aisle needed to
4  know what we were doing and have time to be
5  able to get with the Reapportionment Office and
6  get it worked out, so it was, it was early in
7  that session.
8    Q    Maybe the first or second week of
9  the legislative session?
10    A    Yeah.  Say second or third week.  I
11  can't put a specific time on it, but it was, it
12  was early, with enough time for them to be able
13  to get the work done that needed to be done.
14    Q    And by this point, had you already
15  spoken with House leadership as to whether or
16  not leadership was interested in pursuing
17  redistricting in the 2015 session?
18    A    Yes.
19    Q    And who did you speak to
20  specifically?
21    A    Here again, I'm sure it was with the
22  Speaker's chief of staff, Spiro Amburn.  He
23  was, as I said, my primary contact, and he
24  would have been the person who would have
25  communicated if we were or were not going

---

84

1  forward with it.
2    Q    And what did he -- strike that.
3      What was the conversation that --
4  the contents of the conversation you had with
5  Spiro Amburn in early 2015?
6    A    Essentially the same things I've
7  been talking about, that it had to be done
8  fairly, we wanted to offer it to everyone, not
9  that everyone could do it because some of the
10  changes some people wanted wouldn't work.  But
11  we wanted to make sure that everybody, both
12  Republican and Democrat, knew that we were
13  going to make changes and that if those changes
14  fit into the parameters that they would be
15  considered.
16    Q    And was that determination that --
17  strike that.
18      Was the determination that you would
19  reach out to members of the minority caucus as
20  well, did that come from you or the leadership?
21    A    It came from our discussion that,
22  that we wanted to do it fairly.  And that was
23  the -- that was the outcome of how do we do
24  this in the most fair open manner.
25    Q    Would it be fair to say that you and

---

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

85

1   the leadership mutually decided that the
2   redistricting process would be open to members
3   of both parties?
4        A   Yes.
5        Q   And you mentioned that some members
6   wanted changes that wouldn't work. What -- do
7   you recall what those changes were?
8        A   They were just things that fell
9   outside the boundaries that we had that would
10  have jeopardized the map. There were some of
11  them that wanted to makes that just didn't
12  work. Some of them wanted to make changes that
13  the other members didn't want to agree to, so
14  it just fell outside of the parameters we had
15  given them in order to make a change.
16       Q   And which members were that?
17       A   I honestly -- I don't, I don't
18  recall the number, the people. There were
19  several people. And when they came to me in
20  some instances, I'd just say go talk with the
21  office. And then they'd go to the office and
22  find out that, you know, what they wanted to do
23  wouldn't work. But I don't have specifics on
24  those.
25       Q   Do you recall whether or not there

86

1   were parts of the state in which members wanted
2   to make changes in 2015 but ultimately no
3   changes were made because it wouldn't work?
4        A   Here again, I don't, I don't recall
5   specifically. I know there were some south
6   Georgia districts that are huge that encompass,
7   you know, five, six counties. And some of
8   those that the member had asked to look at just
9   did not work, did not work.
10       Q   When you refer to south Georgia --
11       A   Excuse me.
12       Q   When you refer to south Georgia,
13  does that include the entire area extending
14  from the southwestern portion of the state over
15  to Savannah? What do you --
16       A   Yeah.
17       Q   Strike that. What do you mean when
18  you refer to south Georgia?
19       A   Quite a bit is just rural Georgia.
20  When you get past the metro area down south, I
21  mean, you can talk about Albany and Bainbridge,
22  you know, all of those areas in there, all the
23  way across to Waycross, all the way to
24  Savannah.
25       So when I say south Georgia, I mean

87

1   south Georgia, basically south of the metro
2   area. Most of those where population had
3   shifted to the point that some of the districts
4   had, had to be enlarged to have the right
5   number of population.
6        So it's, it's those districts,
7   basically, away from the metro.
8        Q   Before becoming chair of the
9   Reapportionment Committee, did you have any
10  prior experience with redistricting?
11       A   Not directly, no. The only
12  experience I had had was when we went through
13  the redistricting after the 2010 census. All
14  of us went in to discuss our district and
15  looked like it was going to be -- that was my
16  exposure to the real process itself.
17       Q   And when you say you went in, do you
18  mean to the Reapportionment Office?
19       A   Yes.
20       Q   And did you have a long meeting with
21  folks at the Reapportionment Office in 2011?
22       A   I don't recall it being a long
23  meeting.
24       Q   And did you request any specific
25  changes to be made to your district?

88

1        A   I did not.
2        Q   And besides that single meeting with
3   the Reapportionment Office, you didn't have any
4   experience with redistricting prior to becoming
5   chair in 2013?
6        A   That's correct.
7        Q   Did you have any background with
8   using GIS, Maptitude, or other kinds of mapping
9   software at the time you became Reapportionment
10  Committee chair?
11       A   No, I did not.
12       Q   Were you familiar with what
13  traditional redistricting principles were at
14  the time you became Reapportionment Committee
15  chair?
16       A   When you -- what do you mean by
17  traditional? There, I --
18       Q   Sitting here today, are you familiar
19  with what traditional redistricting principles
20  are?
21       A   Here again, it depends on how you
22  define traditional. You know, they've been
23  done in somewhat the same fashion, I'm sure,
24  for a long time, probably a lot more
25  sophisticated now due to the extreme detail

Donovan Reporting, PC                                    770.499.7499

89

1   that they have on the maps down to the street
2   level.
3       So I know that at times they didn't
4   have that much detail, but it was still the
5   same type of process, whereas now we can get
6   down to the street level. You know, back then,
7   they picked a river or something. They had to
8   have a little different way of bounding.
9       But if that's what you mean as
10  traditional, yeah, I had some familiarity with
11  that.
12      Q    And sitting here today, can you name
13  any traditional districting principles?
14      MR. KHOURY: Object to the form of
15  the question. You can answer it if you know
16  what that means.
17      A    I really don't, unless you can
18  somehow better explain to me by what you mean
19  by traditional. I mean, it's a process that's
20  been happening ever since we became a state, I
21  assume. So I'm sure there are things that
22  happen the same way now. There's much more
23  sophistication maybe than there was before.
24      Q    Had you undertaken any kind of
25  research or study into redistricting prior to

90

1   becoming chair of the Reapportionment
2   Committee?
3       A    No.
4       Q    What qualifications do you have that
5   made you the most suitable person in the
6   Georgia legislature to serve as Reapportionment
7   Committee chair?
8       MR. KHOURY: Object to the form of
9   the question. You can answer.
10      A    The Committee on Assignments chose
11  me.
12      Q    And while you served as -- strike
13  that.
14      Subsequent to your appointment as
15  committee chair, what training in
16  redistricting-related matters did you undertake
17  or were given to you?
18      A    I had no formal training other than,
19  as I said, the discussions with the office
20  there in terms of some of the things that they
21  did, you know, what do you do.
22      Q    And what did they tell you?
23      A    They said, we figure out where the,
24  where the people live. We -- they've gotten a
25  very sophisticated map, and we use this to put

91

1   together the districts. And essentially, that
2   was their -- that was their thing, not mine, in
3   terms of the very sophisticated statistics they
4   get down to.
5       Q    Did they tell you anything else with
6   respect to redistricting?
7       A    I'm sure that they did, but what
8   specifically are you looking for?
9       Q    Did they, for example, train you on
10  how to use mapping-related software or things
11  of that nature?
12      A    No.
13      Q    Did they give you any training on
14  analyzing elections?
15      A    No.
16      Q    In the course of getting up to speed
17  for serving as chair of the Reapportionment
18  Committee, did you ever talk with Dan O'Connor
19  from the Reapportionment Committee?
20      A    Yes.
21      Q    And did you speak with him
22  frequently or from time to time?
23      A    From time to time. Of course, I
24  spoke with all the people in the office there
25  as they were working on this, they would --

92

1   when I'd go to the office, you know, but not
2   very -- I mean, there was no organized meeting
3   or schedule of meetings with them.
4       Q    When you say, "from time to time,"
5   would you talk with Mr. O'Connor once every few
6   weeks or few days, few months?
7       A    Well, depending on what we were
8   doing. When we were in the -- when we were
9   trying to finalize this, I talked to him
10  probably daily trying to put the -- as all of
11  the pieces were coming together to develop the
12  legislation, since I was going to carry it.
13      On a general basis, those first
14  couple of years, it was, you know, other than
15  just when I happened to see him, you know, it
16  was probably every other week.
17      And here again, we were on the same
18  floor there, so it wasn't unusual to meet him
19  in the hall, hey, what's going on, and that
20  kind of thing, but not a -- not any type of
21  formalized, detailed meeting.
22      Q    And when you were talking with
23  Mr. O'Connor, what were you talking to him
24  about?
25      A    There was no specific subject. If

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

30 (Pages 93 to 96)

93
1   he had been working with one of the members, it
2   might be something, you know, you know, will
3   this work within the parameters we've got, what
4   do you think about it, that type of
5   conversation.
6       Q    Was he involved in the redistricting
7   process in 2015?
8       A    Yes.
9       Q    And what was Mr. O'Connor's role
10  with respect to the 2015 redistricting process?
11      A    Dan probably knows more about the
12  maps than any human being alive, and he was --
13  Dan could stand right here probably and name
14  every district and pretty much give you the
15  boundaries.  So he was, he was one of those
16  people that had -- knew all the stats, the
17  statistics, and he was much deeper than I could
18  ever be.
19          So usually, it was just, Dan, does
20  this meet the parameters or not?
21      Q    And when you say "the parameters,"
22  was he conducting analyses to determine whether
23  the districts complied with the law?  You know,
24  what, what kinds of analysis was he
25  undertaking?

94
1       A    Everything that you go through in
2   the redistricting process.  You know, all the
3   statistical information, that's what Dan does.
4       Q    And what statistics would Dan
5   discuss with you?
6       A    Very seldom was it a -- was it
7   specific statistics.  It was, you know, is
8   this -- if we do this, is it going to affect
9   the integrity of the maps?  Are we going to
10  create problems if we should do this?  Does
11  this fit within -- does everybody agree?
12          My conversations with him was not
13  into the very specific statistics.  But here
14  again, does it fit within the parameters that
15  we've discussed earlier?  You know, is it --
16  make sure that the map -- the integrity of the
17  map's not violated.  You know, does everybody
18  agree?
19          Those were the type things, again,
20  very high level.  I did not get down into
21  individual statistics with him.
22      Q    And when you say protect the
23  integrity of the map, what do you mean by that?
24      A    Like I've told you several times, we
25  were very proud of the maps that were drawn

95
1   that were not challenged.  They had been
2   accepted by the Obama administration's Justice
3   Department.
4           So when I say the integrity of the
5   map, we didn't want to do anything that would
6   call those into question and cause us problems
7   that we didn't have.
8       Q    And with respect to the 2015
9   redistricting specifically, what was the
10  breakdown of labor, if you will, in terms of
11  the roles and responsibilities that you had
12  and -- strike that.
13          What was the division of labor with
14  respect to responsibilities for drafting and
15  analyzing the 2015 bill as it progressed?
16      A    The Reapportionment Office, I mean,
17  they were the primary factor there in terms of
18  putting it together, legislative counsel,
19  again, to make sure that it fit within all the
20  parameters.
21          My, my job was to coordinate and
22  make sure that everybody was in agreement, to
23  make sure that we were staying within the
24  parameters that we had set, and make sure that
25  I was comfortable enough to be able to present

96
1   it and pass the legislation, carry the
2   legislation.
3           But the primary responsibility was
4   the Reapportionment Office and probably hand in
5   hand with legislative counsel.
6       Q    And what was the breakdown of roles
7   and responsibilities within the Reapportionment
8   Office?
9       A    I couldn't tell you.  You would need
10  to talk with the executive director there.  She
11  could give you that.
12      Q    Who did you interact with most
13  frequently when you needed to contact someone
14  at the Reapportionment Office?
15      A    Usually the executive director, with
16  Gina.
17      Q    Other than Ms. Wright and
18  Mr. O'Connor, did you interact with anyone else
19  at the Reapportionment Office regarding the
20  2015 redistricting plan?
21      A    You know, occasionally I would --
22  Brian would be working on it as well.  The
23  front desk secretary, you know, in and out with
24  her.  So, yeah, there was, there was
25  interaction.  But as far as specifics, it was

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

31 (Pages 97 to 100)

97

1  more Gina and Dan in terms of, you know, is
2  this going well, or is this not going well?
3  Are we good with what people are asking? Can
4  we -- can we do it?
5      Q    What was your role as committee
6  chair with respect to getting House Bill 566
7  through the legislature?
8      A    As the committee chair, I was the
9  sponsor of the bill. So --
10     Q    Is that an automatic thing, that the
11 chair of the committee is a sponsor of the
12 bill?
13     A    In my experience, that's usually
14 been true. When, when Roger was there, I know
15 Roger carried the legislation. So I can't tell
16 you -- in my experience, that's true, yeah.
17     Q    And beyond serving as -- strike
18 that.
19          As committee chairman and sponsor of
20 the bill, what were your responsibilities with
21 respect to helping the legislation move along?
22     A    Essentially being able to explain,
23 it, here again, to tell why we were doing it,
24 to explain that the members had agreed to it,
25 to explain that we had gone through the process

98

1  to make sure that we stayed within the
2  parameters and didn't jeopardize previous work,
3  to, to let them understand the process we had
4  gone through and make them comfortable that
5  they would be willing to support that.
6      Q    And when you explained to other
7  legislators why you were pursuing House
8  Bill 566, what did you tell them?
9      A    Essentially that we had chosen to do
10 that in the mid-cycle, which is perfectly
11 permissible, that we'd had a number of people
12 who had asked over the last couple of years the
13 possibility of making changes and that the
14 leadership had agreed that we would make those
15 changes, that we have worked within all the
16 parameters that I've described to you, and that
17 this is, this is something we can, we can feel
18 comfortable voting for.
19     Q    Was it your responsibility to
20 facilitate committee hearings on House Bill
21 566?
22     A    Yes.
23     Q    Was it your responsibility to decide
24 whether the redistricting bill would have a
25 public hearing outside of, outside of the

99

1  committee hearing process?
2      A    It, it was, but our hearing was a
3  public hearing when we, when we met.
4      Q    And you're referring to the
5  committee hearing.
6      A    Yes.
7          (Whereupon a document was identified as
8  Plaintiff's Exhibit 88.)
9      Q    Is that correct? I'm going to hand
10 you what I've marked as Plaintiff's Exhibit 88.
11 What is this document?
12     A    This is the website page for
13 Chairman Lane from the 2011-2012 session.
14     Q    And the members of the Legislative &
15 Congressional Reapportionment Committee in the
16 2011-2012 regular session included Chairman
17 Lane, Vice Chairman Ramsey, Doug McKillip,
18 Sharon Beasley-Teague, Ellis Black, Bob Bryant,
19 Tom Dickson, Matt Dollar, Earl Ehrhart, Henry
20 Wayne Howard, Sistie Hudson, Mack Jackson, Sean
21 Jerguson, Jan Jones, Rahn Mayo, Barbara Massey
22 Reece, Ed Rynders, Lynn Smith, Richard
23 H. Smith, Mickey Stephens, Willie Talton, and
24 John Yates; is that correct?
25     A    You know, I was not on there. I'm

100

1  assuming that the information you have produced
2  here is true. That's what's on the sheet that
3  you gave me, yes.
4          (Whereupon a document was identified as
5  Plaintiff's Exhibit 89.)
6      Q    I'm handing you what I'm marking for
7  identification as Plaintiff's Exhibit 89.
8          And what is this document?
9      A    This is my -- well, the committee
10 web page for 2013-2014.
11     Q    And it lists the committee members
12 for -- on the Reapportionment Committee during
13 that session; correct?
14     A    Yes.
15     Q    And those members include, in
16 addition to yourself, Susan Holmes, Ed Rynders,
17 Kimberly Alexander, Sharon Beasley-Teague,
18 Ellis Black, Kevin Cooke, Pam Dickerson, Tom
19 Dickson, Matt Dollar, Earl Ehrhart, Mack
20 Jackson, Jan Jones, Rahn Mayo, Sandra Scott, Ed
21 Setzler, Lynn Smith, Richard Smith, Mickey
22 Stephens, Willie Talton, Able Mable Thomas, and
23 John Yates; correct?
24     A    That is correct.
25          (Whereupon a document was identified

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

101

1    as Plaintiff's Exhibit 90.)
2    Q    Now handing you what I've marked
3    for identification as Plaintiff's Exhibit 90.
4    And what is this document?
5    A    This is the committee web page for
6    the 2015-2016 session.
7    Q    And this document lists the
8    committee members on the Reapportionment
9    Committee during that session; correct?
10   A    That is correct. I believe those
11   are the members.
12   Q    And the committee members, include,
13   in addition to you, Susan Holmes, Ed Rynders,
14   Kimberly Alexander, Sharon Beasley-Teague,
15   Kevin Cooke, Pam Dickerson, Tom Dickson, Matt
16   Dollar, Chuck Efstration, Earl Ehrhart, Matt
17   Jackson, Jan Jones, Rahn Mayo, Sandra Scott,
18   Ed Setzler, Lynn Smith, Richard H. Smith,
19   Mickey Stephens, Able Mable Thomas, and John
20   Yates; correct?
21   A    That is correct.
22        (Whereupon a document was identified as
23        Plaintiff's Exhibit 91.)
24   Q    Handing you what I've just marked
25   for identification as Plaintiff's Exhibit 91.

102

1    And what is this document?
2    A    This is the committee web page for
3    the 2017-2018 session.
4    Q    And while you are not chairman of
5    the committee, at that time you were -- you're
6    still a member; correct?
7    A    That is correct, yes.
8    Q    And the members of the committee,
9    in addition to you, include Chairman Johnnie
10   Caldwell, Vice Chairman Chuck Efstration,
11   Susan Holmes, Kimberly Alexander, Sharon
12   Beasley-Teague, Kevin Cooke, Pam Dickerson,
13   Matt Dollar, Earl Ehrhart, Rich Golick, Mack
14   Jackson, Jan Jones, Ed Rynders, Sandra Scott,
15   Ed Setzler, Lynn Smith, Richard H. Smith,
16   Mickey Stephens, and Able Mable Thomas;
17   correct?
18   A    That, that is the list. I believe
19   that is true.
20   Q    All right. I'd like to turn back
21   to the 2015-2016 session.
22   A    Uh-huh (affirmative).
23   Q    And I wanted to ask you what the,
24   what the breakdown of the reapportionment --
25   strike that.

103

1         Which members of the Legislative &
2    Congressional Reapportionment Committee in the
3    2015-2016 session were Republicans?
4    A    You want me to go down by name?
5    Q    Yes.
6    A    I believe I can get all of these
7    right. Myself, Susan Holmes, Ed Rynders,
8    Kevin Cooke, Tom Dickson, Matt Dollar, Chuck
9    Efstration, Earl Ehrhart, Jan Jones, Ed
10   Setzler, Lynn Smith, Richard Smith, and John
11   Yates.
12   Q    And which members of the
13   Reapportionment Committee in the 2015-2016
14   session are African-American?
15   A    Able Mable Thomas, Mickey Stephens,
16   Sandra Scott, Rahn Mayo, Matt Jackson, Pam
17   Dickerson, Sharon Beasley-Teague, Kimberly
18   Alexander. I believe, I believe that's,
19   that's correct.
20   Q    How many of the -- strike that.
21        Which members of the
22   Reapportionment Committee represent districts
23   that are wholly or partly in Gwinnett County?
24   A    I honestly could not tell you that.
25   I don't, I don't have that information.

104

1    Q    Okay. Do you know if
2    Representative Efstration's district is wholly
3    or partly within Gwinnett County?
4    A    I do not.
5    Q    And do you know if any of the
6    members of the Reapportionment Committee
7    represent districts wholly or partly within
8    Henry County?
9    A    I do not.
10   Q    What is the process by which
11   members get selected to serve on committees?
12   A    That's a function of the leadership
13   of the Speaker's office of the Committee on
14   Assignments.
15   Q    And what is the process by which --
16   strike that.
17        Does the leadership of the minority
18   party determine which members of the minority
19   party serve on the Reapportionment Committee?
20   A    I don't know.
21   Q    But with respect to the majority
22   party, that determination is made by the
23   Speaker and the Committee on Assignments?
24   A    Correct.
25   Q    All right. What was your -- strike

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

105

1  that.
2       In the course of drafting the House
3  Bill 566 and the subsequent hearing process,
4  what documents did the Reapportionment
5  Committee generate?
6       A   They -- of course, each, each
7  district had its own map they was -- they
8  would generate, and I can't remember if that
9  was actually presented to the, to the entire
10 committee or even to the body. But they
11 generated that.
12      They generated the bill itself that
13 had the legal descriptions on it. And I
14 believe, if I recall, we had a map that just
15 showed the -- in colors, you know, where the
16 districts were that were being affected.
17      And there could have been more
18 documents, but that's all I specifically
19 remember.
20      Q   And how would you communicate with
21 committee members to share documents with them
22 related to House Bill 566?
23      A   Essentially, the members, if they
24 had questions, was the same as a member who
25 wanted to change -- you would need to go -- if

106

1  you want the specifics on it, go to the office
2  and get with, with them and let them give you
3  the specifics. Let them give you the details.
4       Q   And -- strike that.
5       Are committees required to retain
6  documents produced in the course of evaluating
7  bills or hearing bills?
8       A   I'm not aware of what the
9  requirements are. I know that most of this,
10 of course, is on computer now. You can, you
11 can see all the stuff. I would be most
12 assured that the Reapportionment Office has
13 all of this.
14      But as far as, as the requirements
15 to retain it, I honestly don't know.
16      Q   What documents -- strike that.
17      Did you have a policy with respect
18 to retaining documents related to House Bill
19 566?
20      A   I didn't have a policy. What I
21 would do is I would have what I presented to
22 the, to the body. That was essentially what
23 I, what I had, you know, essentially going
24 over what we've already discussed.
25      This is why, this is why we're

107

1  doing it. This is why I think you can be
2  comfortable with the, the bill. And that was
3  it. I did not have -- there was no big file
4  on it in terms of, of documents other than
5  what the Reapportionment Office itself may
6  have kept or what was required.
7       The clerk's office keeps a lot of,
8  a lot of that as well, but I don't know the
9  requirements, and I did not have a file on it.
10      Q   What documents -- strike that.
11      Would you provide documents to the
12 clerk's office for them to retain?
13      A   No.
14      Q   Does Georgia law require that
15 official records related to any changes
16 affecting voting precincts be retained for a
17 certain amount of time?
18      A   I don't know.
19      Q   Do you know if any document --
20 strike that.
21      Outside of the bill itself and any
22 analyses maintained by the Reapportionment
23 Office, did the House committee generate or
24 receive any other documents or records related
25 to the 2015 redistricting?

108

1       A   Not that I'm aware of.
2       Q   Have you kept any House
3  Reapportionment Committee documents in your
4  possession?
5       A   I've got the notes that I had when
6  we presented it is the only thing.
7       Q   And you still have those in your
8  possession today?
9       A   Yes.
10      Q   And have you produced those notes
11 to your counsel?
12      A   I have not. I don't, I don't know
13 that it was, it was ever solicited, but I have
14 those.
15      Q   And what do those notes consist of?
16      A   Primarily what I've told you all
17 along: the basis for why we did it, how we
18 did it, the parameters, and the -- I think I
19 had a one-page picture of where the districts
20 were that were being changed.
21      But again, going back to the fact
22 that everybody agreed, the fact that, you
23 know, we were very -- every, everything was
24 done within the parameters to make sure that
25 we did not, you know, affect the integrity of

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

109

1   the map that we had, had done well on before.
2         Essentially, those, those were the
3   things that I kept in my notes that I had to
4   use to present the bill. I don't think
5   that 1 -- I'm trying to remember. Probably
6   not three pages in there, but those are the
7   things that I had to feel comfortable with to
8   go to the well.
9         Q    It was basically an outline of your
10  presentation for the committee or --
11        A    Yeah.
12        Q    -- House floor?
13        A    Yes.
14        Q    And did you produce those notes
15  yourself?
16        A    In terms of like handwritten?
17        Q    Did you create the notes or outline
18  yourself?
19        A    Most of it, I did. Now, the
20  Reapportionment Office created the map, you
21  know, that they gave to me and those things.
22  But other than that, yeah, there was no
23  outside source. The -- with my legislation, I
24  take the things that I, that I've got to
25  present and put it together myself.

110

1         There was no outside documentation
2   there, if I understand your question
3   correctly.
4         (Whereupon a document was identified as
5         Plaintiff's Exhibit 92.)
6         Q    You do. Thank you.
7         I'm handing you what I've marked
8   for identification as Plaintiff's Exhibit 92.
9   Representative Nix, is my understanding
10  correct that the 2011 redistricting wasn't
11  a -- didn't affect you in a major way?
12        A    Again, it depends on how you define
13  major. A great deal of my district moved to
14  the north, as a number of districts did. I
15  lost voters in my home county and picked up
16  voters in Carroll County. Whether you can
17  call that major or not, it was -- I would call
18  it significant.
19        Q    Your district was underpopulated at
20  the time of the 2010 census and needed to pick
21  up population; is that correct?
22        A    It wasn't underpopulated. The
23  underpopulated districts were the south of us,
24  and everything kind of got pushed to the
25  north. The growth had been in the northern

111

1   part of the state, so a lot of those districts
2   got pushed to the north, including mine.
3         Q    And did you have to negotiate
4   changes concerning -- strike that.
5         When you met with the
6   Reapportionment Office to discuss the changes
7   to your district, did you suggest any changes
8   to what they proposed, or were you okay with
9   what they'd given you?
10        A    Well, like most anybody else, I
11  wanted to keep as much of my home county as I
12  could. I said, you know, I'd really rather
13  keep that. And the maps just didn't, didn't
14  support that.
15        The other alternative that was
16  given to me was to move into Coweta County,
17  which I did not know the people over there. I
18  knew the people in Carroll County. So I said,
19  if I've got to pick up additional folks, I'm
20  already familiar with the leadership up there.
21  We'll go there.
22        It was not a, it was not a
23  contentious meeting. It was -- I would have
24  rather have kept my old district. But just by
25  nature of what happens when you do this with

112

1   requirements that are south of us, I got
2   pushed up.
3         Q    Did your personal experiences
4   during the 2011 redistricting affect your
5   approach with respect to your role as
6   Reapportionment Committee chair?
7         A    Only that I saw what extreme data
8   it takes to put this together. I think that
9   would be the only way that it affected me. Up
10  until that time, I had no idea the amount of
11  data that they had on a map and the way that
12  the districts were, were assembled.
13        Q    When you met with the
14  Reapportionment Committee, what statistical
15  data did they share with you?
16        A    Basically, it was population data
17  and the fact that the folks that were south of
18  me, in order to maintain their districts, had
19  to pick up population to the north. So it was
20  basically the population migration -- not
21  migration, but the population growth in the
22  north part of the state versus the southern
23  part of the state, the metro area and the
24  northern area, was the primary driver of
25  everything that we did.

113

1    And that's why I did not try to
2  raise any objection because I understood what
3  they were up against, that, you know, they had
4  to try to make those things work. And, you
5  know, I wasn't 100 percent happy, but, you
6  know, I respected the fact that they had, had
7  a job to do.
8    And I felt like they did it as best
9  they could even if it didn't -- I wasn't a
10  hundred percent happy.
11    Q    At the time of the 2011 and the
12  2012 redistricting, did you ever consider or
13  concern yourself with any of the State House
14  districts other than yours?
15    A    Well, just by nature of the fact
16  that I was giving up some and taking some,
17  yeah, yeah. Just looking at, you know, the
18  fact that a number of precincts that I had in
19  the LaGrange area that I was very familiar
20  with, I was going to be giving up, that the
21  person south of me, who happened to be John
22  Pezold, was going to pick up, and that I was
23  taking some, some of the precincts that were
24  in the northern area there that, that a
25  previous Representative had as well.

114

1    So, yeah, that was, that was the
2  biggest concern about those. And as I said,
3  with Coweta County, with that as an option, I
4  just felt like that, rather than try to have
5  to learn a whole new set of leadership over
6  there, that I was content to stay within the
7  counties that I had.
8    Q    And have you ever -- strike that.
9    As you became Reapportionment
10  Committee chair and took a look at the
11  existing House districts, did you ever have
12  any concerns that the existing plan violated
13  federal or state law?
14    A    No.
15    Q    Did you ever have any concerns that
16  the existing plan contained any technical
17  mistakes or errors in terms of the description
18  of any districts?
19    A    No.
20    Q    Did you have any concerns that the
21  existing plan was unfair to any racial or
22  ethnic minority group?
23    A    No.
24    Q    Did you have any concerns that the
25  2012 plan contained districts that were

115

1  misshapen or not sufficiently compact?
2    A    No.
3    Q    Did you have any concerns that the
4  2012 plan unduly split voting precincts or
5  counties?
6    A    No.
7    Q    Did you have any concerns that the
8  2012 House plan did not sufficiently keep
9  together communities of interest?
10    A    No.
11    Q    At the time of the 2015
12  redistricting, did you have any concerns that
13  the 2012 had any unequal population deviations
14  that needed to be fixed?
15    A    Now, this is the 2012? What --
16  state your question again, please.
17    Q    At the, at the time you -- of the
18  2015 redistricting, did you have any concerns
19  that the existing 2012 plan had unequal
20  population deviations that needed to be
21  corrected?
22    A    No.
23    Q    At the time that you were drafting
24  House Bill 566 in 2015, did you think that the
25  existing 2012 plan suffered from any legal,

116

1  technical, or other shortcomings?
2    A    No.
3    MR. POWERS:  This would be a fine
4  time to take a five-minute break, if that's
5  okay with you guys?
6    MR. KHOURY:  That's okay.
7    MR. STRICKLAND:  How much more you
8  got, John?
9    THE VIDEOGRAPHER:  Going off the
10  record at 3:46.
11    (Proceedings in recess, 3:46 p.m. to
12  4:05 p.m.)
13    THE VIDEOGRAPHER:  We're now back
14  on the video record at 4:05 p.m. This is the
15  start of video file number three.
16    MR. POWERS:  Great.
17    Q    Representative Nix, how many bills
18  did you sponsor while you were the chair of
19  the House Reapportionment Committee in the
20  2013 legislative session?
21    A    None.
22    Q    And how many bills did the
23  Reapportionment Committee consider during the
24  2013 legislative session?
25    A    None.

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix      Georgia State Conference of the NAACP, et al vs Kemp      January 10, 2018

117

1    Q    How many bills did the
2  Reapportionment Committee consider during the
3  2014 legislative session?
4    A    None.
5    Q    Did the Reapportionment Committee
6  consider any legislation -- strike that.
7        Did the House Reapportionment
8  Committee consider any legislation in the 2015
9  session other than House Bill 566?
10    A    No, not that I recall. I don't
11  believe we did.
12    Q    Did the House Reapportionment
13  Committee consider any legislation during the
14  2016 legislative session?
15    A    No, I don't believe we did.
16    (Whereupon a document was identified as
17    Plaintiff's Exhibit 93.)
18    Q    I am handing you what I'm marking
19  for identification as Plaintiff's Exhibit 93.
20  And before I forget, I'd like to ask you to,
21  when we're done with it, keep it to the side
22  or keep it somewhere nearby because we'll be
23  referring to it --
24    A    Okay.
25    Q    -- as we, as we go along. What is

118

1  Plaintiff's Exhibit 93?
2    A    That's the record of the votes
3  related to House Bill 566 from the 2015-2016
4  regular session.
5    Q    And it lists who the bill was
6  sponsored, by providing a summary of the bill,
7  a status history of the bill, and describes
8  votes?
9    A    Yes.
10    Q    And Ed Rynders -- Representative
11  Rynders, Holmes, and Stephens were cosponsors
12  with you; is that correct?
13    A    That is correct.
14    Q    And what was their role related to
15  the drafting and moving along of House Bill
16  566?
17    A    They were committee members, and
18  essentially they were kind of supportive of
19  what we were doing and were -- had agreed to
20  cosign it. There was no relationship other
21  than that they had agreed to be signers on the
22  bill.
23    Q    And did those sponsors have any
24  substantive role beyond that of other members
25  of the Reapportionment Committee?

119

1    A    Not that I know of, no.
2    Q    And the bill was sponsored in the
3  Senate by Senator Bill Cowsert; correct?
4    A    Correct.
5    Q    And what was his role with respect
6  to helping House Bill 566 move along?
7    A    He was the majority leader over
8  there, I think. And when I had talked to him
9  about moving the bill, he had agreed to, to
10  carry it in the Senate.
11    Q    And when did you talk with Senator
12  Cowsert about House Bill 566?
13    A    Probably about the time we passed
14  it in the House and it was time for it to go
15  over.
16    Q    So the Senate sponsor isn't
17  determined until the bill crosses over; is
18  that correct?
19    A    It, it's at different times.
20  Sometimes there may be one who -- somebody who
21  has an interest that follows it all the way
22  through. But in this case, it was not.
23    Q    And was Senator Cowsert chair of
24  the Senate Reapportionment Committee at the
25  time?

120

1    A    No.
2    Q    Who was the chair of the Senate
3  Reapportionment Committee at the time?
4    A    Senator Crane.
5    Q    And was it unusual for someone
6  other than the chair of the Reapportionment
7  Committee to sponsor a redistricting bill?
8    A    In my experience, I couldn't tell
9  you. I don't know from the past what the
10  Senate's done. The Senate does things
11  different than the House.
12    Q    And is the first reader summary
13  listed on Plaintiff's Exhibit 93 accurate as
14  far as you're concerned?
15    A    Yeah, I would -- it would appear to
16  be. You know, I would -- usually their
17  information is correct. I would have to look
18  at those things to be 100 percent sure,
19  certain, but I would say that it is, yes.
20    Q    And the status history lists all of
21  the significant events and dates in the life
22  cycle of House Bill 566; is that correct?
23    A    Yes.
24    Q    And let's start at the bottom and
25  make our way to the top. On March 5th, 2015,

Electronically signed by Joel Moyer (501-161-376-4513)                4dd8d33d-566f-46b5-8729-373a760afce8

121

1   it says, "House hopper." Correct?
2       A    Yeah. Okay.
3       Q    And what does that mean?
4       A    It's been dropped. The bill has
5   been given to the clerk's office.
6       Q    And so the bill was filed --
7       A    Yes.
8       Q    -- on March 5th, 2015? And then it
9   says on March 5th, 2015, "House first
10  readers."
11      A    Uh-huh (affirmative).
12      Q    What does that mean? And -- strike
13  that.
14           Let the record state that the
15  witness nodded affirmative.
16           March 5th, 2015, it says, "House
17  first readers." Correct?
18      A    It does, yes.
19      Q    Okay. What does House first
20  readers mean?
21      A    That's the process that the bill
22  has to go through and be read in front of the
23  House. Before it can ever come up, it's got
24  to have the readers come through. It's got to
25  have three reads of the bill.

122

1       Q    And does that mean that the bill is
2   read aloud on the House floor?
3       A    In practice, it is not -- the
4   complete bill is not read. It's usually the
5   header that's read.
6       Q    And when the -- strike that.
7            On March 9th, 2015, it says, "House
8   second readers." Correct?
9       A    Yes.
10      Q    And I take it that's -- on the 9th,
11  it was read a second time, or at least a
12  summary was read a second time on the House
13  floor?
14      A    Yes.
15      Q    And then on March 9th, 2015, it
16  says, "House committee favorably reported by
17  substitute." Correct?
18      A    Correct.
19      Q    And does that mean that the House
20  Reapportionment Committee voted in favor of
21  House Bill 566 on March 9, 2015?
22      A    Yes.
23      Q    And then on March 11, 2015, the
24  bill was read a third time on the House floor
25  and then passed by the House; is that correct?

123

1       A    That is correct.
2       Q    And it says on March 11th, 2015,
3   "House passed/adopted by substitute."
4       A    Correct.
5       Q    What does the adopted by substitute
6   mean?
7       A    When you have a substitute when you
8   introduce a bill, if anything changes in it,
9   it becomes a substitute. And due to the
10  nature of the bill, there were some changes
11  made, so there was -- the original bill was
12  not the one that was passed.
13           It was something that had some
14  different -- there was something different in
15  it. I don't know what it was, but that's why
16  it says a substitute.
17      Q    And because it says on March 9th,
18  2015, "House committee favorably reported by
19  substitute," is it fair to say that the
20  amendments were made in committee and then
21  subsequently approved by the House?
22      A    Yes.
23      Q    And then the Senate read the bill
24  and referred it on March 13th, 2015?
25      A    Yes.

124

1       Q    And then the Senate Committee
2   favorably reported the bill on March 27th,
3   2015?
4       A    Yes.
5       Q    And then the bill, House Bill 566,
6   was read a second time in the Senate on March
7   27th?
8       A    That's the status history that I'm
9   assuming is correct. That's what's on the
10  data -- documents you gave me, yes.
11      Q    And then the Senate passed and
12  adopted House Bill 566 on March 31st, 2015?
13      A    That's what the data states, yes.
14      Q    The bill was sent to the governor
15  on April 7th, 2015?
16      A    Correct.
17      Q    And the governor signed House Bill
18  566 into law on May 12th, 2015; correct?
19      A    That's what the data states, yes.
20      Q    And in the footnotes section, it
21  says March 11th, 2015, "Structured rule."
22  What does, what does that mean?
23      A    That means it cannot be amended
24  from the floor.
25      Q    Could amendments be made in Senate

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

38 (Pages 125 to 128)

125

1    Committee or, or could it not -- or could no
2    amendments be made in the Senate at all?
3        A    I believe that the Senate could
4    amend if they wished to.  But ours, ours was
5    strictly for the House.  The Senate, once they
6    get it, if they wish to amend it, I don't
7    think there's any reason they cannot amend it.
8        Q    And on looking down at the votes,
9    this provides a listing of the various votes
10   by the House and the Senate as a whole; is
11   that correct?
12       A    That, that is correct.
13       Q    So House Bill 566 was approved in
14   House vote 175 on March 11th, 2015; is that
15   correct?
16       A    That's what it states, yes.
17       Q    And then there are three votes in
18   the Senate; correct?
19       A    That is correct.
20       Q    And Senate vote 281 on March 31st,
21   2015, that's the final vote by the Senate to
22   adopt House Bill 566?
23       A    That is -- if the dates are
24   correct, that is correct.
25       Q    And 39 senators voted in favor of

126

1    House Bill 566?
2        A    That's correct, according to the
3    data.
4        Q    And 14 senators voted against House
5    Bill 566?
6        A    That is correct.
7        Q    And then on the next page, it lists
8    several versions.  And what, what do those
9    versions stand for?
10       A    Well, the -- any time the bill has
11   any change in it, it has a different number
12   assigned.  So the original bill starts off
13   7570, and then the amendments in the House
14   change it to 7599.  That's just an identifier.
15            And then when it goes to the
16   Senate, the Senate did attempt an amendment.
17   And then the 7599, which is what we passed, is
18   what came before the Senate.  Their amendment
19   apparently failed because if you see the
20   7599S, House substitute, that's what the
21   Senate approved.
22            So that's just the following of it
23   through the legislative counsel any time
24   changes or amendments are either made or
25   attempted.

127

1            (Whereupon a document was identified as
2    Plaintiff's Exhibit 94.)
3        Q    And I'm handing you what I've
4    marked as Plaintiff's Exhibit 94.  And is
5    this -- strike that.
6            What is this document?
7        A    I'm assuming that it is the final
8    product of House Bill 566 that -- well, I
9    don't see it stamped that this is the one that
10   was passed, but --
11       Q    Yeah.  Isn't this --
12       A    -- it is, it is the -- hold on just
13   a second.
14       Q    On the top right-hand corner of --
15       A    7570.  Yeah.  That appears to be
16   the original bill that was introduced.
17       Q    And that's, that's because it says
18   LC 28 7570 at the top?
19       A    That's correct.
20            (Whereupon a document was identified as
21   Plaintiff's Exhibit 95.)
22       Q    And to the best of your knowledge,
23   were there any -- well, strike that.
24            I'm now handing you what I've
25   marked for identification as Plaintiff's

128

1    Exhibit 95.
2            MR. STRICKLAND:  Is that the right
3    number?
4            MR. POWERS:  Yes.  Right?
5        A    It appears to be, yeah.  It's the
6    second one up there, the 7599S.  That would be
7    the substitute, the committee substitute.
8        Q    And so just to be clear,
9    Plaintiff's Exhibit 95 is the version of House
10   Bill 566 as passed by both the House and the
11   Senate?
12       A    It appears to be.  Now, normally,
13   the final bill would have the stamp on the
14   front, as passed the House and the Senate.  I
15   don't see that on here, but I believe that
16   this is, yeah.
17            (Whereupon a document was identified as
18   Plaintiff's Exhibit 96.)
19       Q    I'm handing you what I've marked
20   for identification as Plaintiff's Exhibit 96.
21   What is this document?
22       A    It appears to be an amendment that
23   was offered and -- in the Senate that was
24   lost, that did not pass.
25       Q    And the change in the Senate floor

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

129

1    amendment was to the effective date of the
2    legislation; correct?
3        A    Yes. That appears to be true.
4    This HB 566, by striking lines 815 and 816 and
5    in lieu thereof following: This act shall
6    become effective July the 1st of 2015.
7        Yes. That, that would have changed
8    it from where it says, "shall become effective
9    upon its approval by the governor or upon its
10   becoming law without such approval."
11       Q    Now, as the primary sponsor of
12   House Bill 566, were you the point person for
13   individual House members if they wanted to
14   discuss the idea of making changes to their
15   districts?
16       A    Essentially, yes. Now, once I made
17   the announcement to them, I told them they
18   could go directly to the office if they wanted
19   to because it was going to have to go through
20   them anyway. But some of them came to me, and
21   some of them didn't in terms of asking to do
22   it.
23       But when the announcement was made,
24   it was, you either need to let me know or you
25   need to get with the Reapportionment Office.

130

1    So whether or not that defines you -- me as
2    point man, that was the mechanics of it.
3        Q    And how would that conversation
4    typically -- strike that.
5        When a legislator approached you
6    and said, hey, I'd like to make some changes
7    to my districts, how would you proceed from,
8    you know, that inception point to getting
9    actual changes made in a bill?
10       A    Essentially, as I've told you, the
11   first discussion when they came to me was, you
12   know, we're looking at it.
13       You know, if you're -- if you're
14   serious, you need to go and get with the
15   Reapportionment Office. And here again,
16   you've got to make sure that the changes are
17   not major. They've got to be very, very
18   specific. And anybody who is touched by it
19   must agree to it.
20       Same, the same thing I told you
21   that I told to the whole group, that was
22   essentially what went to everybody because I
23   didn't get into the specifics of it. They'd
24   come and say, hey, I'm interested, or I think
25   I'd like to try to make this changes.

131

1        And my thing was, if they fit
2    within the parameters, we'll consider it.
3        Q    And did you ever have any kind of
4    involvement beyond that sort of initial stage
5    of essentially serving as a referral to the
6    Reapportionment Office with respect to the
7    substance of any actual changes?
8        A    Not, not any substantive things
9    after that because of the, here again, the
10   technical nature of it. The professionals in
11   the Reapportionment Office had to determine if
12   it was doable.
13       Q    And do you recall any legislators
14   coming to you to ask for guidance with respect
15   to redrawing their district?
16       A    Tell me what you mean by guidance.
17   My, my standing thing was, due to the very,
18   you know, the very complicated nature of it,
19   you've got to make sure that it, that it works
20   through the Reapportionment Office.
21       There was very little guidance
22   other than that, that it's got to be able to
23   fit within the parameters that we gave you, if
24   that's what you mean by guidance.
25       (Whereupon a document was identified as

132

1    Plaintiff's Exhibit 97.)
2        Q    I'm going to hand you what I've
3    marked for identification as Plaintiff's
4    Exhibit 97. And this is an email sent by Rich
5    Golick to Dan O'Connor, Bates page numbers
6    starting GA2-003403; correct?
7        A    Say that again now? What -- where,
8    where are you?
9        Q    The Bates page number is
10   GA2-003403?
11       A    Yes. I'm sorry. Yeah, yeah.
12       Q    And it's an email from Rich Golick
13   to Dan O'Connor; correct?
14       A    Uh-huh, uh-huh (affirmative).
15       Q    And it's dated Wednesday, August
16   19th, 2015; correct?
17       A    Correct.
18       Q    And you can feel free to, you know,
19   just read the first page and let me know when
20   you're through it.
21       MR. KHOURY: Yeah, you should read
22   the whole thing, not just the first page.
23       A    Okay.
24       Q    Did you speak with Representative
25   Golick about the possibility of making changes

Randall O. Nix            Georgia State Conference of the NAACP, et al vs Kemp            January 10, 2018

133

1    to his House district in 2015?
2        A    Yes.  He did, he did bring that up,
3    but you will see the date.  That was certainly
4    not within the, the session.  That was in
5    August after we had already done the bill.
6        Q    And so he initially approached you
7    after the end of the legislative session; is
8    that correct?
9        A    I don't recall, I don't recall the
10   conversation with him.  I'm just, I'm just
11   looking at the date of this.  It was not part
12   of the, the legislation or the discussion of
13   the legislation that we passed is the point
14   I'm making.
15       Q    And what did -- he says in the --
16   Representative Golick says in his email that
17   he wants to keep -- he says, "let's keep this
18   in reserve as a possibility depending on what
19   guidance I get from DR and Chairman Nix."
20   Correct?
21       A    Yes.
22       Q    And first, who is DR?
23       A    I don't -- I don't know.
24       Q    And when Representative Golick
25   approached you to discuss the redrawing of his

134

1    district, what did he ask you?
2        A    You know, I don't recall the
3    conversation that I had with him.  But as I
4    did with everybody else, I said, if you want
5    to do this, you've got to get with the
6    Reapportionment folks and see if they feel
7    like it would fit within the parameters that
8    we've had.
9        And since it was passed, the
10   legislative session, it would, it was -- you
11   know, it would have to be determined whether
12   or not later it would be taken up.  It had to
13   have been a separate bill.
14       So any conversation I had to him
15   would have been the same as before.  You've
16   got to get with the legislative counsel -- not
17   legislative counsel.  You've got to get with
18   the Reapportionment Office and have them look
19   at the specifics and see if it will work.
20       Q    But hadn't he already done that?
21   It looks like Representative Golick and Dan
22   O'Connor had already met in the middle, the
23   middle of the page.  Do you see where he says,
24   "compared to 54.3 percent in version we did
25   this morning"?

135

1        A    Yeah. .
2        MR. KHOURY:  Object to the form of
3    the question.  Are we -- are you asking --
4    when you say, already done that, I'm confused
5    about what sequence you're asking him about,
6    John.  I'm not sure -- was there a date
7    established for when he talked to
8    Representative Golick?
9        MR. POWERS:  Fair enough.
10       Q    Do you recall -- strike that.
11       When did Representative Golick
12   approach you regarding redrawing his district?
13       A    I honestly cannot give you a date.
14   I remember he had asked me about it.
15   Everything else had been done.  And the gist
16   of the conversation was that it would have to
17   be something that would have to be considered
18   later because we had already passed the other
19   bill.
20       So it was obviously after the other
21   when this was brought to my attention.  I'm
22   not -- you know, I was not privy to this.  I
23   don't recall this coming before me.  But he
24   obviously had gone to legislative counsel,
25   which I would have directed him to do -- not

136

1    legislative counsel.  I'm sorry -- to the
2    Reapportionment Office and have them look at
3    it.
4        Q    Did -- do you believe he spoke with
5    you after August 19th, 2015?
6        A    Here again, I don't recall it.
7        Q    And what did you and Representative
8    Golick talk about with respect to the
9    redrawing of his district?
10       A    Here again, very little other than,
11   if you think it's something that needs to be
12   done, if you want to do it, let's get it
13   approved, let's get the specifics on it before
14   we even go any further in terms of --
15       Just like everybody else, if you,
16   if you feel like it's something that can be
17   done and needs to be done, you'll have to have
18   Reapportionment Office tell me that it fits
19   within the parameters we want to fit it in.
20       Q    And did that in fact happen?
21       A    No.  We didn't -- I don't, I don't
22   recall acting on this at all.
23       Q    Did folks at the Reapportionment
24   Office discuss the redrawing of Representative
25   Golick's district with you?

Donovan Reporting, PC                                                    770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

137

1    A   I don't recall that they did.
2    Q   When -- strike that.
3        Did Representative Golick tell you
4    why he was interested in redrawing his
5    district?
6    A   Here again, I don't, I don't recall
7    why he wanted to do the, the change. It was
8    something that he had apparently anticipated
9    that he wanted to do, but he had waited around
10   and had not brought it up when it came before
11   the House.
12       So it was, it was outside of the
13   time when we had been, had been working on it,
14   so it just put him back in the situation of
15   having to go do his own to get it ready.
16   Q   Did you ask him why he hadn't
17   brought this to your attention earlier during
18   the legislative session?
19   A   I don't recall asking him why. I
20   just told him that he was, he was too late for
21   what we had done in 2015 and it would have to
22   be something that would have to be looked at
23   later.
24   Q   Did other legislators approach you
25   after the session about making changes to

138

1    their districts in 2015?
2    A   I don't, I don't recall it. No.
3    Q   And did, did any legislators
4    approach you during 2016 about making any
5    changes to their districts?
6    A   I -- here again, I don't recall any
7    of them because we kind of made the point when
8    we did 2015 that we weren't going to be
9    looking to do anything -- you know, we had
10   tried to get everybody in there because we
11   didn't want to have to go back and reopen the
12   map and do that.
13       So if they did, most likely it
14   was -- you know, we did that last year would
15   be kind of the answer.
16   Q   Did anyone inquire with you
17   specifically?
18   A   Other than, other than this from
19   Rich, I don't recall anybody requesting
20   changes after, after the 2015 session when we
21   did the other bill.
22   Q   And did Representative Golick
23   provide you with any analysis of the effective
24   changes on his district?
25   A   No. Or if -- let's put it this

139

1    way. If he did, I don't recall it. This is,
2    this is the first detailed information I've
3    seen.
4    Q   And during the -- strike that.
5        Let's turn back to the 2015
6    legislative session. Which legislators
7    approached you and asked to have changes made
8    to their districts?
9    A   I don't know that I could list
10   them. At some point in time, everybody whose
11   district was touched probably came to me, so
12   you'd have to look at those districts and see
13   whose districts they are. But, but I couldn't
14   give you a list of people who came
15   specifically and said I want to change it.
16   Q   Did Representative Chandler
17   approach you at any point prior to or during
18   the 2015 session about having changes made to
19   her district?
20   A   I did talk to her, yes.
21   Q   And roughly when did you talk with
22   her?
23   A   Probably very early in the session
24   there, as we were beginning, when we said we
25   were going to look at doing some changes.

140

1    Probably early in that session, January to
2    February of 2015.
3    Q   And what was the nature of that
4    conversation?
5    A   She had indicated to me that she
6    was looking at her district. I don't remember
7    what the changes had been made, but she wanted
8    to see if she could move that district back to
9    some, some -- the district that she had had
10   prior to the redistricting, bring some people
11   back in there.
12   Q   Do you know -- strike that.
13       Was District 105 a district that
14   had been newly created following the 2010
15   census as a result of demographic or
16   population growth and -- in the Gwinnett
17   County area?
18   A   I don't, I don't recall that. I
19   don't know that.
20   Q   And she told you that she wanted
21   areas put back into her district that had
22   previously been in her district prior to the
23   2011 redistricting?
24   A   To be very specific to it, I had
25   several people that asked that. I can't give

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

42 (Pages 141 to 144)

141

1  you 100 percent that's what she asked
2  for, but that was what happened with a number
3  of those districts that had been, had been
4  split before.
5        So I can't give you the exact
6  conversation, but she was looking at what it
7  had been like I think prior to the
8  redistricting.
9      Q   When you say, "prior to the
10  redistricting," you mean prior to the 2011 --
11     A   Yes.
12     Q   -- redistricting?
13     A   Yes.
14     Q   And did she express an interest in
15  improving her political performance in --
16     A   Yes.
17     Q   -- the redrawn district?
18     A   Yes.
19     Q   And what discussions did you have
20  about improving Representative Chandler's
21  political performance?
22     A   The same thing I told you before.
23  Anybody that touches has to agree to it. The
24  Reapportionment Office has to go through the
25  numbers and make sure that it doesn't

142

1  jeopardize what we've done before. And if all
2  of those things can fall into place, then
3  we'll consider it.
4      Q   Did she ask you whether or not it
5  was something that you would agree to consider
6  yourself?
7        MR. KHOURY:  Object to the form.
8      Q   Strike that. I'll --
9      A   I'm sorry. If you would, rephrase
10  it.
11     Q   Yeah.
12     A   I'm not exactly sure what you're,
13  you're asking.
14     Q   I'll rephrase the question. Did
15  she ask you for any guidance regarding whether
16  or not she could have the district redrawn in
17  a way that would improve her political
18  performance?
19     A   I don't recall her asking for
20  guidance because, as I've said, the specifics
21  of that are very detailed, and any
22  conversation we had would have been referred
23  to the Reapportionment Office that you've got
24  to go get with them, let them look at what you
25  would like to do and what you would like to

143

1  accomplish and see if it will fall within the
2  parameters that we put out here.
3      Q   And did you participate in any
4  map-drawing sessions at the Reapportionment
5  Office?
6      A   I don't recall any of the
7  map-drawing sessions. I think that there were
8  several people there that would be touched by
9  that, and I went in when they were there
10  looking at the map. But it was not anything
11  in specific other than, you know, will
12  everybody be able to agree to this.
13        That was the only, that was the
14  only meeting that I recall going where they
15  were actually looking at the maps.
16     Q   And who was present for that
17  meeting?
18     A   You would have to look at the
19  people that, that this district touched that
20  would have had to agree with it. Several of
21  those people were there. I'm pretty sure that
22  the director, Gina Wright, was there. And I
23  don't recall who else was in that meeting.
24     Q   And this was a map-drawing session
25  related specifically to changes to

144

1  Representative Chandler's district?
2        MR. KHOURY:  Object to the form of
3  the question. I don't think he said it was a
4  map-drawing meeting.
5        MR. POWERS:  Okay. I'll rephrase
6  the question.
7      Q   Was this meeting at the
8  Reapportionment Office related to the
9  redrawing of Representative Chandler's
10  district?
11     A   It was a time when they, they
12  looked at scenarios to see if we -- could we
13  do this, this, or this. It was more of a
14  scenario and how will it affect the other
15  people, will everybody be able to agree to it.
16        But the biggest participation I had
17  was, within the parameters we have, will
18  everybody that it touches agree to it. That
19  was my, that was my participation in that.
20        It was not a map drawing, but it
21  was a question-answering session and is this
22  possible, will this fit within the box that
23  we're putting it in.
24     Q   And at this meeting, I'm just
25  trying to understand which districts were

Donovan Reporting, PC                                    770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

145

1  being looked at in terms of the various
2  scenarios. So is my, is my understanding
3  correct that this meeting involved
4  Representative Chandler's district and
5  other -- any other districts that might be
6  affected by the adjustments to her district?
7      A    Yes. Any district that it would
8  touch that would have possibly been changed,
9  yes.
10     Q    And do you recall whether or not --
11  strike that.
12         Was Representative Efstration
13  present at that meeting?
14     A    I'm not 100 percent sure, but I
15  think he was. I think his one was of the
16  districts that, that bordered hers, yes.
17     Q    And when did this meeting take
18  place?
19     A    It was early in the process of
20  trying to put the legislation together. I
21  couldn't give you a specific date, but it was
22  well before our, you know, before we took it
23  to the committee. We had to have all of
24  our --
25         As I said, we were trying to put it

146

1  all in one bill, so we wanted to make sure
2  everybody would agree before we took it in and
3  started trying to actually take action on it.
4      Q    So somewhere in the area of January
5  or February of 2015? Is that --
6      A    Yeah. That would be my best --
7  that would be my best guess.
8      Q    And there might have been members
9  of the Gwinnett County delegation present
10  other than Representatives Chandler or
11  Efstration; is that correct?
12     A    Yeah, because the -- I think the
13  biggest part of her district there is part of
14  Gwinnett, so it would be the people that
15  touched that district.
16     Q    And you mentioned that it was a
17  question-and-answer session
18  involving different possible scenarios; is
19  that correct?
20     A    Yes.
21     Q    And is it accurate to say that the
22  Reapportionment Office had drawn a couple of
23  different maps and would show them to you and
24  the other -- Representative Chandler and the
25  other affected legislators to see whether or

147

1  not they would go along with any of them?
2      A    As I recall that meeting, I don't
3  know that there were any specifically drawn
4  maps. But they took her district, and if
5  you've seen the sophistication of that
6  software, they could click over here and say,
7  if we were to do this, would this happen? If
8  we were to click over here and we would do
9  this, would this happen?
10         So there was nothing concrete. It
11  was more, if we do this, this happens. You're
12  okay with it if we do this. This happens,
13  you're okay with it.
14         So there were no maps drawn. But
15  due to the sophistication of the process, they
16  could say, okay, the goal we wanted to achieve
17  is this. If we do this, this could possibly
18  work here. It could possibly work here. It
19  could possibly work here. And that's the
20  essence of what they were doing.
21         I don't know if you've seen those
22  maps, but they're very sophisticated, and they
23  can drill down to, you know, a very low level
24  or very intense level of what's there.
25     Q    Help me picture this. First, this

148

1  meeting occurred in an office within the
2  Reapportionment Office; is that correct?
3      A    Yes.
4      Q    And is the -- was the map of the
5  House District 105 and the surrounding
6  districts sort of blown up on a screen?
7      A    Yes.
8      Q    And you and the other
9  representatives are sort of looking at the
10  screen up on the wall while Gina Wright is
11  clicking around and showing proposed changes?
12     A    Yes.
13     Q    And on the wall, could you see
14  statistical tables in addition to a map of the
15  districts?
16     A    Yes.
17     Q    And what -- the map presumably
18  included House District 105 and the
19  surrounding districts?
20     A    Yes.
21     Q    And the -- what information, you
22  know, how many tables were on the screen next
23  to the map?
24     A    There were multiple tables, and
25  they can click and bring up, you know, various

Donovan Reporting, PC                                        770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

149

1  sets of data, you know, anything from
2  Republican-Democrat to how did it perform in a
3  previous election.  Just a huge range of data
4  could be brought up.
5        Each, each time they would click,
6  each click would bring up -- they could drill
7  down, you know, further and further.  As some
8  of this states, those were the type things
9  they were looking at.  You could pull up and
10  see what, you know, how did this perform in
11  this election, how did it perform in this
12  election.
13        Those types of data sets would come
14  up as part of the, as part of the map.
15     Q     And just for the sake of the
16  record, you're referring to Plaintiff's
17  Exhibit 97; is that right?
18     A     Correct.
19     Q     And, and you were pointing towards
20  some of the political performance results for
21  past candidates in statewide elections; is
22  that correct?
23     A     Yes.
24     Q     And so to go back to the
25  visualization of the wall in the

151

1  at this, at this meeting?
2     A     The, the big thing was the
3  performance in Republican-Democrat voters and
4  how it affected one district, how it affected
5  the other.  If you were to move some to one
6  district, how would it affect that district,
7  et cetera.  It was primary a -- primarily a
8  political information that was -- that we were
9  looking at.
10     Q     And is it fair to say that the --
11  a concern at the meeting would have been to --
12  or was to find a way to improve the political
13  performance of Representative Chandler's
14  district without, without doing so much as to
15  maybe endanger other -- Representative
16  Efstration or other legislators in neighboring
17  districts?  Is that correct?
18     A     The -- the idea was to try to see
19  if her improvement -- her district performance
20  could be improved.  It wasn't so much an
21  engagement for them.  But as I said, everybody
22  had to agree.  So that term would have been
23  within their mind, you know, are you willing
24  to do this.
25        It was not a -- there was no hard

150

1  Reapportionment Office, you could see, is
2  it -- strike that.
3        Is it fair to say that you could
4  see how each click might change the political
5  performance of candidates in past statewide
6  elections?
7     A     Yes.
8     Q     And could you also -- were there
9  also tables displayed that showed a racial
10  breakdown of the population in the various
11  districts?
12     A     Yes.
13     Q     And was, was the data containing
14  the population breakdown by race census data,
15  or was it voter registration data?
16     A     I, I don't know.
17     Q     What other information was
18  contained in tables next to the, next to the
19  map on the screen?
20     A     As I said before, there was
21  multiple data sets.  I honestly could not tell
22  you what, what all of those were.  A lot more
23  than I could comprehend, I could tell you.
24     Q     Probably me too.  And what, what
25  were the various scenarios that were discussed

152

1  and fast rule, we will do this or this.  So
2  that's the reason we had everybody there.  I
3  wouldn't use the term to endanger, but --
4     Q     Okay.
5     A     -- is it -- will you agree to this.
6  And then they had to go through whatever
7  thought process they would as to whether or
8  not they would agree to the potential scenario
9  that was being, you know, being proposed.
10     Q     Right.  If you -- if you moved
11  Democratic voters out of Representative
12  Chandler's district, they had to go somewhere
13  else?
14     A     Yeah.
15     Q     And if you moved Republican voters
16  into Representative Chandler's district,
17  they'd have to come from somewhere else?
18     A     Yes.
19     Q     And do you have any, do you have
20  any recollection as to whether the data --
21  strike that.
22        Do you have any recollection as to
23  whether political performance data could be
24  sliced any lower than the voting precinct
25  level?

Donovan Reporting, PC                                    770.499.7499

153

1    A   Yeah. I mean, those -- the
2  sophistication of that map can take it down to
3  the block level, to the street level. They're
4  extremely sophisticated. You can get it down
5  to a very, very small geographical area.
6    Q   And when Gina Wright was clicking
7  around at the, at the Reapportionment Office
8  meeting, was she assigning individual census
9  blocks and low level geography below the
10  precinct level in and out of Representative
11  Chandler's district?
12    A   I believe that she did, yeah. You
13  don't want to split precincts. But for the --
14  running the scenarios that she ran, they were,
15  they were looked at even at a level below the
16  precinct level.
17    Q   And why, why didn't she want to
18  split voting precincts?
19    A   It's, it's just not a -- it becomes
20  more difficult when you -- if you split a
21  precinct, you know. You get people coming in.
22  You've got a split ballot. You know, half of
23  them can vote for me, and half of them can't.
24  It adds some levels of confusion.
25    It's, it's not that it's not ever

154

1  done, but it's -- if you can get away without
2  doing it, it's better. So that's always,
3  that's always a consideration.
4    Q   And at this meeting at the
5  Reapportionment Office, was there -- was any
6  kind of consensus developed as to the final
7  configuration of what, of what Representative
8  Chandler's district might look like in House
9  Bill 566?
10    A   If my memory's correct, going out
11  of that meeting, I don't know that we made any
12  final decision at that point. But everybody
13  had something to think about. And I think
14  that at a later time several of them went back
15  and got with the office and ran through the
16  scenarios again to make sure they fully
17  understood.
18    There's a tremendous amount of data
19  there, and I think some of them may have gone
20  back later and said, okay, let's look at this
21  a little bit closer. So when we left that
22  meeting, my recollection is there was no
23  definite thing that this is the way we're
24  going to do it.
25    It was more of a these are some of

155

1  the ways we could do it and be within the
2  parameters that, that we've laid out.
3    Q   And did the changes that you
4  discussed as being potential options coming
5  out of that meeting, did any of them involve
6  swapping out voters between Representative
7  Chandler's district and any district other
8  than Representative Efstration's district?
9    A   I don't recall. They were, there
10  were some other people in there. I don't
11  recall. My recollection is there were others
12  that were looked at besides his, but I can't
13  say that specifically there were other people
14  that were, that were looked at.
15    So without being 100 percent sure,
16  I think there were other scenarios besides
17  just his district.
18    Q   And is it your understanding that
19  there were subsequent meetings at the
20  Reapportionment Office involving
21  Representative Chandler and others that you
22  did not attend?
23    A   Yes.
24    Q   And would those meetings have been
25  in the same time frame of January, February of

156

1  2015?
2    A   Yes. They would have been leading
3  up to the, to the time when we -- when we had
4  our committee meetings, so probably all during
5  the month of February. Well, we introduced it
6  in March. They had already been working on
7  it.
8    But probably all during February
9  and in that early part of March because it
10  didn't -- it didn't come out of our committee
11  until March the 11th. So probably the
12  fourth -- at least four or five weeks leading
13  up to that, there were multiple meetings.
14    Q   Got it. And do you recall whether
15  or not there were any -- whether there was any
16  goal in terms of the percentage of Republican
17  performance that, that was hoped to have been
18  achieved in Representative Chandler's redrawn
19  district?
20    A   I don't recall any specific number.
21  The idea was can we improve it at all, so
22  there was no -- I don't recall any specific
23  number that says we'll move it this amount or
24  this amount or this amount because, here
25  again, we were trying to stay within the

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

157

1  integrity of the map so that we didn't violate
2  that.
3       So that's why those scenarios got
4  real complicated as we, as we began -- as we
5  worked on it and as we, as we talked about
6  them. That's why it had -- we had multiple
7  meetings to try to make sure we could make it
8  all fit in the box that we had.
9     Q    And were there any Reapportionment
10  Committee employees present at the meeting
11  other than Gina Wright?
12    A    I don't recall that.
13    Q    Okay. Did Representative
14  Strickland approach you about making changes
15  to his district in the 2015 legislative
16  session?
17    A    I don't know that he approached me.
18  I think he did go to the Reapportionment
19  Office once I had told him that we were going
20  to look at some of these scenarios and had
21  worked with him. I don't recall him coming
22  directly to me.
23       Had he done that, though, the story
24  would have been exactly what I told you. I'd
25  have just said you've got to go get with them.

158

1  So I don't recall a direct conversation with
2  him.
3     Q    Did Representative Yates speak with
4  you regarding making changes to his district
5  or Representative Strickland's district?
6     A    Representative Yates did speak with
7  me, and basically the essence of the
8  conversation was that he wanted to make sure
9  he understood what was going on.
10    Q    And when you say, "understood what
11  was going on," what do you mean by that?
12    A    At that point in time,
13  Representative Yates was probably 93 years
14  old. And if you think those maps confused me,
15  they really confused him. And he was just
16  concerned that, you know, the right process
17  was being followed.
18       And when we, when we talked about
19  it, I had him go back over there and let them
20  sit down and talk with him to make sure that,
21  that everything was as he thought it was. It
22  was an explanation to make sure he understood
23  the process.
24    Q    And so did you have some kind of
25  conversation or meeting with Representative

159

1  Yates and folks at the Reapportionment Office?
2     A    I don't recall that I did, no.
3     Q    So you just directed Representative
4  Yates to the Reapportionment Office to speak
5  with them about the changes that were being
6  made?
7     A    Yes.
8     Q    And did he express concern to you
9  that -- strike that.
10       What, what specifically was he
11  concerned about with respect to making sure
12  that the right process was being followed?
13    A    That his district would not be
14  adversely impacted.
15    Q    So is it fair to say that he was
16  concerned that efforts made to improve the
17  political performance of Representative
18  Strickland's district might negatively impact
19  the political performance -- his political
20  performance in his own district; is that
21  correct?
22    A    Yes, that was a concern. That was
23  why he was wanting -- that's why he asked
24  questions.
25    Q    And did you speak with

160

1  Representative Yates after he went to the
2  Reapportionment Office to, to meet with them?
3     A    I did not meet with him. I did get
4  his agreement after he had spoken with them
5  that he was okay with it.
6     Q    And did you speak with him about
7  that? How did, how did that conversation
8  happen?
9     A    It was probably a simple, did you
10  get with them, and are you okay with it?
11       And he said, yeah, I'm okay with
12  it.
13       There was no, there was no
14  detailed, you know, meeting. He just wanted
15  to be assured that his district was going to
16  be okay.
17    Q    And did you speak with
18  Representative Knight about the changes made
19  in the Henry County area?
20    A    I don't recall having a
21  conversation with him. I'm trying to check my
22  memory as to what his involvement was. I
23  don't recall conversations with Representative
24  Knight related to the changes.
25    Q    And did you have any conversations

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

161

1    with Representative Welch regarding the
2    changes to districts in the Henry County area
3    in 2015?
4        A    I'm -- I did have conversations
5    with him.  Again, it was to direct him.  He
6    had, he had some concerns.  Directed him back
7    to the Reapportion Office so that they
8    could address his concerns in terms of the
9    impact that the scenarios that we had looked
10   at would -- how it would affect his district.
11       Q    And what scenarios had you looked
12   at regarding House District 111?
13       A    I can't give you specific
14   scenarios.  It's like we had talked about on
15   Representative Chandler's district.  You know,
16   if we do this here, what will it do here?  If
17   we do this to this district, what does it do
18   to that district?
19            And if I recall correctly,
20   Representative Welch's district did join
21   Representative Strickland's district, if I'm
22   not mistaken.
23       Q    And when did you look at these
24   various scenarios in Henry County?
25       A    They were all drawn up in that same

162

1    time frame of trying to get it all together,
2    so it was probably in the same time frame we
3    looked at earlier, you know, February to early
4    March.
5        Q    Of 2015?
6        A    Yes.
7        Q    And did you look at these scenarios
8    on your own or as part of a meeting with -- at
9    the Reapportionment Office?
10       A    I did not specifically look at
11   those scenarios.  I don't think that we had --
12   or that I was engaged in a meeting like we
13   were with Representative Chandler.  I think
14   they probably did that, but I don't recall
15   being a part of that.
16            But I think they got together and
17   did the same type of thing that we'd done on
18   the other one.
19       Q    Got it.  So there's -- it's your
20   understanding that there was a similar
21   map-drawing session at the Reapportionment
22   Office in this time frame in which
23   Representative Strickland and other
24   neighboring affected legislators met with Gina
25   Wright and looked at various scenarios;

163

1    correct?
2        A    Yes.  I wouldn't call it
3    map-drawing.  But again, it's the idea of
4    let's look at the scenarios and see what might
5    work.
6        Q    And you did not attend that
7    session?
8        A    I don't recall attending that.  I
9    recall being in Representative Chandler's, but
10   I do not recall being a part of that.
11       Q    And it was nonetheless your
12   understanding that Representative Strickland
13   was concerned about his political performance
14   and wanted to redraw his district in such a
15   way as to improve it; correct?
16       A    Yes.
17       Q    And how did you obtain that
18   understanding?
19       A    How did, how did I obtain the
20   understanding that he wanted to make those
21   changes?  He had, he had approached me when we
22   said we were going to do this.  And he said,
23   you know, if possible, I'd like to look at my
24   district and see if we can -- if there's any
25   way to strengthen the performance of my

164

1    district.
2            It was not a -- there was nothing
3    formal.  But, you know, and here again, the
4    mandate was go get with the Reapportionment
5    people, let them start looking at it, get with
6    the people that would be affected, and make
7    sure that they're okay with it.
8        Q    And so -- and this was just an
9    informal conversation?
10       A    Yes.
11       Q    And would that have been -- roughly
12   when would that have taken place?
13       A    Again, it's that same, same time
14   frame.  From the time we decided that we would
15   make the changes, I had various people come to
16   me and say, you know, I want to -- I do want
17   to make changes.
18            So it was in that same time frame,
19   from just the first few weeks of the session
20   on up to essentially almost the day of the
21   committee.
22       Q    And did you speak with
23   Representative Jones, Jan Jones, about
24   redistricting in the Gwinnett County area
25   around that time?

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

165

1    A   I don't, I don't recall that.
2    She's not in that, I don't believe -- I don't
3    think her district is in there. I don't, I
4    don't recall a discussion with her relative to
5    her district, no.
6        Q   Did you have a conversation with
7    Representative Rutledge with respect to any
8    changes made to his district related to
9    redistricting?
10   A   I believe that his was one of those
11   districts that was touched by the others,
12   and --
13       Q   And just to be clear, by "the
14   others," you're referring to the changes to
15   District 111 in the Henry County area;
16   correct?
17   A   I believe that's correct. But it
18   was essentially the same as a couple of the
19   others. You know, if we do this, how is it
20   going to affect me? And essentially, you
21   know, go get with Reapportionment, let them,
22   let them show you what the thoughts are or get
23   with -- usually, it was get with the person
24   who would -- who was proposing the change and
25   make sure that it can be worked out.

166

1        Here again, I'm -- I can't remember
2    specific conversations, but there was so many
3    things going on at that time, I'm sure that we
4    did. And most of those people that were
5    touched at some point in time, I got an okay
6    from them that they were good to go with it.
7        So, usually, that conversation --
8    at some point in time, I talked to all of
9    them, but it was usually to affirm whether
10   they were a go or no-go on it.
11       Q   Were there ever any instances in
12   which a representative said, I'm not okay with
13   these changes because they're negatively
14   affecting my district in a way that I, I don't
15   like?
16   A   We did not have that. We had full
17   agreement. Now, as the scenarios, various
18   scenarios, were being discussed, there were
19   some of the scenarios that they did not like
20   as well as they did the others. So that was
21   part of the process, is to make sure everybody
22   could get comfortable with it.
23       So in some of the, some of the
24   instances, I think there were some people that
25   said, no, I don't think that's going to work

167

1    for me. And then we had to go to a different
2    scenario. But there were some times there
3    where in the process they weren't totally
4    comfortable with it.
5        But in the final product, everybody
6    was, was on board.
7        Q   And with respect to sort of
8    objections in the process, do you recall --
9    strike that.
10       In terms of the process, at the
11   meeting referring to Representative Chandler's
12   district, did Representative Efstration raise
13   any objections about particular changes made
14   to his district?
15   A   I believe that he was one person
16   that when we, when we first started and we
17   were working on some of the scenarios that he
18   was not, he was not comfortable with them, so
19   we looked at some other scenarios.
20       But in the final analysis, he was
21   able to agree to the final product, but there
22   were some times there where he wanted to look
23   at some other scenarios, did not feel totally
24   comfortable with them.
25       Q   And do you recall that those

168

1    involved changes in the Lawrenceville area?
2    A   I don't recall the specifics on it,
3    no.
4        MR. KHOURY: John, at some point
5    here, can we take a short break so we -- I
6    need to make a call. I think Frank needs to
7    make a call. Like a five-minute?
8        MR. POWERS: Sure.
9        MR. STRICKLAND: It's either call
10   now or the people won't be there.
11       THE WITNESS: Want to do it, do it
12   now?
13       MR. KHOURY: Yeah. I think we're
14   going to do it now; right? Break now? Is
15   that okay?
16       MR. POWERS: Sure.
17       MR. KHOURY: Okay.
18       THE VIDEOGRAPHER: Going off the
19   video record at 5:23.
20       (Proceedings in recess, 5:23 p.m. to
21   5:31 p.m.)
22       THE VIDEOGRAPHER: We're back on
23   the video record at 5:31 p.m. This is the
24   start of video file number four.
25       Q   Representative Nix, before the

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

169

1    break, we were talking about your
2    conversations with various members of the
3    legislature. And you had, you had mentioned
4    that it was -- all of the legislators whose
5    districted were affected consented to the
6    changes at -- prior to you putting the package
7    of House Bill 566 together; is that correct?
8        A    That is correct. Prior to taking
9    it to committee and passing it, yes.
10       Q    And would you yourself obtain that
11   consent from each of the legislators, or did
12   you delegate that to someone else?
13       A    It was either, it was either
14   through me or through the Reapportionment
15   Office.
16       Q    Okay.
17       A    If anyone had a problem, they would
18   have come to me. But it was, it was made
19   clear that everybody had to agree.
20       Q    And these conversations occurred in
21   February, early March of '15?
22       A    Somewhere in that time frame, yes.
23       Q    And had you -- aside from the
24   changes in the Gwinnett County and Henry
25   County areas, had you been -- had you talked

170

1    with legislators in -- had you -- strike that.
2           Had you spoken with Representative
3    Kaiser regarding changes to her district?
4        A    In terms of, yes, I spoke to her.
5    She -- they were interested in making changes.
6    It was the same scenario. You know, go to the
7    Reapportionment Office and let them look at
8    it.
9        Q    And did Representative Waites speak
10   to you about redistricting during this period?
11       A    I don't recall a direct
12   conversation with her.
13       Q    Did you attend any meetings at the
14   Reapportionment Office with or involving
15   legislators and Reapportionment Office
16   staffers other than the one that involved the
17   Gwinnett County delegation and Representative
18   Chandler?
19       A    I don't recall that I did.
20       Q    Did you ever speak to legislators
21   in groups, or was it all private
22   conversations?
23       A    Other than what we've described in
24   a group and making the announcements to the
25   House and to the caucuses, it was primarily

171

1    individual.
2        Q    And when you spoke with
3    Representative Chandler about making changes
4    to her district, did she tell you that there
5    were any specific areas that she wanted in or
6    out of her district?
7        A    I don't recall the specifics of it,
8    no.
9        Q    Were there any legislators who
10   asked for changes to be made to their
11   districts who did not in fact get changes to
12   their district in House Bill 566?
13       A    Yes.
14       Q    And who were they?
15       A    The one that I remember the most,
16   Representative Gerald Greene down in south
17   Georgia wanted to look at his. I think there
18   was at least one other that wanted to look at
19   it, but they did not fit into the parameters
20   that we had.
21       Q    And why -- what parameters were
22   those?
23       A    Well, the same one I've told you
24   that you had to have full agreement, the
25   changes had to be within that map integrity.

172

1    And for whatever reasons, they were not -- we
2    did not feel like those could be made.
3        Q    Do you know whether Gerald Greene
4    represented a majority-minority district?
5        A    I don't recall that it was
6    majority, majority-minority.
7        Q    And did you in the course of
8    these -- the meeting at the Reapportionment
9    Office concerning Representative Chandler's
10   district discuss the possibility that changes
11   to her district would dilute the voting
12   strength of African-American voters?
13       A    I do not recall that being part of
14   the conversation.
15       Q    Did the -- in the meeting at the
16   Reapportionment Office concerning
17   Representative Chandler's district, did the --
18   was the African-American population percentage
19   of the district discussed?
20       A    I don't recall that.
21       Q    And at this stage in the process,
22   were other members of the Reapportionment
23   Committee being involved in or informed of the
24   conversations that you were having with the
25   various representatives?

Electronically signed by Joel Moyer (501-161-376-4513)                4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

50 (Pages 173 to 176)

173

1    A    Were they being informed? Say the
2  question again, please. I'm sorry.
3         MR. POWERS: Would the court
4  reporter mind repeating the question?
5         (Whereupon the court reporter read back
6         the referred-to portion as follows:)
7    Q    And at this stage in the process,
8  were other members of the Reapportionment
9  Committee being involved in or informed of the
10  conversations that you were having with the
11  various representatives?
12        (Whereupon the reading back was
13        concluded.)
14    A    Yes. They were -- they knew that
15  we were working on the legislation. There was
16  no formal meeting until we met to take up the
17  bill, but they knew we were working on
18  legislation.
19    Q    Were you informing the members of
20  the Reapportionment Committee of the substance
21  of the conversations that you were having with
22  representatives, for example, related to
23  increasing their political performance?
24    A    Not specifically.
25    Q    What do you mean by not

174

1  specifically?
2    A    I did not go, approach them and
3  say, this is why we're doing this or this. If
4  they had questions, they would ask me, and we
5  would discuss it. I don't recall those
6  questions. But they were, they were aware of
7  the fact that we were working on some changes.
8    Q    And so unless -- for example,
9  Representative Efstration was on the
10  Reapportionment Committee at the time;
11  correct?
12    A    I believe that's correct, yes.
13    Q    And so he would have been informed
14  because his district was specifically
15  affected?
16    A    That is correct, yes.
17    Q    But is it fair to say that it was
18  kind of a need-to-know basis for informing
19  certain members about the changes being made
20  to the various districts?
21    A    I wouldn't call it a need to know.
22  It was -- if they ask, you know, we answered
23  the questions, but it was not -- there was
24  nothing being held back from anybody who
25  wanted to know.

175

1    Q    And did you receive questions
2  about -- from members of the minority party
3  about what changes were being considered with
4  respect to districts in the Atlanta metro
5  area?
6    A    We had discussions when we had the
7  bill before the committee. But other than
8  that, I don't recall any discussions on it as
9  we, as we put the bill together, other than
10  those who were affected with it.
11    Q    Were, for example, members of the
12  minority party whose districts are wholly or
13  partly within Gwinnett or Henry Counties
14  informed that changes were being made to other
15  districts within Gwinnett and Henry Counties?
16    A    I don't recall specifically
17  informing them of that.
18    Q    And were you keeping Georgia House
19  leadership or their staffs abreast of the
20  conversations you were having with the various
21  members as the process moved along?
22    A    Yes.
23    Q    And were you speaking with Spiro
24  Amburn during this period or with the Speaker
25  directly or with both of them?

176

1    A    It was primarily through Spiro. I
2  don't recall a direct conversation with the
3  Speaker on it.
4    Q    And was he providing any feedback,
5  or were you just kind of letting him know that
6  so-and-so said yes or, you know, so-and-so
7  said no?
8    A    That was the essence of it. He
9  would just ask me is it -- how's the process
10  going. And I would just tell him what was
11  happening.
12    Q    Were there any other staffers who
13  were particularly involved in the
14  redistricting during this period?
15    A    No.
16    Q    In your conversations with various
17  legislator -- strike that.
18         In the course of your conversation
19  with Representative Strickland, did she have
20  any goals with respect to the redistricting
21  other than improving her political
22  performance?
23    A    Representative Strickland is a he,
24  and --
25    Q    Oh, sorry.

Donovan Reporting, PC                                                    770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

---

177

1  A   The answer is no.
2  Q   I'll rephrase the question.
3      Did Representative Strickland have
4  any goals for the 2015 redistricting other
5  than improving the political performance of
6  his district?
7  A   No.
8  Q   Similarly, did Representative
9  Chandler have any goals for the 2015 other
10 than improving the political performance of
11 her district?
12 A   No.
13 Q   When draft plans for -- strike
14 that.
15     So when it got to the point where
16 various legislators had approved the changes
17 to their district, how did you consolidate all
18 of the various changes and get yourself up to
19 speed so that you could be able to present the
20 bill in committee and eventually on the floor?
21 A   Well, the assimilation was strictly
22 through the Reapportionment Office, and the
23 legal structuring was through legislative
24 counsel. And I had already known that
25 everyone was in agreement. That was part of

---

178

1  the deal.
2      So that was basically how I put my
3  presentation together is that they had fallen
4  within the parameters, we had full agreement,
5  and the legislative counsel was okay with
6  that.
7  Q   So prior to the bill being proposed
8  and -- or filed, it had already been reviewed
9  by the legislative counsel's office?
10 A   Legislative counsel is the one who
11 draws it up, yes.
12 Q   In the course of your conversations
13 with Representative Strickland and
14 Representative Chandler, did the issue of
15 changing demographics come up?
16 A   No.
17 Q   Were you aware of demographic
18 changes occurring in Gwinnett and Henry
19 Counties at the -- prior to and at the time of
20 the 2015 redistricting?
21 A   Yes.
22 Q   And what demographic changes had,
23 had been occurring in Gwinnett County?
24 A   There was quite a, quite a number
25 of -- I think Gwinnett County in the schools

---

179

1  they speak like 74 languages or more than
2  that. There was a considerable number of
3  diverse populations in the -- and in the
4  Gwinnett County area.
5      Part of the redistricting, they had
6  talked about how there had been -- that change
7  was going on and is still ongoing, that there
8  was a huge -- that the demographics were
9  shifting rather significantly, not just in
10 Gwinnett County, but north -- in the north
11 Atlanta area.
12 Q   And so Gwinnett County's population
13 both is exploding as a total number, correct,
14 and also, and also there's an increasing
15 diversity in Gwinnett County's population?
16 MR. KHOURY: Object to the form.
17 A   I would say that's correct. The
18 population is growing, and it's growing more
19 diverse as it grows.
20 Q   And the white population as a
21 percentage of the entire whole in Gwinnett
22 County has been decreasing for some time; is
23 that correct?
24 A   I don't know that for a fact. No,
25 I can't say that for a fact.

---

180

1  Q   And what demographic changes have
2  been occurring in Henry County?
3  A   I don't know. I can't give you
4  specifics on it.
5  Q   And were you aware that the
6  minority population had been increasing in
7  Representative Chandler's district?
8  A   That was not a part of our
9  conversation as we, as we looked at this.
10 Q   Were you aware that the
11 African-American population percentage was
12 increasing in Representative Strickland's
13 district?
14 A   That was, that was not a part of
15 the conversation as we looked at that.
16 Q   Did you speak with members of the
17 Reapportionment Office about the changing
18 demographics in the Atlanta metro area?
19 A   In a broad sense. Just as I told
20 you before, I knew that there was significant
21 changes occurring in the metro area.
22 Q   And who did you have those
23 conversations with?
24 A   Just the staff there in general.
25 Q   With Gina Wright?

---

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

181

1    A    Yes.
2    Q    With Dan O'Connor?
3    A    Probably.
4    Q    And when did these conversations
5   take place?
6    A    I don't recall specific times that
7   we -- that that was part of the thing.  That
8   was part of the -- when the other
9   reapportionment had done, as we had talked
10   about everything that had happened, that was,
11   that was even prior to this that the changes
12   were occurring.
13    Q    So it would have been -- you would
14   have had these conversations with Gina Wright
15   and Dan O'Connor prior to or maybe also during
16   the 2015 legislative session?
17          MR. KHOURY:  Object to the form.
18    A    I would say prior to.
19    Q    Okay.  So you did -- it's fair to
20   say that you did have conversations regarding
21   demographic changes with Gina Wright and Dan
22   O'Connor prior to the 2015 legislative
23   session?
24    A    Yes.
25    Q    When in the legislative process do

182

1   you share copies of a bill with other
2   legislators?
3    A    As soon as the bill's dropped, it's
4   available online.  Anyone can go and look at
5   it.  So it's, it's available from essentially
6   from day one once it shows up on the roster.
7    Q    Do you, do you share -- strike
8   that.
9          Did you share House Bill 566 with
10   any of the members of the legislature prior to
11   the filing of House Bill 566?
12    A    I don't recall doing that
13   specifically.  The people who cosigned it of
14   course saw the bill, so they specifically
15   knew, but I didn't take it directly to other
16   members.
17    Q    And when you would show the bill
18   to, say, Representative Strickland, would you
19   have done that right before the bill was filed
20   or just -- or once he signed off on the
21   changes to his district, would you go back to
22   him after that?
23    A    No.  The work was done in the
24   lead-up to the bill.  If you look at the bill,
25   there's not a whole lot of detail that anybody

183

1   can look at and get out of that, so the
2   Reapportionment Office had to have gone
3   through that with them.
4    Q    And when the bill is filed or
5   dropped, is there a map that accompanies it?
6    A    No.
7    Q    It just includes a list of
8   precincts and VTDs and census blocks; correct?
9    A    Correct.
10    Q    And when you filed the bill --
11   strike that.
12          When is the first time that the
13   actual map was shared with legislators other
14   than those whose districts were specifically
15   affected?
16    A    At the committee meeting when we
17   met to, to, to go over the bill, to consider
18   the bill.  They may have been available prior
19   to that, but that was when they were
20   disseminated to the members.
21    Q    I'm handing you what I just marked
22   as Plaintiff's Exhibit 101.
23          MR. KHOURY:  Are we skipping them
24   for a reason?
25          MR. POWERS:  No.  Here.  Let me

184

1   re-mark that.
2          MR. STRICKLAND:  Is it supposed to
3   be 98?
4          MR. KHOURY:  98.
5          MR. POWERS:  Yeah.  I'm going to
6   re-mark it, so strike all of that.
7          (Whereupon a document was identified as
8          Plaintiff's Exhibit 98.)
9    Q    I'm handing you what I've marked as
10   Plaintiff's Exhibit 98.  What is this
11   document?
12    A    This is a Reapportionment Committee
13   Meeting Notice.
14    Q    And when -- how far in advance of a
15   meeting do you disseminate committee meeting
16   notices?
17    A    I don't know that there's a set
18   time, but it's usually several days prior to
19   the meeting.  I couldn't give you a specific
20   time.
21    Q    So you disseminated -- is it fair
22   to say that you probably disseminated this
23   notice sometime between when you filed the
24   bill or dropped the bill on March 5th and the
25   date of the meeting on the 9th?

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

185

1    A    Yes.
2    Q    And this -- it says, Agenda:  To be
3  determined; correct?
4    A    Correct.
5    Q    Is it your recollection that any
6  matters were discussed other than House
7  Bill 566?
8    A    Not that I recall.  Now, it says
9  organizational committee meeting.  We may have
10  had to adopt our, our bylaws and everything at
11  that time, but the general meeting was for the
12  bill.
13    Q    And you would have adopted the
14  bylaws because it would have been the first
15  meeting of the Reapportionment Committee
16  during the '15 -- 2015 legislative session?
17    A    If my recollection is correct and
18  based on the fact that it says organizational
19  committee meeting, yes.
20    Q    Did the Reapportionment Committee
21  meet at all during the 2013 or 2014
22  legislative session?
23    A    Here again, if I remember
24  correctly, we probably met one time as an
25  organizational meeting just to get everybody

186

1  there.
2    Q    And was this committee meeting the
3  first time at which you provided members of
4  the minority party with a copy of the House
5  Bill 566 map?
6    A    Yes.
7    Q    And did you present House Bill 566
8  at this committee hearing?
9    A    I believe that I did.  That was the
10  time that it was considered and was favorably
11  considered, so yes.
12    Q    What did you say about House Bill
13  566 in the course of your presentation at that
14  meeting?
15    A    I said that we had determined that
16  we would make some changes.  It had been
17  offered to all members to be considered.  The
18  ones who had asked to be considered had
19  gone -- gotten with the Reapportionment Office
20  to have those considered; that any changes
21  made, every district that was touched was 100
22  percent agreement; and that the
23  Reapportionment Office had determined that it
24  was -- that it did not violate any of the --
25  it did not violate the integrity of the

187

1  previous map.
2    Q    Was there any subsequent debate
3  between members of the committee regarding
4  House Bill 566?
5    A    I don't recall.  I don't recall
6  that there was.
7    Q    Was this hearing held close in time
8  to crossover day?
9    A    I don't recall when the crossover,
10  when the crossover day was that time.  But I
11  don't think it was extremely close to it.  I
12  don't recall when the crossover day was.
13    Q    Was there -- was the -- why was the
14  hearing held on March 9th when the legislative
15  session and legislature had already been in
16  session for almost two months?
17    A    That was probably the time that it
18  took to get everything together, to get the
19  agreements we need, to get the approvals that
20  we needed, and just so have it drawn up.
21  There's a number of people involved, so it
22  took some time to get it all together.
23    Q    It's fair to say that House Bill
24  566 spent relatively little time in the House;
25  is that correct?

188

1    A    No.
2    Q    Well, if the -- why not?
3    A    Well, first of all, the final bill
4  was a culmination of work that we had been
5  doing ever since we had begun the process, so
6  it was not like anything had been hidden.
7  The -- as you can see when it was dropped,
8  everything had gone into it at that time, so
9  it didn't -- I wouldn't say that it was a
10  relatively short -- that's not unusual in the
11  process of the -- of a piece of legislation.
12    There was nothing there that was
13  not available for people to see.  It was just
14  that, by the time you put all the details
15  together, it took that long to get it ready to
16  be able to present.
17    Q    And it's your testimony that it's
18  not unusual for a bill to be introduced on
19  March 5th, get three readings, pass a
20  committee, and get adopted on the -- by the
21  House as a whole on March 11th?
22    A    No, I would say that's not unusual.
23    Q    Have you sponsored or worked on
24  other bills that have been approved by the
25  House within six days?

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

54  (Pages 189 to 192)

189

1     A    Probably so.  I can't give you
2   specifics, but that's not -- it's just not
3   unusual at all.
4     Q    Do any records remain from the
5   hearing on March 9th aside from the notes that
6   you referred to earlier today?
7     A    None that I know of.
8     Q    Did you send or receive any emails
9   or text messages regarding this, this meeting?
10     A    Did I send or receive text messages
11   regarding this meeting?
12     Q    Any emails or text messages
13   regarding this meeting.
14     A    None that I know of, other than the
15   meeting notices that went out, as you have
16   here.
17     Q    Were there -- did you -- strike
18   that.
19          Did you participate in any other
20   conversations or meetings between the approval
21   of the bill in committee on March 9th and
22   presenting it on the floor on March 11th?
23     A    Not that I recall.
24     Q    Did you talk with the Speaker or
25   with Spiro Amburn regarding House Bill 566

190

1   before introducing it in committee or
2   presenting it on the floor?
3     A    Yes.
4          MR. KHOURY:  Object to the form.
5   Sorry.
6     Q    When did you have those
7   conversations?
8     A    Well, as we said earlier, with
9   Spiro he would ask for progress or is it
10   coming together, those types of things.  And
11   essentially, I just said, you know, we're
12   getting it together.  And they were, they were
13   aware of it.
14     Q    Prior to presenting the bill, had
15   you reviewed the racial demographics of the
16   districts that were affected by House Bill
17   566?
18     A    No.
19     Q    Were you provided information
20   regarding the racial demographics of House
21   Bill 566 prior to presenting it, that bill, on
22   the House floor or in the Reapportionment
23   Committee hearing?
24     A    Not that I recall, no.
25     Q    Did you have any concerns that --

191

1   strike that.
2          Wouldn't you need to review racial
3   data to ensure that the plan in House Bill 566
4   complied with the Voting Rights Act?
5     A    That was the function of the
6   Reapportionment Office.
7     Q    So in essence, if the -- if there
8   were any changes to racial demographics of
9   districts affected by House Bill 566, you
10   deferred to the Reapportionment Office's
11   analysis with respect to whether they were
12   legally compliant?
13     A    Yes.
14     Q    At the committee hearing on March
15   9th, did you say anything about whether you
16   would consider making additional changes to
17   districts in the next legislative session?
18     A    I don't recall that I did.
19     Q    Were there any public comments
20   submitted at the committee hearing on March
21   9th?
22     A    I don't recall.  It's been -- I
23   don't -- it was a public meeting, and it was
24   available, but I do not recall whether anybody
25   specifically had comments.

192

1     Q    What efforts did you make to
2   solicit public input and comment regarding
3   House Bill 566?
4     A    All of these things are posted as
5   public notice when we're having the hearings,
6   and that in and of itself is -- anybody who's
7   following it can come and make their comments.
8     Q    Did you do anything else to solicit
9   public input or comment regarding House Bill
10   566?
11     A    No.
12     Q    Are you aware of any efforts by
13   anyone else to make the public aware of the
14   fact that redistricting was taking place in
15   the Georgia House of Representatives in 2015?
16     A    Not that I'm aware of in terms of
17   legislatively.  What -- say -- rephrase your
18   question for me.
19          MR. POWERS:  Would the court
20   reporter mind repeating the question?
21          (Whereupon the court reporter read back
22          the referred-to portion as follows:)
23     Q    Are you aware of any efforts by
24   anyone else to make the public aware of in
25   fact that redistricting was taking place in

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

193

1    the Georgia House of Representatives in 2015?
2        (Whereupon the reading back was
3        concluded.)
4        A   The only thing I know of is there
5    were -- there was some emails out there,
6    people who were opposed to the process. I got
7    some emails from people that did not like the
8    process. But in terms of anything that I did
9    or anything within the legislature, no.
10       Q   And what emails did you receive
11   from folks who were opposed to the process?
12       A   Just emails that said they didn't
13   like the way we were doing it and they felt
14   like it was not a fair process or they thought
15   it was gerrymandering.
16       Q   Were there any complaints raised
17   that House Bill 566 diluted minority voting
18   rights?
19       A   Not within those -- not within
20   that, within those emails. It was a much
21   broader context.
22       Q   The complaints just referred to
23   gerrymandering globally?
24       A   More or less, yes.
25       Q   And what response did you, did you

194

1    make to those emails?
2        A   I did not respond to them.
3        Q   Did you or anyone else make efforts
4    to inform minority community members about
5    House Bill 566?
6        A   I did not.
7        Q   Did you ever consider making
8    efforts to inform community leaders in areas
9    where voters were being affected by the 2015
10   redistricting?
11       A   Nothing other than making sure that
12   all of the participants agreed.
13       Q   Do you know whether or not there
14   were any public hearings to discuss
15   reapportionment in 2011 outside of the
16   committee process?
17       A   I don't know.
18       Q   Did you ever consider holding a
19   public hearing outside of the committee
20   hearing process in 2015?
21       A   No.
22       Q   Do you think that constituents
23   affected by House Bill 566 were adequately
24   informed about the changes that were being
25   made to their districts?

195

1        A   Yes.
2        Q   And why is that?
3        A   Their members had requested it and
4    had agreed with it, so they're the ones that
5    elect them, so I would assume that they --
6    that was their responsibility to communicate
7    that.
8        Q   Now, were you aware that racial
9    demographic data was available for House Bill
10   566 while it was being considered in the
11   legislature?
12       A   Yes.
13       Q   And would it have been -- would it
14   surprise you to know that the racial
15   demographic data was being disseminated by the
16   Reapportionment Office outside of legislature?
17       A   I -- I would not be surprised. I
18   mean, it's not secret data. It's available to
19   anyone, I would assume, who would request it.
20       Q   But you didn't review that data
21   yourself?
22       A   No.
23       (Whereupon a document was identified as
24   Plaintiff's Exhibit 99.)
25       Q   Handing you what I've just marked

196

1    for identification as Plaintiff's Exhibit 99.
2    And this is an article from the Atlanta
3    Journal-Constitution titled Gwinnett House
4    District Gets Voting Rights Scrutiny; correct?
5        A   That is correct.
6        Q   And it's dated Wednesday, September
7    1st, 2016; correct?
8        A   Correct.
9        Q   And I'd like to direct your
10   attention to the middle of the second page.
11   And in the middle of the second page, the --
12   do you see where the article quotes you?
13       A   Yes, uh-huh.
14       Q   And do you recall making this
15   quote?
16       A   Yes. That's what I've told you
17   multiple times, that we had not done it and
18   told you what the requirements were. So, yes,
19   that was my quote.
20       Q   And, yeah, the -- that sentence
21   starting the -- you say that the requirement
22   was that it not make significant statistical
23   changes. What did you -- what did you mean by
24   "not make significant statistical changes"?
25       A   That we would not violate the

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

56  (Pages 197 to 200)

197

1   integrity of the maps that had been drawn and
2   approved earlier.
3       Q    But I guess I'm struggling with
4   significant statistical changes doesn't really
5   have anything to do with the integrity of the
6   map.  So if it's not -- how are statistics
7   related to the integrity of the map?
8       A    Well, that's what the -- that's how
9   the districts are drawn.  So the set of
10  statistics that had been used to draw the maps
11  that were done after the census, we did not
12  want to violate the -- whatever the parameters
13  that were there, I mean, that's what, that's
14  what it deals with is statistics.
15      So we did not want to violate the
16  integrity of those, the work that had been
17  done previously.
18      Q    And when you were referring to the
19  requirement that it not make statistical --
20  significant statistical changes, were you
21  referring to, to racial statistics?
22      A    Not specifically, no.
23      Q    What -- was racial statistics part
24  of what you meant by not making significant
25  statistical changes?

198

1       MR. KHOURY:  Object to the form of
2   the question.  I mean, I think he's answered
3   this question at least 20 times today.
4       If you understand it to be asking
5   something other than what you've already
6   answered, feel free to respond, but.
7       A    No.  I think he's correct.  This --
8   I've answered that in numerous forms already
9   today.
10      Q    I don't understand what statistics
11  you're referring to.
12      MR. KHOURY:  I mean, can we read
13  back his previous answer?  I think that -- I
14  think he just explained that in good detail.
15  I mean, I'm -- he may not be saying what you
16  want him to say, but he just said in very
17  explicit detail what statistics he was
18  referring to.  Let's look at the answer.
19      (Whereupon the court reporter read back
20      the referred-to portion as follows:)
21      Q    But I guess I'm struggling with
22  significant statistical changes doesn't really
23  have anything to do with the integrity of the
24  map.  So if it's not -- how are statistics
25  related to the integrity of the map?

199

1       A    Well, that's what the -- that's how
2   the districts are drawn.  So the set of
3   statistics that had been used to draw the maps
4   that were done after the census, we did not
5   want to violate the -- whatever the parameters
6   that were there, I mean, that's what, that's
7   what it deals with is statistics.
8       So we did not want to violate the
9   integrity of those, the work that had been
10  done previously.
11      (Whereupon the reading back was
12      concluded.)
13      Q    So you didn't want to violate the
14  integrity of the statistics?  I thought we
15  were talking about the integrity of the map.
16      MR. KHOURY:  Object to the form of
17  the question.
18      Q    You may answer.
19      A    Tell me again exactly what you're
20  asking.  Explain to me what you mean by
21  statistics.  I don't, I don't understand what
22  the question is.
23      Q    Well, when you're referring to
24  significant statistical changes, are you
25  referring to total population, to political

200

1   performance, to racial demographics, to number
2   of precincts split, to number of
3   municipalities split?
4       You have not answered what -- I
5   understand that statistics exist, but what
6   statistics are those?
7       A    All of the things that are
8   considered in the Voting Rights Act that were
9   used when it was -- when this was originally
10  put together, those are the statistics I'm
11  referring to.
12      MR. POWERS:  Thank you.  Why don't
13  we take a five-minute break?
14      THE VIDEOGRAPHER:  Okay.  Going off
15  the video record at 6:25.
16      (Proceedings in recess, 6:25 p.m. to
17      6:41 p.m.)
18      THE VIDEOGRAPHER:  We're back on
19  the video record at 6:41 p.m.  This is the
20  start of video file number five.
21      Q    Representative Nix, prior to the
22  break, you had referred to the statistics that
23  were used in the prior redistricting with
24  respect to assessing compliance with the
25  Voting Rights Act; is that correct?

Electronically signed by Joel Moyer (501-161-376-4513)                  4dd8d33d-566f-46b5-8729-373a760afce8

201

1    A    Yes, whatever the, whatever the
2  parameters were that we had to stay within,
3  yes.
4    Q    And racial demographic data would
5  have been among the various statistics that
6  would have been considered; is that correct?
7    A    I would assume that is true, yes.
8    Q    Was House District 111 moved to
9  Henry County to accommodate population growth
10  in that area between the 2000 and 2010
11  censuses?
12    A    I don't have knowledge of that. I
13  don't know.
14    Q    Now, let's go back to the
15  legislative history to discuss the vote in the
16  House. The vote in the House was unanimous;
17  is that correct?
18    A    That is correct, 168 to zero.
19    Q    And is that unusual for a
20  redistricting plan to be unanimously approved
21  by a legislative body in Georgia?
22    A    Honestly, the only two that I have
23  seen are the votes on the -- after the 2010
24  census and this one. I think there was some
25  dissent in the previous one, so I can't give

202

1  you a generalization on that.
2    (Whereupon a document was identified as
3    Plaintiff's Exhibit 8.)
4    Q    I'd like to ask you to refer to
5  Plaintiff's Exhibit 8, which should be located
6  in this binder.
7    A    P-8?
8    Q    Yes. And that is the Defendants'
9  Initial Disclosures, if you're interested.
10  And specifically, I'd like you to turn past
11  the pages and to the exhibits.
12    A    The attachments? Attachment AC?
13  Is that where we --
14    Q    Yeah. Past the exhibit -- past the
15  attachments, so now you're on Exhibit 1.
16    A    Okay. I see Exhibit 1. Uh-huh
17  (affirmative).
18    Q    Now, I want you to keep flipping
19  until you get to the Senate Committee on
20  Reapportionment meeting agenda from January
21  26th. It's the -- in fact, I want to correct.
22  It's the minutes.
23    A    Rules for the Senate Committee on
24  reapportionment and redistricting? Make sure
25  I'm looking -- okay.

203

1    Q    Yeah.
2    A    Right before that, Senate Committee
3  on Reapportionment and Redistricting met in
4  room 307 of the Coverdell Legislative Office
5  Building on Monday, January 26th. Is that
6  what you're talking about?
7    Q    Yes.
8    MR. KHOURY: Hold on one second.
9    Q    And House Bill 566 would not have
10  been considered at this Senate hearing,
11  committee hearing; correct?
12    A    Correct, uh-huh.
13    Q    Then if you could flip forward one,
14  two, three pages, that's -- the Senate
15  Committee on Reapportionment could not have
16  addressed House Bill 566 on February 23rd
17  because the bill hadn't been introduced;
18  correct?
19    A    That would be correct, yes.
20    Q    And then flip ahead two pages.
21  This is the Senate Committee on
22  Reapportionment and Redistricting minutes from
23  a meeting held on Thursday, March 26th; is
24  that correct?
25    A    Thursday, March 26th, yes, uh-huh.

204

1    Q    Were you present at this hearing?
2    A    Yes.
3    Q    And did you present House Bill 566
4  at this committee hearing?
5    A    I did.
6    Q    And did you give roughly the same
7  presentation to the Senate Committee as you
8  did to the House committee?
9    A    Yes.
10    Q    And had you spoken with any of the
11  senators about House Bill 566 prior to that
12  hearing?
13    A    Yes.
14    Q    And who had you spoken to?
15    A    I had spoken to Senator Crane, I
16  spoke to Senator Cowsert, and possibly Senator
17  Shafer as part of the House -- the Senate
18  leadership, I don't remember, but at least
19  those two.
20    Q    And what did you talk to Senator
21  Crane and Senator Cowsert about?
22    A    Just told them the process that we
23  had gone through to come up with the bill, the
24  fact that the House had approved it 168 to
25  zero, and look for their favorable

Electronically signed by Joel Moyer (501-161-376-4513)                4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

58 (Pages 205 to 208)

205

1    consideration.
2        Q    Did they ask you any questions
3    about House Bill 566?
4        A    Yes.
5        Q    And what did they ask you about?
6        A    Well, Senator Crane kind of had a
7    number of things he asked about it, you know,
8    why we were doing it, you know, had we done it
9    appropriately, those types of questions.
10       Q    And when you say whether you'd done
11   it appropriately, what do you mean by that?
12       A    Within the rules that we needed to
13   be within to pass the legislation effectively.
14   As I'd said before, to make sure that we
15   hadn't violated, you know, the integrity of
16   the maps that had been drawn before.
17       Q    So was he asking if you had made
18   substantial changes to existing districts?
19       A    He just asked the essence of the
20   bill, and I told him basically what I've told
21   you, you know, that we had set the parameters,
22   everyone had agreed to it, and that the House
23   had passed it 168 to zero.
24       Q    And did anyone ask you about
25   whether or not all of the members of the House

206

1    whose districts were affected had consented to
2    the changes?
3        A    Yes.
4        Q    And was that Senator Crane as well?
5        A    Yes.
6        Q    And what did you tell Senator
7    Crane?
8        A    I told him that they had.
9        Q    Did you speak with any members of
10   the minority party prior to the hearing on the
11   26th of March?
12       A    Yes.
13       Q    Who did you speak with?
14       A    Senator Fort.
15       Q    And what was the substance of your
16   conversation with Senator Fort?
17       A    Senator Fort wanted to raise
18   objections to it relative to some of the
19   districts that were part of his Senate
20   district.
21       Q    And what objections did he raise?
22       A    He just didn't particularly like
23   the bill.
24       Q    Did he give a reason for why he
25   didn't like the bill?

207

1        A    He's just Senator Fort.
2        Q    What does that mean?
3        A    He didn't like the bill.  You would
4    have to ask Senator Fort if you would like to
5    have an answer to that.
6        Q    And what was the breakdown of the
7    vote in committee on House Bill 566?
8        A    I don't recall, unless it's what's
9    written down at the bottom there.  They show
10   who voted do pass and then who voted against
11   it, so I would assume that the information you
12   have there would have that.
13       Q    Senators Cowsert, Jackson, Shafer,
14   and Williams voted in favor of House Bill 566;
15   is that correct?
16       A    That's what it says, yes.
17       Q    And Senators Henson, Harbison,
18   Tate, and Fort voted against House Bill 566?
19       A    That's what it says, yes.
20       Q    And then Senator Crane broke the
21   motion -- or voted in favor of the motion to
22   break the tie?
23       A    That is correct.
24       Q    Did -- let's turn back to the
25   legislative history.  House Bill 566 was

208

1    debated and voted on by the Senate on March
2    31st, 2015; is that correct?
3        A    Yes.  That's -- I assume this is
4    correct on the history.
5        Q    And were you present on the Senate
6    floor when House Bill 566 was considered?
7        A    I was there I believe for the --
8    when final passage came.  I was not there for
9    the full debate.
10       Q    Who presented House Bill 566 to the
11   full Senate?
12       A    Senator Cowsert.
13       Q    And did you help Senator Cowsert
14   prepare for that presentation?
15       A    Essentially from the presentation I
16   had made to them in committee.  I don't recall
17   directly helping him to make the presentation.
18       Q    Did you give your set of talking
19   points to Senator Cowsert so he could use them
20   for the Senate presentation?
21       A    I don't recall that specifically,
22   but I'm pretty sure that's what he used.
23       Q    And there were senators who voiced
24   opposition to House Bill 566 on the Senate
25   floor; is that correct?

Electronically signed by Joel Moyer (501-161-376-4513)                4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

59 (Pages 209 to 212)

209

1    A    I believe that is correct, yes.
2    Q    And were you present at the time
3  that some of those objections were raised?
4    A    I was, I was in and out. It was a
5  very busy day. Yes.
6    Q    Was it close to the end of the
7  legislative session at that point?
8    A    Yes. It was on March the 31st when
9  they passed it, so it was -- we were getting
10 very close to the, to the end of the session.
11   Q    Had you been made aware of the
12 substance of the objections to House Bill 566
13 prior to the debate?
14   A    Yes.
15   Q    And what objections were there
16 beyond those that we've already discussed?
17   A    There really, there really was none
18 that was of any significance other than
19 Senator Fort's concern about that -- the
20 relationship it had to his district.
21   Q    And it was at this time that the
22 Senate-proposed amendment to change the
23 effective date was considered; correct?
24   A    That would have been the time, yes.
25   Q    And Senator Crane was among those

210

1  proposing that amendment; is that correct?
2    A    I believe that is correct.
3    Q    And why did Senator Crane and
4  others want to change the effective date of
5  House Bill 566?
6    A    I do not know.
7    Q    Did Senator Fort allege on the
8  Senate floor that House Bill 566 resulted in
9  vote dilution?
10   A    I think the term that he used was
11 packing.
12   Q    And packing of African-American
13 voters; correct?
14   A    I would assume that's what he
15 meant. I can't speak for him. You would need
16 to talk to Senator Fort to find out exactly
17 what his concerns were.
18   Q    And were you present on the floor
19 at the time Senators Nan Orrock or Emanuel
20 Jones voiced their objections to House Bill
21 566?
22   A    I don't think I was there at that
23 time.
24   (Whereupon a document was identified as
25   Plaintiff's Exhibit 100.)

211

1    Q    I'm handing you what I've just
2  marked for identification as Plaintiff's
3  Exhibit 100.
4         Representative Nix, is this the
5  recording of the Senate vote on the motion to
6  table the amendment seeking to change the
7  effective date of House Bill 566?
8    A    That's what it indicates on the
9  sheet that you gave me, yes.
10   Q    And 34 legislators voted against
11 the motion to table; is that correct?
12   A    That is what it states, yes.
13   Q    And 17 senators voted in favor of
14 the motion; is that correct?
15   A    That, again, that's what it says,
16 yes.
17   (Whereupon a document was identified
18   as Plaintiff's Exhibit 101.)
19   Q    Once the motion to table was turned
20 down, the Senate then voted to approve the
21 legislation.
22         I'm handing you Plaintiff's
23 Exhibit 101, and this is the final Senate vote
24 on passage of House Bill 566; correct?
25   A    No. This is on the amendment.

212

1  Adoption of Amendment #1 is what you gave me.
2    Q    Sorry. I'll re-ask the question.
3  So Senator Crane --
4         Representative Nix, Plaintiff's
5  Exhibit 101 is the record of the Senate vote
6  on whether to adopt Senator Crane's amendment
7  to change the effective date of House Bill
8  566; correct?
9    A    That appears to be what this is,
10 yes.
11   (Whereupon a document was identified as
12   Plaintiff's Exhibit 102.)
13   Q    Now handing you what I've marked
14 for identification as Plaintiff's Exhibit 102.
15 Representative Nix, is Plaintiff's Exhibit 102
16 the record of the vote by the full Senate on
17 passage of House Bill 566?
18   A    That is what it states, yes.
19   (Whereupon a document was identified as
20   Plaintiff's Exhibit 103.)
21   Q    I'm now handing you what I've
22 marked for identification as Plaintiff's
23 Exhibit 103, and is this the final version of
24 House Bill 566 as approved by the governor?
25   A    I believe that it is, yes. I'm --

213

1  I'm looking at it. There's so many statistics
2  on it, but that's essentially what it says,
3  yes.
4      Q    And it's from -- it was actually
5  codified as Act No. 251.
6      A    Yes.
7      Q    Is that correct?
8      A    That's -- yeah. Here again,
9  that's, that's what it states.
10      Q    Now, prior to the bill being signed
11  by the governor, you received a press inquiry
12  regarding House Bill 566; correct?
13      A    I'm sure I did. You'd have to show
14  me specifically, but there were press
15  inquiries, yes.
16      (Whereupon a document was identified as
17      Plaintiff's Exhibit 104.)
18      Q    I'm handing you what I've marked
19  for identification as Plaintiff's Exhibit 104,
20  and if you could let me know when you finish
21  having a chance to read it.
22      A    Okay.
23      Q    Referring to the email at the
24  bottom of the chain on the second page, you
25  received a press inquiry from Sandra Parrish

214

1  at WSB Radio; is that correct?
2      A    That is correct according to the
3  record you have here.
4      Q    And this is on Bates page GA000101;
5  correct?
6      A    Yes, uh-huh.
7      Q    And then you, you drafted an email
8  proposing to respond to her email and ran it
9  by Spiro Amburn and Gina Wright; is that
10  correct?
11      A    That is correct.
12      Q    And why did you send this email to
13  them specifically?
14      A    Well, I wanted to -- when I send
15  something to the press, I want to make sure
16  it's absolutely correct and that I have not
17  misstated anything. And it's always good to
18  have somebody look at it, and those are the
19  two people I chose to have a look at it.
20      Q    And what knowledge of the
21  redistricting did Spiro Amburn have that made
22  you want to run this by him to check it for
23  accuracy?
24      A    Well, he's, he's the Speaker's --
25  in the Speaker's office. And when I send

215

1  something out, a major release like that, I
2  want the Speaker's office to be aware of it.
3      Q    And Spiro Amburn replied and
4  offered a few suggestions which he placed in
5  brackets in your original email; is that
6  correct?
7      A    Uh-huh (affirmative).
8      Q    And in the first paragraph, he
9  added very, very minor adjustments in the
10  first sentence. Do you see that?
11      A    I do.
12      Q    And you eventually sent an email
13  with these edits back to Sandra Parrish; is
14  that correct?
15      A    I'm -- I would assume that I do. I
16  don't see it here, but that was the purpose of
17  trying to get the, you know, the details
18  together to make sure we had accurate
19  information to her.
20      Q    Do you agree with the
21  characterization that the -- that very minor
22  adjustments were made to districts in House
23  Bill 566?
24      A    Yes.
25      Q    As chair of the Reapportionment

216

1  Committee, did you feel that you had any
2  special responsibility to stay knowledgeable
3  about elections in Georgia?
4      A    No.
5      Q    During your time in the
6  legislature, have you come to any conclusions
7  whether or not there is any correlation
8  between race and party in Georgia?
9      A    What do you mean by correlation?
10  If you look at the -- if you look at the two
11  caucuses, there are more minorities in the
12  Democratic caucus, if that's the question
13  you're asking. Is that the question you're
14  asking?
15      Q    I'll take that as a, as a response,
16  yes.
17      And why do you think that is?
18      A    I, I don't know. They obviously --
19  there's, there's a -- they agree with the
20  philosophy there rather than in the Republican
21  Party.
22      Q    And when you say "they," are you
23  referring to African-American voters?
24      A    Well, the question you asked me,
25  yes, the people who are part of the party

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

217

1 obviously adhere to the properties of that
2 party.
3     Q    And are there any African-American
4 Republican representatives in the Georgia
5 House currently?
6     A    At this time, I don't believe so.
7     Q    In -- does this -- does the makeup
8 of the districts from a racial demographic
9 perspective correlate to whether that district
10 is a Democratic district or a Republican
11 district?
12    A    I would say in general, yes.
13    Q    And what is that, what is that
14 correlation?
15    A    What do you mean?  Restate the
16 question.
17        MR. POWERS:  Joel, would you mind
18 repeating the question?
19    (Whereupon the court reporter read back
20    the referred-to portion as follows:)
21    Q    And what is that, what is that
22 correlation?
23    (Whereupon the reading back was
24    concluded.)
25        MR. KHOURY:  Yeah.  I think he

218

1 asked you to restate, not to repeat it.
2 There's a difference.  Is that what you --
3 you're asking him to --
4        THE WITNESS:  Yeah.
5        MR. KHOURY:  You're not
6 understanding what he's asking; correct?
7     A    I'm not understanding exactly what
8 you're asking in terms of correlation.
9        MR. POWERS:  And I had forgotten
10 what I said, so I'm asking him to repeat it.
11       MR. KHOURY:  Okay.  He should have
12 read one back.
13    (Whereupon the court reporter read back
14    the referred-to portion as follows:)
15    Q    And are there any African-American
16 Republican representatives in the Georgia
17 House currently?
18    A    At this time, I don't believe so.
19    Q    In -- does this -- does the makeup
20 of the districts from a racial demographic
21 perspective correlate to whether that district
22 is a Democratic district or a Republican
23 district?
24    A    I would say in general, yes.
25    Q    And what is that, what is that

219

1 correlation?
2     A    What do you mean?  Restate the
3 question.
4     (Whereupon the reading back was
5     concluded.)
6        MR. POWERS:  I'll move on.
7        MR. KHOURY:  Okay.
8     (Whereupon a document was identified as
9     Plaintiff's Exhibit 105.)
10    Q    I'm handing you what I've marked
11 for identification as Plaintiff's Exhibit 105.
12 And I'd actually -- I'm actually going to ask
13 you about the first attachment to that email,
14 Bates page -- let's see, which is following
15 Bates page GA2-001169.
16    A    69.  Okay.
17    Q    Yeah.  So it's the --
18    A    The second page.
19    Q    And in particular, I'm going to ask
20 you about the spreadsheet on the next page.
21    A    Okay.
22    Q    Right.  But just as a housekeeping
23 matter, Plaintiff's Exhibit 105 begins as an
24 email from Dan O'Connor to Jan Jones dated
25 September 4th, 2015, at 4:24 p.m., and that's

220

1 Bates page number GA2-001168.
2     A    Okay.
3     Q    And referring now to the
4 spreadsheet, what's the title of the
5 spreadsheet?
6     A    Georgia - Members Elected to State
7 House November 2014 (Based on Black Percentage
8 of Registered Voters, October 2014).
9     Q    And what does, what does this
10 spreadsheet tell you about the relationship
11 between the black percentage of registered
12 voters and whether that district elects a
13 Democrat or a Republican representative?
14    A    The higher the black percentage,
15 the higher the percentage of elected official
16 being Democrats.
17    Q    And as of, as of November 2014,
18 only two Republicans were elected in districts
19 in which the black registered voter percentage
20 was greater than 40 percent; correct?
21    A    Yes, that appears to be true,
22 uh-huh (affirmative).
23    Q    And as of the same time period,
24 only five Democrats were elected in State
25 House districts in which the black registered

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

221

1    voter percentage was below 40 percent; is that
2    correct?
3        A    Only -- state that again now.
4    Only --
5        Q    Five Democrats were elected as of
6    November 2014 in districts in which the black
7    registered voter percentage was less than 40
8    percent?
9        A    Yes, yes.
10       Q    And this is -- this is common
11   knowledge in Georgia, right, that if a
12   district has a high black population
13   percentage, it will be a Democrat district?
14       MR. KHOURY:  Is that -- I'll
15   object.  Objecting to the form of the
16   question.
17       Q    You may answer.
18       A    In general, I would say that, that
19   tends to be correct, yes.  The statistics are
20   right there.
21       Q    And is this subject one that you
22   talked about with members of the
23   Reapportionment Office?
24       A    No.
25       Q    Is this a subject you talked about

222

1    with other legislators?
2        A    In terms of specifics and looking
3    at what the, what the, what the districts are,
4    yes.
5        Q    And who did you have those
6    conversations with?
7        A    I can't give you specifics.
8        Q    And how frequently have you had
9    those conversations over the years?
10       A    Very infrequently.  That's never
11   been a consideration.
12       Q    And did it come up while you were
13   chair of the House Reapportionment Committee?
14       A    It did not come up in anything
15   other than statistics.
16       Q    A number of -- strike that.
17       The Reapportionment Office had
18   drawn several proposed iterations of House
19   District 105 over the course of the
20   legislative session; correct?
21       A    I would assume so.
22       Q    And you were -- these probably
23   would have been created subsequent to the
24   meeting that you attended at the
25   Reapportionment Office?

223

1        A    In terms of the final product, yes.
2        (Whereupon a document was identified as
3        Plaintiff's Exhibit 106.)
4        Q    I'm handing you what I've marked
5    as -- marked for identification as Plaintiff's
6    Exhibit 106.  This is Bates page number
7    GA2-003027; correct?
8        A    That's correct.
9        Q    And it has the stamp of the
10   Legislative & Congressional Reapportionment
11   Office; correct?
12       A    At the bottom, yes.
13       Q    And in the top right, it says,
14   "Client: HD105."  Correct?
15       A    Yes.
16       Q    And then under that, it says,
17   "Plan: HD105amdp2-2014"?
18       A    Correct.
19       Q    And was this map something that
20   would have been placed in your, in your folder
21   for review?
22       A    I, I don't recall ever having seen
23   it.  I guess the answer is no.  I don't -- I
24   don't recall this.  I didn't get these types
25   of things.  There's very little information

224

1    there I can use, so no.
2        Q    And did you review maps like these
3    during the redistricting process in 2015?
4        A    I'm sure we did.  I looked at maps,
5    but these are, these are very -- these are
6    very blank in what they have.  Yeah, we looked
7    at a lot of maps.
8        Q    And this configuration of House
9    District 105 is, is different from House
10   District 105 as it existed prior to HB 566 as
11   well as the version that was finally adopted
12   in House Bill 566; correct?
13       A    I can't verify that, no.
14       Q    And in the middle of the page,
15   there's a little star, and it has an address
16   for 275 Helen's Manor Drive.  Do you see that?
17       A    In the middle of the page?  No.
18   Help me out.
19       Q    That may not be the middle of the
20   page.  Sorry.
21       A    And what is -- what does it
22   signify?  The closest thing at 147 Bay Crest
23   something, 275 Helen's Manor Drive, is that
24   what you're --
25       Q    Yeah.

Donovan Reporting, PC                                    770.499.7499

225

1    A    Okay.
2    Q    Is that Representative Chandler's
3    address there?
4    A    I don't know.
5    Q    And in this version of House
6    District 105, there's -- Harbins B is located
7    within this version, correct, of -- within
8    this version of House District 105?
9    A    Are you talking about this?
10   Q    Yes.
11   A    It says that it is, yes.  Now, this
12   map to me doesn't give me a lot of detail.
13   That does appear on the piece of paper that
14   you gave to me.  The significance, I cannot
15   verify.
16        (Whereupon a document was identified as
17        Plaintiff's Exhibit 107.)
18   Q    I'm handing you what I've marked
19   for identification as Plaintiff's Exhibit 107,
20   and this is Bates page GA2-003012; correct?
21   A    Yes, uh-huh.
22   Q    And this is another map titled
23   House District 105; correct?
24   A    That's what it states, yes.
25   Q    And it has the Legislative &

226

1    Congressional Reapportionment Office stamp at
2    the bottom; correct?
3    A    Yes.
4        (Whereupon a document was identified as
5        Plaintiff's Exhibit 108.)
6    Q    And I'm handing you what I've just
7    marked for identification as Plaintiff's
8    Exhibit 108.  And I'll represent to you that
9    this spreadsheet was associated with the plan
10   name HD105amdp1-2014.
11   A    That's what it says, yes.
12        (Whereupon a document was identified as
13        Plaintiff's Exhibit 109.)
14   Q    Handing you what I've just marked
15   for identification as Plaintiff's Exhibit 109.
16   And this is Bates page number GA2-003019;
17   correct?
18   A    Correct.
19   Q    And this map is titled Proposed
20   House District 104 and 105; correct?
21   A    That's correct.
22   Q    And if you look in the top
23   right-hand corner, the plan number or the plan
24   is called HD105amdp1-2014; correct?
25   A    That's, that's what's there, yes.

227

1    Q    And that, that number matches the
2    number of the spreadsheet in Plaintiff's
3    Exhibit 108; correct?
4    A    Yes, it does, uh-huh.
5    Q    Is this the sort of data that you
6    reviewed when looking at proposed changes to
7    maps such as House District 105?
8    A    I did not review this information.
9    This was produced by the Reapportionment
10   Office.  I'm assuming they produced it for
11   their review.  I did not review this.
12   Q    Did you review statistics like
13   these, for example, in the meeting at the
14   Reapportionment Office or in other
15   conversations you had with folks at the
16   Reapportionment Office?
17   A    Not specifically, no.
18   Q    When you reviewed the -- when you
19   were at the Reapportionment Office and you had
20   the tables on the screen next to, next to the
21   maps, did the tables contain the same kinds of
22   political performance data and population and
23   demographic data contained in these charts?
24   A    There was a tremendous amount of
25   data on the maps, and I'm sure that some of

228

1    that did appear.
2        (Whereupon a document was identified as
3        Plaintiff's Exhibit 110.)
4    Q    I'm handing you what I've marked
5    for identification as Plaintiff's Exhibit 110.
6    And this spreadsheet is titled
7    HD105amdp2_2014_data; correct?
8    A    Correct.
9    Q    And on the left under plan name, it
10   says HD105amdp2-2014; correct?
11   A    Correct.
12        MR. POWERS:  Can we take a
13   five-minute break so I can get my documents
14   together?
15        THE WITNESS:  Okay.
16        MR. POWERS:  I think we're getting
17   close.
18        THE VIDEOGRAPHER:  Going off the
19   video record at 7:49.
20        (Proceedings in recess, 7:39 p.m. to
21        7:56 p.m.)
22        THE VIDEOGRAPHER:  We are now back
23   on the video record at 7:56 p.m.  This is the
24   start of video file number six.
25        (Whereupon a document was identified

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

Case 1:17-cv-01427-TCB-MLB-BBM   Document 124   Filed 02/26/18   Page 65 of 96

---

229

1    as Plaintiff's Exhibit 111.)
2        Q    Representative Nix, I am handing
3    you what I've previously marked for
4    identification as Plaintiff's Exhibit 111.
5    And tell me when you've had a chance to read
6    through the document.
7        A    Okay.
8        Q    And this is on Bates page GA000079.
9    Do you see that?
10       A    Yes, uh-huh.
11       Q    And at the top of the chain, you
12   were forwarding to Gina Wright and Spiro
13   Amburn an email dated April 29th, 2015;
14   correct?
15       A    Yes.
16       Q    And you were forwarding an email
17   that had actually been sent to you by
18   Representative Chandler, I take it?
19       A    Yes.
20       Q    On April 28th, 2015.  And she said
21   that she wanted to be sure that you were aware
22   of this.  Do you see that?
23       A    Yes.
24       Q    And as we discussed earlier, you
25   were in fact contacted by the press around

---

230

1    this time?
2        A    Yes.
3        Q    Regarding redistricting in
4    Gwinnett; correct?
5        A    That is correct.
6        Q    And why did you forward the email
7    on to Gina Wright and Spiro Amburn?
8        A    I felt like they need to be aware
9    of the fact that the -- that this was out
10   there.
11       Q    Were you surprised when you became
12   aware of complaints that House Bill 566
13   diluted African-American voting strength in
14   Gwinnett County?
15       A    No, I was not surprised.
16       Q    And why weren't you surprised?
17       A    Well, for the reasons we talked
18   about earlier.  There was some stir made about
19   it in the Senate, and some people picked that
20   up, and I think they took a lot of things out
21   of context and tried to make something out of
22   it.
23            But there was -- I'm not -- I was
24   not surprised by it.
25       Q    And when you say, "take things out

---

231

1    of context," what do you mean by that?
2        A    Well, I don't think they were
3    working off of the real information here.
4            AUTOMATED MESSAGING:  Due to the
5    small number of remaining conferees, this
6    conference will be broken down in five
7    minutes.  Enter star one to cancel and
8    continue the conference.
9            MR. KHOURY:  Is anybody still on
10   the phone?
11           MR. STRICKLAND:  I didn't know we
12   had anybody on the phone.
13           MR. KHOURY:  I don't know that we
14   did either, but I was asked to set up a call,
15   so I did.  I can hang it up.
16           MR. POWERS:  Yeah.
17           MR. KHOURY:  All right.  Sorry.
18           MR. POWERS:  Lost, lost the train
19   of thought.
20           MR. KHOURY:  Didn't know that was
21   coming.  Sorry.
22           THE WITNESS:  Yeah.
23           MR. POWERS:  If you wouldn't mind
24   reading back the question and answer?
25           (Whereupon the court reporter read back

---

232

1    the referred-to portion as follows:)
2        Q    And when you say, "take things out
3    of context," what do you mean by that?
4        A    Well, I don't think they were
5    working off of the real information here.
6            (Whereupon the reading back was
7    concluded.)
8        Q    And what do you mean by that?
9        A    They did not have the information.
10   Usually when these things come out, they're
11   not working off the real data we used.  I
12   trusted our process.  I trusted the
13   Reapportionment Office that everything we had
14   done was well within the bounds of what we
15   could do.
16           As I've mentioned many times, we
17   did not want to do anything that would violate
18   the integrity of the maps that had been done
19   before.  So I was not surprised that they did
20   it.  I did not feel like what they were saying
21   was accurate.
22       Q    You were aware that House Bill 566
23   decreased the black population percentage in
24   House District 105; correct?
25       A    I honestly did not look at that.

---

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

233

1    Q    And did reading this email prompt
2    you to conduct any investigation into whether
3    House Bill 566 did in fact decrease the black
4    population percentage in House District 105?
5    A    No.
6    Q    Why not?
7    A    Because I knew that we had done our
8    process properly, that the Reapportionment
9    Office had made sure that they had done their
10   things appropriately, that all members had
11   agreed to it. We passed it 168 to zero, and I
12   felt that was good enough for me.
13   Q    If House Bill 566 had in fact
14   decreased the black population percentage in
15   House District 105, would that have been
16   something that you would have wanted to know
17   about?
18   A    Only if it violated the tenets that
19   we have of making sure that we did not do
20   anything to call ourselves into question.
21   Q    Did you follow up regarding the
22   allegations of vote dilution in Gwinnett
23   County in any way other than forwarding along
24   these complaints to Gina and Spiro?
25   A    No.

234

1    Q    The House considered a new
2    redistricting plan in 2017; correct?
3    A    Yes.
4    Q    What was your involvement in the
5    redistricting plan this time given that you
6    were a member of the Reapportionment Committee
7    but no longer the chair?
8    A    Just as a, just as a committee
9    member in the committee hearing to hear the
10   bill presented. I had nothing to do with the
11   preparation.
12   Q    Were you, were you surprised that
13   the House was considering redistricting again
14   in 2017 after adopting House Bill 566 in 2015?
15   A    I did not anticipate it happening.
16   But, you know, with a new chairman, they're
17   pretty much free to look at what they would
18   want to look at.
19   Q    And did you attend the
20   Reapportionment Committee meeting in which
21   House Bill 515 was considered?
22   A    Was that the -- was that the one
23   for this year?
24   Q    Yes.
25   A    515? Yes, I was there for the

235

1    committee meeting. I thought mine was 515.
2    What was mine?
3    Q    566.
4    A    Okay. I'm sorry. Yes, I did.
5    Q    Okay. And what, what was discussed
6    at the committee meeting in March of 2017?
7    A    As I recall, it was -- the change,
8    I believe that it was only two districts, but
9    the proposed change in the -- in two districts
10   that the chairman had proposed.
11        (Whereupon a document was identified
12        as Plaintiff's Exhibit 53.)
13   Q    I'm handing -- actually, if you
14   wouldn't mind in the exhibit book flipping to
15   Plaintiff's Exhibit 53. It should be towards
16   the bottom there.
17   A    Okay.
18   Q    There, if you want to follow. And
19   this is Bates page GA000092; correct?
20   A    Correct.
21   Q    And this has the -- it's an email
22   from Dan O'Connor dated March 16th, 2017;
23   correct?
24   A    That is correct.
25   Q    And as you're flipping to page

236

1    GA00093, if you wouldn't mind reading, reading
2    that document, and tell me when you're done.
3    A    Okay.
4    Q    Do these minutes accurately reflect
5    your recollection of the, of the committee
6    meeting on House Bill 515?
7    A    They are the official record. I
8    think I spoke earlier that I thought there
9    were two districts. I think maybe there were
10   two districts that there was some concern
11   about. I did not remember the number of
12   districts.
13        But I would think that this is an
14   accurate portrayal of what happened. I just
15   did not remember the number of districts.
16   Q    Fair enough. And what districts do
17   you recall there being some concern about?
18   A    I think, as it mentioned in here,
19   Representative Jones, and I think her district
20   was the one that had some questions.
21   Representative Scott expressed concern about
22   the changes to District 73 and 111.
23        Those were the ones that I
24   remembered. That's why I was thinking it was
25   a two-district thing. But I think this

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

237

1  adequately does it. My memory's not as good
2  as the notes.
3      Q    And what do you recall -- strike
4  that.
5          Representative Strickland
6  represents District 111 in Henry County;
7  correct?
8      A    I believe that's correct, yes.
9      Q    And do you recall the nature of the
10  concerns Representative Scott expressed with
11  respect to Representative Strickland's
12  district?
13     A    May I raise a question?
14         MR. KHOURY: Yes.
15     A    This does not show me as in
16  attendance at this meeting, if you read the
17  members --
18         MR. KHOURY: Right.
19     A    -- that are present.
20         MR. KHOURY: I noticed that. Was
21  there more than one meeting?
22     A    I remember one meeting, and that's
23  why I'm a little bit confused with this, with
24  the number of districts. I'm on a number of
25  committees, and I could have missed a

238

1  committee meeting, but I -- my name does not
2  appear is what I'm saying.
3          Like I said, my recollection is not
4  great, but my name does not appear as person
5  in attendance there. I may very well have
6  been there, but I just noticed as I looked at
7  it. Apparently, if this was done correctly, I
8  was, I was not there.
9          And I'm not sure what significance
10  that is other than the fact my name does not
11  appear on the list. Is that -- is any more I
12  need to say? I don't know what the --
13         MR. KHOURY: I mean, you should
14  testify whatever you recall.
15         THE WITNESS: Yeah.
16         MR. KHOURY: I mean, you recall a
17  meeting. Whether it was this one or not, I
18  don't know.
19     A    I recall having a meeting. I think
20  there was only one meeting of that committee
21  during the session. If this was it, then I
22  was there. And a lot of this is somewhat
23  familiar. The number of districts for some
24  reason was not familiar.
25          So I'm just trying to make sure

239

1  that we're talking about the same thing.
2      Q    Absolutely. Absolutely.
3      A    So.
4      Q    And please only testify to what you
5  can remember.
6      A    Yeah.
7      Q    So referring to the meeting that
8  you attended --
9      A    Yes.
10     Q    -- related to House Bill 515, do
11  you recall there being concern about
12  Representative Strickland's district?
13     A    I don't recall the concern about
14  Representative Strickland's district. The
15  only one I remember with a significant concern
16  was Representative Sheila Jones. That's my
17  recollection.
18     Q    And was her concern related to the
19  substance of the changes to her district or
20  the amount of notice that she had received of
21  the changes prior to the committee hearing?
22     A    I believe it's the latter, the --
23  her understanding of the meeting in the time
24  that she had had to look at it.
25     Q    And do you recall any other

240

1  concerns being expressed with respect to House
2  Bill 515 at the hearing?
3      A    I do not. I do not. It was a
4  relatively short meeting. And those concerns
5  were raised and addressed, and we voted on it.
6      Q    And you voted to approve House Bill
7  515; is that correct?
8      A    That is correct.
9      Q    Both in committee and on the House
10  floor?
11     A    I believe that was correct. If I
12  was there, I did.
13         (Whereupon a document was identified as
14         Plaintiff's Exhibit 112.)
15     Q    Now I'm handing you what I've
16  marked for identification as Plaintiff's
17  Exhibit 112.
18     A    Okay.
19         MR. STRICKLAND: Is this 112?
20         MR. KHOURY: This is 112. It's a
21  dirty trick, John, to give us this little font
22  in the sixth hour in the deposition.
23         MR. POWERS: I'm sorry.
24         MR. KHOURY: I'm teasing.
25         THE WITNESS: Oh, oh. There's more

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

241

1    to it. I just read the first one. Okay. The
2    font, the font does get smaller as you go
3    back. I'm sorry. I didn't read all of this.
4        MR. KHOURY: We got four pages on
5    one.
6        THE WITNESS: Okay. I'm sorry.
7    Okay.
8        Q    And these were emails you received
9    from constituents regarding House Bill 515; is
10   that correct?
11       A    Apparently, if you look at the
12   addresses, nobody except one person did -- did
13   it have an address that could possibly be made
14   by a constituent. The others either did not
15   give an address or they were not in my
16   district.
17       Q    Fair enough. These were emails you
18   received from various -- some people opposing
19   House Bill 515.
20       A    Yes.
21       Q    Is that correct? And were you
22   surprised to receive these emails?
23       A    No.
24       Q    And why not?
25       A    That's become a big talking point

242

1    for some people that, you know, they want to
2    push on the idea of having a -- that whole
3    independent voter thing that we talked about
4    earlier that would have to be appointed.
5        And they're trying to figure out a
6    way to do something that would be different
7    from the current process. And I've seen that.
8    It's talked about a lot.
9        Q    So because people are opposed to
10   independent -- or strike that.
11       Your testimony that because people
12   are opposed to having the legislature draw
13   redistricting plans, they voice an opposition
14   to every redistricting plan that comes down
15   the pike?
16       A    That's pretty much true. I
17   wouldn't say that, that it's every one, but
18   that seems to be what generates these types of
19   emails.
20       Q    And did you undertake any kind of
21   investigation into whether House Bill 515 did
22   in fact dilute minority voting strength in any
23   of the affected districts?
24       A    I did not.
25       Q    And that's because you dismissed

243

1    the complaints as, as not being really related
2    to the substance of the bill. Is that
3    accurate?
4        A    I just disagree with their premise.
5    I think we do a good job with what we do. And
6    I know the one that I did, the work that went
7    into it. And I'm not sure that there's a
8    better process that it can be under, so I just
9    disagree with their, their premise.
10       Q    Did you ever -- strike that.
11       So is it fair to say that you
12   consider the crafting of House Bill 566 to be a
13   success?
14       A    Yes.
15       Q    At the time the bill was enacted,
16   were you aware of the potential that the bill
17   had the chance to affect electoral outcomes in
18   House District 105 and 111?
19       A    Yes.
20       Q    And after the election, did you look
21   into whether House Bill 566 might have changed
22   the outcome in the 2016 elections in House
23   Districts 105 and 111?
24       A    I did not look at the specifics. I
25   know both of those people won their election,

244

1    but I did not look at the specifics in the
2    return.
3        Q    Do you know if the House District
4    elections in House Districts 105 and 111 were
5    close in 2016?
6        A    I don't remember the numbers, but
7    they were relatively close.
8        Q    Now, do you recall -- strike that.
9        Did the Senate make any changes to
10   the 2017 redistricting bill, House Bill 515,
11   after it was passed by the House?
12       A    I don't know.
13       Q    Do you know if any changes to House
14   Bill 515 were made in the House?
15       A    Not, not anything made after we
16   voted on it. The bill we passed is the one
17   that went to the Senate is my understanding.
18       (Whereupon a document was identified as
19   Plaintiff's Exhibit 113.)
20       Q    I'm handing you I've marked for
21   identification as Plaintiff's Exhibit 113.
22   And, Representative Nix, what is Plaintiff's
23   Exhibit 113?
24       A    Proposed Georgia House Districts -
25   Committee Substitute.

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

245

1    Q    And does the -- would this have been
2  the packet that would have -- that is produced
3  by the Legislative & Congressional
4  Reapportionment Office?
5    A   I believe that it is, yes.
6    Q    And it has a statewide map and then
7  zoom-ins of Districts 104 and 105, 53 and 55,
8  27 and 30, and a variety of -- and then a
9  zoom-in of Districts 73, 109, 110, 111, and
10  130; is that correct?
11    A   Yes.
12    Q    And then what follows is the
13  statistical data produced by the
14  Reapportionment Office; correct?
15    A   Yes.
16    MR. POWERS:  All right.  I think
17  I'm, I'm getting very close.  If we could just
18  have a couple-minute break for me to make sure
19  I haven't missed anything.
20    THE VIDEOGRAPHER:  Going off the
21  video record at 8:27 p.m.
22    (Proceedings in recess, 8:27 p.m to
23    8:39 p.m.)
24    THE VIDEOGRAPHER:  We're now back on
25  the video record at 8:39 p.m.

246

1    (Whereupon a document was identified
2    as Plaintiff's Exhibit 114.)
3    Q    Representative Nix, I'm going to
4  hand you what I've marked for identification as
5  Plaintiff's Exhibit 114.  I only seem to have
6  three copies.
7    MR. KHOURY:  Okay.  We'll share.
8  And take a second to read, and let me know when
9  you're done.
10    MR. STRICKLAND:  Off the record.
11    (Whereupon off-the-record discussions
12    ensued.)
13    A   Okay.  I've gone through it pretty
14  quickly.
15    Q    Do you recall -- well, first, at the
16  top, this says it's an email from Dan O'Connor
17  to you dated June 7th, 2016; is that correct?
18    A   That's correct.
19    Q    And the first Bates page number is
20  GA2-002542; correct?
21    A   Correct.
22    Q    And what was -- if you look at the
23  bottom of the second page, following the (End
24  of the Lindsay Comments)—Dan Below Here says,
25  "As we also discussed, midterm redistricting is

247

1  nothing new in Georgia."  Do you see that?
2    A   Yes.
3    Q    And what did -- what was the genesis
4  of this email exchange between you and
5  Mr. O'Connor?
6    A   I don't recall.  Apparently, he was
7  updating me on the information relative to the
8  outcome of that commission and just giving his
9  experience in the fact that, you know, midterm
10  reapportionment is not a, not an unusual
11  occurrence.
12    I don't recall what initiated other
13  than him coming and following up and just, just
14  kind of letting me know where, where things
15  were is my recollection.
16    Q    And what was your view as to the
17  recommendations of the -- with respect to an
18  independent redistricting commission?
19    A   I think it just validated the things
20  that I had been saying.  It's a, it's a
21  political process.  And at that -- I don't
22  think there's the way to eliminate that from
23  it.  I think it validates everything that I
24  said to you thus far.
25    (Whereupon a document was identified as

248

1    Plaintiff's Exhibit 115.)
2    Q    I'm handing you what I've marked for
3  identification as Plaintiff's Exhibit 115.  And
4  this is an article entitled Georgia Republican
5  Redistricting Plan Called, quote-unquote,
6  'Blatant' Power Grab.  Do you see that title?
7    A   Yes.
8    Q    And it's dated March 8th, 2017.  Do
9  you see that?
10    A   Yes.
11    Q    And I'd like to refer you to the
12  third page and in particular to the paragraph
13  beginning, "When Republican Speaker of the
14  House, David Ralston, defended the boundary
15  changes, he alluded to the fact the party who
16  controls the state legislature also controls
17  how districts are drawn."  Do you see that?
18    A   Yes.
19    Q    And goes on to say that when
20  Democrats ruled the State House, they tried to
21  set up the districts in a way that would enable
22  them to retain political power?
23    A   Yes.
24    Q    Is it your view that Democrats did
25  in fact try to draw districts in a way that

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

249

1  would enable them to retain political power
2  when they ruled the State House?
3      A    According to the record, if you read
4  the next sentence, it was declared
5  unconstitutional by federal court.  So I would
6  assume that that would be true.
7      That's why I was so adamant about
8  the fact that we did not want to break with the
9  integrity of the plan we got passed that had no
10  challenges whatsoever, I think the first time
11  in the history of the state of Georgia.
12      Q    And do you also agree with the quote
13  attributed to Speaker Ralston that the party
14  who controls the state legislature has the
15  power to control how the districts are drawn?
16      A    Yes.
17      MR. POWERS:  I have no further
18  questions.
19      The only thing I would add is that
20  if documents from you are discovered or
21  produced later in the litigation that we want
22  to have the ability to depose on the additional
23  documents.
24      MR. KHOURY:  And we can -- we'll
25  address that if it comes up.  I'm not going to

250

1  agree to that right now.  But I know there's
2  one document that was discovered during this
3  deposition that you're going to give to me.
4      THE WITNESS:  Yes.
5      MR. KHOURY:  And that I will
6  produce.  I think it's a three-page document.
7  He's already testified to the contents of the
8  document, so let's address that if it comes up.
9      MR. POWERS:  I, I agree.
10      MR. KHOURY:  Sure.  Okay.  Great.
11  Thank you.
12      THE VIDEOGRAPHER:  This concludes
13  the video deposition at 8:49 p.m.
14      THE COURT REPORTER:  And you're
15  going to reserve signature?
16      MR. KHOURY:  Yes, please.
17      (Proceedings adjourned, 8:49 p.m.)
18
19
20
21
22
23
24
25

251

1  I, RANDALL O. NIX, Deponent,
2  do hereby certify that I have read the
3  foregoing deposition, and the same is a true
4  and accurate transcript of my testimony, except
5  for the changes listed below, if any.
6  PAGE/LINE/CHANGE                    REASON
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
     If additional space is needed, please attach
20  separate sheet(s) and indicate number of
     additional page(s) here:_____
21
22
     RANDALL O. NIX, Deponent
23  This _____ day of _____, 20____.
24  Donovan Reporting, PC FAX: 770-428-5801
     237 Roswell Street Marietta, GA  30060
25  Date of Deposition: 1-10-2018 CR: JM

252

1      CERTIFICATE OF COURT REPORTER
2  STATE OF GEORGIA
3  COUNTY OF COBB
4      I hereby certify that the foregoing
5  deposition was reported as stated in the
6  caption, and the questions and answers thereto
7  were reduced to writing by me;
8      That the witness's right to read and
9  sign the deposition was reserved;
10      That the foregoing pages 1 through 253
11  represent a true, correct, and complete
12  transcript of the evidence given on the
13  above-referenced date by the witness, RANDALL
14  O. NIX, who was first duly sworn by me;
15      That I am not of kin or counsel to any
16  of the attorneys or parties in this case.
17      I do hereby disclose pursuant to
18  Article 10.B. of the Rules and Regulations of
19  the Board of Court Reporting of the Judicial
20  Council of Georgia that I am a Georgia
21  Certified Court Reporter; that I am an employee
22  of Donovan Reporting PC; that Donovan
23  Reporting PC was contacted by the attorney
24  taking the deposition to provide court
25  reporting services for this deposition; that I

Electronically signed by Joel Moyer (501-161-376-4513)                    4dd8d33d-566f-46b5-8729-373a760afce8

253

1   am not taking this deposition under any
2   contract that is prohibited by OCGA 15-14-37(a)
3   and (b) or Article 7.C. of the Rules and
4   Regulations of the Board; and I am not
5   disqualified for a relationship of interest
6   under OCGA 9-11-28(c).
7          There is no contract to provide
8   reporting services between myself or any person
9   with whom I have a principal and agency
10  relationship nor any attorney at law in this
11  action, party to this action, party having a
12  financial interest in this action, or agent for
13  an attorney at law in this action, party to
14  this action, or party having a financial
15  interest in this action.  Any and all financial
16  arrangements beyond my usual and customary
17  rates have been disclosed and offered to all
18  parties.
19         This 23rd day of January 2017.
20
21
        _____
        JOEL P. MOYER, CCR 2745
22      Certified Court Reporter
23
24
25

Electronically signed by Joel Moyer (501-161-376-4513)          4dd8d33d-566f-46b5-8729-373a760afce8

Randall O. Nix                Georgia State Conference of the NAACP, et al vs Kemp                January 10, 2018

**A**

**ABHA** 2:13
**ability** 41:5 42:7
  69:13 249:22
**able** 41:25 42:4 46:11
  81:18 83:5,12
  95:25 97:22 100:22
  101:19 102:16
  103:15 131:22
  143:12 144:15
  167:21 177:19
  188:16
**above-referenced**
  252:13
**abreast** 175:19
**absolutely** 214:16
  239:2,2
**AC** 202:12
**accept** 44:19 54:17
**acceptable** 12:1 81:5
**accepted** 55:2,4,20
  95:2
**accommodate** 201:9
**accompanies** 183:5
**accomplish** 143:1
**account** 50:19
**accuracy** 214:23
**accurate** 120:13
  146:21 215:18
  232:21 236:14
  243:3 251:4
**accurately** 236:4
**achieve** 147:16
**achieved** 156:18
**act** 72:5 129:5 191:4
  200:8,25 213:5
**acted** 45:5
**acting** 136:22
**action** 146:3 253:11
  253:11,12,13,14,15
**active** 21:16 40:13
  45:2,4,15
**activity** 76:19
**actual** 130:9 131:7
  183:13
**adamant** 249:7
**add** 249:19
**added** 215:9
**addition** 17:8 100:16
  101:13 102:9
  148:14

**additional** 111:19
  191:16 249:22
  251:19,20
**address** 12:20 13:1
  161:8 224:15 225:3
  241:13,15 249:25
  250:8
**addressed** 203:16
  240:5
**addresses** 13:5
  241:12
**adds** 153:24
**adequately** 194:23
  237:1
**adhere** 217:1
**adjourned** 250:17
**adjustments** 145:6
  215:9,22
**administration** 57:9
**administration's**
  95:2
**adopt** 71:22 72:12
  125:22 185:10
  212:6
**adopted** 123:5
  124:12 185:13
  188:20 224:11
**adopting** 234:14
**Adoption** 6:22 212:1
**advance** 184:14
**advanced** 27:5
**advantage** 5:18 74:8
  77:14 80:12
**adversely** 159:14
**advice** 56:3
**affairs** 51:12
**affect** 79:4 94:8
  108:25 110:11
  112:4 144:14 151:6
  161:10 165:20
  243:17
**affirm** 166:9
**affirmative** 25:5
  53:20 77:19,24
  102:22 121:11,15
  132:14 202:17
  215:7 220:22
**afraid** 43:25
**African-American**
  103:14 172:12,18
  180:11 210:12
  216:23 217:3

  218:15 230:13
**afternoon** 9:19 15:12
**agency** 253:9
**agenda** 185:2 202:20
**agent** 253:12
**ago** 10:9,10 18:21
**agree** 41:9 60:24 72:9
  72:21 73:2,7 79:21
  80:5 85:13 94:11
  94:18 130:19
  141:23 142:5
  143:12,20 144:15
  144:18 146:2
  151:22 152:5,8
  167:21 169:19
  215:20 216:19
  249:12 250:1,9
**agreed** 97:24 98:14
  108:22 118:19,21
  119:9 194:12 195:4
  205:22 233:11
**agreement** 9:25
  95:22 160:4 166:17
  171:24 177:25
  178:4 186:22
**agreements** 187:19
**ahead** 203:20
**aid** 60:22
**Air** 21:16,17
**aisle** 41:8 83:3
**aisles** 80:1
**Alabama** 19:10,11,14
  21:3,7 26:16
**Alaga** 21:19,23
**Albany** 86:21
**Alex** 3:2 13:10
**Alexander** 100:17
  101:14 102:11
  103:18
**alive** 93:12
**allegations** 233:22
**allege** 210:7
**Allen** 3:3
**alluded** 248:15
**aloud** 122:2
**alternative** 111:15
**Amburn** 7:7,18
  67:20 69:1 83:22
  84:5 175:24 189:25
  214:9,21 215:3
  229:13 230:7
**amend** 125:4,6,7

**amended** 124:23
**amendment** 6:22
  126:16,18 128:22
  129:1 209:22 210:1
  211:6,25 212:1,6
**amendments** 123:20
  124:25 125:2
  126:13,24
**amount** 75:21 80:24
  107:17 112:10
  154:18 156:23,24
  156:24 227:24
  239:20
**analyses** 93:22
  107:22
**analysis** 93:24 138:23
  167:20 191:11
**analyzing** 91:14
  95:15
**ANDERSON** 1:7
**ANDREA** 1:7
**Angeles** 2:10
**announcement** 79:8
  82:21,23 129:17,23
**announcements**
  170:24
**annual** 32:6
**answer** 43:23 52:5
  72:3 74:12 76:20
  77:4 89:15 90:9
  138:15 177:1
  198:13,18 199:18
  207:5 221:17
  223:23 231:24
**answered** 48:1
  174:22 198:2,6,8
  200:4
**answering** 12:8,10
**answers** 252:6
**anticipate** 234:15
**anticipated** 137:8
**anybody** 55:2 70:15
  79:14 80:4 111:10
  130:18 138:19
  141:23 174:24
  182:25 191:24
  192:6 231:9,12
**anyway** 129:20
**apparently** 30:12,15
  126:19 137:8 238:7
  241:11 247:6
**appear** 52:18 120:15

  225:13 228:1 238:2
  238:4,11
**APPEARANCES** 2:1
**appeared** 51:1
**appears** 127:15 128:5
  128:12,22 129:3
  212:9 220:21
**appoint** 78:14
**appointed** 29:3,6
  54:4,10 78:13
  242:4
**appointment** 90:14
**appointments** 18:9
**appoints** 29:5
**appreciate** 12:6,11
**approach** 112:5
  135:12 137:24
  138:4 139:17
  157:14 174:2
**approached** 130:5
  133:6,25 139:7
  157:17 163:21
**appropriate** 81:18
**appropriately** 205:9
  205:11 233:10
**Appropriations**
  29:16 38:5,19
  39:22
**approval** 129:9,10
  189:20
**approvals** 187:19
**approve** 61:3 78:5
  211:20 240:6
**approved** 75:11
  76:16 123:21
  125:13 126:21
  136:13 177:16
  188:24 197:2
  201:20 204:24
  212:24
**approximately** 24:5
  24:10 25:1 33:3
**approximation** 66:7
**April** 32:17 124:15
  229:13,20
**area** 41:14 47:15
  63:15 65:25 66:1,2
  73:14 86:13,20
  87:2 112:23,24
  113:19,24 140:17
  146:4 153:5 160:19
  161:2 164:24

Randall O. Nix                Georgia State Conference of the NAACP, et al vs Kemp                January 10, 2018

Page 255

165:15 168:1 175:5
179:4,11 180:18,21
201:10
**areas** 65:22 86:22
140:21 169:25
171:5 194:8
**ARIEL** 2:7
**arrangements** 253:16
**arrested** 27:17
**ARREYMBI** 1:7
**article** 5:18 6:17 8:1
9:5 77:13,25 196:2
196:12 248:4
252:18 253:3
**aside** 15:5 45:13
169:23 189:5
**asked** 10:14,23 17:10
34:11;23,23 42:6
43:18,21 44:6,9,12
44:19 47:23 49:3,6
53:18,21 54:15
66:5 70:12,15 86:8
98:12 135:14 139:7
140:25 141:1
159:23 171:10
186:18 205:7,19
216:24 218:1
231:14
**asking** 12:7 57:14
62:19 63:17 64:15
65:23 97:3 129:21
135:3,5 137:19
142:13,19 198:4
199:20 205:17
216:13,14 218:3,6,8
218:10
**asks** 54:21
**aspect** 15:3 80:7
**assembled** 112:12
**Assembly** 6:7,19,21
7:1,4
**assess** 52:21 81:21
**assessing** 200:24
**assessment** 82:12
**assets** 23:5
**assigned** 34:8,11,13
126:12
**assigning** 153:8
**assignments** 43:18
56:17 90:10 104:14
104:23
**assimilation** 177:21

**assist** 16:20
**assistant** 22:2
**associated** 226:9
**association** 46:23
**assume** 33:16 72:1
89:21 195:5,19
201:7 207:11 208:3
210:14 215:15
222:21 249:6
**assuming** 100:1
124:9 127:7 227:10
**assured** 106:12
160:15
**Athens** 24:2,4,5
**Atlanta** 1:2,18 2:20
3:4 6:17 175:4
179:11 180:18
196:2
**attach** 251:19
**attached** 4:19
**attachment** 202:12
219:13
**attachments** 7:9
202:12,15
**attempt** 126:16
**attempted** 126:25
**attend** 155:22 163:6
170:13 234:19
**attendance** 237:16
238:5
**attended** 26:10
222:24 239:8
**attending** 163:8
**attention** 135:21
137:17 196:10
**attorney** 9:21 252:23
253:10,13
**attorneys** 9:23
252:16
**attributed** 249:13
**Audits** 34:3
**AUDRA** 1:6
**August** 77:17 132:15
133:5 136:5
**AUSTIN** 1:6
**AUTOMATED**
231:4
**automatic** 97:10
**available** 182:4,5
183:18 188:13
191:24 195:9,18
**Avenue** 2:5,10

**aware** 54:9 57:15
69:20 71:16,20
76:13 79:14 106:8
108:1 174:6 178:17
180:5,10 190:13
192:12,13,16,23,24
195:8 209:11 215:2
229:21 230:8,12
232:22 243:16

_____
                    **B**
**b** 2:18 225:6 253:3
**bachelor's** 20:22
**back** 17:22 20:1
21:18 22:20,21
23:7 32:19 50:8,13
64:6 76:10,11 77:2
79:5,7 89:6 102:20
108:21 116:13
137:14 138:11
139:5 140:8,11,21
149:24 154:14,20
158:19 161:6
168:22 173:5,12
174:24 182:21
192:21 193:2
198:13,19 199:11
200:18 201:14
207:24 215:13
217:19,23 218:12
218:13 219:4
228:22 231:24,25
232:6 241:3 245:24
**background** 88:7
**Bainbridge** 86:21
**balance** 79:3 80:3,20
**Balch** 1:17 3:2
**ballot** 51:1 153:22
**bank** 21:5,7,15 24:22
26:22
**banking** 21:2 27:19
29:16 34:2 36:17
38:5,20 39:1,23
40:4
**Banks** 29:16 34:2
36:17 38:5,19 39:1
39:22 40:4
**Barbara** 99:21
**base** 72:2,3
**based** 51:25 71:24
72:15 185:18 220:7
**basic** 65:15

**basically** 11:2 26:22
55:2 57:4 66:20
67:14,24 87:1,7
109:9 112:16,20
158:7 178:2 205:20
**basis** 17:17 92:13
108:17 174:18
**Bates** 4:23 132:5,9
214:4 219:14,15
220:1 223:6 225:20
226:16 229:8
235:19 246:19
**Bay** 224:22
**BB&T** 27:23 28:2,3
**Beasley-Teague**
99:18 100:17
101:14 102:12
103:17
**becoming** 54:1 87:8
88:4 90:1 129:10
**began** 68:20 157:4
**beginning** 1:19 4:22
7:20 47:15 50:13
82:25 139:24
248:13
**begins** 219:23
**begun** 188:5
**believe** 13:14 21:24
22:13 25:10 30:18
33:8 48:7 49:1,16
49:22 101:10
102:18 103:6,18,18
105:14 117:11,15
125:3 128:15 136:4
153:12 165:2,10,17
167:15 174:12
186:9 208:7 209:1
210:2 212:25 217:6
218:18 235:8 237:8
239:22 240:11
245:5
**benefit** 71:22 72:13
75:21
**best** 14:3 42:21 43:4
44:18 54:25 66:6
75:4 113:8 127:22
146:6,7
**better** 81:10 89:18
154:2 243:8
**beyond** 97:17 118:24
131:4 209:16
253:16

**big** 28:11 34:18 47:13
55:10 107:3 151:2
241:25
**biggest** 36:25 47:18
114:2 144:16
146:13
**bill** 6:10,11 7:5 37:7
37:12 42:2 43:5
83:1 95:15 97:6,9
97:12,20 98:8,20,24
105:3,12,22 106:18
107:2,21 109:4
115:24 117:9 118:3
118:5,6,7,15,22,24
119:2,3,6,9,12,17
120:7,22 121:4,6,21
121:25 122:1,4,21
122:24 123:8,10,11
123:23 124:2,5,5,12
124:14,17 125:13
125:22 126:1,5,10
126:12 127:8,16
128:10,13 129:12
130:9 133:5 134:13
135:19 138:21
146:1 154:9 169:7
171:12 173:17
175:7,9 177:20
178:7 182:1,9,11,14
182:17,19,24,24
183:4,10,17,18
184:24,24 185:7,12
186:5,7,12 187:4,23
188:3,18 189:21,25
190:14,16,21,21
191:3,9 192:3,9
193:17 194:5,23
195:9 203:9,16,17
204:3,11,23 205:3
205:20 206:23,25
207:3,7,14,18,25
208:6,10,24 209:12
210:5,8,20 211:7,24
212:7,17,24 213:10
213:12 215:23
224:12 230:12
232:22 233:3,13
234:10,14,21 236:6
239:10 240:2,6
241:9,19 242:21
243:2,12,15,16,21
244:10,10,14,16

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

**bills** 37:4 106:7,7
   116:17,22 117:1
   188:24
**bill's** 182:3
**binder** 202:6
**Bingham** 1:17 3:2
**bio** 20:18,20 30:13,15
**Biography** 5:5
**birth** 19:7
**bit** 28:25 30:14 35:9
   56:3 64:23 79:6
   86:19 154:21
   237:23
**black** 99:18 100:18
   220:7,11,14,19,25
   221:6,12 232:23
   233:3,14
**blank** 63:6,9 224:6
**Blatant** 8:2 248:6
**block** 153:3
**blocks** 153:9 183:8
**blown** 148:6
**board** 9:6 167:6
   252:19 253:4
**boards** 60:11
**board's** 61:9
**Bob** 99:18
**bodies** 60:17
**body** 69:9 70:25
   78:21 105:10
   106:22 201:21
**bolts** 56:6 59:12
**book** 235:12
**bordered** 145:16
**bottom** 120:24 207:9
   213:24 223:12
   226:2 235:16
   246:23
**bought** 62:23,25
**Boulevard** 3:3
**boundaries** 6:8 75:3
   75:24 82:6 85:9
   93:15
**boundary** 248:14
**bounding** 89:8
**bounds** 232:14
**box** 144:22 157:8
**Boys** 46:18
**brackets** 215:5
**break** 56:8 63:21,23
   63:25 64:12 116:4
   168:5,14 169:1

200:13,22 207:22
   228:13 245:18
   249:8
**breakdown** 95:10
   96:6 102:24 150:10
   150:14 207:6
**Brian** 1:10 96:22
**briefly** 13:10
**bring** 41:6,15 42:1,4
   42:5,8 43:2 133:2
   140:10 148:25
   149:6
**bringing** 41:12
**broad** 180:19
**broader** 193:21
**Brockington** 2:18
**broke** 207:20
**broken** 231:6
**broker** 22:8 23:15
**brokerage** 22:7,20
   25:11,16,18,21
**brought** 25:9 135:21
   137:10,17 149:4
**Brown** 45:25 46:24
**Bryant** 99:18
**bubbling** 47:18
**build** 62:25 64:20
**Building** 203:5
**business** 13:1 20:22
   22:8,19,21,24,25
   23:3,6,8 25:11,18
   25:21 26:6,7,9 27:3
**busy** 44:22 209:5
**bylaws** 185:10,14

────────────────
          **C**
**C** 2:7
**CA** 2:10
**Caldwell** 6:3 102:10
**calendar** 18:4,6,9,12
   18:14
**call** 19:3 95:6 110:17
   110:17 163:2 168:6
   168:7,9 174:21
   231:14 233:20
**called** 8:1 226:24
   248:5
**cancel** 231:7
**candidates** 149:21
   150:5
**capacity** 1:10 11:15
**capitol** 33:4

**caption** 252:6
**career** 37:11
**carried** 57:18,21 58:5
   72:24 97:15
**Carroll** 31:7 110:16
   111:18
**carry** 92:12 96:1
   119:10
**case** 1:9 9:24 10:18
   13:19,22 14:6,14,17
   14:20,24 15:3
   30:22 119:22
   252:16
**cases** 41:7
**caucus** 79:12,13
   84:19 216:12
**caucuses** 170:25
   216:11
**cause** 95:6
**CCR** 253:21
**cc'd** 7:18
**CELESTE** 1:4
**census** 55:10 66:17
   69:10,16,21 70:9
   71:15,19 87:13
   110:20 140:15
   150:14 153:8 183:8
   197:11 199:4
   201:24
**censuses** 201:11
**central** 19:10
**certain** 6:8 7:4 49:7
   107:17 120:19
   174:19
**certainly** 43:24 44:20
   58:8 76:21 133:3
**certificate** 4:14 26:20
   252:1
**Certified** 1:16 252:21
   253:22
**certify** 251:2 252:4
**cetera** 20:6 27:9
   151:7
**chain** 213:24 229:11
**chair** 39:10 43:18
   44:2,6,10,14 45:15
   53:21 54:1,4,11,15
   55:21 56:2,9 70:1
   76:3 79:1 87:8 88:5
   88:10,15 90:1,7,15
   91:17 97:6,8,11
   112:6 114:10

116:18 119:23
   120:2,6 215:25
   222:13 234:7
**chaired** 39:5 43:7
**chairing** 39:6 78:1
**chairman** 5:20,22 6:1
   6:3 30:21 39:2 40:4
   43:12 44:13 97:19
   99:13,16,17 102:4,9
   102:10 133:19
   234:16 235:10
**chairmanship** 43:21
**challenge** 57:8
**challenged** 57:6 75:9
   95:1
**challenges** 249:10
**chamber** 46:19 47:25
   49:2 79:9
**chance** 213:21 229:5
   243:17
**Chandler** 139:16
   146:10,24 155:21
   162:13 170:18
   171:3 177:9 178:14
   229:18
**Chandler's** 141:20
   144:1,9 145:4
   151:13 152:12,16
   153:11 154:8 155:7
   156:18 161:15
   163:9 167:11 172:9
   172:17 180:7 225:2
**change** 68:24 73:1
   74:19 75:12 79:22
   80:22 85:15 105:25
   126:11,14 128:25
   137:7 139:15 150:4
   165:24 179:6
   209:22 210:4 211:6
   212:7 235:7,9
**changed** 108:20
   129:7 145:8 243:21
**changes** 58:6 62:8,20
   63:18 64:16,17
   65:3 66:5,16,19
   68:9 72:22 73:17
   73:23 75:17 76:9
   80:1,2 81:4,22
   82:13 84:10,13,13
   85:6,7,12 86:2,3
   87:25 98:13,15
   107:15 111:4,6,7

123:8,10 126:24
   129:14 130:6,9,16
   130:25 131:7
   132:25 137:25
   138:5,20,24 139:7
   139:18,25 140:7
   143:25 148:11
   155:3 157:14 158:4
   159:5 160:18,24
   161:2 163:21
   164:15,17 165:8,14
   166:13 167:13
   168:1 169:6,24
   170:3,5 171:3,10,11
   171:25 172:10
   174:7,19 175:3,14
   177:16,18 178:18
   178:22 180:1,21
   181:11,21 182:21
   186:16,20 191:8,16
   194:24 196:23,24
   197:4,20,25 198:22
   199:24 205:18
   206:2 227:6 236:22
   239:19,21 244:9,13
   248:15 251:5
**changing** 62:4 178:15
   180:17
**chaplain** 42:23,25
**characterization**
   215:21
**charge** 74:14,17 75:7
   79:6 80:17
**charges** 82:9
**charts** 227:23
**Chattahoochee** 34:17
   34:21 35:2,5,7,13
   47:12
**check** 160:21 214:22
**chief** 67:20 83:22
**children** 30:3
**chose** 90:10 214:19
**chosen** 98:9
**Chuck** 101:16 102:10
   103:8
**church** 27:25 28:9,11
   28:16,20 29:5
**cities** 60:11
**citizens** 78:6
**city** 28:6 60:11
**Civil** 2:4 9:22 10:1
**claim** 10:18,23

**clarify** 54:20
**classify** 58:7
**clean** 12:5 17:16,19
  81:14
**cleanliness** 34:19
  35:1,7
**clear** 75:19 128:8
  165:13 169:19
**clerk's** 107:7,12
  121:5
**click** 20:19 33:17
  147:6,8 148:25
  149:5,6 150:4
**clicking** 148:11 153:6
**Client** 223:14
**close** 187:7,11 209:6
  209:10 228:17
  244:5,7 245:17
**closer** 154:21
**closest** 19:13 224:22
**Club** 46:18,19
**COBB** 252:3
**codified** 213:5
**coercion** 80:4
**Coie** 2:14
**COLEY** 1:4
**colleagues** 15:15
**college** 19:17
**Color** 5:2,5,6,8,10,12
  5:14,16 6:5 8:1
**colors** 105:15
**come** 10:24 41:8,21
  42:1 49:2 50:8,13
  61:8 62:7 65:1
  66:11 67:9,13,25
  84:20 121:23,24
  130:24 149:13
  152:17 156:10
  164:15 169:18
  178:15 192:7
  204:23 216:6
  222:12,14 232:10
**comes** 20:20 242:14
  249:25 250:8
**comfortable** 95:25
  98:4,18 107:2
  109:7 166:22 167:4
  167:18,24
**coming** 47:16 62:2
  63:17 65:16 68:19
  92:11 131:14
  135:23 153:21

155:4 157:21
190:10 231:21
247:13
**comment** 192:2,9
**comments** 191:19,25
  192:7 246:24
**Commerce** 48:1
**commercial** 28:7
**commission** 78:7,10
  78:12,17 247:8,18
**committee** 2:4 4:20
  6:11,15 7:21 9:22
  30:22 34:11,15,24
  35:25 38:8 39:1,7
  39:10 40:4,6 41:20
  43:9,9,14,17,17,19
  43:20 44:6,9,10,15
  44:21 45:2,10,14,15
  53:4,7,13,14,19,22
  53:25 54:4,16,22,23
  55:6,21,22 56:9,16
  60:10,15,16,19 61:3
  66:14 70:2 76:4
  78:2 79:2 87:9
  88:10,14 90:2,7,10
  90:15 91:18,19
  97:5,8,11,19 98:20
  99:1,5,15 100:9,11
  100:12 101:5,8,9,12
  102:2,5,8 103:2,13
  103:22 104:6,13,19
  104:23 105:5,10,21
  107:23 108:3
  109:10 112:6,14
  114:10 116:19,23
  117:2,5,8,13 118:17
  118:25 119:24
  120:3,7 122:16,20
  123:18,20 124:1
  125:1 128:7 145:23
  156:4,10 157:10
  164:21 169:9
  172:23 173:9,20
  174:10 175:7
  177:20 183:16
  184:12,15 185:9,15
  185:19,20 186:2,8
  187:3 188:20
  189:21 190:1,23
  191:14,20 194:16
  194:19 202:19,23
  203:2,11,15,21

204:4,7,8 207:7
208:16 216:1
222:13 234:6,8,9,20
235:1,6 236:5
238:1,20 239:21
240:9 244:25
**committees** 20:6
  29:12,20 34:4,8
  36:20 38:23 39:3,5
  40:1,9 43:7 44:13
  54:11 104:11 106:5
  237:25
**common** 221:10
**communicate** 19:2
  105:20 195:6
**communicated** 14:17
  14:22 15:1 18:22
  83:25
**communicating** 13:5
**communications**
  15:5
**communities** 115:9
**community** 46:18
  80:13 194:4,8
**commute** 32:23
**compact** 115:1
**companies** 25:16
**company** 10:10,11,20
  21:19,22 22:12
  24:19 25:14
**company's** 10:24,25
**compared** 134:24
**competitive** 51:9,14
  52:19
**complaint** 13:18
**complaints** 45:5
  193:16,22 230:12
  233:24 243:1
**complete** 122:4
  252:11
**completed** 26:21
**compliance** 81:23
  200:24
**compliant** 82:14
  191:12
**complicated** 131:18
  157:4
**complied** 93:23 191:4
**Composite** 4:22 7:20
**composting** 41:24
**comprehend** 150:23
**computer** 106:10

**conceived** 55:13
**concern** 113:13 114:2
  151:11 159:8,22
  209:19 236:10,17
  236:21 239:11,13
  239:15,18
**concerned** 35:1,17
  57:17 120:14
  158:16 159:11,16
  163:13
**concerning** 111:4
  172:9,16
**concerns** 35:6 64:16
  114:12,15,20,24
  115:3,7,12,18 161:6
  161:8 190:25
  210:17 237:10
  240:1,4
**concluded** 173:13
  193:3 199:12
  217:24 219:5 232:7
**concludes** 250:12
**conclusion** 66:11
**conclusions** 216:6
**concrete** 147:10
**conduct** 13:1 17:3
  233:2
**conducting** 93:22
**conferees** 231:5
**conference** 1:3 2:2
  231:6,8
**configuration** 154:7
  224:8
**confused** 135:4
  158:14,15 237:23
**confusion** 153:24
**congregation** 28:24
**congress** 55:17
**Congressional** 4:20
  29:18 38:21 39:2,6
  39:24 40:5 43:8,13
  78:2 99:15 103:2
  223:10 226:1 245:3
**consecutive** 32:12
**consensus** 40:23 41:1
  42:15,20 154:6
**consent** 169:11
**consented** 169:5
  206:1
**conservative** 31:16
  40:21,24 41:2
**conservative-leaning**

31:13
**consider** 40:12,20
  49:5 51:11 61:17
  62:4 67:16 72:14
  79:10,15 113:12
  116:23 117:2,6,8,13
  131:2 142:3,5
  183:17 191:16
  194:7,18 243:12
**considerable** 179:2
**consideration** 154:3
  205:1 222:11
**considerations** 79:3
**considered** 71:23
  72:14 84:15 135:17
  175:3 186:10,11,17
  186:18,20 195:10
  200:8 201:6 203:10
  208:6 209:23 234:1
  234:21
**considering** 234:13
**consist** 108:15
**consolidate** 177:17
**constituent** 241:14
**constituents** 34:22
  40:18 194:22 241:9
**constitutes** 67:5
**Constitution** 32:11
**consultant** 23:16
**contact** 68:2,25 83:23
  96:13
**contacted** 229:25
  252:23
**contain** 227:21
**contained** 1:22
  114:16,25 150:18
  227:23
**containing** 150:13
**content** 114:6
**contentious** 111:23
**contents** 84:4 250:7
**context** 20:5 193:21
  230:21 231:1 232:3
**continue** 231:8
**Continued** 2:22 4:25
  5:25 6:25 7:25
**contract** 253:2,7
**control** 249:15
**controls** 248:16,16
  249:14
**conversation** 84:3,4
  93:5 130:3 133:10

134:3,14 135:16
140:4 141:6 142:22
158:1,8,25 160:7,21
164:9 165:6 166:7
170:12 172:14
176:2,18 180:9,15
206:16
conversations 69:5
70:20 71:3 74:1
94:12 160:23,25
161:4 166:2 169:2
169:20 170:22
172:24 173:10,21
175:20 176:16
178:12 180:23
181:4,14,20 189:20
190:7 222:6,9
227:15
Cooke 100:18 101:15
102:12 103:8
coordinate 95:21
copies 182:1 246:6
copy 5:2,5,6,8,10,12
5:14,16 6:5 8:1
186:4
CORETTA 1:7
corner 33:19 127:14
226:23
correct 11:21 17:9,10
20:22 29:13,20
30:1,2,3,17,23,24
33:8 34:5,6 36:1,20
38:8,9,23,24 39:3,4
39:11,12 40:1,6,7
43:6,10 44:3,4
45:16,17 50:21
51:8 53:4,5 54:1,2
55:18 56:11 77:17
78:7 88:6 99:9,24
100:13,23,24 101:9
101:10,20,21 102:6
102:7,17 103:19
104:24 110:10,21
118:12,13 119:3,4
119:18 120:17,22
121:1,17 122:8,17
122:18,25 123:1,4
124:9,16,18 125:11
125:12,15,18,19,24
125:24 126:2,6
127:19 129:2 132:6
132:13,16,17 133:8

133:20 145:3
146:11,19 148:2
149:18,22 151:17
154:10 159:21
163:1,15 165:16,17
169:7,8 174:11,12
174:16 179:13,17
179:23 183:8,9
185:3,4,17 187:25
196:4,5,7,8 198:7
200:25 201:6,17,18
202:21 203:11,12
203:18,19,24
207:15,23 208:2,4
208:25 209:1,23
210:1,2,13 211:11
211:14,24 212:8
213:7,12 214:1,2,5
214:10,11,16 215:6
215:14 218:6
220:20 221:2,19
222:20 223:7,8,11
223:14,18 224:12
225:7,20,23 226:2
226:17,18,20,21,24
227:3 228:7,8,10,11
229:14 230:4,5
232:24 234:2
235:19,20,23,24
237:7,8 240:7,8,11
241:10,21 245:10
245:14 246:17,18
246:20,21 252:11
corrected 115:21
correctly 25:10 34:10
48:5 50:18 57:3
60:7,20 110:3
161:19 185:24
238:7
correlate 217:9
218:21
correlation 216:7,9
217:14,22 218:8
219:1
cosign 118:20
cosigned 182:13
cosponsors 118:11
Council 252:20
counsel 2:1 9:4 15:22
15:24 81:16 82:1
82:17 95:18 96:5
108:11 126:23

134:16,17 135:24
136:1 177:24 178:5
178:10 252:15
counsel's 178:9
counties 60:12 86:7
114:7 115:5 175:13
175:15 178:19
county 12:23 31:6,6,7
32:20 63:15 64:15
66:1 103:23 104:3
104:8 110:15,16
111:11,16,18 114:3
140:17 146:9
160:19 161:2,24
164:24 165:15
169:24,25 170:17
178:23,25 179:4,10
179:22 180:2 201:9
230:14 233:23
237:6 252:3
County's 179:12,15
couple 49:1 52:15
92:14 98:12 146:22
165:18
couple-minute
245:18
course 26:21,24
50:12 64:24 69:3
91:16,23 105:2,6
106:6,10 172:7
176:18 178:12
182:14 186:13
222:19
courses 27:7,9,12
court 1:1,16 9:6,11
11:4,21 12:4 69:17
69:22 70:10 173:3
173:5 192:19,21
198:19 217:19
218:13 231:25
249:5 250:14 252:1
252:19,21,24
253:22
Coverdell 203:4
covers 31:5
Coweta 111:16 114:3
Cowsert 119:3,12,23
204:16,21 207:13
208:12,13,19
CR 251:25
crafting 243:12
Crane 120:4 204:15

204:21 205:6 206:4
206:7 207:20
209:25 210:3 212:3
Crane's 212:6
create 94:10 109:17
created 109:20
140:14 222:23
Crest 224:22
criminal 27:15
crosses 81:4 119:17
crossover 187:8,9,10
187:12
culmination 188:4
CUNNINGHAM 1:6
current 33:23 242:7
currently 29:7,12,15
217:5 218:17
custom 71:17 72:20
73:9 76:8
customary 253:16
cycle 66:17 69:1,10
70:9,22 71:15,19
120:22
cycles 49:23 52:11,15
69:16,21

D

D 2:8
daily 92:10
Dan 4:19 6:13 7:8,23
91:18 93:11,13,19
94:3,4 97:1 132:5
132:13 134:21
181:2,15,21 219:24
235:22 246:16,24
DARRYL 1:6
data 112:7,11,15,16
124:10,13,19 126:3
149:1,3,13 150:13
150:14,15,21
152:20,23 154:18
191:3 195:9,15,18
195:20 201:4 227:5
227:22,23,25
232:11 245:13
date 9:8 19:6 30:14
129:1 133:3,11
135:6,13 145:21
184:25 209:23
210:4 211:7 212:7
251:25 252:13
dated 132:15 196:6

219:24 229:13
235:22 246:17
248:8
dates 120:21 125:23
David 248:14
Davis 48:15 49:12
day 14:10 42:23,25
164:20 182:6 187:8
187:10,12 209:5
251:23 253:19
days 32:11,12,24
92:6 184:18 188:25
day-to-day 18:9
DC 2:6,15
deal 57:9 110:13
178:1
dealing 63:3
dealings 46:22
deals 197:14 199:7
dealt 60:14 71:6
debate 47:24 49:5
187:2 208:9 209:13
debated 208:1
debates 47:20,22
48:21 51:4
Debra 30:1
decide 45:23 46:13
98:23
decided 26:7 44:15
54:17 70:25 85:1
164:14
deciding 46:22
decision 154:12
declared 249:4
decrease 233:3
decreased 232:23
233:14
decreasing 179:22
deeper 93:17
Defendant 1:11 2:17
Defendants 4:17
202:8
defended 248:14
defer 82:3
deferred 81:25
191:10
define 88:22 110:12
defines 130:1
definite 154:23
degree 20:22 26:17
26:19 73:9 74:7
delegate 169:12

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

delegation 146:9
170:17
delete 16:24 17:22
18:1
deleted 17:14
demand 61:22 62:1
Democrat 76:8 84:12
220:13 221:13
Democratic 152:11
216:12 217:10
218:22
Democrats 220:16,24
221:5 248:20,24
demographic 140:15
178:17,22 180:1
181:21 195:9,15
201:4 217:8 218:20
227:23
demographics 31:17
31:20 178:15 179:8
180:18 190:15,20
191:8 200:1
department 24:7
95:3
depended 71:7 73:14
depending 59:10
92:7 133:18
depends 88:21
110:12
Deponent 251:1,22
depose 249:22
deposed 10:8 11:12
deposition 1:13 5:1
9:25 10:4,12 13:9
13:11,25 14:10,12
15:7,11,16,20 20:11
240:22 250:3,13
251:3,25 252:5,9,24
252:25 253:1
depositions 13:22
described 48:23
98:16 170:23
describes 118:7
description 114:17
descriptions 105:13
designing 60:23
desire 46:16
desk 96:23
detail 68:7 88:25 89:4
182:25 198:14,17
225:12
detailed 92:21 139:2

142:21 160:14
details 106:3 188:14
215:17
determination 67:2
81:3,19 82:2 84:16
84:18 104:22
determine 93:22
104:18 131:11
determined 119:17
134:11 185:3
186:15,23
develop 92:11
developed 154:6
development 29:17
34:3 36:18 37:1
38:6,20 39:23
deviations 115:13,20
Dickerson 100:18
101:15 102:12
103:17
Dickson 99:19
100:19 101:15
103:8
difference 218:2
different 15:25 18:16
52:7 89:8 119:19
120:11 123:14,14
126:11 146:18,23
167:1 224:9 242:6
difficult 153:20
dilute 172:11 242:22
diluted 193:17
230:13
dilution 210:9 233:22
direct 68:13 77:20
158:1 161:5 170:11
176:2 196:9
directed 135:25
159:3 161:6
directly 67:9 68:4
87:11 129:18
157:22 175:25
182:15 208:17
director 58:24 96:10
96:15 143:22
dirty 240:21
disagree 243:4,9
disapprove 61:4
disclose 252:17
disclosed 253:17
disclosure 9:4
Disclosures 4:17

202:9
discovered 249:20
250:2
discovery 16:22
discuss 59:25 68:13
75:6 87:14 94:5
111:6 129:14
133:25 136:24
172:10 174:5
194:14 201:15
discussed 14:6,14
60:3 94:15 106:24
150:25 155:4
166:18 172:19
185:6 209:16
229:24 235:5
246:25
discussion 81:11
84:21 130:11
133:12 165:4
discussions 62:14
90:19 141:19 175:6
175:8 246:11
dismissed 242:25
displayed 150:9
disqualified 253:5
disseminate 184:15
disseminated 183:20
184:21,22 195:15
dissent 201:25
distinction 40:25
district 1:1,1 6:5,18
7:10,12,15 30:25
31:1,3,4,9,13,14,16
31:18,21 32:3
34:16,17,20 35:1,11
35:12 45:21,24
50:9,20 52:3,7,8
53:15,16 62:4,24
63:1,5,10,19 64:22
64:24,25 65:3,10
72:22 73:1 76:6,10
79:23 80:14,23,23
81:4 87:14,25
93:14 104:2 105:7
110:13,19 111:7,24
131:15 133:1 134:1
135:12 136:9,25
137:5 138:24
139:11,19 140:6,8,9
140:13,13,21,22
141:17 142:16

143:19 144:1,10
145:4,6,7 146:13,15
147:4 148:5,18
151:4,6,6,14,19
152:12,16 153:11
154:8 155:7,7,8,17
156:19 157:15
158:4,5 159:13,18
159:20 160:15
161:10,12,15,17,18
161:20,21 163:14
163:24 164:1 165:3
165:5,8,15 166:14
167:12,14 170:3
171:4,6,12 172:4,10
172:11,17,19
174:14 177:6,11,17
180:7,13 182:21
186:21 196:4 201:8
206:20 209:20
217:9,10,11 218:21
218:22,23 220:12
221:12,13 222:19
224:9,10 225:6,8,23
226:20 227:7
232:24 233:4,15
236:19,22 237:6,12
239:12,14,19
241:16 243:18
244:3
districted 169:5
districting 89:13
districts 6:8,8 7:4,21
18:24 53:16,17
57:16 62:9,20
65:12 66:16 74:20
81:23 86:6 87:3,6
91:1 93:23 103:22
104:7 105:16
108:19 110:14,23
111:1 112:12,18
113:14 114:11,18
114:25 129:15
130:7 138:1,5
139:8,12,13 141:3
144:25 145:5,16
148:6,15,19 150:11
151:17 161:2
165:11 171:11
174:20 175:4,12,15
183:14 190:16
191:9,17 194:25

197:9 199:2 205:18
206:1,19 215:22
217:8 218:20
220:18,25 221:6
222:3 235:8,9
236:9,10,12,15,16
237:24 238:23
242:23 243:23
244:4,24 245:7,9
248:17,21,25
249:15
diverse 179:3,19
diversity 179:15
divide 32:18
division 1:2 95:13
doable 131:12
Doc 48:15 49:12
document 6:7 7:10
7:12,13,14,16,20
19:22 20:2,5,17
30:7,11 33:10,15
36:5,10 37:19,25
38:10,14 39:13,17
77:6 99:7,11 100:4
100:8,25 101:4,7,22
102:1 107:19 110:4
117:16 127:1,6,20
128:17,21 131:25
184:7,11 195:23
202:2 210:24
211:17 212:11,19
213:16 219:8 223:2
225:16 226:4,12
228:2,25 229:6
235:11 236:2
240:13 244:18
246:1 247:25 250:2
250:6,8
documentation 110:1
documents 13:24
16:8,16 20:7 105:4
105:18,21 106:6,16
106:18 107:4,10,11
107:24 108:3
124:10 228:13
249:20,23
doing 36:23 55:6
70:19 83:4 92:8
97:23 107:1 118:19
139:25 147:20
151:14 154:2 174:3
182:12 188:5

193:13 205:8
**Dollar** 99:19 100:19
   101:16 102:13
   103:8
**Dome** 5:18 77:15
**Donovan** 251:24
   252:22,22
**Doug** 99:17
**downhill** 50:12
**dozen** 16:6
**DR** 133:19,22
**draft** 177:13
**drafted** 214:7
**drafting** 95:14 105:2
   115:23 118:15
**draw** 53:15 197:10
   199:3 242:12
   248:25
**drawing** 63:6,9 66:15
   144:20
**drawn** 10:12 60:11
   73:20 75:22 94:25
   146:22 147:3,14
   161:25 187:20
   197:1,9 199:2
   205:16 222:18
   248:17 249:15
**draws** 178:11
**drill** 147:23 149:6
**drive** 33:2 224:16,23
**driver** 112:24
**dropped** 121:4 182:3
   183:5 184:24 188:7
**due** 52:3 88:25 123:9
   131:17 147:15
   231:4
**duly** 9:14 252:14
**Dunahoo** 63:14 64:13
**duties** 28:15,22 54:15
**duty** 21:16

**E**
**Earl** 99:19 100:19
   101:16 102:13
   103:9
**earlier** 47:19 48:24
   53:2 79:6,20 82:11
   82:20 94:15 137:17
   162:3 189:6 190:8
   197:2 229:24
   230:18 236:8 242:4
**early** 24:15 32:17

56:16,18,22 57:2
58:12,19 82:24
83:6,12 84:5
139:23 140:1
145:19 156:9 162:3
169:21
**economic** 29:16 34:2
   36:17 38:6,20
   39:23 47:17 50:14
**economy** 47:14 50:7
   50:9,14
**Ed** 99:22 100:16,20
   101:13,18 102:14
   102:15 103:7,9
   118:10
**edits** 215:13
**education** 29:17
   35:21,25 36:18,24
   38:6,21 39:24
   41:11,20 42:3
**education-related**
   35:22
**effect** 52:12
**effective** 42:14 129:1
   129:6,8 138:23
   209:23 210:4 211:7
   212:7
**effectively** 205:13
**effort** 57:6
**efforts** 159:16 192:1
   192:12,23 194:3,8
**Efstration** 101:16
   102:10 103:9
   145:12 146:11
   151:16 167:12
   174:9
**Efstration's** 104:2
   155:8
**Ehrhart** 99:19
   100:19 101:16
   102:13 103:9
**eight** 66:9
**either** 19:3 24:15
   36:3 45:16 51:21
   64:18 126:24
   129:24 168:9
   169:13,13 231:14
   241:14
**elect** 16:12 195:5
**elected** 27:22 33:5,7
   33:9 45:19 220:6
   220:15,18,24 221:5

**election** 47:9 48:4,12
   48:17,22 49:9,10,18
   50:2,5,17 52:15,21
   72:16 76:7,12
   149:3,11,12 243:20
   243:25
**elections** 51:10,16,25
   52:2,17,19 71:25
   91:14 149:21 150:6
   216:3 243:22 244:4
**electoral** 45:19
   243:17
**elects** 220:12
**eliminate** 247:22
**Ellis** 99:18 100:18
**email** 4:18,18,22 6:13
   7:6,6,6,8,8,17,17,22
   7:22 12:25 13:4
   17:11,12 18:24
   132:4,12 133:16
   213:23 214:7,8,12
   215:5,12 219:13,24
   229:13,16 230:6
   233:1 235:21
   246:16 247:4
**emails** 4:22 15:18,25
   16:3,5,21 17:4,8,8
   17:14,17,20,22 18:1
   189:8,12 193:5,7,10
   193:12,20 194:1
   241:8,17,22 242:19
**Emanuel** 210:19
**employee** 252:21
**employees** 157:10
**employer** 25:7,25
   26:1
**enable** 248:21 249:1
**enacted** 55:7,16
   243:15
**encompass** 86:6
**encouraging** 46:6
**endanger** 151:15
   152:3
**ended** 23:2
**engaged** 40:17,18
   46:16,17 162:12
**engagement** 151:21
**enlarged** 87:4
**ensued** 246:12
**ensure** 191:3
**entailed** 56:4
**Enter** 231:7

**entire** 79:9 86:13
   105:9 179:21
**entitled** 248:4
**environment** 29:20
   34:4,12,15 38:7,23
   40:1 41:14,23
   50:10
**Environments** 36:19
**Errata** 4:13
**errors** 114:17
**especially** 52:10
**essence** 147:20 158:7
   176:8 191:7 205:19
**essentially** 23:6 27:2
   29:4 50:6 59:8
   78:22 84:6 91:1
   97:22 98:9 105:23
   106:22,23 109:2
   118:18 129:16
   130:10,22 131:5
   164:20 165:18,20
   182:5 190:11
   208:15 213:2
**establish** 75:1,2
**established** 135:7
**et** 20:6 27:9 151:7
**ethics** 29:17 39:10
   43:9 44:6,10,14,21
   45:2,5,10
**ethnic** 114:22
**evaluating** 106:6
**events** 16:17 49:2
   120:21
**eventually** 177:20
   215:12
**everybody** 43:5 73:1
   73:7 79:21 80:5,5
   84:11 94:11,17
   95:22 108:22
   130:22 134:4
   136:15 138:10
   139:10 143:12
   144:15,18 146:2
   151:21 152:2
   154:12 166:21
   167:5 169:19
   185:25
**everybody's** 42:20
**evidence** 252:12
**exact** 36:2 53:11
   62:22 141:5
**exactly** 11:1 37:10

48:18 142:12
157:24 199:19
210:16 218:7
**Examination** 4:10,12
   9:16
**examined** 9:14
**example** 72:12 91:9
   173:22 174:8
   175:11 227:13
**Excerpt** 7:3
**exchange** 247:4
**Excuse** 20:16 86:11
**executive** 28:6 58:23
   96:10,15
**exercise** 77:5
**exhibit** 4:15 19:23
   20:1,8,9,12,14
   29:11,11 30:8,10
   33:11,14 36:6,8
   37:20,23 38:11,13
   39:14,16 77:7,12
   99:8,10 100:5,7
   101:1,3,23,25 110:5
   110:8 117:17,19
   118:1 120:13 127:2
   127:4,21 128:1,9,18
   128:20 132:1,4
   149:17 183:22
   184:8,10 195:24
   196:1 202:3,5,14,15
   202:16 210:25
   211:3,18,23 212:5
   212:12,14,15,20,23
   213:17,19 219:9,11
   219:23 223:3,6
   225:17,19 226:5,8
   226:13,15 227:3
   228:3,5 229:1,4
   235:12,14,15
   240:14,17 244:19
   244:21,23 246:2,5
   248:1,3
**exhibits** 1:22 4:16
   202:11
**exist** 200:5
**existed** 224:10
**existing** 72:21 114:11
   114:12,16,21
   115:19,25 205:18
**expectations** 55:5
**experience** 54:7
   87:10,12 88:4

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

97:13,16 120:8
247:9
**experiences** 112:3
**expertise** 59:9
**explain** 14:19 89:18
97:22,24,25 199:20
**explained** 98:6
198:14
**explanation** 158:22
**explicit** 198:17
**exploding** 179:13
**exposure** 87:16
**express** 141:14 159:8
**expressed** 236:21
237:10 240:1
**extending** 86:13
**extreme** 88:25 112:7
**extremely** 42:18
153:4 187:11

**F**

**Facebook** 5:7 30:13
30:15,16
**facilitate** 98:20
**fact** 14:23 42:16,24
57:4 66:14 79:19
108:21,22 112:17
113:6,15,18 136:20
171:11 174:7
179:24,25 185:18
192:14,25 202:21
204:24 229:25
230:9 233:3,13
238:10 242:22
247:9 248:15,25
249:8
**factor** 95:17
**failed** 126:19
**fair** 10:17 11:3 34:25
58:2 63:12 70:4
81:24 84:24,25
123:19 135:9 150:3
151:10 159:15
174:17 181:19
184:21 187:23
193:14 236:16
241:17 243:11
**fairly** 17:17 84:8,22
**fairness** 83:3
**fall** 60:10 73:20
142:2 143:1
**fallen** 178:3

**familiar** 88:12,18
111:20 113:19
238:23,24
**familiarity** 89:10
**family** 65:9 77:1
**fans** 77:23
**far** 80:6 96:25 106:14
120:14 184:14
247:24
**farm** 63:1,4
**fashion** 88:23
**fast** 152:1
**favor** 55:15 122:20
125:25 207:14,21
211:13
**favorable** 204:25
**favorably** 122:16
123:18 124:2
186:10
**FAX** 251:24
**February** 140:2
146:5 155:25 156:5
156:8 162:3 169:21
203:16
**federal** 53:16 81:24
82:14 114:13 249:5
**feedback** 176:4
**feel** 10:4 40:17 80:24
98:17 109:7 132:18
134:6 136:16
167:23 172:2 198:6
216:1 232:20
**fell** 85:8,14
**fellow** 14:15 54:10
**felt** 44:17 73:23 75:1
81:14,17 113:8
114:4 193:13 230:8
233:12
**figure** 90:23 242:5
**file** 4:2,3,4,5,6,7,8
9:10 64:8 107:3,9
116:15 168:24
200:20 228:24
**filed** 10:23 14:24
18:2 121:6 178:8
182:19 183:4,10
184:23
**filing** 182:11
**final** 125:21 127:7
128:13 154:6,12
167:5,20,21 188:3
208:8 211:23

212:23 223:1
**finalize** 92:9
**finally** 12:10 224:11
**financial** 23:15 26:8
27:5,9 253:12,14,15
**find** 42:19 63:10,11
85:22 151:12
210:16
**fine** 116:3
**finish** 12:7 213:20
**finished** 32:16
**first** 9:14 11:19 21:1
21:6 32:13 33:5
36:3 46:11 49:19
51:15,20 83:8
92:13 120:12 121:9
121:17,19 130:11
132:19,22 133:22
139:2 147:25
164:19 167:16
183:12 185:14
186:3 188:3 215:8
215:10 219:13
241:1 246:15,19
249:10 252:14
**fit** 84:14 94:11,14
95:19 131:1,23
134:7 136:19
144:22 157:8
171:19
**fits** 136:18
**five** 4:7 63:24 86:7
156:12 200:20
220:24 221:5 231:6
**five-minute** 63:23,25
116:4 168:7 200:13
228:13
**fixed** 115:14
**flight** 21:17
**flip** 76:10 203:13,20
**flipped** 76:6
**flipping** 202:18
235:14,25
**floor** 2:9 59:22 69:4
82:21 92:18 109:12
122:2,13,24 124:24
128:25 177:20
189:22 190:2,22
208:6,25 210:8,18
240:10
**Florida** 11:7,8
**folder** 223:20

**folks** 14:22 15:1 19:3
58:15 59:18 60:5
65:22 70:6,21 74:1
87:21 111:19
112:17 134:6
136:23 159:1
193:11 227:15
**follow** 233:21 235:18
**followed** 158:17
159:12
**following** 27:19
126:22 129:5
140:14 192:7
219:14 246:23
247:13
**follows** 9:15 119:21
173:6 192:22
198:20 217:20
218:14 232:1
245:12
**font** 240:21 241:2,2
**food** 10:11,20 21:19
21:22
**Foods** 21:20,23
**footnotes** 124:20
**Force** 21:16
**foregoing** 251:3
252:4,10
**forget** 117:20
**forgotten** 218:9
**form** 52:4 74:3,11
89:14 90:8 135:2
142:7 144:2 179:16
181:17 190:4 198:1
199:16 221:15
**formal** 59:20 60:1
90:18 164:3 173:16
**formalized** 92:21
**formation** 78:6
**former** 56:2,8
**forms** 198:8
**formulating** 82:25
**Fort** 206:14,16,17
207:1,4,18 210:7,16
**forth** 32:20
**fortunate** 45:11
**Fortunately** 44:23
**Fort's** 209:19
**forum** 48:1
**forums** 47:23 51:4
**forward** 84:1 203:13
230:6

**forwarding** 229:12
229:16 233:23
**four** 4:6 21:11 156:12
168:24 241:4
**fourth** 59:22 156:12
**frame** 25:23 155:25
162:1,2,22 164:14
164:18 169:22
**Frank** 2:18 168:6
**free** 10:4 132:18
198:6 234:17
**frequently** 17:19
32:4 68:25 91:22
96:13 222:8
**friend** 46:1
**front** 96:23 121:22
128:14
**full** 12:18 166:16
171:24 178:4 208:9
208:11 212:16
**fully** 154:16
**function** 104:12
191:5
**funerals** 28:23
**further** 58:5 79:8
136:14 149:7,7
249:17

**G**

**Ga** 2:20 3:4 8:1
251:24
**gain** 80:11
**GA000079** 7:18
229:8
**GA000092** 4:21
235:19
**GA000100** 7:7
**GA000101** 214:4
**GA000093** 236:1
**GA2-001168** 7:9
220:1
**GA2-001169** 219:15
**GA2-002542** 7:23
246:20
**GA2-002750** 4:23
**GA2-003012** 7:12
225:20
**GA2-003019** 226:16
**GA2-003027** 7:11
223:7
**GA2-003403** 6:14
132:6,10

Randall O. Nix     Georgia State Conference of the NAACP, et al vs Kemp     January 10, 2018

Page 262

**general** 6:7,19,21 7:1
  7:3 14:9 16:19
  46:15 48:12 49:8
  49:18,20,21,23 50:2
  54:7 70:12 82:3
  92:13 180:24
  185:11 217:12
  218:24 221:18
**generalization** 202:1
**generalize** 52:6,9
**generate** 105:5,8
  107:23
**generated** 105:11,12
**generates** 242:18
**genesis** 247:3
**geographical** 153:5
**geography** 153:9
**Georgia** 1:1,3,11,18
  2:2 5:3,8,10,12,14
  5:16,20,22 6:1,3,5,7
  6:19,21 7:1,3,20
  11:6 12:22 18:23
  23:20,22 24:1 29:8
  32:8,19 40:10,21
  51:25 52:17 60:17
  63:7,7 65:25 69:8
  69:15,21 70:8 86:6
  86:10,12,18,19,25
  87:1 90:6 107:14
  171:17 175:18
  192:15 193:1
  201:21 216:3,8
  217:4 218:16 220:6
  221:11 244:24
  247:1 248:4 249:11
  252:2,20,20
**Gerald** 171:16 172:3
**gerrymandering**
  193:15,23
**getting** 32:19 44:24
  91:16 97:6 130:8
  190:12 209:9
  228:16 245:17
**Giles** 49:25 50:23
**Gina** 4:19 7:6,18
  58:23 60:21 61:11
  96:16 97:1 143:22
  148:10 153:6
  157:11 162:24
  180:25 181:14,21
  214:9 229:12 230:7
  233:24

**Gina's** 61:5
**Girls** 46:18
**GIS** 88:8
**gist** 135:15
**give** 10:24 62:13 63:8
  66:3 71:4 73:10,22
  74:9 75:13,14,22
  76:1 91:13 93:14
  96:11 106:2,3
  135:13 139:14
  140:25 141:5
  145:21 161:13
  180:3 184:19 189:1
  201:25 204:6
  206:24 208:18
  222:7 225:12
  240:21 241:15
  250:3
**given** 43:1 44:17 55:6
  55:23 85:15 90:17
  111:9,16 121:5
  234:5 252:12
**gives** 43:1
**giving** 29:1 113:16,20
  247:8
**globally** 193:23
**go** 11:18 15:11,16
  16:13 17:22 19:15
  19:17 23:6 32:14
  33:17 42:18 53:1,9
  59:24 60:18 61:11
  79:7 80:7 81:8
  85:20,21 92:1 94:1
  103:4 105:25 106:1
  109:8 111:21
  117:25 119:14
  121:22 129:18,19
  130:14 136:14
  137:15 138:11
  141:24 142:24
  147:1 149:24 152:6
  152:12 157:18,25
  158:19 164:4
  165:21 166:6,10
  167:1 170:6 174:2
  182:4,21 183:17
  201:14 241:2
**goal** 147:16 156:16
**goals** 176:20 177:4,9
**goes** 60:25 79:5
  126:15 248:19
**going** 11:18 14:10,12

19:24 20:11,13
  25:13 35:13 46:3,9
  46:9 47:13 61:6
  63:20 64:2 66:21
  66:24 67:15 68:11
  74:20 77:10 78:13
  79:9,22,22,24 81:12
  81:12 82:6 83:25
  84:13 87:15 92:12
  92:19 94:8,9 97:2,2
  99:9 106:23 108:21
  113:20,22 116:9
  129:19 132:2 138:8
  139:25 143:14
  154:10,24 157:19
  158:9,11 160:15
  163:22 165:20
  166:3,25 168:14,18
  176:10 179:7 184:5
  200:14 219:12,19
  228:18 245:20
  246:3 249:25 250:3
  250:15
**Gold** 5:18 77:15
**Golick** 6:13 102:13
  132:5,12,25 133:16
  133:24 134:21
  135:8,11 136:8
  137:3 138:22
**Golick's** 136:25
**good** 9:18,19 46:1
  57:20 73:19 74:21
  75:12 80:18 82:11
  97:3 166:6 198:14
  214:17 233:12
  237:1 243:5
**goodness** 45:1
**GOP** 5:18 77:14
**gotten** 90:24 186:19
**government** 60:19
  61:1,1
**governments** 60:18
**governor** 124:14,17
  129:9 212:24
  213:11
**Grab** 8:2 248:6
**graduate** 19:19
**graduated** 20:21,25
  27:1
**Grand** 2:10
**Grayson** 12:21
**great** 57:9 64:12

110:13 116:16
  238:4 250:10
**greater** 52:12,16
  80:24 220:20
**greatly** 47:11
**GREEN** 2:7
**Greene** 171:16 172:3
**GREGORY** 2:8
**grew** 19:10
**ground** 11:19
**group** 114:22 130:21
  170:24
**groups** 170:21
**grow** 19:9
**growing** 179:18,18
**grows** 179:19
**growth** 110:25
  112:21 140:16
  201:9
**Guard** 21:17
**guess** 20:3 43:23
  76:20 146:7 197:3
  198:21 223:23
**guidance** 131:14,16
  131:21,24 133:19
  142:15,20
**guys** 116:5
**Gwinnett** 6:17
  103:23 104:3
  140:16 146:9,14
  164:24 169:24
  170:17 175:13,15
  178:18,23,25 179:4
  179:10,12,15,21
  196:3 230:4,14
  233:22

---
        **H**

**H** 99:23 101:18
  102:15
**half** 23:12 153:22,23
**hall** 59:23 63:15
  64:15 66:1 92:19
**hand** 19:24 20:13
  77:10 96:4,5 99:9
  132:2 246:4
**handed** 10:3
**handing** 30:9 33:12
  36:7 37:21 38:12
  39:15 100:6 101:2
  101:24 110:7
  117:18 127:3,24

128:19 183:21
  184:9 195:25 211:1
  211:22 212:13,21
  213:18 219:10
  223:4 225:18 226:6
  226:14 228:4 229:2
  235:13 240:15
  244:20 248:2
**handled** 57:10
**handwritten** 109:16
**hang** 231:15
**happen** 47:15 68:11
  68:15 89:22 136:20
  147:7,9 160:8
**happened** 70:13
  92:15 113:21 141:2
  181:10 236:14
**happening** 23:2
  89:20 176:11
  234:15
**happens** 111:25
  147:11,12
**happy** 11:25 113:5
  113:10
**Harbins** 225:6
**Harbison** 207:17
**hard** 23:5 52:6,9
  151:25
**HB** 6:8,20,22 7:1
  82:13 129:4 224:10
**HD105** 223:14
**HD105amdp1-2014**
  7:15 226:10,24
**HD105amdp1_201...**
  7:13
**HD105amdp2-2014**
  7:11 223:17 228:10
**HD105amdp2_201...**
  7:16 228:7
**head** 12:14
**header** 122:5
**hear** 234:9
**Heard** 31:6
**hearing** 98:25 99:1,2
  99:3,5 105:3 106:7
  186:8 187:7,14
  189:5 190:23
  191:14,20 194:19
  194:20 203:10,11
  204:1,4,12 206:10
  234:9 239:21 240:2
**hearings** 98:20 192:5

Randall O. Nix

Georgia State Conference of the NAACP, et al vs Kemp

January 10, 2018

Page 263

194:14
hears 60:16
heavily 35:22
held 174:24 187:7,14
   203:23
Helen's 224:16,23
help 37:2 42:14 73:9
   147:25 208:13
   224:18
helping 97:21 119:6
   208:17
Henry 99:19 104:8
   160:19 161:2,24
   165:15 169:24
   175:13,15 178:18
   180:2 201:9 237:6
Henson 207:17
Herbert 49:24 50:23
hey 92:19 130:6,24
hidden 188:6
high 19:15,16 94:20
   221:12
higher 220:14,15
historically 69:11
history 45:19 118:7
   120:20 124:8
   201:15 207:25
   208:4 249:11
Hogansville 12:22
hold 23:13 24:3,16
   29:7 127:12 203:8
holding 194:18
Holmes 100:16
   101:13 102:11
   103:7 118:11
Holtville 19:16
home 32:20 64:19,21
   110:15 111:11
honest 50:24 52:24
honestly 31:19 53:8
   85:17 103:24
   106:15 135:13
   150:21 201:22
   232:25
hoped 156:17
hopper 121:1
hour 63:21 240:22
house 4:20 5:3,8,10
   5:12,14,16,20,22
   6:1,3,5,8,10,11,18
   7:4,5,10,12,14,20
   13:2 17:8 18:23

20:3,19 31:1,3 32:1
   32:4 33:4,6,18 34:9
   37:12,17 38:3,15
   39:19 40:10,13,22
   42:15 45:13 52:2
   52:17 53:3,15
   71:10,14,18,22
   72:11,20 73:10
   76:3 78:1 82:21
   83:15 97:6 98:7,20
   105:2,22 106:18
   107:23 108:2
   109:12 113:13
   114:11 115:8,24
   116:19 117:7,9,12
   118:3,15 119:6,12
   119:14 120:11,22
   121:1,9,16,19,23
   122:2,7,12,16,19,21
   122:24,25 123:3,18
   123:21 124:5,12,17
   125:5,10,13,14,22
   126:1,4,13,20 127:8
   128:9,10,14 129:12
   129:13 133:1
   137:11 148:5,18
   154:8 161:12 169:7
   170:25 171:12
   175:18 182:9,11
   185:6 186:4,7,12
   187:4,23,24 188:21
   188:25 189:25
   190:16,20,22 191:3
   191:9 192:3,9,15
   193:1,17 194:5,23
   195:9 196:3 201:8
   201:16,16 203:9,16
   204:3,8,11,17,24
   205:3,22,25 207:7
   207:14,18,25 208:6
   208:10,24 209:12
   210:5,8,20 211:7,24
   212:7,17,24 213:12
   215:22 217:5
   218:17 220:7,25
   222:13,18 224:8,9
   224:12 225:5,8,23
   226:20 227:7
   230:12 232:22,24
   233:3,4,13,15 234:1
   234:13,14,21 236:6
   239:10 240:1,6,9

241:9,19 242:21
   243:12,18,21,22
   244:3,4,10,11,13,14
   244:24 248:14,20
   249:2
housekeeping 20:10
   219:22
House-amdsub-2015
   7:21
House12re 6:6
Howard 99:20
how's 176:9
Hudson 99:20
huge 34:20 55:11
   86:6 149:3 179:8
huh-uh 11:16
human 93:12
Humphrey 22:8,14
   22:17,23
hundred 113:10

_____

                I

idea 57:24 65:2 66:20
   69:19 112:10
   129:14 151:18
   156:21 163:3 242:2
identification 19:25
   33:13 37:22 38:13
   39:16 77:11 100:7
   101:3,25 110:8
   117:19 127:25
   128:20 132:3 196:1
   211:2 212:14,22
   213:19 219:11
   223:5 225:19 226:7
   226:15 228:5 229:4
   240:16 244:21
   246:4 248:3
identified 19:22 20:7
   30:7 33:10 36:5
   37:19 38:10 39:13
   77:6 99:7 100:4,25
   101:22 110:4
   117:16 127:1,20
   128:17 131:25
   184:7 195:23 202:2
   210:24 211:17
   212:11,19 213:16
   219:8 223:2 225:16
   226:4,12 228:2,25
   235:11 240:13
   244:18 246:1

247:25
identifier 126:14
identifying 20:5
ignoring 80:12
imagine 28:19,22
impact 65:7 159:18
   161:9
impacted 159:14
important 12:3
improve 142:17
   151:12 156:21
   159:16 163:15
improved 35:10
   151:20
improvement 151:19
improving 141:15,20
   176:21 177:5,10
inception 130:8
include 86:13 100:15
   101:12 102:9
included 99:16
   148:18
includes 17:7 183:7
including 111:2
increasing 173:23
   179:14 180:6,12
incumbent 73:11
   74:10
incumbents 75:22
independent 78:9,17
   242:3,10 247:18
Index 4:1,2,10,15 8:5
indicate 251:20
indicated 140:5
indicates 211:8
individual 94:21
   129:13 153:8 171:1
industrial-type 23:1
industry 21:2 27:20
influence 52:16 78:24
influences 78:20
inform 15:13 194:4,8
informal 164:9
information 34:3
   71:8 81:7 94:3
   100:1 103:25
   120:17 139:2
   148:21 150:17
   151:8 190:19
   207:11 215:19
   223:25 227:8 231:3
   232:5,9 247:7

informed 15:10
   172:23 173:1,9
   174:13 175:14
   194:24
informing 173:19
   174:18 175:17
infrequent 69:6
infrequently 222:10
inherently 76:18
initial 4:17 131:4
   202:9
initially 133:6
initiated 247:12
input 192:2,9
inquire 70:6 138:16
inquiries 213:15
inquiry 213:11,25
insistence 79:20
instances 54:9 85:20
   166:11,24
integrity 73:16 75:12
   94:9,16,23 95:4
   108:25 157:1
   171:25 186:25
   197:1,5,7,16 198:23
   198:25 199:9,14,15
   205:15 232:18
   249:9
intense 32:25 147:24
interact 96:12,18
interaction 96:25
interest 34:20 36:25
   46:4,15 115:9
   119:21 141:14
   253:5,12,15
interested 46:14 68:9
   83:16 130:24 137:4
   170:5 202:9
intergovernmental
   61:1
introduce 123:8
introduced 37:4
   127:16 156:5
   188:18 203:17
introducing 61:18
   190:1
inventory 10:21
investigation 233:2
   242:21
investigative 45:10
involve 155:5
involved 35:21 42:22

67:23 81:8 93:6
145:3 168:1 170:16
172:23 173:9
176:13 187:21
**involvement** 131:4
160:22 234:4
**involving** 146:18
155:20 170:14
**issue** 35:16,20 37:5
41:4 50:11 67:24
74:2 80:9 178:14
**issues** 34:18 35:22
41:6,10,11,16 44:25
47:8,12,17,19 49:7
49:8 50:4,8,14 59:9
60:13,14 61:4,14
63:2 67:19,23
**iterations** 222:18
**Ivan** 3:3

_____
          **J**
_____
**Jackson** 1:7 99:20
100:20 101:17
102:14 103:16
207:13
**JAMIDA** 1:6
**Jan** 7:8 99:21 100:20
101:17 102:14
103:9 164:23
219:24
**January** 1:19 9:1,9
29:23 32:15 140:1
146:4 155:25
202:20 203:5
253:19
**Jason** 63:7
**Jeff** 45:25 46:1,4,23
73:16,19 74:15
80:18 81:13 98:2
142:1
**jeopardize** 58:1,9
**jeopardized** 85:10
**jeopardizing** 82:7
**jeopardy** 74:22
**Jerguson** 99:21
**Jess** 30:6
**JM** 251:25
**job** 21:1,13 22:5,15
24:4 29:7 55:11
56:4,25 95:21
113:7 243:5
**jobs** 27:20 50:11

**Joe** 44:15
**Joel** 1:15 217:17
253:21
**John** 1:14 2:3 9:20
63:20 99:24 100:23
101:19 103:10
113:21 116:8 135:6
168:4 240:21
**Johnnie** 102:9
**join** 53:19 161:20
**Jones** 7:8 99:21
100:20 101:17
102:14 103:9
164:23,23 210:20
219:24 236:19
239:16
**Journal-Constituti...**
6:17 196:3
**Jr** 3:3
**judgment** 54:23
**Judicial** 252:19
**Judiciary** 29:18
36:18 38:7
**Julie** 30:6
**July** 129:6
**June** 29:4,5 246:17
**Justice** 95:2

_____
          **K**
_____
**K** 3:2
**Kaiser** 170:3
**keep** 18:4,7 81:13
82:6 111:11,13
115:8 117:21,22
133:17,17 202:18
**keeping** 18:17,18
175:18
**keeps** 107:7
**KEMP** 1:10
**kept** 107:6 108:2
109:3 111:24
**Kevin** 100:18 101:15
102:12 103:8
**KHANNA** 2:13
**KHOURY** 3:2 52:4
63:20 74:3,11
89:14 90:8 116:6
132:21 135:2 142:7
144:2 168:4,13,17
179:16 181:17
183:23 184:4 190:4
198:1,12 199:16

203:8 217:25 218:5
218:11 219:7
221:14 231:9,13,17
231:20 237:14,18
237:20 238:13,16
240:20,24 241:4
246:7 249:24 250:5
250:10,16
**Kia** 47:16
**Kimberly** 100:17
101:14 102:11
103:17
**kin** 252:15
**kind** 13:11 17:23
18:4,6,11 26:6
46:10 68:12 89:24
92:20 110:24
118:18 131:3 138:7
138:15 154:6
158:24 174:18
176:5 205:6 242:20
247:14
**kinds** 60:2 88:8 93:24
227:21
**knew** 14:12 51:21
55:9,11,12 66:18
81:19,20 84:12
93:16 111:18
173:14,17 180:20
182:15 233:7
**Knight** 160:18,24
**know** 11:24 14:9,11
16:23 23:5 28:17
31:8 34:19 40:16
42:17 44:12 45:7
46:4 49:6 51:21,23
52:7 53:11 54:6,6
54:13 56:6 57:14
57:16 59:11 60:1
61:9,11,25 62:3
65:6 67:15 68:8,18
68:21,23 70:11,13
70:14,16 71:5 72:6
72:24 73:3,4 75:5
75:24,25 76:2
79:15 80:10 81:9
81:12 83:4 85:22
86:5,7,22 88:22
89:3,6,15 90:21
92:1,14,15 93:2,2
93:23 94:2,7,15,17
96:21,23 97:1,14

99:25 104:1,5,20
105:15 106:9,15,23
107:8,18,19 108:12
108:23,25 109:21
111:12,17 113:3,5,6
113:17 119:1 120:9
120:16 123:15
129:24 130:8,12,13
131:18 132:18,19
133:23 134:2,11
135:22 138:9,14
139:9 140:12,19
143:11 145:22
147:3,21,23 148:22
148:25 149:1,7,10
150:16 151:23
152:9 153:21,22
154:11 157:17
158:16 160:14
161:15 162:3
163:23 164:3,16
165:19,21 170:6
172:3 174:21,22,25
176:5,6 179:24
180:3 184:17 189:7
189:14 190:11
193:4 194:13,17
195:14 201:13
205:7,8,15,21 210:6
213:20 215:17
216:18 225:4
231:11,13,20
233:16 234:16
238:12,18 242:1
243:6,25 244:3,12
244:13 246:8 247:9
247:14 250:1
**knowledge** 14:3 52:1
70:12 75:4 127:22
201:12 214:20
221:11
**knowledgeable** 216:2
**known** 46:1 47:10,11
177:24
**knows** 93:11

_____
          **L**
_____
**labor** 95:10,13
**LaGrange** 24:6 25:12
27:23 47:15 113:19
**laid** 155:2
**lake** 34:21 35:14

47:13,19 50:10
**Lakeland** 63:7
**land** 64:19 68:21
**landfills** 41:24
**Lane** 5:20 56:10,14
56:24 57:1 58:11
99:13,17
**Lane's** 58:2
**languages** 179:1
**large** 48:6
**late** 24:15 137:20
**LAURETHA** 1:4
**LAVELLE** 1:3
**law** 2:4 9:22 11:21
81:24 82:14 93:23
107:14 114:13
124:18 129:10
253:10,13
**Lawrenceville** 168:1
**Laws** 7:3
**lawsuit** 14:2 18:2
**Lawyers** 2:4 9:21
**LC** 6:10,11 127:18
**leader** 79:13 119:7
**leaders** 194:8
**leadership** 34:9 44:7
46:19 67:4,5 68:1
83:15,16 84:20
85:1 98:14 104:12
104:17 111:20
114:5 175:19
204:18
**leading** 156:2,12
**lead-up** 182:24
**League** 49:3
**learn** 66:13 114:5
**learning** 27:2
**leave** 24:13
**leaving** 15:15
**Lee** 5:19 77:16
**left** 21:15 22:3,13,17
22:22 23:19 24:19
24:21 25:9 44:8
154:21 228:9
**legal** 105:13 115:25
177:23
**legally** 191:12
**legislation** 37:2,11,14
37:16 41:9,22,23
60:17 61:18 72:24
92:12 96:1,2 97:15
97:21 109:23 117:6

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

117:8,13 129:2
133:12,13 145:20
173:15,18 188:11
205:13 211:21
**legislative** 4:20 18:15
29:18 32:11 38:2
38:21 39:2,6,24
40:5 43:8,13 44:3,7
44:22 53:16 62:15
69:9 78:1 81:16
82:1,16 83:9 95:18
96:5 99:14 103:1
116:20,24 117:3,14
126:23 133:7
134:10,16,17
135:24 136:1
137:18 139:6
157:15 177:23
178:5,9,10 181:16
181:22,25 185:16
185:22 187:14
191:17 201:15,21
203:4 207:25 209:7
222:20 223:10
225:25 245:3
**legislatively** 192:17
**legislator** 130:5
176:17
**legislators** 14:15
54:10 98:7 131:13
137:24 138:3 139:6
146:25 151:16
162:24 169:4,11
170:1,15,20 171:9
177:16 182:2
183:13 211:10
222:1
**legislature** 27:23 28:1
32:8 35:18 36:12
37:5 42:7 46:22
55:17 69:13 70:7
72:4 78:5 82:22
90:6 97:7 169:3
182:10 187:15
193:9 195:11,16
216:6 242:12
248:16 249:14
**LEMON** 1:3
**lender** 28:7
**letting** 51:23 176:5
247:14
**let's** 22:13 23:11

25:22 56:8 68:13
79:7 120:24 133:17
136:12,13 138:25
139:5 154:20 163:4
198:18 201:14
207:24 219:14
250:8
**level** 52:21,25 53:1
61:7 89:2,6 94:20
147:23,24 152:25
153:3,3,9,10,15,16
**levels** 153:24
**Lewis** 2:18
**liberal** 31:14
**lieu** 129:5
**life** 120:21
**limitation** 71:13
76:17
**limitations** 75:20
**limited** 10:12
**limiting** 71:18 73:9
**limits** 81:20
**Lindsay** 246:24
**line** 62:24 64:23
76:25 81:5
**lines** 60:10 129:4
**list** 102:18 139:9,14
183:7 238:11
**listed** 29:25 120:13
251:5
**listing** 125:9
**lists** 100:11 101:7
118:5 120:20 126:7
**litigation** 249:21
**little** 19:13 30:14,19
56:3 63:21 64:23
68:7 79:6,7 89:8
131:21 136:10
154:21 187:24
223:25 224:15
237:23 240:21
**live** 64:24 90:24
**LLP** 1:17 2:9,14,18
3:2
**local** 51:11,19,22
52:3 60:9,17,18,19
60:25 61:7
**locals** 60:24
**located** 202:5 225:6
**long** 10:9 11:10 13:15
21:8,21 22:9 23:9
24:3,8,24 25:17

28:8 32:7,8 33:2
87:20,22 88:24
188:15
**longer** 30:22 234:7
**longstanding** 44:14
**longtime** 52:1
**look** 10:4 17:1,12
52:20,25 53:9
63:11 80:21 86:8
114:10 120:17
134:18 136:2
139:12,25 142:24
143:18 154:8,20
157:20 161:23
162:7,10 163:4,23
167:22 170:7
171:17,18 182:4,24
183:1 198:18
204:25 214:18,19
216:10,10 226:22
232:25 234:17,18
239:24 241:11
243:20,24 244:1
246:22
**looked** 87:15 137:22
144:12 145:1
153:15 155:12,14
161:9,11 162:3,25
167:19 180:9,15
224:4,6 238:6
**looking** 16:20 30:13
33:24 45:9 91:8
113:17 125:8
130:12 133:11
138:9 140:6 141:6
143:10,15 148:9
149:9 151:9 164:5
202:25 213:1 222:2
227:6
**looks** 134:21
**Los** 2:10
**lost** 6:12 110:15
128:24 231:18,18
**lot** 36:23 50:14 57:13
88:24 107:7,8
111:1 150:22
182:25 224:7
225:12 230:20
238:22 242:8
**low** 147:23 153:9
**lower** 152:24
**lubricants** 23:1

**Lynch** 22:22 23:10
23:11
**Lynn** 99:22 100:21
101:18 102:15
103:10
**LYNNE** 1:7

**— M —**

**Mable** 100:22 101:19
102:16 103:15
**Mack** 99:20 100:19
102:13
**Maggie** 5:19 77:16
**main** 47:8 50:4
**maintain** 112:18
**maintained** 107:22
**major** 110:11,13,17
130:17 215:1
**majority** 71:21 72:8
72:18 76:9,15,21
79:11 104:21 119:7
172:6
**majority-minority**
172:4,6
**makeup** 31:9,11
217:7 218:19
**making** 58:5 62:8
65:2 66:15 68:9
76:9 80:22 81:3
82:1,12 98:13
129:14 132:25
133:14 137:25
138:4 157:14 158:4
159:11 170:5,24
171:3 191:16 194:7
194:1 196:14
197:24 233:19
**man** 51:2 130:2
**manager** 22:2,4
**mandate** 164:4
**manner** 84:24
**Manor** 224:16,23
**map** 6:5 73:16 85:10
90:25 94:16,23
95:5 105:7,14
109:1,20 112:11
138:12 143:10
144:20 148:4,14,17
148:23 149:14
150:19 153:2 157:1
171:25 183:5,13
186:5 187:1 197:6

197:7 198:24,25
199:15 223:19
225:12,22 226:19
245:6
**mapping** 88:8
**mapping-related**
91:10
**maps** 5:18 53:15
55:11 57:5,25 58:3
60:23 73:20 75:11
75:12 77:15 80:19
81:13 89:1 93:12
94:9,25 111:13
143:15 146:23
147:4,14,22 158:14
197:1,10 199:3
205:16 224:2,4,7
227:7,21,25 232:18
**Maptitude** 88:8
**map's** 94:17
**map-drawing** 143:4
143:7,24 144:4
162:21 163:3
**March** 4:21 32:17
120:25 121:8,9,16
122:7,15,21,23
123:2,17,24 124:2,6
124:12,21 125:14
125:20 156:6,9,11
162:4 169:21
184:24 187:14
188:19,21 189:5,21
189:22 191:14,20
203:23,25 206:11
208:1 209:8 235:6
235:22 248:8
**margin** 48:3,6,16
50:16
**Marietta** 251:24
**mark** 20:11 77:8
**marked** 30:9 32:12
36:7 37:22 38:12
39:15 77:11 99:10
101:2,24 110:7
127:4,25 128:19
132:3 183:21 184:9
195:25 211:2
212:13,22 213:18
219:10 223:4,5
225:18 226:7,14
228:4 229:3 240:16
244:20 246:4 248:2

Donovan Reporting, PC                                                    770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

**marking** 19:25 20:14
33:13 100:6 117:18
**MARLON** 1:3
**Massey** 99:21
**MassMutual** 26:2,4
**matches** 227:1
**Matt** 99:19 100:19
101:15,16 102:13
103:8,16
**matter** 20:10 42:24
219:23
**matters** 41:19 90:16
185:6
**Mayo** 99:21 100:20
101:17 103:16
**MCKENZIE** 1:6
**McKillip** 99:17
**mean** 14:19,21 31:10
49:2 51:14,14
57:22,23 59:21
65:13 66:19 86:17
86:21,25 87:18
88:16 89:9,18,19
92:2 94:23 95:16
121:3,12,20 122:1
122:19 123:6
124:22 131:16,24
141:10 153:1
158:11 173:25
195:18 196:23
197:13 198:2,12,15
199:6,20 205:11
207:2 216:9 217:15
219:2 231:1 232:3
232:8 238:13,16
**means** 89:16 124:23
**meant** 66:10 197:24
210:15
**mechanics** 130:2
**meet** 13:13 51:23
58:25 92:18 93:20
160:2,3 185:21
**meeting** 4:20 6:15
55:3 59:4,7,21
87:20,23 88:2 92:2
92:21 111:23
143:14,17,23 144:4
144:7,24 145:3,13
145:17 147:2 148:1
151:1,11 153:8
154:4,11,22 155:5
157:10 158:25

160:14 162:8,12,15
167:11 172:8,15
173:16 183:16
184:13,15,15,19,25
185:9,11,15,19,25
186:2,14 189:9,11
189:13,15 191:23
202:20 203:23
222:24 227:13
234:20 235:1,6
236:6 237:16,21,22
238:1,17,19,20
239:7,23 240:4
**meetings** 18:10 59:20
60:1 92:3 155:19
155:24 156:4,13
157:7 170:13
189:20
**member** 32:1 37:17
38:19 40:13 53:3
75:17 80:10 86:8
102:6 105:24 234:6
234:9
**members** 28:18
40:10 45:6 53:6
65:9 71:10,23
72:13,21 75:15,16
77:2 79:7 80:13
82:22 84:19 85:2,5
85:13,16 86:1 93:1
97:24 99:14 100:11
100:15 101:8,11,12
102:8 103:1,12,21
104:6,11,18 105:21
105:23 118:17,24
129:13 146:8 169:2
172:22 173:8,19
174:19 175:2,11,21
180:16 182:10,16
183:20 186:3,17
187:3 194:4 195:3
205:25 206:9 220:6
221:22 233:10
237:17
**memory** 16:17 24:12
160:22
**memory's** 154:10
237:1
**mentioned** 36:23
47:11,19 53:2,18
58:14 64:13 82:20
85:5 146:16 169:3

232:16 236:18
**merely** 34:8
**Merrill** 22:21 23:9,11
**mess** 82:11
**message** 18:25
**messages** 189:9,10,12
**MESSAGING** 231:4
**messed** 61:9
**met** 13:10 14:10
28:20 59:17 99:3
111:5 112:13
134:22 162:24
173:16 183:17
185:24 203:3
**Methodist** 27:25 28:9
29:5
**metro** 66:2,2 86:20
87:1,7 112:23
175:4 180:18,21
**Mickey** 99:23 100:21
101:19 102:16
103:15
**middle** 66:16 69:9
70:9 71:15,19
77:22 134:22,23
196:10,11 224:14
224:17,19
**midterm** 246:25
247:9
**Midtown** 2:19
**mid-census** 70:22
73:11 74:8
**mid-cycle** 98:10
**migration** 112:20,21
**miles** 33:3
**mind** 43:16 151:23
173:4 192:20
217:17 231:23
235:14 236:1
**mine** 31:15 46:1 91:2
111:2 235:1,2
**minor** 45:1 62:8
63:18 64:16 65:12
73:18 74:24 75:13
215:9,21
**minorities** 216:11
**minority** 79:12,13
84:19 104:17,18
114:22 175:2,12
180:6 186:4 193:17
194:4 206:10
242:22

**minutes** 4:19 13:16
13:17 63:24 202:22
203:22 231:7 236:4
**missed** 237:25 245:19
**misshapen** 115:1
**missing** 10:22 11:2
**misstated** 214:17
**mistaken** 161:22
**mistakes** 114:17
**Mobile** 26:15
**moment** 5:25 112:13
**Monday** 32:14 203:5
**Montgomery** 21:2,20
**month** 156:5
**months** 17:21,25
32:13 92:6 187:16
**morning** 9:18 134:25
**motion** 6:20 207:21
207:21 211:5,11,14
211:19
**move** 23:22 24:1
43:20 64:23 82:19
97:21 111:16 119:6
140:8 151:5 156:23
219:6
**moved** 23:19 24:6
110:13 152:10,15
175:21 201:8
**moving** 118:15 119:9
**Moyer** 1:15 253:21
**multiple** 148:24
150:21 156:13
157:6 196:17
**Munger** 2:9
**municipalities** 200:3
**mutually** 85:1

———————
**N**
———————

**NAACP** 1:3,5 2:2
**name** 9:20 12:18
25:13 33:17 47:6,6
48:14 50:25 63:6,8
89:12 93:13 103:4
226:10 228:9 238:1
238:4,10
**names** 30:5 62:22
65:5,19 66:4
**Nan** 210:19
**national** 21:17 51:10
52:12,15
**NationsBank** 23:21
24:7,9,14,18,20,21

**natural** 29:19 34:4
34:11,15 36:19
38:7,22 39:25
41:14,20,22 46:20
**nature** 10:18 14:9
16:19 52:8 76:23
77:1 78:11 91:11
111:25 113:15
123:10 131:10,18
140:3 237:9
**NE** 2:20
**near** 63:22
**nearby** 117:22
**necessarily** 32:12
**necessary** 41:15
**need** 33:1 40:18 59:8
60:21 61:10 62:3
67:25 82:4 96:9
105:25 129:24,25
130:14 168:6
174:21 187:19
191:2 210:15 230:8
238:12
**needed** 63:10 79:16
83:3,13 96:13
110:20 115:14,20
187:20 205:12
251:19
**needs** 80:13 136:11
136:17 168:6
**need-to-know** 174:18
**negative** 11:17
**negatively** 159:18
166:13
**negotiate** 111:3
**neighborhood** 48:19
**neighboring** 151:16
162:24
**Neither** 47:10
**never** 11:11 50:25
51:1,3,5 54:5 68:13
78:11 222:10
**new** 2:5 45:6 114:5
234:1,16 247:1
**newly** 140:14
**Nix** 1:13 4:11,22 5:1
5:9,11,13,15,17,22
6:1 7:6,18,23 9:13
10:7 12:19 19:6
33:14 64:9 110:9
116:17 133:19
168:25 200:21

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

Page 267

211:4 212:4,15
229:2 244:22 246:3
251:1,22 252:14
**Nix's** 5:3,5,7
**nodded** 121:15
**nonverbal** 12:13
**normally** 128:12
**north** 110:14,25
111:2 112:19,22
179:10,10
**northern** 1:1 31:5
66:2 110:25 112:24
113:24
**notes** 30:19,20 108:5
108:10,15 109:3,14
109:17 189:5 237:2
**notice** 5:1 6:16 10:3
20:11 184:13,23
192:5 239:20
**noticed** 237:20 238:6
**notices** 184:16
189:15
**notion** 55:14
**November** 33:9
220:7,17 221:6
**no-go** 166:10
**number** 9:10 40:9
41:10 42:22,24
53:9,11 60:8 64:8
65:6 66:7 71:14,18
85:18 87:5 98:11
110:14 113:18
116:15 126:11
128:3 132:9 141:2
156:20,23 168:24
178:24 179:2,13
187:21 200:1,2,20
205:7 220:1 222:16
223:6 226:16,23
227:1,2 228:24
231:5 236:11,15
237:24,24 238:23
246:19 251:20
**numbers** 4:23 73:22
132:5 141:25 244:6
**numerous** 42:5,10,11
198:8
**nuts** 56:6 59:12
**NW** 2:5,15 3:3

────── **O** ──────

**O** 1:13 4:11 9:13

251:1,22 252:14
**oath** 11:20 64:10
**Obama** 57:8 95:2
**object** 52:4 74:3,11
89:14 90:8 135:2
142:7 144:2 179:16
181:17 190:4 198:1
199:16 221:15
**Objecting** 221:15
**objection** 113:2
**objections** 167:8,13
206:18,21 209:3,12
209:15 210:20
**obtain** 163:17,19
169:10
**obviously** 135:20,24
216:18 217:1
**occasionally** 32:24
59:24 96:21
**occupy** 64:20
**occurred** 42:12 70:23
148:1 169:20
**occurrence** 247:11
**occurring** 178:18,23
180:2,21 181:12
**OCGA** 253:2,6
**October** 220:8
**offer** 55:20 84:8
**offered** 11:14 128:23
186:17 215:4
253:17
**office** 14:18,23 15:2
15:16 29:22 45:20
46:12 56:5 58:15
58:22 59:1,18,22
60:6 61:6 67:6 70:7
71:6 73:15,21 74:2
74:6,25 79:16
80:17 81:2,25
82:16 83:5 85:21
85:21 87:18,21
88:3 90:19 91:24
92:1 95:16 96:4,8
96:14,19 104:1,12
106:1,12 107:5,7,12
107:23 109:20
111:6 121:5 129:18
129:25 130:15
131:6,11,20 134:18
136:2,18,24 141:24
142:23 143:5 144:8
146:22 148:1,2

150:1 153:7 154:5
154:15 155:20
157:19 159:1,4
160:2 161:7 162:9
162:22 169:15
170:7,14,15 172:9
172:16 177:22
178:9 180:17 183:2
186:19,23 191:6
195:16 203:4
214:25 215:2
221:23 222:17,25
223:11 226:1
227:10,14,16,19
232:13 233:9 245:4
245:14
**officer** 24:23 25:3,4
**Offices** 1:17
**Office's** 191:10
**official** 1:10 12:25
30:16 107:15
220:15 236:7
**off-the-record**
246:11
**oh** 30:12 77:8 176:25
240:25,25
**okay** 10:6 11:8,18
12:15,16 15:13
16:16 23:25 24:11
25:6,24 26:3 36:9
37:24 47:1 69:7
80:22 104:1 111:8
116:5,6 117:24
121:2,19 132:23
144:5 147:12,13,16
152:4 154:20
157:13 160:5,10,11
160:16 164:7 166:5
166:12 168:15,17
169:16 178:5
181:19 200:14
202:16,25 213:22
218:11 219:7,16,21
220:2 225:1 228:15
229:7 235:4,5,17
236:3 240:18 241:1
241:6,7 246:7,13
250:10
**old** 111:24 158:14
**older** 28:24 33:25
**Olson** 2:9
**once** 28:20 40:3 92:5

125:5 129:16
157:19 182:6,20
211:19
**ones** 63:3 186:18
195:4 236:23
**one-page** 108:19
**ongoing** 179:7
**online** 27:9 180:17 183:2
**open** 80:4 84:24 85:2
**opinion** 37:18 42:20
52:14 76:19
**opinions** 41:25
**opponent** 47:4 48:11
49:17,23
**opponents** 49:14
**opponent's** 48:14
**opportunity** 43:2,20
46:10 54:24 55:3
**opposed** 193:6,11
242:9,12
**opposing** 241:18
**opposition** 208:24
242:13
**option** 114:3
**options** 155:4
**ORANGE** 1:7
**order** 4:23 69:17,23
70:10 85:15 112:18
**organization** 1:3
**organizational** 185:9
185:18,25
**organized** 92:2
**original** 123:11
126:12 127:16
215:5
**originally** 200:9
**Orrock** 210:19
**Otis** 12:19
**outcome** 71:24 72:15
84:23 243:22 247:8
**outcomes** 243:17
**outdated** 30:20
**outline** 109:9,17
**outside** 85:9,14 98:25
98:25 107:21
109:23 110:1
137:12 194:15,19
195:16
**overnight** 33:1
**O'Connor** 4:19 6:14
7:8,23 91:18 92:5
92:23 96:18 132:5

132:13 134:22
181:2,15,22 219:24
235:22 246:16
247:5
**O'Connor's** 93:9

────── **P** ──────

**P** 1:15 253:21
**package** 169:6
**packet** 245:2
**packing** 210:11,12
**page** 2:22 4:14,25 5:3
5:7,8,10,12,14,16
5:20,22,25 6:1,3,25
7:25 20:4 30:13,17
33:16 36:11 38:2
38:15 39:18 53:9
77:21,22 99:12
100:10 101:5 102:2
126:7 132:5,9,19,22
134:23 196:10,11
213:24 214:4
219:14,15,18,20
220:1 223:6 224:14
224:17,20 225:20
226:16 229:8
235:19,25 246:19
246:23 248:12
**pages** 7:3 109:6
202:11 203:14,20
241:4 252:10
**page(s)** 251:20
**PAGE/LINE/CHA...**
251:6
**Pam** 100:18 101:15
102:12 103:16
**paper** 225:13
**paragraph** 77:21
215:8 248:12
**parameters** 79:17
84:14 85:14 93:3
93:20,21 94:14
95:20,24 98:2,16
108:18,24 131:2,23
134:7 136:19 143:2
144:17 155:2
171:19,21 178:4
197:12 199:5 201:2
205:21
**Parrish** 213:25
215:13
**part** 27:7 31:5,7

Donovan Reporting, PC

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

74:17,18 78:19
111:1 112:22,23
133:11 146:13,13
149:14,14 156:9
162:8,15 163:10
166:21 172:13
177:25 179:5 180:8
180:14 181:7,8
197:23 204:17
206:19 216:25
**participants** 194:12
**participate** 143:3
189:19
**participated** 51:3
**participation** 144:16
144:19
**particular** 41:19
77:21 167:13
219:19 248:12
**particularly** 45:14
176:13 206:22
**parties** 10:1 85:3
252:16 253:18
**partisan** 41:5,16
42:19
**partly** 103:23 104:3,7
175:13
**parts** 65:21 86:1
**party** 71:21,23 72:8
72:13 76:9,11
104:18,19,22 175:2
175:12 186:4
206:10 216:8,21,25
217:2 248:15
249:13 253:11,11
253:13,14
**pass** 42:2 96:1 128:24
188:19 205:13
207:10
**passage** 7:2 208:8
211:24 212:17
**passed** 37:7,12 41:11
55:12,24 57:5 58:3
119:13 122:25
123:12 124:11
126:17 127:10
128:10,14 133:13
134:9 135:18
205:23 209:9
233:11 244:11,16
249:9
**passed/adopted**

123:3
**passes** 60:16
**passing** 169:9
**pastor** 27:24 28:8,13
28:15
**pastoral** 28:18,22
**pathways** 37:11
**PATRICIA** 1:4
**PAYTON** 1:6
**PC** 251:24 252:22,23
**Peachtree** 2:20
**people** 15:10,17
16:12 28:19 32:2
34:22 35:11 41:6
41:12,15 42:1,6,8
42:17,18 43:2 46:8
49:3 56:5 61:8 62:2
62:6,21 65:4,6,9
66:5,7,23 68:8,19
68:20,22 71:4,5
73:6 74:19 78:12
79:23,25 81:9
84:10 85:18,19
90:24 91:24 93:16
97:3 98:11 111:17
111:18 139:14
140:10,25 143:8,19
143:21 144:15
146:14 153:21
155:10,13 164:5,6
164:15 166:4,24
168:10 182:13
187:21 188:13
193:6,7 214:19
216:25 230:19
241:18 242:1,9,11
243:25
**percent** 113:5,10
120:18 134:24
141:1 145:14
155:15 186:22
220:20 221:1,8
**percentage** 156:16
172:18 179:21
180:11 220:7,11,14
220:15,19 221:1,7
221:13 232:23
233:4,14
**perfectly** 98:10
**perform** 54:15 149:2
149:10,11
**performance** 141:15

141:21 142:18
149:20 150:5 151:3
151:13,19 152:23
156:17 159:17,19
159:20 163:13,25
173:23 176:22
177:5,10 200:1
227:22
**period** 170:10 175:24
176:14 220:23
**Perkins** 2:14
**permissible** 98:11
**person** 19:4 42:17
44:18 78:14 83:24
90:5 113:21 129:12
165:23 167:15
238:4 241:12 253:8
**personal** 17:7,11,12
26:7 46:21 76:23
112:3
**person's** 78:13
**perspective** 217:9
218:21
**Pezold** 113:22
**PHILLIPS** 2:8
**philosophy** 216:20
**phone** 18:8,13,16,20
231:10,12
**pick** 110:20 111:19
112:19 113:22
**picked** 89:7 110:15
230:19
**picture** 108:19
147:25
**piece** 37:14,15 188:11
225:13
**piecemeal** 67:1 83:2
**pieces** 92:11
**pike** 242:15
**place** 82:23 142:2
145:18 164:12
181:5 192:14,25
**placed** 34:7 215:4
223:20
**places** 21:9
**Plaintiffs** 1:5,8 2:2,12
9:24 16:21
**Plaintiff's** 4:16 19:23
20:1,8,8,12,14
29:10 30:8,10
33:11,14 36:6,8
37:20,22 38:11,13

39:14,16 77:7,11
99:8,10 100:5,7
101:1,3,23,25 110:5
110:8 117:17,19
118:1 120:13 127:2
127:4,21,25 128:9
128:18,20 132:1,3
149:16 183:22
184:8,10 195:24
196:1 202:3,5
210:25 211:2,18,22
212:4,12,14,15,20
212:22 213:17,19
219:9,11,23 223:3,5
225:17,19 226:5,7
226:13,15 227:2
228:3,5 229:1,4
235:12,15 240:14
240:16 244:19,21
244:22 246:2,5
248:1,3
**plan** 6:6 7:10,15,21
8:1 55:7,23 66:15
71:22 73:11 74:9
75:21 96:20 114:12
114:16,21,25 115:4
115:8,19,25 191:3
201:20 223:17
226:9,23,23 228:9
234:2,5 242:14
248:5 249:9
**planning** 27:5,10
**plans** 55:16 72:12
177:13 242:13
**play** 66:15
**playing** 55:22
**please** 9:11 11:24
12:17 115:16 173:2
239:4 250:16
251:19
**plus-40** 48:20
**point** 34:21 35:14
47:13 66:10 68:14
82:20 83:14 87:3
129:12 130:2,8
133:13 138:7
139:10,17 154:12
158:12 166:5,8
168:4 177:15 209:7
241:25
**pointing** 149:19
**points** 208:19

**policy** 106:17,20
**political** 31:8,10 74:7
76:14,19,22 77:5,5
78:13,20,24 80:7,11
141:15,21 142:17
149:20 150:4 151:8
151:12 152:23
159:17,19,19
163:13 173:23
176:21 177:5,10
199:25 227:22
247:21 248:22
249:1
**politics** 46:16 51:10
52:16 78:25,25
79:3
**population** 31:23
87:2,5 110:21
112:16,19,20,21
115:13,20 140:16
150:10,14 172:18
179:12,15,18,20
180:6,11 199:25
201:9 221:12
227:22 232:23
233:4,14
**populations** 179:3
**portion** 86:14 173:6
192:22 198:20
217:20 218:14
232:1
**portrayal** 236:14
**position** 10:14 21:25
23:13,17 24:4,16
43:1 54:17,25 75:8
**possess** 42:14
**possession** 108:4,8
**possibility** 62:7 80:16
98:13 132:25
133:18 172:10
**possible** 66:18 144:22
146:18 163:23
**possibly** 145:8
147:17,18,19
204:16 241:13
**posted** 192:4
**potential** 63:18 152:8
155:4 243:16
**power** 8:2 72:4 248:6
248:22 249:1,15
**Powers** 1:14 2:3 4:12
9:17,21 63:24

116:3,16 128:4
135:9 144:5 168:8
168:16 173:3
183:25 184:5
192:19 200:12
217:17 218:9 219:6
228:12,16 231:16
231:18,23 240:23
245:16 249:17
250:9
**practical** 10:15
**practice** 71:17 72:19
73:8 76:8 122:3
**precedent** 70:14,21
**precinct** 52:21,25
77:2 152:24 153:10
153:16,21
**precincts** 65:13
107:16 113:18,23
115:4 153:13,18
183:8 200:2
**precise** 74:2
**predecessor** 45:25
**predominantly** 31:22
**premise** 243:4,9
**preparation** 13:25
15:20 234:11
**prepare** 13:8 37:2
208:14
**prescribed** 32:10
**present** 3:5 59:3
95:25 109:4,25
143:16 145:13
146:9 157:10
177:19 186:7
188:16 204:1,3
208:5 209:2 210:18
237:19
**presentation** 109:10
178:3 186:13 204:7
208:14,15,17,20
**presented** 105:9
106:21 108:6
208:10 234:10
**presenting** 189:22
190:2,14,21
**press** 213:11,14,25
214:15 229:25
**presumably** 148:17
**pretty** 53:10 93:14
143:21 208:22
234:17 242:16

246:13
**prevent** 76:9
**prevented** 70:18
**previous** 55:24 65:8
98:2 113:25 149:3
187:1 198:13
201:25
**previously** 58:9
74:16 140:22
197:17 199:10
229:3
**primarily** 16:9 28:7
28:17,21 108:16
151:7 170:25 176:1
**primary** 47:4,21 48:7
49:10,21 68:1
83:23 95:17 96:3
112:24 129:11
151:7
**principal** 253:9
**principles** 88:13,19
89:13
**prior** 46:22 47:20
48:21 53:25 55:8
70:13 76:7 87:10
88:4 89:25 139:17
140:10,22 141:7,9
141:10 169:6,8
178:7,19 181:11,15
181:18,22 182:10
183:18 184:18
190:14,21 200:21
200:23 204:11
206:10 209:13
213:10 224:10
239:21
**private** 170:21
**privy** 135:22
**probably** 10:9 13:16
17:21,25 18:16,21
19:14 21:10,11,11
22:22 23:12 25:22
34:16 42:16 47:16
47:18 48:19 52:11
60:21 66:22 68:11
68:20 88:24 92:10
92:16 93:11,13
96:4 109:5 119:13
139:11,23 140:1
150:24 156:4,8,11
158:13 160:9 162:2
162:14 181:3

184:22 185:24
187:17 189:1
222:22
**problem** 169:17
**problems** 94:10 95:6
**Procedure** 10:2
**proceed** 130:7
**proceeding** 12:5
**Proceedings** 4:1 64:4
116:11 168:20
200:16 228:20
245:22 250:17
**process** 60:20 76:15
79:4 85:2 87:16
89:5,19 93:7,10
94:2 97:25 98:3
99:1 104:10,15
105:3 121:21
145:19 147:15
152:7 158:16,23
159:12 166:21
167:3,8,10 172:21
173:7 175:21 176:9
181:25 188:5,11
193:6,8,11,14
194:16,20 204:22
224:3 232:12 233:8
242:7 243:8 247:21
**produce** 109:14
250:6
**produced** 100:1
106:6 108:10 227:9
227:10 245:2,13
249:21
**producing** 16:21
**product** 10:22 127:8
167:5,21 223:1
**professionals** 131:10
**program** 18:11
**progress** 190:9
**progressed** 95:15
**progression** 46:20
**Progressives** 5:18
77:14
**prohibited** 253:2
**prompt** 233:1
**properly** 233:8
**properties** 217:1
**property** 62:23 76:25
**proposed** 7:10,14,20
72:8,17 76:15
111:8 148:11 152:9

178:7 222:18
226:19 227:6 235:9
235:10 244:24
**proposing** 165:24
210:1 214:8
**Proscenium** 2:19
**protect** 94:22
**proud** 57:4,10 94:25
**provide** 107:11
138:23 252:24
253:7
**provided** 9:3 186:3
190:19
**provides** 125:9
**providing** 118:6
176:4
**public** 98:25 99:3
191:19,23 192:2,5,9
192:13,24 194:14
194:19
**pull** 149:9
**purchased** 64:18
**purchases** 68:21
**purpose** 53:12,14
215:16
**purposes** 10:15 13:5
**pursuant** 9:4 10:1
252:17
**pursuing** 83:16 98:7
**push** 242:2
**pushed** 110:24 111:2
112:2
**put** 20:4 74:21 75:8
83:11 90:25 92:10
109:25 112:8
137:14 138:25
140:21 143:2
145:20,25 175:9
178:2 188:14
200:10
**putting** 83:1 95:18
144:23 169:6
**P-8** 202:7
**p.m** 1:19,19 9:2,8
64:4,5,7 116:11,12
116:14 168:20,21
168:23 200:16,17
200:19 219:25
228:20,21,23
245:21,22,23,25
250:13,17

**Q**
**qualifications** 90:4
**qualities** 42:13
**question** 12:7 43:23
52:5 69:25 70:3,3,5
70:16 74:4,5,12
77:4 81:22 89:15
90:9 95:6 110:2
115:16 135:3
142:14 144:3,6
173:2,4 177:2
192:18,20 198:2,3
199:17,22 212:2
216:12,13,24
217:16,18 219:3
221:16 231:24
233:20 237:13
**Questioning** 14:4
**questions** 10:14
11:24 12:11 45:7
47:23 48:2 49:3,6
59:25 60:2,8 65:15
67:12 105:24
159:24 174:4,6,23
175:1 205:2,9
236:20 249:18
252:6
**question-and-answer**
146:17
**question-answering**
144:21
**queue** 17:23
**quickly** 53:10 246:14
**quite** 28:25 35:9
41:10 57:4 81:8
86:19 178:24,24
**quo** 77:23
**quote** 78:8,15,19
196:15,19 249:12
**quotes** 196:12
**quote-unquote** 248:5

**R**
**race** 47:3 48:8 150:14
216:8
**racial** 31:17,20
114:21 150:9
190:15,20 191:2,8
195:8,14 197:21,23
200:1 201:4 217:8
218:20
**Radio** 214:1

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

Rahn 99:21 100:20
   101:17 103:16
raise 64:17 113:2
   167:12 206:17,21
   237:13
raised 193:16 209:3
   240:5
raising 65:2,2
Ralston 248:14
   249:13
Ramsey 99:17
ran 49:15,20,24 51:6
   51:20 153:14
   154:15 214:8
Randall 1:13 4:11
   9:13 12:19 251:1
   251:22 252:13
Randy 4:22 5:1,2,5,6
   5:8,10,12,14,16 7:6
   7:18,23
randy.nix@house....
   13:3
range 73:24 149:3
rates 253:17
reach 84:19
read 13:18,21,24
   121:22 122:2,4,5,11
   122:12,24 123:23
   124:6 132:19,21
   173:5 192:21
   198:12,19 213:21
   217:19 218:12,13
   229:5 231:25
   237:16 241:1,3
   246:8 249:3 251:2
   252:8
reader 120:12
readers 121:10,17,20
   121:24 122:8
reading 173:12 193:2
   199:11 217:23
   219:4 231:24 232:6
   233:1 236:1,1
readings 188:19
reads 121:25
ready 137:15 188:15
real 32:25 87:16
   157:4 231:3 232:5
   232:11
realize 64:9 68:23
really 13:10 14:13
   26:19 45:4 47:10

47:14 49:5 52:9
   55:13 57:13 64:19
   68:18 89:17 111:12
   158:15 197:4
   198:22 209:17,17
   243:1
reapportionment
   4:20 6:15 14:18,23
   15:2 29:19 30:21
   38:22 39:3,7,25
   40:6 43:8,13 44:9
   45:14 53:3,7,25
   54:16 55:6 56:5,9
   57:6,11 58:15,22
   59:1,10,13,18 60:5
   70:2,7 71:6 73:21
   74:1,6,25 76:4 78:2
   79:2,16 80:17 81:2
   81:25 82:16 83:5
   87:9,18,21 88:3,9
   88:14 90:1,6 91:17
   91:19 95:16 96:4,7
   96:14,19 99:15
   100:12 101:8
   102:24 103:2,13,22
   104:6,19 105:4
   106:12 107:5,22
   108:3 109:20 111:6
   112:6,14 114:9
   116:19,23 117:2,5,7
   117:12 118:25
   119:24 120:3,6
   122:20 129:25
   130:15 131:6,11,20
   134:6,18 136:2,18
   136:23 141:24
   142:23 143:4 144:8
   146:22 148:2 150:1
   153:7 154:5 155:20
   157:9,18 159:1,4
   160:2 161:7 162:9
   162:21 164:4
   165:21 169:14
   170:7,14,15 172:8
   172:16,22 173:8,20
   174:10 177:22
   180:17 181:9 183:2
   184:12 185:15,20
   186:19,23 190:22
   191:6,10 194:15
   195:16 202:20,24
   203:3,15,22 215:25

221:23 222:13,17
   222:25 223:10
   226:1 227:9,14,16
   227:19 232:13
   233:8 234:6,20
   245:4,14 247:10
reason 12:6 61:24
   70:24 125:7 152:2
   183:24 206:24
   238:24 251:6
reasons 44:16 172:1
   230:17
recall 10:19 11:9,16
   13:7 19:1 21:11
   27:13 34:10 36:2
   47:22,25 57:3 59:5
   59:16 60:7 61:16
   65:18,21 82:18
   85:7,18,25 86:4
   87:22 105:14
   117:10 131:13
   133:9,9 134:2
   135:10,23 136:6,22
   137:1,6,19 138:2,6
   138:19 139:1
   140:18 142:19
   143:6,14,23 145:10
   147:2 155:9,11
   156:14,20,22
   157:12,21 158:1
   159:2 160:20,23
   161:19 162:14
   163:8,9,10 165:1,4
   167:8,25 168:2
   170:11,19 171:7
   172:5,13,20 174:5
   175:8,16 176:2
   181:6 182:12 185:8
   187:5,5,9,12 189:23
   190:24 191:18,22
   191:24 196:14
   207:8 208:16,21
   223:22,24 235:7
   236:17 237:3,9
   238:14,16,19
   239:11,13,25 244:8
   246:15 247:6,12
receive 26:17 27:4
   52:23 107:24 175:1
   189:8,10 193:10
   241:22
received 52:22

213:11,25 239:20
   241:8,18
recess 64:4 116:11
   168:20 200:16
   228:20 245:22
recognize 19:14
recognized 26:23
recollection 152:20
   152:22 154:22
   155:11 185:5,17
   236:5 238:23 239:17
   247:15
recommendations
   247:17
reconnect 77:2
record 9:8 12:5,18
   27:15 64:3,7
   116:10,14 118:2
   121:14 149:16
   168:19,23 200:15
   200:19 212:5,16
   214:3 228:19,23
   236:7 245:21,25
   246:10 249:3
recording 211:5
records 107:15,24
   189:4
redistrict 69:9 71:14
   71:19 72:20
redistricted 50:21
   69:16,21 70:8
redistricting 8:1 13:6
   14:4,24 15:19
   16:18 17:5 18:23
   55:7,16,23,23 58:11
   60:9 61:14,18 65:8
   66:14 68:5 69:3
   70:22 71:12,22
   72:12 73:11 74:9
   75:21 76:18 78:6
   78:10,17,21 79:4,10
   83:17 85:2 87:10
   87:13 88:4,13,19
   89:25 91:6 93:6,10
   94:2 95:9 96:20
   98:24 107:25
   110:10 112:4
   113:12 115:12,18
   120:7 140:10,23
   141:8,10,12 164:24
   165:9 170:10
   176:14,20 177:4

178:20 179:5
   192:14,25 194:10
   200:23 201:20
   202:24 203:3,22
   214:21 224:3 230:3
   234:2,5,13 242:13
   242:14 244:10
   246:25 247:18
   248:5
redistricting-related
   67:23 90:16
redraw 163:14
redrawing 131:15
   133:25 135:12
   136:9,24 137:4
   144:9
redrawn 141:17
   142:16 156:18
reduced 252:7
Reece 99:22
reelection 49:15
refer 86:10,12,18
   202:4 248:11
referral 131:5
referred 123:24
   142:22 189:6
   193:22 200:22
referred-to 173:6
   192:22 198:20
   217:20 218:14
   232:1
referring 56:10 99:4
   117:23 149:16
   165:14 167:11
   197:18,21 198:11
   198:18 199:23,25
   200:11 213:23
   216:23 220:3 239:7
refers 78:1
reflect 236:4
refresh 16:17
regarding 16:17
   96:19 135:12
   142:15 158:4 161:1
   161:12 170:3
   181:20 187:3 189:9
   189:11,13,25
   190:20 192:2,9
   213:12 230:3
   233:21 241:9
regional 25:15
registered 220:8,11

Randall O. Nix                Georgia State Conference of the NAACP, et al vs Kemp                January 10, 2018

**220**:19,25 **221**:7
**registration** 150:15
**regular** 5:3,9,11,13
  5:15,17,21,23 6:2,4
  6:7,20,22 7:1 17:17
  33:22 36:16 99:16
  118:4
**Regulations** 9:5
  252:18 253:4
**REID** 1:4
**related** 17:4,13 18:23
  34:18 41:13,19,24
  47:12 48:2 50:9,10
  50:15 59:9 60:9,17
  61:14 105:22
  106:18 107:15,24
  118:3,14 143:25
  144:8 160:24 165:8
  173:22 197:7
  198:25 239:10,18
  243:1
**relations** 61:2
**relationship** 118:20
  209:20 220:10
  253:5,10
**relative** 40:9 69:2
  165:4 206:18 247:7
**relatively** 31:12,13
  31:15 40:8,13
  44:25 65:12 73:18
  74:23 187:24
  188:10 240:4 244:7
**release** 215:1
**reliably** 40:21
**relied** 81:6
**remain** 189:4
**remaining** 231:5
**remember** 25:8,10,14
  27:14 41:18 48:5
  48:18 50:18 62:22
  63:16 65:25 66:2
  105:8,19 109:5
  135:14 140:6 166:1
  171:15 185:23
  204:18 236:11,15
  237:22 239:5,15
  244:6
**remembered** 236:24
**remove** 16:24
**reopen** 138:11
**repeat** 218:1,10
**repeating** 173:4

**192**:20 **217**:18
**rephrase** 11:25 142:9
  142:14 144:5 177:2
  192:17
**replied** 215:3
**reported** 122:16
  123:18 124:2 252:5
**reporter** 1:16 9:3,11
  12:4 173:4,5
  192:20,21 198:19
  217:19 218:13
  231:25 250:14
  252:1,21 253:22
**reporting** 9:6 251:24
  252:19,22,23,25
  253:8
**represent** 31:1 32:2
  103:22 104:7 226:8
  252:11
**representative** 5:1,2
  5:5,6 10:7 19:6
  20:2 29:8 31:2
  33:14 45:20 52:1
  63:14 64:9,13
  104:2 110:9 113:25
  116:17 118:10
  132:24 133:16,24
  134:21 135:8,11
  136:7,24 137:3
  138:22 139:16
  141:20 144:1,9
  145:4,12 146:24
  151:13,15 152:11
  152:16 153:10
  154:7 155:6,8,21
  156:18 157:13
  158:3,5,6,13,25
  159:3,17 160:1,18
  160:23 161:1,15,20
  161:21 162:13,23
  163:9,12 164:23
  165:7 166:12
  167:11,12 168:25
  170:2,9,17 171:3,16
  172:9,17 174:9
  176:19,23 177:3,8
  178:13,14 180:7,12
  182:18 200:21
  211:4 212:4,15
  220:13 225:2 229:2
  229:18 236:19,21
  237:5,10,11 239:12

**239**:14,16 **244**:22
  246:3
**representatives** 5:3,8
  5:10,12,14,16,20,22
  6:1,3,5 7:4 13:2
  20:4,19 33:18 38:3
  38:16 39:19 146:10
  148:9 172:25
  173:11,22 192:15
  193:1 217:4 218:16
**represented** 172:4
**representing** 9:23
**represents** 237:6
**Republican** 8:1 47:4
  47:21 72:13 76:7
  76:11 84:12 152:15
  156:16 216:20
  217:4,10 218:16,22
  220:13 248:4,13
**Republicans** 72:11
  103:3 220:18
**Republican-Democ...**
  149:2 151:3
**request** 87:24 195:19
**requested** 75:18
  195:3
**requesting** 138:19
**requests** 16:22
**require** 107:14
**required** 41:12 69:17
  69:22 70:10 72:23
  72:25 106:5 107:6
**requirement** 196:21
  197:19
**requirements** 106:9
  106:14 107:9 112:1
  196:18
**research** 89:25
**reserve** 133:18
  250:15
**reserved** 252:9
**residents** 34:25
**resources** 29:19 34:4
  34:12,15 36:19
  38:7,22 39:25
  41:14,20,22
**respect** 11:1 31:22
  42:20 55:22 70:22
  74:7 78:19 91:6
  93:10 95:8,14 97:6
  97:21 104:21
  106:17 112:5 119:5

**131**:6,14 **136**:8
  159:11 165:7 167:7
  175:4 176:20
  191:11 200:24
  237:11 240:1
  247:17
**respected** 113:6
**respects** 42:17
**respond** 194:2 198:6
  214:8
**response** 16:21
  193:25 216:15
**responses** 12:12,13
**responsibilities** 31:25
  95:11,14 96:7
  97:20
**responsibility** 44:20
  81:3 96:3 98:19,23
  195:6 216:2
**restate** 217:15 218:1
  219:2
**restrict** 76:14
**restriction** 69:12 72:6
**result** 140:15
**resulted** 210:8
**results** 52:21 149:20
**resumé** 25:9
**retain** 106:5,15
  107:12 248:22
  249:1
**retained** 107:16
**retaining** 106:18
**retired** 29:4
**return** 244:2
**reunite** 65:14
**reverse** 4:23
**review** 15:18,23
  191:2 195:20
  223:21 224:2 227:8
  227:11,11,12
**reviewed** 15:21,22
  81:15 178:8 190:15
  227:6,18
**revise** 6:9 7:4
**re-ask** 70:4 74:5
  212:2
**re-mark** 184:1,6
**Rich** 6:13 102:13
  132:4,12 138:19
**Richard** 99:22
  100:21 101:18
  102:15 103:10

**right** 9:20 12:17
  32:16 87:4 93:13
  102:20 103:7
  104:25 128:2,4
  149:17 152:10
  158:16 159:12
  168:14 182:19
  203:2 219:22
  221:11,20 223:13
  231:17 237:18
  245:16 250:1 252:8
**rights** 2:4 6:18 9:22
  191:4 193:18 196:4
  200:8,25
**right-hand** 33:19
  127:14 226:23
**river** 34:17,21 35:2,7
  47:12 50:11 89:7
**road** 64:21
**Robinson** 22:8,14,17
  22:23
**Roger** 56:10 97:14,15
**role** 44:13 55:21
  66:15 93:9 97:5
  112:5 118:14,24
  119:5
**roles** 95:11 96:6
**room** 203:4
**roster** 182:6
**Roswell** 251:24
**Rotary** 46:18
**roughly** 16:5 33:2
  49:9 53:6 56:13
  62:10 139:21
  164:11 204:6
**rule** 73:4,14 124:21
  152:1
**ruled** 248:20 249:2
**rules** 9:5 10:1 11:19
  202:23 205:12
  252:18 253:3
**run** 44:16 45:19,23
  46:3,9,9,11,12,23
  214:22
**running** 45:20 46:5
  153:14
**rural** 86:19
**Rutledge** 165:7
**Rynders** 99:22
  100:16 101:13
  102:14 103:7
  118:10,11

Donovan Reporting, PC

**S**

SABRINA 1:6
sake 149:15
sales 22:2,3 26:7,8
SAMMY 1:7
Sandra 100:20
  101:17 102:14
  103:16 213:25
  215:13
satisfactory 58:4
Savannah 86:15,24
saw 51:1 112:7
  182:14
saying 12:14 46:8
  62:3 65:16 198:15
  232:20 238:2
  247:20
says 121:1,9,16 122:7
  122:16 123:2,16,17
  124:21 127:17
  129:8 133:15,16,17
  134:23 156:23
  185:2,8,18 207:16
  207:19 211:15
  213:2 223:13,16
  225:11 226:11
  228:10 246:16,24
scenario 144:14
  152:8 167:2 170:6
scenarios 144:12
  145:2 146:18
  150:25 153:14
  154:16 155:16
  157:3,20 161:9,11
  161:14,24 162:7,11
  162:25 163:4
  166:17,18,19
  167:17,19,23
scene 52:12
schedule 92:3
school 19:15,16
  26:11,14,18,25 27:1
  27:8 60:11 61:9
schools 178:25
Scott 100:20 101:17
  102:14 103:16
  236:21 237:10
screen 148:6,10,22
  150:19 227:20
Scrutiny 6:18 196:4
Sean 99:20

search 17:3
seat 45:24 76:11
second 32:14 36:4
  77:20 78:18 83:8
  83:10 122:8,11,12
  124:6 127:13 128:6
  196:10,11 203:8
  213:24 219:18
  246:8,23
secret 195:18
secretary 1:10 38:25
  40:3 96:23
section 124:20
securities 23:21 26:2
see 17:12 22:13 23:11
  25:22 53:10 61:11
  68:20 69:4 77:25
  79:17 92:15 106:11
  126:19 127:9
  128:15 133:3 134:6
  134:19,23 139:12
  140:8 143:1 144:12
  146:25 148:13
  149:10 150:1,4
  151:18 163:4,24
  188:7,13 196:12
  202:16 215:10,16
  219:14 224:16
  229:9,22 247:1
  248:6,9,17
seeking 80:11 211:6
seen 42:8 71:11 139:3
  147:5,21 201:23
  223:22 242:7
seldom 94:6
selected 43:15 104:11
self-interested 80:11
Senate 6:20,22 7:1
  119:3,10,16,24
  120:2,10 123:23
  124:1,6,11,25 125:2
  125:3,5,10,18,20,21
  126:16,16,18,21
  128:11,14,23,25
  202:19,23 203:2,10
  203:14,21 204:7,17
  206:19 208:1,5,11
  208:20,24 210:8
  211:5,20,23 212:5
  212:16 230:19
  244:9,17
Senate's 120:10

Senate-proposed
  209:22
Senator 6:23 119:3
  119:11,23 120:4
  204:15,16,16,20,21
  205:6 206:4,6,14,16
  206:17 207:1,4,20
  208:12,13,19
  209:19,25 210:3,7
  210:16 212:3,6
senators 125:25
  126:4 204:11
  207:13,17 208:23
  210:19 211:13
send 189:8,10 214:12
  214:14,25
sense 54:7 180:19
sent 15:19 16:4,8,10
  16:15 17:4 124:14
  132:4 215:12
  229:17
sentence 196:20
  215:10 249:4
separate 1:22 134:13
  251:20
September 196:6
  219:25
sequence 135:5
serious 130:14
seriously 40:16
sermon 28:21
sermons 29:1
serve 22:24 29:15
  34:14 40:17 43:12
  43:22 90:6 104:11
  104:19
served 27:24,25 34:2
  35:17 36:17 38:18
  39:22 40:8 44:2
  53:24 54:5,11
  90:12
services 28:18 252:25
  253:8
serving 24:12 29:8,12
  30:20 35:24 43:16
  70:1 91:17 97:17
  131:5
session 5:4,9,11,13,15
  5:17,21,23 6:2,4,7
  6:20,22 7:1,3 17:15
  18:15 32:5,9,21,24
  32:24 33:22,24

34:1 35:25 36:3,4
  36:13,14,16 37:9
  38:2,4,17,18 39:9
  39:20,21 44:22,24
  45:3 55:8,24 56:16
  61:19 62:12,15
  63:13 66:8 68:16
  68:16 79:10 83:7,9
  83:17 99:13,16
  100:13 101:6,9
  102:3,21 103:3,14
  116:20,24 117:3,9
  117:14 118:4 133:4
  133:7 134:10
  137:18,25 138:20
  139:6,18,23 140:1
  143:24 144:21
  146:17 157:16
  162:21 163:7
  164:19 181:16,23
  185:16,22 187:15
  187:16 191:17
  209:7,10 222:20
  238:21
sessions 32:6 44:3
  68:4 143:4,7
set 65:8 75:6 95:24
  114:5 184:17 197:9
  199:2 205:21
  208:18 231:14
  248:21
sets 149:1,13 150:21
Setzler 100:21
  101:18 102:15
  103:10
Seven 22:10
Shafer 204:17 207:13
shaking 12:13
share 105:21 112:15
  182:1,7,9 246:7
shared 183:13
Sharon 99:18 100:17
  101:14 102:11
  103:17
sharply 41:16
sheet 4:13 100:2
  211:9
sheet(s) 251:20
Sheila 239:16
shifted 87:3
shifting 179:9
shoes 44:18

short 22:19 168:5
  188:10 240:4
shortcomings 116:1
show 16:13 146:23
  165:22 182:17
  207:9 213:13
  237:15
showed 26:20 50:25
  51:5 105:15 150:9
showing 148:11
shown 16:1
shows 20:6 29:11
  182:6
sick 28:20
side 10:24 11:1 41:8
  117:21
sides 41:4,25 42:4
  43:2 79:25 83:3
sign 252:9
signature 250:15
signed 124:17 182:20
  213:10
signers 118:21
significance 209:18
  225:14 238:9
significant 37:14,15
  110:18 120:21
  180:20 196:22,24
  197:4,20,24 198:22
  199:24 239:15
significantly 179:9
signify 224:22
similar 48:23 49:11
  63:15 162:20
Similarly 177:8
simple 160:9
simply 23:7
SIMS 1:4
single 88:2
Sistie 99:20
sit 52:24 68:13
  158:20
sitting 88:18 89:12
situation 63:15
  137:14
situations 62:22
six 4:8 17:21,25 86:7
  188:25 228:24
sixth 240:22
size 52:3 73:9 74:7
  75:20
skipping 183:23

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

Page 273

sliced 152:24
slightly 64:22
small 73:24 153:5
   231:5
smaller 241:2
Smith 1:4 4:22 99:22
   99:23 100:21,21
   101:18,18 102:15
   102:15 103:10,10
SNOW 1:7
software 88:9 91:10
   147:6
sold 22:25
solicit 192:2,8
solicited 108:13
somebody 54:3 76:24
   119:20 214:18
somewhat 88:23
   238:22
soon 182:3
sophisticated 88:25
   90:25 91:3 147:22
   153:4
sophistication 89:23
   147:5,15 153:2
sorry 17:24 19:25
   30:10 39:11 77:8
   132:11 136:1 142:9
   173:2 176:25 190:5
   212:2 224:20
   231:17,21 235:4
   240:23 241:3,6
sort 131:4 148:6,9
   167:7 227:5
source 109:23
south 2:10 12:21 63:7
   65:24 86:5,10,12,18
   86:20,25 87:1,1
   110:23 112:1,17
   113:21 171:16
southern 21:5 26:11
   26:13,25 27:1,8
   31:6 112:22
southwestern 86:14
so-and-so 176:6,6
space 251:19
speak 19:3 54:14
   56:13 58:21 83:19
   91:21 132:24 158:3
   158:6 159:4,25
   160:6,17 164:22
   170:9,20 179:1

180:16 206:9,13
   210:15
Speaker 34:13 44:11
   44:16 53:23 54:21
   67:6,8,21 68:3,8
   104:23 175:24
   176:3 189:24
   248:13 249:13
Speaker's 67:6 83:22
   104:13 214:24,25
   215:2
speaking 175:23
special 216:2
specific 41:18 60:1
   62:13 65:5 68:7
   71:4 83:11 87:24
   92:25 94:7,13
   130:18 140:24
   143:11 145:21
   156:20,22 161:13
   166:2 171:5 181:6
   184:19
specifically 16:14
   17:2 23:25 43:19
   53:21 54:13 58:22
   60:14 63:17 66:3
   69:24 70:11,15
   73:13 83:20 86:5
   91:8 95:9 105:18
   138:17 139:15
   143:25 147:3
   155:13 159:10
   162:10 173:24
   174:1,14 175:16
   182:13,14 183:14
   191:25 197:22
   202:10 208:21
   213:14 214:13
   227:17
specifics 59:11 60:22
   74:14 75:13,14,23
   76:1 85:23 96:25
   106:1,3 130:23
   134:19 136:13
   142:20 168:2 171:7
   180:4 189:2 222:2
   222:7 243:24 244:1
speed 91:16 177:19
spent 22:19 27:6
   35:15 187:24
Spiro 7:6,18 67:20
   68:1 69:1 83:22

84:5 175:23 176:1
   189:25 190:9 214:9
   214:21 215:3
   229:12 230:7
   233:24
split 65:13,14 77:3
   115:4 141:4 153:13
   153:18,20,22 200:2
   200:3
spoke 56:2,4 57:2
   58:15 91:24 136:4
   170:4 171:2 204:16
   236:8
spoken 15:6 83:15
   160:4 170:2 204:10
   204:14,15
sponsor 97:9,11,19
   116:18 119:16
   120:7 129:11
sponsored 118:6
   119:2 188:23
sponsors 118:23
spot 63:22
spouse 29:25
spreadsheet 219:20
   220:4,5,10 226:9
   227:2 228:6
stacked 17:23
staff 14:11 15:15
   67:14,20 83:22
   180:24
staffer 67:22
staffers 67:10,11,18
   170:16 176:12
staffs 175:19
stage 131:4 172:21
   173:7
stamp 128:13 223:9
   226:1
stamped 127:9
stand 78:15,18 93:13
   126:9
standing 74:15,21
   80:19 131:17
standpoint 45:11
star 224:15 231:7
start 9:9 12:8 64:8
   116:15 120:24
   164:5 168:24
   200:20 228:24
started 35:24 44:24
   146:3 167:16

starting 132:6 196:21
starts 77:22,22
   126:12
state 1:3,10,10 2:2
   6:8 11:3 12:17
   19:18,20 20:21
   29:8 30:16,25
   45:20 52:1,2,16
   53:15 55:16 65:22
   66:4 69:8 81:23
   82:14 86:1,14
   89:20 111:1 112:22
   112:23 113:13
   114:13 115:16
   121:14 220:6,24
   221:3 248:16,20
   249:2,11,14 252:2
stated 252:5
states 1:1 124:13,19
   125:16 149:8
   211:12 212:18
   213:9 225:24
statewide 149:21
   150:5 245:6
state-level 61:14
statistical 94:3
   112:14 148:14
   196:22,24 197:4,19
   197:20,25 198:22
   199:24 245:13
statistics 81:7 91:3
   93:17 94:4,7,13,21
   197:6,10,14,21,23
   198:10,17,24 199:3
   199:7,14,21 200:5,6
   200:10,22 201:5
   213:1 221:19
   222:15 227:12
stats 93:16
status 77:23 118:7
   120:20 124:8
stay 33:1 75:25 114:6
   156:25 201:2 216:2
stayed 98:1
staying 95:23
step 44:18
Stephens 99:23
   100:22 101:19
   102:16 103:15
   118:11
stir 230:18
stop 25:20 26:3 61:5

story 157:23
street 2:15,20 89:1,6
   153:3 251:24
strength 172:12
   230:13 242:22
strengthen 163:25
Strickland 2:18,18
   116:7 128:2 157:14
   162:23 163:12
   168:9 176:19,23
   177:3 178:13
   182:18 184:2
   231:11 237:5
   240:19 246:10
Strickland's 158:5
   159:18 161:21
   180:12 237:11
   239:12,14
strictly 125:5 177:21
strike 16:4 32:7 35:5
   35:15 36:14,22
   43:11 56:20,25
   66:12 72:10 84:2
   84:17 86:17 90:12
   95:12 97:17 102:25
   103:20 104:16,25
   106:4,16 107:10,20
   111:4 114:8 117:6
   121:12 122:6 127:5
   127:23 130:4
   135:10 137:2 139:4
   140:12 142:8
   145:11 150:2
   152:21 159:9 167:9
   170:1 176:17
   177:13 182:7
   183:11 184:6
   189:17 191:1
   222:16 237:3
   242:10 243:10
   244:8
striking 129:4
strong 41:25
strongly 41:5
Structured 124:21
structuring 177:23
struggling 197:3
   198:21
students 37:2
studies 27:5
study 26:21,24 89:25
stuff 106:11

**subject** 92:25 221:21
221:25
**submitted** 191:20
**subsequent** 90:14
105:3 155:19 187:2
222:23
**subsequently** 123:21
**substance** 131:7
173:20 206:15
209:12 239:19
243:2
**substantial** 205:18
**substantive** 118:24
131:8
**substitute** 6:11 7:21
122:17 123:3,5,7,9
123:16,19 126:20
128:7,7 244:25
**success** 243:13
**successful** 57:7,25
**suffered** 115:25
**sufficiently** 115:1,8
**suggest** 111:7
**suggestions** 215:4
**suitable** 90:5
**Suite** 2:5,14,19 3:3
**summary** 118:6
120:12 122:12
**Sunday** 28:21
**SunTrust** 24:22,25
25:7,9
**support** 52:22,23
98:5 111:14
**supported** 46:2
**supportive** 118:18
**supposed** 184:2
**sure** 12:2,9 37:10,13
60:7 63:24 64:1
68:6,15,15 72:23
73:12 74:13 78:9
78:16,22 80:18
83:21 84:11 88:23
89:21 91:7 94:16
95:19,22,23,24 98:1
108:24 120:18
130:16 131:19
135:6 141:25
142:12 143:21
145:14 146:1
154:16 155:15
157:7 158:8,20,22
159:11 164:7

165:25 166:3,21
168:8,16 194:11
202:24 205:14
208:22 213:13
214:15 215:18
224:4 227:25
229:21 233:9,19
238:9,25 243:7
245:18 250:10
**surprise** 195:14
**surprised** 195:17
230:11,15,16,24
232:19 234:12
241:22
**surrounding** 148:5
148:19
**Susan** 4:22 100:16
101:13 102:11
103:7
**SWANSON** 1:6
**swapping** 155:6
**swear** 9:12
**switch** 44:13
**sworn** 9:14 11:14
29:22 33:7 252:14

— T —
**table** 6:20 211:6,11
211:19
**tables** 148:14,22,24
150:9,18 227:20,21
**take** 19:25 27:11
40:16 54:22,22
63:21,22 65:18
76:11 78:25 80:7
82:23 109:24 116:4
122:10 145:17
146:3 153:2 168:5
173:16 181:5
182:15 200:13
216:15 228:12
229:18 230:25
232:2 246:8
**taken** 1:14 13:22
65:10 134:12
164:12
**takes** 112:8
**talk** 55:1 59:6,14
60:21 61:6 68:3
85:20 86:21 91:18
92:5 96:10 119:11
136:8 139:20,21

158:20 189:24
204:20 210:16
**talked** 58:11 71:5
76:24 79:13,20
92:9 119:8 135:7
157:5 158:18
161:14 166:8
169:25 179:6 181:9
221:22,25 230:17
242:3,8
**talking** 67:19 69:2
84:7 92:22,23
169:1 199:15 203:6
208:18 225:9 239:1
241:25
**Talton** 99:23 100:22
**target** 5:18 46:10
77:14
**Tate** 207:18
**Taylor** 3:6 47:7 48:9
**teasing** 240:24
**technical** 114:16
116:1 131:10
**Telephone** 2:8,13
**tell** 14:19,20 16:14
31:19 53:8 56:24
57:1,12 59:21 65:5
66:23 69:18 74:6
90:22 91:5 96:9
97:15,23 98:8
103:24 120:8
131:16 136:18
137:3 150:21,23
171:4 176:10
199:19 206:6
220:10 229:5 236:2
**ten** 66:9
**tend** 41:3 52:2
**tends** 221:19
**tenets** 233:18
**term** 151:22 152:3
210:10
**terms** 28:22 45:9
47:24 50:13 54:20
59:9,20,21 66:5
69:5 75:23 90:20
91:3 95:10,17 97:1
107:4 109:16
114:17 129:21
136:14 145:1
156:16 161:8
167:10 170:4

192:16 193:8 218:8
222:2 223:1
**testified** 9:15 250:7
**testify** 238:14 239:4
**testifying** 11:20
**testimony** 1:21 11:15
81:1 188:17 242:11
251:4
**text** 18:25 189:9,10
189:12
**thank** 45:1 110:6
200:12 250:11
**theft** 10:21
**theirs** 59:23
**thereof** 129:5
**thereto** 252:6
**they'd** 55:7 85:21
111:9 130:23
152:17
**thing** 15:21 91:2
92:20 97:10 108:6
130:20 131:1,17
132:22 141:22
151:2 154:23
162:17 181:7 193:4
224:22 236:25
239:1 242:3 249:19
**things** 12:14 17:1
18:10 23:4 32:25
41:13 42:6,23
46:17,19 47:13,14
50:7,12 59:12,25
60:12 67:1 68:22
76:22 81:8 84:6
85:8 89:21 90:20
91:10 94:19 109:3
109:7,21,24 113:4
120:10,18 131:8
142:2 149:8 166:3
190:10 192:4 200:7
205:7 223:25
230:20,25 232:2,10
233:10 247:14,19
**think** 42:6,10,13,19
42:25 43:3 46:5
49:18 50:24 51:9
51:24 52:2,10
57:24 60:4 69:12
70:17 76:16 78:24
79:5 80:2,6 82:24
82:25 83:2 93:4
107:1 108:18 109:4

112:8 115:24 119:8
125:7 130:24
136:11 141:7 143:7
144:3 145:15,15
146:12 154:13,13
154:19 155:16
157:18 158:14
162:11,13,16 165:3
166:24,25 168:6,13
171:17 178:25
187:11 194:22
198:2,7,13,14
201:24 210:10,22
216:17 217:25
228:16 230:20
231:2 232:4 236:8
236:9,13,18,19,25
238:19 243:5
245:16 247:19,22
247:23 249:10
250:6
**thinking** 236:24
**third** 36:4 83:10
122:24 248:12
**Thomas** 100:22
101:19 102:16
103:15
**Thompson** 1:6,8 2:12
3:6
**thought** 23:7 152:7
158:21 193:14
199:14 231:19
235:1 236:8
**thoughts** 165:22
**thread** 4:18 7:6,8,17
7:22
**three** 4:5 21:11,24
32:13 49:22,22
109:6 116:15
121:25 125:17
188:19 203:14
246:6
**three-page** 250:6
**Thursday** 13:14
203:23,25
**tie** 207:22
**tight** 73:24
**time** 9:8 10:9,9 11:10
15:19 17:15 18:15
21:5 22:19,22
25:23 26:15 27:6
27:24 32:15,18

Randall O. Nix                 Georgia State Conference of the NAACP, et al vs Kemp                 January 10, 2018

36:2 43:14 44:5
45:7,7 46:12 47:13
49:17,19,20 51:15
51:20 55:4 58:4,16
59:16,17 60:8
62:14 64:7 66:25
70:1 76:3 81:21
83:4,11,12 88:9,14
88:24 91:22,22,23
91:23 92:4,4 102:5
107:17 110:20
112:10 113:11
115:11,17,23 116:4
119:13,14,25 120:3
122:11,12,24 124:6
126:10,23 137:13
139:10 144:11
149:5 154:14
155:25 156:3
158:12 162:1,2,22
164:13,14,18,25
166:3,5,8 169:22
174:10 178:19
179:22 183:12
184:18,20 185:11
185:24 186:3,10
187:7,10,17,22,24
188:8,14 209:2,21
209:24 210:19,23
216:5 217:6 218:18
220:23 230:1 234:5
239:23 243:15
249:10
**times** 42:11,24 69:15
69:20 71:14,18
89:3 94:24 119:19
167:2,22 181:6
196:17 198:3
232:16
**tired** 26:6
**title** 77:12 220:4
248:6
**titled** 5:18 6:5,7,17
7:10,12,13,14,16,20
8:1 196:3 225:22
226:19 228:6
**today** 9:25 10:4 13:9
13:25 15:7 18:20
25:18 88:18 89:12
108:8 189:6 198:3
198:9
**told** 13:11 15:15

16:23 67:8 73:6
74:18 75:19 78:23
79:5 94:24 108:16
129:17 130:10,20
130:21 137:20
140:20 141:22
157:19,24 171:23
180:19 196:16,18
204:22 205:20,20
206:8
**Tolles** 2:9
**Tom** 99:19 100:18
101:15 103:8
**top** 33:19 67:25
120:25 127:14,18
223:13 226:22
229:11 246:16
**total** 179:13 199:25
**totally** 167:3,23
**touch** 145:8
**touched** 130:18
139:11 143:8,19
146:15 165:11
166:5 186:21
**touches** 73:2,7
141:23 144:18
**Tourism** 29:17 34:3
36:18 38:6,20
39:23
**town** 19:12,13
**traditional** 88:13,17
88:19,22 89:10,13
89:19
**Trail** 12:21
**train** 91:9 231:18
**training** 21:18 45:6
90:15,18 91:13
**transcribing** 12:4
**transcript** 251:4
252:12
**traveling** 32:19
**tremendous** 154:18
227:24
**tremendously** 81:10
**trick** 240:21
**tried** 138:10 230:21
248:20
**Troup** 12:24 31:5
**Troy** 19:18,19 20:21
**true** 51:24 78:8 97:14
97:16 100:2 102:19
129:3 201:7 220:21

242:16 249:6 251:3
252:11
**trust** 24:7,22 25:3,4
26:11,13,25 27:1,2
27:8
**trusted** 54:23 232:12
232:12
**try** 17:16 40:17 41:3
42:18,21 65:14
75:17 76:10 113:1
113:4 114:4 130:25
151:18 157:7
248:25
**trying** 25:8 67:1 77:1
80:3 92:9,10 109:5
144:25 145:20,25
146:3 156:25
160:21 162:1
215:17 238:25
242:5
**tune** 35:12
**turn** 102:20 139:5
202:10 207:24
**turned** 211:19
**Turning** 29:10
**two** 4:4 21:10 30:3
43:7 44:2 63:16
64:8 187:16 201:22
203:14,20 204:19
214:19 216:10
220:18 235:8,9
236:9,10
**two-and-a-half** 24:10
**two-district** 236:25
**type** 18:10 71:7,7
89:5 92:20 93:4
94:19 149:8 162:17
**types** 60:13 61:4 63:2
149:13 190:10
205:9 223:24
242:18
**typical** 40:9
**typically** 130:4
**TYSON** 1:4

**U**

**uh-huh** 12:14 25:5
53:20 77:18,24
102:22 121:11
132:14,14 196:13
202:16 203:12,25
214:6 215:7 220:22

225:21 227:4
229:10
**ultimately** 86:2
**unacceptable** 81:5
**unanimous** 201:16
**unanimously** 201:20
**unconstitutional**
249:5
**underpopulated**
110:19,22,23
**understand** 11:19,23
12:1 43:4 60:20
81:10 98:3 110:2
144:25 198:4,10
199:21 200:5
**understanding** 14:5
43:6 69:7 110:9
145:2 155:18
162:20 163:12,18
163:20 218:6,7
239:23 244:17
**understood** 113:2
154:17 158:9,10,22
**undertake** 90:16
242:20
**undertaken** 89:24
**undertaking** 93:25
**unduly** 115:4
**unequal** 115:13,19
**unfair** 114:21
**United** 1:1 27:25 28:9
**University** 19:18
**unopposed** 51:7
**unusual** 54:3,8 66:19
92:18 120:5 188:10
188:18,22 189:3
201:19 247:10
**updating** 247:7
**use** 13:1 18:20 90:25
91:10 109:4 152:3
208:19 224:1
**usual** 253:16
**usually** 18:8 32:13,16
32:23 54:21,22
93:19 96:15 97:13
120:16 122:4
165:23 166:7,9
184:18 232:10

**V**

**vague** 68:12
**validated** 247:19

**validates** 247:23
**variety** 245:8
**various** 16:11 125:9
145:1 148:25
150:10,25 161:24
162:25 164:15
166:17 169:2
172:25 173:11
174:20 175:20
176:16 177:16,18
201:5 241:18
**verbal** 12:12
**verify** 224:13 225:15
**version** 128:9 134:24
212:23 224:11
225:5,7,8
**versions** 126:8,9
**versus** 112:22
**Vice** 99:17 102:10
**victory** 48:3,16 50:16
**video** 4:2,3,4,5,6,7,8
9:8,10 64:3,7,8
116:14,15 168:19
168:23,24 200:15
200:19,20 228:19
228:23,24 245:21
245:25 250:13
**Videographer** 3:6
9:7 64:2,6 116:9,13
168:18,22 200:14
200:18 228:18,22
245:20,24 250:12
**Videotaped** 1:13
**view** 58:3 247:16
248:24
**views** 82:17
**violate** 157:1 186:24
186:25 196:25
197:12,15 199:5,8
199:13 232:17
**violated** 94:17 114:12
205:15 233:18
**visitation** 28:23
**visiting** 28:19
**visualization** 149:25
**voice** 40:21,23,24
41:1,2 42:15
242:13
**voiced** 208:23 210:20
**Volume** 1:21,22
**vote** 6:20,22 7:1
125:14,20,21

Donovan Reporting, PC                                                                 770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

153:23 201:15,16
207:7 210:9 211:5
211:23 212:5,16
233:22
**voted** 55:15 72:18
122:20 125:25
126:4 207:10,10,14
207:18,21 208:1
211:10,13,20 240:5
240:6 244:16
**voter** 150:15 220:19
221:1,7 242:3
**voters** 49:4 110:15,16
151:3 152:11,15
155:6 172:12 194:9
210:13 216:23
220:8,12
**votes** 48:6,7 72:5,7
118:2,8 125:8,9,17
201:23
**voting** 6:18 98:15
107:16 115:4
152:24 153:18
172:11 191:4
193:17 196:4 200:8
200:25 230:13
242:22
**vs** 1:9
**VTDs** 183:8
**vulnerable** 71:24
72:15 73:10 74:9
75:22

---
**W**
---
**wait** 12:7 77:8
**waited** 137:9
**Waites** 170:9
**walk** 45:18
**wall** 148:10,13
149:25
**want** 43:12 44:1 58:1
73:16 82:10,10
83:2 85:13 95:5
103:4 106:1 134:4
136:12,19 138:11
139:15 153:13,17
164:16,16 168:11
197:12,15 198:16
199:5,8,13 202:18
202:21 210:4
214:15,22 215:2
232:17 234:18

235:18 242:1 249:8
249:21
**wanted** 26:5 62:25
63:1,4 64:20,20,22
65:13,14 68:24
74:19 80:1 84:8,10
84:11,22 85:6,11,12
85:22 86:1 102:23
105:25 111:11
129:13,18 137:7,9
140:7,20 146:1
147:16 158:8
160:14 163:14,20
167:22 171:5,17,18
174:25 206:17
214:14 229:21
233:16
**wanting** 76:24
159:23
**wants** 133:17
**wars** 34:18
**Washington** 2:6,15
**wasn't** 45:14 69:17
69:22 70:10 92:18
110:10,22 113:5,9
151:20
**water** 34:18
**waters** 34:19
**way** 18:18 41:16 42:3
45:4 52:18 57:10
58:8 86:23,23 89:8
89:22 110:11 112:9
112:11 119:21
120:25 139:1
142:17 151:12
154:23 163:15,25
166:14 193:13
233:23 242:6
247:22 248:21,25
**Waycross** 86:23
**Wayne** 1:6 99:20
**ways** 155:1
**web** 5:8,10,12,14,16
5:20,22 6:1,3 39:18
53:9 100:10 101:5
102:2
**website** 38:3,16 39:19
99:12
**Wednesday** 1:19
132:15 196:6
**week** 28:20 29:2 83:8
83:10 92:16

**weeks** 92:6 156:12
164:19
**Welch** 161:1
**Welch's** 161:20
**went** 21:16,17,19
22:7,20,21 23:7,20
24:21 25:10 59:12
80:6 87:12,14,17
130:22 143:9
154:14 160:1
189:15 243:6
244:17
**weren't** 138:8 167:3
230:16
**West** 34:21 35:14
47:12
**Wetumpka** 19:14
**we'll** 66:25 75:9
111:21 117:22
131:2 142:3 156:23
246:7 249:24
**we're** 32:16,25 44:24
64:6 66:24 67:15
74:20 81:12,12
106:25 116:13
117:21 130:12
144:23 154:23
168:13,22 174:3
190:11 192:5
200:18 228:16
239:1 245:24
**we've** 57:19 63:20
82:7 93:3 94:15
106:24 134:8 142:1
155:2 170:23
209:16
**whatever's** 18:13
**whatsoever** 69:13
249:10
**white** 31:22 48:10
49:12 50:23 179:20
**Whitfield** 21:20,23
**wholly** 103:23 104:2
104:7 175:12
**Wilkinson** 44:15
**Williams** 207:14
**Willie** 99:23 100:22
**willing** 44:19 98:5
151:23
**wish** 125:6
**wished** 70:25 79:14
125:4

**wishes** 72:25
**witness** 3:1 9:12 64:1
121:15 168:11
218:4 228:15
231:22 238:15
240:25 241:6 250:4
252:13
**witness's** 252:8
**Women** 49:4
**won** 48:7 243:25
**work** 21:4,8,19,21
22:7,21 23:20
24:22,24 25:11
27:19 35:10 36:22
36:23,24 41:3,6,19
42:4,21 43:4 57:19
61:2 73:19 74:16
79:17 82:7,11
83:13 84:10 85:6
85:12,23 86:3,9
93:3 98:2 113:4
134:19 147:18,18
147:19 163:5
166:25 182:23
188:4 197:16 199:9
243:6
**worked** 10:11,20
21:2,6,23 22:12
37:16 38:4 41:7
74:25 75:15,16
76:22 83:6 98:15
157:5,21 165:25
188:23
**workforce** 37:1,3
**working** 10:10 25:6
25:20 26:3 37:1
41:4 91:25 93:1
96:22 137:13 156:6
167:17 173:15,17
174:7 231:3 232:5
232:11
**works** 131:19
**wouldn't** 58:7,7
84:10 85:6,23 86:3
152:3 163:2 174:21
188:9 191:2 231:23
235:14 236:1
242:17
**Wow** 48:8
**Wright** 4:19 7:6,18
58:23 96:17 143:22
148:10 153:6

157:11 162:25
180:25 181:14,21
214:9 229:12 230:7
**writing** 252:7
**written** 9:3 73:4,13
77:16 207:9
**WSB** 214:1

---
**Y**
---
**Yates** 99:24 100:23
101:20 103:11
158:3,6,13 159:1,4
160:1
**yeah** 13:2 22:18 28:4
33:21 37:21 48:10
48:25 49:11,11
50:1,3 51:17 61:12
62:16,17,18 64:14
79:1 81:7 83:10
86:16 89:10 96:24
97:16 109:11,22
113:17,17 114:1
120:15 121:2
127:11,15 128:5,16
132:11,11,21 135:1
142:11 146:6,12
152:14 153:1,12
160:11 168:13
184:5 196:20
202:14 203:1 213:8
217:25 218:4
219:17 224:6,25
231:16,22 238:15
239:6
**year** 18:21 22:11,22
23:12,23 24:6,13
25:1 29:6 32:9,14
37:13 49:19 67:17
138:14 234:23
**years** 10:10 21:12,24
22:10 24:10 28:10
55:10 67:16 92:14
98:12 158:13 222:9
**yesterday** 42:25
**York** 2:5

---
**Z**
---
**Zachary** 47:7
**zero** 201:18 204:25
205:23 233:11
**zoom-in** 245:9
**zoom-ins** 245:7

Donovan Reporting, PC          770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

**#**

#1 6:22 212:1
#279 6:22
#280 6:20
#281 7:2

**0**

04 28:3,4
05 28:3,4
06 28:4 33:9
069 6:6

**1**

1 4:21 202:15,16
   252:10
1st 129:6 196:7
1-10-2018 251:25
1:02 1:19 9:2,8
1:17-cv-01427-TC...
   1:9
10 1:19 9:1
10th 9:9
10.B 252:18
100 5:22 6:19 113:5
   120:18 141:1
   145:14 155:15
   186:21 210:25
   211:3
101 6:1,3,21 7:7
   183:22 211:18,23
   212:5
102 7:1 212:12,14,15
103 7:3 212:20,23
104 7:6,10,15 213:17
   213:19 226:20
   245:7
105 7:8,10,12,15
   140:13 148:5,18
   219:9,11,23 222:19
   224:9,10 225:6,8,23
   226:20 227:7
   232:24 233:4,15
   243:18,23 244:4
   245:7
106 7:10 223:3,6
107 7:12 225:17,19
108 7:13 226:5,8
   227:3
109 7:14 226:13,15
   245:9
11 122:23
11th 123:2 124:21

125:14 156:11
   188:21 189:22
110 6:5 7:16 228:3,5
   245:9
111 7:17 161:12
   165:15 201:8 229:1
   229:4 236:22 237:6
   243:18,23 244:4
   245:9
112 240:14,17,19,20
113 7:20 244:19,21
   244:23
114 7:22 246:2,5
115 8:1 48:6,7 248:1
   248:3
116 4:5
116 7:9
117 6:7
1170 2:20
12 28:10
12th 124:18
127 6:10,11
128 6:12
13 66:21 68:19
13th 2:15 123:24
130 245:10
132 6:13
14 66:21 68:20 126:4
1401 2:5
1413 7:3
1431 6:12
1433 7:3
147 224:22
15 66:22 169:21
   185:16
15th 77:17
15-14-37(a) 253:2
16th 235:22
168 4:6 201:18
   204:24 205:23
   233:11
17 211:13
175 125:14
184 6:15
186 37:12
19 5:2
19th 132:16 136:5
195 6:17
1975 19:21
1990 22:14

**2**

2-21-2017 4:23
2:14 64:3,4
2:29 64:5,7
20 5:1,5 198:3 251:23
200 4:7
2000 25:22 201:10
20005 2:6
20005-3960 2:15
2004-2005 25:23
2006 33:7 45:21,24
   47:3 51:16 52:20
2007 29:23 33:8
2007-2008 5:9 33:20
   34:1
2008 49:15,16
2009 35:25
2009-2010 5:11 36:12
   36:16
2010 87:13 110:20
   140:14 201:10,23
2011 37:11 55:17
   87:21 110:10 112:4
   113:11 140:23
   141:10 194:15
2011-2012 5:13,20
   38:1 99:13,16
2012 49:24 51:18
   52:20 55:17 113:12
   114:25 115:4,8,13
   115:15,19,25
2013 39:7 53:22
   56:22 57:2 58:12
   58:19 59:19 60:3
   61:7,15,19 68:4,16
   88:5 116:20,24
   185:21
2013-2014 5:15,22
   38:16 100:10
2014 18:24 51:6 62:5
   62:6,10 63:13 65:1
   66:8 68:4,16 69:1
   117:3 185:21 220:7
   220:8,17 221:6
2015 7:3 14:5 16:18
   17:15 18:2,15 39:9
   56:18 82:24 83:17
   84:5 86:2 93:7,10
   95:8,15 96:20
   107:25 115:11,18
   115:24 117:8
   120:25 121:8,9,16
   122:7,15,21,23

123:2,18,24 124:3
   124:12,15,18,21
   125:14,21 129:6
   132:16 133:1 136:5
   137:21 138:1,8,20
   139:5,18 140:2
   146:5 156:1 157:15
   161:3 162:5 177:4
   177:9 178:20
   181:16,22 185:16
   192:15 193:1 194:9
   194:20 208:2
   219:25 224:3
   229:13,20 234:14
2015-2016 5:17 6:1,7
   6:19,21 7:1 39:20
   39:21 101:6 102:21
   103:3,13 118:3
2016 51:6 77:17
   117:14 138:4 196:7
   243:22 244:5
   246:17
2017 4:21 39:11,12
   45:3 234:2,14
   235:6,22 244:10
   248:8 253:19
2017-2018 5:3 6:4
   102:3
2018 1:19 9:1,9
202 4:17
202.654.6200 2:16
202.662.8391 2:6
210 6:19
211 6:21
212 7:1,3
213 7:6
213.683.9100 2:11
219 7:8
2200 2:19
223 7:10
225 7:12
226 7:13,14
228 4:8 7:16
229 7:17
23rd 203:16 253:19
235 4:18
237 251:24
240 4:22
244 7:20
246 7:22
248 8:1
251 4:13 7:4 213:5

253 4:14 252:10
26th 202:21 203:5,23
   203:25 206:11
27 245:8
27th 124:2,7
2745 253:21
275 224:16,23
28 6:10,11,12 127:18
28th 6:23 229:20
281 125:20
29th 229:13

**3**

3-16-2017 4:19
3-8-2017 8:2
3-9-2015 6:16
3:46 116:10,11
30 3:3 5:6 13:16
   245:8
30060 251:24
30230 12:22
30308 3:4
30309-7200 2:20
307 203:4
31st 124:12 125:20
   208:2 209:8
33 5:8
34 211:10
350 2:10
36 5:10
37 5:12
371 12:21
38 5:14
39 5:16 125:25

**4**

4th 219:25
4-29-2015 7:18
4-30-2015 7:7
4:05 116:12,14
4:24 219:25
40 10:10 32:11
   220:20 221:1,7
400 2:5
404 6:14
404.261.6020 3:4
45 13:16,16

**5**

5th 120:25 121:8,9,16
   184:24 188:19
5:23 168:19,20

Donovan Reporting, PC                                              770.499.7499

Randall O. Nix          Georgia State Conference of the NAACP, et al vs Kemp          January 10, 2018

**5:31** 168:21,23
**50th** 2:9
**515** 234:21,25 235:1
  236:6 239:10 240:2
  240:7 241:9,19
  242:21 244:10,14
**53** 4:18 235:12,15
  245:7
**54** 4:22
**54.3** 134:24
**544** 7:23
**55** 245:7
**566** 6:8,10,11,20,22
  7:1,5 45:13 82:13
  97:6 98:8,21 105:3
  105:22 106:19
  115:24 117:9 118:3
  118:16 119:6,12
  120:22 122:21
  124:5,12,18 125:13
  125:22 126:1,5
  127:8 128:10 129:4
  129:12 154:9 169:7
  171:12 182:9,11
  185:7 186:5,7,13
  187:4,24 189:25
  190:17,21 191:3,9
  192:3,10 193:17
  194:5,23 195:10
  203:9,16 204:3,11
  205:3 207:7,14,18
  207:25 208:6,10,24
  209:12 210:5,8,21
  211:7,24 212:8,17
  212:24 213:12
  215:23 224:10,12
  230:12 232:22
  233:3,13 234:14
  235:3 243:12,21

**6**
**6-19-52** 19:8
**6-7-2016** 7:23
**6:25** 200:15,16
**6:41** 200:17,19
**60** 48:20
**60-40** 48:19
**600** 2:14
**64** 4:4
**65-35** 50:19
**678.347.2211** 2:21
**69** 31:3 45:21,24

219:16

**7**
**7th** 124:15 246:17
**7.C** 253:3
**7:39** 228:20
**7:49** 228:19
**7:56** 228:21,23
**70** 33:3
**700** 2:15 3:3
**73** 236:22 245:9
**74** 179:1
**743** 4:23
**7570** 6:10 126:13
  127:15,18
**7599** 126:14,17
**7599S** 6:11 126:20
  128:6
**77** 5:18
**770-428-5801** 251:24
**78** 5:1 20:8,12
**79** 5:2 19:23 20:1
  29:11

**8**
**8** 4:17 202:3,5
**8th** 29:23 248:8
**8-15-2016** 5:19
**8-19-2015** 6:14
**8.B** 9:5
**8:27** 245:21,22
**8:39** 245:23,25
**8:49** 1:19 250:13,17
**80** 5:5 7:19 20:9,14
**81** 5:6 30:8,10
**815** 129:4
**816** 129:4
**82** 5:8 33:11,14
**83** 5:10 36:6,8
**84** 5:12 37:20,23
**85** 5:14 38:11,13
**86** 5:16 39:14,16
**87** 5:18 77:7,12
**88** 5:20 99:8,10
**89** 5:22 100:5,7

**9**
**9** 4:3,12 122:21
**9th** 122:7,10,15
  123:17 184:25
  187:14 189:5,21
  191:15,21

**9-11-28(c)** 253:6
**9-21-2016** 6:18
**9-4-2015** 7:8
**90** 6:1 101:1,3
**90071** 2:10
**91** 6:3 101:23,25
**92** 6:5 110:5,8
**93** 6:7 23:24 117:17
  117:19 118:1
  120:13 158:13
**94** 4:21 6:10 24:6
  127:2,4
**95** 6:11 127:21 128:1
  128:9
**96** 6:12 24:15 128:18
  128:20
**97** 6:13 24:15 132:1,4
  149:17
**98** 6:15 184:3,4,8,10
**99** 5:20 6:17 195:24
  196:1