**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| NAACP, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Case No. 1:17-cv-01427- |
| v. | * | TCB-WSD-BBM |
| | * | |
| BRIAN KEMP, in his official capacity | * | CONSOLIDATED CASES |
| as Secretary of State for the State of | * | |
| Georgia, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| AUSTIN THOMPSON, *et al.,* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| BRIAN KEMP, in his official capacity | * | |
| as Secretary of State of the State of | * | |
| Georgia, | * | |
| | * | |
| Defendant. | * | |

**DEFENDANT BRIAN KEMP'S BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INUNCTION**

COMES NOW BRIAN KEMP, Georgia Secretary of State ("Kemp"), by and

through his attorney of record, the Attorney General of the State of Georgia, and files

this Brief in Opposition to the NAACP Plaintiffs' Motion for a Preliminary

1

Injunction and Permanent Injunction, in which the Thompson Plaintiffs have joined. ECF 103, 120.

## INTRODUCTION

Plaintiffs challenge House Districts ("HDs") 105 and 111 as racial gerrymanders under the Fourteenth Amendment.  ECF 1 at 24; ECF 84 at 39. Plaintiffs premise their racial gerrymandering claims entirely on the correlation between the race of voters and their partisanship.  Despite direct evidence from the State's demographer that she used only partisan data to make the 2015 changes to HD 105 and HD 111, Plaintiffs argue that because state officials were aware of the correlation, and because the partisan changes have a racial effect, the plan is predominantly based on race.  Under Plaintiffs' rationale, the existence of a correlation between race and party means that any time a district's boundaries are altered for a partisan reason, using partisan data, there will necessarily be a negative racial impact and therefore racial intent. For the reasons that follow, Plaintiffs' theory is inconsistent with Supreme Court precedent and the evidence in this case.

Further, Kemp notes at the outset that any urgency is the product of Plaintiffs' choices. H.B. 566 became effective in 2015 and was used in the 2016 elections, but Plaintiffs did not file suit until April 24, 2017 and October 3, 2017.  ECF 1 and ECF 84.  Their Motion for Preliminary Injunction was filed shortly before candidates

began qualifying to run for State House districts, including HDs 105 and 111, and other offices. Candidate qualifying has now closed, and, as set out in greater detail below, the ballot creation process is underway. In short, the entry of a preliminary injunction as sought by Plaintiffs threatens to disrupt an election process that is already underway and will confuse voters.

## I.   STATEMENT OF FACTS

### A.   H.B. 566 was an Effort to Consolidate Minor District Changes that Representatives Started Requesting in 2014.

Representative Randy Nix, chair of the House Reapportionment Committee from 2013 to 2016, testified that, during the 2014 legislative session, approximately eight to ten members came forward requesting minor changes to their districts.  Nix Dep. 62:6-9, 66:9. [1]  These changes included moving district lines to accommodate incumbents who had moved or bought new property. *Id.* at 68:19-24.  In response to these requests, House Republican leadership then decided that "[i]f we do anything, we'll do it all at one time rather than trying to do things piecemeal." *Id.* at 66:24 to 65:7. Mr. Nix insisted, however, that "any changes that were made had to be relatively minor so that we didn't jeopardize the good work that we had done when the maps were drawn before [in 2011 and 2012]." *Id.* at 73:17-20.

---

[1] The Nix Deposition appears at ECF 124.

At the beginning of the 2015 legislative session, Rep. Nix announced that redistricting would be considered "before the entire chamber . . . during the session." Nix Dep. 79:8-11. He made the same announcement before both the majority and minority caucuses in the House and talked to the minority leader, Representative Stacey Abrams, as well. *Id*. at 79:11-18. People on both sides of the aisle wanted to make changes. *Id*. at 79:25 to 80:1.

**B.    Chairman Nix Established Clear Guidelines for Changes that would be Made in 2015, and Gina Wright was Tasked with Keeping all Changes Within These Guidelines.**

Rep. Nix outlined clear parameters for any redistricting that would take place in 2015. First, "it had to be done fairly, we wanted to offer it to everyone, not that everyone could do it because of some of the changes some people wanted wouldn't work." Nix Dep. 84:7-10. Second, Rep. Nix insisted that any changes to district lines could not jeopardize the integrity of the map drawn in 2011 and modified in 2012. *See id*. at 73:14-20, 74:14-16, 108:23-25 to 109:1. Rep. Nix was proud of the fact the Obama Administration did not challenge the 2012 map and was insistent that any changes in 2015 would not undermine the integrity of the map that led to federal approval. *Id*. at 57:3-11, 94:24-25 to 95:1-7, 75:11-13. Third, Nix required that all members who would be affected by a proposed change must consent to the change. *Id*. at 72:19-25 to 73:1-7. Finally, Nix required all members who were requesting changes

4

to do so through the Legislative and Congressional Reapportionment Office (the "LCRO"). *Id.* at 79:13-18, 83:3-7. Rep. Nix tasked the LCRO with ensuring that any changes fell into the broad requirements that he had established for the 2015 redistricting process—that all changes must (1) be fair and bipartisan, (2) maintain the integrity of the 2012 map, and (3) be made with the consent of all affected members. *See id.* at 80:15-20, 82:3-9, 141:23-25 to 142:1-3, 136:15-19 (describing how the LCRO must inform Nix whether a proposed changes fits within the parameters he established).

## C.     The Process that the LCRO Used to Draw the Changes that Became H.B. 566.

Gina Wright is the Executive Director of the LCRO. She was the primary map drawer for H.B. 566. Wright Dep., 15:25-16:20.[2] Ms. Wright is the person in the LCRO who is typically approached about a modification to a district. Deposition of Strangia Dep., 30:24-31:1.[3] Ms. Wright oversaw the redistricting of all seventeen districts included in H.B. 566, although certain of her staff did provide technical assistance on two areas that are not at issue in this litigation. Declaration of Gina Wright at ¶ 5, attached hereto as Exhibit A. Ms. Wright was the only person in the LCRO who worked

---

[2] The Deposition of Gina Wright appears at ECF 112.
[3] The Deposition of Rob Strangia appears at ECF 110.

on that portion of the H.B. 566 that touched any part of Gwinnett and Henry County, including HD 105 and HD 111. *Id.*

During the 2015 redistricting process, Ms. Wright had access to political data down to the census block level. The LCRO "allocate[s]" the political data that comes in from the Secretary of State's Office "to the block level . . . based on the percentage and proportions of the population." Wright Dep., 106:7-13. If "for example, you have a block where, or several blocks, in a precinct where you have a lot of population right here in these blocks and then nobody, you have zeroes out here, it's going to obviously allocate that proportion there of the voter data, not here because nobody lives here. So it spreads out through the blocks." Wright Dep., 106:17-23. The political data is election results that come from statewide contested races. Exhibit A at ¶ 7.

Rob Strangia, a geographical information specialist in the LCRO, likewise testified that political data the office uses goes all the way "down to the block level of geography based on voting age population." Strangia Dep., 25:7-9. The allocation is done by Geographic Information System (GIS) software every two years. Exhibit A at ¶ 7. Strangia explained:

> If you have a hundred registered voters in precincts ... and there's two blocks in the precinct, one block has 60 percent of the voting age population, the other block has 40 percent of the voting age population, it's going to allocate the election data based on those percentages to the block level geography. It's only an estimate.

6

Strangia Dep., 25:20 to 26:3. For the same precinct in which the voting-age population is split 60-40, and the vote is split on a 50-50 basis, Strangia testified that the software would "put 60 percent of the votes for both candidates in the block with the larger population and 40 percent in the one with the lower population." *Id.* at 26:10-17.

The software presents a "typical and customary way of translating political data down to the block level." *Id.* at 26:19-22. It has been used not only by Georgia, but also by Texas, Florida, and California. *Id.* at 26:23 to 27:23. The allocation is "a pretty decent estimate, but it's an estimate."[4] Wright Dep., 111:23-24.

In his Expert Report and his Reply Report, Plaintiffs' expert, Dr. Jowei Chen said that he "found that the Legislature's primary map-drawer had access only to racial data, but not partisan data, at the sub-precinct level." ECF 63-1 at 3; ECF 63-1 at 33; ECF 94-1 at 16. Chen testified that he based that "finding" on his reading of the depositions of Gina Wright and Rob Strangia. Chen Dep., 15:19 to 16:12.

Chen's "finding" fails to account for the process that the LCRO actually uses and the data that Ms. Wright actually had access to when drawing the maps for H.B. 566. This information was provided in both Ms. Wright's and Mr. Strangia's

---

[4] While Plaintiffs' expert, Dr. Peyton McCrary, believes such allocation to be less predictable political data than racial population data, ECF 65-1 ¶ 47, it is nonetheless what Wright used.  Exhibit A at ¶¶ 7-10.

depositions, both of whom testified that political data at the block level was available. More to the point, Wright testified that she relied on political data, and not racial data, in making the changes to HDs 105 and 111.  Wright Dep., 30:1-31:10, 219:9-220:21; Exhibit A at ¶¶ 7-10.

**D.    After Mr. Nix Announced that Representatives Could Request Small District Changes, Representatives Chandler and Strickland Decided to Investigate Whether Small Changes Could Increase their Political Chances.**

HDs 105 and 111 were created in the redistricting that followed the 2010 Census. Chandler Dep., 60:20-22; [5] Strickland Dep., 45:21 to 46:2. [6] To make changes to the Districts in 2015, the Reapportionment Office focused on political data from statewide races to draw to 2015 changes to HD 105 and HD 111. As stated above, Ms. Wright performed the entire map drawing process for the 2015 changes to HD 105 and HD 111.  Exhibit A ¶ 5. In redistricting HD 105 and HD 111, she understood the goal to be improving the political performance of the two districts for the Republican incumbents. *Id.* at ¶ 6. To draw the districts, she used a 2014 voting precinct data layer, which included 2014 general election results, to measure the political effectiveness of the districts.  *Id.* at ¶ 8. The precinct layer included a total of support to the Republican ("%TRepVots14") and Democratic ("%TDemVots14") candidates that represents the

---

[5] The Deposition of Joyce Chandler appears at ECF 126.
[6] The Deposition of Brian Strickland appears at ECF 127.

average performance among all contested statewide general elections for 2014. *Id.* This political data was available at the voting precinct level and was allocated to the precinct boundaries on the map layer.  *Id.* at ¶ 9. When a precinct is split, the redistricting software allocates the votes from that election to the individual blocks. *Id.*  When Ms. Wright worked on the 2015 redistricting of HD 105 and HD 111, including all surrounding affected districts, she did not keep data regarding the racial make-up of the census blocks and precincts visible on the pending changes portion of the Maptitude screen. *Id.* at ¶ 10. She was not working with that data because her goal was to improve the Republican political performance of the districts, so she worked with the relevant data for that goal, i.e., the total population and the political data (the %TRepVots14 and %TDemVots14 data). *Id.* at ¶ 10.

## 1.    The Election History of HD 105 Prior to 2015.

In 2012, Joyce Chandler defeated Renita Hamilton by a margin of 51.35% to 48.65%, a difference of 554 votes. Chandler Dep., Pls.' Ex. 124. She outperformed Republican Presidential candidate Mitt Romney, who lost in HD 105. Chandler Dep., Pls.' Ex. 130 at 1.

In 2014, Rep. Chandler again defeated Renita Hamilton, this time by 789 votes. Chandler Dep., Pls.' Ex. 36 at 7. She won the Baycreek K, Baycreek C, Baycreek D,

Baycreek F, Baycreek H, and Baycreek I precincts, while losing the Lawrenceville D, Lawrenceville F, and Lawrenceville M precincts. *Id*.

Rep. Chandler does not look at racial information as part of her campaign strategy. Chandler Dep. 60:2-4. She canvases all parts of her district. Chandler Dep. 66:20-22. In campaigning, she believes she just has "to work hard, period." Chandler Dep., 75:23-76:1.

## 2. Plaintiffs Suggest that Chandler was Interested in Racial Data by Use of Misleading Exhibit.

Rep. Chandler believed the demographics of HD 105 changed between 2012 and 2014 by becoming more Democratic than Republican, in that "the percentage of Republican voters were less . . . than the percentage of Democrat voters." Chandler Dep. 126:16-127:3. After the 2014 election she wanted to redraw the lines of her district because she "would like for [her] district to have been more Republican than it was in the previous year." *Id.* at 131:15-23. She hoped to improve her chances of reelection in 2016 by tweaking her district. *Id.* at 178:5-7. Moving African-Americans out of her district was never mentioned to her. *Id.* at 178:16-19. She did not want to change the racial demographics of her district, remove African-American voters from her district, dilute the voting strength of minorities in her district, nor add white voters to her district. *Id.* at 187:17-188:3.

10

Rep. Chandler was also not interested in the percentage of African-Americans that would live in HD 104 and 105 after making a proposed change. *Id.* at 207:22-208:1. She does not recall any discussions about increasing or decreasing the number of black people in a district or getting below a certain percentage of black people as a reason to change a district. *Id.* at 236:5-16. In fact, she does not remember any racial considerations ever being discussed. *Id.* at 238:18-21.

Plaintiffs insinuate that Representative Chandler was interested in the racial make-up of her district because of an email chain between Chandler and Dan O'Connor where O'Connor appears to have sent Chandler both election data and voter registration data by race. ECF 103-34. At her deposition, Representative Chandler testified that she does not recall asking for any racial data for her district, just a map, so she can campaign. Plaintiffs' counsel then showed her the two pages of voter registration data that are part of ECF 103-34, and represented that these pages are part of the email from Dan O'Connor. Chandler Dep. 97-98. The data attached to this exhibit was *not* an attachment to the Dan O'Connor email. *See* Declaration of Howe Taing, attached hereto as Exhibit B. As is clear by looking at the Bates stamp on the bottom right hand corner of documents,[7] the email is GA2-

---

[7] Exhibit 128 to the Deposition is Exhibit 33 to Plaintiffs' Motion for Preliminary Injunction. Doc. 103-34.

001195, the attachments are GA2-001197 and GA2-001198, which are attachments to

the email in GA2-001196.  *See* Exhibit B at ¶¶ 5-6.  Despite Representative

Chandler's testimony that she did not recall requesting such data, the following

exchange occurs:

Q:  Does Mr. O'Connor send you things that you don't ask for?

A:  I don't know.  I doubt it, but I don't know.

Q:  Why did you thank him for sending the voter registration data?

A:  I don't know.  I would just courteous - - I would just usually respond thank

you to anybody.

Q:  Let's look at the spreadsheet on the second page.

Chandler Dep., 99:9-19.  Counsel than repeatedly asks Representative Chandler if she

could find any election data or partisan data on the two pages.  *Id.* at 99:21 – 101:2.

When Representative Chandler answered that she could only find "total voters," she

is asked:

Q:  So is that a no?

A:  That's a no, unless I'm just missing it.

*Id.* at 101:4-6.  Chandler is then asked if it's a "fair summary" that the two pages

(GA2-001197 and GA2-001198) provide voter registration by race but not by party.

*Id.* at 101:7-22.  Chandler is then, again, asked to explain why O'Connor would send her this information, and not the election returns, if she had not asked for them.

Q:  Do you have any reason to believe you did not request this information from Mr. O'Connor?

A:  I do not recall requesting anything like this.

Q:  But that's not my question.  My question is:  Do you have any reason to believe that you did not request this information from Mr. O'Connor?

*Id.* at 101:23 – 102:6.  The email from Dan O'Connor, 103-34 p. 1, clearly indicates on its face that two excel files had been included.  The email was a reply email from Chandler, so the attachments were not included.  From the face of this email, it appears that O'Connor sent Representative Chandler both some registration data by precinct and general election (GE) returns for HD 105.  Plaintiffs however, insinuate that only registration data, by race, was provided to Chandler, and because she thanked O'Connor for the data, registration data must be all she wanted.  ECF 103-1 at 16 ("O'Connor gave [Chandler] precinct-level racial data and Chandler thanked him.") (citing Ex. 33).

### 3.    The New District 105 Map

Once Chairman Nix opened up the redistricting process in 2015, HD 105 was examined to determine whether any changes could make it a little more Republican.

13

Chandler Dep. 138:5-9. To improve the Republican political performance of HD 105, Representative Efstration's HD 104 was a target district from which Ms. Wright could move GOP voters because his district is "very Republican," *Id.* at 112:13-113:3. Using the political data layer in Maptitude, Ms. Wright began the redistricting of HD 105 with the district at 50.98% (%TRepVots14) and 48.13% (%TDemVots14).  HD 104, which is adjacent to HD 105, was 69.68% (%TRepVotes14) and 28.87% (%TDemVots14). Exhibit A ¶ 12. A detailed explanation of Wright's process for redrawing these districts is included below in Section II.A.1.a. *See also* Exhibit A ¶¶ 11-25.

### 4.    The Election History of HD 111 Prior to 2015.

In 2012, Brian Strickland defeated Bill Blackmon by a margin of 53% to 47%, a difference of 1,477 votes. Strickland Dep., Pls.' Ex. 288 at 2. He ran ahead of Republican Presidential candidate Mitt Romney, who garnered only 50% of the vote in HD 111. Strickland Dep. Pls.' Ex. 290 at 1. Strickland carried the Lowes, North Hampton, Stagecoach, Unity Grove, Pate's Creek, Oakland, Dutchtown, and McDonough Central precincts, losing in Mount Carmel, Wesley Lakes, and Stockbridge West. Strickland Dep. Pls.' Ex.  288 at 3.

Strickland explained that he did not look at "past voting information" in 2012 because, with a newly created district, "there was no past data to look at." Strickland Dep. 45:21 to 46:2. He did not look at racial information either. *Id*. at 46:8-11.  Instead,

Strickland "ma[de] sure to focus on everyone, and . . . campaigned in all communities." *Id*. at 46:21-23; *see also id.* at 48:4-5 ("[W]e worked the entire district."). In his view, he "outworked" Blackman, noting, "I knocked on doors. I was an unknown candidate at that time. I had no record to run on. I was a young guy, too." *Id.* at 119:16-20; *see also id.* at 62:13-14 ("[I]f I work hard, then I can win any election.").

Strickland explained his strategy: "Someone that has met me is more likely to vote for me. In my experience, if I'm able to reach a voter, then I have a good chance that they'll vote for me." *Id.* at 49:14-17. He testified, "In my experience, when I knock on a door, whether they're white, black, purple, green, orange, I get a very similar response." *Id.* at 50:9-11. Strickland does not know how individual people vote, but he does believe that whether someone has "met [him] or been reached by [his] campaign" was the key to electoral success. *Id.* at 50:23-24. He stated, "In my experience, no matter who the person is, if I get a chance to reach them, I'm able to get votes whether white or black." *Id.* at 56:23-25.

Representative Andrew Welch observed that Strickland "has a very high likability" in the polls. Welch Dep., 197:16-17. [8] People who Welch "know[s] are typically Democratic leaning, they vote presidential Democratic, but they like him." *Id.* at 197:18-23. As a result, Strickland "gets crossover votes." *Id.* at 197:3.

---

[8] The Deposition of Andrew Welch appears at ECF 129.

Strickland characterized the partisanship of HD 111 as "evenly split." *Id.* at 58:6; *see also* Jones Dep., 175:8-16 ("[p]retty even[ly]" split; "probably less Trump type" Republicans); Welch Dep., 97:23 (HD 111 has "always been tight."). Strickland explained that, by looking at precinct-level results in benchmark races, one could see "Republicans, Democrats switching around. I'd win places where a Democrat would win state wide or the Democrat would win a presidential election too, so it was a good mix." Strickland Dep., at 58:16-20. He did not "consider racial information in determining whether [he] thought [he] would win or lose." *Id.* 46:8-11.

In 2014, Strickland defeated Jim Nichols by a margin of 53.1% to 46.9%, a difference of some 1,124 votes. Strickland Dep. Ex 290 at 5. Again, Strickland carried the Lowes, North Hampton, Stagecoach Unity Grove, Pate's Creek, Oakland, Dutchtown, and McDonough Central precincts, while losing Mount Carmel, Wesley Lakes, and Stockbridge West. *Id.* And he ran ahead of Governor Deal, who garnered only 48% of the vote in HD 111. *Id.* at 1.

### 5.   The New District 111 Map

Rep. Strickland heard that there would be a bill in 2015 dealing with changes to the House districts. Strickland Dep., 123:23 to 124:10; *id.* at 148:25 to 149:8. He believed that it was "traditional to have another look at revisiting or revising maps in small ways in a midterm, if you will, in a '15 year." *Id.* at 124:11-14; *see also* Nix Dep.,

70:12-13 ("[I]t was general knowledge that it had happened prior."). Strickland understood that the changes could not be "drastic or . . . really change the intent from 2010." *Id*. at 150:4-6.

Rep. Welch testified that the 2015 changes to HD 111 came about because Representative Dale Rutledge "was telling [Welch] he wanted to move somewhere around Lawrenceville Street in McDonough." Welch Dep., 77:18-20; *see also* Strickland Dep., 128:19-22 ("I remember in particular Representative Rutledge wanting to have a particular part of McDonough for personal reasons."); Rutledge Dep., 94:9-13. That move would put Rutledge into Welch's district, "so we had to redraw those lines." Welch Dep., 77: 22-23.  It would affect portions of the McDonough Central and McDonough precincts, where Welch's parents live. *Id*. at 80:24 to 81:2, 81:25. Welch told them that he "wasn't happy because they were talking about cutting my parents out. But I said, if that's what you're planning on doing, we'll work around it." *Id*. at 84:10-15.

The possible changes were discussed at a meeting in early 2015 that may have been attended by Strickland, Rutledge, Welch, Representative Yates, and Gina Wright. Welch Dep., 77:6-9; Strickland Dep., 126:7-11.  No data regarding the racial or partisan effect of the change to accommodate Rutledge was presented at the meeting. Welch Dep., 83:17 to 84:4. Strickland recalled a meeting at which the

attendees looked at "benchmark political race[s]." Strickland Dep., at 155:17-24, 159:9-25.

Strickland "wasn't interested in changing the lines at all" (*id*. at 162:22-23), but when he "was told that changes were going to happen and that we were making changes to maps," he chose to participate. *Id*. at 163:4-6.

Welch knew that Strickland "was concerned about having to keep running in such a tight district." Welch Dep. 98:12-14.  At the meeting, Welch told Strickland "that they needed to do what they needed to do to adjust for Dale [Rutledge], and if that swung any . . . of my district over to Brian's, they could do that." *Id*. at 98:19-23. He told Gina Wright to "make it work within the parameters that they have. But if they have to move my stuff around, then just don't hurt Brian." *Id*. at 101:6-9. None of them wanted to make HD 111 "less safe." *Id*. at 101:5.

In contrast to Strickland, Rutledge attributed the changes to Strickland's desire to "increase the Republican base in his district." Rutledge Dep., 71:25 to 72:1.  The "plan" was to move Democrats from Strickland's district into Rutledge's and Republicans into Strickland's district. *Id*. at 103:9-21. There was no discussion of moving people because of their race. *Id*. at 104:14-25. The changes to HD 111 "targeted Democrats and Republicans," not African-Americans. *Id*. at 143:11 to 144:3.

18

Rutledge knew that any change to Strickland's district would mean changes to his own. *Id*. at 74:19-20. And he knew that "if the districts are going to change, the parties involved have to agree to the change." *Id*. at 84:9-10.

Based on these concerns, Ms. Wright used the same process for redrawing HD 111 as she had for HD 105 "because the objective was to try and politically help the incumbent for purposes of reelection." Wright Dep., 224:2-5. She stated that the legislators in the area of HD 111 did not suggest any particular changes to her, but left it to her to suggest specific changes. *Id.* at 178:3-12.

Ms. Wright's objective in making changes to the districts surrounding HD 111was to increase the political performance of Strickland in HD 111 while not significantly lowering the political performance numbers for the surrounding Republican incumbents.  Exhibit A ¶ 27.  Additionally, she was aware of the fact that Representative Rutledge, the incumbent in HD 109, was considering purchasing a house in an area that, under the 2012 plan, was in HD 111. *Id.*

Using the political data layer in Maptitude, she began the redistricting of HD 111 with the district at 50.14% (%TRepVots14) and 48.65% (%TDemVots14).  *Id.* at ¶ 28. HD 109 was 60.43% (%TRepVots14) and 38.44% (%TDemVots14). *Id.* HD 110 was 61.98% (%TRepvots14) and 36.97% (%TDemVots14). *Id.* A detailed explanation of

Wright's process for redrawing these districts is included below Section II.A.1.a. *See also* Exhibit A ¶¶ 26-40.

### E.   The Passage of HB 566

The Reapportionment Office's work for the seventeen representatives who had requested changes was bipartisan; "both parties, Republicans, Democrats, got together and did tweaks to a map." Strickland Dep., 124:17-19. The key to HB 566 was that "both parties consented to it. It was completely bipartisan, and both parties got to make tweaks." *Id*. at 135:18-21. Strickland testified that "[i]t was communicated to me that [Stacey Abrams, minority leader in the House] was in consent with the changes that were being proposed by the Republicans, which is part of the reason it was bipartisan." *Id*. at 177:24 to 178:3, 178:11-13 ("But it was my understanding that she was also involved and consented to the changes to 111.").

Representative Jones testified that the changes made by H.B. 566 "certainly were not controversial." Jones Dep., 112:11. [9] She explained, "[W]e put it through the sieve of our judgment of 180 people, the entire body. There were no dissents and ... if anyone had objected at the time, it would have merited further scrutiny, and there was no objection." *Id*. at 112:17-22.

Representative Chuck Efstration concurred. He testified:

The purpose of House Bill 566, as I understood it to be, was to ...

---

[9] The Deposition of Jan Jones appears at ECF 128.

> make district changes that were by the consent of or agreement of
> all members affected, Republican and Democrat, as I recall.
>
> And that was the reason that it passed unanimously in committee
> and unanimously on the House floor.

Efstration Dep., 181:5-17. Efstration explained that he sits in the same row in the House

Chamber as the minority leader, Stacey Abrams, and that "there had been no partisan

objection whatsoever to the legislation at the time." *Id*. at 184:14-18.

 Rep. Efstration, a member of the House Reapportionment Committee, does not

recall any discussion of racial makeup at the committee meeting at which H.B. 566 was

considered. *Id.* at 124:16-125:11.

The vote in the House on H.B. 566 was 168-0.

Plaintiffs suggest that the summary of HB 566 which Dan O'Connor drafted is

misleading and "conveniently omitted" the true purpose of the legislation.  ECF 103-

1 at 28-29.   The omission is with Plaintiffs' summary of the document.  The

O'Connor summary, recites at the bottom of the second page:

> District line changes can be made for a variety of reasons - - as some
> *examples*, eliminating a split precinct (a precinct divided into multiple
> districts), reuniting a neighborhood or community of interest, or
> addressing technical concerns.

ECF 103-64 at 2 (emphasis added).  By eliminating the beginning language, which

makes clear that the examples are not exclusive, or even necessarily related to the

purposes of the changes made in HB 566, Plaintiffs suggest that O'Connor's memo is

intentionally misleading.  O'Connor testified he did not know anything about the

specific changes to HD 105 and HD 111 because he was not involved.  O'Connor

Dep., 140:4 – 5 ("I wasn't involved in the, you know, the map drawing of 111.");

135:15 -16 ("And, again, I wasn't involved in 111."); 135:19 -20 ("I wasn't involved

in [HD 105]").   Having not been involved in the redistricting, it is not surprising he

could not give specifics about the changes.

## II.    ARGUMENT AND CITATION OF AUTHORITY

### A.    Plaintiffs Have Not Met Their Burden of Showing That They are Entitled to a Preliminary Injunction.

A preliminary injunction in advance of trial is an extraordinary measure.

*United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983); *Univ. of*

*Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  In order to prevail on a motion for

preliminary injunction, the movant must show: 1) a substantial likelihood of

prevailing on the merits; 2) that the plaintiff will suffer irreparable injury unless the

injunction issues; 3) that the threatened injury to the movant outweighs whatever

damages the proposed injunction may cause the opposing party; and 4) that if issued,

the injunction would not be adverse to the public interest."  *Baker v. Buckeye*

*Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988); *Levi Strauss and Co. v. Sunrise*

*Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995).  A preliminary injunction is a drastic

remedy "which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974).

Plaintiffs have the burden of establishing their entitlement to a preliminary injunction. *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1217 (11th Cir. 2009). Plaintiffs' motion for a preliminary injunction should be denied because they have not shown any of the elements necessary to support their request for this extraordinary remedy.

**1.    Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.**

The most important factor in deciding whether to grant or withhold a preliminary injunction is the consideration of a plaintiff's likelihood of succeeding on the merits, and a failure to meet this initial hurdle relieves a court from considering the remaining factors. *Church v. City of Huntsville*, 30 F.3d 1332, 1341-45 (11th Cir. 1994) (citing *Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("We need not address every element because we conclude that no showing of irreparable injury was made.")). Here, Plaintiffs are neither likely to succeed on the merits of their claims nor are they likely to satisfy the other requisites for relief.

**a.  The Redistricting of HD 105 and HD 111 Was Not Predominantly Based on Race.**

23

Plaintiffs completely ignore both the direct testimony of the individual who drafted the districts at issue in this litigation and the testimony of the legislators representing HD 105 and HD 111, and ask this Court to infer discriminatory intent because there is a correlation between a voter's race and partisanship. The Supreme Court has repeatedly condemned such an approach.

> If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify.

*Bush v. Vera*, 517 U.S. 952, 967-968 (1996) (plurality). Three years later, the Court again stressed that awareness of a relationship between race and partisanship does *not* transform use of partisan data into racial intent.

> Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.

*Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (emphasis in original).

Redistricting plans are subject to strict scrutiny only where "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). It is the Plaintiffs' burden to show that race was the predominant factor in drawing these districts. *Id.*

The Plaintiffs cannot meet this burden because the evidence in this case is that partisanship considerations and data, not race, drove the redistricting of HD 105 and HD 111.

Moreover, Gina Wright, Executive Director of the Legislative and Congressional Reapportionment Office, who actually drafted the plans, testified that she did *not* look at race as she was moving precincts and blocks in and out of these districts. *See* Exhibit A at ¶¶ 8-10; Wright Dep., 219:9 to 220: 21.[10]  Wright testified that she looked at the racial demographics for the districts only at the end, *after* she had finished making changes, and only, then, to see that she had not made a significant change in the racial demographics of the districts. *Id.* Plaintiffs ignore this testimony, and instead quote her testimony regarding the data available to her when redistricting and, in the context of a discussion about the 2011 redistricting, her practice of what data she would generally include in a pending changes box.[11]  ECF 103-1 at 26 and 47.  Prior to *Shelby Co. v. Holder*, 570 U.S. 529 (2013), it would have been a practical necessity to consider race in order to comply with the non-

---

[10] As Ms. Wright noted, neither district was majority minority.  Wright Dep., 30:12 to 30:19.

[11] Plaintiffs' expert, Peyton McCrary, makes the same false assumption, taking Wright's deposition testimony from 2011 and attributing it to her work on the 2015 maps.  ECF 65-1 ¶ 51.  McCrary does this despite Wright's clear testimony to the contrary.  Wright Dep.. 219:9 to 220:21.

retrogression standard of Sec. 5 of the Voting Rights Act. Plaintiffs then misinterpret this testimony as a concession that Ms. Wright used racial data while moving blocks and precincts in and out of HD 105 and HD 111 in 2015.[12]

In another instance, Plaintiffs again state that "Wright testified that in finding [] balance, she looked at racial data," referring the Court to page 29 of her deposition. ECF 103-1 at 24.  However, Wright's testimony continues to the following page where she explains that she looked at the racial make-up of the district "eventually . . . to make sure that [she] did not do significant harm in that respect."  Wright Dep. 30:6-30:8.  That is not a concession that she used race in making changes to the districts.

Ms. Wright testified that she first made the changes to the districts and only *after* completing those changes looked at resulting racial demographics.

> [M]y objective was to see if I could find political improvement in the Republican number for her district.  So I'm going about this in a way of knowing that, let's see if we - - Republican area here, try and see if that boosts the district.

---

[12] Plaintiffs also recite in their brief that Wright ran reports providing detailed racial breakdowns of the precincts, appearing to interpret this to mean that Wright was interested in these demographics.  ECF 103-1 at 31.  Plaintiffs fail to include that these reports were only run *after* the litigation was filed and at the request of counsel from the Attorney General's Office.  Wright Dep. 295:19 – 296:19; 331:1-15; Strangia Dep. 96:1-14 (testifying that report is not typical report prepared by the LCRO).  The same demographic report appears at Pls.' Exhibits. 77, 146 and 167 in the depositions.  ECF 103-72.

If that boosted the district, what my next objective would be is to find a way to balance that population out, . . .

And, obviously, the places where I had split precincts would be my first choice to go . . .

And then I added some . . . [population] to complete a balancing of population.  And it was at that point that  I would then go back and see, if I did these changes, what impact did that then have on the overall percent total black, Hispanic, and whatnot.

. . .

I'm looking at what was my overall objective? Can I achieve that? Then can I balance [the population]? And then what is the numerical result of that after that is done?

Wright Dep. 219:9 – 220:21.  *See also* Exhibit A at ¶¶ 8-10.

Plaintiffs contend that "[t]he high number and character of the split precincts in Districts 105 and 111 indicate that Wright used racial data in creating them."  ECF 103-1 at 33.  Again, Wright's deposition testimony clearly refutes the suggestion. Asked at her deposition about the precinct splits in HD 105, Wright testified that she started by adding heavily Republican areas to the district and then balancing out the population to get the district's total population back to near the ideal district size. Wright Dep. 213:14 – 214:2.  Wright began by adding an area she knew to be "very, very, Republican" to the district, Harbins C.  *See* Exhibit A ¶¶ 13-15 and Exhibit 2 attached thereto; Wright Dep. 214:9 - 214:11.  She then tried to take all of Harbins A, but due to its size, settled on a road that cut through the entire precinct.  *Id.*; Wright

27

Dep., 214-216.  Asked about the demographics of precinct Harbins A, and told that the portion of Harbins A that was put in HD 105 has a lower African-American percentage than that part of the precinct that was left in HD 104, Wright stated "I would not know that.  I didn't look at that that way."  Wright Dep. 217:8-9.

Review of Exhibit 2 of Gina Wright's declaration, Exhibit A attached hereto, further supports Wright's decision to split Harbins A using the boundary she chose. The shape of the Harbins C precinct makes taking the area in Harbins A that is adjacent to it a natural choice.  Plaintiffs, and Plaintiffs' expert Chen, criticize Wright for choosing that part of Harbins A in grey on Exhibit 2 rather than the part just above it in blue.  ECF 103-1 at 47 and 63-1 at 24-25 and 34-35.[13]  But the resulting district shape between those two choices supports Wright's decision.  It is Plaintiffs, not Wright, that want to make choices based on the racial composition of the blocks. Wright chose *not* to look at race.

Wright testified further that she tried to balance the population total in HD 111 by putting precinct Lawrenceville M back together and settling on a boundary in

---

[13] Chen further criticizes Wright's split of the Baycreek H precinct, but fails to mention that Wright made *no change* to the Baycreek H precinct that is split between HD 105 and HD 114, a district that was *not* part of the 2015 redistricting.  ECF 63-1 at 34.

28

Harbins A.[14]  Exhibit A ¶¶ 17-19 and Exhibit 3 attached thereto; Wright Dep., 219-220.  Needing additional population in HD 105 to balance the total population, she naturally looked to a precinct that was already split.  Exhibit A ¶ 30 and Exhibit 4 attached thereto; Wright Dep., 219:21 to 220:5.  In fact, the two blocks in Lawrenceville D that Wright added to HD 105 are majority African American.  Exhibit A ¶ 24.

Plaintiffs nonetheless report the Lawrenceville D precinct split as yet another indication that Wright used race to *lower* the African American percentage in HD 105.  Rather than focus on the boundary change to the Lawrenceville D precinct split in 2015, i.e., the population of the two blocks that were moved, Plaintiffs instead submerge the population of the two blocks that were moved with the population in Lawrenceville D that was untouched and remained in HD 105, then they argue that the Lawrenceville D precinct was split in a manner that disadvantaged minority voters.  Doc. 63-1 at 34.  Plaintiffs' characterization of this precinct split choice is even more suspect when looking at a map.  Review of Exhibits 2 and 4 of Wright's declaration show that had she chosen to swap the two parts of the Lawrenceville D precinct between HD 104 and HD 105, HD 105 would not be contiguous.

---

[14] Precinct Lawrenceville M is oddly shaped and a little difficult to see with the 2012 district boundaries overlay.  The precinct extends to highway 316, just below the grey area on the map with the district label 102.  *See* Exhibit 3 to Wright Declaration.

Chen's criticism of the precinct splits in HD 111 is equally uninformative. Again, Chen infers racial intent because in four (4) of the five (5) precinct splits in HD 111 that portion of the precinct included in HD 111 has a lower African-American concentration than the part of the precinct outside of HD 111. ECF 63-1 at 36-38. The first such precinct identified by Chen is Tussahaw, a precinct that "performs pretty strongly Republican [and] was beneficial to [Strickland's] T-rep number" according to Wright. Wright Dep., 230:9-12. According to Chen, the portion of the precinct that Wright included in HD 111 is 4.8% African-American voting age population, and the part outside of HD 111 was 6.9% African-American voting age population, numbers that are both nominal. ECF 63-1 at 36. More importantly, Chen does not consider 1) that Wright took only roughly 25% of the precinct's population (Exhibit 10); 2) that Representative Welch (HD 110) lives in Tussahaw and wanted to stay in his own district; or 3) that swapping those two parts of Tussahaw would make HD 110 non-contiguous. *See* Exhibits 6 and 10 to Exhibit A.

The next precinct split that Chen criticizes is Mount Carmel. According to Chen, the African American voting age population included in HD 111 is 43.7% while the part excluded from HD 111 is 45.2%, a minimal difference. ECF 63-1 at 36. Of course, since HD 111 began with a total African-American voting age

population of 33.9%, ECF 63-1 at 25, adding either part of the Mount Carmel split precinct necessarily increased the overall African-American voting age population in this district. However, like the problems with the Tussahaw precinct, swapping the split precinct parts of Mount Carmel between HD 73 and HD 111 would cause contiguity problems. *See* Exhibits 6 and 14 to Exhibit A. Chen does not mention these.

With respect to the Flippen precinct, Chen notes that the portion of the precinct in HD 111 is 38.8% African-American voting age population while the part of the precinct outside of HD 111 is 41.1% African-American voting age population. ECF 63-1 at 38. Like the Mount Carmel precinct, this precinct is over 33.9% African-American voting age population, so addition of either part of the precinct increases slightly the majority African-American percentage. However, with respect to the choice of which part of the precinct to take, again, looking at the maps makes the choice rather obvious. *See* Exhibits 6 and 8 to Exhibit A. Taking that part of the Flippen precinct that is in HD 109 (orange) and swapping it with the part of Flippen in HD 111 (purple) would make the Stagecoach and Stockbridge West precincts non-contiguous with the rest of HD 109.

Chen's analysis is not probative of any racial *intent,* rather, it merely reports the racial demographic change in the districts and within precinct splits.[15]  Plaintiffs themselves contend that there is a high correlation between race and partisanship in Gwinnett and Henry counties.  Yet when Wright's deliberate attempts to increase Republican political performance through the use of political data (election returns) is successful, Plaintiffs argue that the resulting correlation to race must mean Wright *used* race as a proxy for partisanship.  The argument is circular.

> Evidence that blacks constitute even a supermajority in one
> congressional district while amounting to less than a plurality in a
> neighboring district will not, by itself, suffice to prove that a jurisdiction
> was *motivated by race* in drawing its district lines when the evidence
> also shows a high correlation between race and party preference.

*Hunt*, 526 U.S. at 551-552 (emphasis added).  The fact that the African-American and/or Hispanic population percentage in HD 105 and HD 111 decreased slightly with the 2015 redistricting is insufficient to establish that the districts were predominantly based on race.  The offense to the Equal Protection Clause is the use of race to draw the districts, not a resulting minority percentage drop in the overall district population.

---

[15] Similarly, Francys Johnson, former President of the GA NAACP, does not point to any evidence other than the fact that the percentage African-American in HD 105 and 111 decreased to support Plaintiffs' contention that race predominated in the redrawing of the districts.  Johnson Dep. 15:21-25.

> [The Equal Protection Clause] prevents a State, in the absence of
> "sufficient justification," from "separating its citizens into different
> voting districts on the basis of race." *Bethune-Hill* v. *Virginia State Bd.*
> *of Elections*, 580 U. S. ___, ___, 137 S. Ct. 788, 197 L. Ed. 2d 85
> (2017) (internal quotation marks and alteration omitted).

*Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017).  Wright testified, both in her

deposition and by declaration, that she did not look at the racial demographics until

*after* making all of the changes to these districts.  Exhibit A ¶¶ 8-10; Wright Dep.,

29:19 to 30:9, 219:9 to 220:21.

It is hard to imagine a scenario where *any* change to district boundaries will

result in no change, up or down, to the racial demographics of a district.  Therefore,

the only way Wright would have been able to redistrict HD 105 and HD 111 and *not*

change the racial demographics of the district, or if possible increase the racial

minority of the district, would have been *by using race* while drawing the districts.

Because the districts at issue are not majority African-American or majority Hispanic,

Wright had no reason to believe she was free to use race to ensure that the minority

percentage in the districts stayed unchanged.

It is only "[i]f a State has a good reason to think that all the '*Gingles*

preconditions' are met, then so too it has good reason to believe that §2 requires

drawing a majority-minority district.  But if not, then not."  *Cooper*, 137 S. Ct. 1455,

1470 (internal citation omitted).  Here, there was no reason for Wright to pay

attention to the racial demographics because the districts were not majority minority. Furthermore, Wright had political data from contested statewide general elections to measure the partisan advantage of each precinct *and* precinct split.  Exhibit A ¶¶ 9-10; Strangia Dep. 24:21 to 26:22 (explaining how precinct election data is allocated down to the block level for use in redistricting).  Nor did Wright get specific direction from the incumbent legislators about which particular areas to move in and out of their districts.  Exhibit A ¶ 42; Wright Dep. 178:3-12.  Wright also did *not* discuss the redistricting plan with Dan O'Connor.  Exhibit A ¶ 43; Wright Dep., 193:2-5. Finally, Dan O'Connor himself, while being questioned about a summary of the redistricting plan that he drafted *after* the plan had been completed, repeatedly testified that he had no role in the redistricting of HD 105 and HD 111.  O'Connor Dep. 140:4 – 5 ("I wasn't involved in the, you know, the map drawing of 111."); 135:15 -16 ("And, again, I wasn't involved in 111."); 135:19 -20 ("I wasn't involved in [HD 105]").  Plaintiffs try to paint O'Connor as the principal architect of the redistricting plan, but both he and Wright testified unequivocally that O'Connor was *not* involved in the creation of the redistricting plan.  O'Connor, like Plaintiffs, does believe that there is a correlation between race and partisanship. But that awareness, particularly from someone that did not participate in drawing the district lines, is not

evidence that race was a predominant factor in the redistricting. *Hunt*, 536 U.S. at 551; *Vera*, 517 U.S. at 967-68.

Plaintiffs' expert, Peyton McCrary, also misinterprets Wright's testimony about the data she relied on in making changes to HD 105 and HD 111. McCrary quotes Wright's testimony in her deposition regarding the data she has available in her redistricting software, but characterizes that testimony as pertaining to her redistricting in 2015. ECF 65-1 ¶ 51. Wright makes it clear in her deposition that she did *not* use the block level race data available to her in drawing HD 105 and HD 111. Wright Dep. 219:9 to 220:21; Exhibit A ¶¶ 8-10. McCrary also concludes that because, in his opinion, the disaggregation of election data below the precinct level is not a particularly reliable indicator of how a precinct voted at the block level, Wright must have used race instead. ECF 65-1 ¶¶ 47-48.

It is these fundamental flaws in McCrary's report that then lead him to the conclusion that HB 566 was the product of intentional racial discrimination. Plaintiffs are simply using the correlation between race and partisanship to argue that because legislators were intending a political result, and after the changes were made African-Americans are a slightly smaller percentage of the population in these districts, the map drawer must have used race to achieve the political end. The Supreme Court has been very clear that:

> If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify.

*Vera*, 517 U.S. at 967-968.  "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn."  *Bethune-Hill*, 137 S. Ct. at 799.  Plaintiffs ignore the direct testimony of Gina Wright that she relied on the political data (election returns) to draw the districts, and instead infer intent from the racial impact of the districts (i.e., a 2% decrease in African-American voting age population), even as they acknowledge a correlation between race and partisanship.  The overwhelming evidence is that race was *not* the predominant factor in drawing HD 105 and HD 111.

### b. Plaintiffs' Request for a Preliminary Injunction is Barred by the Doctrine of Laches.

Laches applies to a request for equitable relief when (1) there was a delay in asserting the claim; (2) the delay was not excusable; and (3) the delay caused the non-moving party undue prejudice.  *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005); *Kason Indus. v. Component Hardware Group*, 120 F.3d 1199, 1203 (11th 1997); *see also Costello v. United States*, 365 U.S. 265, 282 (1961).

Here, the legislation adopting the challenged redistricting plan was adopted in 2015.  The *NAACP* Plaintiffs first waited until April 24, 2017 to file the complaint challenging the plan, and then waited until February 20, 2018 to file their motion for

preliminary injunction.  The *Thompson* Plaintiffs did not file their Complaint until October 3, 2017.

As outlined in the Declaration of Michael Barnes, Director of the Center for Election Systems at the Office of the Secretary of State ("CES"), the Secretary of State is responsible for creating each type of ballot that will be used in 158 of 159 Georgia counties. Exhibit C at ¶ 4. To ensure that each ballot is accurate and complete, CES had to begin this process for the May 22, 2018 primary, which includes elections HDs 105 and 111, on March 10, 2018.  *Id.* at 7. Absentee ballots must be mailed to voters by April 6, 2018, and counties could start receiving completed absentee ballots as early as April 9, 2018.  *Id.* at ¶ 5.  Because of this timeline, the counties that encompass HDs 105 and 111 have to begin administering the May 22, 2018 election as early as April 7, 2018. *See* Exhibit E at ¶ 2; Exhibit F at ¶ 2.

Finally, candidates have already qualified for both the Republican Primary and Democratic Primary in HDs 105 and 111. Exhibit D at ¶ 6. Five other districts were redrawn in H.B. 566 to make the changes to HDs 105 and 111 (*see* Exhibit A at ¶ 5), and candidates have qualified for the Republican and Democratic Primaries, as applicable, in these districts as well. Exhibit D at ¶ 6.  In HD 105, one of the four candidates running for office lives in an area of HD 105 that was in HD 104 under the 2012 plan. Exhibit A at ¶ 50. This candidate has already paid a qualifying fee to run in

HD 105 and is presumably already campaigning for office.  The same is true for HD 111; two of the four candidates running for office live in an area of HD 111 that was in HD 109 under the 2012 plan.  *Id.* at ¶ 51. In addition, the voters in HD 105 and 111 will already be expecting to have the opportunity to vote for these candidates as their representatives.

It is clear, then, that a preliminary injunction at this late stage in the election process not only unduly prejudice the Secretary of State and cause harm to the counties administering the election, but such an injunction would also harm the candidates and voters who are already participating in the elections for the next representatives from HDs 105 and 111.

### 2.    Plaintiffs Cannot Show That They Will Suffer Irreparable Harm Absent the Granting of a Preliminary Injunction

Plaintiffs have not shown that they will suffer irreparable harm if a preliminary injunction is not granted.   "A showing of irreparable harm is the '*sine qua non*' of injunctive relief."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  When a plaintiff has not shown a likelihood of success on the merits, claims for irreparable injury based on an alleged constitutional injury have no merit. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  Here, Plaintiffs have failed to show irreparable harm.

**3.     The Damage to the Defendants Outweighs Any Alleged Injury to Plaintiff.**

On a motion for preliminary injunction, the plaintiff bears the burden of showing that the perceived injury outweighs the damages that the preliminary injunction might cause to the defendants. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).  "Only in rare instances is the issuance of a mandatory preliminary injunction proper." *Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979).  Additionally, in election cases courts should give consideration to the proximity of the election and the potential for any voter confusion that a last minute change to the State's processes may lead to. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

As explained above, here, candidates have already qualified for office.  And some of the candidates that qualified for HD 105 and HD 111 will not live in those districts if they revert to the 2012 boundaries.  Exhibit A ¶¶ 49-51 and exhibits attached thereto.

If this Court ordered that the election for the seven affected House Districts must be conducted using the 2012 boundaries, county registrars for *all* of the affected counties would have to reassign all of the affected voters to new House Districts.  *See* Harvey Decl. ¶ 6. The process is manual, and requiring that county registrars engage in this process, while in the midst of conducting an election has never been attempted.

*Id.* at ¶ 7.  Nor was mid-election redistricting contemplated when Georgia's voter registration system was designed. *Id.*  In addition, mid-election redistricting combined with a new special election would lead to voter confusion and likely lower turnout. *Id.* at ¶ 5; Exhibit F at ¶ 10.

### 4.    The Preliminary Injunction Will Not Serve the Public Interest

A plaintiff also bears the burden of showing that the preliminary injunction would serve the public interest. *Baker*, 856 F.2d at 169.  Contrary to the Plaintiffs' contention, reversing the changes made to HDs 105 and 111 for the purpose of conducting a special election either parallel to the regularly scheduled General Primary / Nonpartisan General Election or on its own would not be in the public interest. Such an order would confuse candidates and voters, disrupt an ongoing process, and tax the public with costs.

In *North Carolina v. Covington*, 137 S. Ct. 1624 (2017), the United States Supreme Court reversed a district court's order directing the conduct of special elections for a truncated one-year term. Significantly, the district court ordered those special elections stating, "While special elections have costs, those costs pale in comparison to the injury caused by allowing citizens to continue to be represented by legislators elected pursuant to a racial gerrymander." *Id*. at 1625 (quoting App. to Juris.

Statement 200). Put simply, the Supreme Court's *per curiam* reversal of that order

shows that racial gerrymandering claims like those of Plaintiffs are not talismanic.

Rather, this Court must weigh the equities, not simply looking for a "fitting

remedy" for any legal violations, but also "taking account of 'what is necessary, what

is fair, and what is workable.'" *Id*. (quoting *New York v. Cathedral Academy*, 434 U.S.

125, 129 (1977)). The Supreme Court identified several "obvious considerations" to

be part of the balancing process: "the severity and nature of the particular constitutional

violation, the extent of the likely disruption to the ordinary processes of governance if

early elections are imposed, and the need to act with proper judicial restraint when

intruding on state sovereignty." *Id*. at 1626. Those factors are not exclusive, "but they

are among the matters a court would generally be expected to consider in its 'balancing

of the individual and collective interests' at stake." *Id*. (quoting *Swann v. Charlotte-*

*Mecklenburg Bd. of Ed*., 402 U.S. 1, 16 (1971)).

The Seventh Circuit noted in *Fulani v. Hogsett*, 917 F. 2d 1028 (7th Cir. 1990),

that claims "against a state electoral process must be expressed expeditiously." *Id*. at

1031. It noted, "As time passes, the state's interest in proceeding with the election

increases as resources are committed and irrevocable decisions are made." *Id*.

As of the filing of this Response, candidates have qualified, and the ballot

preparation process is well underway. The Secretary of State is required by federal law

to transmit all absentee ballots to military and civilian overseas voters ("UOCAVA voters") *at least 45 days prior* to the date of any election for federal office. *United States v. Georgia*, 778 F.3d 1202, 1203 (11th Cir. 2015); *United States v. Alabama*, 778 F.3d 926, 934-35 (11th Cir. 2015). *See also* 52 U.S.C. § 20302.[16]   Thus, the Secretary of State is legally required to transmit all UOCAVA ballots to voters by no later than April 6, 2018.[17] Exhibit C ¶ 5.  In addition, advance voting for the May 22, 2018 Primary Election begins on April 30, 2018.  Exhibit D, Harvey Decl. Exhibit 1 at 2.  As Michael Barnes explains, CES prepares all election ballots for every county in Georgia except Pike County. Exhibit C ¶ 4.  For the May 22, 2018 General Primary Election, CES began preparing ballots on March 10, 2018, the day after the closing of candidate qualification and more than 80 days before the election. *Id*. ¶ 7. CES is transmitting ballot images, including images for printed absentee ballots, to the counties designated printer between March 24, 2018, and April 1, 2018. *Id*. ¶ 6. Barnes notes, "[T]hese ballots must be transmitted by no later than 50 days prior to the date of the election" so that they are in the hands of the local election officials in time for them

---

[16] Formerly 42 U.S.C. § 1973ff(a)(8)(A).

[17] Georgia law provides that absentee ballots may be transmitted to UOCAVA voters up to 49 days prior to the date of the election.  O.C.G.A. § 21-2-384(a)(2).

to be sent to the voters covered by the Uniformed and Overseas Citizens Absentee

Voting Act ("UOCAVA") and state law not less than 45 days before the election.[18] *Id.*

In addition, notices will have to be sent to voters telling them which precincts

they will vote in and which offices they will vote for. As Tina Lunsford notes, those

notices should go out no less than 60 days before the election so that voters covered by

the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301-

20311, are reached in timely fashion. Exhibit E, Lunsford Decl. ¶ 8.

The declarations of Chris Harvey, Lynn Ledford, and Tina Lunsford show that

in order to use the 2012 district boundaries in a special election conducted in

conjunction with the regularly scheduled 2018 elections would result in the imposition

of both monetary and nonmonetary costs. Those declarations also detail the magnitude

of the tasks that public officials must perform in order to redistrict and put on a special

election.

Lunsford and Ledford each outline the steps they must take and the monetary

costs that are associated with each step. Lunsford states, "The estimated cost to hold a

court-ordered Special Election with the General Primary/General Election would be

$66, 995." Exhibit E ¶ 7. That estimated cost would triple if the elections were not all

on the same ballot. *Id.*  Ledford estimates her costs for HDs 104 and 105 as $168,000,

---

[18] O.C.G.A. § 21-2-384(a)(2) implements the requirements of  UOCAVA.

exclusive of the cost of advance in-person satellite locations, runoffs, and other redistricting changes. Exhibit F ¶ 8.

As for nonmonetary costs, changing the district lines and ordering a special election will disqualify some candidates, cause others to change their strategy in midstream, and confuse voters. As Gina Wright notes, one of the four candidates who has qualified to run in HD 105 lives in a portion of HD 105 that was in HD 104 in 2012. Exhibit A ¶51. She also points out that two of the four candidates who have qualified to run in the 2015 version of HD 111 live in portions of that district that were in HD 109 under the 2012 plan. *Id*. Accordingly, absent some other changes to the ballots, the Plaintiffs contemplate disqualifying three candidates.

Putting the districts back as they were in 2012 would alter their political landscapes, given that it would undo Wright's effort to add Republican voters to HDs 105 and 111. The candidates who remain after the disqualifications will have to reach voters in precincts other than the ones they presently have in mind. Democrats in HD 111, for example, would likely target precincts like McDonough Central, and Republicans could no longer reach their partisans in Tussahaw.

The affected voters would be confused by the change in their representatives. Ledford explains that running elections in parallel causes voter confusion. Exhibit F ¶ 10. She notes further that, if there are stand-alone elections for HDs 104 and 105 in

44

Gwinnett County, voters may think that everyone is entitled to vote in those elections. Anyone who shows up to find his or her polling place closed is unlikely to appreciate the County's efforts.

As Ledford also notes, there is no guarantee that the polling places that are used for regularly scheduled elections will be available if a special election is ordered. Ledford also points out the effect of the Census Bureau's designation of Gwinnett County as a covered § 203 jurisdiction for Spanish: all sorts of election materials and the ballots will have to be translated. *See* 52 U.S.C. § 10503.

All of this effort to hold a special election must be balanced against the return. As Lynn Ledford observes, "[S]pecial elections historically do not garner the same level of attention and voter turnout as regularly scheduled elections do." Exhibit F ¶ 10.

Ledford's experience is reflected in the two stand-alone special elections conducted most recently in Georgia. A special election for HD 175 was held on February 13, 2018, and voter turnout was only 9.93% of the registered voters in the district. *See* http://results.enr.clarityelections.com/GA/72657/Web02-state.192841/#/. In the special election for Senate District 17 and HD 111 held on January 16, 2018, turnout was only 6.99% of the registered voters involved. *See* http://results.enr.clarityelections.com/GA/72405/Web02-state/#/.

45

As noted above, Defendant believes that Plaintiffs are unlikely to prevail in this matter and therefore the motion for preliminary injunction should be denied. However, even if the Court believed that Plaintiffs were likely to prevail, the public interest is not served by scheduling a special election.

## III.   CONCLUSION

As Plaintiffs cannot satisfy the standards for an injunction, their request for a preliminary injunction should be denied.

Respectfully submitted this 26th day of March, 2018.

s/ Frank B. Strickland
Frank B. Strickland
Special Assistant Attorney General
Georgia Bar No. 687600
fbs@sbllaw.net
John J. Park, Jr.
Georgia Bar No. 547812
jjp@sbllaw.net
Barclay S. Hendrix
Georgia Bar No. 917852
Barclay.hendrix@sbllaw.com
STRICKLAND BROCKINGTON
LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street NE
Atlanta, Georgia 30309
678-347-2200 (telephone)
678-347-2210 (facsimile)

CHRISTOPHER M. CARR
Attorney General 112505

ANNETTE M. COWART 191199
Deputy Attorney General

RUSSELL D. WILLARD 760280
Senior Assistant Attorney General

CRISTINA CORREIA 188620
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

*Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing

DEFENDANT BRIAN KEMP'S BRIEF IN OPPOSITION TO PLAINTIFFS'

MOTION FOR A PRELIMINARY INUNCTION has been prepared in Times New

Roman 14, a font and type selection approved by the Court in L.R. 5.1(C).

s/ Frank B. Strickland<br>
Frank B. Strickland<br>
Special Assistant Attorney General<br>
Georgia Bar No. 687600

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2018, I served the within and foregoing DEFENDANT BRIAN KEMP'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INUNCTION with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties to this matter via electronic notification or otherwise:

Jon Greenbuam
jgreenbaum@lawyerscommittee.org
Julie Houk
houk@lawyerscommittee.org
John Powers
jpowers@lawyerscommittee.org
Ezra Rosenberg
erosenberg@lawyerscommittee.org
Lawyers' Committee for Civil Rights
    Under Law
1401 New York Avenue, Suite 400
Washington, DC  20005

William Vance Custer, IV
bill.custer@bryancave.com
Jennifer Burch Dempsey
Jennifer.dempsey@bryancave.com
Julia Fenwick Ost
Julie.ost@bryancave.com
Bryan Cave, LLP-ATL
One Atlantic Center
14th Floor
1201 West Peachtree St, NW
Atlanta, GA  30309-3488

Bradley S. Phillips
Brad.phillips@mto.com
Gregory D. Phillips
Gregory.phillips@mto.com
John F. Muller
Thomas P. Clancy
Thomas.clancy@mto.com
Munger, Tolles & Olson, LA-CA
50th Floor
350 South Grand Avenue
Los Angeles, CA  90071-1560

Quinton Washington
quinton@bellwashington.com
Bell & Washington LLP
196 Peachtree Street SW, Suite 310
Atlanta, GA 30303

Marc Erik Elias
melias@perkinscoie.com
Aria C. Branch
abranch@perkinscoie.com
Perkins Coie LLP
700 13th Street, N.W., Suite 600
Washington, D.C. 20005

Abha Khanna
Akhanna@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Ste. 4900
Seattle, WA 98101

This 26th day of March, 2018.

s/ Frank B. Strickland
Frank B. Strickland
Georgia Bar No. 687600

50