IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Case No. 1:17-cv-01427-TCB-WSD-BBM |
| BRIAN KEMP, in his official capacity CASES as Secretary of State for the State of Georgia, | * * * * | CONSOLIDATED |
| Defendant. | * * | |
| AUSTIN THOMPSON, *et al.*, | * * | |
| Plaintiffs, | * * | |
| v. | * * | |
| BRIAN KEMP, in his official capacity Secretary of State of the State of Georgia, | * * * * | |
| Defendant. | * | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..........................................................................1

II.  ARGUMENT ..............................................................................2

    A.  Plaintiffs Are Entitled to a Preliminary Injunction. .............................2

        1.  Plaintiffs Are Likely to Succeed on the Merits ........................2

            (a)  The 2015 Redistricting Was Racially Motivated ............2

            (b)  Plaintiffs Satisfy the Standard for Racial Predominance ..........................................................4

            (c)  Gina Wright's New Declaration Is Inaccurate and Irrelevant and Should Be Disregarded .............................5

            (d)  Defendant Concedes that Voting Is Racially Polarized and that the Redistricting Achieved Its Intended Result ...............................................................10

            (e)  Defendant Misconstrues Plaintiffs' Expert's Analysis ........................................................................12

        2.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ................................................................14

        3.  The Balance of the Equities Weighs in Favor of Plaintiffs, and a Preliminary Injunction Serves the Public Interest..........................................................14

    B.  Plaintiffs' Claim Is Not Barred by the Laches Doctrine.....................18

III.  CONCLUSION............................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Bonner v. City of Pritchard*,
  661 F.2d 1206 (11th Cir. 1981) .......................................................19

*Bush v. Vera*,
  517 U.S. 952 (1996).........................................................................4

*Common Cause/Georgia v. Billups*,
  406 F. Supp. 2d 1326 (N.D. Ga. 2005).....................................14, 15

*Cooper v. Harris*,
  137 S. Ct. 1455 (2017)......................................................................4

*Feldman v. Ariz. Sec'y of State's Office*,
  843 F.3d 366 (9th Cir. 2016), *stayed*, 137 S. Ct. 446 (2016) ...........16

*Fulani v. Hogsett*,
  917 F.2d 1028 (7th Cir. 1990) ..................................................18, 19

*Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*,
  214 F. Supp. 3d 1344 (S.D. Ga. 2016) ............................................15

*Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
  118 F. Supp. 3d 1338 (N.D. Ga. 2015)..............................................15

*Garza v. Cty. of Los Angeles*,
  918 F.2d 763 (9th Cir. 1990) ....................................................11, 19

*Harris v. McCrory*,
  159 F. Supp. 3d 600, 627 (M.D.N.C. 2016), *stay pending appeal
  denied*, 136 S. Ct. 1001 (2016), *aff'd sub nom Cooper v. Harris*,
  137 S. Ct. 1455 (2017).....................................................................16

*Hunt v. Cromartie*,
  526 U.S. 541 (1999).........................................................................4

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Johnson v. Miller*,
  929 F. Supp. 1529 (S.D. Ga. 1996) ......................................16, 17, 20

*Larios v. Cox*,
  300 F. Supp. 2d 1320 (N.D. Ga. 2004)......................................15, 16

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)................................................................11

*McDaniel v. Gulf & S. Am. S.S. Co., Inc.*,
  228 F.2d 189 (5th Cir. 1955) ..................................................18

*Miller v. Bd. of Comm'rs of Miller Cty.*,
  45 F. Supp. 2d 1369 (M.D. Ga. 1998) .....................................19

*Miller v. Johnson*,
  515 U.S. 900 (1995)............................................................4, 17

*North Carolina v. Covington*,
  137 S. Ct. 1624 (2017).........................................................18

*Perez v. Abbott*,
  253 F. Supp. 3d 864, 946 (W.D. Tex. 2017) ..........................11

*Perez v. Texas*,
  891 F. Supp. 2d 808 (W.D. Tex. 2012) ..............................17, 18

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)................................................................16

*Rogers v. Lodge*,
  458 U.S. 613 (1982)............................................................11

*United States v. Barfield*,
  396 F.3d 1144 (11th Cir. 2005) ...........................................19

*United States v. Georgia*,
  952 F. Supp. 2d 1318 (N.D. Ga. 2013), *vacated as moot* 778 F.3d
  1202 (11th Cir. 2015)..........................................................15

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**RULES - OTHER**

Fed. R. Civ. P. 8(c)(1) ..................................................................................................19

**OTHER AUTHORITIES**

Call for Special Election for State Representative, District 111,
http://sos.ga.gov/admin/uploads/HD111_Call1.pdf (last visited
Apr. 9, 2018) ...................................................................................................15

Calls for Special Elections,
http://sos.ga.gov/index.php/elections/calls_for_special_elections
(last visited Apr. 9, 2018) ................................................................................15

http://sos.ga.gov/index.php/Elections/current_and_past_elections_resu
lts (last checked April 9, 2018) ........................................................................15

## I.   __INTRODUCTION__

The record overwhelmingly supports the conclusion that the movement of African-American voters into House Districts 105 and 111 drove the decision of Georgia Republicans to gerrymander those two districts in 2015. The evidence is similarly clear that the participants, in gerrymandering these districts, used racial data to deny African-American voters the opportunity to use their growing political power to elect candidates of their choice. The Defendant concedes many of the essential and historical facts supporting these conclusions and cannot dispute the documentary trail of misconduct here, which is both long and detailed.

Indeed, the Defendant does not deny that Districts 105 and 111 were gerrymandered. Rather, he remarkably contends, in spite of all the testimony and the litany of documents to the contrary, that race played no part in this scheme. Relying on the post hoc "say so" of one person, the Defendant argues that the changing racial demographics of the districts were simply ignored. This defense consists of the newly minted declaration of Gina Wright, the primary mapdrawer, who now claims that she did not "look" at racial data as she was actually drawing the maps. It is on this thin reed that the Defendant largely rests his argument that preliminary injunctive relief must be denied. This new testimony, however, not only directly contradicts Ms. Wright's earlier testimony and much of the rest of the

1

record, but is also internally inconsistent and largely irrelevant. While Ms. Wright may claim she did not "look" at racial data while she was actually drawing the maps, she confessed to being well aware of the location of black population concentrations in the area before she drew the maps. Regardless, this argument is at best an exercise in conscious ignorance and cannot rebut the considerable evidence demonstrating that the General Assembly engaged in racial gerrymandering to secure the incumbents' reelection.

Accordingly, despite Defendant's arguments, Plaintiffs are likely to succeed on the merits of their racial gerrymander claim. Plaintiffs also meet the other factors for a preliminary injunction, and Plaintiffs' claim, brought within two years of the districting plan challenged in this case, is clearly not untimely under the laches doctrine. This Court should issue injunctive relief immediately and remedy the constitutional violations in advance of this year's election.

## II.   ARGUMENT

### A.   Plaintiffs Are Entitled to a Preliminary Injunction.

#### 1.   Plaintiffs Are Likely to Succeed on the Merits

##### (a)   The 2015 Redistricting Was Racially Motivated

The record shows that key players in the House decided to redistrict House Districts 105 and 111 because the changing racial demographics threatened the reelection prospects of Representatives Chandler and Strickland. In 2014, these

2

incumbents won reelection in Districts 105 and 111 by very narrow margins. *See*

Doc. 103-87, pp. 3-4. Meanwhile, large numbers of black voters were migrating

into both districts. *See* Doc. 103-1, pp. 8-10. These changing demographics

threatened the incumbents' future reelection prospects due to the differing voting

patterns of black and white voters. *See id.* pp. 10-15. Fearing loss of these seats,

the House leadership and the incumbents decided to redraw the districts' lines.

Chandler Dep. 131:15-23, 178:5-10, 203:25-204:3; Nix Dep. 177:3-12; Wright

Dep. 236:10-239:5. The record thus demonstrates that migration of African

Americans into Districts 105 and 111 triggered Republicans' redistricting efforts.

In his response brief, Defendant argues Reps. Chandler and Strickland

decided to seek redistricting only after Rep. Nix made an announcement at the

outset of the 2015 legislative session, Doc. 137 ("Opp."), at 8, and Chandler[1] and

Strickland[2] deny they considered the racial composition of their districts during

---

[1] Some aspects of Rep. Chandler's explanation of her motivations are dubious. She testified that, in addition to wanting to improve her chances of reelection, she merely wanted to eliminate precinct splits in 2015. *Compare* Chandler Dep. 178:5-10, *with* 144:15-148:25. That makes little sense because the redistricting added a new precinct split, in addition to taking one away. Wright Dep. 236:25-237:13.

[2] Senator Strickland's credibility is equally suspect. He went so far as to testify that the 2015 redistricting "hurt" his performance in the 2016 election, making it "a little bit tighter" than it otherwise would have been. Strickland Dep. 218:11-221:25. His belief is curious because, as he must know, the redistricting removed

this process. Chandler Dep. 60:9-17, 71:11-15; Strickland Dep. 218:2-219:16. All of these assertions are contrary to the record evidence, which, as discussed below, shows that these efforts began months before Nix's announcement. The final boundaries were not spontaneous, bottom-up "small changes," Opp. 8, but the result of a coordinated effort to halt the growing impact of black voters on incumbents' chances for reelection.

(b)    *Plaintiffs Satisfy the Standard for Racial Predominance*

Although a legislature can redistrict in the middle of a census cycle, this case goes far beyond "subordinat[ing] traditional race-neutral districting principles… to racial considerations," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), because there was no need to redistrict whatsoever. Unlike the cases cited by Defendant—where states had to redistrict mid-cycle to comply with the one person/one vote principle or to remedy a constitutional violation[3]—here, reversing racial demographic changes was the *raison d'être* for deciding to redraw districts in the middle of a census cycle. That is impermissible. *Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7

---

his worst-performing precinct from the November 2014 election, Stockbridge West, which had the highest black voting age population from HD 111. Strickland lost that precinct by a margin of 1,220 votes to 265. Doc. 103-87, p. 4; Doc. 103-72, pp. 11-12, 14.

[3] *See Hunt v. Cromartie*, 526 U.S. 541 (1999); *Bush v. Vera*, 517 U.S. 952 (1996).

4

(2017) ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

    *(c)*    *Gina Wright's New Declaration Is Inaccurate and Irrelevant and Should Be Disregarded*

In her new declaration,[4] Ms. Wright attempts to leave the impression that she created the maps by herself in one fell swoop without assistance and without looking at racial data until she finished. As she puts it, "[w]hen I worked on the 2015 redistricting of HD 105 and HD 111, including all surrounding impacted districts, I did not keep data regarding the racial make-up of the census blocks and precincts open on my screen, or pending change window . . . I intentionally did not look at the racial breakdown of the population until *after* I had finished making changes to the districts." Doc. 137-1, ¶ 10. Significantly, Wright does not deny that she was aware of racial data or that the movement of black voters into Districts 105 and 111 drove the redistricting. Wright also does not deny discussing racial data during the months the maps were being drawn. And while she claims to not have discussed the redistricting of Districts 105 and 111 with key staff member Dan

---

[4] Plaintiffs' Objections to Declarations Offered by Defendant in Response to Plaintiffs' Motion for a Preliminary Injunction are attached hereto as Ex. 1.

O'Connor and specifically denies discussing any "desired racial effect of the redistricting" with Chandler and Strickland, *id*. ¶¶ 42-43, the evidence is undisputed that O'Connor and these legislators engaged in detailed discussions with each other about the racial demographics of Districts 105 and 111, and that the legislators had a significant impact on the details of the redistricting.

Wright's statement that she did not keep racial data in a "pending changes" box contradicts both her prior testimony and that of Rep. Nix. Wright testified that, when drawing maps, she keeps a pending changes box visible showing "how your numbers change" with each click. Wright Dep. 105:10-105:16. She "like[s] to have the political data there as well as other data, racial data, population data, all of those other things" in the pending changes box. *Id*. 105:18-105:23.[5] When asked if she was aware of the racial data for the "proposed [District] 105" during the 2015 re-redistricting, Wright stated that she had been aware because racial demographics were "in that pending changes box that [she] mentioned before." *Id*. 195:5-196:2. Wright was "sure" racial data would have been "somewhere on the [pending changes] box that at some point through the process [she] would have gone to look

---

[5] Defendant asserts Wright was referring only to the 2011 redistricting. Opp. 25. That is incorrect. She was discussing her "usual[]" practice, not the process used in 2011. Wright Dep. 104:25-105:23. Any dispute, however, is academic since she stated that racial data was in the pending changes box while drawing the 2015 plan.

for." *Id.* Similarly, when asked if she used racial data to determine the makeup of a split precinct, Wright insisted she had not because she would only look at racial demographics of the district "as a whole" in "the pending changes box," as she would not make "the extra effort to hunt up" racial demographics for the split precinct alone. *Id*. 217:10-23. Thus, on two separate occasions, Wright testified to having racial data in the pending changes box while drawing the 2015 maps. Rep. Nix confirmed this, testifying about a meeting where "Wright is clicking around and showing proposed changes," with "tables displayed that showed a racial breakdown of the population in the various districts." Nix Dep. 148:8-150:12.

The following chronology contradicts Defendant's assertions that the redistricting process only began after the Nix announcement and that race did not factor into the redistricting of Districts 105 and 111:

(1)    Spring 2014: Wright completes two re-drawn plans for Districts 105 and 104, providing statistical sheets including black and Latino population data. Wright Dep. 300:6-302:16; Docs. 103-42-45. Wright provides completed maps to Rep. Chandler and discusses the changing demographics of Gwinnett County, a subject "most likely" brought up by Wright. *Id.* at 23:5-24:15.

(2)    July 2014: O'Connor gives Chandler updated precinct-level racial data, and Chandler thanks him. Doc. 103-33; Doc. 103-34.[6]

---

[6] Defendant makes much ado about whether the tables included in Doc. 103-34, pp. 2-3, were attached to the email on the first page, arguing Plaintiffs' counsel misled Rep. Chandler. Opp. 10-13. But in that email, O'Connor gives Rep. Chandler the

(3)    Summer 2014: O'Connor tells Rep. Efstration that black migration to Gwinnett makes District 105 a target for "tweaking" and his district (104) a target for swapping "extra GOP voters" during redistricting. Doc. 103-3, p. 1.

(4)    September 2014: O'Connor tells Speaker Pro Tem Jones he is concerned about Gwinnett and Henry Counties since "virtually all the growth . . . is minority," O'Connor Dep. 290:11-291:22, and flags District 105 as one of three top targets for Democrats due to racial demographic changes. Doc. 103-11.

(5)    On November 14, 2014, Rutledge emailed O'Connor and Wright requesting demographic data on Districts 109, 110, and 111. Doc. 103-39.

(6)    December 19, 2014: O'Connor suggests that Spiro Amburn, Speaker Ralston's Chief of Staff, look at Districts 105 and 111 as candidates for redistricting. O'Connor notes Gwinnett and Henry Counties are getting more Democratic due to their changing racial makeup, sends him data on those districts, and invites him to a meeting with Wright and Rep. Strickland on December 22. Doc. 103-37; O'Connor Dep. 220:21-222:25.

(7)    Mid-January of 2015: At the direction of Amburn, Nix announces the House is planning to redistrict again. Nix Dep. 66:13-68:2; 79:1-80:8.

(8)    January to February 2015: Chandler tells Nix and Wright that she wants to give a political boost to her district, Wright Dep. 22:6-14; Nix Dep. 139:16-142:3, after observing a recent increase in the ratio of minority residents relative

---

"latest voter registration data by precinct for HD 105 (data from Gwinnett Board of Elections and Voter Registration which I have put in Excel format)," Doc. 103-34, p. 1, a fact Defendant acknowledges, Opp. 13. Further, in the email that Defendant argues Plaintiffs' counsel withheld, O'Connor notes that "Chandler . . . would like data concerning voter registration by precinct for her House district," Doc. 137-2, p. 5; *see also* Chandler Dep. 106:21-107:7. A few hours later, the Elections Board sent the requested information in PDF format. Doc. 137-2. That document provides registration data by precinct for District 105—the same data O'Connor says he "put in Excel format" in Exhibit 33 a few hours later. Doc. 103-34, p. 1. Thus, O'Connor gave Chandler the tables in Exhibit 33. O'Connor Dep. 182:2-11. Finally, the email in question was introduced as an exhibit during Chandler's deposition. Chandler Dep. 104:22-107:7.

to white residents. Chandler Dep. 130:17-131:14. Wright, Nix, Chandler, and Efstration explore proposed changes to District 105 and surrounding districts. Nix Dep. 144:11-148:20.

(9)   January to February 2015: Wright meets with Reps. Strickland, Rutledge, Welch and Yates to consider multiple options for redistricting District 111, and they discuss population and performance data. Wright Dep. 176:25-177:25; Strickland Dep. 127:22-130:11, 154:9-20, 158:18-159:25.

(10)  February 2015: O'Connor emails Speaker Pro Tem Jones that "once a district gets in the 30-35% black range, it becomes more of a target for Democrats," pointing out that 105 and 111 were two of four Republican-held districts that tipped over 35% black voter registration. Doc. 103-4, p. 1.

(11)   February 27, 2015 to March 5, 2015: Wright completes the redrawing of Districts 105 and 111. *See* Doc. 103-52.

(12)  March 5, 2015 (the same day HB 566 is introduced): O'Connor emails voter registration data by race for Districts 109, 110, 111, and 129 to Rep. Welch to assess political performance. O'Connor Dep. 243:4-244:7.

This chronology refutes Defendant's attempt to recast the months-long redistricting process as Ms. Wright sitting alone at her computer, without any input from anyone else, completely insulated from discussions of racial demographics. Strickland Dep. 182:16-25, 211:2-17; Nix Dep. 146:21-147:24.

Moreover, whether or not Wright had racial data in her pending changes box at the precise moment she drew the maps is irrelevant. In addition to being aware of and discussing the ongoing demographic changes in Henry and Gwinnett Counties, Wright "knew more or less" where the black population concentrations were located. *See*, *e.g.*, Wright Dep. 23:25-25:3, 102:20-103:14, 182:14-24. That

she now claims not to have had that data "open" at the precise moment she drew the final lines is an exercise in misdirection. The redistricting was initiated to reverse changing racial demographics and the participants discussed the racial data throughout the map-drawing process, sometimes with Wright.

Finally, the chronology undercuts Defendant's attempt to downplay O'Connor's role in the redistricting. Throughout the process, O'Connor was communicating about racial considerations relevant to the districts with affected legislators and other key players, as confirmed by Rep. Nix. *See* Nix Dep. 91:16-93:20. When Speaker Pro Tem Jones searched for documents to prepare for her deposition in this case, she searched her emails for only one term other than "redistricting" and the bill numbers for redistricting legislation—"Dan O'Connor," Jones Dep. 17:9-15, because she "can't imagine [she] would have communicated with anyone other than Dan O'Connor" about redistricting. *Id.* at 28:16-28:18.

Try as they might, Defendant cannot distance O'Connor from the redistricting of Districts 105 and 111, and cannot distance Wright from the paramount influence of racial considerations in the redistricting.

> (d)   *Defendant Concedes that Voting Is Racially Polarized and that the Redistricting Achieved Its Intended Result*

A finding of racial predominance is particularly appropriate where the actors know that racially polarized voting behavior is the cause of the electoral dynamics

affecting incumbents' reelection chances. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440-41 (2006).[7] Here, the evidence indicates that an awareness of racially polarized voting and the correlation between blacks and the Democratic Party, and whites and the Republican Party, in the Atlanta metro-area motivated the redrawing of Districts 105 and 111. This correlation is taken as a given by local legislators and candidates for office, as well as participants in the 2015 redistricting.[8] They realized that reversing the racial demographic changes in HD 105 and 111 was a prerequisite to improving Rep. Chandler's and Strickland's political performance. *See* Chandler Dep. 243:6-244:13; O'Connor Dep. 220:21-222:25; 290:11-291:22. Indeed, Defendant's expert, Dr. Alford, agrees with Dr. Chen "that black voters are voting cohesively for Democratic candidates and white voters are voting cohesively for Republican candidates." Alford Dep. 90:6-92:5. More important, Dr. Alford does not contest Chen's and O'Connor's determination

---

[7] *See also Rogers v. Lodge*, 458 U.S. 613, 623-24 (1982) (noting "[v]oting along racial lines allows those elected to ignore black interests without fear of political consequences," such that the "fact that none have ever been elected is important evidence of purposeful exclusion."); *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (affirming that Supervisors chose "fragmentation of the Hispanic voting population. . . to achieve [] self-preservation"); *Perez v. Abbott*, 253 F. Supp. 3d 864, 946 (W.D. Tex. 2017) (three-judge panel).

[8] *See* Wright Dep. 31:15-32:11; Chandler Dep. 77:1-13; Nix Dep. 221:10-222:4; O'Connor Dep. 156:3-157:5, 283:3-284:10; Jones Dep. 116:9-117:20; Balfour Dep. 13:10-15:5; McLeod Dep. 97:24-99:16; Payton Dep. 43:10-17.

that Rep. Chandler and Strickland would have lost in the November 2016 general election if the 2015 redistricting had not taken place. Alford Dep. 75:15-77:2. Defendant concedes the redistricting was the difference between victory and defeat and therefore essential to the incumbents' survival.

### (e)    *Defendant Misconstrues Plaintiffs' Expert's Analysis*

Defendant misconstrues Dr. Chen's analysis in several respects. First, the argument that swapping portions of split precincts results in non-contiguity, Opp. 29-31, is a red herring because there was no need to split any precinct in the first place. Precinct-splitting is discouraged under Georgia's redistricting guidelines. Chen Dep. 55:8-57:24; Docs. 94-1 p. 16, 137-1 ¶ 44 (Wright says that, "when possible, I try not to split precincts among districts."). The Defendant's splits in the redistricting process can only be explained in light of racial considerations.

As to Lawrenceville D, the excluded portion of that precinct has a significantly higher black proportion than that of District 105, and splitting it effectively lowered the district's black population percentage. Doc. 94-1, pp. 17-18. Defendant's critique of Chen's analysis of changes to Mount Carmel, Opp. 30-31, is misleading because it ignores the fact that the entire precinct was located in District 111 in the 2012 plan. In 2015, Wright excised the western part of Mount Carmel, which, as Defendant acknowledges, has a higher black population

percentage than the rest of District 111 or the eastern portion that remained in 111. *Id*.

Defendant's discussion of the Flippen precinct, Opp. 31, is also nonsensical because the Stockbridge West and Stagecoach precincts were not part of District 109 in the 2012 plan: they were moved there from 111. Wright swapped out those precincts, which have a combined black voting age population of 45.2 percent, from 111, while moving in a part of Flippen, which has a black voting age population of 38.7 percent. Doc. 63-1, p. 25. Doing so decreased HD 111's black proportion while creating the purported contiguity issue of which Defendant complains.

Defendant also misunderstands Chen's explanation of the partisan political data available to Wright. *See* Opp. 7-8. Because election results are "available only at the precinct level. . . it is impossible for a map-drawer to gain detailed knowledge of whether one split portion of a precinct is more heavily Democratic or Republican-leaning than another split portion of the same precinct." Doc. 63-1, pp. 32-33; Chen Dep. 39:7-41:1. The IT manager for the Reapportionment Office, Rob Strangia, confirmed that if the partisan split in a precinct is 50-50, the *political* data reported for every census block within it will be reported as 50-50, which is "not an exact science." Strangia Dep. 88:24-89:13. By contrast, accurate *racial* data are

reported for each block. *Id*. 91:7-12. In short, Wright had available racial data more helpful for drawing partisan districts than the allocated election return estimates, and she took advantage of this data when drawing Districts 105 and 111. Doc 63-1, pp. 32-38.

### 2.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

Defendant asserts that "Plaintiffs have failed to show irreparable harm," Opp. 38, ignoring the settled case law that state actions infringing on the right to vote constitute irreparable injury. *See* Doc. 103-1, pp. 44-46. Indeed, courts have repeatedly found that "denying an individual the right to vote works a serious, irreparable injury." *See*, *e.g.*, *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1375-76 (N.D. Ga. 2005).

### 3.   The Balance of the Equities Weighs in Favor of Plaintiffs, and a Preliminary Injunction Serves the Public Interest

Defendant contends it will suffer harm if an injunction is issued because candidates have already qualified for the 2018 primary election and conducting the election using the 2012 maps would require the reassignment of affected voters on short notice, causing voter confusion and imposing administrative burdens. Opp. 39-46. Not only does Defendant ignore the injury Plaintiffs suffer by participating in elections with constitutionally infirm districts, Defendant also fails to

acknowledge that it has repeatedly conducted special elections on short notice.[9]

For example, Defendant conducted a recent special election for HD 111 within 34

days, completing candidate qualifying in just three days.[10] Tellingly, nowhere in its

opposition brief does Defendant contend that election officials cannot conduct the

2018 elections using the 2012 maps, just that it may be burdensome. But assuring

the right to vote "outweighs the cost and the inconvenience" election officials

might incur. *United States v. Georgia,* 952 F. Supp. 2d 1318, 1333 (*N.D. Ga.*

*2013), vacated as moot* 778 F.3d 1202 (11th Cir. 2015).[11]

---

[9] Georgia has held 57 special elections for Congressional, State House, or State Senate seats since 2010. *See* http://sos.ga.gov/index.php/Elections/current_and_past_elections_results (last checked April 9, 2018).

[10] *See* Call for Special Election for State Representative, District 111, http://sos.ga.gov/admin/uploads/HD111_Call1.pdf (last visited Apr. 9, 2018). Defendant also conducted six special elections on November 7, 2017, apparently with no complications. *See* Calls for Special Elections, http://sos.ga.gov/index.php/elections/calls_for_special_elections (last visited Apr. 9, 2018).

[11] *See also Common Cause/Georgia*, 406 F. Supp. 2d at 1375-76; *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016), and "the protection of 'franchise-related rights is without question in the public interest.'" *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1349 (N.D. Ga. 2015) (citing *Larios v. Cox*, 300 F. Supp. 2d 1320, 1355 (N.D. Ga. 2004)).

Case 1:17-cv-01427-TCB-MLB-BBM   Document 143   Filed 04/09/18   Page 21 of 29


Defendant cites *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006), for the proposition that "courts should give consideration to the proximity of the election and the potential for any voter confusion that a last minute change to the State's processes may lead to." Opp. 39. But, "the Supreme Court in *Purcell* did not set forth a *per se* prohibition against enjoining voting laws on the eve of an election." *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367-68 (9th Cir. 2016), *stayed*, 137 S. Ct. 446 (2016). And courts frequently grant injunctive relief to remediate constitutionally infirm districts in election years. *See, e.g.*, *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (in racial gerrymandering case, ordering new map to be drawn in election year), *stay pending appeal denied*, 136 S. Ct. 1001 (2016), *aff'd sub nom Cooper v. Harris*, 137 S. Ct. 1455 (2017); *Cox*, 300 F. Supp. 2d at 1356-57.

*Johnson v. Miller*, 929 F. Supp. 1529 (S.D. Ga. 1996) (Carnes, J.; Bowen, J.; Carnes, J.) provides guidance on how the equitable standards should be applied in this case. There, the plaintiffs filed a motion for preliminary injunction challenging thirty-three Georgia House and Senate legislative districts as unconstitutional racial gerrymanders. *See id.* at 1542. The court granted the motion "to provide an interim remedy for a serious constitutional violation affecting the electoral process in the State of Georgia." *Id.* at 1561. Of particular relevance here, the court issued an

order on April 30 of an election year requiring the State to conduct that year's elections using entirely new maps for 63 state House and Senate districts. *Id.* Here, by contrast, Plaintiffs seek an order requiring Defendant to use preexisting maps for only seven House districts. The burden on election officials is therefore significantly lower than those imposed in *Johnson*.

*Johnson* is particularly instructive because, in reaching its decision, the court expressly recognized that constitutional violations of the sort claimed by Plaintiffs here trump administrative concerns of the sort raised by Defendant. Deeming the potential harm caused by unconstitutional redistricting "irreparable harm in its purest sense," *id.* at 1560, the court further explained that the balance of the equities did not favor Georgia, because "[n]o department of the government or citizen has a legitimate interest in continuing in effect a violation of another citizen's constitutional rights." *Id.* Finally, turning to the public interest criterion, the court declared that "[t]he public has a strong interest in having elections conducted according to constitutionally drawn districts, instead of pursuant to racially gerrymandered lines that violated the constitutional rights of all citizens within those districts." *Id.* at 1560-61.

Consistent with this reasoning, in *Perez v. Texas*, a three-judge panel issued orders in February and March of an election year setting new district maps,

reopening candidate qualifying for that year's election, and setting new dates for the primary. 891 F. Supp. 2d 808, 810 (W.D. Tex. 2012) (order adopting interim districting plan); Doc. 689 (filed Mar. 19, 2012).[12]

### B.   Plaintiffs' Claim Is Not Barred by the Laches Doctrine.

Defendant's argument that Plaintiffs' claim is barred by the laches doctrine, Opp. 36-38, fails because Defendant failed to assert laches as an affirmative defense and therefore waived it. *See* Doc. 30; *see McDaniel v. Gulf & S. Am. S.S. Co., Inc.*, 228 F.2d 189, 192 (5th Cir. 1955) ("[l]aches is an affirmative defense, and, unless appearing upon the face of the pleading, must be asserted by the

---

[12] Defendant misapprehends the import of *North Carolina v. Covington*, 137 S. Ct. 1624 (2017). The Supreme Court reversed the three-judge panel for "address[ing] the balance of equities in only the most cursory fashion," providing the Court with "no meaningful basis for even deferential review." 137 S. Ct. at 1626. Plaintiffs expect that the Court here will provide the required level of careful analysis in its order.

Defendant also cites to *Fulani v. Hogsett*, 917 F.2d 1028 (7th Cir. 1990), in arguing that claims "against a state electoral process must be expressed expeditiously" and that "[a]s time passes, the state's interest in proceeding with the election increases as resources are committed and irrevocable decisions are made." Opp. 41. But in *Fulani*, the plaintiffs waited until a mere three weeks before the election to file suit, making it "extremely difficult, if not impossible," to remedy the defect in time for the election. *Fulani*, 917 F.2d at 1031. Here, by contrast, Plaintiffs brought suit over a year prior to the 2018 election cycle. *See* Doc. 1 (original complaint filed April 4, 2017).

answer of the respondent."); Fed. R. Civ. P. 8(c)(1).[13] Even if Defendant had not waived its laches defense, Defendant has failed to establish any of its required elements. Contrary to Defendant's unsupported assertions, Plaintiffs did not delay in asserting their claim, filing the instant complaint less than two years after it became law. When courts have found lawsuits barred under laches, the claims were brought *mere weeks* before the election. *See, e.g.*, *Fulani*, 917 F. 2d at 1031 (three weeks before election); *Miller v. Bd. of Comm'rs of Miller Cty.*, 45 F. Supp. 2d 1369, 1373-74 (M.D. Ga. 1998) (two weeks before election). Indeed, the Ninth Circuit found that a delay of *eight years* between the implementation of a districting plan and the filing of a lawsuit did not render the claim barred under the laches doctrine. *See Garza*, 918 F.2d at 772.[14] Defendant also failed to demonstrate undue prejudice. This case was filed in April 2017, well in advance of any steps Defendant took to prepare for the May 2018 elections, and therefore no prejudice was caused by the timing of this lawsuit. *See United States v. Barfield*, 396 F.3d

---

[13] The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

[14] Notably, the *Garza* court reasoned that "the ongoing nature of the violation" weighed against dismissing the claim on laches grounds. 918 F.2d at 772. The same reasoning applies here. The injury to Plaintiffs caused by constitutionally infirm districts would continue unabated absent relief from this court.

1144, 1150 (11th Cir. 2005) (laches argument failed, in part, because defendant failed to demonstrate "undue prejudice from the delay").

## III.  CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunction (Doc. 103). When faced with an unconstitutional racial gerrymander on the eve of the 1996 elections, the Southern District of Georgia held, "[c]onsidering the four factors relevant to the grant of a preliminary injunction, this case is not even a close one. Preliminary injunctive relief is not only appropriate, but also necessary in order to provide an interim remedy for a serious constitutional violation affecting the electoral process in the State of Georgia." *Johnson*, 929 F. Supp. at 1561. Plaintiffs ask the Court here, as the court did in 1996, to put a stop to the unconstitutional racial gerrymander present here and to do so now as to prevent further harm to the citizens of Gwinnett and Henry Counties in the next election.

Dated: April 9, 2018                    Respectfully submitted,

By:   */s/ Jon Greenbaum*
Jon Greenbaum*
Ezra D. Rosenberg*
Julie Houk*
John Powers*
Samuel Weiss*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
jpowers@lawyerscommittee.org
sweiss@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under
Law
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
Telephone:   (202) 662-8600
Facsimile:    (202) 783-0857


*/s/ Gregory D. Phillips*
Bradley S. Phillips*
Gregory D. Phillips*
Kenneth Trujillo-Jamison*
Ariel Green*
Munger, Tolles, & Olson LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*/s/ William V. Custer*
William V. Custer
Georgia Bar No. 202910
Jennifer B. Dempsey
Georgia Bar No. 217536

21

Julia F. Ost
Georgia Bar No. 940532
bill.custer@bryancave.com
jennifer.dempsey@bryancave.com
Bryan Cave LLP
One Atlantic Center, Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, Georgia 30309-3488
Phone: (404) 572-6600
Fax: (404) 572-6999

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION was prepared double-spaced in 14-point Times New Roman pursuant to Local Rule 5.1(c) and in compliance with the length requirements set forth in Plaintiffs' consent motion to exceed page limitation.

*/s/ Julie M. Houk*
Julie M. Houk
Lawyers' Committee for Civil Rights Under Law

## **CERTIFICATE OF SERVICE**

This is to certify that on April 9, 2018, I electronically filed the **Certificate of Service** serving **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

*/s/ Julie M. Houk*
Julie M. Houk
Lawyers' Committee for Civil Rights Under Law