NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

2                          ATLANTA DIVISION

3  NAACP, et al.,                  )
                                   )
4       PLAINTIFFS,                )
                                   )
5  vs.                             )   Case No.:
                                   )   1:17-cv-01427-TCB-WSD-BBM
6  Brian Kemp, in his             )
   official capacity as           )
7  Secretary of State for the )
   State of Georgia,              )
8                                  )
        DEFENDANT.                 )
9  _____ )
                                   )
10 AUSTIN THOMPSON, et al.,        )
                                   )
11      PLAINTIFFS,                )
                                   )
12 vs.                             )
                                   )
13 Brian Kemp, in his             )
   official capacity as           )
14 Secretary of State for the )
   State of Georgia,              )
15                                 )
        DEFENDANT.                 )
16

17                      ***************

18      The following deposition of Darryl Payton was taken

19 pursuant to stipulations contained herein, the reading and

20 signing of the deposition reserved, before Stephen Mahoney,

21 Certified Court Reporter, 4921-4880-0199-0656, in the State of

22 Georgia, on February 21, 2018 at 1170 Peachtree Street, NE,

23 Atlanta, Georgia, at 10:00 a.m.

24                  Stephen Mahoney, CVR, CCR
                       Orange Legal, Inc.
25            1100 Peachtree Street NE, Suite 200
                     Atlanta, GA 30308



**Orange Legal**
**800-275-7991**

```
 1                      APPEARANCES

 2    ON BEHALF OF THE PLAINTIFFS:

 3    JOHN POWERS, ESQUIRE    (VIA TELEPHONE)
      LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER THE LAW
 4    1401 NEW YORK AVE., N.W.
      SUITE 400
 5    WASHINGTON, DC 20005
      (202) 662-8600
 6    JPOWERS@LAWYERSCOMMITTEE.ORG

 7    ARIA BRANCH, ESQUIRE
      PERKINS COIE LLP
 8    1201 THIRD AVENUE,
      SUITE 4900
 9    SEATTLE, WASHINGTON 98101
      (206)359-8312
10    ABRANCH@PERKINSCOIE.COM

11

12    ON BEHALF THE DEFENDANT:

13    FRANK STRICKLAND, ESQUIRE
      STRICKLAND, BROCKINGTON, LEWIS, LLP
14    1170 PEACHTREE STREET, N.E.
      SUITE 2200
15    ATLANTA, GEORGIA 30309
      (678) 347-2200
16    FBS@SBLLAW.COM

17

18

19

20

21                   TRANSCRIPT LEGEND
      -  Interjection for clarification or correction
22    -- Cross-talk/interruption/change of thought
      ... Trailing off or incomplete thought
23    (ph) Phonetically spelled
      [sic] Written as spoken
24    (unintelligible) Not capable of being understood

25
```



```
 1                  INDEX TO PROCEEDINGS

 2   EXAMINATION OF DARRYL PAYTON              PAGE

 3       BY MR. STRICKLAND.........................04

 4   DISCLOSURE....................................73

 5   CERTIFICATE OF REPORTER.......................74

 6   READ & SIGN LETTER............................75

 7   ERRATA SHEET..................................76

 8

 9                  INDEX TO EXHIBITS

10   IDENTIFIED                                PAGE

11   EXHIBIT 01 - PLAINTIFFS' INITIAL DISCLOSURES.....32

12   EXHIBIT 02 - CAMPAIGN CONTRIBUTION REPORT.......44

13   EXHIBIT 03 - CAMPAIGN CONTRIBUTION REPORT.......46

14   EXHIBIT 04 - CAMPAIGN CONTRIBUTION REPORT.......50

15   EXHIBIT 05 - CAMPAIGN CONTRIBUTION REPORT.......53

16   EXHIBIT 06 - CAMPAIGN CONTRIBUTION REPORT.......55

17   EXHIBIT 07 - CAMPAIGN CONTRIBUTION REPORT.......56

18   EXHIBIT 08 - CAMPAIGN CONTRIBUTION REPORT.......58

19

20

21

22

23

24

25
```



```
 1                    P R O C E E D I N G S

 2                    DARRYL PAYTON,

 3    being first duly sworn, was examined and testified

 4    as follows:

 5              THE WITNESS:  I do.

 6                    DIRECT EXAMINATION

 7    BY MR. STRICKLAND:

 8         Q.   Good morning, Mr. Payton.  You and I have

 9    already met.  My name is Frank Strickland and I am

10    the Special Assistant Attorney General appointed by

11    the Attorney General of Georgia to represent the

12    State's interest in this litigation.

13              Have you been in involved in a deposition

14    before?

15         A.   No, sir.

16         Q.   It is an informal setting where I'm going

17    to ask you questions, and you will be testifying

18    under oath as if you were in a courtroom.  The

19    reporter will take down everything verbatim.

20              So in doing that, it is better to answer

21    yes or no as opposed to nodding or shaking your

22    head.

23         A.   Okay.

24         Q.   You cannot take down gestures.

25         A.   Okay.  I was about to ask you that because
```

1    I thought about it and then you said it.

2        Q.    Okay.  Now, if I ask you something you do

3    not understand or the question is not clear, if you

4    will just ask me to repeat the question, I will be

5    glad to do that.

6        A.    Not a problem.

7        Q.    Ms. Branch may object to some of the

8    questions, in which event, it is likely she will go

9    ahead and tell you to answer the question.  Unless

10   she tells you not to answer, you should go ahead and

11   answer.  And if you need a break, at any time along

12   the way -- we will probably take a break after about

13   an hour, but if you needed break otherwise, please,

14   speak up and we will be glad to accommodate you.

15       A.    Okay.

16       Q.    So some formalities here just for the

17   record.

18             Please state your full name?

19       A.    Isaac Darryl Payton.

20       Q.    Could you spell that for the reporter?

21       A.    I-S-A-A-C D-A-R-R-Y-L P-A-Y-T-O-N.

22       Q.    Thank you, sir.

23             Have you ever been known by any other

24   name?

25       A.    No, sir.



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                          6

```
1       Q.   And what is your address?

██████████████████████████████████████████

██████████████████████████████████████████

4       Q.   Is that in Henry County?
5       A.   Henry County, Georgia, yes.
6       Q.   How long have you lived at that address?
7       A.   Since 1997.
8       Q.   How about before that, where did you live
9  before that?
10      A.   Marietta, Georgia.
11      Q.   The address is not particularly important.
12           Anyone else live with you at that address?
13      A.   Yes, sir.  My wife Anne, ANNE. My daughter
14  █████████████████████████ and my son,████████
██████████████████████████████
16      Q.   All right.  What do you consider your
17  race?
18      A.   Black, African-American.
19      Q.   Okay.  Are you on any medications today
20  that might impair your testifying?
21      A.   I am on medication today.  I do not feel
22  it will impair my testifying.
23           Would you like do you know what I am on?
24      Q.   No.  That is all right.  I just wanted to
25  make sure that you are squared away.
```

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                    7

```
 1                   What is your date of birth?

 █████████████████████████████████████

 3          Q.    Where were you born?

 4          A.    Valdosta, Georgia.  That is Lowndes

 5    County.

 6          Q.    And I think we have already covered the

 7    fact that you are married and have children.

 8                 Are you registered to vote in Henry

 9    County?

10          A.    Yes, sir.

11          Q.    When did you first register to vote in

12    Henry County?

13          A.    Let's see.  When I moved down in '97.

14          Q.    Meaning down from Marietta?

15          A.    Yes, sir.

16          Q.    With regard to the pending case, have you

17    talked -- discussed the case with anyone before

18    today?

19          A.    I told one gentleman about it yesterday.

20    What I was going to be doing.  That is pretty much

21    it.  Well, maybe some with the Democratic Party of

22    Georgia.  That is about it.

23          Q.    Anybody specifically in the Democratic

24    Party of Georgia.

25          A.    What was the person's name -- I know his
```

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                          8

1    first name was Craig.  I cannot think of his last

2    name right now.

3        **Q.    So other than your lawyer, those are the**

4    **people that you discussed the case with?**

5        A.    Yeah.  I pretty much just told them -- I

6    pretty much did all of the talking.

7        **Q.    Okay.  Did you review --**

8        A.    I did mention it to my wife.  I'm sorry.

9        **Q.    Okay.  Did you review any papers -- the**

10   **lawsuit itself, anything like that, in preparation**

11   **for your testimony today?**

12       A.    I looked over the papers.  I believe the

13   papers were the filing --

14       **Q.    The complaint?**

15       A.    The complaint, yes.  Well, three different

16   sets of papers that I looked at.  I think the

17   complaint, the filing, and the summons.  Whatever

18   you guys -- whoever sent me to appear here today.

19       **Q.    Okay.  Have you ever been a party to any**

20   **other lawsuit?**

21       A.    One lawsuit a long time ago.  It was a

22   class-action lawsuit.

23       **Q.    A consumer type class-action?**

24       A.    Yes, sir.

25       **Q.    Or was it something else?**



**Orange Legal**
**800-275-7991**

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                    9

1          A.   I do not know if it is called consumer or

2     not.  It was a class-action.  I am sure that you

3     heard of the class-action suit that they --

4     employees had against Coca-Cola.

5               So is that consumer?

6          Q.   That is probably an employment case, but

7     were you a part of a class-action against Coca-Cola?

8          A.   Yes, sir.

9          Q.   Were you working for Coca-Cola at the

10    time?

11         A.   Yes, sir.

12         Q.   Did it have something to do with your

13    employment status?

14         A.   I'm not sure because I became a part -- I

15    was not a main plaintiff or anything.  I was just

16    part of the class because I was employed there.

17         Q.   Is it a class of employees against

18    Coca-Cola?

19         A.   Yes.  It was employees.

20         Q.   Okay.  Anyone else in your family been

21    involved in a lawsuit?

22         A.   My wife.  Also Coca-Cola.  We both worked

23    for them at the same time.

24         Q.   She was in that same case?

25         A.   Yes.



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                    10

```
 1          Q.   Have you ever been a witness in a case?

 2          A.   I do not believe so.

 3          Q.   And I think we have talked about the fact

 4     that you have never participated in a deposition

 5     before; is that right?

 6          A.   No, sir.

 7          Q.   Have you ever been arrested?

 8          A.   No, sir.

 9          Q.   Have you ever been convicted of a crime?

10          A.   No, sir.

11          Q.   Let's talk a little bit about your

12     background -- your educational background.

13               Where did you go to high school?

14          A.   Valdosta High School.

15          Q.   I believe Valdosta is well known for its

16     pretty high-caliber of high school football; is that

17     right?

18          A.   Yes, sir.

19          Q.   How about colleges or universities, did

20     you attend one of those?

21          A.   Yes, sir.  Clark Atlanta University.  It

22     was called Clark College back when I went there.

23     Here in Atlanta.

24          Q.   What did you study a Clark Atlanta?

25          A.   Marketing.
```

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                          11

```
 1        Q.    Did you receive any degree?

 2        A.    No, sir.  I did not.

 3        Q.    Okay.  Do you have any other

 4   certifications from any educational institutions?

 5        A.    I'm trying to think what's it called now.

 6   Southern Crescent, I got a certificate in heating

 7   and air condition technology.

 8        Q.    Well, let's talk a little bit about your

 9   employment history.  By whom are you employed right

10   now?

11        A.    Self-employed.

12        Q.    In what field?

13        A.    Screen printing and embroidering.

14        Q.    Do you operate out of your home?

15        A.    Yes, sir.  I don't do the actual screen

16   printing and embroidering.  I'm, more or less, the

17   broker -- the broker of the company.

18        Q.    And you run your broker operations out of

19   your residence?

20        A.    Yes, sir.

21        Q.    Tell us a little bit about what you do in

22   connection with your work.

23        A.    I get business through word of mouth and

24   some I solicit.  Like, if there's -- say, for, like,

25   t-shirts, hats, apparel, I purchase the product
```



Orange Legal
800-275-7991

1    wholesale and then I resell it.  Like -- or, say, a

2    baseball team needs some uniforms or a company needs

3    shirts or hats, and we also do point of sale stuff

4    also, like, your -- what do you call those things

5    there?  Your --

6         **Q.   Coasters?**

7         A.    Coasters, yeah.  Your coasters, or

8    portfolio, ink pens, we do that also.

9         **Q.   So, you put -- you bring together the**

10   **t-shirt and the emblem and arrange to have the**

11   **emblem put on the shirt?**

12        A.    Yeah.  Well, I've got the person that does

13   the embroidery and the printing.  I've got a company

14   on retainer that I use, mostly, and I will sometimes

15   get them to, you know, get the design together.

16   Sometimes people will already have their logo or

17   whatever, and I just get it to them and they

18   digitize it, or create it, and do the imprinting on

19   it.

20        **Q.   Okay.**

21        A.    And I also, too, do some carpet cleaning,

22   floor -- floor cleaning; stripping and waxing it,

23   you know, I also do some of that too.

24        **Q.   Do you do that yourself or do you engage**

25   **others to work with you on that?**



```
1          A.    Mostly, I would do that myself.  Yeah.

2          Q.    Is that also by word of mouth?

3          A.    Yeah.  Yeah.  I don't do any advertising

4     for it, but, you know.

5          Q.    People know about your availability?

6          A.    Yes, I would say a limited amount of

7     people.

8          Q.    Right.

9          A.    That's something I don't do a lot of.

10    It's a trade I learned through my dad's business, so

11    it's something that I do also.

12         Q.    So, is it fair to say you grew up in

13    Valdosta?

14         A.    Yes, sir.

15         Q.    Let's talk a little bit about things you

16    might do outside of your working activities, civic

17    activities or anything like that?  Are you involved

18    in a civic organization?

19         A.    No, I wouldn't say any civic organization.

20    I, you know, I do some volunteering and stuff, but

21    as far as, like, a Kiwanis Club or something like

22    that, no.

23         Q.    You're not a member of any clubs?

24         A.    No, sir.

25         Q.    Are you a member of any religious
```



1    institution?

2          A.    Yes, sir.

3          Q.    And which one is that?

4          A.    Mount Olive Baptist Church of Stockbridge.

5          Q.    Do you have any leadership positions

6    there?

7          A.    Yes, sir.

8          Q.    And what are those?

9          A.    I'm on the deacon board, I'm on the

10   outreach ministry, and work some with the kids, but

11   that's kind of an as needed.

12         Q.    Now, you are -- no, let me go back to

13   another question.  In terms of a public office, have

14   you ever been appointed to any public office?

15         A.    Yes, sir.

16         Q.    To what -- what office?

17         A.    Planning and Zoning Commissioner, the City

18   of McDonough.

19         Q.    Are you currently on that commission?

20         A.    No, sir.

21         Q.    And who appointed you to that position?

22         A.    District 2 city council person.

23         Q.    Does each district council member have the

24   right to appoint someone to that commission?

25         A.    Yes, sir.



1       Q.    Okay.  And what size is the commission in

2  total?

3       A.    Let's see, I believe a total of five, I

4  believe.  I think it's a total of five.

5       **Q.    So, what does the commissioner do?**

6       A.    The --

7       **Q.    The planning commissioner, yeah.**

8       A.    Okay.  They hear cases of people, you

9  know, wanting to, maybe, bring a business to the

10  city, zonings.  They listen to it and they vote on

11  it, whether to send it over to the City Council for

12  an approval or for not an approval.  That's,

13  basically, it.  They need, you know, they need to

14  hear the cases.

15       **Q.    Okay.  Are you a member of a political**

16  **party?**

17       A.    The Henry County Democratic Party.

18       **Q.    How about the state democratic party?**

19       A.    I'm affiliated with them.  I don't know if

20  -- I don't have a card or anything to say that I

21  signed up for the -- but that's who I'm affiliated

22  with.

23       **Q.    Does the Henry County party give you a**

24  **card, a membership card?**

25       A.    You sign up and pay dues.



**Orange Legal**
**800-275-7991**

1       Q.    Okay.  So, you're a dues paying member

2    then?

3       A.    Yeah.  Yes.

4       Q.    All right.

5       A.    Of the Henry County Democratic Party.

6       Q.    Now, you ran as a candidate in House

7    District 111; is that right?

8       A.    Yes sir, 2016.

9       Q.    Okay.  Have you ever run for any other

10   public office?

11      A.    Yes, sir.

12      Q.    And what was that?

13      A.    I ran for the City Council District 2, and

14   I've also ran for Henry County Commissioner District

15   3.

16      Q.    Those are the districts that you reside

17   in?

18      A.    Yes, sir.  Yes.

19      Q.    Then and now?

20      A.    Then and now, yes sir.

21      Q.    And were you successful in either of those

22   races?

23      A.    No sir, I wasn't.

24      Q.    So, all three of the ones you mentioned,

25   you were not successful in?

```
 1        A.    Correct.
 2        Q.    So -- well, let's go in reverse
 3   chronological order.  Was the most recent thing you
 4   ran for was House District 111?
 5        A.    Yes, sir.  Yes, sir.
 6        Q.    And then, again, in reverse chronological
 7   order, what --
 8        A.    County Commissioner.
 9        Q.    And when was that?
10        A.    That was -- I believe it was 2014, I
11   think.  Let me see.  I think it was 2014.  Because I
12   ran for City Council in, I believe, it was 2012.
13        Q.    Now, with respect to those races, are they
14   -- do you run on a partisan or nonpartisan basis?
15        A.    Nonpartisan on City Council, partisan on
16   the County Commission and, of course, the 111.
17        Q.    So, in the County Commission race where
18   you ran as partisan, I presume you ran as the
19   Democrat; is that correct?
20        A.    Yes, sir.
21        Q.    So, you ran in the -- first, in the
22   Democratic Primary?
23        A.    Was it primary?  Yes.  I didn't have a
24   challenger, but yes, it was the primary, then the
25   general.
```



```
 1        Q.    All right.  So, if you were unopposed in
 2   the primary, then you ran in the general election
 3   against a Republican candidate?
 4        A.    Yes, sir.
 5        Q.    And what was the outcome of that, if you
 6   remember, roughly by number of votes or percentage?
 7        A.    I don't know.  I lost.  It wasn't a
 8   runaway, but I -- I lost.  I don't remember the
 9   numbers.  I'm sorry.
10        Q.    Okay.  You think the margin was just over
11   50 percent or -- in the terms of the person who won
12   it?
13        A.    If I had to guess, I would say definitely
14   over 50 percent.  Maybe 55, 45.
15        Q.    Okay.
16        A.    That's just a guess.
17        Q.    I'll be glad to take that estimate.
18        A.    Okay.
19        Q.    So, why did you decide to run for those
20   offices?
21        A.    Well, I thought I could make a difference.
22   Yeah.  I thought I could make a difference and the
23   people thought otherwise, so.
24        Q.    So, did you have -- did you finance those
25   campaigns yourself or did you raise money from
```



1    others?

2         A.   I raised -- yeah, I raised money, and I

3    also --

4         Q.   From contributors?

5         A.   Yeah, from contributors, and I also

6    contributed too.

7         Q.   Do you recall how much money you raised in

8    either of those local races?

9         A.   If I had to guess, I would say 3,000 or

10   less.

11        Q.   Okay.

12        A.   Yeah.

13        Q.   Did you have any support -- again, I'm

14   talking about these two local races now.  Did you

15   have any support, any financial support, from

16   contributors outside of the districts?

17        A.   Well, I had some support from my family.

18        Q.   How about from the Democratic Party?

19        A.   In the County Commission, I had some -- I

20   had a contribution from the Democratic Party.

21        Q.   Okay.

22        A.   None from the other one because it was

23   nonpartisan.

24        Q.   All right.  Let's, now, focus on your

25   campaign for House District 111, and that was in



1    2016; is that right?

2         A.   Yes, sir.

3         Q.   Did you have a -- I take it you ran in the

4    Democratic Primary?

5         A.   I didn't have a challenger in the primary.

6         Q.   All right.  So, you didn't have to raise a

7    lot of money in a primary, if you're running

8    unopposed?

9         A.   No, sir.  No sir, I didn't.

10        Q.   Do you recall the margin in that race?

11        A.   I believe I lost by about 3 percent, maybe

12   a little bit over 3 percent.

13        Q.   Okay.  It was not close enough for you to

14   seek a recount; is that accurate?

15        A.   I think it's pretty accurate because, I

16   think in order to request a recall, it has to be 1

17   percent or less, I think.

18        Q.   I think that's right.  So, there was not a

19   recount in that election?

20        A.   No, sir.

21        Q.   What do you think the main issues were in

22   the House District 111 race?

23        A.   The main issues?  Explain that a little

24   bit.

25        Q.   Well, as a candidate for -- you were



Orange Legal
800-275-7991

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                    21

```
 1    running for the State House of Representatives.

 2        A.    Uh-huh.

 3        Q.    So, what do you think were the significant

 4    issues in the campaign, or what things were you

 5    advocating?

 6        A.    Oh, okay.  I thought that's what you were

 7    talking about, but I -- I was advocating for

 8    Medicaid expansion, education, and communication

 9    with the -- and citizen services.  Those were my --

10    the issues that I was running on.

11        Q.    Okay.  Do you think -- would you describe

12    those as the main issues in that campaign?

13        A.    I could say yes, but my opponent never --

14    we never got together and did any forms or anything

15    to, kind of, see where he was coming from other than

16    what was read, so.

17        Q.    Who was your opponent?

18        A.    That was Brian Strickland.

19        Q.    Was he the incumbent?

20        A.    Yes, sir.

21        Q.    Do you know how long he had been the

22    incumbent?

23        A.    I believe since 2012.

24        Q.    I'm not too familiar with the geography;

25    is the district entirely in Henry County?
```



1        A.   Yes, sir.

2        **Q.   Are there particular areas of the district**

3    **that -- where you enjoyed, let's say, majority --**

4    **the support of a majority of the voters in a**

5    **particular area?**

6        A.   I know there were -- there were a few

7    areas where we got the majority.  Those areas, I

8    can't name them all.  I can name Wesley Lakes area,

9    the Mount Carmel Road, the Mount Carmel area, and

10   there were some other areas too.

11       **Q.   Did you have strong support in the**

12   **African-American community?**

13       A.   Yes, sir.

14       **Q.   How about in the White community?**

15       A.   I think I had some support in the White

16   community.

17       **Q.   So, when you were campaigning, did you**

18   **knock on doors?**

19       A.   Oh, yes sir, a lot of them.

20       **Q.   In what parts of the county did you knock**

21   **on doors?**

22       A.   I was in a lot of places.  I would say an

23   area that I count -- me, myself, concentrated on a

24   lot was the area of Highway 2081.  I'm trying to

25   think what that area was called district wise.  I



1    can't think what the area is called.  Locust Grove,

2    also.

3         Q.   Okay.  Let's approach it in a slightly

4    different way.

5         A.   Okay.

6         Q.   Was most of your door knocking in -- I

7    don't know what the population is -- fits together

8    in the county, so --

9         A.   Okay.

10        Q.   -- excuse my lack of knowledge about Henry

11   County.  Were you knocking on doors mostly in what

12   might be referred to in the county as the

13   African-American community?

14        A.   I did knock on some African-American

15   communities, and I knocked on some predominant White

16   communities.

17        Q.   Okay.  I was going to ask you that

18   question.

19        A.   Okay.

20        Q.   So, you're ahead of me on that one.

21        A.   I guess I didn't -- yeah.  Yeah.

22        Q.   Yeah.  So, you think you covered the

23   territories both in the African-American community

24   and the White community in terms of your campaign

25   activities?



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                          24

```
 1        A.    Yes, sir.
 2        Q.    Did you have any campaign volunteers?
 3        A.    Yes, sir, I did.  I did have some.
 4        Q.    How about a campaign manager?
 5        A.    Yes, sir.
 6        Q.    When I say campaign manager, I'm wondering
 7   if you had a professional campaign manager, somebody
 8   who's being paid?
 9        A.    Yes, sir.
10        Q.    Who was that?  Do you remember the name of
11   that person?
12        A.    Her name was Nuala Hutton.
13        Q.    Had she worked on other campaigns?
14        A.    Yes, sir.  She had worked on -- it was
15   another representative campaign.  I don't know if
16   she worked in the capacity of campaign manager on
17   that campaign or not, but yeah, she had worked on --
18        Q.    Okay.
19        A.    -- other campaigns.
20        Q.    So, what did you do to campaign other than
21   knocking on doors.  Did you have printed sign --
22   yard signs, bumper stickers, things of that sort?
23        A.    We had printed signs, some small, some
24   large.  We had, some people call them junk its, but
25   the little cards that had the information on it that
```



 1    we stuck in doors or handed out.  And we also had,

 2    it's called, the magnetic door signs you put on your

 3    car or vehicle.  And of course, we had some social

 4    media also.

 5         Q.   How about yard signs that you put up in

 6    people's front yard?

 7         A.   Yeah, yard signs.

 8         Q.   Did you have bigger signs?  I mean, yard

 9    signs are fairly typical.

10         A.   About a 18 by 24.

11         Q.   Yeah.  So, did you have a lot of yard

12    signs of that size?

13         A.   Yes, sir.

14         Q.   And did you have bigger signs?

15         A.   Yes, sir.

16         Q.   So, did you have your volunteers put up

17    those signs?  Is that how that worked?

18         A.   Yeah.  Some -- yeah, some volunteers put

19    some up, and I also put some up too.

20         Q.   Yourself?

21         A.   Yes, sir.

22         Q.   Do you recall whether there were any

23    campaign forums where both candidates came together

24    before a group to talk about what they stood for and

25    so on?



```
 1        A.   There were some forums, but the incumbent
 2   didn't show up for any of those.
 3        Q.   So, the forum was attended only by you?
 4        A.   Me and other folks that were running was
 5   -- there was other people --
 6        Q.   So, it was for multiple races?
 7        A.   Yes, sir.
 8        Q.   Is that what you're talking about?
 9        A.   Yes, sir.
10        Q.   Not just House District 111?
11        A.   Yes, sir.  Not just House District, yes,
12   sir.
13        Q.   Did you run any ads in the newspaper?
14        A.   Yes, sir, I did.  I forgot about that.
15   Yeah.
16        Q.   And what kind of newspaper do you have
17   Henry County, is it weekly or daily?
18        A.   Weekly.  Weekly, I believe.  I think the
19   -- I think the one I advertised, it was a weekly
20   paper.  It was a smaller paper.
21        Q.   Is that called Henry County Times?
22        A.   I think it may be the Henry Herald.
23        Q.   Okay.
24        A.   But it could've been times, too.  A small
25   town, got a couple papers here.
```



1      Q.    Did you have any public figures endorse

2    your campaign?

3      A.    Yes, sir.

4      Q.    Who endorsed your campaign?

5      A.    Let's see.  Well, of course, the Henry

6    County Democrats.  We had John Lewis, he came down

7    and spoke.  Stacey Abrams, she came down and spoke.

8    Let's see.  As far as public figures, I think that's

9    about it.  I think, that I can recall right now.

10     Q.    I don't know that this was case, I just

11   want to ask about it.  But do you think race was a

12   factor in the election?

13     A.    Yes, sir.

14     Q.    In what way?

15     A.    Well, you know, I had -- I had one

16   particular visit while I was out, you know, walking,

17   you know, going from house to house.  I had one

18   homeowner -- how could I say it.  He said if I

19   didn't get off his property, he was going to blow my

20   head off.

21     Q.    Oh my goodness.

22     A.    And I got off his property.  On that

23   particular day, I had my daughter with me.  You

24   know, she didn't experience that, but she was across

25   the street at another house, but that just kind of,



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                    28

```
 1    I don't know, it kind of, you know -- I'm kind of

 2    out and it just, kind of, it kind of riled me a

 3    little bit, but I didn't let it stop me.

 4         Q.    So, was that in a White community?

 5         A.    Majority White.  I wouldn't say all White,

 6    but majority White.

 7         Q.    So, how about the person who ordered you

 8    off his property?

 9         A.    Well, he was okay until I told him I was a

10    Democrat.

11         Q.    I see.

12         A.    When I mentioned Democrat that's when he,

13    you know -- I said, "Okay, sir," you know.

14         Q.    That's what set him off?

15         A.    I --

16         Q.    Was he White?

17         A.    Yes, sir.

18         Q.    Okay.

19         A.    And the thing about it, I assume it was

20    his mom or wife, you know, had opened the door, you

21    know.  She got him and started talking and once, you

22    know, I told him -- he asked me, was I Republican or

23    Democrat, and I said Democrat.  "Get off my property

24    before I blow your head off."  And she was sitting

25    there like, you know, but it's -- I guess I keep
```



1  that picture there because it just, you know, I

2  didn't think people were like that.  You know, I

3  mean, because you don't know if he's going to do it

4  or not, you know, so.

5       **Q.   All right.**

6       A.   Yeah.

7       **Q.   Let's talk a little bit about what's in**

8  **the District 111.**

9       A.   Okay.  And I just, you know --

10      **Q.   I'm sorry.  Go ahead.**

11      A.   You know, when I say that, you know,

12  probably a little over 11 or 12 hours ago I lost my

13  mom.  And, you know, that just kind of --

14      **Q.   I'm very sorry to hear that, and your**

15  **lawyer here advised me about that before we got**

16  **started.  Do you want to take a break?**

17           MS. BRANCH:  Let's take a break.

18           (A break was taken.)

19           MR. STRICKLAND:  All right.  We'll go back

20      on the record.

21  BY MR. STRICKLAND:

22      **Q.   Let's talk a little bit about the**

23  **characteristics of House District 111.**

24      A.   Okay.

25      **Q.   Are there a number of public schools in**



```
 1    the district?

 2         A.   Yes, sir.

 3         Q.   And I don't know, are the schools operated

 4    by the city or the county or both in Henry?

 5         A.   Pretty much the county.

 6         Q.   A county board of education?

 7         A.   Yes, there's just a county board of

 8    education.

 9         Q.   Was there any issue about the public

10    school system in your campaign?

11         A.   I guess -- yeah, because during the time I

12    ran, there was an issue about Governor Deal, you

13    know, having the school system taken over, like out

14    of the county hands, and having somebody that he

15    assigned over them.  So, that was a big issue about

16    the education at that point in time.

17         Q.   Did that ever come to pass?

18         A.   No, it didn't, as I remember.  I don't

19    believe it did.  No, it didn't.

20         Q.   Okay.

21         A.   But there was a big -- a big uprising

22    about that.  And that was, you know, not just in

23    Henry, but, you know, the state because there

24    would've been a person who would've been overseeing

25    the entire state.
```



```
 1        Q.   If that had been the case, in other words,
 2   if there had been some sort of, to use your word, a
 3   takeover, would that have been based on what?  The
 4   performance of students in the school system or
 5   things of that sort?
 6        A.   Yes, sir.  Because in Henry, I want to say
 7   it was 33 or 38 failing schools there, so, yeah.
 8        Q.   "Failing," meaning low graduation rates or
 9   what?
10        A.   Low test scores.  Low test scores.
11        Q.   But notwithstanding those difficulties,
12   the so-called takeover never occurred?
13        A.   I don't -- I don't believe it did.  I
14   don't believe it -- I'm pretty sure it didn't, but
15   you kind of cause me to question a little bit for
16   sure.  I'm pretty sure it didn't.  I'm pretty sure
17   it didn't.
18        Q.   Now, if you had been elected as the
19   Representative for House District 111, would you
20   have been able to represent everybody in the
21   district?
22        A.   Oh, yes.
23        Q.   Even those who didn't vote for you?
24        A.   Yes, sir.  That's one of the things I ran,
25   like I told you, communication.  And you know, one
```



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                32

```
 1   of the things I said that I would do was communicate

 2   with all of the district, not just part of the

 3   district.

 4        Q.   So, you would have been able to represent

 5   even Republican voters?

 6        A.   Yes, sir.  I even talked about working

 7   across the aisles with the Republican

 8   Representatives.

 9        Q.   Let's see here.

10        MR. STRICKLAND:  Do you have the exhibit

11        numbers already in sequence?

12        THE COURT REPORTER:  Restarting each time

13        at one.

14        MR. STRICKLAND:  Restarting each time?

15        Okay.  Let's do this.

16                 (Defendant's Exhibit Number D-1

17                  was marked for identification.)

18   BY MR. STRICKLAND:

19        Q.   All right.  Mr. Payton, I'm going to hand

20   you the paper here that's been marked as Exhibit D-1

21   for identification and ask you if you can identify

22   that.  I'll represent to you that that paper is

23   called the Plaintiff's Initial Disclosure, something

24   prepared by your lawyers and filed on your behalf.

25        A.   Okay.  Yes, sir.
```



```
 1        Q.   Do you agree that that's what it is?

 2        A.   Yes, sir.

 3        Q.   Okay.  We may refer back to that.  Let's

 4   talk a little bit about the current case brought by

 5   Austin Thompson and others, including you, against

 6   Brian Kemp, the Secretary of State.

 7             When did you first hear about this case?

 8        A.   It was last year some time.  I'm not sure

 9   of the exact month.  I want to say maybe around

10   August, maybe, August of 2017.

11        Q.   So, did somebody tell you about the case?

12        A.   Yes, sir.

13        Q.   Who was that?

14        A.   Craig.  I can't remember his last name.

15   The one I mentioned earlier, Craig -- what's Craig's

16   last name?  I can't remember his last name.  Sorry.

17        Q.   Whoever it was, what did he tell you about

18   the case?

19        A.   He just told me that a case was being

20   filed -- what's the gentleman's name?  Mr. Holder

21   was filing the case against the Secretary of State

22   because they believed that gerrymandering had went

23   on and --

24        Q.   Did you take any notes?

25        A.   No, I didn't.  It was, actually, a quick
```



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                34

```
 1   phone call.
 2        Q.   Did you go to any meetings about the case?
 3        A.   No, sir.
 4        Q.   Were you contacted by any lawyers in the
 5   case?
 6        A.   After I said I would be a plaintiff,
 7   that's when I got contacted.
 8        Q.   And do you remember the person you talked
 9   to about being a plaintiff?
10        MS. BRANCH:  Objection to the extent that
11        this calls for any information protected by the
12        attorney-client privilege.  You can answer that
13        question, but I just want to be careful here.
14        THE WITNESS:  Okay.  What's the question?
15   BY MR. STRICKLAND:
16        Q.   I didn't ask you what you talked about.  I
17   just said, how did you become acquainted with the
18   lawyers in this case?
19        A.   I got contacted after I said, you know, I
20   would agree to be a plaintiff.
21        Q.   Okay.  Did somebody contact you?
22        A.   Yes, sir.
23        Q.   A lawyer?
24        A.   No, sir.  No, it wasn't a lawyer.
25        Q.   Who contacted you?
```



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                          35

```
 1        A.   Craig.

 2        Q.   And you don't remember Craig's last name?

 3        A.   I sure don't.

 4        Q.   All right.  Let's walk it forward from the

 5   time you talked to Craig.

 6        A.   Uh-huh.

 7        Q.   Who was the next person you talked to

 8   about being a plaintiff in the case?

 9        A.   I guess, the attorney.

10        Q.   Which attorney?

11        A.   At --

12             THE WITNESS:  What's the name of your

13        firm?

14             MS. BRANCH:  Perkins Coie.

15             THE WITNESS:  Perkins, yeah.

16   BY MR. STRICKLAND:

17        Q.   You were contacted by Perkins Coie?

18        A.   I believe so.  I'm trying to make sure I

19   -- yeah, because he didn't give me a number to call.

20   So, yeah.

21        Q.   So, had you ever heard of Perkins Coie

22   before this case?

23        A.   No, sir.

24        Q.   All right.  So, the lawyers contacted you

25   or did you contact the lawyers?
```



                              **Orange Legal**
                              **800-275-7991**

1      A.    I believe the lawyers contacted me.

2      Q.    Okay.  Were you invited to any meetings

3   with the lawyers to talk about the case?

4      A.    No, sir.

5      Q.    What did you understand the purpose of the

6   case was?

7      A.    To file -- to file a case against the

8   gerrymandering and to, you know, try to make

9   something that was not legal, legal.

10     Q.    Did you sign an engagement letter with the

11  lawyers?

12     A.    I believe --

13         MS. BRANCH:  Objection to the extent that

14     this calls for information protected by the

15     attorney-client privilege.  I'll instruct you

16     not to answer.

17         MR. STRICKLAND:  Wait a minute.  I'm not

18     asking the contents of the letter.  I'm just

19     asking you the fact; did you sign an engagement

20     letter with any lawyers?  Not the contents of

21     it.

22         THE WITNESS:  So, it's all right to answer

23     that?

24         MS. BRANCH:  You can answer that one.

25         THE WITNESS:  Okay.  I believe so.  I'm

1        pretty sure I did.

2   BY MR. STRICKLAND:

3        Q.   Okay.  Do you think it was with Perkins

4   Coie?

5        A.   I believe so.

6        Q.   And did you sign an engagement with any

7   other lawyers?

8        A.   No, sir.  I didn't sign anything else with

9   nobody.

10        Q.   Okay.  And before you signed this

11   engagement letter, did you know any of the lawyers

12   in the case?

13        A.   No, sir.

14        Q.   So, when you talk about gerrymandering,

15   what does that mean to you?

16        A.   As it relates to this, it means to me

17   that, you know, something illegal has been done as

18   far as the boundaries as to where things are, you

19   know, have not been legal and fair when it comes to

20   the voting.

21        Q.   Do you think there's racial discrimination

22   in Georgia today?

23        A.   Yes, sir.

24        Q.   Can you give some examples of that?

25        A.   Okay.  When you can, you know, be my color



1    and can knock on somebody's door and they are of

2    different color, and I'm not dressed, acting, by no

3    means a danger, but, you know, to get turned away,

4    you know, that's -- I think that's racism.

5        **Q.    Could it have been political**

6    **discrimination?**

7            MS. BRANCH:  Objection.  Calls for

8        speculation, but you may answer.

9            THE WITNESS:  I'll give you another

10       example too.

11   BY MR. STRICKLAND:

12       **Q.    Let's finish up on that one and then go to**

13   **your other one.**

14       A.    Okay.

15       **Q.    Could the person who ordered you off his**

16   **property when he found out you were a Democrat,**

17   **could that have been the reason why he ordered you**

18   **off his property?**

19           MS. BRANCH:  Same objection, but you may

20       answer.

21           THE WITNESS:  I may answer?

22           MS. BRANCH:  Yes.

23           THE WITNESS:  Okay.  Yeah, it could've

24       been, but it's my belief that it was both.

25

```
 1    BY MR. STRICKLAND:

 2         Q.    Okay.

 3         A.    Yeah.

 4         Q.    Go ahead with your other example.

 5         A.    Well, another example, you know, you're in

 6    the certain locations and, you know, you walk into

 7    the store, like say, dressed just like a normal

 8    person and you find somebody walking and looking at

 9    you like you may well steal something.  And you see

10    other folks walking around, not having that issue.

11    So, I -- yes, I think discrimination is still here,

12    and I just think that's a realization that, you

13    know, as much as you want to see it doesn't exist,

14    it exists.

15         Q.    You feel it exists?

16         A.    Yes, sir.

17         Q.    Okay.

18         A.    You know, when I'm asked questions like

19    that, the person who asks me just makes -- and I

20    don't mean in a deposition, it just makes me want to

21    ask your thoughts on it, but I'm not asking.

22         Q.    Fair enough.

23         A.    Yeah.

24         Q.    We'll talk about that later.

25               Have you ever read these initial
```



Orange Legal
800-275-7991

1   disclosures identified as Exhibit D-1?

2        A.   Yes, sir.

3        Q.   Now, in those disclosures, there's talk

4   about Georgia's history of discrimination.  Do you

5   have any personal information on that subject?

6        A.   The history of Georgia discrimination?

7   Information as far as I'd like to discuss or talk

8   about or --

9        Q.   Just, what do you have that would be the

10  basis for that statement in these initial

11  disclosures?  What information do you have?

12       A.   I guess I don't quite understand the

13  question.  Could you, kind of --

14       Q.   Well, we'll move along.  It's probably too

15  difficult for me to lay out that question.

16       A.   Okay.

17       Q.   Are you aware that four experts have

18  produced reports to be filed in this case?

19       A.   I don't know the number of experts, but I

20  know there's experts involved with the results

21  there.

22       Q.   Okay.  Have you read any of their reports?

23       A.   Other than what's in there?  Reports that

24  have --

25       Q.   Separate reports prepared by experts.



1    Have you read those reports?

2         A.   I believe I have.  I believe I have.

3         Q.   Okay.

4         A.   Because I don't know the experts, and I

5    wouldn't remember the expert's names, so.

6         Q.   Now, House Bill 566 was the bill that made

7    some changes in -- to the lines in House District

8    111.

9              Do you know anything about those changes?

10        A.   Yes, sir.

11        Q.   So, what do you think happened to the

12   lines of House District 111 that impacted you as a

13   candidate?

14        A.   Well, it appears that the lines were -- it

15   moves some people in and some people out.  To be

16   more specific, it seemed like it moved some more

17   White voters in and some of the Black voters out,

18   which, in my view, I think -- I always heard that

19   that stuff was did -- the line drawing was did, you

20   know, after the census, so the way it was did, it

21   looked like it was, you know, like it was favoring

22   -- favoring, you know, by race.

23        Q.   Is it also possible that the lines were

24   shifted for political reasons, move Republicans in,

25   Democrats out?



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                42

```
 1              MS. BRANCH:  Objection.  Calls for
 2         speculation, but you may answer.
 3              THE WITNESS:  I believe it appears, the
 4         way it was did, it moved -- it moved people in
 5         and out and some were Democrats and some were
 6         Republicans.  So, that could be the case.
 7    BY MR. STRICKLAND:
 8         Q.   Okay.  Do you believe that the -- I think
 9    that legislation occurred in 2015, let's call it the
10    2015 map that was enacted under House Bill 566.  Do
11    you think that was enacted for a racially
12    discriminatory purpose?
13         A.   Yes.
14         Q.   And why do you believe that?
15         A.   Because it moved -- it moved White in and
16    it seemed to have benefited Republicans or, you
17    know, the White candidate.  And it moved some of the
18    Blacks, you know, out.  We seem to kind of put the
19    Blacks at a -- at a disadvantage.  Whether it was
20    political or not, you know, I think that's just the
21    facts of it.
22         Q.   All right.
23         A.   And it seemed like -- well, that just
24    seemed like the facts.
25         Q.   Do you have any understanding of the
```

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                43

```
 1    things that a legislature considers when engaged in
 2    redistricting?
 3         A.   Not that I have on mind -- have in mind.
 4    I don't.  Could you explain it to me?
 5         Q.   No.
 6         A.   Oh, okay.
 7         Q.   But do you know anything about what's
 8    called traditional redistricting principals?
 9         A.   No, sir.
10         Q.   Do you think there is any correlation
11    between race and political party in Georgia?
12         A.   Yes, sir.
13         Q.   Could you explain that?
14         A.   It seems to me, I don't know if I read
15    this or in talking with someone, but it seems like
16    more Blacks vote Democrat and more Whites vote
17    Republican, so.
18         Q.   Do you plan to run for office in 2018?
19         A.   Yes, sir.
20         Q.   And what office?
21         A.   The 111.
22         Q.   House District 111?
23         A.   Yes, sir.
24         Q.   Are you already doing some fundraising?
25         A.   I just did my declaration last Friday.
```



1      Q.    Your Declaration of Intent to run?

2      A.    Yes, sir.  I would be glad to accept

3   something from you.

4      **Q.    You don't want to miss any opportunity.**

5   **Let's talk a little bit about the funds that you**

6   **raised in your last campaign.  I'm going to show you**

7   **about, let's see, how many of these here?  One, two,**

8   **about half a dozen Campaign Contribution Disclosure**

9   **reports that were filed in connection with your 2016**

10  **campaign for House District 111.**

11     A.    Okay.

12     **Q.    And I want to -- first, we're going to**

13  **identify each one and then I want to ask you about**

14  **those.**

15     A.    Okay.

16         MR. STRICKLAND:  So, let's see, this will

17     be 2.

18              (Defendant's Exhibit Number D-2

19              was marked for identification.)

20  BY MR. STRICKLAND:

21     **Q.    Well, let's start with Exhibit D-2 and ask**

22  **-- I want to ask you if you can identify that.**

23     A.    Okay.

24     **Q.    And I'm representing to you that it is a**

25  **copy of a Campaign Contribution Disclosure report**



1   obtained from the website of the organization where

2   these are filed.  But if you'll take a look at it,

3   and I'll ask you if you can identify that.

4       A.   Okay.

5       Q.   I'm sorry that you looked through so many

6   pages.  That was three copies --

7       A.   Okay.

8       Q.   -- of the same report.

9       A.   Uh-huh.

10      Q.   I'm sorry.  All right.

11           Mr. Payton, I'm handing you now what's

12  been marked as Exhibit D-2, which is a Campaign

13  Contribution Disclosure Report filed in connection

14  with your campaign for State Representative from

15  District 111.

16           In some places it says 112, but in any

17  event, these are the reports that were filed.  We're

18  going to be talking about a series of reports that

19  were filed in connection with your run for the State

20  House.

21      A.   Okay.

22      Q.   And there are certain dates by which

23  you're supposed to file these reports and it appears

24  that you -- they were all filed on time.  But the

25  first one D-1 -- D-2 is a report that was filed on



1   March 31, 2016.  And it lists contributions and

2   expenditures during that period.  And, apparently,

3   in that particular reporting period, you had zero to

4   report.

5          Does that appear to be the case?  Other

6   than the expenditure, I think, was for your filing

7   fee.

8      A.   Yeah, I believe it was -- I believe it was

9   and I think that may have been the post office box,

10  but I'm not sure.

11     Q.   Okay.  All right.  So, that report has

12  zero contributions in it and expenditure 460 --

13     A.   Yes, sir.

14     Q.   -- is that correct?

15     A.   Yes, sir.

16     Q.   Okay.

17          MR. STRICKLAND:  We'll mark this D-3.

18               (Defendant's Exhibit Number D-3

19               was marked for identification.)

20  BY MR. STRICKLAND:

21     Q.   Now, I want to hand you what's been marked

22  as Defendant's Exhibit 3, which I'll represent to

23  you is another one in a series of Campaign

24  Disclosure reports that were filed in connection

25  with your run for the House District.  So, this is



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                47

```
 1    the one for June 30, 2016.  I'll ask if you can

 2    identify that.

 3              MS. BRANCH:  Do you have an extra copy?

 4              MR. STRICKLAND:  I'm sorry.  Yes, I do.

 5              MS. BRANCH:  Thank you.

 6              THE WITNESS:  Yes, sir.

 7    BY MR. STRICKLAND:

 8         Q.   Okay.  Is that Exhibit --

 9         A.   D-3?

10         Q.   Right.  That's the one you filed, you

11    filed or either it was filed on your behalf, for the

12    period ending June 30, 2016.  Let's go to page -- I

13    don't know that they're numbered, but if you'll turn

14    to the page that starts up at the top, it's about

15    the fourth page over, it's called Itemized

16    Contributions.  Do you see that?

17         A.   Yes, sir.

18         Q.   Okay.  Let's talk about some of these

19    contributors.  The first one listed there is Henry

20    Van Ameringen in New York City.  Do you know that

21    gentleman?

22         A.   Only through contributions.

23         Q.   Right.  How did he come to make a

24    contribution to your campaign?

25         A.   I assume someone recommended him to
```



Orange Legal
800-275-7991

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                      48

1   support me.

2        Q.   Who might that someone have been?

3             MS. BRANCH:  Objection.  Calls for

4        speculation.  You may answer.

5             THE WITNESS:  Somebody from the Democratic

6        Party.

7   BY MR. STRICKLAND:

8        Q.   When you say the "Democratic Party," in

9   this instance, are you talking about the Henry

10  County Democratic Party?

11       A.   No, from the -- what do you call it?  The

12  DPG, the Democratic Party of Georgia.

13       Q.   Okay.  The second contributor is David

14  Dechman, also a resident of New York.  Do you know

15  Mr. Dechman?

16       A.   Only through contribution.

17       Q.   Have you ever met him?

18       A.   No, sir.

19       Q.   How about Andrew Goffe?

20       A.   Same.

21       Q.   Have you ever heard of him?

22       A.   No, sir.

23       Q.   Esmond Harmsworth?  Same question, you

24  ever head of Ms. Harmsworth?

25       A.   Only through contributions.



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                    49

```
 1        Q.   You don't know her?

 2        A.   No, sir.

 3        Q.   David Hochberg, same question.

 4        A.   Only through contribution.

 5        Q.   You don't know him.  Have you ever heard

 6   of him?

 7        A.   No.

 8        Q.   How about Curtis Mack?

 9        A.   Yes, sir.

10        Q.   You know Mr. Mack?

11        A.   Yes, sir.  You probably know Mr. Mack.

12        Q.   I do.  How about Carol Master from

13   Watertown, Maine?  Do you know Ms. Master?

14        A.   No sir, only through contribution.

15        Q.   Ted Snowdon?

16        A.   Only through contribution.

17        Q.   On the next page, Andrew Tobias?

18        A.   Only through contribution.

19        Q.   And Leslie Wilkes?

20        A.   Only through contribution.

21        Q.   All right.  So, fair to say you've never

22   heard of any of these people other than Curtis Mack?

23        A.   Yes.

24        Q.   Okay.

25
```

```
 1                    (Defendant's Exhibit Number D-4

 2                    was marked for identification.)

 3          Okay.  I'm going to show you what's been

 4    identified as Defendant's Exhibit D-4 and I'll

 5    represent to you that this is your Campaign

 6    Disclosure Report filed on September 30, 2016, and

 7    also ask you if you can identify that report.

 8          A.   Can you give me a copy of it?

 9          Q.   Sorry.  So, can you agree that that's the

10    campaign disclosure report filed on your behalf?

11          A.   Yes, sir.

12          Q.   Okay.  Let's go get into the page at the

13    beginning, itemized contributions.

14          A.   Okay.

15          Q.   Rather than ask you name my name.  I will

16    ask you to look over the list of contributors

17    particularly the individuals?

18          A.   Same question?

19          Q.   Same question.  As to all of the

20    individuals -- there are some contributions that I

21    will ask you about separately that were not

22    individuals, but with respect to all of the

23    individuals on there, do you know any of them or

24    have you ever met any of them?

25          A.   Only through contributions.
```

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                    51

1       Q.   Have you ever heard of them?

2       A.   No, sir.

3       Q.   So someone was raising money on your

4   behalf and contacting individuals in other parts of

5   the country; does that appear to be accurate?

6       A.   I guess that could be said, yes, sir.

7       Q.   Let's go back to the first page, about the

8   fourth one down. DLCC, 1401 K Street in Washington,

9   a contribution of $2500 twice, do you know what DLCC

10  is?

11      A.   I know what it is, I just can't remember

12  what those letters stand for.  But I can tell you

13  that was an error that I had amended.  Someone did

14  complain about that.  That was an error that I

15  amended and straighten it out.

16      Q.   What was the error, the two contributions?

17      A.   Yes.  It was another person that should

18  have went down there.  It was put in wrong.

19      Q.   Okay.

20      A.   I do not remember the other person.

21      Q.   Okay.  With respect to any of these

22  contributors here, did you solicit those

23  contributions?

24      A.   Did I solicit them?

25      Q.   Right.



**Orange Legal**
**800-275-7991**

1      A.   That would involve talking to them?

2      Q.   **Right.**

3      A.   The only way that I know them is through

4  contributions.

5      Q.   **No.  That's not my -- my question is, did**

6  **you contact these individuals and ask them to make a**

7  **contribution to your campaign?**

8      A.   No, I did not.

9      Q.   **So someone contacted them on your behalf;**

10  **is that correct?**

11      A.   I would say so.

12      Q.   **Is the same thing true the DLCC -- let me**

13  **restate that.**

14          **Did you contact the DLCC and ask for a**

15  **contribution?**

16      A.   That one I am not sure of.  I know it is a

17  Democratic affiliation.  I am not sure about that

18  one.

19      Q.   **Okay.  Do you know who was generating**

20  **these contributions for your campaign?  Was it an**

21  **individual handling that?**

22      A.   I believe it was, but I can't remember

23  that individual's name.

24      Q.   **Okay.  Now, we are going to move to**

25  **Defendant's Exhibit D-5, which I will hand you, but**



1    I am also going to hand you a copy.  I will

2    represent to you that this is your Campaign

3    Disclosure Report filed October 25, 2016 and ask you

4    if you can identify that.

5                    (Defendant's Exhibit Number D-5

6                     was marked for identification.)

7        A.   Yes, sir.

8        Q.   Okay.  Let's turn to the page marked

9    itemized contributions, are you on that page?

10       A.   Yes, sir.

11       Q.   Okay.  The Georgia Federation of

12   Democratic Women, Georgia Next, UFCW Local 1996, and

13   United Brotherhood of Carpenters; did you solicit

14   any of those contributions?

15       A.   Yes, sir.

16       Q.   Yourself?

17       A.   Yes, sir.

18       Q.   Which ones did you solicit personally?

19       A.   The Georgia Federation of Democratic

20   Women.  I believe that they had me fill out some

21   type of -- some kind of candidates' form.

22       Q.   Okay.

23       A.   I was going to tell you that the Boston,

24   Massachusetts, James Richardson, only through

25   contribution.



1       Q.    Say that again.

2       A.    The James Richardson, only through

3    contribution.

4       Q.    Did you solicit that contribution

5    personally?

6       A.    No, sir.  I didn't.

7       Q.    Okay.  The last two, UFCW Local, and the

8    United Brotherhood of Carpenters, did you solicit

9    those two?

10      A.    Yes, sir.

11      Q.    Personally?

12      A.    Yes, sir.

13      Q.    Did you know someone at those

14   organizations?

15      A.    Yes, sir. I had a meeting with the Labor

16   Council, I believe they are called, and solicited.

17      Q.    Okay.  I think that is all that I have for

18   that one.

19            I am now going to hand you the original

20   and a copy of Defendant's Exhibit D-6 and I will

21   represent to you that is a copy of your Campaign

22   Contribution Disclosure report filed on October 25,

23   2016.

24      A.    Yes, sir.

25



```
 1                        (Defendant's Exhibit Number D-6

 2                         was marked for identification.)

 3   BY MR. STRICKLAND:

 4        Q.   Can you identify that?

 5        A.   Yes, sir.

 6        Q.   Is it what I represented it to be?

 7        A.   Yes, sir.

 8        Q.   Let's turn to the page in there called

 9   itemized contributions, same question as to all of

10   those contributions. It is just one page.

11        A.   Like a copy -- well, my copy anyway of the

12   last one that you just did -- when I looked at the

13   itemization, it is the same.

14        Q.   It is possible that we have a duplicate in

15   here, but I will ask you the same question with

16   respect to the five names on there.  This may be a

17   duplicate, but did you, personally, solicit any of

18   those contributions?  If so, which ones?

19        A.   Both of the labor unions and the Georgia

20   Federation of Democratic Women.

21        Q.   Okay.  Hand me that original back and I

22   will give you this copy.  That is all on that

23   Exhibit.

24             Now, I'm going to hand you what has been

25   identified as Defendant's Exhibit D-7, which I will
```

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                    56

1    **represent to you is your Campaign Contribution**

2    **Disclosure report filed on October 25, 2016, and**

3    **I'll ask if you can identify that?**

4        A.   Yes, sir.

5                     (Defendant's Exhibit Number D-7

6                     was marked for identification.)

7    BY MR. STRICKLAND:

8        **Q.   Turn to the page designated itemized**

9    **contributions, David Wilkerson for Cobb, did you**

10   **solicit Mr. Cobb?**

11       A.   No, sir. I didn't.

12       **Q.   How about the Georgia Federation of**

13   **Democratic Women?**

14       A.   Yes, sir.

15       **Q.   You already said that you solicited those.**

16       **Same for Georgia Next?**

17       A.   Yes.  And it looks like other than that

18   this almost looks like a duplicate except for that

19   top name.

20       **Q.   Yes.  Well, this one was an in-kind**

21   **contribution, staff and overhead.**

22       **Do you know what that was for?**

23       A.   Staff that, you know, we had an office --

24   a Democratic office in McDonough and the staff in

25   there.  There may have been some other staff, but



```
 1    that was what it was for.

 2         Q.   Was that office working with more than one

 3    candidate?

 4         A.   I would say more than one candidate had

 5    their information there, so, yes I believe so.

 6         Q.   Okay.

 7         A.   I'm not 100 percent sure on that though.

 8         Q.   I believe that you already said you

 9    solicited these contributions from the UFCW and

10    United Brotherhood of Carpenters?

11         A.   Yes, sir.

12         Q.   And again Mr. Richardson from Boston, do

13    you know him?

14         A.   No, sir.

15         Q.   And did you solicit him directly?

16         A.   No, sir.

17         Q.   Now, I'm going to hand you a document

18    identified as Defendant's Exhibit D-8, which I will

19    represent you as a disclosure report filed

20    September 30, 2016.  Now, this may be a duplicate I

21    don't know how we got --

22         A.   The date sounds familiar, September 30th.

23         Q.   Let's identify this anyway and I will ask

24    you if you can identify that report?

25         A.   Yes, sir.
```



 1                    (Defendant's Exhibit Number D-8

 2                    was marked for identification.)

 3       Q.   Let me give you this copy and I will work

 4    off of that one.

 5       A.   Okay.

 6       Q.   Let's again turn to the page of the report

 7    called itemized contributions. The first three here

 8    are John Alchin from Philadelphia, Gerald Cacciotti

 9    from San Francisco, and Stephen Carlino of Fort

10    Lauderdale, do you know any of those individuals?

11       A.   No, sir. Only through contribution.

12       Q.   Did you solicit any of those three?

13       A.   No, sir.

14       Q.   So someone else solicited these

15    contributors on your behalf; is that fair?

16       A.   I would say so.

17       Q.   The next item is DPG in Atlanta, do you

18    know what that organization is?

19       A.   Democratic Party of Georgia.

20       Q.   Okay.  Did you solicit that or did the

21    party just step up and make that contribution?

22       A.   I believe that the party stepped up on

23    that one.  It is kind of hard to say because I would

24    welcome all of the help that I could get.

25       Q.   That is not a surprise.

```
 1              Toward the bottom of the page there,

 2    Georgia State AFL-CIO.

 3         A.   Yes, sir.

 4         Q.   Did you solicit that contribution?

 5         A.   Yes, sir.

 6         Q.   And the next one is Tim Gil of Denver

 7    Colorado, do you know that gentlemen?

 8         A.   Only through contribution.

 9         Q.   So you did not solicit that contribution?

10         A.   No, sir.

11         Q.   Let's go to the next page.  These are all

12    individual contributions.  Just take a look at the

13    list of names there and tell me if you know any of

14    those people personally or whether or not you

15    solicited them?

16         A.   I don't know them.  Only through

17    contribution.

18         Q.   Back to your campaign for 2018.  That is

19    House District 111, right?

20         A.   Yes, sir.

21         Q.   Did you tell me a while ago that you had

22    already started campaigning?

23         A.   I just filed my letter of intent.

24         Q.   Yes.  Anything other than filing your

25    letter of intent?
```

1        A.   No, sir.

2        Q.   **Have you raised any money yet?**

3        A.   No, sir. I'm looking for the first one

4   though.

5        Q.   **Do you expect to have an opponent -- you**

6   **are soliciting me?**

7        A.   If you want to be first.

8        Q.   **Do you know whether or not you have an**

9   **opponent?**

10       A.   I have heard of two opponents.

11       Q.   **In the Democratic primary?**

12       A.   Yes, sir.

13       Q.   **And how about on the Republican side?**

14       A.   Only on the -- I haven't heard of them,

15   but I know they had a special election, so I will

16   assume the incumbent Republican.

17       Q.   **It was won by a Republican without a**

18   **runoff; is that correct?**

19       A.   Yes, sir.

20       Q.   **And you did not run in that special**

21   **election?**

22       A.   No, sir.

23       Q.   **Why not?**

24       A.   I was a little under the weather.

25       Q.   **I see.  Had you not been under the**



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                              61

```
 1    weather, would you have run in the special election?

 2        A.   I may have, yeah. I would have, probably.

 3    I had some surgery back in November.

 4        Q.   I understand. But in the special election

 5    everyone runs at the same time. There is not a

 6    primary in advanced to that, is there?

 7        A.   Right.

 8        Q.   So it is probably what is called a jungle

 9    primary where everybody just gets into the mix?

10        A.   Yes. As you know, they had -- it was a

11    special election, but it was for State House 111 and

12    for the Senate.

13        Q.   At the same time?

14        A.   Yes, sir.  Rick Jeffares resigned his seat

15    to run for Lieutenant Governor and Brian Strickland

16    resigned the 111 seat to run for his seat.

17        Q.   And Mr. Strickland won that seat without a

18    runoff?

19        A.   Yes, sir.

20        Q.   And the same thing for the successful

21    candidate in the House race?

22        A.   Yes, sir.

23        Q.   What was his name again?

24        A.   Jeffrey Cobble, I believe.

25        Q.   That Mr. Cobble won without a runoff?
```



1      A.    Yes, sir.

2      Q.    **Let's think about that special election.**

3  **Were there any, what you viewed as, racial appeals**

4  **in that race -- in that special election?**

5      A.    I did not look at it too close, so I

6  really couldn't say one way or the other.

7      Q.    **So nothing that came to your attention?**

8      A.    Well, I guess the main thing that came to

9  my attention was, you know, you've got -- a 30-day

10  or a little bit more than that election, so to me it

11  did seem kind of -- I don't know why they would do

12  it at that time, but that just seemed kind of

13  funny -- not funny, but maybe not all the way good

14  for the candidates.

15      I think the election was January 8th or

16  9th and you call it the first part of December, I

17  believe it was, or the end of November.  So that is

18  really, on both candidates' side, not a whole lot of

19  time to campaign.  If that makes any sense.

20      Q.    **I will accept your view of that, but was**

21  **there anything racial about that?**

22      A.    I did not really look into that deep.

23  Because a special election you do not know who is

24  going to run.  It could have been me.  That was a

25  hard one to answer.



1        Q.    Let me try to rephrase it.

2              The fact that the special election

3     occurred relatively quickly after the vacancy,

4     whatever the impact of that was, would it not have

5     applied to all candidates equally?

6        A.    Yes.

7        Q.    Regardless of race?

8        A.    Yes.  Everybody was effected I would say.

9     I would say everyone was effected the same way I

10    guess for lack of better words, on the surface.

11       Q.    Do you think there was anything under the

12    surface?

13       A.    That is a hard one to answer without

14    having all of the facts.

15       Q.    What additional facts would you need?

16       A.    Facts on, was that the only time that he

17    could have resigned and had the race.  Could more

18    time have been given.  I would say too, that is a

19    large area.

20       Q.    But on the assumption the special election

21    was called by the Governor --

22       A.    Secretary of State, right?

23       Q.    Whoever called it.  Assume for discussion

24    that the public official who called it, be the

25    Governor or the Secretary of State, did so in



Orange Legal
800-275-7991

1    accordance with the law in terms of the timing of

2    the special election; isn't it fair to say whatever

3    impact that had, applied equally to any candidate?

4         A.   Well, I guess if you look at it -- the

5    fact of the matter, the gerrymandering was still a

6    fact.  So you are still dealing with what you were

7    dealing with in the 2016 race.  The way things were

8    drawn up.  Whether it was 30 days or whether it was

9    12 months.  You are still dealing with the same

10   thing.  In that instance, I would say, yes that race

11   is involved in that also. But the variables did not

12   change just the timing.

13        Q.   Okay.  Either you did not answer the

14   question I asked or we got crossed.

15        A.   Okay.

16        Q.   I am not talking about the way that the

17   lines are drawn.  I am talking simply asking, if the

18   appropriate public official, whether it is the

19   Governor or the Secretary of State, says, there has

20   been a vacancy in the position for Representative of

21   House District 111, and therefore, there is a need

22   for a special election, I hereby call that election

23   for a certain date, assume just that.

24        A.   Okay.

25        Q.   Isn't it accurate to say, the calling of



1    the election would impact all candidates equally,

2    whoever wants to run?

3        A.   Yes.  It will.  And that was legal.  He

4    did what, you know, he was allowed to do by law, but

5    it did not change the variables.

6        Q.   I understand what you said about the

7    lines, this was not about the lines, just about the

8    mere fact of calling the election.

9        A.   Yes.  Because everybody has to abide by

10   the same rules.

11       Q.   Correct.  You do not know of any election

12   practice in Georgia that discriminates against

13   minority voters do you?

14       A.   Do I know --

15       Q.   Any election practices is -- the way the

16   elections are run, the polling places, the poll

17   workers, anything discriminatory about that

18   activity?

19       A.   Outside looking in, I cannot say that I

20   do.  None has been brought to my attention.

21       Q.   Just think about when you go to -- what is

22   your voting precinct?

23       A.   My voting precinct used to be -- well, it

24   is still Wesley Lakes, but for the special election

25   it went to the main office.



```
 1        Q.   Let's talk about a typical election where
 2   people go to the different precincts to vote.  Just
 3   a regular election, a primary election or a general
 4   election?
 5        A.   Okay.
 6        Q.   What is your polling place called?
 7        A.   Wesley Lakes.
 8        Q.   All right.  Think about when you walk
 9   into -- you have gotten out of your vehicle and your
10   headed toward -- is it a school?
11        A.   Yes.
12        Q.   So you are approaching the polling place,
13   any difficulty getting in?
14        A.   No, sir.
15        Q.   Is it properly staffed, poll workers, poll
16   manager?
17        A.   I believe so.
18        Q.   And are the voting procedures smooth, you
19   are able to vote without any difficulty?
20        A.   Yes, sir.
21        Q.   Do you see any evidence of discrimination
22   against minority voters at that Wesley Lakes
23   precincts?
24        A.   The time that I have been there, normally
25   I try to go up when I think it is not crowded, I
```



1   have not witnessed it myself.

2       Q.   Have you heard of it at other polling

3   places, it meaning discrimination against minority

4   voters?

5       A.   I have heard of issues, but I cannot

6   remember what the issues were.  It goes in one ear

7   and out the next.

8       Q.   Okay.  Is there anything that stops you

9   from participating in the election process in Henry

10  County?

11      A.   No, sir.

12      Q.   Have you ever been prohibited from

13  registering to vote based on your race?

14      A.   No, sir.

15      Q.   In other elections in Georgia, let's think

16  about other than your own campaign for House

17  District 111, is there typically a reference to the

18  race of candidates?

19      A.   Could you elaborate a little bit more on

20  that?

21      Q.   In observing other campaigns, whether it

22  be, for state office, local office, city, county,

23  State Representative, State Senator, in your view

24  has there been anything -- have you observed

25  anything with reference to the race of candidates



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                      68

1   being an issue in any of those campaigns?

2        A.   Well, I personally experienced, you know,

3   I chose not to do anything about it.  This person

4   took a picture -- White person took a picture of my

5   sign put it on Facebook of him pulling it up, and

6   throwing it in the back of his truck.  And I think

7   in the caption, he captioned, look who is taking

8   your sign.

9        Q.   I don't quite follow that connection with

10  Facebook and his truck.

11       A.   Well, somebody taking my sign and then

12  having the audacity -- a White guy to put it on

13  Facebook.  Like, hey, you can't touch me.  You can

14  kind of put in some blanks there.

15            What would it look like to you if you got

16  a White guy in a truck taking your sign up and had

17  the audacity to take a picture of it, and then post

18  it on Facebook.

19       Q.   I don't do Facebook so --

20       A.   I don't either.  I only did it for the

21  campaign.

22       Q.   Let's talk about -- was that in your

23  campaign?

24       A.   Yes, sir.

25       Q.   Let's put it aside for a moment.  In your



Orange Legal
800-275-7991

1    own observation of other candidates running for

2    offices, state, local, has there ever been any, in

3    your personal experience, have you observed any

4    reference to race in those campaigns?

5         A.   So you said, put me aside, you don't feel

6    like that --

7         Q.   I have accepted that.

8         A.   Okay.

9         Q.   I'm just asking you to set that aside for

10   a moment and talk about other campaigns you have

11   observed other people.  Whether they are your

12   friends versus not known to you running for public

13   office, have you observed anything that seemed

14   overtly racial on any of those campaigns?

15        A.   I'm trying to think.  I'm sure that I have

16   heard some, but that kind of stuff you do not want

17   to retain.

18        Q.   Well, I am asking you about your personal

19   observations as opposed to what you might have

20   heard?

21        A.   Okay. So if I know of someone personally

22   doing something racial.

23        Q.   Yes.  In other campaigns, not your

24   campaign.

25        A.   I want to say not because -- I want to say



1  not, but I'm not 100 percent sure to tell you the

2  truth.  I want to say not.

3      Q.    I will accept that answer.

4      A.    That may have been somebody else talking

5  about somebody doing something. I mean, yeah.

6      Q.    Do you know what the African-American

7  voter turnout was in House District 111?

8      A.    No, I do not.

9      Q.    You understand that Georgia has a majority

10  vote requirement that a candidate has to win a

11  majority of the votes to be a winner?

12      A.    Yes, sir.

13      Q.    And if there is not -- well, an example in

14  the special election.  There would have been a

15  runoff between the top two vote getters, but this

16  particular one in 111, the special election where

17  the person won without a runoff, but if there had

18  been someone who had gotten -- out of the four or

19  five candidates nobody got a majority, there would

20  have been a runoff; isn't that right?

21      A.    Right.  As long as they did not get

22  50 percent.

23      Q.    That's, right.  Let's say five candidates

24  ran and nobody got a majority, there would be a

25  runoff between the top two, and the person that



```
 1    ought to be elected has to get a majority vote?

 2         A.   Right.

 3         Q.   Do you think a majority vote requirement

 4    is a good thing?

 5         A.   Yes, sir.

 6         Q.   More people should want you to be elected

 7    than not?

 8         A.   I agree with that.

 9         Q.   Let me just look back through my notes

10    here to see if I have anything else.

11         A.   Okay.

12         Q.   Now, you are one of several Plaintiff's in

13    this case.  What is it that the Plaintiff's are

14    seeking in this case -- what is it all about?

15         A.   We are seeking to have things did legally

16    and right.  I think as a candidate -- and the

17    citizens deserve to have things did legally, you

18    know, everybody on the same playing field.  Not push

19    Black, not push White, you know, be a whole.

20         Q.   Okay.  I think that is all that I've got.

21              MS. BRANCH:  Did you have any questions on

22         the phone?

23              MR. STRICKLAND:  Maybe they are not there.

24              THE WITNESS:  Thank you.

25              MR. STRICKLAND:  Thank you.
```



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                72

1

2

3     (PROCEEDINGS CONCLUDED AT 12:01 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



D I S C L O S U R E

STATE OF GEORGIA                          DEPOSITION OF

COUNTY OF FULTON                          DARRYL PAYTON

    Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

    I am a Georgia Certified Court Reporter. I am here as an independent contractor.

    I am not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

    I was contacted by the offices of Strickland, Brockington, Lewis, LLP to provide court reporting services for these proceedings.

    I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-34 (a) or (b).

    I have no written contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

    I will charge my usual and customary rates to all parties in the case.

DATED: March 06, 2018

*Stephen Mahoney*

Stephen Mahoney
Certified Court Reporter
4921-4880-0199-0656



C E R T I F I C A T E

I hereby certify that the foregoing deposition was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 72 pages represent a true, correct, and complete transcript of the evidence given on February 6, 2018 by the witness, Donna McLeod, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28 (c); I am a Georgia Certified Court Reporter here as an independent contractor of Orange Legal; I was contacted by Orange Legal to provide court reporting services for this deposition; I will not be taking this deposition under any other contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that Orange Legal is not a party to a contract prohibited by O.C.G.A. 15-14-37 or Article 7.C.of the Rules and Regulations of the Board.


This 6th day of March, 2018.        *Stephen Mahoney*
                                    _____
                                    Stephen Mahoney
                                    Certified Court Reporter
                                    4921-4880-0199-0656



March 7, 2018

Darryl Payton
c/o Aria Branch, Esquire
PERKINS COIE LLP
1201 THIRD AVENUE,
SUITE 4900
SEATTLE, WASHINGTON 98101


IN RE:  NAACP, ET AL. VS. BRIAN KEMP

Dear Darryl Payton:

This letter is to advise you that the transcript taken in
the above-referenced deposition has been transcribed.
Please contact our office at (800)275-7991 to make
arrangements to read and sign  or sign below to waive review
of this transcript.

It is suggested that the review of this transcript be
completed within 30 days of your receipt of this letter, as
considered reasonable under Federal Rules; however, there is
no Georgia Statute to this regard.

The original of this transcript has been forwarded to the
ordering party and your errata, once received, will be
forwarded to all ordering parties for inclusion in the
transcript.

Sincerely,

Stephen C. Mahoney, CVR, CCR, FPR
Court Reporter
Orange Legal, Inc.

cc:  MR. FRANK STRICKLAND, ESQ; MR. JOHN POWERS, ESQ

Waiver:

I, Darryl Payton, hereby waive the reading & signing of my
deposition transcript.

_____
Darryl Payton                              DATE



**Orange Legal**
**800-275-7991**

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                                                    76

E R R A T A   S H E E T

I have read the foregoing transcript of my testimony given

on February 21, 2018, and wish to make the following changes.

Page No. _____ Line No. _____

Reason:_____

Page No. _____ Line No. _____

Reason:_____

Page No. _____ Line No. _____

Reason:_____

Page No. _____ Line No. _____

Reason:_____

Page No. _____ Line No. _____

Reason:_____

Page No. _____ Line No. _____

Reason:_____

I wish to make no changes. _____

_____

Signed: Darryl Payton, Deponent

Sworn and subscribed before me

This _____ day of _____

_____

NOTARY PUBLIC



**Orange Legal**
**800-275-7991**

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON

**Exhibits**

022118_D.
PAYTON_
EXHIBIT 01

022118_D.
PAYTON_
EXHIBIT 02

022118_D.
PAYTON_
EXHIBIT 03

022118_D.
PAYTON_
EXHIBIT 04

022118_D.
PAYTON_
EXHIBIT 05

022118_D.
PAYTON_
EXHIBIT 06

022118_D.
PAYTON_
EXHIBIT 07

022118_D.
PAYTON_
EXHIBIT 08

**$**

**$2500** 51:9

**1**

**1** 20:16

**100** 57:7 70:1

**11** 29:12

**111** 16:7 17:4,16
19:25 20:22 26:10
29:8,23 31:19 41:8,
12 43:21,22 44:10
45:15 59:19 61:11,
16 64:21 67:17 70:7,
16

**112** 45:16

**12** 29:12 64:9

**12:01** 72:3

**1401** 51:8

**171** 6:2

**18** 7:2 25:10

**1962** 7:2

**1996** 53:12

**1997** 6:7

**2**

**2** 14:22 16:13 44:17

**2012** 17:12 21:23

**2014** 17:10,11

**2015** 42:9,10

**2016** 16:8 20:1 44:9
46:1 47:1,12 50:6
53:3 54:23 56:2
57:20 64:7

**2017** 33:10

**2018** 43:18 59:18

**2081** 22:24

**24** 25:10

**25** 53:3 54:22 56:2

**3**

**3** 16:15 20:11,12
46:22

**3,000** 19:9

**30** 47:1,12 50:6
57:20 64:8

**30-day** 62:9

**30253** 6:3

**30th** 57:22

**31** 46:1

**33** 31:7

**38** 31:7

**4**

**45** 18:14

**460** 46:12

**5**

**50** 18:11,14 70:22

**55** 18:14

**566** 41:6 42:10

**8**

**8th** 62:15

**9**

**97** 7:13

**9th** 62:16

**A**

**abide** 65:9

**Abrams** 27:7

**accept** 44:2 62:20
70:3

**accepted** 69:7

**accommodate** 5:14

**accordance** 64:1

**accurate** 20:14,15
51:5 64:25

**acquainted** 34:17

**acting** 38:2

**activities** 13:16,17
23:25

**activity** 65:18

**actual** 11:15

**additional** 63:15

**address** 6:1,6,11,12

**ads** 26:13

**advanced** 61:6

**advertised** 26:19

**advertising** 13:3

**advised** 29:15

**advocating** 21:5,7

**affiliated** 15:19,21

**affiliation** 52:17

**AFL-CIO** 59:2

**African-american**
6:18 22:12 23:13,14,
23 70:6

**agree** 33:1 34:20
50:9 71:8

**ahead** 5:9,10 23:20
29:10 39:4

**air** 11:7

**aisles** 32:7

**Alchin** 58:8

**allowed** 65:4

**amended** 51:13,15

**Ameringen** 47:20

**amount** 13:6

**Andrew** 48:19 49:17

**Anne** 6:13

**apparel** 11:25

**apparently** 46:2

**appeals** 62:3

**appears** 41:14 42:3
45:23

**applied** 63:5 64:3

**appoint** 14:24

**appointed** 4:10
14:14,21

**approach** 23:3

**approaching** 66:12

**approval** 15:12

**area** 22:5,8,9,23,24,
25 23:1 63:19

**areas** 22:2,7,10

**arrange** 12:10

**arrested** 10:7

**asks** 39:19

**assigned** 30:15

**Assistant** 4:10

**assume** 28:19 47:25
60:16 63:23 64:23

**assumption** 63:20

**Atlanta** 10:21,23,24
58:17

**attend** 10:20

**attended** 26:3

**attention** 62:7,9
65:20

**attorney** 4:10,11
35:9,10

**attorney-client**
34:12 36:15

**audacity** 68:12,17

**August** 33:10

**Austin** 33:5

**availability** 13:5

**aware** 40:17

**B**

**back** 10:22 14:12
29:19 33:3 51:7
55:21 59:18 61:3
68:6 71:9

**background** 10:12

**Baptist** 14:4

**baseball** 12:2

**based** 31:3 67:13

**basically** 15:13

**basis** 17:14 40:10

**beginning** 50:13

**behalf** 32:24 47:11
50:10 51:4 52:9
58:15

**belief** 38:24

**believed** 33:22

**benefited** 42:16

**big** 30:15,21

**bigger** 25:8,14



**bill** 41:6 42:10

**birth** 7:1

**bit** 10:11 11:8,21
13:15 20:12,24 28:3
29:7,22 31:15 33:4
44:5 62:10 67:19

**Black** 6:18 41:17
71:19

**Blacks** 42:18,19
43:16

**blanks** 68:14

**blow** 27:19 28:24

**board** 14:9 30:6,7

**born** 7:3

**Boston** 53:23 57:12

**bottom** 59:1

**boundaries** 37:18

**box** 46:9

**Branch** 5:7 29:17
34:10 35:14 36:13,
24 38:7,19,22 42:1
47:3,5 48:3 71:21

**break** 5:11,12,13
29:16,17,18

**Brian** 21:18 33:6
61:15

**bring** 12:9 15:9

**broker** 11:17,18

**Brotherhood** 53:13
54:8 57:10

**brought** 33:4 65:20

**bumper** 24:22

**business** 11:23
13:10 15:9

**C**

**Cacciotti** 58:8

**call** 12:4 24:24 34:1
35:19 42:9 48:11
62:16 64:22

**called** 9:1 10:22 11:5
22:25 23:1 25:2

26:21 32:23 43:8
47:15 54:16 55:8
58:7 61:8 63:21,23,
24 66:6

**calling** 64:25 65:8

**calls** 34:11 36:14
38:7 42:1 48:3

**campaign** 19:25
21:4,12 23:24 24:2,
4,6,7,15,16,17,20
25:23 27:2,4 30:10
44:6,8,10,25 45:12,
14 46:23 47:24 50:5,
10 52:7,20 53:2
54:21 56:1 59:18
62:19 67:16 68:21,
23 69:24

**campaigning** 22:17
59:22

**campaigns** 18:25
24:13,19 67:21 68:1
69:4,10,14,23

**candidate** 16:6 18:3
20:25 41:13 42:17
57:3,4 61:21 64:3
70:10 71:16

**candidates** 25:23
62:14 63:5 65:1
67:18,25 69:1 70:19,
23

**candidates'** 53:21
62:18

**capacity** 24:16

**caption** 68:7

**captioned** 68:7

**car** 25:3

**card** 15:20,24

**cards** 24:25

**careful** 34:13

**Carlino** 58:9

**Carmel** 22:9

**Carol** 49:12

**Carpenters** 53:13
54:8 57:10

**carpet** 12:21

**case** 7:16,17 8:4 9:6,
24 10:1 27:10 31:1
33:4,7,11,18,19,21
34:2,5,18 35:8,22
36:3,6,7 37:12 40:18
42:6 46:5 71:13,14

**cases** 15:8,14

**census** 41:20

**certificate** 11:6

**certifications** 11:4

**challenger** 17:24
20:5

**change** 64:12 65:5

**characteristics**
29:23

**children** 7:7

**chose** 68:3

**chronological** 17:3,
6

**Church** 14:4

**citizen** 21:9

**citizens** 71:17

**city** 14:17,22 15:10,
11 16:13 17:12,15
30:4 47:20 67:22

**civic** 13:16,18,19

**Clark** 10:21,22,24

**class** 9:16,17

**class-action** 8:22,23
9:2,3,7

**cleaning** 12:21,22

**clear** 5:3

**close** 20:13 62:5

**Club** 13:21

**clubs** 13:23

**coasters** 12:6,7

**Cobb** 56:9,10

**Cobble** 61:24,25

**Coca-cola** 9:4,7,9,
18,22

**Coie** 35:14,17,21

37:4

**College** 10:22

**colleges** 10:19

**color** 37:25 38:2

**Colorado** 59:7

**commission** 14:19,
24 15:1 17:16,17
19:19

**commissioner**
14:17 15:5,7 16:14
17:8

**communicate** 32:1

**communication**
21:8 31:25

**communities** 23:15,
16

**community** 22:12,
14,16 23:13,23,24
28:4

**company** 11:17
12:2,13

**complain** 51:14

**complaint** 8:14,15,
17

**concentrated** 22:23

**CONCLUDED**
72:3

**condition** 11:7

**connection** 11:22
44:9 45:13,19 46:24
68:9

**considers** 43:1

**consumer** 8:23 9:1,
5

**contact** 34:21 35:25
52:6,14

**contacted** 34:4,7,19,
25 35:17,24 36:1
52:9

**contacting** 51:4

**contents** 36:18,20

**contributed** 19:6

**contribution** 19:20
44:8,25 45:13 47:24
48:16 49:4,14,16,18,
20 51:9 52:7,15
53:25 54:3,4,22
56:1,21 58:11,21
59:4,8,9,17

**contributions** 46:1,
12 47:16,22 48:25
50:13,20,25 51:16,
23 52:4,20 53:9,14
55:9,10,18 56:9 57:9
58:7 59:12

**contributor** 48:13

**contributors** 19:4,
5,16 47:19 50:16
51:22 58:15

**convicted** 10:9

**copies** 45:6

**copy** 44:25 47:3 50:8
53:1 54:20,21 55:11,
22 58:3

**correct** 17:1,19
46:14 52:10 60:18
65:11

**correlation** 43:10

**could've** 26:24
38:23

**council** 14:22,23
15:11 16:13 17:12,
15 54:16

**count** 22:23

**country** 51:5

**county** 6:4,5 7:5,9,
12 15:17,23 16:5,14
17:8,16,17 19:19
21:25 22:20 23:8,11,
12 26:17,21 27:6
30:4,5,6,7,14 48:10
67:10,22

**couple** 26:25

**Court** 6:2,3 32:12

**courtroom** 4:18

**covered** 7:6 23:22

**Craig** 8:1 33:14,15
35:1,5



**Craig's** 33:15 35:2

**create** 12:18

**Crescent** 11:6

**crime** 10:9

**crossed** 64:14

**crowded** 66:25

**current** 33:4

**Curtis** 49:8,22

---

**D**

**D-1** 32:16,20 40:1 45:25

**D-2** 44:18,21 45:12, 25

**D-3** 46:17,18 47:9

**D-4** 50:1,4

**D-5** 52:25 53:5

**D-6** 54:20 55:1

**D-7** 55:25 56:5

**D-8** 57:18 58:1

**D-A-R-I-A-N-N-E** 6:14

**D-A-R-R-Y-L** 5:21

**dad's** 13:10

**daily** 26:17

**danger** 38:3

**Darianne** 6:14

**Darryl** 4:2 5:19

**date** 7:1 57:22 64:23

**dates** 45:22

**daughter** 6:13 27:23

**David** 48:13 49:3 56:9

**day** 27:23

**days** 64:8

**deacon** 14:9

**Deal** 30:12

**dealing** 64:6,7,9

**December** 62:16

**Dechman** 48:14,15

**decide** 18:19

**declaration** 43:25 44:1

**deep** 62:22

**defendant's** 32:16 44:18 46:18,22 50:1, 4 52:25 53:5 54:20 55:1,25 56:5 57:18 58:1

**degree** 11:1

**Democrat** 17:19 28:10,12,23 38:16 43:16

**democratic** 7:21,23 15:17,18 16:5 17:22 19:18,20 20:4 48:5, 8,10,12 52:17 53:12, 19 55:20 56:13,24 58:19 60:11

**Democrats** 27:6 41:25 42:5

**Denver** 59:6

**deposition** 4:13 10:4 39:20

**describe** 21:11

**deserve** 71:17

**design** 12:15

**designated** 56:8

**difference** 18:21,22

**difficult** 40:15

**difficulties** 31:11

**difficulty** 66:13,19

**digitize** 12:18

**DIRECT** 4:6

**directly** 57:15

**disadvantage** 42:19

**disclosure** 32:23 44:8,25 45:13 46:24 50:6,10 53:3 54:22 56:2 57:19

**disclosures** 40:1,3, 11

**discriminates** 65:12

**discrimination** 37:21 38:6 39:11 40:4,6 66:21 67:3

**discriminatory** 42:12 65:17

**discuss** 40:7

**discussed** 7:17 8:4

**discussion** 63:23

**district** 14:22,23 16:7,13,14 17:4 19:25 20:22 21:25 22:2,25 26:10,11 29:8,23 30:1 31:19, 21 32:2,3 41:7,12 43:22 44:10 45:15 46:25 59:19 64:21 67:17 70:7

**districts** 16:16 19:16

**DLCC** 51:8,9 52:12, 14

**document** 57:17

**door** 23:6 25:2 28:20 38:1

**doors** 22:18,21 23:11 24:21 25:1

**dozen** 44:8

**DPG** 48:12 58:17

**drawing** 41:19

**drawn** 64:8,17

**dressed** 38:2 39:7

**dues** 15:25 16:1

**duly** 4:3

**duplicate** 55:14,17 56:18 57:20

---

**E**

**ear** 67:6

**earlier** 33:15

**education** 21:8 30:6,8,16

**educational** 10:12 11:4

**effected** 63:8,9

**elaborate** 67:19

**elected** 31:18 71:1,6

**election** 18:2 20:19 27:12 60:15,21 61:1, 4,11 62:2,4,10,15,23 63:2,20 64:2,22 65:1,8,11,15,24 66:1,3,4 67:9 70:14, 16

**elections** 65:16 67:15

**emblem** 12:10,11

**embroidering** 11:13,16

**embroidery** 12:13

**employed** 9:16 11:9

**employees** 9:4,17,19

**employment** 9:6,13 11:9

**enacted** 42:10,11

**end** 62:17

**ending** 47:12

**endorse** 27:1

**endorsed** 27:4

**engage** 12:24

**engaged** 43:1

**engagement** 36:10, 19 37:6,11

**enjoyed** 22:3

**entire** 30:25

**equally** 63:5 64:3 65:1

**error** 51:13,14,16

**Esmond** 48:23

**estimate** 18:17

**event** 5:8 45:17

**evidence** 66:21

**exact** 33:9

**educational** 10:12 11:4

**EXAMINATION** 4:6

**examined** 4:3

**examples** 37:24

**excuse** 23:10

**exhibit** 32:10,16,20 40:1 44:18,21 45:12 46:18,22 47:8 50:1,4 52:25 53:5 54:20 55:1,23,25 56:5 57:18 58:1

**exist** 39:13

**exists** 39:14,15

**expansion** 21:8

**expect** 60:5

**expenditure** 46:6, 12

**expenditures** 46:2

**experience** 27:24 69:3

**experienced** 68:2

**expert's** 41:5

**experts** 40:17,19,20, 25 41:4

**explain** 20:23 43:4, 13

**extent** 34:10 36:13

**extra** 47:3

---

**F**

**Facebook** 68:5,10, 13,18,19

**fact** 7:7 10:3 36:19 63:2 64:5,6 65:8

**factor** 27:12

**facts** 42:21,24 63:14, 15,16

**failing** 31:7,8

**fair** 13:12 37:19 39:22 49:21 58:15 64:2

**fairly** 25:9



**familiar** 21:24 57:22

**family** 9:20 19:17

**favoring** 41:21,22

**February** 7:2

**Federation** 53:11, 19 55:20 56:12

**fee** 46:7

**feel** 6:21 39:15 69:5

**field** 11:12 71:18

**figures** 27:1,8

**file** 36:7 45:23

**filed** 32:24 33:20 40:18 44:9 45:2,13, 17,19,24,25 46:24 47:10,11 50:6,10 53:3 54:22 56:2 57:19 59:23

**filing** 8:13,17 33:21 46:6 59:24

**fill** 53:20

**finance** 18:24

**financial** 19:15

**find** 39:8

**finish** 38:12

**firm** 35:13

**fits** 23:7

**floor** 12:22

**focus** 19:24

**folks** 26:4 39:10

**follow** 68:9

**football** 10:16

**forgot** 26:14

**form** 53:21

**formalities** 5:16

**forms** 21:14

**Fort** 58:9

**forum** 26:3

**forums** 25:23 26:1

**forward** 35:4

**found** 38:16

**fourth** 47:15 51:8

**Francisco** 58:9

**Frank** 4:9

**Friday** 43:25

**friends** 69:12

**front** 25:6

**full** 5:18

**fundraising** 43:24

**funds** 44:5

**funny** 62:13

---

**G**

**general** 4:10,11 17:25 18:2 66:3

**generating** 52:19

**gentleman** 7:19 47:21

**gentleman's** 33:20

**gentlemen** 59:7

**geography** 21:24

**Georgia** 4:11 6:3,5, 10 7:4,22,24 37:22 40:6 43:11 48:12 53:11,12,19 55:19 56:12,16 58:19 59:2 65:12 67:15 70:9

**Georgia's** 40:4

**Gerald** 58:8

**gerrymandering** 33:22 36:8 37:14 64:5

**gestures** 4:24

**getters** 70:15

**Gil** 59:6

**give** 15:23 35:19 37:24 38:9 50:8 55:22 58:3

**glad** 5:5,14 18:17 44:2

**Goffe** 48:19

**good** 4:8 62:13 71:4

**goodness** 27:21

**Governor** 30:12 61:15 63:21,25 64:19

**graduation** 31:8

**grew** 13:12

**group** 25:24

**Grove** 23:1

**guess** 18:13,16 19:9 23:21 28:25 30:11 35:9 40:12 51:6 62:8 63:10 64:4

**guy** 68:12,16

**guys** 8:18

---

**H**

**half** 44:8

**hand** 32:19 46:21 52:25 53:1 54:19 55:21,24 57:17

**handed** 25:1

**handing** 45:11

**handling** 52:21

**hands** 30:14

**happened** 41:11

**hard** 58:23 62:25 63:13

**Harmsworth** 48:23, 24

**hats** 11:25 12:3

**head** 4:22 27:20 28:24 48:24

**headed** 66:10

**hear** 15:8,14 29:14 33:7

**heard** 9:3 35:21 41:18 48:21 49:5,22 51:1 60:10,14 67:2,5 69:16,20

**heating** 11:6

**Henry** 6:4,5 7:8,12 15:17,23 16:5,14 21:25 23:10 26:11, 21,22 27:5 30:4,23 31:6 47:19 48:9 67:9

**Herald** 26:22

**hey** 68:13

**high** 10:13,14,16

**high-caliber** 10:16

**Highway** 22:24

**history** 11:9 40:4,6

**Hochberg** 49:3

**Holder** 33:20

**home** 11:14

**homeowner** 27:18

**hour** 5:13

**hours** 29:12

**house** 16:6 17:4 19:25 20:22 21:1 26:10,11 27:17,25 29:23 31:19 41:6,7, 12 42:10 43:22 44:10 45:20 46:25 55:19 61:11,21 64:21 67:16 70:7

**Hutton** 24:12

---

**I**

**I-S-A-A-C** 5:21

**identification** 32:17,21 44:19 46:19 50:2 53:6 55:2 56:6 58:2

**identified** 40:1 50:4 55:25 57:18

**identify** 32:21 44:13,22 45:3 47:2 50:7 53:4 55:4 56:3 57:23,24

**illegal** 37:17

**impact** 63:4 64:3 65:1

**impacted** 41:12

**impair** 6:20,22

**important** 6:11

**imprinting** 12:18

**in-kind** 56:20

**including** 33:5

**incumbent** 21:19,22 26:1 60:16

**individual** 52:21 59:12

**individual's** 52:23

**individuals** 50:17, 20,22,23 51:4 52:6 58:10

**informal** 4:16

**information** 24:25 34:11 36:14 40:5,7, 11 57:5

**initial** 32:23 39:25 40:10

**ink** 12:8

**instance** 48:9 64:10

**institution** 14:1

**institutions** 11:4

**instruct** 36:15

**intent** 44:1 59:23,25

**interest** 4:12

**invited** 36:2

**involve** 52:1

**involved** 4:13 9:21 13:17 40:20 64:11

**Isaac** 5:19

**issue** 30:9,12,15 39:10 68:1

**issues** 20:21,23 21:4, 10,12 67:5,6

**item** 58:17

**itemization** 55:13

**itemized** 47:15 50:13 53:9 55:9 56:8 58:7



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                    Index: James..October

**J**

**James** 53:24 54:2

**January** 62:15

**Jeffares** 61:14

**Jeffrey** 61:24

**John** 27:6 58:8

**June** 47:1,12

**jungle** 61:8

**junk** 24:24

**K**

**Kemp** 33:6

**kids** 14:10

**kind** 14:11 21:15
26:16 27:25 28:1,2
29:13 31:15 40:13
42:18 53:21 58:23
62:11,12 68:14
69:16

**Kiwanis** 13:21

**knock** 22:18,20
23:14 38:1

**knocked** 23:15

**knocking** 23:6,11
24:21

**knowledge** 23:10

**L**

**L-I-V-I-N-G-S-T-
O-N** 6:3

**labor** 54:15 55:19

**lack** 23:10 63:10

**Lakes** 22:8 65:24
66:7,22

**large** 24:24 63:19

**Lauderdale** 58:10

**law** 64:1 65:4

**lawsuit** 8:10,20,21,
22 9:21

**lawyer** 8:3 29:15
34:23,24

**lawyers** 32:24 34:4,
18 35:24,25 36:1,3,
11,20 37:7,11

**lay** 40:15

**leadership** 14:5

**learned** 13:10

**legal** 36:9 37:19 65:3

**legally** 71:15,17

**legislation** 42:9

**legislature** 43:1

**Leslie** 49:19

**letter** 36:10,18,20
37:11 59:23,25

**letters** 51:12

**Lewis** 27:6

**Lieutenant** 61:15

**limited** 13:6

**lines** 41:7,12,14,23
64:17 65:7

**list** 50:16 59:13

**listed** 47:19

**listen** 15:10

**lists** 46:1

**litigation** 4:12

**live** 6:8,12

**lived** 6:6

**Livingston** 6:2

**local** 19:8,14 53:12
54:7 67:22 69:2

**locations** 39:6

**Locust** 23:1

**logo** 12:16

**long** 6:6 8:21 21:21
70:21

**looked** 8:12,16
41:21 45:5 55:12

**lost** 18:7,8 20:11
29:12

**lot** 13:9 20:7 22:19,
22,24 25:11 62:18

**low** 31:8,10

**Lowndes** 7:4

**M**

**M-O-R-G-A-N**
6:15

**Mack** 49:8,10,11,22

**made** 41:6

**magnetic** 25:2

**main** 9:15 20:21,23
21:12 62:8 65:25

**Maine** 49:13

**majority** 22:3,4,7
28:5,6 70:9,11,19,24
71:1,3

**make** 6:25 18:21,22
35:18 36:8 47:23
52:6 58:21

**makes** 39:19,20
62:19

**manager** 24:4,6,7,
16 66:16

**map** 42:10

**March** 46:1

**margin** 18:10 20:10

**Marietta** 6:10 7:14

**mark** 46:17

**marked** 32:17,20
44:19 45:12 46:19,
21 50:2 53:6,8 55:2
56:6 58:2

**Marketing** 10:25

**married** 7:7

**Massachusetts**
53:24

**Master** 49:12,13

**matter** 64:5

**Mcdonough** 6:3
14:18 56:24

**meaning** 7:14 31:8
67:3

**means** 37:16 38:3

**media** 25:4

**Medicaid** 21:8

**medication** 6:21

**medications** 6:19

**meeting** 54:15

**meetings** 34:2 36:2

**member** 13:23,25
14:23 15:15 16:1

**membership** 15:24

**mention** 8:8

**mentioned** 16:24
28:12 33:15

**mere** 65:8

**met** 4:9 48:17 50:24

**mind** 43:3

**ministry** 14:10

**minority** 65:13
66:22 67:3

**minute** 36:17

**mix** 61:9

**mom** 28:20 29:13

**moment** 68:25
69:10

**money** 18:25 19:2,7
20:7 51:3 60:2

**month** 33:9

**months** 64:9

**Morgan** 6:14

**morning** 4:8

**Mount** 14:4 22:9

**mouth** 11:23 13:2

**move** 40:14 41:24
52:24

**moved** 7:13 41:16
42:4,15,17

**moves** 41:15

**multiple** 26:6

**N**

**names** 41:5 55:16
59:13

**needed** 5:13 14:11

**newspaper** 26:13,16

**nodding** 4:21

**nonpartisan** 17:14,
15 19:23

**normal** 39:7

**notes** 33:24 71:9

**notwithstanding**
31:11

**November** 61:3
62:17

**Nuala** 24:12

**number** 18:6 29:25
32:16 35:19 40:19
44:18 46:18 50:1
53:5 55:1 56:5 58:1

**numbered** 47:13

**numbers** 18:9 32:11

**O**

**oath** 4:18

**object** 5:7

**objection** 34:10
36:13 38:7,19 42:1
48:3

**observation** 69:1

**observations** 69:19

**observed** 67:24
69:3,11,13

**observing** 67:21

**obtained** 45:1

**occurred** 31:12 42:9
63:3

**October** 53:3 54:22
56:2



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON                                                              Index: office..register

**office** 14:13,14,16 16:10 43:18,20 46:9 56:23,24 57:2 65:25 67:22 69:13

**offices** 18:20 69:2

**official** 63:24 64:18

**Olive** 14:4

**opened** 28:20

**operate** 11:14

**operated** 30:3

**operations** 11:18

**opponent** 21:13,17 60:5,9

**opponents** 60:10

**opportunity** 44:4

**opposed** 4:21 69:19

**order** 17:3,7 20:16

**ordered** 28:7 38:15, 17

**organization** 13:18, 19 45:1 58:18

**organizations** 54:14

**original** 54:19 55:21

**outcome** 18:5

**outreach** 14:10

**overhead** 56:21

**overseeing** 30:24

**overtly** 69:14

---
**P**
---

**P-A-Y-T-O-N** 5:21

**P.M.** 72:3

**pages** 45:6

**paid** 24:8

**paper** 26:20 32:20, 22

**papers** 8:9,12,13,16 26:25

**part** 9:7,14,16 32:2

62:16

**participated** 10:4

**participating** 67:9

**partisan** 17:14,15, 18

**parts** 22:20 51:4

**party** 7:21,24 8:19 15:16,17,18,23 16:5 19:18,20 43:11 48:6, 8,10,12 58:19,21,22

**pass** 30:17

**pay** 15:25

**paying** 16:1

**Payton** 4:2,8 5:19 32:19 45:11

**Paytons** 6:15

**pending** 7:16

**pens** 12:8

**people** 8:4 12:16 13:5,7 15:8 18:23 24:24 26:5 29:2 41:15 42:4 49:22 59:14 66:2 69:11 71:6

**people's** 25:6

**percent** 18:11,14 20:11,12,17 57:7 70:1,22

**percentage** 18:6

**performance** 31:4

**period** 46:2,3 47:12

**Perkins** 35:14,15,17, 21 37:3

**person** 12:12 14:22 18:11 24:11 28:7 30:24 34:8 35:7 38:15 39:8,19 51:17, 20 68:3,4 70:17,25

**person's** 7:25

**personal** 40:5 69:3, 18

**personally** 53:18 54:5,11 55:17 59:14 68:2 69:21

**Philadelphia** 58:8

**phone** 34:1 71:22

**picture** 29:1 68:4,17

**place** 66:6,12

**places** 22:22 45:16 65:16 67:3

**plaintiff** 9:15 34:6,9, 20 35:8

**Plaintiff's** 32:23 71:12,13

**plan** 43:18

**planning** 14:17 15:7

**playing** 71:18

**point** 12:3 30:16

**political** 15:15 38:5 41:24 42:20 43:11

**poll** 65:16 66:15

**polling** 65:16 66:6, 12 67:2

**population** 23:7

**portfolio** 12:8

**position** 14:21 64:20

**positions** 14:5

**post** 46:9 68:17

**practice** 65:12

**practices** 65:15

**precinct** 65:22,23

**precincts** 66:2,23

**predominant** 23:15

**preparation** 8:10

**prepared** 32:24 40:25

**presume** 17:18

**pretty** 7:20 8:5,6 10:16 20:15 30:5 31:14,16 37:1

**primary** 17:22,23, 24 18:2 20:4,5,7 60:11 61:6,9 66:3

**principals** 43:8

**printed** 24:21,23

**printing** 11:13,16 12:13

**privilege** 34:12 36:15

**problem** 5:6

**procedures** 66:18

**PROCEEDINGS** 72:3

**process** 67:9

**produced** 40:18

**product** 11:25

**professional** 24:7

**prohibited** 67:12

**properly** 66:15

**property** 27:19,22 28:8,23 38:16,18

**protected** 34:11 36:14

**public** 14:13,14 16:10 27:1,8 29:25 30:9 63:24 64:18 69:12

**pulling** 68:5

**purchase** 11:25

**purpose** 36:5 42:12

**push** 71:18,19

**put** 12:9,11 25:2,5, 16,18,19 42:18 51:18 68:5,12,14,25 69:5

---
**Q**
---

**question** 5:3,4,9 14:13 23:18 31:15 34:13,14 40:13,15 48:23 49:3 50:18,19 52:5 55:9,15 64:14

**questions** 4:17 5:8 39:18 71:21

**quick** 33:25

**quickly** 63:3

---
**R**
---

**race** 6:17 17:17 20:10,22 27:11 41:22 43:11 61:21 62:4 63:7,17 64:7,10 67:13,18,25 69:4

**races** 16:22 17:13 19:8,14 26:6

**racial** 37:21 62:3,21 69:14,22

**racially** 42:11

**racism** 38:4

**raise** 18:25 20:6

**raised** 19:2,7 44:6 60:2

**raising** 51:3

**ran** 16:6,13,14 17:4, 12,18,21 18:2 20:3 30:12 31:24 70:24

**rates** 31:8

**read** 21:16 39:25 40:22 41:1 43:14

**realization** 39:12

**reason** 38:17

**reasons** 41:24

**recall** 19:7 20:10,16 25:22 27:9

**receive** 11:1

**recent** 17:3

**recommended** 47:25

**record** 5:17 29:20

**recount** 20:14,19

**redistricting** 43:2,8

**refer** 33:3

**reference** 67:17,25 69:4

**referred** 23:12

**regard** 7:16

**register** 7:11



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON

**registered** 7:8

**registering** 67:13

**regular** 66:3

**relates** 37:16

**religious** 13:25

**remember** 18:6,8 24:10 30:18 33:14, 16 34:8 35:2 41:5 51:11,20 52:22 67:6

**repeat** 5:4

**rephrase** 63:1

**report** 44:25 45:8, 13,25 46:4,11 50:6, 7,10 53:3 54:22 56:2 57:19,24 58:6

**reporter** 4:19 5:20 32:12

**reporting** 46:3

**reports** 40:18,22,23, 25 41:1 44:9 45:17, 18,23 46:24

**represent** 4:11 31:20 32:4,22 46:22 50:5 53:2 54:21 56:1 57:19

**representative** 24:15 31:19 45:14 64:20 67:23

**Representatives** 21:1 32:8

**represented** 55:6

**representing** 44:24

**Republican** 18:3 28:22 32:5,7 43:17 60:13,16,17

**Republicans** 41:24 42:6,16

**request** 20:16

**requirement** 70:10 71:3

**resell** 12:1

**reside** 16:16

**residence** 11:19

**resident** 48:14

**resigned** 61:14,16 63:17

**respect** 17:13 50:22 51:21 55:16

**Restarting** 32:12,14

**restate** 52:13

**results** 40:20

**retain** 69:17

**retainer** 12:14

**reverse** 17:2,6

**review** 8:7,9

**Richardson** 53:24 54:2 57:12

**Rick** 61:14

**riled** 28:2

**Road** 22:9

**roughly** 18:6

**rules** 65:10

**run** 11:18 16:9 17:14 18:19 26:13 43:18 44:1 45:19 46:25 60:20 61:1,15,16 62:24 65:2,16

**runaway** 18:8

**running** 20:7 21:1, 10 26:4 69:1,12

**runoff** 60:18 61:18, 25 70:15,17,20,25

**runs** 61:5

---

**S**

**sale** 12:3

**San** 58:9

**school** 10:13,14,16 30:10,13 31:4 66:10

**schools** 29:25 30:3 31:7

**scores** 31:10

**screen** 11:13,15

**seat** 61:14,16,17

**Secretary** 33:6,21 63:22,25 64:19

**seek** 20:14

**seeking** 71:14,15

**Self-employed** 11:11

**Senate** 61:12

**Senator** 67:23

**send** 15:11

**sense** 62:19

**Separate** 40:25

**separately** 50:21

**September** 50:6 57:20,22

**sequence** 32:11

**series** 45:18 46:23

**services** 21:9

**set** 28:14 69:9

**sets** 8:16

**setting** 4:16

**shaking** 4:21

**shifted** 41:24

**shirt** 12:11

**shirts** 12:3

**show** 26:2 44:6 50:3

**side** 60:13 62:18

**sign** 15:25 24:21 36:10,19 37:6,8 68:5,8,11,16

**signed** 15:21 37:10

**significant** 21:3

**signs** 24:22,23 25:2, 5,7,8,9,12,14,17

**simply** 64:17

**sir** 4:15 5:22,25 6:13 7:10,15 8:24 9:8,11 10:6,8,10,18,21 11:2,15,20 13:14,24 14:2,7,15,20,25 16:8,11,18,20,23

17:5,20 18:4 20:2,9, 20 21:20 22:1,13,19 24:1,3,5,9,14 25:13, 15,21 26:7,9,11,12, 14 27:3,13 28:13,17 30:2 31:6,24 32:6,25 33:2,12 34:3,22,24 35:23 36:4 37:8,13, 23 39:16 40:2 41:10 43:9,12,19,23 44:2 46:13,15 47:6,17 48:18,22 49:2,9,11, 14 50:11 51:2,6 53:7,10,15,17 54:6, 10,12,15,24 55:5,7 56:4,11,14 57:11,14, 16,25 58:11,13 59:3, 5,10,20 60:1,3,12,19, 22 61:14,19,22 62:1 66:14,20 67:11,14 68:24 70:12 71:5

**sitting** 28:24

**size** 15:1 25:12

**slightly** 23:3

**small** 24:23 26:24

**smaller** 26:20

**smooth** 66:18

**Snowdon** 49:15

**so-called** 31:12

**social** 25:3

**solicit** 11:24 51:22, 24 53:13,18 54:4,8 55:17 56:10 57:15 58:12,20 59:4,9

**solicited** 54:16 56:15 57:9 58:14 59:15

**soliciting** 60:6

**somebody's** 38:1

**son** 6:14

**sort** 24:22 31:2,5

**sounds** 57:22

**Southern** 11:6

**speak** 5:14

**special** 4:10 60:15, 20 61:1,4,11 62:2,4,

23 63:2,20 64:2,22 65:24 70:14,16

**specific** 41:16

**specifically** 7:23

**speculation** 38:8 42:2 48:4

**spell** 5:20

**spoke** 27:7

**squared** 6:25

**Stacey** 27:7

**staff** 56:21,23,24,25

**staffed** 66:15

**stand** 51:12

**start** 44:21

**started** 28:21 29:16 59:22

**starts** 47:14

**state** 5:18 15:18 21:1 30:23,25 33:6,21 45:14,19 59:2 61:11 63:22,25 64:19 67:22,23 69:2

**State's** 4:12

**statement** 40:10

**status** 9:13

**steal** 39:9

**step** 58:21

**Stephen** 58:9

**stepped** 58:22

**stickers** 24:22

**Stockbridge** 14:4

**stood** 25:24

**stop** 28:3

**stops** 67:8

**store** 39:7

**straighten** 51:15

**street** 27:25 51:8

**Strickland** 4:7,9 21:18 29:19,21 32:10,14,18 34:15



NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON

35:16 36:17 37:2
38:11 39:1 42:7
44:16,20 46:17,20
47:4,7 48:7 55:3
56:7 61:15,17 71:23,
25

**stripping** 12:22

**strong** 22:11

**stuck** 25:1

**students** 31:4

**study** 10:24

**stuff** 12:3 13:20
41:19 69:16

**subject** 40:5

**successful** 16:21,25
61:20

**suit** 9:3

**summons** 8:17

**support** 19:13,15,17
22:4,11,15 48:1

**supposed** 45:23

**surface** 63:10,12

**surgery** 61:3

**surprise** 58:25

**sworn** 4:3

**system** 30:10,13
31:4

— T —

**t-shirt** 12:10

**t-shirts** 11:25

**takeover** 31:3,12

**taking** 68:7,11,16

**talk** 10:11 11:8
13:15 25:24 29:7,22
33:4 36:3 37:14
39:24 40:3,7 44:5
47:18 66:1 68:22
69:10

**talked** 7:17 10:3
32:6 34:8,16 35:5,7

**talking** 8:6 19:14

21:7 26:8 28:21
43:15 45:18 48:9
52:1 64:16,17 70:4

**team** 12:2

**technology** 11:7

**Ted** 49:15

**tells** 5:10

**terms** 14:13 18:11
23:24 64:1

**territories** 23:23

**test** 31:10

**testified** 4:3

**testifying** 4:17 6:20,
22

**testimony** 8:11

**thing** 17:3 28:19
52:12 61:20 62:8
64:10 71:4

**things** 12:4 13:15
21:4 24:22 31:5,24
32:1 37:18 43:1 64:7
71:15,17

**Thompson** 33:5

**thought** 5:1 18:21,
22,23 21:6

**thoughts** 39:21

**throwing** 68:6

**Tim** 59:6

**time** 5:11 8:21 9:10,
23 30:11,16 32:12,
14 33:8 35:5 45:24
61:5,13 62:12,19
63:16,18 66:24

**times** 26:21,24

**timing** 64:1,12

**Tobias** 49:17

**today** 6:19,21 7:18
8:11,18 37:22

**told** 7:19 8:5 28:9,22
31:25 33:19

**top** 47:14 56:19
70:15,25

**total** 15:2,3,4

**touch** 68:13

**town** 26:25

**trade** 13:10

**traditional** 43:8

**truck** 68:6,10,16

**true** 52:12

**truth** 70:2

**turn** 47:13 53:8 55:8
56:8 58:6

**turned** 38:3

**turnout** 70:7

**type** 8:23 53:21

**typical** 25:9 66:1

**typically** 67:17

— U —

**UFCW** 53:12 54:7
57:9

**Uh-huh** 21:2 35:6
45:9

**understand** 5:3
36:5 40:12 61:4 65:6
70:9

**understanding**
42:25

**uniforms** 12:2

**unions** 55:19

**United** 53:13 54:8
57:10

**universities** 10:19

**University** 10:21

**unopposed** 18:1
20:8

**uprising** 30:21

— V —

**vacancy** 63:3 64:20

**Valdosta** 7:4 10:14,
15 13:13

**Van** 47:20

**variables** 64:11 65:5

**vehicle** 25:3 66:9

**verbatim** 4:19

**versus** 69:12

**view** 41:18 62:20
67:23

**viewed** 62:3

**visit** 27:16

**volunteering** 13:20

**volunteers** 24:2
25:16,18

**vote** 7:8,11 15:10
31:23 43:16 66:2,19
67:13 70:10,15 71:1,
3

**voter** 70:7

**voters** 22:4 32:5
41:17 65:13 66:22
67:4

**votes** 18:6 70:11

**voting** 37:20 65:22,
23 66:18

— W —

**Wait** 36:17

**walk** 35:4 39:6 66:8

**walking** 27:16 39:8,
10

**wanted** 6:24

**wanting** 15:9

**Washington** 51:8

**Watertown** 49:13

**waxing** 12:22

**weather** 60:24 61:1

**website** 45:1

**weekly** 26:17,18,19

**Wesley** 22:8 65:24
66:7,22

**White** 22:14,15
23:15,24 28:4,5,6,16

41:17 42:15,17 68:4,
12,16 71:19

**Whites** 43:16

**wholesale** 12:1

**wife** 6:13 8:8 9:22
28:20

**Wilkerson** 56:9

**Wilkes** 49:19

**win** 70:10

**winner** 70:11

**wise** 22:25

**witnessed** 67:1

**Women** 53:12,20
55:20 56:13

**won** 18:11 60:17
61:17,25 70:17

**wondering** 24:6

**word** 11:23 13:2
31:2

**words** 31:1 63:10

**work** 11:22 12:25
14:10 58:3

**worked** 9:22 24:13,
14,16,17 25:17

**workers** 65:17
66:15

**working** 9:9 13:16
32:6 57:2

**would've** 30:24

**wrong** 51:18

— Y —

**yard** 24:22 25:5,6,7,
8,11

**year** 33:8

**yesterday** 7:19

**York** 47:20 48:14

— Z —

**Zoning** 14:17



**Orange Legal**
**800-275-7991**

NAACP, et al. vs Brian Kemp, Austin Thompson vs Brian Kemp
DARRYL PAYTON

Index: zonings..zonings

**zonings** 15:10

