```
 1                   United States District Court
                     Northern District Of Georgia
 2                         Atlanta Division

 3

     Georgia State Conference )
 4   of the NAACP, et al.,     )
                              )
 5                Plaintiffs,)
                              )     Civil Action
 6          vs.              )     File No. 1:17-CV-1427-TCB-WSD-BBM
                              )
 7                           )     Atlanta, Georgia
     Brian Kemp              )     April 24, 2018
 8   in his official capacity )     2:00 p.m.
     as Secretary of State    )
 9   for the State of Georgia,)
                              )
10                Defendant. )
     _____)
11

12
                     Transcript MOTIONS Hearing before:
13
                     THE HONORABLE BEVERLY B. MARTIN,
14              11th Circuit Court of Appeals Judge

15            THE HONORABLE TIMOTHY C. BATTEN, SR,
                   United States District Judge
16
                 THE HONORABLE WILLIAM S. DUFFEY, JR.
17                  United States District Judge

18
     APPEARANCES:
19
         FOR THE PLAINTIFF:           William Vance Custer, IV
20                                    Jon M. Greenbaum
                                      Attorneys at Law
21
         FOR THE DEFENDANT:           John J. Park, Jr.
22                                    Attorney at Law

23

     Lori Burgess, Official Court Reporter
24   (404) 215-1528

25   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
```

1          JUDGE BATTEN:  All right.  Thank you.  We will hear
2     from the movants.
3          MR. CUSTER:  May it please the Court.  We are here
4     for the motion of preliminary injunction.  For the interest of
5     efficiency, I am not going to repeat what was in our briefs.
6     I know that you've read those, so let's get straight to the
7     key issue in this case.  Why we believe we have shown a
8     substantial likelihood of success on the merits.  The evidence
9     here, we submit, demonstrates all the classic elements of a
10    racial gerrymander.  One, it involved an unnecessary
11    mid-decade redistricting.  Two, it was motivated to protect
12    white incumbents against a significant and surging
13    African-American and minority migration into their districts,
14    and to protect them against capable and qualified candidates
15    who were the preferred choice for African-American voters in
16    those districts.  It used methods that were not traditional
17    redistricting methods.  It resulted in transfers of white
18    voters into the districts.  It resulted in the transfer of
19    African-American voters out of the districts.  And both
20    parties, witnesses for both sides, concede that those
21    transfers resulted in the white incumbent succeeding in
22    successive elections.
23          JUDGE DUFFEY:  Can you tell me so I can
24    differentiate between the two kinds of evidence, because I
25    think I understood the position in the briefs, but what would

1     be the direct evidence?

2             MR. CUSTER:  The direct evidence, we would submit,

3     is the testimony about what happened here and the historical

4     evidence of intent.  And although the --

5             JUDGE DUFFEY:  So what specifically would that be?

6             MR. CUSTER:  Although the emails themselves, which

7     are the focal point of our case, are obviously not direct

8     evidence.  The testimony authenticating those emails and the

9     long picture they paint of a racial intent, we submit, is

10    direct evidence.

11            JUDGE DUFFEY:  But the emails are generally are

12    emails to Mr. O'Connor.  The person who draw the map was Ms.

13    Wright.  What would be the direct evidence of their intent,

14    and specifically the intent as manifested in the drawing of

15    the maps?

16            MR. CUSTER:  One, we don't believe the evidence that

17    Ms. Wright drew the maps without input from third parties is

18    credible.  It's inconsistent with the testimony.  For

19    instance, the head of the reapportionment committee, Mr. Nix,

20    testified that he consulted with Mr. O'Connor on a daily

21    basis.  He had inputs into the maps.  Representative

22    Efstration testified he had input into the drawings of the

23    maps.  These maps were drawn in secret in a conference room

24    with the Republican leadership.  We simply do not believe it

25    is a credible position to take as they do that Ms. Wright went

1    into a darkened conference room without outside influence and

2    without peeking at race, which she already knew the answer to.

3    She already knew African-Americans --

4           JUDGE BATTEN:  So what do you with that knowledge?

5    What is she supposed to do with that knowledge?  Block it out

6    of her mind?

7           MR. CUSTER:  She obviously can't block it out of her

8    mind, but she also can't claim that it didn't enter into these

9    decisions, especially when the results belie the suggestion

10    that race was not involved in drawing the lines.

11           JUDGE DUFFEY:  The Supreme Court has said that

12    racial considerations just can't be the predominant

13    consideration.  The predominant consideration has to be racial

14    and not political.

15           MR. CUSTER:  You are absolutely correct.  But here

16    what we have shown is that race is the predominant

17    consideration.  They didn't start drawing these maps because

18    Democrats were moving into these districts.  The record, the

19    long train of emails shows they started drawing these maps

20    because of African-American migration into these districts --

21           JUDGE DUFFEY:  Well I know, but you've made the

22    comment throughout your briefs in both that because there is

23    such political polarization that in fact blacks generally vote

24    Democratic.  And if that was the test you could never

25    politically redistrict because, by necessity, there would

1    always be a disproportionate number of blacks affected because

2    they predominantly, including your expert says, that they vote

3    Democratic.

4              MR. CUSTER:  Absolutely.  But we go one step further

5    in the proof here.  The proof shows they went out to identify

6    black groups, African-American voting groups, and they moved

7    those groups into adjoining districts.  And not only that,

8    but --

9              JUDGE DUFFEY:  Because they were black?

10             MR. CUSTER:  Absolutely.  Absolutely.

11             JUDGE DUFFEY:  Tell me what, in Ms. Wright's

12   deposition testimony, did she say that she used racial

13   information at all in drawing the districts initially?

14             MR. CUSTER:  Some of her testimony suggests she had

15   the window open in which the racial data -- running total of

16   the racial data was shown.  Now, she denies that -- that

17   testimony is a little bit conflicted in her various testimony.

18   But the written --

19             JUDGE DUFFEY:  She is unequivocal that she did not

20   use racial information to draw the maps.

21             MR. CUSTER:  I grant you --

22             JUDGE DUFFEY:  I guess what I hear you saying is

23   that you are saying she didn't tell the truth.

24             MR. CUSTER:  Absolutely.  We do not think that is

25   credible.  And in fact, the --

1          JUDGE BATTEN:  That is the only way you can win, if

2     she is not telling the truth.

3          MR. CUSTER:  That is not true.  We believe that if

4     we show purpose -- and this is what the Supreme Court said in

5     the most recent cases, in *Bethune-Hill* and in the *Cooper* case,

6     if we show that there was a racial purpose behind these

7     changes, the burden then shifts to the State to show a

8     compelling interest.  They can't do that.  They haven't tried

9     to do that, much less --

10          JUDGE MARTIN:  May I -- so after 18 years of doing

11     this job in one capacity or another I have done several of

12     these panels.  And on one I actually went into Ms. Wright's

13     office and watched her use the Maptitude tool.  And my

14     recollection is vivid in that the racial designation was right

15     there on the screen for all of us to see.  And so if you drew

16     the line this way, the racial makeup would be this one thing;

17     if you drew it slightly on the other side of the street, it

18     could be another.  And so did you understand her testimony to

19     be that she -- I mean, she says, ordinarily I like to have the

20     political data combination, I like to have the political data

21     as well as the racial data, the population data, all those

22     other things.  That is one that I recall of her deposition.

23     So is it your understanding of her deposition that she had

24     somehow removed that information --

25          MR. CUSTER:  No.

1          JUDGE MARTIN:  -- and then once she had drawn the

2    lines she put it back in to check the racial makeup?

3          MR. CUSTER:  As we understand her testimony, her

4    claim presently is that she did not put that information on

5    the screen as she was drawing the maps, that she only looked

6    at it at the end.  The individual who carried the bill at the

7    legislature, Representative Nix, who was the chair of the

8    reapportionment committee, said that information was on the

9    screen as the maps were being drawn.

10          JUDGE BATTEN:  Not for this particular map.

11          MR. CUSTER:  For this particular map.

12    Representative Nix carried these bills, 566.  And he testified

13    that the race data was -- the race screen was open while he

14    was viewing the maps and viewing the alternatives for the

15    maps.

16          JUDGE BATTEN:  You incredulously asked whether or

17    not Ms. Wright peeked at the information.  Who cares?  I mean,

18    she knows the information, doesn't she?

19          MR. CUSTER:  Of course she does.

20          JUDGE BATTEN:  So who cares if she peeked?

21          MR. CUSTER:  It doesn't matter that she peeked.  I

22    just --

23          JUDGE BATTEN:  So you believe it is difficult to

24    believe her assertion that she didn't look?

25          MR. CUSTER:  That is absolutely correct.  It doesn't

1    matter whether she looked or not.  She knew that

2    African-Americans predominated in the McDonough Circuit,

3    predominated in the Stage Coach Circuit, and the Stockbridge

4    West Circuit, and predominated in downtown Lawrenceville.

5    Those were no secrets.

6         JUDGE BATTEN:  Who else is at fault?  I want to know

7    if Dan O'Connor is at all at fault.

8         MR. CUSTER:  We believe he is.

9         JUDGE BATTEN:  What did he do wrong?

10         MR. CUSTER:  We believe he is the mastermind --

11         JUDGE BATTEN:  Because in your Amicus sure praised

12    him.

13         MR. CUSTER:  I think Mr. O'Connor has an

14    extraordinary reputation down at the legislature.  He is

15    referred to as the guru of numbers and analytics.

16         JUDGE DUFFEY:  Do you think that he exerted his

17    influence over Ms. Wright as she was drawing these maps and

18    caused her to unduly consider race as opposed to what she said

19    she was doing, which is looking at --

20         MR. CUSTER:  Mr. O'Connor and the Republican

21    leadership in the House.  Mr. O'Connor is just the Speaker's

22    agent.  He is clearly a political operative.  He was appointed

23    to the reapportionment office after was being a political

24    operative.  He reported to the Speaker's office at the

25    beginning of the session saying we need to redistrict these

1   two districts.  He supplies the justification for

2   redistricting these two districts, which is that both of these

3   districts are approaching what Mr. O'Connor identifies as the

4   danger line, 35 to 40 percent, when the districts begin to

5   flip from Republican to Democrat.  And it is Dan O'Connor that

6   then communicates throughout the session.  At the beginning of

7   the session he communicates with the Speaker.  Then he

8   communicates with the Speaker Pro Tem.  Then he communicates

9   with the head of the reapportionment office.  His fingers and

10  his fingerprints are all over this bill.  Dan O'Connor is

11  simply acting as the instrument of the Republican leadership.

12  And the emails demonstrate that.

13          JUDGE BATTEN:  So they are influencing him, or he is

14  influencing them?

15          MR. CUSTER:  He testified that he understood that it

16  was his job to keep the Republicans in power in the Georgia

17  House.  He is purely --

18          JUDGE BATTEN:  Anything wrong with that?

19          JUDGE DUFFEY:  Isn't that everybody's job, whether

20  you are a Democrat or Republican?  Wasn't that the Democrats's

21  job when they controlled the seat?

22          MR. CUSTER:  I would submit it is unusual for a

23  full-time State employee to engage in partisan activities.

24  But nonetheless, that was his job and he was carrying out the

25  instructions --

1          (Reporter Note:  Speakers talk over each other.)

2               JUDGE BATTEN:  -- Tom Murphy did that for three

3     decades.

4               MR. CUSTER:  Absolutely.  I am not going stand here

5     and defend Tom Murphy either, Your Honor.  The emails that we

6     do have paint a picture of Dan O'Connor talking about one

7     thing to the Republican leadership again and again and again.

8     And it is not changing Democrats in these districts, it is

9     changing migrations of African-Americans.  The email to Chuck

10    Efstration four months before.  The email to a political

11    consultant three months before, one month before the session.

12    The email to the Speaker's office and the Chief of Staff.  In

13    the session his email to Speaker Pro Tem Jones.

14              JUDGE DUFFEY:  What evidence do you have, and where

15    in the deposition of Ms. Wright, did anybody say I want to

16    talk to you, Ms. Wright, about how Dan O'Connor, or anybody

17    else, instructed you or guided you to look at this racial data

18    in order to draw these districts?

19              MR. CUSTER:  I can't quote you -- excuse me just a

20    moment.  (pause).  I can't quote you the exact testimony where

21    she said Dan O'Connor or we asked her if Dan O'Connor

22    instructed her.  But, what she --

23              JUDGE DUFFEY:  I don't think that question was ever

24    asked.

25              MR. CUSTER:  It may not have been asked.

1           JUDGE DUFFEY:  Why not?

2           MR. CUSTER:  You know, I don't know.  I didn't take

3   that deposition.  But I can tell you what that Ms. Wright

4   described was a series of meetings that she had with a variety

5   of different legislators, and these maps were not crafted in

6   one sitting by Gina Wright.  To suggest that that is the case

7   is simply inconsistent with the record.  In fact, as we

8   seek --

9           JUDGE BATTEN:  Why is it that each participant in

10  all of these conversations that are discussed disavows

11  changing the district lines based on race?  Are they all

12  lying?

13          MR. CUSTER:  I think they are all incorrect, Your

14  Honor.  The -- the --

15          JUDGE DUFFEY:  Well they --

16          MR. CUSTER:  The consistent contemporaneous --

17          JUDGE DUFFEY:  Excuse me.  If you think they are

18  not telling the truth, don't use the words like "incorrect."

19  Tell me plainly what the plaintiff's position is with respect

20  to the disavowals of the people who were deposed.

21          JUDGE BATTEN:  By everybody.

22          MR. CUSTER:  They are absolutely incorrect.  I don't

23  know how to say it.  I am not going to accuse them of perjury,

24  but in every single one of these redistricting cases, and you

25  can look at all of them, there is always a disavowal that race

1    was the issue.

2              JUDGE DUFFEY:  That is not true.  I've read these

3    cases.  And in fact, in a number of the cases, including the

4    Supreme Court, there was an admission that race was the

5    driving factor, and that is what has led to this point --

6              MR. CUSTER:  In fact, the only case -- the only

7    thing that we don't have in this case is an admission.  What

8    we do have is an uninterrupted stream of contemporaneously

9    prepared documents that point to one issue, and that is -- and

10   that is race.

11             JUDGE BATTEN:  I don't think the evidence is that

12   unambiguous.

13             JUDGE DUFFEY:  I don't either.

14             JUDGE MARTIN:  Maybe it's my turn.  So you know a

15   lot more about -- all of y'all know a lot more about these

16   voting cases than I do.  But both sides were citing *Bush*

17   *versus Vera* for kind of opposite propositions.  One of the

18   things I wanted to check with you about was, I know Justice

19   O'Connor in the plurality opinion referred to, quote, "The

20   bizarre shaping and noncompactness."  We don't have that in

21   this case, do we?

22             MR. CUSTER:  We do have a lessening of compactness.

23   This is not one of those cases where there is an

24   extraordinarily bizarre shape.  However, I would suggest to

25   you that the truth is in the numbers.  And let me focus you on

1     one issue that you may not have considered.  I know there is a

2     lot of data overload in these documents, but let me sharpen

3     the issue just a little bit.  One thing that you will see in

4     all of Dan O'Connor's writings is a focus or his attempt to

5     focus the Republican leadership on numbers.  One is 30 to 35

6     percent.  That is when the district becomes a target for

7     Democrats, and the other number is the 40 percent.  That is

8     the tipping number.  And he says that more than once.  And we

9     have included those documents in your packet.

10          But let's just look at where the numbers end up.

11    After all these changes, we end up with the Caucasian

12    population, according to the 2010 census, going up a few

13    percent.  We end up with the African-American population,

14    according to the 2010 census, going down about two percent.

15    The important number, according to Mr. O'Connor, is the black

16    registration number and you can see that in 2015 it is

17    creeping up towards that red line.  It is 36.7 percent.  And

18    they reduce it very close to the 35 percent number.

19          Now, they would suggest that after all of these

20    changes that is purely accident that Mr. O'Connor doesn't get

21    these numbers down to just 35 percent.  But you also see the

22    same pattern in 111.  And then they make ten different changes

23    in 111, but again, you get the same pattern.  Caucasian voters

24    go up about two percent, the black voter population, according

25    to the 2010 census, goes down about two percent.  And that

1    number which is so threatening to Mr. O'Connor, the black

2    voter registration number that is caused by this black

3    migration is, again, shaved down to 35.3 percent.  And we are

4    to believe that all of that is purely happenstance after

5    that -- those are the numbers --

6         JUDGE DUFFEY:  It is not happenstance.  If you

7    listen to Ms. Wright's description of what she had to do in

8    the adjustments that she had to make to accomplish what she

9    admitted that she was trying to accomplish, which was to

10   improve the incumbent's prospects for being reelected, that

11   there were a number of different decisions that she had to

12   make that took into account mainly some of the traditional

13   redistricting criteria.  And so you make it look like she said

14   I've got to get this up three percent, I have to get this down

15   three percent.  Let me just pick off because Dan O'Connor said

16   so.

17        MR. CUSTER:  And she has the data that finely

18   refined on a political level, but she doesn't have the data

19   that finely refined on a racial level.

20        JUDGE DUFFEY:  Which means that she might have

21   over-compensated in order to accomplish the political purpose

22   that might have driven those numbers up because I agree it

23   wasn't --

24        MR. CUSTER:  Not only -- excuse me -- (pause).  My

25   co-counsel has corrected me, Your Honor, as is frequently the

1    case.  The problem is, they did -- they increased their splits

2    and they changed their splits.  They changed the splits in

3    Gwinnett County.  And they went from two splits to five splits

4    down in Henry County.  And they don't know how that number is

5    going to break at the split level, because all they have at

6    the block level is racial data.  That is all they have to

7    operate on.  They are making just broad assumptions about the

8    political data at the block level.  And that's what the

9    Supreme Court, I believe it was in the *Bush v. Vera* case, said

10   was indicative of race-based decision making.  If you are

11   putting more African-Americans on the districts going out than

12   coming in, which was the case in several of these decisions

13   she made, it belies her contention that race was not a factor.

14   She had to have race to carve the data this precisely.  I

15   don't know where I am precisely, Judge Batten.

16          JUDGE BATTEN:  We haven't given you much of a chance

17   to stay on task, which you intended to do.  I need to change a

18   little bit and just ask you, what is the significance of the

19   fact that House Bill 566 passed the House unanimously?  Every

20   Republican and every Democrat voted in favor of it.  How can

21   we come in after the fact and find that the Democrats, you

22   know, and agree with the Democrats that the map was

23   predominantly based on race?

24          MR. CUSTER:  Your Honor, that is obviously a

25   question we've anticipated.  It is obviously a big defense

1     that the defendants have raised.  I think you have to look at

2     the context of how House Bill 566 was actually introduced into

3     the House.  It was drafted in secret in the reapportionment

4     conference room.  The bill itself was not dropped until May --

5     March 5th.  Those bills are unintelligible.  I can't read it.

6                    JUDGE BATTEN:  We know how the bill was enacted.  We

7     read the briefs and we understand what you are saying, I am

8     sure about that.  But I just, to me, I am a little concerned

9     about intervening in the legislative process, how they do

10    their work.  Are we supposed to give them a letter grade for

11    the job they did passing this bill, or are we supposed to take

12    nothing from the fact that the Democrats voted in favor of

13    this?

14                    MR. CUSTER:  Well, I have two responses to that.

15    First of all, Your Honor, I think there is a good deal of

16    evidence to suggest that the true nature of this bill was

17    concealed from the Democrats, and that disinformation was

18    provided to them during the session.  Plus I think perhaps

19    they took too much comfort from the fact that only Republican

20    districts were being manipulated here.  No district -- no

21    Democratic district was being manipulated.  And so when you

22    had the bill drop on the 5th, it comes to the House on the

23    11th with only two days for them to review the maps.  Maybe

24    they missed it.  Obviously the Senate picked it up.  When it

25    got to the Senate enough time had passed that people began to

1    realize what was going on and there was a debate on the Senate

2    floor.  But to your legal question, can you disregard what the

3    House said and did, I think the answer is absolutely.  If you

4    find that there was a predominant racial purpose, you not only

5    can disregard what the House did, you should disregard what

6    the House did.

7            JUDGE MARTIN:  Can I ask you to give me -- what is

8    your best evidence of racial bias in the drawing of these

9    lines?

10           MR. CUSTER:  I think the best evidence of the

11   drawing of these lines are the consistent stream of emails,

12   communications between Dan O'Connor and the key Republican

13   leadership.  I would probably start out with Representative

14   Nix simply because he is chairman of the committee, and he

15   said that he worked with Dan O'Connor on a daily basis.  I

16   would probably next point to the communications between

17   defense counsel and the Speaker's office.  Because O'Connor

18   clearly says that the Speaker makes the decision on whether or

19   not there is going to be tweaking.  This is not a case where a

20   low-level career bureaucrat, and I don't mean to demean

21   Ms. Wright, but this was not conceived by a low-level career

22   bureaucrat.

23           JUDGE BATTEN:  And people that high up that ladder

24   were so dumb as to memorialize their racist intent?

25           MR. CUSTER:  You know, the only person that

1    memorialized their racist intent was Dan O'Connor.  The record

2    is amazingly devoid of communications back to him.  Dan

3    O'Connor is the proverbial loose lips in this scheme.

4              JUDGE DUFFEY:  So if that is true, if the people

5    that he was writing to rejected, as I suspect they would have,

6    any claim that or any desire that he might have to racially

7    manipulate this redistricting, what is the evidence that Dan

8    O'Connor sat on Ms. Wright's shoulder and said, look at that

9    box over there, you've got to go further?  Because I think

10   what you just said is that you don't believe that the senior

11   administrator, people that are in political office, were

12   saying, Dan that is great job, go and do what you need to do,

13   and that in fact Dan O'Connor had the authority to do that.

14             MR. CUSTER:  No, I think it is just the opposite,

15   Judge Duffey.  If you will look at these emails you see no

16   rejection of the proposals by Dan O'Connor.  You see no one

17   who says, no that's not the way we are going to do it.  When

18   he sends these emails, they say, thank you Dan.  Thank you for

19   that information.  And they regard him so highly --

20             JUDGE BATTEN:  How dumb would they have to be to say

21   thank you for the racial impropriety?  I mean --

22             MR. CUSTER:  That is what they did.  I agree.  That

23   is what they did.  He sends them these emails and they thank

24   him for it again and again and again.  There is only one

25   person as I recall from the group who said they really didn't

1    like Dan O'Connor.  I believe that is Representative Andrews.

2    But to a person, the rest of them said he was their guy in the

3    reapportionment office.  And we can't divorce and they can't

4    divorce Dan O'Connor from these maps.

5              JUDGE MARTIN:  You know --

6              JUDGE DUFFEY:  That is what you say, I understand

7    that.  But you know, all of us do a lot of criminal law, and

8    ultimately in criminal law, to show a conspiracy, you have to

9    show by a preponderance of the evidence that there was an

10   understanding between everybody.  I just don't see the

11   evidence of that here.  I understand that you've got these

12   pieces and that you are trying to weave this relationship

13   between Dan O'Connor and the emails and ultimately that gets

14   forced upon Ms. Wright, but a lot of it seems speculative and

15   conjecturous to me.

16             JUDGE BATTEN:  My experience similarly is, in the

17   race cases, that 1983 cases, Title VII cases, you know, often

18   the animus is readily inferred.  But I am loathe to find -- to

19   make an inevitable inference of racism -- not animus -- but

20   racism here.  I just don't think the evidence is that strong.

21   I just -- I hear what you are saying.  You are saying, look at

22   these emails and everybody authenticated them and they were

23   going back and forth, but every one of them denies -- there is

24   no smoking gun.  That is what I am trying to say.  I don't

25   think there is a smoking gun.  Do you?

1          MR. CUSTER:  Judge Batten, I do think there is a

2     smoking gun.  I think all of this email documentation taken as

3     a whole is a smoking gun.  You may could take one of those

4     documents and disprove it.  One, if it were not to the

5     Speaker, if it were not to the Speaker Pro Tem, if it were not

6     to the head of the reapportionment committee if it were not

7     photo vice chair of this reapportionment committee, and other

8     members of that committee and other people affected, you may

9     be able to explain away that bomb shell of emails that Dan

10    O'Connor wrote.  But no one disabused him.  Everyone seemed to

11    be on board with what Dan O'Connor was proposing.

12         JUDGE DUFFEY:  You know, there is a hypothesis here

13    that you don't address, and that is, if you read all of the

14    information that comes from exit polls and national or state

15    elections, one of the principal things they focus on is

16    demographic changes as it affects political power of a party

17    within a specific jurisdiction in which there is held an

18    election, and I think to say that every time somebody talks

19    about the changes in demographics and the concentration of

20    minorities in a state that, I totally agree with you that we

21    are racially polarized to the extreme when it comes to

22    politics, that that sort of information tells you that there

23    are shifts, and to understand that there are shifts in

24    demographics that can affect partisan abilities for parties to

25    have their candidates elected, it is interesting information,

1    I think useful information, for somebody to say we are

2    probably going to lose that district.

3                MR. CUSTER:  You know --

4                JUDGE DUFFEY:  You don't give any credit to that.

5                MR. CUSTER:  No, I do give credit for that.  But our

6    evidence goes beyond that.  Because to make the decisions they

7    made, they had to go beyond the political data.  They had to

8    rely on the racial data to get to this end result.  They

9    didn't have access to racial data at the street-by-street --

10   excuse me -- they didn't have an access to political data at a

11   street-by-street level, which is what they needed to do to

12   make these surgical changes.  The reason these changes had to

13   be so surgical is because you not only had to make the

14   district you were changing better for that incumbent, but you

15   also had to make sure that in the process of doing so you

16   didn't make the surrounding districts worse for those

17   incumbents.  What they feared most was that they --

18                JUDGE DUFFEY:  They were all made worse for those

19   incumbents.

20                JUDGE BATTEN:  Safely worse for the incumbents.

21                MR. CUSTER:  Safely worse.  Thank you, Your Honor.

22   They clearly were.  What you didn't want to end up with was,

23   instead of one vulnerable district, three vulnerable

24   districts.  So they had to move the African-American voters by

25   only two percent.  And you can't do that and split districts

1    without knowing the racial data at the split precinct level.

2    And they had that -- that is the only place they had access to

3    information that was would guide the splitting, was the racial

4    data at the street-by-street level, which only came from the

5    census.

6             JUDGE BATTEN:  All right.  Thank you, counsel.

7             MR. CUSTER:  Thank you, Your Honor.

8             JUDGE BATTEN:  Even though it is past the time, we

9    will give a little rebuttal back to Mr. Greenbaum.  All right.

10   Mr. Park?

11            MR. PARK:  Yes, Your Honor.  May it please the

12   Court.  I am Jack Park, and I am one of the attorneys for

13   Secretary of the State Kemp.  I would like to start with Dan

14   O'Connor, because his deposition testimony tells you that he

15   had nothing to do with drawing the lines in the plan.  On page

16   134 of his deposition he is asked:

17            "So I am going to ask you with respect to District

18   105.  Was District 105 changed to eliminate a split precinct?"

19            "I don't recall."

20            "You don't recall that as being a primary reason,

21   correct?"

22            "I wasn't involved in this.  I don't recall."

23            "Sure.  But is it fair to say that the primary

24   objective of District 105 was to make it safer for the

25   Republican incumbent?"

1            "Well again, I wasn't involved in that so I won't

2    speculate."

3            With respect to House District 111 he said again, "I

4    wasn't involved in the, you know, map drawing of 111" on page

5    140 of his deposition.  So the evidence suggests that it was

6    Ms. Wright and Ms. Wright alone who drew the plans.  Now those

7    plans had to be acceptable to the members she drew them for.

8    And --

9            JUDGE MARTIN:  Can you answer my question for me?

10            MR. PARK:  Yes, ma'am.

11            JUDGE MARTIN:  With my experience seeing the

12    Maptitude application used, and my experience was that the

13    racial information was the most detailed of any, you know,

14    description of the population on the map, I mean, do you

15    understand Ms. Wright's testimony to be -- I mean, she said

16    usually she worked with that on there; right?  I mean, on page

17    105 or whatever of her deposition.

18            MR. PARK:  What I understand her deposition

19    testimony to be in essence is there is a pending changes box

20    and you can decide what goes in that pending changes box.  And

21    for the purpose of this case she started with the political

22    data.  She started with the political data for a good reason

23    because these aren't black majority districts.

24            JUDGE MARTIN:  But the political data is the most

25    recent voting history that you have available, right?

1      MR. PARK:  2014 statewide races that are contested.

2      JUDGE MARTIN:  Okay, but as I understand it, the

3    computer program says generally this, you know, this division

4    of voting voted in this percentage.  So it just spreads that

5    equally.  It shows the voting history just kind of equally

6    across the voting area; is that right?

7      MR. PARK:  Her testimony -- you know precinct

8    results; right?

9      JUDGE MARTIN:  Yeah.

10      MR. PARK:  You know precinct results.  And what she

11    testifies the software does, is if you are going to split the

12    precinct down to census blocks, it allocates them to census

13    blocks and it allocates them in a rational manner.  If nobody

14    lives in those blocks, it's not going to put people in it.

15      JUDGE MARTIN:  But bottom line, you have much more

16    detailed information about race than you do about voting

17    history.  I mean, based on what I saw.

18      MR. PARK:  That is correct, you do.  What you do

19    have, though, is an estimate of the behavior of blocks within

20    a precinct, an estimate of the political behavior of blocks

21    within a precinct that you can use to make a judgment as to

22    the affect of a change on the political outcome.

23      JUDGE MARTIN:  And didn't she say then, after she

24    drew it, she came back and looked at the racial data when she

25    was, quote, finished?  Is that --

1          MR. PARK:  That is correct, Your Honor.  And she

2     would do that because these districts start with 33, 31

3     percent black voting age population; right?  In order to elect

4     the candidate of their choice, they are going to need votes

5     from non-blacks.

6          JUDGE MARTIN:  When you say their choice, you

7     mean --

8          MR. PARK:  The African-American community in the

9     district.  They need non-African-American votes.  In fact,

10    they are getting some.

11         JUDGE MARTIN:  But you are not saying that was her

12    motive, right?  She was very up front about the fact that

13    people had come to see her and say I need a little boost for

14    105.

15         MR. PARK:  Correct.

16         JUDGE MARTIN:  I guess Representative Chandler went

17    to her house.

18         MR. PARK:  Representative Chandler went to --

19         JUDGE MARTIN:  Went to Ms. Gina Wright's house and

20    explained to her, right?  I mean, that was her testimony.

21         MR. PARK:  I don't recall her going to her house,

22    but Representative Chandler did want a boost to her district.

23         JUDGE DUFFEY:  But didn't Ms. Wright also meet with

24    members, maybe not as a whole, but of the black caucus to talk

25    to them about the redistricting that was going to go on in

1    2015?

2            MR. PARK:  That was her testimony.  And

3    Representative Strickland said that he knew that the minority

4    leader, Ms. Abrams, knew about the changes.

5            JUDGE MARTIN:  But I mean, just in general she, on

6    page 22 of her deposition, she said, you know, these folks

7    that were coming to talk to her about District 105 were

8    looking for a political advantage to see if there was any way

9    to give a political boost, meaning a boost to the incumbent;

10   right?

11           MR. PARK:  Correct.

12           JUDGE MARTIN:  You know, so my experience has been

13   over the years, and the law has changed, but that is legally

14   acceptable to redraw lines to give an incumbent a boost.

15           MR. PARK:  Incumbent protection is generally

16   recognized as a legitimate purpose of drawing districts.

17           JUDGE MARTIN:  And you seem to openly acknowledge

18   that is what happened here, both for 105 and 111; is that

19   right?

20           MR. PARK:  That is correct.  And 111 was driven at

21   least in part by Rutledge's move into McDonough.

22           JUDGE MARTIN:  But I mean, there was an adjustment

23   on --

24           MR. PARK:  There was an adjustment, but Strickland

25   was winning with 53 percent of the vote.

1          MR. PARK:  But I mean in both.  White voters were

2     moved in and black voters were moved out.

3          MR. PARK:  Some of both.

4          JUDGE MARTIN:  Yeah.  I mean, white were voted in

5     and moved in, blacks moved out.

6          MR. PARK:  There may have been more white voters in

7     than --

8          JUDGE MARTIN:  Well I know in May it was, but I mean

9     I guess your position is that we can do that.

10          MR. PARK:  But -- and it wasn't exclusively them.

11     And we can do it.  If it -- it happens to correlate with

12     politics, but race and politics are two entirely different

13     considerations.

14          JUDGE MARTIN:  You know, I noticed that in the *Bush*

15     *v. Vera* case, Justice O'Connor in the plurality opinion

16     referred to it as a, quote, mixed motive case.  And that's

17     kind of what we have here; right?  I mean, we know that race

18     was impacted.  It is just a matter of evaluating which motive

19     fell to which category, political, race.  Is that -- is that a

20     fair -- I mean, that is the way she characterized it in *Bush*

21     *v. Vera,* but would you characterize that case that way?

22          MR. PARK:  No, Your Honor.  Because redistricting

23     law puts the burden on the plaintiffs to show that race

24     predominated over other --

25          JUDGE MARTIN:  I am not asking you that, as far as

1    procedure.  But you acknowledge this is a mixed motive case?

2           MR. PARK:  No, I don't.  Her testimony is politics

3    drove it.  The plaintiffs would have you focus on race as the

4    motive, and it's their burden to show that race predominated.

5           JUDGE MARTIN:  Let me ask you this other fact

6    question.  So as I understand it, Representative Nix said when

7    he was looking at these maps with Gina Wright the race

8    information was there.  Have I got that right?

9           MR. PARK:  I think there is testimony that he

10   thought that back in 2015 when he looked at it he saw racial

11   data.  Yes.

12          JUDGE MARTIN:  And she was there with him?

13          MR. PARK:  Correct.  He was in a meeting in her

14   office.

15          JUDGE BATTEN:  What do you do with that?  She says

16   it wasn't there and he says it was there.

17          MR. PARK:  You have to see both of them and decide

18   who you believe.  There is a value to seeing witnesses testify

19   and being cross-examined.

20          JUDGE MARTIN:  What about this, that there was a

21   series of, I mean, just based on my own experience again,

22   there is a series of meetings maybe in the early on meetings

23   when Representative Nix was there, the race data was there

24   when they were playing with the lines for Districts 105 and

25   111 and then later in the process maybe she took that out.

1    Would that be consistent with the evidence?

2              MR. PARK:  No.  I don't think so, Your Honor.

3    Because I -- you know, Mix doesn't really have an interest in

4    105 or 111.

5              JUDGE MARTIN:  Well --

6              MR. PARK:  The folks who are interested in 105 and

7    111 are Efstration and Chandler in 105, and then Rutledge and

8    Welch and -- well, it is now Mathiak in 73, and was

9    Strickland.  Strickland is no longer there, he is now in the

10   Senate.  It is a guy named Cauble, and there is one more whose

11   name I can't recall off the top of my head.

12             JUDGE MARTIN:  Can I ask you, you know, just again,

13   I don't live in this world and you do, I mean, is this kind

14   of -- I know that *Bush v. Vera* is a 1996 case where there was

15   some recognition that it was, you know, you could consider

16   incumbency.  But I just don't remember that type of thing

17   going on in these cases that I've been involved with.  Is

18   that -- I mean, is it your position that it's okay to consider

19   that in ways that were not okay before *Shelby County* was

20   decided in 2013?  I don't -- did you follow all of that?

21             MR. PARK:  I think it was okay both before and after

22   *Shelby County*.

23             JUDGE MARTIN:  No doubt --

24             MR. PARK:  Now if your changed your plan, before

25   *Shelby County,* you would have to send it up to DOJ and go

1     through that process.  And it was opaque at the best.

2                 JUDGE MARTIN:  Maybe people feel bolder to try stuff

3     that they wouldn't have tried when they knew it was subject to

4     preclearance.  Is that fair?

5                 MR. PARK:  I think that it's a political process,

6     and the political process has to be fair to --

7                 JUDGE MARTIN:  No, my characterization, I mean, that

8     people are a little bold now that they don't have to go

9     through --

10                MR. PARK:  I think it is overstated.  I think the

11    political process has to be generally transparent and fair.

12    And there is no evidence in the House, the Georgia House, that

13    this was unfair or not transparent.  And if you think about,

14    you know, after the census, you are going to have to redraw.

15    It is going to be done by the majority, and you -- because

16    that plan has to be passed by the legislature.  It's got to

17    pass the legislature be signed by the Governor, so it has to

18    take care --

19                JUDGE MARTIN:  But that is not what we are talking

20    about.  We are talking about something in 2015.  It wasn't

21    based on a new census.

22                MR. PARK:  Correct.  And then also, you know, you

23    have the Constitution and the Voting Rights Act that say you

24    have to do certain things with respect to race.  And *Thornburg*

25    *v. Gingles* says if you have a compact contiguous group of

1    minority citizens that is big enough to be a majority in a

2    single member district, you draw a district around them.  And

3    that makes sense because that's where people live.  You know.

4    You try --

5              JUDGE MARTIN:  But I mean --

6              MR. PARK:  What you want to do is draw where people

7    live.

8              JUDGE MARTIN:  So she said, Ms. Wright again, and I

9    found her to be very impressive, certainly very knowledgeable

10   about the Maptitude tool, but she talked about, you know, the

11   obligations of drawing these things.  She said if you are

12   trying to balance population and you can't do it within the

13   realms of keeping the precincts whole, but she always tried to

14   do that first, but sometimes it happened that you had to

15   divide a precinct.  But that is not what happened here, is it?

16   I mean, she --

17             MR. PARK:  She made some of the moves that she made

18   to even out the population.  If you look at her declaration,

19   which is clearer, because it doesn't have the questions moving

20   around, than her deposition testimony, what she says is

21   that -- I lost my point.  But if you look at her

22   declaration --

23             JUDGE MARTIN:  But you would agree with me that, I

24   mean, it was balanced before, you know, she --

25             MR. PARK:  Correct.  But when she redoes it, she has

1    to keep it within tolerance as well.  So some of the moves she

2    made in Gwinnett, when she added black majority blocks in

3    Lawrenceville-D to 105, were driven for population purposes.

4    There were a number of changes in 111 that were driven for

5    population.

6            JUDGE MARTIN:  And this is kind of a bad fact for

7    you, isn't it?  I mean after she got through doing what she

8    did, there were five split precincts where there had only been

9    two before.

10           MR. PARK:  She did explain though that Henry County

11   has pretty large precincts.  So it's supposed --

12           JUDGE MARTIN:  But the goals, they were together.

13   So if your goal was to keep them together, then you just leave

14   it the way it was and have two split precincts instead of five

15   split precincts, which is where we wound up after this

16   redistricting; right?

17           MR. PARK:  Correct.  That is where it ended up, with

18   five split precincts.  But splitting precincts, while

19   discouraged, is not unconstitutional.

20           JUDGE DUFFEY:  Even in *Bush,* doesn't the plurality

21   opinion notice specifically state that when you are protecting

22   incumbencies, that might be more of a reason to depart from

23   traditional criteria for redistricting.  And in fact, often

24   those departures are more explainable when you try to protect

25   incumbency than it would be to look at race exclusively.

1          MR. PARK:  I think that is correct, Your Honor.  But

2     I don't think we really deviated substantially from the

3     criteria.  We split a few more precincts in 105.  We put one

4     back together.  We split a few more in 111, but we put one

5     back together for which we get criticized in 105.  So --

6          JUDGE BATTEN:  These denials, disavowals by all of

7     the players of any racist intent, how are we to not be

8     suspicious that that's part of their clear understanding of

9     how the game is played?  They know the Federal courts are

10    looking over their shoulder to watch what they are doing, even

11    after *Shelby County* and with the Voting Rights Act in the 14th

12    Amendment.  So these are sophisticated people who are coming

13    in here and saying I really didn't use race as a motive.  How

14    else can they prove it than what the evidence -- the evidence

15    they have here?  Nobody is going to come out and admit it

16    explicitly.  What other proof would you expect the plaintiffs

17    to provide that they were right than what they have already

18    provided?

19         MR. PARK:  Circumstantial evidence of a district

20    shape, a substantially greater correlation between the move --

21    the racial move and political moves.  Here, you know, again,

22    these are cross-over districts at best.  The plaintiffs have

23    got to get 16, 17 percent of the non-African voters to go with

24    them.  So you know, they are just real difficult districts to

25    say -- there is an obligation to protect them.  And for all of

1     their complaints about politics they say, well, you know, we

2     are coming, we are going to get these districts, and that is a

3     political consideration.  The Democrats want to win them and

4     the Republicans don't want to lose them.

5                JUDGE DUFFEY:  Can I ask a perspective question?

6     With the two cases before to Supreme Court now on political

7     gerrymandering, let's assume that the Supreme Court, despite

8     their questioning during the oral arguments, can find a way to

9     give some certainty to states, and let's say that they find

10    and basically say political gerrymandering in some respects is

11    unconstitutional.  Will that affect this case?  I mean, is

12    this political gerrymandering?

13                MR. PARK:  It is done for political purpose.  The

14    test that they used in Wisconsin was something of a wasted

15    votes theory.

16                JUDGE MARTIN:  Efficiency.

17                JUDGE BATTEN:  Right.

18                MR. PARK:  Which is a -- probably needs more than

19    one or two House districts to show that you are wasting votes.

20    It is kind of a -- almost a statewide claim.  Because, you

21    know, the Democrats pile up votes in Atlanta and don't pile

22    them up outside in the country.

23                JUDGE DUFFEY:  What of the Maryland case?

24                MR. PARK:  The Maryland case, in the Maryland case

25    the people complaining have the advantage of living in the

1    district they are complaining about.  They don't in Wisconsin.

2    The Maryland case is a difficult case.  Having looked at the

3    transcript, some members of the Court think it has a vehicle

4    problem.  And just -- which may be a good way to docket.  You

5    know.  If they can say that Wisconsin plaintiffs lack

6    standing, and the vehicle is bad, and -- then everybody is

7    free to politically gerrymander for another decade.  I don't

8    think you could prove wasted votes on these two districts, if

9    that is the theory.  Now there may be another theory.  I

10   guess --

11             JUDGE BATTEN:  That is one for sale right now.

12             MR. PARK:  That is correct, Your Honor.  But we

13   don't think that the Plaintiffs have shown a substantial

14   likelihood of prevailing on the merits.  And I will just say

15   that the process is ongoing.  Absentee ballots have gone out,

16   some have been received, and early voting person starts

17   Monday.

18             JUDGE BATTEN:  Let me ask you about the remedy

19   issue.  If we agree with the Plaintiffs, you know, you haven't

20   come out and said we can't pull this off, have you?

21             MR. PARK:  It is too late to pull --

22             JUDGE BATTEN:  That is what they told me with the

23   6th Congressional District race.  They just said this would

24   just be so difficult it would be really hard.  And I looked at

25   them and said I think you can do it.  And this really

1    resembles that to me.  I haven't read anything, with a right

2    this important, that they are able to say that they just can't

3    make it happen.

4            MR. PARK:  There is a good reason why this case is

5    different from Congressional 6.  Here the plaintiffs's remedy

6    would have you moving all of those people who were moved back

7    into the old districts.  So what the election officials first

8    have to do is tell all of those voters, you know, what we told

9    you about a month ago about where you voted and who you were

10   voting for, never mind that, we have new instructions for you.

11   That's the first problem.  If you do that in Gwinnett County,

12   they are going to have to translate those notices into Spanish

13   because they are 203 jurisdiction.  You've got -- so you've

14   got that in front of you at a time where roughly a month out

15   from election day people going to -- going to the polls to

16   vote, they can vote early, they are already voting.  So I

17   would respectfully suggest that it is too late to stop the

18   train at this point.

19           JUDGE BATTEN:  All right.

20           JUDGE DUFFEY:  Is there any anybody qualified in

21   either of these districts that would not qualify if you went

22   back to the 2012 map?

23           MR. PARK:  Yes, Your Honor.  In Ms. Wright's

24   declaration, towards the end of it she points to House

25   District 111, the two people would not qualify.  And in House

1    District 105 one person would not qualify.  So unless the

2    Court were to get really creative in qualifications as part of

3    its remedy, you would end up disqualifying some folks.  And we

4    don't think creativity in remedies is appropriate.

5                JUDGE BATTEN:  All right.  Thank you, sir.

6                MR. PARK:  Thank you, Your Honor.

7                MR. GREENBAUM:  May it please the Court.  John

8    Greenbaum for the plaintiffs.  Let me start with what the

9    legal standard is.  We don't have to show that the

10   representatives were racist, we don't have to show that they

11   had racial animus.  We do have to show that race was the

12   predominant motive.  And we can show that, even if it's to

13   achieve a partisan end.  And I will refer you to the Supreme

14   Court's latest racial gerrymandering case, *The People vs.*

15   *Harris*.  In footnote 7 the Court says:  If legislators use

16   race as a predominant districting criterion with the end goal

17   of advancing their partisan interests, that's going to

18   implicate strict scrutiny.  And that is what we have here.

19   The main goal, the end goal, was to protect these Republican

20   incumbents.  And how do they get there?  They use race as the

21   means for getting there.  First of all, race was the reason

22   why they did needed to do this in the first place.  Highly

23   unusual thing to redistrict mid decade from a planned drawn by

24   the legislature that had not been found unconstitutional, that

25   a court had not redrawn.  Very unusual what Georgia did here,

1    which actually separates itself out from all of the other

2    cases -- from all the cases that the Supreme Court has

3    decided, and makes this more suspect that Georgia did it.  Why

4    did they do it?  Because of the racial demographic changes

5    going on in Henry and Gwinnett Counties, and in particularly

6    in Districts 105 and 111.  The districts were getting blacker

7    and the results were getting closer.  And so they --

8            JUDGE DUFFEY:  Excuse me.  The reason why they --

9    the concern is, as you've told us a number of times, is this

10   racial polarization, is that as they get blacker, they know

11   that they are Democratic voters.

12           MR. GREENBAUM:  That's right.

13           JUDGE DUFFEY:  So it's almost as if you could never

14   have a case where you know -- if you have a jurisdiction where

15   for some reason it is all minorities, and therefore the

16   supposition I think that the data would show that they

17   probably are all going to vote Democratic, and you were trying

18   to protect an incumbent, which you are allowed to do, you

19   would say I could never touch that one because as soon as I do

20   it is going to look like I am moving blacks out of that

21   district into another district to protect the incumbent in the

22   district to which they reside.  It is Hobson's choice.

23           MR. GREENBAUM:  So let me unpack that, Judge Duffey.

24   The first thing about incumbent protection, what the Georgia

25   standard is, in their rules, and this is consistent with what

1    courts have found, this is what you are allowed to do.  You
2    are allowed, in a redistricting process, to not -- to pair
3    incumbents together.  That is what they are talking about in
4    terms of incumbent protection.  When, instead, the goal is I
5    want to protect a particular incumbent whose district
6    demographics are changing, and save that incumbency, that gets
7    no protection at all.  And you can look -- I will tell you two
8    places where you can look for this.  The Supreme Court case in
9    *Lulac versus Perry*, where that is what Texas tried to do, move
10   voters out and move voters in, and the Court said, no you
11   can't do that to protect this incumbent, at a time in which
12   Latinos in that case were about to be able to elect their
13   candidate of choice.  The same facts here.  Also you can look
14   at this Court's three-judge Court's decision, *Larios v. Cox*
15   where the Court lays it out in detail that the type of
16   incumbency -- when they are talking about what type of
17   incumbency protection is legally acceptable, it is not pairing
18   incumbents together, which is not an issue in this case.  So
19   there is no -- there is no special protection for incumbents,
20   especially when you are using the fact that the racial
21   demographics of a district are changing and that minority
22   voters are finally going to be able to elect their candidates
23   of choice, you can't use incumbency protection as the reason
24   why; it is not a legitimate reason that justifies.
25            JUDGE DUFFEY:  I understand that you can do it, but

1    it doesn't justify racially moving people from one place to

2    another to avoid a racial gerrymandering, but you can protect

3    incumbents, that that is a legitimate end means, and you can

4    consider that in the way that they go about that to determine

5    whether or not the primary motivation is that they are moving

6    minorities as opposed to Democrats.

7              MR. GREENBAUM:  If you are using race as a means to

8    protect an incumbent, I would submit to you, Judge Duffey,

9    that that is a racial gerrymander.

10              JUDGE DUFFEY:  But the question is whether or not

11    that happened here.

12              MR. GREENBAUM:  Oh, it is exactly what happened

13    here.  If you look at -- if you look at some of the -- so

14    first of all, the racial demographics are changing.  There is

15    no doubt about that.  The defendants don't dispute that.  And

16    that is what was causing them to have to redistrict in the

17    first place.  And then you look at some of the choices that

18    were made -- if you look at Gwinnett County, one of the

19    interesting things that they did in Gwinnett County -- I don't

20    know if we have the detail on this -- is the Harbins -- the

21    Harbins precinct that had been fully in 104 previously and now

22    gets split between 104 and 105.  This map might not show it,

23    but we actually have the big maps.  What happens in -- it's

24    over here in the right-hand corner, towards the right-hand

25    corner.  And what happens is, Harbins 104 is a majority white

1    precinct.  They move it in -- they move a portion of it into

2    105.  The split is very interesting.  The portion that got

3    moved into 105 is less than 15 percent black.  The portion

4    that stayed in 104 was more than 30 percent black.  So there

5    you clearly --

6              JUDGE DUFFEY:  If you left that you would have an

7    odd-looking district.

8              MR. GREENBAUM:  Well, because the other thing

9    that -- the other thing that the legislature did was it moved

10   the other Harbins precinct into 105, which is about 90 percent

11   white and about 12 percent black.  So that's right.

12             JUDGE DUFFEY:  So your argument is that they

13   shouldn't have done any of this and we should go back to the

14   2002 map, but it was also in that map that they put together

15   two previously segments of a single, or used to be a single,

16   precinct.  Isn't that right?

17             MR. GREENBAUM:  Well, in 2015 they did put together

18   a precinct in Lawrenceville and they split another one.  But

19   the main motivation was they wanted to get the Harbins

20   precincts into 105; that was Gina Wright's testimony that is

21   what motivated that.  But the split in the Harbins precinct

22   between the 30 plus percent portion staying in 104 and the

23   under 15 percent portion staying in 105 is indicative of a

24   racial intent.  Because as we know, they can't estimate

25   partisan performance at the block level.  They can estimate

1    race, but they can't estimate partisanship.  Then if we move

2    to -- we move to 111 --

3            JUDGE BATTEN:  Well, there is just not that

4    empirical a study.  There is a lot of subjectivity that goes

5    into the calculus.  This isn't just to these maps.  And

6    this -- this data is particularly valuable because it goes

7    down to the race, down to the block level, and the other

8    doesn't.  I understand what you are saying, but there is still

9    a whole lot of subjectivity in making guesstimates as to where

10   people are going to vote.

11           MR. GREENBAUM:  I would agree with that, Your Honor,

12   but the fact that they actually made the decision to split the

13   precinct there is -- and the fact that the population splits

14   in that way, why else do it?  Why else do it?  And going back

15   originally, why did they redistrict in the first place?  They

16   didn't need to do it.  They needed to make these districts

17   safer for the Republican incumbents.  Those were the orders

18   that the legislature gave to Gina Wright.  How do you do it?

19           JUDGE BATTEN:  And there is nothing wrong with those

20   orders.

21           MR. GREENBAUM:  There is nothing wrong unless race

22   is the motivation behind why they did it.  And that race is a

23   key part in terms of actually how they went about doing it.

24           JUDGE DUFFEY:  So you believe the test is that we

25   would have to find evidence, direct or circumstantial, that

1    these changes that somebody sat there and said we get a

2    partisan benefit from this, but we also need to move blacks

3    from this district into the new district or from the new

4    district into the old district?

5            MR. GREENBAUM:  I wouldn't quite phrase it that way.

6    What I would say is, going back to the fact that if you are

7    using race as a means to achieve a partisan end, that that is

8    a racial gerrymander, and that's --

9            JUDGE DUFFEY:  But you would have to consciously say

10   we are going to move minorities, race is going to be

11   predominant, we are going to move minorities from one district

12   to another or from that district back into this other

13   district, but somebody has to have said race is important in

14   order to accomplish our objective.

15           MR. GREENBAUM:  You know, I would disagree with

16   that, given what everybody knows about racial polarization in

17   Georgia.  You said it yourself, Judge Duffey, everybody knows

18   voting is racially polarized in Georgia.  That is not news to

19   anybody.  Even Gina Wright said she was aware of studies

20   showing that voting is racially polarized.  Everybody knows

21   it.  And these legislators were smart enough -- maybe

22   Mr. O'Connor -- Mr. O'Connor is very candid and very

23   forthright in his emails.  It is interesting that the

24   legislators don't say anything to the contrary.  And why is

25   it -- you know, we had an extensive discovery effort.  Why is

1    it that we have no emails between the legislators themselves

2    on this?  They didn't produce any to us.  They knew what --

3    they knew what was going on here.  O'Connor told them -- if

4    you want O'Connor, who the Speaker installed in that office to

5    protect Republican interest told them, told Efstration, told

6    the Speaker's office, told the Speaker Pro Tem, this is what

7    we need to do to make these seats safer for the Republican

8    incumbents.

9              JUDGE BATTEN:  At the risks of being overly

10   pedantic, is this different from *Romer v. Evans* where the

11   Court drew the inevitable inference of animus?  Do you say

12   that that is what -- that we are basically doing the same

13   thing here, is that we have to draw this inevitable inference

14   that race did in fact predominate?

15             MR. GREENBAUM:  Well yes, I think it is inevitable,

16   Your Honor.  But the one thing I would hesitate on, as I said,

17   we don't have to prove animus here.  It is very clear in these

18   cases --

19             JUDGE BATTEN:  I didn't mean by referring to *Evans*

20   that I think you do, I know you don't.  It is just whether it

21   was the predominant factor.

22             MR. GREENBAUM:  Sure.

23             JUDGE BATTEN:  But the point is, the Court drew what

24   it called an inevitable inference, and I think your proof, I

25   think, is not as strong as I am sure you would like it to be.

1    And I am wondering if you are asking us to engage in that type

2    of inference drawing.

3         MR. GREENBAUM:  We are, but I would actually submit

4    to you, and I've done voting rights for 20 years, that this

5    proof is pretty strong.  I mean, rarely are you going to get

6    this level of candor in terms of emails.  I mean, people are

7    usually sophisticated enough in this day and age -- maybe in

8    the mid 1990's, you know, I remember Bill Gates in the

9    Microsoft case said all of this stuff in emails.  People

10   really don't do that to this degree anymore.  One of the

11   things that is very interesting about this too is that why the

12   legislators -- if you look at all of the emails we submitted

13   in this case, I think there is only one legislator who uses

14   his Georgia email in all of the email traffic, and I think

15   that might be Representative Welch.  Why are they using their

16   private emails?  They are conducting state business here.  I

17   mean, there is something -- there is something that really

18   smells badly about this.  I mean, there is no doubt about

19   that.

20        JUDGE BATTEN:  All right.  Thank you, counsel.

21   We're adjourned.

22              (end of hearing at 3:04 p.m.)

23                        * * * * *

24

25

1          REPORTER'S CERTIFICATION

2

3          I certify that the foregoing is a correct transcript from

4     the record of proceedings in the above-entitled matter.

5

6                              _____
                               Lori Burgess
7                              Official Court Reporter
                               United States District Court
8                              Northern District of Georgia

9                              Date:  May 1, 2018

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25