## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

AUSTIN THOMPSON, et al.,

    Plaintiffs,

v.

Civil Case No. 1:17-CV-01427

BRIAN KEMP, et al.,

    Defendants.

## DECLARATION OF LAUGHLIN MCDONALD

Laughlin McDonald

Laughlin McDonald

Aug. 6, 2018

Date

LAUGHLIN MCDONALD, acting in accordance with 28 U.S.C. § 1746, Federal Rules of Civil Procedure 26(a)(2)(B), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

## I.       STATEMENT OF PURPOSE

I have been retained by the Plaintiffs in this litigation to prepare a report on the history of official race discrimination in voting in Georgia, and other social and historical conditions to determine how the current Georgia State House district map fits into the arc of the history of voting rights of African Americans in Georgia, and the ability of African Americans to participate in the electoral process. I am being compensated for my work in this matter at a rate of $150 per hour.

## II.      QUALIFICATIONS

I am an attorney at law with a B.A. degree from Columbia University in 1960, and an LL.B degree from the University of Virginia Law School in 1965. I have been employed by the American Civil Liberties Union (ACLU) since the early 1970s when I became the Director of the ACLU Voting Rights Project. I now serve as Special Counsel and Director Emeritus of the ACLU Voting Rights project.

For the past 45 years, I have studied and written about the history of minority voting rights in Georgia. I am the author of several books, book, chapters, and scholarly articles discussing minority voting rights and the historical struggle of African Americans in Georgia to gain access to the franchise. I am the author of the following books: A Voting Rights Odyssey: Black Enfranchisement in Georgia (Cambridge; Cambridge U. Press, 2003); American Indians and the Fight for Equal Voting Rights (Norman; U. Oklahoma Press, 2010); and The Rights of Racial Minorities (Carbondale; Southern Illinois U. Press, 1993 (co-author)). Several of my publications, including my book entitled A Voting Rights Odyssey: Black Enfranchisement in Georgia, which documents in detail the history of the struggle of African Americans against disenfranchisement in Georgia, bear directly on this report.

I have written book chapters on minority voting rights, including: "The Bull Connor Is Dead Myth: Or Why We Need Strong, Effectively Enforced Voting Rights Laws," in The Most Fundamental Right (Bloomington; Ind. U. Press, 2012); "Redistricting and Voting Rights Issues, 1992-2002: A Legal Analysis," in Voting Rights and Minority Representation: Redistricting, 1992-2002 (Washington, D.C.; Joint Center for Political and Economic Studies, 2006); "Congressional Redistricting on the Basis of Race: Abrams v. Johnson," in Commentaries on Law & Public Policy: 1997 Yearbook (East Orange, N.J.: The Dumont Institute, 1998); "Georgia," in Quiet Revolution in the South (Princeton; Princeton U. Press, 1994) (co-author); and "The 1982 Amendments of Section 2 and Minority Representation," in Controversies in Minority Voting: The Voting Rights Act in Perspective (Washington, D.C.; The Brookings Institution, 1992). Nearly all of these book chapters relate directly to the subject of this report.

A copy of my resume is attached; it further discusses my publications as well as awards I have received for my work.

## III.   EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS

A substantial portion of this report is drawn from A Voting Rights Odyssey: Black Enfranchisement in Georgia. In working on that book, I did exhaustive research using primary and secondary sources available at the time. In the course of my research for A Voting Rights Odyssey: Black Enfranchisement in Georgia, I read numerous books, articles, cases, and dissertations, all of which shaped my conclusions.

In completing this report, I consulted additional primary and secondary sources, including state statutes, constitutional provisions, legislative records and histories, testimony of public officials, judicial decisions, books and articles, and congressional records.

A complete list of the primary and secondary sources that I consulted and relied upon in writing of A Voting Rights Odyssey: Black Enfranchisement in Georgia is available in the book. I have provided detailed citations and footnotes in the body of this report that identify the sources used in the preparation of this report, including sources consulted in relevant portions of A Voting Rights Odyssey: Black Enfranchisement in Georgia.

The conclusions drawn in this report are based on materials available to me at the time. I reserve the right to revise my expert opinion if presented with new information.

**My major opinions are summarized briefly below:**

While Georgia was not an anomaly in terms of Southern states, no state was more systematic and thorough in efforts to deny or limit voting and officeholding by African Americans after the Civil War. Georgia adopted virtually every one of the traditional "expedients" to obstruct the exercise of the franchise by blacks, including literacy and understanding tests, poll taxes, felony disenfranchisement laws, onerous residency requirements, cumbersome registration procedures, voter challenges and purges, the use of discriminatory redistricting and apportionment schemes, the expulsion of elected blacks from office, and the adoption of primary elections in which only whites were allowed to vote. Where these measures failed to work or were thought insufficient, Georgia was more than willing to resort to fraud and violence in order to smother black political participation and safeguard white supremacy. Georgia continued its opposition to equal voting rights into the twentieth century and after the passage of the Civil Rights Act of 1957 and the Voting Rights Act of 1965, both of which were met with fierce opposition by the state. Outside of the voting context, too, African Americans suffered as a result of the state's commitment to white supremacy. African Americans have historically lived in substandard housing and sent their children to inferior schools.

In the half-century since the Civil Rights Movement, efforts to tamp down on the political access of African Americans in Georgia have continued. The consequences of a century of official disenfranchisement and segregation persist as African Americans continue to trail whites in every measurable assessment of success—from education to employment, income, and access to housing. These disparities in turn hinder African Americans' access to the polls.

Race has played a significant role in redistricting in Georgia. The Georgia legislature has repeatedly drawn maps that have the intent or effect of diluting the voting power of African Americans. The current State House map is best viewed in this context, with the history of racial discrimination in voting as the backdrop. It is my conclusion that to the extent that the legislature should have drawn additional majority African-American districts in the current State House map, the construction of legislative districts in the current Georgia State House map is but

one of the latest in a long line of attempts to suppress the voting power of African-American voters in Georgia.

## IV. THE HISTORY OF RACE DISCRIMINATION IN VOTING IN GEORGIA

Georgia has a long history of official discrimination that denied or limited the rights of blacks to register, to vote, or otherwise to participate in the democratic process. The State has continuously used the law to officially discriminate, in overt and more subtle ways, against African Americans' ability to freely access the franchise. As the court held in *Brooks v. State Board of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994): "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception."  And racial discrimination in voting and other facets of life continue to affect African Americans in Georgia today.

### A. 1777-1877: Civil War to the Ratification of the Fifteenth Amendment

In language that reveals the legal and social status of African Americans in Georgia during the time period leading up to and around the Civil War, the Georgia State Supreme Court held in *Bryan v. Walton,* 14 Ga. 185, 198 (1853): "The *status* of the African in Georgia, whether bond or free, is such that he has no civil, social or political rights or capacity, whatever, except such as are bestowed on him by statute."  The court further held in a passage of torrid prose that "the social and civil degradation, resulting from the taint of blood adheres to the descendants of Ham in this country, like the poisoned tunic of Nessus." 14 Ga. at 202.

In keeping with that promise of white supremacy, which was the law of the land, Georgia adopted several state constitutions and laws that made it clear that Blacks were not entitled to the right to vote. Georgia's 1777 Constitution limited the right to vote to "male white inhabitants, of the age of twenty-one years." Article IX, 1777 Ga. Const. The state's Constitution adopted in 1861, after Georgia seceded from the Union, reaffirmed that the franchise was limited to "free white male citizens of this State."  Article V, 542.1, 1861 Ga. Const.  The state's code of laws also made it clear that "[t]he free person of color is entitled to no right of

citizenship." Ga. Code of 1861, § 1612. As Alexander H. Stephens, a Georgian and Vice President of the Confederacy, said in a speech he gave in Savannah on March 21, 1861, the foundations of the Confederate government "are laid, its cornerstone rests, upon the great truth that the negro is not equal to the white man; that slavery, subordination to the superior race, is his natural and moral condition. This, our new Government, is the first, in the history of the world, based upon this great physical, philosophical, and moral truth."[1]

Following the Civil War, and during and after Reconstruction, Georgia continued to adopt laws that denied blacks the equal right to vote and to participate in the political process. The 1865 Constitution, which was adopted by the state at the end of the Civil War, limited the franchise to "free white male citizens of this State." Article V, 639.1, 1865 Ga. Const. The state also defined "persons of color" as "all negroes, mulattoes, mestizoes, and their descendants, having one-eighth negro, or African blood, in their veins." Ga. Laws 1866, p. 239.

A third Constitution was adopted in 1868 during Reconstruction which guaranteed blacks the right of male suffrage, Art. II, Sec. 2, 1868 Ga. Const., but it did not expressly guarantee the right of blacks to hold office. As a result, the Georgia House of Representatives adopted a Resolution in 1868 that expelled its twenty-five black members because "[f]ree persons of color . . . are, under the Constitution of the State of Georgia, ineligible to seats on the floor of this House." Ga. Laws 1868, pp. 294-5. The expulsion of Black elected officials, along with racial violence and terrorism in the 1868 election, prompted Congress to place Georgia once again under military supervision. It is not a coincidence that to this day, Blacks have not been elected to office, especially statewide office, in significant numbers in Georgia. Historically, and continuing to this day, some white voters and white elected officials view Black candidates less favorably than identical white candidates.[2]

Following the ratification of the Fifteenth Amendment, Georgia was readmitted to the union for the second time on July 15, 1870. 16 Stat. 363-64. The Fifteenth Amendment provides that: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on

---

[1]Kenneth Stampp, *The Causes of the Civil War* (New York: Touchstone, 1991), p. 153.

[2]Hutchings, Vincent L., and Nicholas A. Valentino. 2004. "The Centrality of Race in American Politics." Annual Review of Political Science 7:383-408.

account of race, color, or previous condition of servitude." Yet, blatant voting discrimination against African Americans continued. In 1871, for example, the state re-imposed payment of a poll tax as a condition for voting, Ga. Laws 1871, p. 74, which had an adverse impact upon Black residents who were more impoverished and economically depressed than white residents and could not afford to pay the poll tax.  The same year the state abolished elected offices in majority black McIntosh County.  Ga. Laws 1871, p. 265.  The following year, the state abolished locally elected school boards in favor of appointments by grand juries. Ga. Laws 1872, p. 279.  The discriminatory intent and impact of these types of laws was apparent. For example, state law required grand juries to be composed of "free white male citizens," Ga. Code of 1867, § 3841, and they would only appoint whites to school boards.   In 1873, the state changed the residency requirements for voting from six months to one year as a requirement for voting to take advantage of the supposed itinerant habits of blacks and deprive them of the right to vote.  Ga. Laws 1873, p. 25.

Even after the passage of the Fifteenth Amendment, Blacks in Georgia were blocked from using federal law to try to gain access to the franchise. In *United States v. Cruikshank*, 92 U.S. 542 (1875), and *United States v. Reese*, 92 U.S. 214 (1875), the Supreme Court restricted the scope of, or held unconstitutional, federal statutes designed to prevent discrimination in voting on account of race, and expressly held that the right to vote was a state-created—not a federal—right.  The effect of the Court's decisions was to leave black voting rights essentially at the mercy of the white majority in Georgia.

## B.     1877-1954: Georgia's New Constitution, Literacy Tests, White Primaries, Racial Violence and Poll Taxes

In 1877, Georgia adopted a new Constitution containing the requirement of payment of all taxes as a condition for voting, which would have a discriminatory impact upon Black voters, most of whom were poor.  Article II, I, para. II, 1877 Ga. Const.  The 1877 Constitution also adopted a provision adding larceny to the list of disfranchising offenses that Blacks were thought more likely to commit than whites.  Article II, § 2. Para. 1, 1877 Ga. Const.  In 1890, the state legislature gave political parties the exclusive power to regulate and conduct primary elections.

Ga. Laws 1890, p. 210.  As a result, the Georgia Democratic Party adopted rules in 1900 limiting voting in all state primaries to whites.[3] A law adopted in 1894 required racial designation of voters in the voters' book, "that is to say, whether white or colored."  Ga. Laws 1894, pp. 115, 117.  The Supreme Court reached a new low point in its decision-making in the area of minority voting rights in *Williams v. Mississippi*, 170 U.S. 213 (1898), and *Giles v. Harris*, 189 U.S. 475 (1903), in which the Court upheld the constitutionality of literacy tests and poll taxes, as well as the refusal of state officials to register black voters.

The decade of the 1890s saw an extraordinary number of lynchings (approximately 132) in Georgia. This reflected the extraordinary level of white discrimination and hostility towards Blacks in voting and in all other facets of life, The causes for the lynchings were based on the immutable characteristics of Blacks, and were said to include: "The color of the negro's skin, his kinky hair, and his general physiognomy, especially his flat nose and protruding lips with receding (actual or apparent) forehead, - all are widely diverse from the white man's standard of beauty and symmetry.  Measured by the Caucasian ideal the features of the negro are course and animal-like."[4]  Between 1889 and 1930, there were more than 450 lynchings reported in Georgia, an average of nearly one every month.[5]

In 1908, Georgia enacted laws providing comprehensive limitations on voting, including a literacy test, poll tax, property ownership requirement, good character test for voting, and limiting voting for the Governor and members of the General Assembly in the general election to those who had paid all taxes due by at least six months before the election. The laws also required voter registration lists to show the race of all voters.  Ga. Laws 1908, pp. 10-1, 16-21, 27-31, 58-9. Each of these measures was adopted with the intent, and had the effect of, disfranchising Black voters.  In *South Carolina v. Katzenbach*, 383 U.S. 301, 310-11 (1966), the Supreme Court acknowledged that the 1908 Georgia scheme was "specifically designed to prevent Negroes from voting."   Indeed, Governor Hoke Smith addressed the Georgia Legislature in 1908, and referred to Ga. Laws 1908 as the

---

[3]Lynwood Holland, *The Direct Primary in Georgia*, (Urbana: U. of Ill. Press, 1949), pp.  50, 54.

[4]James Elbert Cutler, *Lynch-Law; An investigation into the History of Lynching in the United States* (Montclair, N.J.; Patterson Smith. 1969), 200, 202.

[5]Numan V. Bartley, *The Creation of Modern Georgia*, (Athens: University of Georgia Press, 1983), p. 139.

"Disfranchisement Act" and urged the legislature to adopt the law and maintain "the purity of the ballot box."  Georgia House Journal, June 24, 1908, p. 11.

Following passage of the 1908 scheme, the Georgia legislature continued to enact laws restricting the rights of blacks to vote.  In 1913, it passed a bill implementing a system of permanent registration, requiring all voters to submit to examination by a board of registrars comprised of whites who were hostile to Black voting.  Ga. Laws 1913, p. 115.  In 1927, the legislature expanded the definition of "persons of color" to include those with "any ascertainable trace of either Negro or African, West Indian, or Asiatic Indian blood in their veins," and all descendants of such persons.  It defined white persons as those of "the white or Caucasian race, who have no ascertainable trace of either Negro, African, West Indian, Asiatic Indian, Mongolian, Japanese, or Chinese blood."  It provided for the registration of persons by race by the State Registrar of Vital Statistics, and that no person, anyone whose ancestors has been duly registered as a "colored person," shall be deemed a white person. Ga. Laws 1927, pp. 272-9.

Several of these discriminatory features were challenged in court. And courts delivered mixed decisions on voting rights during this era. For example, Georgia's poll tax was upheld by the Supreme Court in *Breedlove v. Suttles*, 302 U.S. 277, 283-84 (1937). But in *King v. Chapman*, 62 F.Supp. 639, 650 (M.D. Ga. 1945), *aff'd sub. nom. Chapman v. King*, 154 F.2d 460 (5th Cir. 1946), the court invalidated the all-white Democratic Primary in Georgia as a violation of the Fourteenth and Fifteenth Amendments.  As a result, white voters challenged Black voters who attempted to vote in primaries en masse in more than 30 counties, and an estimated 15,000 to 25,000 were purged from the voting rolls.[6]

Georgia abolished its poll tax in 1945, Ga. Laws 1945, p. 129, but continued to enact devices to exclude blacks from voting, including a purge law and registration requirements of literacy or ability to answer 10 of 30 factual questions correctly.  Ga. Laws 1949, pp. 1204, 1214-17.

---

[6]V. O. Key Jr., *Southern Politics in State and Nation* (Knoxville: Univ. of Tenn. Press, 1984), p. 570.

### C.    1954-1965: Judicial Intervention, the Long Civil Rights Movement

In 1954, the Supreme Court issued its decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), invalidating segregation in public schools. The decision would lead to the passage of the Civil Rights Act of 1957 – the first federal civil rights law since Reconstruction. The 1957 law contained several modest provisions designed to protect the right to vote.

Many Georgia elected officials were openly hostile to both the *Brown* decision and the passage of the Civil Rights Act. Indeed, every member of Congress from Georgia voted against the bill that became the Civil Rights Act, with the exception of Prince H. Preston from Statesboro, who didn't vote.[7] The white leadership of Georgia was also outraged over the *Brown* decision and its consequences. The same year that the Civil Rights Act of 1957 was passed, the legislature adopted a resolution calling for the impeachment of Chief Justice Earl Warren and several other justices of the Supreme Court on the grounds that they had committed high crimes and misdemeanors by rendering decisions such as *Brown v. Board of Education* that they said gave aid and comfort to "Godless communism." Ga. Laws 1957, pp. 553, 561-62. During the same session, the general assembly by unanimous vote in both houses adopted a resolution calling for repeal of the Fourteenth and Fifteenth Amendments because they were "malignant acts of arbitrary power" and "are null and void and of no effect." Ga. Laws 1957, p. 348.

In 1958, just one year after the passage of the Civil Rights Act, Georgia established new discriminatory and more difficult registration requirements, including purge laws, vague reading and writing tests, and a requirement that illiterates answer 20 of 30 questions in order to become registered. Ga. Laws 1958, pp. 269, 274-83. These requirements were adopted with the intent, and had the effect of, disfranchising Black voters.

In 1960, the Supreme Court rejected arguments raised by registration officials in Terrell County that the Civil Rights Act of 1957 was unconstitutional, and the Court reversed the dismissal of a suit against the officials who were alleged to have discriminated on racial grounds against blacks who wanted to register to

---

[7]85 Congressional Record S.13900, Aug. 7, 1957; Congressional Record H.6127, Aug. 29, 1957.

vote. *United States v. Raines*, 362 U.S. 17, 19, 25 (1960). In a subsequent suit, the district court found that Terrell County registration officials "engaged in acts and practices which deprive Negro citizens" of the right to vote and enjoined them from continuing their discriminatory practices, noting that while the county was 64% black, only 48 blacks, compared to 2,810 whites, were registered to vote in 1958. *United States v. Raines*, 189 F.Supp. 121, 125, 127, 129-30, 132, 135 (M.D. Ga. 1960). In 1962, the state adopted countywide voting for state senators in counties with more than one senator and imposed a majority vote requirement. Ga. Laws 1962, Ex. Sess., p. 30. As the Supreme Court held in *City of Rome, Georgia v. United States*, 446 U.S. 156, 183-84 (1980), a majority vote requirement can "significantly" decrease the electoral opportunities of a racial minority.

Although the white primary had been invalidated in 1945, voter registration and voting by blacks continued to be racially segregated into the mid-1960s. In June 1962, the U.S. Department of Justice identified 48 counties and 17 municipalities in Georgia that were still segregating voting and vote counting. Assistant Attorney General Burke Marshall wrote letters to the jurisdictions advising them that such segregation was unlawful and asking them to end it.[8] Most did, but lawsuits were required to stop segregated voting in Bibb County in 1962, in Jones County in 1963, and in Johnson County in 1967. *United States v. Bibb County Democratic Executive Committee*, 222 F.Supp. 493, 499 (M.D. Ga. 1962); *United States v. Jones County Democratic Executive Committee*, 8 R.R.L.Reptr. 1091 (M.D. Ga. 1963); *United States v. Attaway*, Civ. No. 962 (S.D. Ga. 1967).

Congress strengthened voting rights again with passage of the Civil Rights Act of 1960, which gave federal officials power to investigate discrimination in voting and to register qualified voters. Pub. L. No. 86-449. The Civil Rights Act of 1964 provided that black registration be based upon the same standards as had traditionally been applied to whites, and that completion of the sixth grade carried a presumption of literacy. Pub. L. No. 88-352.

In 1964, the Georgia House called the "one person, one vote" decision in *Reynolds v. Sims,* 377 U.S. 533 (1964), which set the stage for the creation of majority black state house and senate districts, "the saddest day in American history," according to a resolution adopted by the House. Georgia House Journal, Ex. Sess., June 16, 1964, p. 876. The same year, the legislature gave local

---

[8]*Atlanta Constitution*, June 13, 1962.

registrars unbridled discretion in the appointment of deputy registrars.  Ga. Laws 1964, Ex. Sess., p. 49.  It also adopted a literacy test for voting, a more stringent and discriminatory good character and understanding test for voting, a statewide majority vote requirement, and a statewide numbered post provision which required candidates to run for specific seats.  *Id.*, pp. 57-60, 89, 174-75.  In *Rogers v. Lodge*, 458 U.S. 613, 627 (1982), the Court held that a numbered post provision disadvantages minorities because it "prevents a cohesive political group from concentrating on a single candidate."

Some of Georgia's discriminatory practices were successfully challenged in federal court by local residents and the Department of Justice.  In *Thornton v. Martin*, 1 R.R.L.Rptr. 213 215 (M.D. Ga. 1956), for example, the court ordered the reinstatement of black voters illegally purged from the rolls in Randolph County.  As noted *supra*, in *United States v. Raines*, 189 F.Supp.  121, 135 (M.D. Ga. 1960), the court held that Terrell County registration officials "engaged in acts and practices which deprived Negro citizens" of the right to vote.  In *Anderson v. Courson*, 203 F. Supp. 806, 810 (M.D. Ga. 1962), the court held that segregated voting in Albany and Dougherty County was unconstitutional.  And as noted, *supra*, courts also invalidated segregated voting in Bibb, Jones, and Johnson Counties.  The payment of a poll tax or other tax as a condition for voting in federal elections was invalidated with the passage of the Twenty-Fourth Amendment in 1964.  Two years later the Supreme Court invalidated use of the poll tax in state and local elections.  *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966).

### D.      1965: The Passage of the Voting Rights Act and its Effect on African-American Voting in Georgia

In an effort to redress the ongoing discrimination against Blacks in registration and voting, Congress enacted the Voting Rights Act of 1965, which was one of the nation's most important civil rights laws because it protected the fundamental right to vote, which is protective of all rights.  The Act contains a set of permanent provisions that apply nationwide, one of the most important of which is Section 2, which prohibits the use of voting practices or procedures that deny or abridge the right to vote "on account of race or color."  52 U.S.C. § 10301.  Other permanent provisions authorize civil and criminal sanctions against interference with the right to vote and facilitate challenges to the imposition of poll taxes for state and local elections.  Under Section 5, the Act also contained special five-year provisions that applied only in jurisdictions, known as "covered jurisdictions," that

had used a "test or device" to discriminate against minorities in voting, and in which registration and voting were depressed.

Because of its history of using poll taxes, literacy tests, and other disfranchising devices, Georgia was not surprisingly one of the covered jurisdictions, along with ten other states or parts of states. The special provisions suspended the use in covered jurisdictions of tests, such as literacy and good character and understanding tests, that had been used to deny minorities the right to vote. 52 U.S.C. §10303, §10501. Under Section 5, covered jurisdictions were also required to get approval, or "preclearance," of any change in their voting practices or procedures by making a submission to the U.S. Attorney General or the U.S. District Court for the District of Columbia. 52 U.S.C. § 10304. Other special provisions authorized the Attorney General to appoint federal examiners to register qualified voters and poll watchers to observe the conduct of elections. 52 U.S.C. § 10310, §103050.

Members of the Georgia congressional delegation and the staff of the state Attorney General argued before Congress that the proposed Voting Rights Act of 1965 was unconstitutional. Howard H. Callaway, a Republican from the third congressional district, argued that the "greatest injustice" in the bill was its abolition of literacy and other tests for voting, which had been adopted by the southern states in the aftermath of Reconstruction to disfranchise black voters.[9] Carl Sanders, the Democratic Governor of Georgia, wrote a letter to President Johnson on April 5, 1965, urging defeat of the bill. He argued that the abolition of literacy tests and the federal registrar scheme was "an extreme measure . . . not even attempted during the vengeful days of the Reconstruction Period."[10] The House approved the voting rights bill on August 3 by a vote of 328 to 74. The next day, the Senate followed suit by a vote of 79 to 18.[11] Georgia's two Senators voted against the Act, as did eight of the state's 10 House members. Representatives James Mackay and Charles Weltner voted for the bill.

After the Voting Rights Act was passed, Georgia immediately joined a lawsuit brought by South Carolina, asking the Supreme Court to hold the Act unconstitutional. The Court, however, upheld the Act as a valid exercise of

---

[9]Hearings before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 89th Cong., on H.R. 6400, 1965, Serial No. 2, p. 543.

[10]LBJ Library, LE/HU 2-7, Box 70, p. 2.

[11]89 Congressional Record H.19201, Aug. 3, 1965, S. 19378. Aug. 4, 1965.

Congressional power to enforce the equal voting rights provisions of the Fifteenth Amendment.  *South Carolina v. Katzenbach*, 383 U.S. 301, 337 (1966).

The state's various voting laws that were not explicitly outlawed by the VRA, e.g., at-large elections, majority vote requirements, and numbered post provisions, continued to have an obvious deterrent effect on minority voter registration and political participation.  A 1968 report of the U.S. Commission on Civil Rights reported that in 34 counties in Georgia fewer than 10% of Blacks were registered.  In the state's 21 counties with black voting age majorities, an average of only 15% of blacks were registered, compared to 91% of whites.[12]

Discrimination and segregation in Georgia were not, of course, limited to voting.  State law required segregation of the races in nearly every area of public life, including schools, hospitals, the bookmobile, prisons, training schools, public transportation, courthouses, public housing, and tax records.  *See, e.g.*, Ga. Code Ann. § 35-225 (1933) (requiring racial segregation in hospitals); Ga. Code Ann. § 77-9904 (1933) (requiring racial segregation in prisons); Ga. Code Ann. § 77-613 (1933) (requiring racial segregation in training schools); Ga. Laws 1931, p. 204 (requiring racial segregation in common carriers and providing civil and criminal penalties for violations). Segregation in public accommodations - theaters, restaurants, hotels, clubs, billiard rooms, civic and community organizations, the American Legion, golf courses, swimming pools, libraries, cemeteries, and so forth - was the prevailing norm.  *See, e.g.*, Ga. Laws 1925, pp. 286-87 (requiring billiard rooms to be racially segregated).  The state bar association was racially segregated and virtually all the lawyers, judges, district attorneys, prosecutors, and police were white.  The only so-called instrumentality of justice in the state that was thoroughly desegregated was the electric chair.  As of 1983, a total of 412 people had been executed in Georgia, 82% of whom were black.[13]

The history of discrimination and segregation in nearly every facet of African-American life has had a profound effect on the status of African Americans in Georgia today. Between the Civil War and the Civil Rights Movement, a century of segregation, racial violence, and economic suppression

---

[12]*U.S. Commission on Civil Rights, Political Participation* (Washington, D.C. Government Printing Office, 1968), pp.  232-39.

[13]*See* Laughlin McDonald, *A Voting Rights Odyssey; Black Enfranchisement in Georgia* (Cambridge U. Press,  2003), pp. 61-3.

has denied African Americans in Georgia their basic rights of access to education, employment, and other basic parts of life that we associate with human rights. The mere half-century since the national Civil Rights Movement has not been sufficient time for African Americans to eradicate the effects of the overt, official segregation and discrimination of the past.

### E.     Post- 1965: Voter Suppression in Georgia Continues after Passage of VRA

Despite passage of the Voting Rights Act of 1965, the Georgia legislature continued to enact voter suppression measures.  In 1968 alone, the legislature adopted: a requirement that registration be conducted only at specifically designated, stationary locations; a majority vote requirement for municipal elections; and a requirement of a designated post system for multiple seat municipal elections.  Ga. Laws 1968, pp. 899-900, 913-14, 977-98.   In 1970, the legislature adopted a majority vote requirement for elected office, and required a designated post system for multiple seat elections.  Ga. Laws 1970, pp. 369-70, 380-83.

Georgia also systematically ignored the preclearance provisions of Section 5.  Although the state enacted or implemented hundreds of new voting practices, during the first three years of operation of the Voting Rights Act, it submitted only *one* new voting practice for preclearance.[14] One of the most common changes the Sate made was transitioning from single-district to at-large elections. As the Supreme Court has noted, at-large elections can be inherently discriminatory, and thus, the adoption of at-large voting schemes is subject to strict scrutiny under Section 5.  *Allen v. State Board of Elections*, 393 U.S. 544, 569 (1969) ("Voters who are members of a racial minority might well be in the majority in one district, but a decided minority in the county as a whole.  This type of change could therefore nullify their ability to elect the candidate of their choice just as would prohibiting some of them from voting.")

Two of the single-member district counties, Bacon and Crisp, adopted at-large elections shortly before enactment of the Voting Rights Act. But since implementation of the changes was to take place after November 1, 1964, the

---

[14]U.S. Department of Justice, "Number of Changes Submitted under Section 5 and Reviewed by the Department of Justice, by State and Year, 1965-December 31, 1980."

changes were subject to Section 5.  Ga. Laws 1963, p. 2665, Ga. Laws 1964, p. 2253.  Other single-member districts counties with significant Black populations followed suit and adopted at-large elections: Calhoun, Clay, Dooly, and Miller in 1967, Ga. Laws 1967, pp. 3068, 3489, 2586, 2387; Early, Henry, and Tattnall in 1968, Ga. Laws 1968, pp. 2110, 3378, 2080; and Meriwether and Walton in 1970, Ga. Laws 1970, pp. 2842, 2475. Of those counties, the only one that complied with the preclearance requirements under Section 5 was Meriwether.[15]   Fourteen counties also adopted at-large elections for their boards of education immediately before or shortly after passage of the Voting Rights Act. All of them implemented the changes without seeking Section 5 review.

Another change that was widely adopted by cities in Georgia to discriminate against minority voters even after passage of the Voting Rights Act was the majority vote requirement.  Some 23 Georgia cities with plurality-vote provisions promptly repealed them in favor of majority-vote provisions, and most of them ignored Section 5.  Under a plurality vote system in a multi-candidate election, the candidate with the most votes is the winner. By contrast, under a majority vote system, there is a runoff between the two highest vote getters.  Thus, a Black candidate might get the most votes in a multi-candidate election, but in a runoff the white majority could coalesce behind a white candidate and insure his or her election. Given the presence of racially polarized voting in Georgia, historically and continuing today, Black candidates were less likely to prevail under majority-vote systems.  The cities which adopted majority vote provisions included Alma, Americus, Bainbridge, Blackshear, Brunswick, Buford, Conyers, Covington, Douglas, Fort Valley, Gainesville, Gordon, Hawkinsville, Manchester, McRae, Monroe, Moultrie, Norcross, Ocilla, Perry, Quitman, Rome, and St. Mary's.[16]

Congress began considering legislation in 1969 to extend the special provisions of the Voting Rights Act for an additional five years.  Georgia's Governor, Lester Maddox, and its Attorney General, Arthur Bolton, led the fight against the proposed legislation. Maddox, in testimony before the U.S. Senate, blasted the Voting Rights Act as an "outrageous piece of legislation." He said it was "illegal, unconstitutional and ungodly and un-American and wrong against the

---

[15]U.S. Department of Justice, "Number of Changes Submitted under Section 5.

[16]*Election Law Changes in Cities and Counties in Georgia* (Atlanta: Voter Education Project, 1976),

good people in this country. . . . And phooey on anything that says otherwise."[17] Arthur Bolton was more restrained in his comments than Maddox, but nonetheless in a letter to the Senate subcommittee, he said "it will come as no great shock to you to discover that my office is not overly fond of Section 5 of the Voting Rights Act of 1965."[18]

Despite the objections of Georgia officials, Congress extended the coverage provisions of the Act for another five years, citing the continued depressed levels of black voter registration and the significant noncompliance with Section 5 by the covered jurisdictions.[19]   Congress also made the suspension of tests or devices effective nationwide, and revised the coverage formula, which resulted in several counties in New York, Arizona, California, and Wyoming, and several towns in Connecticut, New Hampshire, Maine, and Massachusetts becoming "covered jurisdictions" under Section 5.[20]

Counties in Georgia with single member districts continued to switch to at-large voting after the extension of the Voting Rights Act in 1970.  Morgan, Newton, and Twiggs Counties abandoned their district systems in 1971.  Ga. Laws 1971, pp. 2638, 3022, 3564.  Wilkes and McDuffie followed suit in 1972.  Ga. Laws 197, pp. 3337, 2536.  McDuffie, Twiggs, and Newton submitted their changes for preclearance, but only McDuffie's was precleared.[21]   Seventeen counties also adopted at-large elections for their boards of education after the 1970 extension of the Act. Thirteen of the counties - Bibb, Treutlen, Charlton, Pike, Sumter, Clarke, Long, Newton, Taylor, Baldwin, Spalding, Wilkes, and Harris - eventually submitted their plans for review under Section 5, but only the submission from Treutlen was precleared.[22]

---

[17]Hearings before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, Ninety-first Congress, First and Second Sessions, on Bills to Amend the Voting Rights Act of 1965, pp. 342, 352.

[18]*Id.*, p. 669.

[19]H. Rep. No. 397, 91st Cong., 2d Sess.

[20]S. Rep. No. 295, 94th Cong., 1st Sess., 13, n. 5.

[21]U.S. Department of Justice, "Number of Changes Submitted under Section 5 and Reviewed by the Department of Justice, by State and Year, 1965-December 31, 1980."

[22]*Id.*

Cities in Georgia also continued to adopt majority-vote requirements after the 1970 extension of Section 5, including Augusta, Alapaha, Ashburn, Athens, Butler, Cairo, Camilla, Cochran, Crawfordville, East Dublin, Hartwell, Hinesville, Hogansville, Homervill, Jesup, Jonesboro, Lakeland, Lumber City, Madison, Nashville, Newnan, Palmetto, Sandersville, Sylvester. Thomasville, Thomson, Wadley, Waynesboro, and Wrens.  The Attorney General objected to 26 of the changes under Section 5.[23]

In 1972, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court struck down the onerous durational residency requirements for voting, which required residence in the State for one year and the County for three months as a prerequisite for registration to vote. And in 1975 the Court ruled that ownership of some real, mixed, or personal property made available for taxation could not be required for voting in local bond issue elections.  *Hill v. Stone*, 421 U.S. 289 (1975).

In 1975, Congress again considered legislation to extend and expand coverage of the Voting Rights Act.  Georgia had begun to submit more of its voting changes for preclearance (809 by 1974), but it was tied with Louisiana for the most Section 5 objections (37).[24]  Black voter registration lagged behind white registration, and there were still relatively few Black elected officials.  For example, in 1975, of the 236 members of the General Assembly, only 21 were Black.  Less than two percent of the members of county governing boards were Black. There were 530 municipalities in the state but only two Black mayors. Only the barest fraction of the state's judges, justices of the peace, probate judges, and clerks of court were Black.[25]

The white leadership of Georgia essentially boycotted the 1975 congressional hearings on extension of the Voting Rights Act.  Andrew Young, the only black member of Georgia's congressional delegation, testified in 1975 in support of the preclearance provision.  Congress concluded that progress under the Act "has been modest and spotty in so far as the continuing and significant deficiencies yet existing in minority registration and political participation."  It was

---

[23]Department of Justice, Civil Rights Division, "Complete Listing of Objections Pursuant to Section 5."

[24]S. Rep. No. 295, 94th Cong., 1st Sess. 17 (1975).

[25]*National Roster of Black Elected Officials* (Washington, D.C.: Joint Center for Political Studies, 1975), 49-55

"imperative," the Senate report said, that Section 5 protection apply to the redistricting that would take place after the 1980 Census.[26]  Congress thus passed legislation in 1975 that made permanent the nationwide ban on tests for voting, extended Section 5 for an additional seven years to 1982 so that it would cover the 1980's redistricting, broadened the reach of the statute by including the 1972 presidential elections in the coverage formula, and extended coverage for the first time to language minorities, identified as American Indians, Asian Americans, Alaskan natives, and those of Spanish heritage.  52 U.S.C. § 10303, § 10503, § 10501(b).

Following the 1975 extension of Section 5, state and local laws in Georgia continued to disfranchise voters. After the Attorney General objected to certain of the City of Rome, Georgia's voting changes, the City filed suit alleging, *inter alia*, that even if Section 5 and the preclearance requirement were constitutional when enacted, "they had outlived their usefulness by 1975, when Congress extended the act for another seven years."  *City of Rome v. United States*, 446 U.S. 156, 180 (1980).   The Supreme Court disagreed and upheld the 1975 extension as a "constitutional method of enforcing the Fifteenth Amendment."  *Id.*, at 182.

In addition, although the nationwide ban on literacy tests was made permanent by the 1975 extension of the Voting Rights Act, 89 Stat. 400, §102, Georgia adopted a new constitution in 1976 which carried forward the traditional literacy test combined with a good character and understanding test.  Article II, I, &III, 1976 Ga. Const.  A state statute also required that a chief registrar be a freeholder.  1976 Ga. Code  34-605.  A number of lawsuits were filed by private parties and the United States challenging those practices and procedures, and some were settled, but others went to trial and resulted in extensive findings of discrimination in voting. For example, in *Bond v. Floyd*, 385 U.S. 116, 350 (1966), the Supreme Court held that Julian Bond, a Black man elected to the state house from a majority black district, had been unlawfully excluded from office by the Georgia legislature.

### F.    1982 Amendments to the Voting Rights Act

Congress again considered legislation to extend and amend the Voting Rights Act in 1981 and 1982.   Freeman Leverett, a former assistant attorney general of Georgia, testified before the Senate.  He said the Voting Rights Act had

---

[26]1975 U.S. Code Cong. & Adm. News 781, 783-84.

been passed in 1965 "to appease the surging mob in the street," and that Section 5 should be repealed because "there is no longer any justification for it at all."[27] Griffin Bell, a native of Americus who served as U.S. Attorney General during the Carter administration, was also opposed to extending Section 5, which he dismissed as "poppycock."[28]   Congress, however, extended Section 5 for an additional twenty-five years, the longest extension in the Act's history.   In doing so, it took special note of the efforts in Georgia to circumvent minority voting rights, including non-compliance with Section 5 and the switch by counties from district to at-large elections.[29]

In 1982, Congress also amended Section 2 to prohibit voting practices, regardless of their purpose, that "result" in discrimination.  52 U.S.C. §10301.  The amendment was in response to the decision in *City of Mobile v. Bolden*, 4467 U.S. 55 (1980), which held that Section 2 required proof of a discriminatory purpose to establish a violation.  The 1982 amendments made clear that proof of discriminatory purpose is not required.

Following the 1982 extension of the Voting Rights Act, minority plaintiffs and the United States filed suits against 26 additional counties, 26 additional cities, and a number of school boards challenging their use of at-large elections. Virtually all of the litigation was successful and resulted in the adoption of single member district elections.

## G.   More Recent History: Race and Redistricting in Georgia

Race has also played a significant role in redistricting in Georgia. Specifically, redistricting has been used by the Georgia General Assembly as a method for reducing the number of Black elected officials in the legislature. Redistricting has also been used to dilute Black voting strength. As discussed in more detail below, the Attorney General refused to preclear several Georgia redistricting plans because they diluted Black voting strength. The current State House plan is best viewed in the context of this history, in which the General Assembly has repeatedly used redistricting as a way to minimize Black voting

---

[27]Voting Rights Act Hearings, United States Senate, Ninety-seventh Congress, Second Session, Bills to Amend the Voting Rights Act of 1965, pp. 942, 950.

[28]*New York Times*, September 27, 1981.

[29]S. Rep. No. 97-417,  97th Cong. 2d Sess. 10, 13 (1982).

strength, especially in the Atlanta area, where the African-American population has grown significantly.

### 1.    1970 Redistricting Plans

Racial discrimination, as discussed above, continued to drive and distort legislative and congressional redistricting in Georgia during the 1970s.  After the 1970 census, the state drew new plans for the House and Senate to comply with one person, one vote and submitted them for preclearance.  The Attorney General objected to the House plan because it contained a number of racially discriminatory features - including multi-member districts, numbered posts, a majority-vote requirement, and "changes in the structure of potential black majority single-member districts." *Georgia v. United States*, 411 U.S. 526, 529-30 (1973).  The structural changes included reducing the Black population in the potentially Black majority single-member districts to insure that white voters could elect their candidates of choice.  The Attorney General objected to the Senate plan because of the discriminatory way in which districts had been drawn in Fulton and Richmond Counties.  *United States v. Georgia*, 351 F.Supp. 444, 445 (N.D. Ga. 1972).

In response, the state adopted new plans in 1972.  The Attorney General approved the Senate plan, which used all single-member districts, two of which were majority Black, but again rejected the House plan.  He concluded it did not remove the objectionable combination of multi-member districts, numbered posts, and the majority vote requirement.  *Georgia v. United States*, 411 U.S. at 530.  The state refused to take any further steps to comply with Section 5, and argued that it now believed Section 5 did not cover reapportionment, but if it did, then the statute was unconstitutional.  The Supreme Court rejected the state's argument and held that its prior decisions compelled the conclusion that the state's plan was subject to the statute.  *Id.*, at 531.  The General Assembly subsequently adopted a new House plan in 1974 that contained fewer multi-member districts. It provided for 180 house members elected from 154 districts, 24 of which were majority Black.  Ga. Laws 1974, pp 16, 1233.  At the November 1974 elections, two Blacks were elected to the Senate, and 19 Blacks were elected to the House.[30]

---

[30]*National Roster of Black Elected Officials* (Washington, D.C.: Joint Center for Political Studies, 1975), 50-1.

The Attorney General also objected to Georgia's 1971 congressional plan because he was unable to conclude that the "new boundaries [between the fifth and sixth districts] will not have a discriminatory racial effect on voting by minimizing or diluting black voting strength in the Atlanta area."[31]   The state enacted a new plan in 1972 that increased the Black percentage in the fifth district from 38% to 44%.  Andrew Young, who played the role of peacemaker during his days with the Southern Christian Leadership Conference in Atlanta, ran for office in the fifth district in the 1972 election. He won and became the first black person elected to Congress from Georgia since Reconstruction.[32]

## 2.    1980 Redistricting Plans

Georgia's initial 1980 House and Senate redistricting plans drew Section 5 objections.   The Attorney General concluded that the state had unnecessarily fragmented concentrations of Black population in DeKalb, Richmond, and Dougherty Counties in ways that were retrogressive and could have "a significant detrimental impact on black voting strength."[33]  The plan finally adopted in 1982 increased the number of majority-Black House districts from 24 to 30, and the number of majority Black Senate districts from two to eight, setting the stage for increased Black representation in both houses of the General Assembly.  Ga. Laws 1982, pp. 444, 452. A number of city and county level redistricting plans were also denied preclearance, including plans for the Dougherty County Commission, the city of McDonough, the Bibb County board of Education, the Sumter County board of education, the city of College Park, and the Thomas County Commission.[34]   But the state's most blatant attempt to contain black voting strength was in its congressional redistricting.

Under the legislature's proposed 1980 congressional plan, nine of the state's ten congressional districts were majority white.  The only majority Black district in

---

[31]David L. Norman to Arthur K. Bolton, February 11, 1972.

[32]Bartlett C. Jones, *Flawed Triumphs: Andy Young at the United Nations* (Lanham, Md.: U. Press of America, 1996), 3.

[33]William Bradford Reynolds to Michael Bowers, Feb. 11, 1982.

[34]William Bradford Reynolds to S. T. Ellis, Nov. 22, 1982; William Bradford Reynolds to Arthur Griffith, Jr., Nov. 26, 1982; William Bradford Reynolds to Henry L. Crisp, Dec. 17, 1982; William Bradford Reynolds to George E. Glaze, Dec. 12. 1983; William Bradford Reynolds to R. Bruce Warner, Sept. 25, 1985.

the plan was the fifth district, which was 57 percent Black, but it still contained a minority of Black registered voters.  *Busbee v. Smith*, 549 F.Supp. 494, 499 (D. D.C. 1982).   The state submitted the plan for preclearance, but the Attorney General denied Section 5 approval.  *Id.*, at 494, 510.   The state then filed a declaratory judgment action in the District Court for the District of Columbia, seeking preclearance.  Julian Bond, who had been elected to the state House in 1965 from a majority Black district and was now a state senator, had introduced a plan creating a fifth district that was 69 percent Black.  The plan had some support, but was strongly opposed by the leadership of the House.  Joe Mack Wilson, the chair of the House reapportionment committee, told his colleagues on numerous occasions: "I don't want to draw nigger districts."  *Id.*, at 501.

The District of Columbia Court concluded the state's plan had a discriminatory purpose and violated Section 5.  As for Joe Mack Wilson, the court made an express finding that "Representative Joe Mack Wilson is a racist."  *Id.*, at 500.  The Supreme Court affirmed the decision on appeal.  *Busbee v. Smith*, 549 U.S. 1166 (1983).  Forced yet again by the Voting Rights Act to construct a racially fair plan, the General Assembly enacted a plan for the fifth district that contained a black population exceeding 65 percent.  The plan was approved by the court and at the election held in 1986, Representative John Lewis was elected from the fifth district, a seat he continues to hold.

### 3.     1990 Redistricting Plans

In 1991, Georgia adopted new legislative redistricting plans that consisted solely of single-member districts for both houses for the first time in Georgia history. The Attorney General objected to certain features of the House and Senate plans.  He concluded that the legislature had fragmented concentrations of Black population in a number of areas of the state in both maps in order to minimize the number of majority Black districts and to insure the reelection of white incumbents at the expense of Black voters.[35]  The state enacted a second plan, but the Attorney General objected again because it continued to "minimize overall black voting strength."[36] The state enacted a third plan in 1992 and it was finally precleared. That plan created 13 majority Black Senate districts, (an increase of five over the 1980 plan), and 41 majority Black house districts, (an increase of 11 over the 1980 plan).  Of the 40 Blacks elected to the House and Senate under the 1992 plan, all

---

[35]John R. Dunn to Mark H. Cohen, Jan. 21, 1992.

[36]John R. Dunn to Mark H. Cohen, Mar. 20, 1992.

but one was elected from a majority Black district. Whites won all but one of the majority white districts and 14 (26 percent) of the majority Black districts.[37]

During a special session in 1995, the Georgia legislature redrew the House and Senate maps. A lawsuit was filed challenging the plan, and following mediation, the parties agreed upon a plan that reduced the number of majority Black Senate districts from 11 to 10 compared to the 1995 plan, and the number of majority Black house districts from 33 to 30. *Johnson v. Miller*, Civ. No. 196-040 (S.D. Ga.).

### 4.   2000 and 2010 Redistricting Plans

Georgia adopted redistricting plans for the House, Senate, and Congress in 2001, and submitted them for preclearance. The district court for the District of Columbia precleared the House and Congressional plans, but objected to the Senate plan, specifically Senate District 2 (Savannah/Chatham County), District 12 (Albany/Dougherty County/Calhoun County), and District 25 (Macon/Bibb County). It found that "the presence of racially polarized voting in the benchmark Senate Districts;" "[l]ay witness testimony also suggests the presence of racially polarized voting;" "the decline in BVAPs in Senate Districts 2, 12 and 26 was not required by the State's constitutional obligation to draw districts that comply with the principle of one person-one vote;" "the State has failed to demonstrate by a preponderance of the evidence that the reapportionment plan for the State will not have a retrogressive effect." *Georgia v. Ashcroft*, 195 F.Supp. 2d 25, 94 (D. D.C. 2002), affirmed, *King v. Georgia*, 537 U.S. 1100 (2003).

The redistricting plan challenged in this litigation, the 2010 State House plan, Act No. 1EX, was enacted by the legislature on August 23, 2011, signed by the Governor on August 24, 2011, and precleared by the Department of Justice on December 23, 2011. The legislature subsequently amended Act No. 1EX by passing Act No. 277, and it was precleared by the Department of Justice on May 11, 2012.

## V.   Voting Rights Post-*Shelby County* and the Effects of Discrimination

### A.   Post-*Shelby County* Voting Laws

---

[37]Members of the Georgia General Assembly, Senate and House of Representatives, Second Session of 1993-94 Term (1994).

In 2013, in *Shelby County, Alabama v. Holder*, 133 S.Ct. 2612, 2627 (2013), the Court invalidated the Section 5 coverage formula, §4(b) of the Voting Rights Act, as being "based on decades-old data and eradicated practices."  But it also held that "voting discrimination still exists; no one doubts that."  *Id.* at 2619. Accordingly, it left Section 5 itself intact and noted that "Congress may draft another formula based on current conditions."  *Id.* at 2631.  Congress has failed to enact a new coverage formula.  Thus, there have been no Section 5 submissions by Georgia or any other covered jurisdiction of changes in their voting practices since the *Shelby County* decision in 2013.  The burdens imposed by *Shelby County* are heavy because the burden of proof is no longer on a jurisdiction making a preclearance submission but upon the plaintiffs challenging a voting practice as violating federal or constitutional law.

Georgia has unfortunately taken advantage of the Court's decision in *Shelby County* by enacting and engaging in voting practices that are discriminatory and that may not have passed muster if Section 5 still had any force. For example, in 2011, prior to the *Shelby County* decision, Augusta-Richmond County attempted to move its local elections from November to July.  The proposed change was submitted for Section 5 preclearance, but the Department of Justice objected because of its disproportionate effect on Black voters.  But on June 29, 2013, four days after the *Shelby County* decision, local newspapers reported that the new voting law was again being considered.  And in early 2014, the board of elections moved local elections from November to July after holding meetings that were closed to the public.  A lawsuit was filed by the ACLU challenging the voting change, but a federal judge dismissed the charges less than a month after the case began.  *See*, "*Shelby County v. Holder's* Biggest and Most Harmful Impact May Be on Our Nation's Smallest Towns," Campaign Legal Center, Advancing Democracy Through Law.

Other discriminatory voting changes that have been introduced in Georgia after the *Shelby County* decision include precinct relocations in Macon-Bibb County, precinct closures in Hancock County, precinct reductions in Bibb County, and voter challenging and purging in Hancock County.  *See* Jennifer L. Patin, "Voting Rights Communication Pipelines: Georgia after *Shelby County v. Holder*," Lawyers Committee for Civil Rights Under Law.  Some of these changes were modified or successfully challenged by community members, activists, and organizations.  But the burdens placed upon local communities and their advocates are heavy and continuing.

In addition, in 2015, the Georgia legislature enacted a mid-cycle redistricting plan, Act No. 251 (2015 Ga. Laws 1413 (H.B. 566) that Plaintiffs in this litigation allege violated the Fourteenth Amendment's prohibition against racial gerrymandering. Because preclearance under Section 5 was no longer required, H.B. 566 went into effect immediately.

## B.  Discriminatory Impact of Voting Restrictions

Georgia continues to discriminate against Black voters using tactics and requirements that were in place prior to the *Shelby County* decision, and that are even more likely to remain in place in its aftermath. For example, the Georgia Constitution denies the right to vote to anyone convicted of a felony involving moral turpitude. However, a person's voting rights are automatically restored once they have completed their term of imprisonment, parole, probation, and have paid all fines and restitution. Unfortunately, the Secretary of State's office has advised registrars not to accept voter registration forms from people convicted of *any* felony even though the constitutional prohibition refers only to *felonies involving moral turpitude*. "Get Your Vote Back," ACLU Georgia, Aug. 3, 2018. In addition, many people cannot afford to pay the restitution that is a part of their sentence and, therefore, are being denied the right to vote based on their economic status. Election officials also have not been proactive in educating people coming out of prison of their voting rights and, consequently, many people falsely believe that once they are convicted of any felony they have lost their right to vote forever. *Id*.

Although people in pre-trial detention retain the right to vote, many correctional facilities do not either have or enforce policies that allow pre-trial detainees to cast ballots. Such felony widespread disenfranchisement has a particularly harmful effect on communities of color considering the Sentencing Project's 2004 Report entitled "The Vanishing Black Electorate: Felony Disenfranchisement in Atlanta, Georgia," in which the authors found that one in eight black men have a felony conviction.

Additionally, Georgia imposes a voter ID law that has a disparate impact on Black voters. Georgia requires that a person seeking to vote in person have one of six forms of photo ID. OCGA § 21-2-417. If a voter does not have one of the forms he or she can get one from the county registrar's office or the Department of Drivers Services office. Lawmakers cite the prevention of fraudulent in-person

voting as the rationale for voter ID laws.  But studies show the incident rate of in-person voter fraud ranges between 0.0003 percent to 0.0025 percent.  "Debunking the Voter Fraud Myth," Brennan Center for Justice, Jan. 31, 2017.  According to the Brennan Center report, it is more likely that an American "will be struck by lightning than that he will impersonate another voter at the polls."  *Id*.   It is apparent that Voter ID laws are not related to or support a legitimate governmental interest.

Equally or more important, studies show that photo ID laws have a negative impact on the turnout of black and mixed race voters.  Studies have concluded that voter ID laws skew democracy in favor of whites and those on the political right.  "Voter Identification Laws and the Suppression of Minority Votes," Zoltan Hajnal, Nazita Lajevardi, and Lindsey Nielson."  Voter ID laws, like poll taxes in the Jim, Crow South, are motivated by political gain and the suppression of minority voting.  Michael Wines, "Some Republicans Acknowledge Leveraging Voter ID Laws for Political Gain," N.Y. Times (Sept. 16, 2016).

Georgia at one time allowed voters to use other forms of identification such as utility bills or bank statements. That provision was repealed in 2005 and now all in-person voters are required to present a photo ID.  There is no evidence that such a provision is necessary while its impact on minority voters is apparent.  As is evident, Georgia continues to practice voter suppression.

## C.   Ongoing Effects of Discrimination

Georgia's restrictive voting requirements, which disproportionately adversely affect African Americans, combined with the fact that African Americans are more likely to live in poverty, have lower education levels and incomes, and are more likely to be unemployed and lack access to a vehicle (as covered in more detail by Bill Cooper's Expert Report in this litigation), make it more difficult for African Americans to effectively participate in the electoral process. African Americans in Georgia lag behind whites in almost every measurable facet of life—education, income, employment, criminal justice, and health—in large part due to historic legacies of unequal treatment, segregation, discrimination, and unequal opportunity to the access to the ballot box to try to change their circumstances.

Demographic markers such as these are strongly associated with the likelihood of an individual being deterred from voting. Research has consistently

shown that where the costs of voting are higher, voters are less likely to vote. Studies have also shown that educational attainment is often the single best predictor of whether an individual will vote.  Steven J. Rosenstone and John Mark Hansen (1993), *Mobilization, Participation and Democracy in America*, Macmillan. Income also affects voter participation; those with lower household incomes are significantly less likely to vote because it is comparably more burdensome for them to make time to do so.  Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Cambridge, MA: Harvard University Press.

African Americans in Georgia bear the effects of discrimination in many areas that hinder their ability to participate effectively in the political process. And, as a result of the ongoing and lingering effects of historical discrimination, African-American voters in Georgia possess fewer of the resources needed to overcome the increased costs of voting.

## VII.  CONCLUSION

African Americans in Georgia have suffered from decades of official discrimination in voting and other aspects of life. There can be little doubt that the lingering effects of Georgia's history of white supremacy have contributed directly to the difficulty that African Americans, in particular, face when attempting to vote in Georgia today. The *Shelby County* decision, which opened the door for the legislature to pass additional discriminatory requirements without oversight, coupled with the lasting effects of discrimination against African Americans in social and economic areas of life, make it more difficult for African Americans in Georgia to gain and maintain access to the electoral process. The current State House map is best viewed in this context, with the history of racial discrimination in voting as the backdrop. It is my conclusion that to the extent that the current State House district map failed to include additional majority African-American districts in the Atlanta area, the map is but one of the latest in a long line of efforts to suppress the voting power of African-American voters in Georgia.

## APPENDIX

### LAUGHLIN MCDONALD

<u>Personal</u>

Born: August 25, 1938, Winnsboro, South Carolina

Married to:  Patricia M. McDonald (now deceased).  Two children (adult)

<u>Education</u>

Mt. Zion Institute
Winnsboro, South Carolina
High School Diploma, 1956

Columbia University
New York, New York
BA in English, 1960

University of Virginia
Law School
Charlottesville, Virginia
LLB, 1965

<u>Military Service</u>

U.S. Army Artillery and Infantry (1960-1962), and South Carolina National Guard (1962-1963).

<u>Employment</u>

Voting Rights Project, Director Emeritus
American Civil Liberties Union Foundation Inc.
2700 International Tower
229 Peachtree Street, NE
Atlanta, Georgia 30303
(404) 500-1235
(404) 565-2886  FAX
e-mail: lmcdonald@aclu.org
(from December, 1972 to the present)

Prior employment has included membership on the faculty of the University of North Carolina Law School, and private practice.

Since its inception in 1965 the Southern Regional Office of the ACLU has provided representation to minority plaintiffs, primarily in the South, in civil rights litigation, including school desegregation, employment discrimination, housing discrimination, jury discrimination, and voting rights.  During the past two decades the SRO, through its Voting Rights Project, has focused on voting rights and has expanded its representation to include Native Americans in various western states and Alaskan Natives.

<u>Publications</u>

<u>Books</u>:

<u>Poems and Pieces: A Celebration of Life</u> (Xlibris; 2011).

<u>American Indians and the Fight for Equal Voting Rights</u> (Norman; U. Oklahoma Press, 2010).

<u>A Voting Rights Odyssey: Black Enfranchisement in Georgia</u> (Cambridge; Cambridge U. Press, 2003).

<u>The Rights of Racial Minorities</u> (New York; Puffin Books, 1998) (co-author) (edition for young adults).

The Rights of Racial Minorities (Carbondale; Southern Illinois U. Press, 1993) (co-author) (second edition).

The Rights of Racial Minorities (New York; Avon Books, 1980) (co-author).

Racial Equality (Skokie, Ill.; National Textbook Co., 1977).

Book Chapters:

"The Bull Connor Is Dead Myth: Or Why We Need Strong, Effectively Enforced Voting Rights Laws," in The Most Fundamental Right ed. Daniel McCool (Bloomington; Ind. U. Press, 2012).

"Beyond School Desegregation: The Impact of Brown," in Remembering Brown at Fifty eds. Orville V. Burton & David O'Brien (Urbana; U. Ill. Press, 2009).

"Ballot Security," in American Crisis, Southern Solutions ed. Anthony Dunbar (Montgomery; NewSouth Books, 2008).

"Expanding Coverage of Section 5 in Indian Country," in The Future of the Voting Rights Act eds. David Epstein, R. de la Graza, S. O'Halloran, & R. Pildes (New York; Russell Sage Foundation, 2006).

"Redistricting and Voting Rights Issues, 1992-2002: A Legal Analysis," in Voting Rights and Minority Representation: Redistricting, 1992-2002 ed. David A. Bositis (Washington, D.C.; Joint Center for Political and Economic Studies, 2006).

"Federal Oversight of Elections and Partisan Realignment," in The Voting Rights Act: Securing the Ballot ed. Richard M. Valelly (Washington, D.C.; CQ Press, 2006).

"Democracy Cannot Be Exported If It Is Not Secure at Home," in Where We Stand: Voices of Southern Dissent ed. Anthony Dunbar (Montgomery; NewSouth Books, 2004).

"Congressional Redistricting on the Basis of Race: Abrams v. Johnson," in Commentaries on Law & Public Policy: 1997 Yearbook, ed. Robert W. McGee (East Orange, N.J.; The Dumont Institute, 1998).

"Georgia," in <u>Quiet Revolution in the South</u>, eds. Bernard Grofman & C. Davidson (Princeton; Princeton U. Press, 1994) (co-author).

"The 1982 Amendments of Section 2 and Minority Representation," in <u>Controversies in Minority Voting: The Voting Rights Act in Perspective</u>, eds. Bernard Grofman & C. Davidson (Washington, D.C.; The Brookings Institution, 1992).

<u>Articles</u>:

"The Looming 2010 Census: A Proposed Judicially Manageable Standard and Other Reform Options for Partisan Gerrymandering," 46 <u>Harv. J. Leg.</u> 243 (2009).

"A Challenge to the Constitutionality of Section 5 of the Voting Rights Act: Northwest Austin Municipal Utility District Number One v. Mukasey," 3 <u>Charleston L. Rev.</u> 231 (2009).

"Obama's Election Does Not Mean We no Longer Need the Voting Rights Act," <u>Jurist</u>, December 1, 2008

"Crawford v. Marion County Board of Elections," 25 <u>MN Journal</u> 4 (November 2008).

"Voting Rights in South Dakota: 1982-2006," 17 <u>So. Calif. Rev. Law & Soc. Just.</u> 195 (Fall 2007) (co-author).

"Why the Renewed Voting Rights Act Will Pass Constitutional Muster," FindLaw.com, June 9, 2006.

"Civil Rights In the Modern Era: Edgefield County, South Carolina, A Personal Reflection," 1 <u>Stan. J. of Civ. Rights & Civ. Lib.</u> 303 (2005).

"The Voting Rights Act in Indian Country: South Dakota, a Case Study," 29 <u>Am. Ind. L. Rev.</u> 43 (2004).

"Redistricting in 2001," 22 <u>Southern Changes</u> 9 (2000).

"Whatever Happened to the Voting Rights Act? Or, Restoring the White Privilege," 7 <u>J. Southern Legal Hist.</u> 207 (1999).

"Redistricting at the Millennium," 20 <u>Southern Changes</u> 8 (1998).

"Can Minority Voting Rights Survive <u>Miller v. Johnson</u>?" 1 <u>Mich. J. R. & L.</u> 119 (1996).

"The Counterrevolution in Minority Voting Rights," 65 <u>Miss. L. J. 271</u> (1995).

"<u>Holder v. Hall</u>: Blinking at Minority Voting Rights," 3 <u>D.C. L. Rev.</u> 61 (1995).

"This Way?  Voting Rights At A Crossroads," 1 <u>Civil Rights J.</u> 36 (1995).

"Racial Fairness--Why Shouldn't It Apply to Section 5 of the Voting Rights Act?" 21 <u>Stetson L.Rev.</u> 847 (1992).

"The Quiet Revolution in Minority Voting Rights," 42 <u>Vand.L.Rev.</u> 1249 (1989).

"Votes of Confidence," <u>Foundation News</u>, Sept./Oct. 1988.

"An Aristocracy of Voters: The Disfranchisement of Blacks in South Carolina," 37 <u>S.C.L.Rev.</u> 557 (1986).

"Uneasy Victories in the Supreme Court," 8 <u>Southern Changes</u> 15 (1986).

"The Majority Vote Requirement: Its Use and Abuse in the South," 17 <u>Urban Lawyer</u> 429 (1985).

"The Voting Rights Act and Vote Dilution," 19 <u>Ga.Law.Rev.</u> 459 (1985).

"The 1982 Extension of Section 5 of the Voting Rights Act of 1965: The Continued Need for Preclearance,"  51 <u>Tenn.L.Rev.</u> 1 (1983).

"He Keeps Georgia's Old-Time Music Alive," <u>Atlanta Weekly</u>, July 24, 1982, p. 8.

"Union Busting in Milledgeville," <u>Atlanta Magazine</u>, April, 1981, p. 96.

"Voting Rights on the Chopping Block," 9 <u>Southern Exposure</u> 8 (1981).

"Jim Crow Is Alive and Well in the Old 'New South,'" <u>Saturday Review</u>, April 1, 1978.

"Speaking of Incompetence Chief, What about Judges?" <u>Juris Doctor</u>, May, 1978.

"Has the Supreme Court Abandoned the Constitution?" <u>Saturday Review</u>, May 28, 1977.

"The Criminal Indictment of Henry Kissinger," <u>Playgirl</u>, December, 1976.

"The Exploitation of Women Piece Workers," <u>Playgirl</u>, January, 1975.

"Capital Punishment in South Carolina: The End of an Era," 24 <u>S.C.L.Rev.</u> 762 (1972).

"In Pursuit of the 'Least Racist' Juror," 23 <u>Stanford L. Rev.</u> (1971).

"GI Rights and Army Justice: The Draftee's Guide to Military Life and Law," 6 <u>Harv.C.R-C.L.L.Rev.</u> 205 (1970).

<u>Other</u>:

<u>VOTE: The Case For Extending And Amending The Voting Rights Act</u> (ACLU, March 2006) (report of litigation, 1982-2006; co-author).

<u>Litigation Under the Voting Rights Act</u> (New York; Center for Constitutional Rights, 1986) (manual; co-author).

<u>Voting Rights in the South: Ten Years of Litigation Challenging Continuing Discrimination against Minorities</u> (New York; ACLU, 1982) (monograph).

<u>Selected Cases</u>

<u>Jackson v. Board of Trustees of Wolf Point, Montana</u>, 2014 WL 1791229 (D. Mont. May 6, 2014) (challenge to malapportioned school board that diluted Indian voting strength).

Shelby County, Alabama v. Holder, 133 S.Ct. 2612 (2013) (challenge to the constitutionality of the coverage formula of Section 5 of the Voting Rights Act. The VRP represented defendant intervenors).

Herbert v. Kentucky State Board of Elections, 2013 WL 4459853 (E.D. Ky. 2013) (successful challenge to malapportioned state legislative districts).

Arizona v. Inter Tribal Council of Arizona, Inc., 133 S.Ct. 2247 (2013) (Arizona's documentary proof of citizenship requirement as applied to Federal Form applicants was pre-empted by the NVRA).

South Carolina v. Holder, 898 F.Supp.2d 30 (D. D.C.  2012) (granting Section 5 preclearance to S.C. photo ID law because citizens could vote without as photo ID).

Nix v. Holder, 133 S.Ct. 610 (2012) (affirming the dismissal of a challenge to the constitutionality of Section 5 of the Voting Rights Act as moot).

Martin v. Augusta-Richmond County, Georgia, Commission, 2012 WL 2339499 (S.D. Ga. 2012) (successful challenge to malapportioned county commission and board of education districts).

Kelly v. McCulloch, 2012 WL 1945423 (D. Mont. 2012) (filing deadline imposed undue burdens on ballot access).

Large v. Fremont County, Wyoming, 670 F.3d 1133 (10th Cir. 2012) (successful challenge to at-large elections under Section 2 of the Voting Rights Act).

Gray v. South Carolina State Election Commission, 2010 WL 753767 (D. S.C. 2010) (successful action to enforce Section 5 of the Voting Rights Act).

Levy v. Lexington County, S.C., 589 F.3d 708 (4th Cir. 2009) (Section 2 challenge to at-large elections).

Janis v. Nelson, 2009 WL 521902 (D. S.D. 2009) (dismissing a challenge to the constitutionality of Section 5).

<u>Northwest Austin Municipal Utility District Number One v. Mukasey</u>,573 F.Supp.2d 221 (D. D.C. 2008) (dismissing a challenge to the constitutionality of Section 5), <u>vacated and remanded on other grounds</u>, 556 U.S. 193 (2009).

<u>Cottier v. City of Martin</u>, 445 F.3d 1113 (8th Cir. 2006) (challenge to at-large elections in Martin, South Dakota).

<u>Bone Shirt v. Hazeltine</u>, 336 F.Supp.2d 976 (D. S.D. 2004) (challenge to legislative redistricting in South Dakota).

<u>Moultrie v. Charleston County, S.C.</u>, 365 F.3d 341 (4th Cir. 2004) (challenge to at-large elections for the Charleston County Council).

<u>Larios v. Cox</u>, 314 F.Supp.2d 1357 (N.D. Ga. 2004) (three-judge court) (court ordered redistricting).

<u>United States v. Blaine County, Montana</u>, 363 F.3d 897 (9th Cir. 2004) (remedial redistricting).

<u>Wright v. City of Albany, Georgia</u>, 306 F.Supp.2d 1228 (M.D. Ga. 2003) (challenge to malapportioned city commission districts).

<u>Colleton County Council v. McConnell</u>, 201 F. Supp.2d 618 (D. S.C. 2002) (three-judge court) (challenge to congressional and legislative redistricting in South Carolina).

<u>Emery v. Hunt</u>, 272 F.3d 1042 (8th Cir. 2001) (challenge to legislative redistricting in South Dakota by Native Americans).

<u>Old Person v. Cooney</u>, 230 F.3d 1113 (9th Cir. 2000) (challenge to state legislative redistricting in Montana by Native Americans).

<u>RWTAAAC v. Sundquist</u>, 209 F.3d 835 (6th Cir. 2000) (challenge to legislative redistricting in Tennessee by racial minorities).

<u>Vander Linden v. Hodges</u>, 193 F.3d 268 (4th Cir. 1999) (challenge to  county legislative delegation system of county government in South Carolina).

Cuthair v. Montezuma-Cortez, Colorado School District, 7 F. Supp. 2d 1152 (D. Colo. 1998) (American Indian vote dilution in school board elections).

Abrams v. Johnson, 521 U.S. 74 (1997) (congressional redistricting in Georgia).

Miller v. Johnson, 515 U.S. 900 (1995) (congressional redistricting in Georgia).

Cousin v. McWherter, 904 F. Supp. 686 (E.D. Tenn. 1995), reversed and remanded, 145 F.3d 818 (6th Cir. 1998) (challenge to circuit wide judicial elections).

Chapman v. Spillers, 44 F.3d 923 (11th Cir. 1995) (refusal to conduct municipal elections).

Holder v. Hall, 512 U.S. 874 (1994) (Section 2 challenge to sole commissioner form of government).

SRAC v. Theodore, 508 U.S. 968 (1993) (congressional and legislative redistricting in South Carolina).

Brooks v. State Board of Elections, 775 F. Supp. 1470 (S.D. Ga. 1989), affirmed, 498 U.S. 916 (1990) (judicial elections; Section 5 enforcement).

Gresham v. Harris, 695 F. Supp. 1179 (N.D. Ga.), affirmed, 495 U.S. 954 (1990) (refusal to conduct municipal elections).

Brown v. Board of Commissioners of Chattanooga, Tenn., 722 F. Supp. 380 (E.D. Tenn. 1989) (minority vote dilution).

Windy Boy v. County of Big Horn, Montana, 647 F. Supp. 1002 (D. Mon. 1986) (Native American vote dilution).

Jackson v. Edgefield County, South Carolina School District, 650 F. Supp. 1176 (D. S.C. 1986) (minority vote dilution).

McCain v. Lybrand, 465 U.S. 236 (1984) (enforcing Section 5 of the Voting Rights Act).

County Council of Sumter County, South Carolina v. United States, 596 F. Supp. 35 (D. D.C. 1984) (Section 5 of the Voting Rights Act).

Busbee v. Smith, 549 F. Supp. 494 (D. D.C. 1982), affirmed, 459 U.S. 1166 (1983) (congressional redistricting).

Rogers v. Lodge, 458 U.S. 613 (1982) (minority vote dilution).

Sumter County School District v. Edge, 541 F. Supp. 55 (M.D. Ga.), affirmed, 456 U.S. 1002 (1982) (minority vote dilution).

Canady v. Lumberton City Board of Education, 454 U.S. 957 (1981) (Section 5 of the Voting Rights Act).

Allen v. Ellisor, 664 F.2d 391 (4th Cir. 1981), vacated and remanded, 454 U.S. 807 (1981) (equal protection challenge to state felon disfranchisement law).

Berry v. Doles, 438 U.S. 190 (1978) (Section 5 of the Voting Rights Act).

Berry v. Cooper, 577 F.2d 322 (5th Cir. 1978) (jury discrimination).

In re Primus, 436 U.S. 412 (1978) (bar disciplinary proceeding against public interest lawyer for solicitation).

Weatherford v. Bursey, 429 U.S. 545 (1977) (Sixth Amendment right to counsel).

Burt v. Board of Trustees of Edgefield County School District, 521 F.2d 1201 (4th Cir. 1975) (employment discrimination).

Eslinger v. Thomas, 476 F.2d 225 (4th Cir. 1973) (gender discrimination in employment by South Carolina Senate).

Carracter v. Morgan, 491 F.2d 458 (4th Cir. 1973) (prison desegregation).

Lee v. Washington, 390 U.S. 333 (1968) (prison desegregation).

Congressional Testimony

House of Representatives, Subcommittee on the Constitution, Civil Rights, and Civil Liberties, February 26, 2008, Oversight Hearing ("Denial and Suppression of the American Indian Vote," written statement).

House of Representatives, Subcommittee on the Constitution, Civil Rights, and Civil Liberties, October 30, 2007, Oversight Hearing on the Voting Section of the U.S. Department of Justice.

United States Senate, Committee on the Judiciary, May 9, 2006, Voting Rights Act Extension.

House of Representatives, Committee on the Judiciary, 2006, Voting Rights Act Extension.

House of Representatives, Committee on the Judiciary, October 25, 2005, Voting Rights Act Extension.

United States Senate, Committee on Rules and Administration, 1988, Universal Voter Registration Act.

House of Representatives, Subcommittee on Civil and Constitutional Rights, 1985, Oversight Hearings.

United States Senate, Committee on the Judiciary, 1982, Voting Rights Act Extension.

House of Representatives, Committee on the Judiciary, 1981, Voting Rights Act Extension.


Awards

Daily Report, 2015 Lifetime Achievement Award

ACLU of Montana, 2014 Jeannette Rankin Civil Liberties Award.

ACLU of Georgia, George & Bee Rich Wolfe Award, December 5, 2013.

Edgefield County Community Award to Laughlin McDonald for "years of dedicated service to the causes of civil rights, " June 2013.

Resolution by Georgia Rep. "Able" Mable Thomas commending Laughlin McDonald for "his many contributions to his county, community, and the State of Georgia," May 2013.

Fairfield County, South Carolina, Council, March 3, 2012, Resolution to "'Celebrate Equal Rights' and honor the life and work of Laughlin McDonald."

Gate City Bar Association of Georgia, Black History Month, Voting Rights Symposium Award, February 18, 2005

Georgia Legislative Black Caucus, Civil Justice Award, November 2004.

ACLU of Georgia, Civil Liberties Award, 1995.

Taylor County, Georgia NAACP Community Service Award, 1995.

Gate City Bar Association of Georgia, The R.E. Thomas Civil Rights Award, 1990

American Bar Association, Litigation Section, Pro Bono and Professional Responsibility Award, 1989

John Bolt Culbertson Civil Liberties Award, ACLU of South Carolina, 1988

Prince Edward County Virginia NAACP, Special Award, 1984

Edgefield County NAACP, Attorney of the Year, 1984

Burke County Improvement Association, Community Service Award, 1983

The American Lawyer, Best Performance of the Year, Civil Rights, Honorable Mention, 1982

ACLU of South Carolina, Special Award, 1980

Atlanta NAACP, NAACP Life Membership, 1980

ACLU of South Carolina, Special Award, 1972