## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; LAVELLE LEMON, MARLON REID, LAURETHA CELESTE SIMS, PATRICIA SMITH, COLEY TYSON,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia,<br><br>Defendants. | Civil Action No. 1:17-cv-01427-TCB-MLB-BBM<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**(First, Fourteenth and Fifteenth Amendments to the United States Constitution; 42 U.S.C. § 1983)** |

## INTRODUCTION

1.      This is an action to enjoin the State of Georgia and its Secretary of

State from enforcing Act No. 251 (2015 Ga. L. 1413) ("H.B. 566"), insofar as it

redistricts Georgia House of Representatives Districts 105 and 111.  This

redistricting of Districts 105 and 111 is a racial gerrymander, enacted for the

purpose of electing and protecting white Republican incumbents.  H.B. 566

therefore violates the United States Constitution.

2.      H.B. 566 is a racial gerrymander that violates the Fourteenth and Fifteenth Amendments because racial concerns predominated with respect to the drawing of the District 105 and 111 boundary lines.

3.      H.B. 566 is a partisan gerrymander that invidiously and improperly distorts the political process in violation of the Fourteenth Amendment.

4.      H.B. 566 is also a partisan gerrymander that violates the First Amendment because the Republican legislators and Reapportionment Office staff members who participated in the drafting of the 2015 redistricting plan for Districts 105 and 111 retaliated against the individual Plaintiffs and similarly situated voters because of their support for Democratic candidates.  The 2015 redistricting plan accomplishes this goal by "cracking" or diluting the Democratic vote in the two districts in violation of the First Amendment.

5.      Voting patterns in Districts 105 and 111 are racially polarized. These polarized voting patterns are highly correlated with support for Georgia's two major political parties.  Georgia's African-American voters overwhelmingly favor candidates from the Democratic Party, and the state's white voters

2

overwhelmingly favor candidates from the Republican Party.

6.      Over the course of this census cycle, Districts 105 and 111 experienced an influx of minority voters and increased minority voter participation.  This resulted in African-American Democratic candidates nearly defeating better-funded white Republican incumbents in those districts.

7.      Instead of allowing the incumbents the opportunity to appeal to their districts' increasingly diverse electorate, the Legislature, which is dominated by white Republicans, redrew these districts to make them safer for white Republican incumbents.  Race was used as the means for achieving this partisan end.

8.      The Legislature manipulated Districts 105 and 111 with surgical precision, splitting precincts to cut out census blocks with higher percentages of African-American Democratic voters and moving in census blocks with higher percentages of white Republican voters.

9.      Since Georgia maintains voter registration by race but not by party, and because the Legislature split voting precincts and divided districts by census blocks, the proponents of H.B. 566 necessarily used race when redrawing the boundary lines of Districts 105 and 111.

10.     H.B. 566 moves pockets of white and minority voters between Georgia House districts, thereby minimizing minority voting strength and making competitive districts safer for white voters' candidates of choice.

11.     H.B. 566 unnecessarily fences many African-American voters out of Districts 105 and 111, which retain a smaller number of African-American voters. H.B. 566 does this for the purpose of impairing the ability of both groups of African-American citizens to elect representatives who share their political views, based on the perceived content of their political speech and political associations.

12.     The racial gerrymander of H.B. 566 has already proven to be very effective, by shifting enough voters to allow white Republican incumbents to prevail over African-American Democratic challengers in Districts 105 and 111 in hotly contested elections held on November 8, 2016.

13.     H.B. 566 is a "mid-census cycle redistricting plan."  Unlike redistricting plans adopted when new census data is released every ten years to comply with the United States Constitution's "one person, one vote" requirement, there was no legitimate reason for the legislature to enact a new redistricting plan for the Georgia House of Representatives, which it had done just a few years

4

earlier in light of the 2010 census.  Under the circumstances, the only rational

explanation is that the General Assembly intended to racially gerrymander

Districts 105 and 111 for partisan purposes.

14.     For these reasons, and as further alleged in detail below, Plaintiffs

respectfully pray for this Court to issue relief by issuing a declaratory

judgment that H.B. 566 is unlawful, insofar as it redistricts House Districts

105 and 111, and to return those districts to the status quo as it existed during

the 2012 and 2014 election cycles.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction of this action pursuant to 42 U.S.C. § 1983

and 28 U.S.C. § 1331, because this action arises under the First, Fourteenth and

Fifteenth Amendments to the United States Constitution.

16.     This Court has jurisdiction to grant both declaratory and injunctive

relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

17.     This Court has personal jurisdiction over the individual Defendant,

who is a citizen of the State of Georgia and resides within this District.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2),

because a substantial part of the events or omissions giving rise to the claim

occurred in this District.

19.    This case must be heard and determined by a district court of three

judges pursuant to 28 U.S.C. § 2284.

## THE PARTIES

### The Plaintiffs

20.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP

("Georgia NAACP") is a non-partisan, interracial, nonprofit membership

organization that was founded in 1941.  Its mission is to eliminate racial

discrimination through democratic processes and ensure the equal political,

educational, social, and economic rights of all persons, in particular African-

Americans.  It is headquartered in Atlanta and currently has approximately 10,000

members.  The Georgia NAACP's membership includes African-American voters

who reside in Georgia House Districts 105 and 111.  Its membership includes

African-American voters who were displaced from those districts by H.B. 566, and

African-American voters who remain in those districts after its enactment.  These

members have suffered harm because they no longer live in a district in which they

6

have an equal opportunity to elect a candidate of choice to the Georgia House of Representatives. These members were subjected to race- and partisan-based redistricting in violation of their constitutional rights.

21. Plaintiff LAVELLE LEMON is an African-American resident and Democratic registered voter of Georgia. She resides within Georgia House of Representatives District 111 in Henry County. Due to the passage of H.B. 566, Plaintiff Lemon did not have an equal opportunity to elect a candidate of choice in District 111 in the November 2016 election, and she will not have an equal opportunity to do so in the 2018 and 2020 election cycles. Plaintiff Lemon is further injured by the race- and partisan-based redistricting of House District 111 perpetrated by H.B. 566.

22. Plaintiff MARLON REID is an African-American resident and Democratic registered voter of Georgia. He resides within Georgia House of Representatives District 105 in Gwinnett County. Due to the passage of H.B. 566, Plaintiff Reid did not have an equal opportunity to elect a candidate of choice in District 105 in the November 2016 election, and he will not have an equal opportunity to do so in the 2018 and 2020 election cycles. Plaintiff Reid is further

7

injured by the race- and partisan-based redistricting of House District 105 perpetrated by H.B. 566.

23.     Plaintiff LAURETHA CELESTE SIMS is an African-American resident and Democratic registered voter of Georgia.  She resides within Georgia House of Representatives District 111 in Henry County.  Due to the passage of H.B. 566, Plaintiff Sims did not have an equal opportunity to elect a candidate of choice in District 111 in the November 2016 election, and she will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Sims is further injured by the race- and partisan-based redistricting of House District 111 perpetrated by H.B. 566.

24.     Plaintiff PATRICIA SMITH is an African-American resident and Democratic registered voter of Georgia.  She resides within Georgia House of Representatives District 105 in Gwinnett County.  Due to the passage of H.B. 566, Plaintiff Smith did not have an equal opportunity to elect a candidate of choice in District 105 in the November 2016 election, and she will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Smith is further injured by the race-and partisan-based redistricting of House District 105 perpetrated by H.B. 566.

Case 1:17-cv-01427-TCB-MLB-BBM Document 171 Filed 09/13/18 Page 9 of 40

25.     Plaintiff COLEY TYSON is an African-American resident and Democratic registered voter of Georgia.  He resides within Georgia House of Representatives District 105 in Gwinnett County.  Due to the passage of H.B. 566, Plaintiff Tyson did not have an equal opportunity to elect a candidate of choice in District 105 in the November 2016 election, and he will not have an equal opportunity to do so in the 2018 and 2020 election cycles.  Plaintiff Tyson is further injured by the race- and partisan-based redistricting of House District 105 perpetrated by H.B. 566.

## The Defendants

26.     Defendant BRIAN KEMP is being sued in his official capacity as the Secretary of State of Georgia.  Defendant KEMP is the State of Georgia's chief election officer and as such is responsible is responsible for overseeing the conduct of its elections.

## FACTS AND BACKGROUND

27.     The Georgia House of Representatives is composed of 180 members. Each representative is elected from a single-member district.

28.     The Georgia state legislative districts are typically redrawn after each census.

Case 1:17-cv-01427-TCB-MLB-BBM   Document 171   Filed 09/13/18   Page 10 of 40

29.     Jurisdictions that undergo demographic changes traditionally adopt a new redistricting plan every ten years, so as to comply with the United States Constitution's "one person, one vote" requirement when new decennial census data is released.

30.     Georgia state legislative elections are partisan.  Primary and general elections feature a majority vote requirement.  If no candidate receives a majority of the votes cast, a runoff election is held between the top two candidates.  This makes it more difficult for African-American, Latino, and Asian-American voters to elect candidates of choice because they comprise a minority of the electorate.

31.     There is a long—and well documented—history of voting discrimination against minority voters, especially African-Americans, in Georgia.  Indeed, the Northern District of Georgia has recently acknowledged "Georgia's long history of discrimination" in this area.  *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (*citing Brooks v. State Bd. of Elections,* 848 F. Supp. 1548, 1560–61, 1571 (S.D. Ga. 1994) (stating that Georgia's "segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof")), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th

Cir. 2015); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga.

1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given

formal judicial notice of the State's past discrimination in voting, and have

acknowledged it in the recent cases").

32.     The history of voting discrimination against minority voters in

Georgia between 1982 and 2006 is further detailed in various reports produced

during the 2006 reauthorization of the Voting Rights Act.  *See* Am. Civil Liberties

Union, *The Case for Extending and Amending the Voting Rights Act* 108-479,

*available at* https://www.aclu.org/files/pdfs/votingrightsreport20060307.pdf;

RenewtheVRA.org, *Voting Rights in Georgia 1982-2000*, *available at*

http://www.protectcivilrights.org/pdf/voting/GeorgiaVRA.pdf.  Additional

evidence of voting discrimination can be found in various academic articles and

books.  *See*, *e.g.*, Laughlin McDonald et al., *Georgia*, *in* QUIET REVOLUTION IN THE

SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990 67-102 (Chandler

Davidson & Bernard Grofman eds., 1994).

33.     The historical background of Georgia House redistricting includes the

enactment of several plans in violation of the federal Voting Rights Act or the

Constitution.  *See*, *e.g.*, *Georgia v. United States*, 411 U.S. 526 (1973) (finding a

violation of Section 5 of the Voting Rights Act); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 1116 (1983) (finding discriminatory purpose); *Miller v. Johnson*, 515 U.S. 900, 917 (1995) (finding racial gerrymandering); *Abrams v. Johnson*, 521 U.S. 74, 107 (1997) (same); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) (finding that the redistricting plan violated one person, one vote principle); *Georgia v. Ashcroft*, 539 U.S. 461, 486 (2003) (noting that redistricting plan made it more difficult for minority voters to elect a candidate of their choice).

34.    One result of the Georgia legislature's redistricting efforts is that minorities have historically been and continue to be underrepresented in the Georgia House of Representatives.  According to the 2015 American Community Survey, approximately 62.8 percent of Georgia's citizen voting age population is white, 31.6 percent is African-American, 4.4 percent is Latino, and 2.6 percent is Asian-American.  Citizen Voting-Age Population: Georgia, U.S. CENSUS BUREAU (2015), *available at*
https://www.census.gov/content/dam/Census/library/visualizations/2016/comm/citizen_voting_age_pop/cb160-tps148_georgia.pdf.

12

35.     By contrast, of the 180 members of the Georgia House of Representatives, 131 (72.8%) are white, 46 (25.6%) are African-American, 2 (1.1%) are Latino, and one (0.6%) is Asian-American.

36.     Moreover, race and party are highly correlated in Georgia and have been for decades.  For example, there are currently 119 Republicans in the Georgia House of Representatives, of whom 118 (99.2%) are white and one (0.8%) is Hispanic.  There are no African-American Republicans in the Georgia House.  By contrast, there are currently 61 Democrats in the Georgia House, of whom 46 (75.4%) are African-American, 13 (21.3%) are white, one (1.6%) is Asian-American, and one (1.6%) is Hispanic.

37.     The Georgia legislature has repeatedly sought to amend the post-2010 redistricting plan for the Georgia House of Representatives even though there is no legal or other legitimate reason for it to do so.

38.     The Georgia legislature enacted Act No. 1EX (2011), its first post-2010 Census redistricting plan for the House of Representatives, in August 2011.  Act No. 1EX (2011) was adopted by both the Georgia House of Representatives and the Georgia Senate after little debate in a largely party-line vote and was

13

Case 1:17-cv-01427-TCB-MLB-BBM   Document 173-1   Filed 09/13/18   Page 14 of 40

opposed by the overwhelming majority of the state's African-American and other minority legislators.

39.    Before the 2011 House of Representatives' plan codified in Act No. 1EX (2011) was ever implemented, the Georgia legislature amended it by enacting Act No. 277 (S.B. 513) (2012) in February 2012.  Act No. 277 amended 15 districts, which encompass 19 different counties.  Act No. 277 was adopted by both the Georgia House of Representatives and the Georgia Senate after little debate in a largely party-line vote and was opposed by the overwhelming majority of the state's African-American and other minority legislators.

40.    The redistricting plans codified in Act No. 1EX (2011) and Act No. 277 (2012) were precleared by the United States Department of Justice.

41.    The Georgia legislature enacted H.B. 566, its third post-2010 Census redistricting plan for the House of Representatives, in May 2015.

42.    H.B. 566 amended 17 districts, which encompass Atkinson, Bryan, Butts, Cobb, Chatham, Clayton, Fayette, Fulton, Gwinnett, Hall, Henry, Lamar, Lanier, Lowndes, Newton, Rockdale, Spalding, Ware, and White Counties.

**Creation of H.B. 566**

14

Case 1:17-cv-01427-TCB-MLB-BBM   Document 173   Filed 09/13/18   Page 15 of 40

43.     At the instruction of Spiro Amburn, the House Speaker's Chief of Staff, Representative Randall Nix, who served as the Chair of the House Reapportionment Committee, told members to plan for re-redistricting prior to the 2015 legislative session.  Legislators were directed to speak with Dan O'Connor and Gina Wright from the Georgia Legislative and Congressional Reapportionment Office if they wanted to make any changes to their districts.

44.     Prior to the 2015 legislative session, Republican Representative Brian Strickland of District 111 approached Rep. Nix and expressed an interest in redrawing his respective district lines to increase his likelihood of being reelected. Republican Representative Joyce Chandler of District 105 asked Gina Wright prior to the November 2014 election if there was a way to provide her district, District 105, with an additional political boost.

45.     In July 2014, Rep. Chandler asked O'Connor for data on her district, and O'Connor sent her precinct-level racial data.

46.     In August 2014, O'Connor emailed Republican Representative Chuck Efstration of adjoining District 104 about the rapid growth in the black registered voter percentage in certain parts of Gwinnett County.   O'Connor noted that District

104 was "an obvious" target for "tweaking" by swapping out Republicans for Democrats.

47.     O'Connor was concerned about the effect of Black population growth on Republican candidates' future electoral prospects in Districts 105 and 111.  In September of 2014, O'Connor flagged District 105 as one of the top three targets for Democrats due to the racial demographic changes.

48.     Representative Dale Rutledge of District 109 emailed Wright and O'Connor after the 2014 election to obtain demographic data for Districts 109, 110, and 111 in Henry County.

49.     Senate Pro-Tempore Jan Jones asked O'Connor to provide research regarding past instances in which a Republican House incumbent had been defeated. O'Connor's research showed that, aside from DeKalb County—where there is an unusually high level of white support for Democrats—a Republican incumbent had not lost in Georgia from 2007 to 2015, except in districts where the minority registered voter percentage exceeded 30 percent.

50.     In February 2015, O'Connor met with Senator Jones and emailed her detailed historical voter registration data by race in Gwinnett County and Henry County.  O'Connor promised to follow up with data for Rep. Chandler's and Rep.

Strickland's districts.  He sent a follow-up email on February 27 that included

voter registration data by race for both District 105 and 111, noting that "once a

district gets in the 30-35% black range, it becomes a target."  At the time, 34.6

percent of registered voters in District 111 were Black, while 36.7 were Black in

District 105.

51.    O'Connor was aware of the strong correlation between race and party

affiliation, and regularly disseminated racial data alongside political performance

data to legislative staff.

52.    O'Connor's analyses for Republican Representatives and key

legislative staffers indicates that—because voting is racially polarized in

Georgia—the larger the percentage of black voters in a district, the more successful

Democratic candidates fare in an election compared to Republican candidates.

53.    Gina Wright drew the maps for both Districts 105 and 111.  She began

drawing maps for District 105 as early as spring of 2014.

54.    Wright conceded that the redrawing of District 105 and District 111

was motivated by partisan advantage and not technical improvements based on

traditional redistricting principles.

55.     After H.B. 566 was introduced, Wright made a second request to the Georgia Secretary of State's office for precinct-level voter registration data, including racial data, and explained that multiple legislators had requested the data. While drawing the maps, she produced accompanying stat sheets that included the black voting age population percentage for Districts 104 and 105.

56.     Maptitude, the mapping software used to develop the 2015 redistricting plan, has a "pending changes" box where demographic data, including race, is visible as proposed changes are made to maps.  Wright kept this box open and consulted it during the development of the maps, and she looked at the racial data after making changes to the maps.

57.     Although political data was available, the racial data available in Maptitude provides a more accurate depiction of the districts because the racial data is calculated down to the Census block level.  The political data, meanwhile, is calculated only at the precinct level.  As such, all Census blocks within a voting precinct report the same partisan information, even if one block within a precinct leans much more heavily Republican or Democratic than others.  The political data is therefore not as reliable at the sub-precinct level as the racial data.

58.     Wright worked on the District 105 map with Reps. Chandler, Efstration, and Nix present, among others.  Representative Nix testified that racial data was used during the map-drawing session that he attended.

59.     Wright was able to draw district maps that split precincts with more precision because she had racial data available. While the new maps had the same number of split precincts for District 105, it altered the area and location of the splits.  In District 111, the new map actually increased the number of split precincts from two to five.

### Enactment of H.B. 566

60.     H.B. 566 was adopted by both the Georgia House of Representatives and the Georgia Senate after little debate.  In fact, minority and Democratic legislators in the House of Representatives were initially given no indication that the changes contained the bill were anything other than innocuous and minor.

61.     Once H.B. 566 reached the Senate and minority legislators discovered the nature of several of the changes, Senator Vincent Fort, who is African-American, criticized the changes to Districts 105 and 111 as racial gerrymanders. Representative Randy Nix, responded only that lawmakers had the opportunity to approach him with changes they wanted to make to their districts.  Sandra Parrish,

19

*Democrats Call on Governor to Veto Redistricting Bill*, WSB RADIO, May 1, 2015,
*available at* http://www.wsbradio.com/news/democrats-call-governor-veto-
redistricting-bill/KBHnfw7ZK6VDvSXw8MiplM/.

62.     Representative Nix argued that the bill made no significant changes to
any of the districts and that all of the lawmakers whose districts were affected had
agreed to the changes.  David Wickert, *Gwinnett House district gets voting rights
scrutiny*, THE ATLANTA JOURNAL-CONSTITUTION, Sept. 21, 2016, *available at*
http://www.myajc.com/news/localgovtpolitics/gwinnetthousedistrictgetsvotingrigh
tsscrutiny/yUlarJWHWlawwAed9nM5uN/.

63.     The Senate passed the measure by a narrower and largely party-line
39-14 margin after minority legislators became aware of and started raising
concerns about potential voting rights violations.  *Id.*  H.B. 566 was opposed by the
state's African-American senators.

64.     The Georgia Legislature's adoption of H.B. 566 included departures
from the normal procedural sequence.  It also included substantive departures from
the factors usually considered by the Legislature in redistricting.

65.     During the 2015 legislative session, African American legislators
serving on the House Legislative and Congressional Reapportionment and the

Senate Reapportionment and Redistricting Committees ("House and Senate

Redistricting Committees") were excluded from the process of drawing and

negotiating the plans codified in H.B. 566.

66.     During the 2015 legislative session, minority residents of Georgia

were denied the opportunity to analyze and comment on the plans enacted in H.B.

566.  The House and Senate Redistricting Committees did not hold any public

hearings or allow public comment on the plans prior to voting on them.

67.     Despite the growth of the minority population in Georgia since 2010,

H.B. 566 reduces the number of districts in which minority voters have an equal

opportunity to elect candidates of choice.  Minority voters have therefore lost

voting strength.

68.     H.B. 566 uses race as the predominant factor to allocate African-

American and other minority voters into and out of House Districts 105 and 111.

The changes to these districts reduce the ability of African-American and other

minority voters to elect a candidate of choice to the Georgia House.

69.     Not satisfied with these efforts, in 2017 the legislature attempted to

enact H.B. 515, which would have decreased the African-American population in

District 111 again, as well as in District 40.  H.B. 515 would have been the fourth

post-2010 Census redistricting plan for the House of Representatives.  This

proposed legislation was ultimately tabled in the face of a backlash from African-

American, Democratic legislators, as well as hostile articles in the news media.

*See*, *e.g.*, Mark Joseph Stern, *Georgia Republicans Pass Racial Gerrymander to*

*Kick Black Voters Out of GOP Districts*, SLATE, March 7, 2017, *available at*

http://www.slate.com/blogs/the_slatest/2017/03/07/georgia_republicans_pass_raci

al_gerrymander.html.

### Changes to House District 105 by H.B. 566

70.     House District 105 elections in the 2012 and 2014 election cycles

were conducted under the boundaries enacted by the legislature in Act No. 277.

71.     Under those boundaries, 48.4 percent of District 105's voting age

population were white, 32.4 percent were African-American, 12.6 percent were

Latino, and 4.6 percent were Asian.  The combined minority voting age population

was 51.6 percent.

72.     In the November 2012 general election, Joyce Chandler received

10,561 votes and Renita Hamilton received 10,007 votes.  The margin of victory

was 554 votes, or 2.7 percentage points.

73.     Representative Chandler is white and a Republican.  Ms. Hamilton is African-American and a Democrat.

74.     In the November 2014 general election, Representative Chandler defeated Renita Hamilton by 789 votes, or 5.6 percentage points.  Representative Chandler received 7,497 votes and Ms. Hamilton received 6,708 votes.

75.     The voting patterns in the November 2012 and November 2014 elections in House District 105 were racially polarized.

76.     H.B. 566 amended House District 105 by moving out part of Precinct Lawrenceville M, and moving in all of Precinct Harbins C and part of Harbins A.  H.B. 566 split Lawrenceville, a majority-black city, into six different districts, including District 105.

77.     Two precincts bordering District 105 are split such that the portions within District 105 have a lower percentage of black voters than the portions that are outside of the district.

### Table 2 – House District 105 Voting Age Population (2010 Census)

|  | 2012 plan | | Current plan | | Change | |
|---|---|---|---|---|---|---|
| **White alone, not Hispanic or Latino** | 17,712 | 48.4% | 19,204 | 52.7% | +1,492 | +4.3% |

| African-American alone, not Hispanic or Latino | 11,841 | 32.4% | 11,071 | 30.4% | -770 | -2.0% |
|---|---|---|---|---|---|---|
| Hispanic/Latino | 4,612 | 12.6% | 3,945 | 10.8% | -667 | -1.8% |
| Other | 2,415 | 6.6% | 2,229 | 6.1% | -186 | -0.5% |
| Total | 36,580 | | 36,449 | | -131 | |

78.     As redrawn by H.B. 566, 52.7 percent of District 105's voting age population are white, 30.4 percent are African-American, 10.8 percent are Latino, and 4.2 percent are Asian.  The combined minority voting age population is 47.3 percent.

79.     H.B. 566 increased the white voting age population of House District 105 by 4.3 percentage points.  It decreased the African-American voting age population by 2.0 percentage points, and it decreased the combined minority voting age population by 4.3 percentage points.

80.     The November 2016 House District 105 election was conducted under the district boundaries codified in H.B. 566.

81.     In the November 2016 general election, Representative Chandler defeated Donna McLeod by 222 votes, or 0.9 percentage points.  Representative Chandler received 12,411 votes and Ms. McLeod received 12,189 votes.  The margin was so close that the race went to a recount.  Curt Yeomans, *Rep. Joyce*

24

*Chandler wins recount in House District 105 race*, THE GWINNETT DAILY POST, Sept. 21, 2016, *available at* http://www.gwinnettdailypost.com/local/rep-joyce-chandler-wins-recount-in-house-district-race/article_52ac6b29-6157-595b-8f16-8da2129e1ad5.html.

82.    Donna McLeod is African-American and a Democrat.

83.    Voting in the November 2016 election in House District 105 was racially polarized.

84.    Most Black voters in House District 105 voted for the Democratic candidate in the November 2016 general election, while most white voters voted for the Republican candidate.

85.    If the November 2016 general election had been conducted under the district boundaries that had been employed in the 2012 and 2014 election cycles, Ms. McLeod would have defeated Representative Chandler.  O'Connor admitted, and Defendants' expert Dr. John Alford does not dispute, that this likely would have been the outcome.

### Changes to House District 111 by H.B. 566

86.    Georgia House District 111 elections in the 2012 and 2014 election cycles were conducted under the district boundaries enacted in Act No. 277.

87.     Under those district boundaries, 56.1 percent of District 111's voting age population were white, 33.2 percent were African-American, 5.6 percent were Latino, and 3.3 percent were Asian.  The combined minority voting age population is 43.9 percent.

88.     In the November 2012 general election, Brian Strickland received 13,172 votes and Bill Blackmon received 11,695 votes.  The margin of victory was 1,477 votes or 5.9 percentage points.

89.     Representative Strickland is white and a Republican.  Mr. Blackmon is African American and a Democrat.

90.     In the November 2014 general election, Representative Strickland received 9,540 votes and Jim Nichols received 8,416 votes.  The margin of victory was 1,124 votes, or 6.3 percentage points.

91.     Mr. Nichols is white and a Democrat.

92.     The voting patterns in the November 2012 and November 2014 elections in House District 111 were racially polarized.

93.     H.B. 566 amended House District 111 by removing precincts and census blocks that are predominantly populated by minority voters, and inserting precincts and census blocks that are predominantly populated by white voters.

26

94.     H.B. 566 split Henry County precinct 32 – Mount Carmel.  Some of the census blocks remained in District 111, while others were moved out.

95.     H.B. 566 also split Stockbridge, a majority-black city, between five House districts, including District 111.

96.     Four precincts bordering District 111 are split such that the portions within District 111 have a lower black voting age population percentage than the portions that are outside of the district.

97.     As redrawn by H.B. 566, 58.1 percent of District 105's voting age population are white, 31.0 percent are African-American, 5.2 percent are Latino, and 3.7 percent are Asian.  The combined minority voting age population was 41.9 percent.

**Table 3 – House District 111 Voting Age Population (2010 Census)**

|  | 2012 plan | | H.B. 566 | | HB   515 | | Total Change | |
|---|---|---|---|---|---|---|---|---|
| **White alone, not Hispanic or Latino** | 21,638 | 56.1% | 22,228 | 58.1% | 22,847 | 59.6% | +1,209 | +3.4% |
| **African-American alone, not Hispanic or Latino** | 12,798 | 33.2% | 11,852 | 31.0% | 11,496 | 30.0% | -1,302 | -3.2% |
| **Other** | 4,109 | 10.7% | 4,155 | 10.9% | 4,014 | 10.5% | -95 | -0.2% |
| **Total** | 38,545 | | 38,235 | | 38,357 | | -188 | |

27

98.  According to the 2010 Census, H.B. 566 increased the white voting age population of House District 111 by 2.0 percentage points.  It decreased the African-American voting age population by 2.2 percentage points.

99.  The November 2016 House District 105 election was conducted under the district boundaries codified in H.B. 566.

100.  In the November 2016 general election, Representative Strickland received 14,488 votes and Darry Payton received 13,542 votes.  The margin of victory was 946 votes, or 3.4 percentage points.

101.  Darryl Payton is African-American and a Democrat.

102.  Voting in the November 2016 election in House District 111 was racially polarized.

103.  Most black voters in House District 105 voted for the Democratic candidate in the November 2016 general election, while most white voters voted for the Republican candidate.

104.  If the November 2016 general election had been conducted under the district boundaries that had been employed in the 2012 and 2014 election cycles, Mr. Payton would have defeated Representative Strickland.  O'Connor admitted,

and Defendants' expert Dr. John Alford does not dispute, that this likely would have been the outcome.

### Demographic Changes in Counties Affected by H.B. 566

105.   Recent demographic changes have taken place in the areas redistricted by H.B. 566, as demonstrated by a comparison of data from the 2010 U.S. Census and the 2015 American Community Survey.

106.   In Gwinnett County, the non-Hispanic African-American population percentage increased from 22.9 percent in 2010 to 24.7 percent in 2015.  The Asian population also rose from 10.5 to 11.0 percent in that span.  The Hispanic population increased from 20.1 to 20.3 percent and the non-Hispanic white population declined from 79.9 percent to 79.7.

107.   In Henry County, the non-Hispanic African-American population increased from 36.3 to 38.4 percent between 2010 and 2015.  The Hispanic population increased from 5.8 to 6.3 percent and the non-Hispanic white population dropped from 52.5 to 49.5 percent during that period.

### COUNT ONE:
**(42 U.S.C. § 1983 – Racial Gerrymander in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution)**

108.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs above, as if fully set forth herein.

109.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

110.    Section 1 of the Fourteenth Amendment to the United States Constitution provides that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

111.    Race predominated with respect to the redistricting in H.B. 566 of Georgia House Districts 105 and 111, where pockets of voters were spirited in and out for the purpose of minimizing the opportunity of minority voters to participate effectively in the political process and for the purpose of capping African American and other minority representation and influence in the Georgia House of Representatives.

112.    The predominance of Defendants' racial purpose is laid bare by their reduction of the African-American population and registered voter percentage in

Case 1:17-cv-01427-TCB-MLB-BBM Document 173-1 Filed 09/13/18 Page 31 of 40

District 105 and 111 after an African-American candidate for the Georgia House nearly defeated the white incumbent. In this context, the reduction of the African-American population percentage constitutes "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale." *Bethune-Hill v. Virginia State Bd. of Elecs.*, 137 S.Ct. 788, 798 (Mar. 1, 2017) (*quoting Miller v. Johnson*, 515 U.S. 900, 913 (1995)).

113. The November 2016 contests in House Districts 105 and 111 demonstrate that the Legislature's efforts have been successful.

114. There is no legitimate reason for the mid-census cycle redistricting of Georgia House Districts 105 and 111.

115. The racial gerrymandering of House Districts 105 and 111 by H.B. 566 violate the rights of Plaintiffs guaranteed to them by the Fourteenth and Fifteenth Amendment to the U.S. Constitution. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

116. By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed

to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## COUNT TWO:
### (42 U.S.C. § 1983 – Partisan Gerrymander in Violation of the Fourteenth Amendment to the United States Constitution)

117.  Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs above, as if fully set forth herein.

118.  The redistricting of Districts 105 and 111 in H.B. 566 is a partisan gerrymander that violates the individual Plaintiffs' Fourteenth Amendment right to equal protection of the laws.

119.  A redistricting plan constitutes an unconstitutional partisan gerrymander if political classifications "were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Vieth v. Jubelirer*, 541 U.S. 267, 307 (Kennedy, J., concurring in the judgment).  In *LULAC v. Perry*, 548 U.S. 399 (2006), a majority of the Justices expressed interest in a test for unconstitutional partisan gerrymandering under the Fourteenth Amendment.  548 U.S. at 420 (Kennedy, J.), 466 (Stevens, J., concurring in part and dissenting in part), and 483 (Souter, J., concurring in part and dissenting in part).

32

Case 1:17-cv-01427-TCB-MLB-BBM   Document 187-1   Filed 09/11/18   Page 33 of 40

120.   A redistricting plan is a partisan gerrymander in violation of the Fourteenth Amendment if it (1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds.

121.   The map drawer intentionally and surgically removed Democratic voters from these districts for the purpose of ensuring electoral victory for their Republican incumbents.  The plan removed a significant number of black, Democratic voters from the districts, while adding more Republican voters—who are overwhelmingly white.  There was no legitimate legislative reason for passing this mid-decade redistricting plan, particularly when a plan that complied with the U.S. Constitution and the Voting Rights Act had been enacted a few years beforehand.

122.   The proponents of H.B. 566 utilized racial demographics and analyses of past elections to predict the level of support for Democratic candidates and, based on the perceived content of voters' political speech, drew Georgia House districts for the purpose of minimizing the electoral strength of voters who seek to be represented by Democratic legislators.

123.   The 2015 redistricting plan subordinates the political interests of the individual Plaintiffs and similarly situated voters in Districts 105 and 111, and it has entrenched the Republican representatives of those districts such that they need not be responsive to members of the opposite political party.

124.   The Georgia Legislature's 2015 redistricting plan was biased against Democratic voters in District 105 and 111 – who are overwhelmingly African-American – because it removed a significant number of them while simultaneously adding a significant number of Republican voters (who are overwhelmingly white).

125.   The 2015 redistricting plan changed the outcome of the November 2016 election in Districts 105 and 111 because it provided the additional Republic voters necessary for Republican incumbents to secure reelection, despite demographic changes favoring their opponents.  The plan will continue to boost the electoral performance of Republican candidates in Districts 105 and 111 in future elections.

126.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

Case 1:17-cv-01427-TCB-MLB-BBM   Document 173-1   Filed 09/13/18   Page 35 of 40

## COUNT THREE:
## (42 U.S.C. § 1983 – Partisan Gerrymander in Violation of the First Amendment to the United States Constitution)

127.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs above, as if fully set forth herein.

128.   The individual Plaintiffs and similarly situated voters in Districts 105 and 111 have a First Amendment right to organize politically and support and vote for Democratic candidates without being burdened, punished or retaliated against by the Georgia legislature due to the exercise of their First Amendment rights.

129.   Those responsible for the 2015 redistricting redrew the lines of Districts 105 and 111 with an intent to burden, penalize, or retaliate against the individual Plaintiffs and similarly situated voters residing in Districts 105 and 111 because they exercised their First Amendment rights to organize politically and to support and vote for Democratic candidates.

130.   Legislators worked with staff in the Reapportionment Office to gather and analyze data based on race and political party—due to their high correlation— to determine how to redraw House Districts 105 and 111 to reelect Republican incumbents in both districts.

Case 1:17-cv-01427-TCB-MLB-BBM   Document 173-1   Filed 09/13/18   Page 36 of 40

131.   The 2015 redistricting plan diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect.  The passage of the 2015 plan changed the outcome of the 2016 elections in Districts 105 and 111, and it threatens to do so in future elections.

132.   Absent the mapmakers' efforts to burden, penalize or retaliate against the individual Plaintiffs and similarly situated voters in Districts 105 and 111 due to the exercise of their First Amendment rights to organize politically and to support and vote for Democratic candidates, the concrete adverse impact would not have occurred.  The Democratic candidates of choice of Districts 105 and 111 would not have been defeated in the 2016 election if the Georgia Legislature had not passed the 2015 plan.

133.   The 2015 redistricting plan reverses ongoing natural demographic changes in Districts 105 and 111, thereby boosting the performance of Republican candidates in those districts.  The plan will continue to do so in the 2018 and 2020 election cycles.

134.   The 2015 redistricting plan is not justified by any legitimate state interest that warrants burdening or penalizing the First Amendment rights of the

Case 1:17-cv-01427-TCB-MLB-BBM Document 173 Filed 09/13/18 Page 37 of 40

individual Plaintiffs and similarly situated Democratic voters in Districts 105 and 111.

135.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the First Amendment to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a.      Assume jurisdiction of this action and request a three-judge panel pursuant to 28 U.S.C. § 2284;

b.      Declare that H.B. 566, insofar as it redistricts Georgia House Districts 105 and 111, violates the First, Fourteenth and Fifteenth Amendments to the United States Constitution;

c.      Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Georgia House Districts 105 and 111 under the current district boundaries as codified in H.B. 566;

Case 1:17-cv-01427-TCB-MLB-BBM   Document 173-1   Filed 07/13/18   Page 38 of 40

  d.  Issue an order requiring Georgia to preclear voting changes during the following ten-year period pursuant to 52 U.S.C. § 10302;

  e.  Set a reasonable deadline for state authorities to enact or adopt a redistricting plan for the Georgia House of Representatives that remedies the statutory and constitutional violations with respect to Districts 105 and 111;

  f.  If state authorities fail to enact or adopt a valid plan by the Court's deadline, order the implementation of a new redistricting plan remedying the aforementioned violations by returning Districts 105 and 111 to their pre-H.B. 566 configurations, and making necessary changes to adjoining districts;

  g.  Retain jurisdiction to render any and all further orders that this Court may deem necessary;

  h.  Award plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action, such as expert fees; and

  i.  Order such additional relief as the interests of justice may require.

Dated: July 13, 2018                    Respectfully submitted,

                          By:    */s/ William V. Custer*
                                 Georgia Bar No. 202910
                                 Jennifer B. Dempsey
                                 Georgia Bar No. 217536
                                 Julia Fenwick Ost
                                 Georgia Bar No. 940532
                                 Bryan Cave LLP
                                 One Atlantic Center
                                 Fourteenth Floor
                                 1201 West Peachtree Street, NW
                                 Atlanta, Georgia 30309-3488
                                 Telephone: (404) 572-6600
                                 Facsimile: (404) 572-6999
                                 bill.custer@bryancave.com
                                 jennifer.dempsey@bryancave.com
                                 julia.ost@bryancave.com

                                 Bradley S. Phillips*
                                 Gregory D. Phillips*
                                 Kenneth Trujillo-Jamison*
                                 Ariel Green*
                                 Munger, Tolles, & Olson LLP
                                 350 South Grand Avenue
                                 Fiftieth Floor
                                 Los Angeles, California 90071-1560
                                 Telephone:   (213) 683-9100
                                 Facsimile:   (213) 687-3702

                                 */s/ John Powers*
                                 Jon Greenbaum*
                                 Ezra D. Rosenberg*
                                 Julie Houk*
                                 John Powers*

Samuel Weiss*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
Telephone:   (202) 662-8600
Facsimile:    (202) 783-0857

*Counsel for Plaintiffs*

*Admitted *pro hac vice*