## EXPERT REPORT OF GINA H. WRIGHT

1.

My name is Gina H. Wright.   I have been asked to review the Second Declaration of William S. Cooper filed in this case and give my expert opinion on the redistricting plans he created and the opinions he espoused.

2.

I am the Executive Director of the Legislative and Congressional Reapportionment Office (LCRO), a joint office of the Georgia General Assembly. The LCRO is responsible for providing redistricting services to legislators using data obtained from the United States Census Bureau.  The LCRO assists  members of the General Assembly in drawing the districts of the State Senate and House of Representatives, as well as the fourteen (14) United States Congressional districts. Through sponsorship from a legislator, the LCRO also assists local County Commissions, Boards of Education, and City Councils in adjusting their districts. Finally, the LCRO also provides an array of maps and data reports to both legislators and the public at large.

As Executive Director I oversee and direct a staff of four (4) in providing redistricting and other mapping services to all members of the Georgia General Assembly.  These services may include drawing maps for statewide legislative districts, local redistricting plans, city creation boundaries, annexations and de-

annexations, as well as precinct boundary changes.  All local redistricting bills through the House Committee on Intragovernmental Coordination require my signature following a technical review of the bill.  I am the official state liaison for the 2020 Census Redistricting Data Program.  I oversee the creation of our statewide voting precinct mapping layer through my work with all county election officials throughout the state.  I assist the Office of the Attorney General in candidate qualification challenges related to issues regarding a candidate's residency.  I regularly assist federal courts as an expert or technical advisor in redistricting matters.  Finally, I regularly participate as a presenter in statewide forums such as the Voter Registrars Association of Georgia and the Georgia Legislative CLE class.

I began work with the LCRO in December of 2000 as a Redistricting Services Specialist.  I became Executive Director of the LCRO in June, 2012.  I am a 2000 summa cum laude graduate from Georgia State University.  I have Bachelor of Arts degree in Political Science and a minor in Spanish.

3.

I have been appointed as an expert or technical advisor for redistricting by federal courts in the following cases:

- *Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1359 (N.D. Ga. 2014) (appointed as the Court's

"independent technical advisor."); *see also Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1340 (N.D. Ga. 2015) ( "Court-appointed expert or technical advisor.")

- *Crumly v. Cobb County Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333, 1344 (N.D. Ga 2012) (appointed as the "Court's technical advisor and consultant.")

- *Martin v. Augusta-Richmond County*, 2012 U.S. Dist. LEXIS 85113, *2-3 (S.D. Ga 2012) (appointed by Court as "advisor and consultant.")

- *Walker v. Cunningham*, 2012 U.S. Dist. LEXIS 178337, *5 (S.D. Ga. 2012) (appointed by Court "as its independent technical advisor.") (3 judge panel).

- *Bird v. Sumter County Board of Educ.*, CA No. 1:12cv76-WLS (M.D. Ga. 2013), ECF 70 p. 5 (appointing Gina Wright as the Court's "independent technical advisor.")

- *Adamson v. Clayton County Elections and Reg. Bd.*, CA No. 1:12cv1665-CAP (N.D. Ga. 2012), ECF 23 p. 2 (appointing Gina Wright as the Court's "independent technical advisor.")

4.

In the past four years I have testified, either at trial or by deposition, in this lawsuit and in *Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1340 (N.D. Ga. 2015).

5.

I am not being compensated separately for my work in this matter.

6.

In preparing this analysis, I considered the following facts and data: The Second Declaration of William S. Cooper, the block-equivalency files of his Illustrative Plans, the 2010 PL-94-171 Census Data and Census Geography files for the state of Georgia, current and past House of Representatives maps maintained by my office, and my personal knowledge of the facts regarding past redistricting in Georgia.

7.

Based on my analysis, as discussed below, I have concluded that it is not possible to draw the two additional majority-minority districts proposed by Mr. Cooper's Illustrative Plans without (1) making race the predominant factor in creating the districts, (2) subjugating all traditional redistricting principles used in Georgia to race, and (3) causing massive disruption in the representation of individuals in the proposed districts.

**History of House Maps**

8.

In 2004, a three-judge panel of the U.S. District Court in the case *Larios v. Cox* created a new map for the Georgia House of Representatives districts. A

special master appointed by the court and his technical expert drew this map. It included 39 majority-black districts that had populations of AP Black[1] and AP Black VAPs greater than 50%. There were two additional districts having a total AP Black over 50% but their AP Black VAP was less than 50%.

9.

In 2006, the Georgia House of Representatives decided to adopt this same court-drawn map through legislation. They made slight adjustments in three areas affecting eight districts. None of the affected districts was a majority-minority district. This map was adopted and used for elections in 2006, 2008, and 2010. It would become the benchmark map of the next redistricting cycle.

**Benchmark 2006 Plan**

10.

The Legislative and Congressional Reapportionment Office received the 2010 Census data for Georgia in early 2011. This data was applied to the benchmark 2006 House map. The statewide plan showed forty-five (45) districts that had over 50% AP Black total population as well as over 50% AP Black VAP. In addition, four (4) districts had over 50% AP Black total population but less than 50% VAP. This is an increase from the 2006 court-drawn map of eight (8)

---

[1] In this report "AP Black" refers to the combined Census population in a district for anyone who are counted as any part African-American. "AP Black VAP" refers to the combined Census population in a district who are counted by the Census as over 18 years of age and any part African-American.

- 5 -

districts having a total population of AP Black over 50% (from 41 to 49).  In terms of AP Black VAP alone, there were now six more majority-AP Black VAP districts (from 39 to 45).

It is important to note, however, that in reviewing the 2010 data applied to the benchmark map and setting a new ideal district size of 53,820, the deviations of the districts are not balanced.[2]  So although a district shows that it has a majority AP black population or BVAP, its deviation most likely is too large or too small.  Of the 49 districts that had a majority AP Black population, only one was within 538 persons or plus/minus 1% deviation from the ideal district size.  Eleven districts had populations more than 1% over the ideal district size and four of those were overpopulated by more than 10,000.  Most of the majority AP Black districts were less than the ideal district size—needing anywhere from 2,000 to over 16,000 additional people to reach the ideal district size.

## History of the Current House Map

### 11.

In a special legislative session in August of 2011, the Georgia General Assembly passed a new redistricting map for its House districts.  The plan

---

[2] The ideal district size is calculated by dividing the total statewide population by the total number of districts.  Subtracting the ideal district size from the total population in a district provides the difference from the ideal size, or deviation.  This deviation can be expressed as a number or percentage.  A negative deviation indicates the district is underpopulated and a positive deviation indicates the district is overpopulated.

contained 47 districts over 50% AP Black Population and AP Black VAP and  two

(2) additional districts over 50% AP Black total population but less than 50% AP

Black VAP.  Despite the many majority-black districts that had extremely low

deviations when reviewing the 2010 data on the benchmark map, the new map

increased the total number of majority- AP black and AP Black VAP districts from

45 to 47.  Two districts have a majority AP Black total but less than 50% Black

VAP.  These two districts have Black VAPs of 49.47% (House district 162) and

48.02% (House district 163).  Overall, 49 districts have over 50% total AP Black

population on this map.  The United States Department of Justice precleared this

map under Section 5 of the Voting Rights Act in December of 2011.  No election

ever occurred using this specific version of the map.

12.

The then-House Minority Leader, Stacey Abrams, presented two alternate

map options during this special session.  The first option (HB 15EX) included 44

districts that had greater than 50% AP Black population and greater than 50% AP

Black VAP.  There were three additional districts on the proposal that had an AP

Black total over 50%.  One district had an overall AP Black percentage of 94.65%

and three others were over 80%.  Rep. Abrams' second bill (HB 64EX) proposed

during the special session contained another state House map plan from the

minority party.  This version made changes in several counties but still maintained the same number of majority AP Black districts.

13.

Following approval and preclearance of the new redistricting map, the General Assembly became aware of a few technical corrections that needed to be made to several districts and wished to reduce the number of districts that split Hall County.  These adjustments produced the map changes to 15 districts that were adopted during the regular legislative session in 2012.  All affected members in these districts signed off and agreed to have the lines moved.  These changes did not affect any of the majority-AP Black districts.  The United States Department of Justice precleared this modification on May 11, 2012.  This precleared map was used for qualifying and elections in 2012 and 2014.

14.

In 2015, all members of the Georgia House of Representatives were presented with the option of making any desired changes to their district boundary lines.  All members were told that if they had a change they wished to make, then all affected members would have to agree and sign off on the adjustment. Seventeen members of the House from both parties agreed to make changes.  This included exchanges between members of the same party and members of differing parties.  This also affected several majority AP Black districts at the request and

agreement of those members.  The bill to make these adjustments passed the

Georgia House unanimously 168-0.  It also passed the Senate in a bipartisan and

biracial vote.  The 2012 map with the adjustments made in 2015 was named the

"House15" map.

### Current House15 map

15.

The map in use today, labeled as plan name House15, contains 47 districts

that have over 50% AP Black Population and AP Black VAP.  Two (2) additional

districts have over 50% AP Black total population but less than 50% AP Black

VAP.  These two districts have Black VAPs of 49.47% (House district 162) and

48.02% (House district 163).  Overall, 49 districts have over 50% total AP Black

population on this map.

16.

The House15 map also includes the first majority Hispanic district in

Georgia, in Gwinnett County. House district 99 has a total of 55.82% Hispanic

population and 51.74% HVAP.

17.

Applying our most recent voter registration data to the House15 map, there

are 46 districts that have more than 50% black voter registration as of November

2016.  One of those is House district 162 that has an AP Black VAP of 49.47% but

a black registered voter percentage of 55.19%. Two (2) House districts in Metro Atlanta have overall and Black VAP numbers that are higher than 50% but show black registered voter numbers less than 50%. House district 58, which is one of the two, has a 61.7% overall AP Black total and 57.46% AP Black VAP, and shows a 48.26% black registration number. This district elects an African-American incumbent and has since it was created.

18.

Currently under this map, the Georgia House of Representatives has forty-six (46) incumbent African-American members. Five (5) of these members are elected from districts with an AP Black population and Black VAP under 50%. There are currently eight (8) districts that are over 50% AP Black population and Black VAP that are represented by members that are not African-American.

**Review of Plaintiffs' Illustrative Plans**

19.

I reviewed the two Illustrative Plans submitted with the Expert Report of William Cooper. To review his plans, I obtained electronic versions of his maps that can be imported into my redistricting software, *Maptitude for Redistricting*. I then analyzed the plan using Census data and other data available to me on my state databases, such as precinct boundaries and political data.

20.

In reviewing the report submitted by Mr. Cooper, there was much focus on certain regional data and information.  When creating district maps, I do not limit analysis of a statewide plan to a particular region, in this case, the Atlanta MSA. The Atlanta area as a whole is very fluid and residents there commute throughout the region daily.  To attempt to proportion districts based on the growth of a county or region limits the ability to adhere to other important redistricting criteria. Having districts that spread into different counties may be because that community or area has some similarities to the area across a county line.  There may be a common shared feature such as a major road, transportation feature, or shopping area.  It may also be because residents in certain areas attended public hearings and specifically asked to be included in a district that has similar values.

21.

As redistricting maps are based on official Census data, I do not utilize the population estimates from the American Community Survey (ACS) or its reports of citizen data.  The ACS is a *random sampling* and does not provide a complete, accurate count.  It has also not always been an accurate predictor of the future Census count for some areas, including the City of Atlanta in 2010.  Citizenship data may be of interest to some, but it is not used by my office in the creation or analysis of any redistricting map.

22.

I also do not do any analysis of race at the level done in the expert report from the plaintiffs.  The standard stat sheet produced by my office for our redistricting plans contains fields that represent one race black, black in combination with another race, and those two fields combined which equates to AP Black or Total Black.  The associated VAP figures are also included as well as the Hispanic ethnicity and its VAP.  These are the only race categories from the Census data that contributed to the drawing of the House redistricting maps from my office.

**Illustrative Plan 1**

23.

As drawn, Illustrative Plan 1 would affect 27 districts from the House15 plan.  Although the districts span several counties, they would require significant changes to voter assignments and ballot combinations in seven counties.  Those counties are: Clayton, DeKalb, Gwinnett, Henry, Newton, Spalding, and Rockdale.

24.

Illustrative Plan 1 would create two additional majority Black VAP districts. But the way those additional districts are created has many detrimental effects. Based on comparisons with the existing map and my knowledge of Georgia redistricting data, the two districts with Black VAPs of only 50.16% and 51.08%

may not even produce a majority-black registered voter district. Under House15, current districts with BVAPs of 50.97% and even 57.46% have less than 50% black registered voters.

## Redistricting Criteria

### *Voting Precincts*

25.

Although Illustrative Plan 1 discusses at length the specific race data used to create the map, it fails to mention other important criteria within any redistricting map. One major concern is the number of voting precincts split between districts throughout this plan. In Georgia, voting precincts are a major feature used to create districts. Using precincts to draw district boundaries allows for ease of voter assignments to ballot combinations as well as an understanding amongst voters as to which district they reside in. Voting precincts are small geographic areas with clearly defined boundaries that are determined locally by each county election supervisor. The Official Code of Georgia specifies what geographic features can be used for precinct boundary lines in O.C.G.A. § 21-2-261.1. Precincts combine voters who live in the same communities and neighborhoods. Election officials assign polling places for precincts often at local schools and churches that are central to the area where these voters live. Voting precincts are also a continuous feature to match between redistricting plans at different levels to assist county

election officials with the assignments of voters to districts (such as assignment of voters in the various Congressional maps, Senate maps, House maps, and Commissions and School Board maps).  Voting precincts do have to be divided at times, but reducing splits to as few as possible is a priority in Georgia.  By keeping precincts whole, communities remain together.

26.

In contrast to this well-established principle of redistricting in Georgia, Illustrative Plan 1 greatly increases the number of split precincts and splits those precincts along racial lines.

27.

By county, it increases the number of precinct splits as follows:

|  | | # SPLIT PRECINCTS | |
|---|---|---|---|
| **County (total precincts as of 2016)** | | **House15** | **Illustrative Plan 1** |
| Clayton | (58) | 5 | 6 |
| DeKalb | (189) | 18 | 59 |
| Gwinnett | (156) | 16 | 38 |
| Henry | (38) | 7 | 14 |
| Newton | (22) | 4 | 3 |
| Rockdale | (18) | 4 | 5 |
| Spalding | (21) | 2 | 2 |

28.

In DeKalb, Gwinnett, and Henry counties where this plan creates additional majority AP Black districts, it splits more than twice as many voting precincts in order to do so. Some of these precincts are divided between three and four different districts on Illustrative Plan 1. Attached as Exhibits 1 through 10 to this declaration are maps of Illustrative Plan 1 which include precinct boundaries for Clayton, DeKalb, Gwinnett, Henry, Newton, Rockdale, and Spalding Counties. Attached as Exhibit 11 is a list of all precinct splits for these seven counties.

29.

Some of the splits will also have a very negative effect on voter anonymity. Twelve times in Illustrative Plan 1 a voting precinct split leaves fewer than 50 people in a single district combination within a precinct.[3] This creates a voter anonymity issue, as only a portion of that small number would be registered voters, and only a portion of those would turn out to vote in any given election. Knowing where the split portion is on a map and being able to see how that area voted would effectively make the votes of the few voters in these areas public. There are an additional six places where a precinct is split for 88 people or less, which could also cause voter anonymity issues depending on turnout.

---

[3] When a precinct is split among districts, different ballots are obviously needed for voters in that precinct. The more a precinct is split among congressional, senate, and house districts, the greater the number of ballot combinations needed.

30.

Illustrative Plan 1 also creates 18 places where a precinct is divided for zero population.

*Incumbency- Community*

31.

Illustrative Plan 1 also does not consider the impact on the existing communities within the current districts.  Current House District 81 is divided into 4 districts leaving the existing incumbent with only 2,490 people from his existing district that he would represent.  Current House District 93 would lose 65% of its current population, placing the majority of the district into Gwinnett County.  The incumbent in current House District 73 would be in a district (district 78) where she loses the opportunity to represent over 23,000 people in her home county of Spalding.  The proposed district carves out only 3,507 people of her home county in that district.  District 78 is made up primarily of residents of two different counties, Clayton and Henry, one of which is not part of the current district at all. In proposed House District 110, (an area currently in House District 78) only 20% of the population is part of the community that the incumbent currently represents. The incumbent in House District 82 has served in the General Assembly for over 15 years and has represented part of the City of Decatur.  Illustrative Plan 1  takes this incumbent out of the city and community with whom she has a longstanding

relationship. Proposed House Districts 88 and 99 gain significant portions of population from counties and communities that they presently do not represent at all.

*Incumbency- Candidates*

32.

At the time the 2011 map was drawn the input and protection of incumbents affected where the lines were drawn. Since that time, several legislators have retired, chosen not to run for reelection, or lost reelection. If newly elected members wished to adjust the maps once they were elected, they had opportunity to do so in 2015 when those changes were made.

33.

Illustrative Plan 1 fails to take into account incumbents, because it only relies on qualifying information for members who have qualified for reelection in 2018. Illustrative Plan 1 also fails to consider that we are presently in the middle of an election. There are candidates who have already won their primary and primary run off who, under Illustrative Plan 1, would now live in a different district than the one in which they qualified to run in the general election. The numbering of the districts in this plan does not align itself to the current incumbent who resides in that district or to the area in which the district previously existed.

34.

In Gwinnett County, Illustrative Plan 1 moves a number of candidates and/or incumbents to new districts. Candidate Donna Sheldon won the primary and run off for House District 105.  Exhibit 12 shows the district boundaries for House District 105 in Illustrative Plan 1 and candidate Sheldon's residence.  As shown on this map, candidate Sheldon would live in House District 104 and would have to run against a sitting incumbent within her party.

Shelly Hutchinson qualified to run in House District 107, which is an open seat.  Exhibit 13 shows the district boundaries for House District 107 in Illustrative Plan 1 and candidate Hutchinson's residence.  As shown on this map, while candidate Hutchinson remains in District 107, it is now redrawn to include incumbent Rep. Brett Harrell.

Candidate Jasmine Clark qualified to run in House District 108.  Exhibit 14 shows the district boundaries for House District 108 in Illustrative Plan 1 and candidate Clark's residence.  As shown on this map, candidate Clark would now live in House District 88 and would have to run against sitting incumbent Rep. Billy Mitchell within her party.

35.

In Henry County, Illustrative Plan 1 places candidate El Mahdi Holly in House District 110 with an incumbent from the same party after he qualified in

House District 111.  Exhibit 15 shows the district boundaries for House Districts 110 and 111 in Illustrative Plan 1 and candidate El Mahdi Holly's residence.

36.

In DeKalb County, candidate Ellen Diehl qualified to run in House District 81 and she would now be in District 82 facing a different incumbent opponent. Exhibit 16 shows the district boundaries for House Districts 81 and 82 in Illustrative Plan 1 and candidate Diehl's residence.

*Political Effects*

37.

Because redistricting affects the districts used for election, those political effects must be considered.  The report on Illustrative Plan 1 fails to mention any of the dramatic political changes this map would cause.

38.

The software I use for redistricting, Maptitude, allows the user to create new Geographic Information System (GIS) layers. Every two years, staff in my office builds a statewide voting precinct boundary layer which we compile by working with each county across the state.  My office maintains this layer and updates it every two years to correspond with the General Election and any precinct boundary changes made by the counties.  In doing analysis of election and political data, the Office of the Secretary of State provides election returns to my office.

- 19 -

Those returns are allocated to our current voting precinct boundary layer. To calculate a percentage of Democrat or Republican, a formula that combines all statewide contested races is used. This formula is applied to the district layer and is 100% accurate where precincts are whole. Where split precincts occur, the software estimates based on population distribution. It has proven to be a very good indicator of political performance. These data also contain voter registration numbers, which are accurate to the whole precinct but are estimated once precincts are split. The registration numbers are available by whatever racial categories are available when registering to vote in Georgia.

39.

Using 2016 election data applied to the districts gives us some idea of its political leanings. I began with the House15 map and reviewed the 27 districts redrawn by Illustrative Plan 1 using political data in my Maptitude system. Under the House15 map, nine of the 27 affected districts show a majority Republican percentage and one district shows less than 50% for both parties. Seventeen districts have a Democratic majority. On Illustrative Plan 1, Republicans are packed into districts to reduce their impact in other districts. Illustrative Plan 1 contains only six districts that would have a Republican majority and all 21 of the other districts are over 50% Democratic. Two sitting Republican incumbents in this plan's districts 78 and 111 are placed into districts that have a Democratic

majority.  In the case of District 111, the district on Illustrative Plan 1 could have been drawn as a Republican district with the simple exchange of several precincts with District 90.

40.

Put more directly, Illustrative Plan 1 effectively adds five Democratic districts over the House15 plan.

41.

There also is a dramatic effect on the delegations within several of the counties on this plan.  County delegations are important in Georgia because the local delegation is able to pass or block local legislation that only affects that particular jurisdiction.  Legislators pay very close attention to county delegations when creating redistricting plans like the 2011 and House15 plans.  In Henry County under House15, eight districts represent a portion of the county.  Currently, five of the eight districts elect Republicans.  Illustrative Plan 1 flips control of this delegation by reducing the number of members who represent the county to six. Of those six, four are Democratic majority districts.  Under House15, four of the eight incumbents who represent the county live in Henry County.  There are three Republican members and one would now be in a Democrat majority district he likely could not win.  The two districts that are majority Republican are so at

71.43% and 62.47%, which is significantly higher than any majority Republican district in Henry County on House15.

42.

Gwinnett County has 18 districts that cover a part of the county on both House15 and Illustrative Plan 1.  Under House15, there are eleven Republican incumbents and seven Democratic incumbents.  Illustrative Plan 1 flips control of this delegation as well.  Illustrative Plan 1 has ten districts that are majority Democratic and eight districts that are majority Republican.

43.

Both Newton and Rockdale County delegations lose a Republican district member of their delegations.  Spalding County, which under House15 has only two Republican representatives, now gains a third member of the delegation, which would be a Democratic district.

44.

DeKalb County under House15 has 16 districts, two of which elect Republican representatives.  Illustrative Plan 1 adds an additional two Democratic districts to this delegation giving the county 18 representatives.

*Compactness*

45.

Compactness can be defined as a measure of the distance between all parts of a district. Several tests have been used to give scores of compactness for a district plan. Different tests measure compactness in different ways. The Reock Test is based on area and compares the district to a circle. The Polsby-Popper Test is a measure of the ratio of the district area to a circle with the same perimeter. For both tests, a score of 1 would be a perfect circle. Using these measures, the closer the score is to 1, the more compact the district is.

46.

As stated by Mr. Cooper, "Illustrative Plan 1 scores about the same as the 2015 Plan on the two most widely cited compactness scores- Reock and Polsby-Popper." While this is true, the information shown is only for certain groupings of the districts affected or for the majority BVAP districts rather than for all changed districts. The table below shows summary information for all 27 modified districts.

47.

Compactness Scores for all affected Districts- Reock

|  | *House15* | *Illustrative Plan 1* |
|---|---|---|
| Min. | 0.13 | 0.14 |
| Max. | 0.54 | 0.52 |
| Mean | 0.33 | 0.29 |
| Std. Deviation | 0.11 | 0.10 |

Compactness Scores for all affected Districts- Polsby-Popper

|  | *House15* | *Illustrative Plan 1* |
|---|---|---|
| Min. | 0.09 | 0.09 |
| Max. | 0.52 | 0.55 |
| Mean | 0.22 | 0.22 |
| Std. Deviation | 0.10 | 0.10 |

48.

From the analysis, the Polsby-Popper test produces an almost identical compactness score for the two plans. The Reock test shows that the House15 plan is slightly higher in overall mean compactness. The proposed changes in Illustrative Plan 1 do not result in any improvement in compactness of the districts.

**Illustrative Plan 2**

49.

As drawn, Illustrative Plan 2 would also affect 27 districts.  Although the proposed districts span several counties, they would require significant changes to voter assignments and ballot combinations in seven counties:  Clayton, DeKalb, Gwinnett, Henry, Newton, Spalding, and Rockdale.  Changes to five of these counties are different from those included in Illustrative Plan 1.

*Number of Majority-Minority Districts*

50.

Illustrative Plan 2 would create two additional majority Black VAP districts. But the way those additional districts are created has many detrimental effects. Based on comparisons with the existing map and my knowledge of Georgia redistricting data, the two districts with Black VAPs of only 50.16% and 50.02% may not even produce a majority-black registered voter district.  Under House15, current districts with BVAPs of 50.97% and even 57.46% have less than 50% black registered voters.

*Voting Precincts*

51.

Like Plan 1, Illustrative Plan 2 continues to split a vast number of voting precincts throughout its proposed districts.  Changes made on this plan increase the

- 25 -

number of precinct splits in Clayton and Spalding counties over Plan 1. Henry

County shows a decrease of one precinct split, but another precinct is now divided

three ways and it was not previously split at all on House15. Attached Exhibits 17

through 19 are maps of Illustrative Plan 2 which include precinct boundaries for

Clayton, Henry, and Spalding Counties. Attached as Exhibit 20 is a list of all

precinct splits for the seven counties identified in paragraph 42 above.

Additionally, the chart below shows the numbers of split voting precincts in Plan 2.

## # SPLIT PRECINCTS

| County (total precincts as of 2016) | | House15 | Plan 1 | Plan 2 |
|---|---|---|---|---|
| Clayton | (58) | 5 | 6 | 7 |
| DeKalb | (189) | 18 | 52 | 59 |
| Gwinnett | (156) | 16 | 38 | 38 |
| Henry | (38) | 7 | 14 | 13 |
| Newton | (22) | 4 | 3 | 3 |
| Rockdale | (18) | 4 | 5 | 5 |
| Spalding | (21) | 2 | 2 | 5 |

52.

In Henry County, there are three instances of a precinct split for 102 people

or fewer. As discussed previously, splits with such a small number of individuals

can present a voter anonymity issue. Because Gwinnett has the same boundaries

on Plan 1 as on this plan, all the previous voter anonymity issues noted above still exist.  DeKalb County has a small change in boundaries from Plan 1 that do not change the number of split precincts or those that previously had voter anonymity issues discussed above for Plan 1.

53.

Another serious concern with the split voting precincts in Henry County is the obvious selection of census blocks with the intent to racially pack District 110 to reach a BVAP of 50.02%.  A close analysis of the census blocks included in District 110 show that the map drawer went block-by-block to remove census blocks with less than 50% black population from precincts rather than include the whole precinct in the district.  This occurs in the Ellenwood, Austin Road, Swan Lake, and Hickory Flat voting precincts.  Places where a whole precinct could have been left intact or where a major road exists as a potential boundary were avoided so that census blocks with higher black population could remain in the district and those with higher non-black population would be left out.  This results in multiple places where the district line cuts through a neighborhood and cul-de-sac or uses less traveled local roads as district boundaries.  Exhibits 21 through 24 are maps illustrating splits in these four precincts.  I have included the total population and AP Black population numbers for each census block.

There is no doubt that the overriding purpose of the map drawer in dividing these precincts was the racial composition of the census blocks, because no other explanation exists for splitting those precincts in the manner in which they were split. This also demonstrates that the black population is not compact—it takes cutting out white areas in order to cobble together a black-majority district.

54.

The division of the Cotton Indian precinct in Henry County uses a string of single census blocks that border District 111 so that District 110 can continue to wrap around District 111 and pick up majority-black voting precinct Stockbridge East. *See* Exhibit 25 showing the string of census blocks with green vertical lines. There are a few other census blocks in Cotton Indian added to District 110  as well that have larger black populations than surrounding census blocks. *See* Exhibit 23 showing these census blocks with green vertical lines.  The only explanation I can identify for this unusual configuration is the racial composition of these particular blocks that were used by the map drawer to achieve a 50.02% majority-black district.

55.

The division of the Hickory Flat precinct in Henry County selects the portion of the precinct that has a 53.35% AP Black population and a BVAP of 50.26%.  This is a total of 5,151 people.  The portion of the same precinct left in

District 109 has an overall AP Black population of 9.69% and a BVAP of 9.5%. This is 1,104 people. See Exhibit 24. Rather than include the whole precinct or follow a major road to make this split, the boundary goes around a neighborhood and juts back in on a city limit line that is not visible or easily definable for voters. The only possible explanation for this particular precinct split is the racial composition of each portion of the split precinct.

56.

The deviation for House District 110 is -0.87%, which is the lowest deviation for any district that was changed on this plan. That is significant because two precincts, Ellenwood and Swan Lake, could be whole in District 110 without making the deviations of the other districts out of range. The portion of District 109 that is in Pleasant Grove could also be added to District 110. This reduces the split of that precinct from three districts to two and puts the boundary on a major road. With these changes, the deviations for all affected districts would still be in range. To do this however, would lower the BVAP of District 110 to 49.45%, which clearly explains why the map drawer included these splits. Other slight changes to blocks could be made to put district lines on better boundaries even within the split precincts. Each change reduces the BVAP just enough to fall below the goal of the plan's 50.00% BVAP for this district. I can only conclude

that the map drawer's sole goal was to ensure that the district was over 50%

BVAP.

In Spalding County, voting precinct splits increase from two to five on

Illustrative Plan 2. On Illustrative Plan 2, House District 78 has a total AP Black

population of 51.77% and a BVAP of near 48%. This district is only mentioned in

Mr. Cooper's report as being racially diverse, apparently because it lacks a

majority of BVAP. It now reaches through the City of Griffin to add voting

precinct 01 to the district. Precinct 01 contains 4,198 people and has an overall AP

black total population of 79.23%. The AP BVAP is 76.76%. Black voter

registration for this district is also over 50%. Including this precinct in District 78

makes its total AP black population a majority AP Black district. By splitting

precincts 05, 10, and 19, which border precinct 01, the map drawer attempts to

make this addition less obvious, but the single racial purpose is apparent due to

these decisions.

*Contiguity*

57.

Illustrative Plan 2 creates a new district that wraps around another district in

Henry County. District 110 begins on the western Henry County line, reaches up

to the northern boundary against DeKalb County, and then hugs the eastern side of

District 111. The issue here is that the populated portions of the district are only

contiguous across a census block of zero population that you cannot travel through as there are no roads or access points at this small point.  Where the two parts join is less than 387 feet across.  *See* Exhibits 26 and 27.

*Incumbency- Community*

58.

Illustrative Plan 2 continues the same problems as Plan 1 regarding issues of incumbency.  For example, the incumbent in current House District 73, Karen Mathiak, would now be in District 78.  The proposed district leaves her with less than 38% of her district in her home county of Spalding.  The new District 78 would be made up primarily of residents of Henry County and Clayton County, and Clayton County is not currently part of her district at all.

In proposed House District 110, Demetrius Douglas, who currently resides in House District 78, would be the incumbent.  As an incumbent in House District 110 he would be in a district where almost 75% of the district had never had the opportunity to vote for him.

The incumbent in new District 130, Andy Welch, who currently resides in House District 110, would now represent a fourth county in this district stretching from near Covington in Newton County to Orchard Hill on the Spalding and Lamar county line.  The incumbent in new District 73, David Knight, who currently resides in House District 130, would represent an area reaching from

downtown Fayetteville to the south side of Barnesville. This area is almost 37

miles long as the crow flies and make up two extremely different communities.

*Incumbency- Candidates*

59.

As the portions of Illustrative Plan 2 in Gwinnett and DeKalb counties have

not changed, the candidate issues mentioned previously on Plan 1 still would exist.

In Henry County, candidate El Mahdi Holly would now reside in House District

110 with an incumbent from the same party after he qualified in House District

111. Candidate Regina Lewis-Ward who qualified to run in District 109 would

now also reside in House District 110 and would have to run against an incumbent

from the same party. Exhibit 27 shows the district boundaries for House District

110 in Illustrative Plan 2 and candidate El Mahdi Holly's residence and Regina

Lewis-Ward's residence.

*Political Effects*

60.

As mentioned with Illustrative Plan 1, Plan 2 also has the same political

impact in Gwinnett County as before. *See* ¶ 37 above. DeKalb County under

House15 has 16 districts and two elect Republican representatives. Illustrative

Plan 2 adds one additional Democratic district to this delegation giving the county

17 representatives.

61.

Newton County maintains the same number of representatives on Illustrative Plan 2 that it currently has on House15.

62.

Rockdale County still loses a Republican district and Spalding County, which under House15 has only 2 Republican representatives, now gains a third district which is strongly Democratic.

63.

Henry County, which has eight districts in its delegation under House15, would again reduce the number to six representatives as it did on Illustrative Plan 1.  Currently, five of the eight districts elect Republicans.  Illustrative Plans 1 and 2 flip control of the delegation to four Democratic-majority districts and two Republican-majority districts.  House District 109 is a Republican majority district under House15 at 56.22%.  Illustrative Plan 2 drops this percentage to 51.98% due to the split precincts.  It appears Mr. Cooper was attempting to make this district more politically competitive and therefore strong Republican precincts are split with other districts or are placed in Democratic districts.  House District 130 that borders House District 109 to the south had its Republican percentage increased to 72.16% making it the highest Republican district modified by this map.  Presently, four of the eight incumbents who represent the county live in Henry County.

- 33 -

There are three Republican members and one would now be in a Democrat majority district.  Another is in a much more competitive district.  The two districts that are majority Republican are packed at 72.16% and 67.87%.  This is significantly higher than any majority Republican district in Henry County on the House15 plan.

<em>Compactness</em>

64.

Illustrative Plan 2 does not improve on compactness from either House15 or Illustrative Plan 1.  These numbers are calculated using only the affected 27 districts in the plan.  The charts below show that on the Reock test, Illustrative Plan 2 scores the same on all areas as Plan 1, showing less overall compactness than House15.

Compactness Scores for all affected Districts- Reock

|  | *House15* | *Illustrative Plan 1* | *Illustrative Plan 2* |
|---|---|---|---|
| Min. | 0.13 | 0.14 | 0.14 |
| Max. | 0.54 | 0.52 | 0.52 |
| Mean | 0.33 | 0.29 | 0.29 |
| Std. Deviation | 0.11 | 0.10 | 0.10 |

65.

For the Polsby-Popper analysis, Illustrative Plan 2 has the same scores for the 27 districts as Illustrative Plan 1, except that the overall mean shows the plan to be slightly less compact.

Compactness Scores for all affected Districts- Polsby-Popper

|  | *House15* | *Illustrative Plan 1* | *Illustrative Plan 2* |
|---|---|---|---|
| Min. | 0.09 | 0.09 | 0.09 |
| Max. | 0.52 | 0.55 | 0.55 |
| Mean | 0.22 | 0.22 | 0.20 |
| Std. Deviation | 0.10 | 0.10 | 0.10 |

## Conclusion

Based on the foregoing analysis, I conclude that the districts contained in Illustrative Plans 1 and 2 are not based on any traditional redistrictingprinciples.  Rather, these majority-minority districts are drawn with a complete and total focus on the race of those individuals that are put into the districts.  House15 considered all traditional redistricting principles and drew majority-minority districts that gave African-American voters the opportunity to elect their candidates of choice.  I do not believe that the Plaintiffs' illustrative plans demonstrate that the African-American population is geographically compact

enough to allow for the creation of additional majority-minority districts without using race as the predominant factor while subjugating all traditional redistricting principles.  The impact these maps would have on all affected voters, communities, incumbents, candidates, and election officials would detrimental.


Executed on this 28 day of September, 2018.



GINA H. WRIGHT