## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

AUSTIN THOMPSON, et al.,

    Plaintiffs,

v.                                  Civil Case  No. 1:17-CV-03856-TCB

BRIAN KEMP, et al.,

    Defendants.

## THIRD DECLARATION OF WILLIAM S. COOPER

WILLIAM S. COOPER, acting in accordance with 28 U.S.C. § 1746, Federal Rules of Civil Procedure 26(a)(2)(B) and 26(e), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

1.    My name is William S. Cooper.  I serve as a demographic and redistricting expert for the Thompson Plaintiffs.  I filed declarations in this case on December 22, 2017 (corrected version on February 27, 2018) and on August 6, 2018 ("August 6 Declaration").

2.    I file this Third Declaration in response to points raised by Ms. Gina H. Wright in her September 28, 2018 Expert Report ("Wright Report").

3.    Ms. Wright does not effectively refute a key conclusion in my August 6 declaration regarding the first *Gingles* precondition:  African Americans in Metro

Atlanta are sufficiently numerous and geographically compact to allow for the creation of at least two additional majority-Black House districts.

4.      Under Illustrative Plan 1, District 106 (50.16% AP BVAP[1]) and District 110 (51.08% AP BVAP) encompass areas with majority-Black voting age populations.

5.      Under Illustrative Plan 1, District 106 is wholly contained within Gwinnett County and scores .38 on the Reock compactness measure and .36 on the Polsby-Popper compactness measure. On Reock, District 106 scores as high as or higher than 80 districts under the 2015 Plan. On Polsby-Popper, District 106 scores as high as or higher than 151 districts under the 2015 Plan.

6.      Under Illustrative Plan 1, District 110 is wholly contained within Henry County and scores .26 on Reock and .21 on Polsby-Popper. On Reock, District 110 scores as high as or higher than 26 districts under the 2015 Plan. On Polsby-Popper, District 110 scores as high as or higher than 55 districts under the 2015 Plan.

7.      Clearly, African Americans are sufficiently numerous and geographically compact to comprise a majority of voting age persons in two Metro Atlanta House districts located in Gwinnett County and Henry County.

---

[1] "AP BVAP" means Any Part Black Voting Age Population.

8.      Ms. Wright states that "[b]ased on comparisons with the existing map and [her] knowledge of Georgia redistricting data," these two illustrative districts "may not even produce a majority-black registered voter district." (Wright Report ¶ 24). It is my understanding that the first *Gingles* precondition requires plaintiffs to demonstrate only that the relevant minority group can comprise more than 50% of a district's voting age population.

9.      In response to Ms. Wright's apparent concern, however, I have reviewed recent voter registration data by race and determined that District 106 and District 110 as drawn under Illustrative Plan 1 and Illustrative Plan 2 would contain a majority of registered voters who are Black.

10.     I geocoded a statewide list of December 2017 active registered voters using Maptitude. Under Illustrative Plan 1, of all voters who identified their race, active Black registered voters are 62.0% in District 106 and 56.32% in District 1l0. Under Illustrative Plan 2, active Black registered voters are 62.0% in District 106 and 61.24% in District 110.

## A.     Precinct Splits and Post-Election Day 2018 Incumbents

11.     Much of Ms. Wright's report is directed toward concerns she has regarding 2016 precinct splits and potential post-Election Day 2018 incumbent conflicts under the two Illustrative Plans.  Ms. Wright's report fails to recognize that the plans in my August 6 Declaration are illustrative plans, not proposed

remedial plans. This Section 2 case is not yet at the remedy stage. Were the Court to consider proposed remedial plans, it could take into account incumbent residences and precinct lines *as they exist at that point in time*.

12.     It is not unusual for remedial plans to differ from illustrative plans. For instance, since 2014, I have developed proposed remedial plans for plaintiffs in eight Section 2 cases in which I also prepared *Gingles 1* illustrative plans. The plaintiffs chose a proposed remedial plan that was the same as the *Gingles 1* illustrative plan(s) in just two of the eight cases – *Montes v. City of Yakima* (E.D. Wash. Feb. 17, 2015) and *Terrebonne Parish Branch NAACP et al. v. Jindal et al* (M.D. La. August 17, 2017).[2] In the majority of these cases, the remedial plans ultimately adopted to remedy the Section 2 violation differ in many respects from the illustrative plans that established Section 2 liability in the first place, presumably taking into account factors other than what is required to establish the first *Gingles* precondition.

13.     Precincts are not sacrosanct in Georgia. In fact, Georgia precincts change with regularity. Precinct lines may represent nothing more than an effort to protect a particular politician at a point in time that has long since passed. Precinct

---

2 In *Montes v. City of Yakima*, the plaintiffs' proposed remedial plan became the court-ordered plan. The court has not yet ruled on a remedial plan in *Terrebonne Parish NAACP v. Jindal*.

lines are often realigned to fit state and local-level electoral districts, as well as to account for underlying population change.

14. Since 2011, at least four GIS shapefiles depicting statewide precincts have been released by the Georgia Legislative and Congressional Reapportionment Office.[3] The 2016 precinct shapefile depicts 2,697 precincts statewide, as compared to 2,850 in the 2010 shapefile, 2,842 in the 2012 shapefile, and 2,756 in the 2014 shapefile.

15. In addition to the 153 precincts that were eliminated between 2010 and 2016, boundaries for many others have changed. About 1.67 million Georgians live in precincts where boundary changes between 2010 and 2016 affected more than one square mile.[4]

16. Just as I used 2010 Census data in my August 6 analysis, I used 2010 precincts as building blocks to draw the two Illustrative Plans. The use of 2010 precincts explains why a number of 2016 precincts are split in the Illustrative Plans.

17. As demonstrated by Hypothetical Plan A below, there is no reason why the boundaries in the Illustrative Plans could not be adjusted to minimize splits in 2016 precincts if and when the Court considers remedial plans. By the same

---

[3] The shapefiles for all four years are available for download via the links listed in Exhibit B (sources and methodology) attached to my August 6 Declaration.

[4] This analysis is based on a block-level comparison of 2010 precinct areas to 2016 precinct areas.

token, if the State adjusts precinct boundaries again in 2018, district boundaries could be adjusted to minimize splits of the new precincts.

18.     Ms. Wright also cites concerns regarding the effect of the Illustrative Plans on post-Election Day 2018 incumbents (Wright Report ¶¶ 32-36). The Illustrative Plans were drawn based on consideration of incumbent residences as of the March 15, 2018 candidate qualification deadline. (See August 6 Declaration ¶ 91, ¶ 136 and Exhibit K). Of course, it is impossible for me to know with certainty which candidates will emerge as incumbents next month. As with precinct lines, there is no reason the Illustrative Plans could not be adjusted to account for new incumbents if and when the Court considers remedial plans.

19.     In short, the concerns Ms. Wright raises about precinct lines and post-Election Day 2018 incumbents could be addressed during a remedial phase. They do not bear on whether the Illustrative Plans effectively demonstrate that African Americans are sufficiently numerous and geographically compact to comprise a majority of the voting age population in two additional House districts.

**B.          Hypothetical Plan A**

20.     This Section 2 case is not at the remedy stage. But if it were, viable remedial plans could be drawn that minimize 2016 precinct splits without pairing pre-Election Day 2018 incumbents.

21.     By way of example, I have developed Hypothetical Plan A which reconfigures Illustrative Plan 1 to fit into 2016 precincts.

22.     Under Hypothetical Plan A, except for two census blocks (shifted to follow 2016 precinct lines), new majority-Black District 106 in Gwinnett County is identical to District 106 as drawn in Illustrative Plan 1. Except for a zero population census block (shifted to follow 2016 precinct lines) new majority-Black District 110 in Henry County is identical to District 110 as drawn in Illustrative Plan 1.

23.     **Exhibit A-1** is an Atlanta-area map depicting Hypothetical Plan A. **Exhibit A-2** presents summary demographics for the 26 modified districts. (The remaining 154 districts are the same as the 2015 Plan districts.)[5]

24.     No incumbents who are running for office in November 2018 are paired in Hypothetical Plan A.

25.     Under Hypothetical Plan A, the 26 modified districts split 58 precincts, one of which is an unpopulated area.  By contrast, the 2015 Plan splits 52 precincts in the 26-district area, two of which are unpopulated areas.[6] Thus, a remedial plan

---

[5] Ms. Wright repeatedly refers to 27 modified districts in Illustrative Plan 1 and Illustrative Plan 2. By my count, there are 26 modified districts – the same number as in Hypothetical Plan A.

[6] Statewide, the 2015 Plan splits 256 of the 2016 precincts, with 43 of the splits affecting unpopulated areas. Hypothetical Plan A splits 262 of the 2016 2016 precincts, with 41of the splits affecting unpopulated areas.

7

that splits no more than six additional 2016 precincts in the Metro Atlanta area can be drawn.

26.     **Exhibit A-3** contains county-level maps depicting the modified areas under Hypothetical Plan A. Blue lines show county boundaries, red lines delineate 2016 precincts, and blue asterisks show incumbents who are running for office in November 2018. Compared to the 2015 Plan, district lines change in seven counties (Clayton, Dekalb, Gwinnett, Henry, Newton, Rockdale, and Spalding).

27.     For comparison, **Exhibit A-4** contains a 7-county set of 2015 Plan maps similar to **Exhibit A-3**.

28.     **Exhibit A-5** is a Maptitude-generated report identifying split precincts for the 26 modified districts under Hypothetical Plan A. **Exhibit A-6** is a similar report showing split precincts for the 26 districts under the 2015 Plan. (References to "unassigned" in the Maptitude reports signify precinct splits that are present in the 2015 Plan involving areas outside the 26-district area.)

29.     The link below is an address-searchable Google map showing the 26 districts that are modified under Hypothetical Plan A. Black lines show county boundaries and red lines show the 58 2016 precincts that are split.

http://www.fairdata2000.com/Fusion/GA_House_Hypothetical_Plan_A.

30.     The link below is an address-searchable Google map showing the 26-district area under the 2015 Plan. Black lines show county boundaries and red lines

show the 52 2016 precincts that are split.

http://www.fairdata2000.com/Fusion/GA_House_2015_Plan_Metro/

31.     Under Hypothetical Plan A, there is a 3-person split in Baycreek G Precinct in Gwinnett County – between modified District 105 and unchanged District 114 (Gwinnett and Walton County).  Given that District 114 in Hypothetical Plan A is the same as HD 114 in the 2015 Plan, the 3-person split may be the result of an error in the state-produced 2016 precinct file. As shown in **Exhibit A-6**, this same 3-person split in Baycreek G exists in the 2015 Plan.

32.     Excluding the 3-person Baycreek G split, which could also be eliminated with a minor change in precinct lines, the next smallest precinct split under Hypothetical Plan A has a population of 132 persons.  By contrast, in addition to Baycreek G, the 2015 Plan splits five 2016 precincts with populations between 5 and 59 persons in the 26-district area. Statewide, the 2015 Plan splits 256 precincts. with 43 of the 256 splits in unpopulated areas. Of the 213 precincts splits involving populations, 76 contain populations with fewer than 75 persons. Thus, under the standard reflected in the 2015 Plan, there is no voter anonymity issue in the 26-district modified area of Hypothetical Plan A. (See Wright Report ¶ 51).

33.     **Exhibit A-7** shows Reock and Polsby Popper compactness scores generated by Maptitude for each of the 26 districts modified in Hypothetical Plan A. **Exhibit A-8** reports compactness scores for the 26 districts under the 2015 Plan.

34.     Under Hypothetical Plan A, for the 26 modified districts, the mean Reock score is .28 and the mean Polsby-Popper score is .20. Mean compactness scores for the 26 districts under the 2015 Plan are slightly higher – Reock is .32 and Polsby-Popper is .21.

35.     In my opinion, the 26 modified districts under Hypothetical Plan A comply with traditional redistricting principles. Compared to the 2015 Plan, there is very little difference in compactness scores, there are no incumbent conflicts, and there are just six more precinct splits. Like Illustrative Plans 1 and 2, Hypothetical Plan A demonstrates that African Americans are sufficiently numerous and geographically compact to comprise a majority of the voting age population in two additional Metro Atlanta House districts.

**C.          Hypothetical Plan B**

36.     Illustrative Plan 1 demonstrates that it is possible to draw two additional Metro Atlanta majority-Black House districts while returning HD 105 (in Gwinnett County) to the boundaries in place under the 2012 Plan. (See August 6 Declaration ¶ 99). Illustrative Plan 2 demonstrates that it is possible to draw two additional majority-Black House districts while returning both HD 105 (in Gwinnett County) and HD 111 (in Henry County) to the boundaries in place under the 2012 Plan. (See August 6 Declaration ¶ 137).

37.     Under the paragraph heading "Contiguity", Ms. Wright notes that in Illustrative Plan 2 there is an area where District 110 boundaries narrow to 387 feet. (Wright Report ¶ 57).  To be clear, District 110 as drawn in Illustrative Plan 2 is contiguous. The corridor area is bounded by the Clayton county line to the west and U.S. 23 to the east.[7]

38.     The corridor Ms. Wright complains about is a function of my effort to avoid changing HD 111 as drawn under the 2012 Plan.  To be sure, it would be possible to alter HD 111 slightly as drawn in Illustrative Plan 2 (and the 2012 Plan), so as to allow for a more direct through-street connecting both areas of District 110. To demonstrate, I have made this modification in Hypothetical Plan B. The map in **Exhibit B-1** zooms on the area with this slight modification. As shown in the statistical summary for modified Districts 110 and 111 in **Exhibit B-2**, the resulting District 110 is 50.21% AP BVAP and District 111 is 34.15% AP BVAP. The Reock score for majority-Black District 110 as modified is .37 and the Polsby Popper score is .15.

39.     With this minor modification to Districts 110 and 111 as drawn in Illustrative Plan 2, majority-Black District 110 is overpopulated by 229 persons.

---

[7] See zoom on the Google map of Illustrative Plan 2 in my August 6 Declaration (¶ 144): http://www.fairdata2000.com/Fusion/GA_House_Illustrative_Plan_2/#/?address=liberty%20bapt ish%20church%2C%20henry%20county%20ga&radius=undefined.

Thus, Hypothetical Plan B demonstrates that the compactness and "contiguity" concerns Ms. Wright has regarding District 110 in Illustrative Plan 2 could be addressed through minor modifications and contingent upon the Court's view of HD 111 under the current plan.

**D.   Hypothetical Plan C**

40.   As reflected above, returning HD 105 and HD 111 to their 2012 boundaries imposes certain restraints on the illustrative districts. In fact, it is possible to draw two additional majority-Black House districts even if HD 105 and HD 111 maintain their current 2015 Plan boundaries.

41.   Hypothetical Plan C maintains HD 105 and HD 111 as they are currently drawn under the 2015 Plan. Hypothetical Plan C maintains new majority-Black District 106 in Gwinnett County as drawn under Hypothetical Plan A. New majority-Black District 110 is modified to fit into a plan with District 111 identical to HD 111 under the 2015 Plan.

42.   As in the Illustrative Plans and Hypothetical Plan A, Hypothetical Plan C has one less county split than the 2015 Plan. (See August 6 Declaration ¶165). Moreover, because Hypothetical Plan C does not change HD 105 (or adjacent HD 104) and HD 111, the number of modified districts drops to 23.

43.     **Exhibit C-1** is an Atlanta-area map depicting Hypothetical Plan C. **Exhibit C-2** presents summary demographics for the 23 modified districts. (The remaining 157 districts are the same as the 2015 Plan districts.)

44.     No incumbents who are running for office in November 2018 are paired in Hypothetical Plan C.

45.     Under Hypothetical Plan C, the 23 modified districts split 56 of the 2016 precincts, two of which are in unpopulated areas – two fewer total splits than Hypothetical Plan A.  Thus, a remedial plan that splits no more than four additional 2016 precincts in the Metro Atlanta area can be drawn.

46.     **Exhibit C-3** contains county-level maps depicting the 23-district modified area under Hypothetical Plan C. Blue lines show county boundaries, red lines delineate 2016 precincts, and blue asterisks show incumbents who are running for office in November 2018. Compared to the 2015 Plan, district lines change in seven counties (Clayton, Dekalb, Gwinnett, Henry, Newton, Rockdale and Spalding).

47.     **Exhibit C-4** is a Maptitude-generated report identifying split precincts for the 23 modified districts under Hypothetical Plan C. **Exhibit C-5** is a similar report showing split precincts for the 23 districts under the 2015 Plan. (References to "unassigned" in the Maptitude reports signify precinct splits that are present in the 2015 Plan involving areas outside the 23-district area.)

48.     The link below is an address-searchable Google map showing the 23 districts that are modified under Hypothetical Plan C. Black lines show county boundaries and red lines show the 56 2016 precincts that are split.

http://www.fairdata2000.com/Fusion/GA_House_Hypothetical_Plan_C/

49.     The compactness scores for majority-Black District 106 are the same as for the identical district in Hypothetical Plan A (and the virtually identical district in Illustrative 1). The Reock score for majority-Black District 110 as modified in Hypothetical Plan C is .37 and the Polsby Popper score is .23. On Reock, District 110 scores as high as or higher than 75 districts under the 2015 Plan. On Polsby-Popper, District 110 scores as high as or higher than 67 districts under the 2015 Plan.

50.     **Exhibit C-6** shows Reock and Polsby Popper compactness scores generated by Maptitude for each of the 23 districts modified in Hypothetical Plan A. **Exhibit C-7** reports compactness scores for the 23 districts under the 2015 Plan.

51.     Under Hypothetical Plan C, for the 23 modified districts, the mean Reock score is .28 and the mean Polsby-Popper score is .19. Mean compactness scores for the 23 districts under the 2015 Plan are slightly higher – Reock is .31 and Polsby-Popper is .21.

52.     In my opinion, the 23 modified districts under Hypothetical Plan C comply with traditional redistricting principles. Compared to the 2015 Plan, there is

very little difference in compactness scores, there are no incumbent conflicts, and there are just four more precinct splits. Like Illustrative Plans 1 and 2 and Hypothetical Plans A and B, Hypothetical Plan C demonstrates that African Americans are sufficiently numerous and geographically compact to comprise a majority of the voting age population in two additional Metro Atlanta House districts.

**E.     Precinct Splits by County**

53.     The table in **Figure 1** (on the next page) summarizes the count of 2016 precincts that are split in the seven counties where there are district changes under Hypothetical Plan A and Hypothetical Plan C, as compared to the 2015 Plan. As shown in **Figure 1**, precinct splits in the hypothetical remedial plans are comparable to precinct splits under the 2015 Plan.[8]

---

[8] The split count for the 2015 Plan in **Figure 1** differs from the split count table at Wright Report ¶ 51 because I have included splits of unpopulated areas. See also attached **Exhibits A-4** (Hypothetical Plan A), **A-5** (2015 Plan), and **C-4** (Hypothetical Plan C) for population components and names of precincts that are split in districts where the hypothetical plans differ from the 2015 Plan.

**Figure 1**

**2016 Precinct Splits by Plan in the 7-County Area**

### 2016 Precinct Splits* by County By Plan

|  | Total 2016 Precincts | 2015 Plan | Hypothetical A | Hypothetical C |
|---|---|---|---|---|
| **CLAYTON** | 58 | 5 | 6 | 6 |
| **DEKALB** | 189 | 23 | 22 | 22 |
| **GWINNETT** | 156 | 17 | 22 | 22 |
| **HENRY** | 38 | 7 | 9 | 7 |
| **NEWTON** | 22 | 4 | 3 | 3 |
| **ROCKDALE** | 18 | 5 | 5 | 5 |
| **SPALDING** | 21 | 2 | 2 | 2 |
|  |  |  |  |  |
| **Total** | **502** | **63** | **69** | **67** |

\* Includes unpopulated area splits and splits in districts outside the areas modified in the hypothetical plans

## F.   Partisan Impact

54.    I did not rely on election data to draw district lines in the two Illustrative Plans or in the hypothetical plans presented in this declaration. (See Wright Report ¶¶ 37-40).

55.    Ms. Wright asserts that the county delegations in Gwinnett and Henry under Illustrative Plan 1 and Illustrative Plan 2 would flip from majority-Republican to majority-Democratic. (Wright Report ¶¶ 41-44).[9] Such an outcome is possible, but not necessarily unfair to voters.

---

[9] I am not aware of any requirement for illustrative plans to consider or maintain the partisan composition of the maps alleged to be in violation of Section 2.

16

56.     Although Ms. Wright acknowledges that county delegations are important in Georgia, she fails to respond to my analysis concluding that the county delegations for both Gwinnett County and Henry County currently maintain a proportionality deficit for African-American representation. (See August 6 Declaration ¶¶ 171-179).

57.     In addition, upon review of election data in response to Ms. Wright's concerns, both counties are trending Democratic.  For instance, in 2016, Hillary Clinton won the popular vote for President in Gwinnett (51.02%) and Henry (50.93%).[10]

58.     Ms. Wright notes that Spalding County has two Republican members on the county delegation and forecasts that the new delegation member (representing District 78 under the Illustrative Plans) would be a Democrat. In 2016, Hillary Clinton received 36.55% of the vote in Spalding County, so one Democrat out of three legislators would be in keeping with the partisan divide in the county.

**E.     Race**

59.     This is a Section 2 case, so I had to take race into account – just as a plan drawer must consider race wherever there is a significant minority population.

_____

[10] Official 2016 county-level results are available via:
:http://results.enr.clarityelections.com/GA/63991/184321/en/select-county.html.

60.     I have followed traditional redistricting principles in the plans I have developed. The illustrative and hypothetical plans are based on consideration of incumbents' residential addresses, the legislature's +/- 1% deviation policy, maintaining surrounding district boundaries (either as drawn in 2012 or under their current configuration), district compactness, contiguity, as well as the racial composition of districts.   In addition, under Hypothetical Plan A and Hypothetical Plan C, 2016 precinct boundaries are prioritized.

# # #

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information and belief.

Executed on: October 19, 2018

WILLIAM S. COOPER